UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| NICOLE CHASE | : | NO.: 3:18-cv-00683 (VLB) |
| | : | |
| v. | : | |
| | : | |
| NODINE'S SMOKEHOUSE, INC., CALVIN | : | |
| NODINE, TOWN OF CANTON, | : | |
| JOHN COLANGELO, & ADAM GOMPER | : | June 19, 2019 |

**SECOND AMENDED COMPLAINT AND CLAIM FOR A JURY**

## I. STATEMENT OF FACTS

### A. Preliminary Statement

1.    Nicole Chase brings various claims for sexual assault by her employer, Calvin Nodine, and his company, Nodine's Smokehouse that took place the evening of May 6, 2017.  Calvin Nodine pulled her into the men's room of his restaurant and forced her to perform oral sex on him.

2.    The following morning, she reported the sexual assault to Police Officers of the Canton Police department.  Over the next three months, Nicole Chase was victimized a second time by the defendant police officers.  Instead of investigating and prosecuting her assailant, they treated her with disrespect and never took her complaint seriously.  They failed to meet even the most minimal standards of law enforcement for officers interviewing a victim of sexual assault and investigating her claims.  They ignored potential areas of corroboration.  In contrast, their treatment of the assailant, Mr. Nodine, was cordial, deferential and accommodating.

3.      On September 8, 2017, the police charged Ms. Chase with Making a False Statement.  The warrant that was submitted in support of the arrest was demonstrably false, palpably biased, and omitted and distorted evidence that was supportive of her claim of sexual assault.

4.      Calvin Nodine, her assailant, has never been charged to date.

5.      Plaintiff claims a trial by jury in this matter.

B.      **Parties and Other Individuals**

6.       The plaintiff, Nicole Chase, brings claims based upon the sexual assault perpetrated by defendant Calvin Nodine on May 6, 2017.

7.      Ms. Chase began working for Nodine's, in approximately September 2016.

8.      At all times mentioned herein, the plaintiff resided in Canton, Connecticut.

      i.      **The Sexual Assault Defendants**

9.      Defendant, Nodine's Smokehouse, Inc. ("Nodine's Smokehouse"), has a business address of 65 Fowler Avenue, Torrington, Connecticut 06790.  Nodine's Smokehouse produces smoked meats for sale to individuals and restaurants.

10.     Nodine's Smokehouse also has a gourmet store/restaurant located in Goshen, CT.

11.     Nodine's Smokehouse employs more than fifteen (15) people.

12.     Nodine's Smokehouse opened a restaurant, Nodine's Smokehouse Deli and Restaurant ("Nodine's Restaurant") at 192 Albany Turnpike, Canton, CT in 2016.

**2**

13.   At all times mentioned herein, defendant Calvin Nodine, was a resident of Norfolk, CT.

14.   At all times mentioned herein, Calvin Nodine was an owner of and President of Nodine's Smokehouse.

15.   At all times mentioned herein, Calvin Nodine controlled all aspects of operations, including hiring, firing, discipline, payroll and the terms and conditions of employment at Nodine's Restaurant.

ii.   The Police Misconduct Defendants

16.   The defendant, the Town of Canton, is a town organized pursuant to the laws of the State of Connecticut.

17.   Pursuant to the town charter and ordinances, and the laws of the State of Connecticut, the defendant Town of Canton maintains a municipal police force. The purpose of the department is the protection of life and property, the preservation of public peace, the prevention and detection of crime, the apprehension of offenders and the enforcement of State, and local laws and ordinances.

18.   At all times mentioned herein, John Colangelo was a Detective in the Canton Police Department.  He is being sued in his personal capacity.

19.   At all times mentioned herein, Adam Gompper was a Police Officer in the Canton Police Department.  He is being sued in his personal capacity.

C.   Jurisdiction and Venue

20.   On or about October 30, 2017, the plaintiff filed a complaint of sexual harassment, hostile work environment and retaliation against the defendants with

**3**

the Connecticut Commission on Human Rights and Opportunities ("CHRO") and the Equal Employment Opportunities Commission ("EEOC").

21.     The plaintiff requested an early Release of Jurisdiction from the CHRO, and received plaintiff's a release against Nodine's Smokehouse on January 15, 2018.  Plaintiff received a release of jurisdiction as to Calvin Nodine on January 20, 2018.

22.     This case is being timely filed within 90 days of the issuance of these releases.

23.     The plaintiff has requested its right to sue letter for Nodine's Smokehouse from the EEOC on April 2, 2018.  The EEOC issued right to sue letter on April 10, 2018.

24.     The plaintiff has timely filed a Notice of Claim as to the defendants, pursuant to Conn. Gen. Stat. §7-465.

25.     On or about APRIL 20, 2018, the defendants removed this matter to federal court pursuant to 28 U.S.C. § 1441 and 28 U.S.C. § 1443.

26.     There is venue pursuant to 28 U.S.C. §1391(b)(1) and (2).

D.     <u>Facts Relating to Sexual Assault and Hostile Environment</u>

27.     In or about September 2016, Ms. Chase began working for defendants. Ms. Chase initially worked at the Nodine's Smokehouse factory in Torrington but helped to set up Nodine's Restaurant in Canton and worked there once it opened.

28.     Nodine's Restaurant opened in or about November 2016.

29.     Between November 2016 and around April 2017, defendant Calvin Nodine came into the restaurant nearly every day; but he rarely stayed very long.

**4**

30.     Even before he sexually assaulted Ms. Chase on May 6, 2017, Mr. Nodine would engage in inappropriate conduct that made her feel uncomfortable. For example:

a.     on several occasions he would throw his eye glasses on the floor and require her to pick them up.   When she bent to pick them up, he would stare down her shirt;

b.     he would make suggestive comments about "pieces of meat";

c.     he would tell graphic stories about his sexual exploits;

d.     he would make dirty jokes and comments;

e.     he would stare at her;

f.     he would follow her around;

31.     These comments and behavior were unwelcome, but she put up with it because he was never around in the restaurant very long.

32.     Starting in April 2017, Calvin Nodine began to spend more time at the restaurant.

33.     He started to give Ms. Chase free items from the restaurant.  He had never done that before.

34.     Ms. Chase came in to work on Saturday May 6, 2017 in the morning.

35.     Calvin Nodine came in later that morning.

36.     One of the first things that he said to Ms. Chase when he arrived was "So did you get laid last night?"  He said that in front of a co-worker.

37.      Ms. Chase observed him drinking alcohol throughout the day.

38.     Mr. Nodine made several offensive comments directed to her that day:

a.      "Blondes are like butter, they're easy to spread."

b.      Mr. Nodine was aware that Ms. Chase had an injury to her leg. He commented that her leg is hurt from having her "legs behind [her] back too much."

39.     Ms. Chase attempted to ignore his comments and avoid Mr. Nodine.

40.     Although he had been verbally offensive prior to May 6, 2017, Calvin had never touched Ms. Chase in an inappropriate manner prior to that date.

41.     That changed on May 6.  Prior to sexually assaulting her at the end of her shift, Mr. Nodine made uncomfortable physical contact with Ms. Chase twice.

42.     On the first occasion, Mr. Nodine gave her an unsolicited and unwelcomed hug and a kiss on the cheek. This occurred in front of Mr. Nodine's wife, Kelly Nodine.

43.     On the second occasion, Ms. Chase was standing at the pizza counter with a co-worker, when Mr. Nodine proceeded to come behind the counter and approached her from behind. Mr. Nodine put his arm across Ms. Chase's back and placed his hand upon her shoulder. Mr. Nodine pulled her into his body and squeezed her arm and back with his hand and he continued to lower his hand until he reached her buttocks, which he proceeded to squeeze.  Ms. Chase stepped forward to get his hand away from her buttocks and hurried away from him.

44.     At the close of business on May 6, 2017, Mr. Nodine made Ms. Chase take his penis into her amount without her consent.

45.     After Ms. Chase had finished closing out the cash drawer and walked toward the rear of the restaurant to leave, Mr. Nodine stood with his arms extended

6

out towards her and proceeded to hug her.   A coworker came back into the building and yelled out Mr. Nodine's name. In response, Mr. Nodine grabbed Ms. Chase's arm and pulled her into the men's bathroom, locking the door behind them. Mr. Nodine then held his finger up to her mouth as to tell her to remain quiet. Ms. Chase was in shock and fearful and did not say anything.

46.     After the co-worker left the building, Defendant Nodine exposed himself to Ms. Chase, grabbed his penis and stated, "Suck it because I know you don't get it at home." Ms. Chase panicked, and was fearful about what might happen, and about losing her job, and did not resist.  Nodine placed his penis into her mouth until he ejaculated.

47.     Ms. Chase's then pushed him away, unlocked the bathroom door, and fled.

48.     When she got home, Ms. Chase immediately texted her former general manager at Nodine's Restaurant and told him that Calvin Nodine had sexually assaulted her.  In the ensuing text exchange, he told Ms. Chase to report it to the police. Ms. Chase also spoke with her mother that night about the sexual assault.

49.     The following morning, on May 7, 2017, Ms. Chase went with her mother to the Canton Police Department and reported the incident.  She told them everything that happened and that she was sexually assaulted except that she omitted the fact that he had succeeded in forcing her to perform oral sex on him until he ejaculated.  Ms. Chase omitted that fact because she was ashamed and humiliated that she had been caught unaware and had not resisted.

50.     Later that morning, Ms. Chase went to the restaurant to collect her

personal belongings.  Mr. Nodine was present.  He asked her to go to his office with him to clean it out; when she refused, he replied "What? Can you think of something else better to do than fuck me?" Not wanting to escalate the situation, she walked away. Before she left, Defendant Nodine asked if he could give her a ride home, which she refused.

51.    On Monday, May 8, 2017, Mr. Nodine called Ms. Chase and stated that he was closing the store until the following Tuesday (May 16, 2017) and asked her to help him clean the restaurant.  She refused.

52.    Ms. Chase's last day at work was May 7, 2017.

53.    As a result of the sexual assault and the defendants' conduct, she was constructively discharged from Nodine's Restaurant.

54.    After her constructive discharge, she applied for and received unemployment compensation in July 2017.

55.    The defendants subsequently retaliated against the plaintiff by falsely accusing her of fraud in her application for unemployment benefits and contesting her right to receive benefits.

56.    Nodine made sexual conduct an explicit or implicit term of her employment.

57.    The defendants' conduct interfered with the terms and conditions of her employment.

58.    Mr. Nodine's conduct created a hostile environment that substantially interfered with the plaintiff's work performance and/or Mr. Nodine's conduct created an intimidating, hostile, or offensive working environment.

**8**

59.     As a result of the defendants' conduct, the plaintiff has incurred medical and legal expenses, and has suffered emotional distress.

E.     Facts Relevant to the Canton Police Department Misconduct

60.     The morning after Nodine sexually assaulted her (May 7, 2017), Ms. Chase went with her mother to the Canton Police Department and reported the sexual assault by Calvin Nodine.

61.     Accepted Law Enforcement Standards exist as to methods and procedures for the investigation and interview of victims of sexual assault. [1] These standards are intended to overcome the longstanding stereotypical assumptions about sexual assault and negative judgments made about victims of sexual assault when they report the crime:[2]

a.     There is no typical victim behavior.

b.     There is no typical sexual assault suspect.

c.     Sex crimes victims almost always arrive at the interview plagued with shame, anxieties, misinformation, and with fears of being judged. Even more significant, they usually come to these interviews still very uncertain about whether they really want to be going forward with the justice process.

d.     Law Enforcement's initial priority when initially meeting a victim of sexual assault is to attend to the victim's immediate needs and stabilize

---

[1]     Sources:  International Association of Chiefs of Police (IACP) and End Violence Against Women International (EVAW).

[2]     Despite persistent stereotypes that women falsely reporting false incidents of sexual assault are common, eight studies over the past 30 years that the number of complaints that were determined to be false are very low (2.1% - 10.9%). Lisak, *False Allegations of Sexual Assault,* Violence Against Women (2010).

the victim's environment:   build rapport with the victim, empower the victim, use advocates, and seek medical services.

e.      The initial Interview should be non-accusatory.  The investigator should endeavor to reassure and gain the trust of the victim.

f.      The interview location should be safe and comfortable for the victim.  It should allow the victim a measure of control over her surroundings, provide privacy, and be distraction free.

g.      The investigator needs to avoid being judgmental. At some point or points in a sex crime victim interview, the investigator may have strong personal feelings or disagreements about the things that the victim did or things that investigator believes are stupid, ineffective, provocative, morally offensive, wrong, risky, unfair, cowardly or dishonest. Finding fault with the victims is one of those reactions that often unconsciously comes to the fore no matter how much training the investigator has.

h.      The investigation must not be based upon sympathy or bias for the suspect.  An investigator cannot be dismissive of a sexual assault complaint because the suspect   seems sincerely outraged and upset by the charges, has a credible story, or he appears to be a responsible citizen who does not meet stereotypical assumptions about who is likely to be a "rapist."

i.      It is not unusual for victims of sexual assault to omit details or make inconsistent statements as they relate their story.  There are many explanations as to why a victim may omit details or tell a different story:

1.      victims might omit information due to trauma or disorganization.

2.      Victims might omit information because they are uncomfortable relaying details of the sexual assault.

3.      Many victims give information that is incomplete, inconsistent, or untrue because they are afraid that they won't be believed or that they will be blamed for the sexual assault.

4.      Victims alter or exaggerate the details of what happened is to create a case that seems more believable. This can be due to guilt, shame, or a fear of not being believed.

None of these explanations means that the sexual assault is a false report.

j.      Investigators should not interrogate a sexual assault victim as if they were a suspect.  Investigators sometimes use information from the suspect to aggressively question the victim. For example, they may interview suspects who claim that the act was consensual and offer facts to support that claim (e.g., how the victim was dressed, what the victim was doing, etc.). Then, the investigators question the victim repeatedly about these claims, until he or she finally gives up and recants.  In this type of situation, no real investigation is even conducted. Rather, the "investigation" stops in the initial stages of the interview with the victim. It is inappropriate to interrogate a victim of sexual assault.

k.      In all dealings with a victim of sexual assault, the investigator

should avoid reproducing the victim-blaming stereotypes that have historically hindered investigations and discouraged victims of sexual assault from coming forward.

I.      It is extremely important for investigators of sexual assaults to keep the victim fully informed of what is happening and what is going to happen next.  Few things make a sex crimes victim more unnecessarily anxious, fearful, and leery of the process than not being informed of what's happening and what's going to happen next.

62.    The Canton Police failed to follow these established standards.

63.    There are no female police officers at the Canton Police Department.

64.    Defendant Adam Gompper met with Ms. Chase in the lobby of the Canton Police Department on May 7, 2017.  He had her relate the details of the assault in a public area, with her mother present.  As they discussed the incident, numerous individuals in the public lobby were walking by.  She related that Calvin Nodine had sexually assaulted her in the men's bathroom without her consent. Ms. Chase omitted the part of the sexual assault that Nodine had forced her to perform a completed act of oral sex on him because she was ashamed, humiliated and distraught.

65.    Officer Gompper did not refer her to a hospital for examination.

66.     He did not provide her with contact information for support groups for victims of sexual assault.

67.     He did not gather any physical evidence from Ms. Chase.

68.     He did not go to the crime scene.

69.    Defendant Gompper did not schedule any follow up meetings for Ms. Chase with an investigator.  He told her that if she decided to pursue the charges, she could come back and make a written statement.

70.    Ms. Chase told Officer Gompper that she was not sure whether she wanted to make a formal complaint.  Officer Gompper responded that she could see how the day goes.  He told her that if she filed the complaint, they would interview Mr. Nodine.  He told her that they had a lot of "he said/she said" cases like this that the police cannot prove.

71.    Ms. Chase told Officer Gompper that she was going to go back to the restaurant.  He did not accompany her.

72.    On Thursday, May 11, 2017, Ms. Chase returned to the police department and spoke to Officer Gompper a second time.  He typed up a statement that he had her sign.

73.    In the statement Ms. Chase reiterated that Calvin Nodine had sexually assaulted her without her consent and continued to omit the fact that it had been a completed act of oral sex because she was ashamed, humiliated and distraught.

74.    Two other employees of the restaurant, Alexandra Archer and Kyle Rouleau also provided statements to Officer Gompper.

75.    Ms. Archer corroborated that Mr. Nodine made unwanted sexual advances towards Ms. Chase on the date of the sexual assault.

76.    Mr. Rouleau corroborated that he had observed Calvin Nodine hovering around and following Ms. Chase in the restaurant during the day and that Calvin Nodine made unwanted sexual advances toward Ms. Chase at the

13

restaurant on the date of the sexual assault.  He also corroborated that Mr. Nodine frequently makes inappropriate sexual comments at the restaurant.

77.     After she provided the statement on May 11, 2017, Officer Gompper told Ms. Chase that they would interview Mr. Nodine, and then submit a warrant to see if it gets signed by the Judge.

78.     He did not gather any physical evidence from Ms. Chase.

79.     He did not go to the crime scene.

80.     Officer Gompper told Ms. Chase that he would call her after the police interviewed Mr. Nodine.

81.     According to Nicole Chase's Arrest Warrant, defendants John Colangelo and Adam Gompper interviewed Calvin Nodine on May 18, 2018.  Nodine was represented by his attorney, David Moraghan, at the time of interview.

82.     At the time that Detective Colangelo interviewed Calvin Nodine, he had never spoken to Nicole Chase.

83.     At no time during the interview, did Colangelo or Gompper make any effort to obtain evidence to support Chase's complaint or give any indication that they took Chase's complaint seriously.

84.     Colangelo did quite the opposite.  Throughout the interview Colangelo made clear that he had absolutely no intention of charging Nodine with any crime. Colangelo spent the first five minutes of the interview trading golf stories with Nodine's attorney.  Colangelo even asked Nodine's attorney for an invitation to play golf at the Attorney Moraghan's Country Club.

85.     When they finally started to discuss what happened, Colangelo did

**14**

not even remember Nicole Chase's name.  Colangelo had to look at his papers to get her name.   When Colangelo finally addressed the charges, Nodine lied.  He denied any sexual contact between himself and Nicole Chase.

86.     Shortly thereafter, Nodine asked for time to speak to his counsel. Nodine, Attorney Moraghan, Detective Colangelo, and Officer Gompper all left the interview room together for approximately six minutes before returning together.

87.     When they all returned, Nodine changed his story completely.  His story was incredible on its face:

> She grabbed me and said, "Look it, I've got something for you to see." I figured there was a problem in the men's room. She was the one that dropped my pants.  And gave me a blow job.   And it was pretty much so fast that it was like, okay! That fucking happened. So, yeah, I got a disaster with the wife- . . .

88.      Officer Gompper never contacted Ms. Chase after Calvin Nodine was interviewed.

89.     Despite Nodine's statement that the encounter was entirely initiated by Nicole Chase, he was adamant that there had never been any prior relationship between the two, and that it came entirely "out of the blue."

90.     Colangelo repeatedly suggests in the interview to Nodine that Chase has made the criminal complaint for monetary gain, although he had never spoken with Chase  prior to this interview.

91.     Colangelo told Nodine that Ms. Chase was just trying to take a lot of money from him.

92.     Colangelo told Nodine that he could draft a warrant against Nodine and that the Court would sign it and then Nodine would have to fight it in court.

93.     Colangelo then suggested that Nodine could take a polygraph and suggested the names of polygraphers that Nodine could use.

94.     Colangelo then suggests to Nodine to take a polygraph test to "put leverage" on Nicole Chase if her story changes.  He tells the story of how a girl made an accusation of sexual assault that he could prove was false, and how instead of writing the case up as a sexual assault, he could write the case up for the state's attorney as a false police report.

95.     Colangelo decided and told Nodine he did not need to go through the actual witness statements with Nodine.

96.     Colangelo *sua sponte* suggests to Nodine theories as to why Jeremy Archer, Nodine's stepson, might be biased against him.

97.     Attorney Moraghan and Colangelo then proceed to discuss how Attorney Moraghan's former law partner spoke highly of Colangelo, and Colangelo tells the story of how his father gave Moraghan's former partner's wife her first job.

98.     Colangelo bragged about a time when he put every piece of exculpatory information in the arrest warrant of Moraghan's former partner's client. He stated:  I built a defense for him in my arrest warrant.  He – because it was there, because it existed.  So, he's not going to leave it out.  That's how it works. In my world.

99.     Colangelo made the decision that an accusation of forcible sexual assault was not a serious crime.

100.    During the interview, Nodine expressed concern that SWAT was going to come in to arrest him. Nodine admitted that he had thirty-five guns at his house,

including a fully automatic weapon.  Colangelo responded that he did not care about Nodine's weapons. At no time did Colangelo, Gompper or any other Canton Police Officer address the fact that an individual accused of sexual assault possessed thirty-five weapons and might pose a threat to Nicole Chase.  They never verified the registration of Nodine's weapons.

101.   Colangelo told Nodine that he was not going to "rush" re-questioning Ms. Chase for a while.  He told Nodine "this is not, this case doesn't have to be pushed through, you're not a menace to society."   Colangelo minimized the case to Nodine, telling him that it was not necessary for him to track down every lead.

102.   Just as promised to Nodine and his attorney, Colangelo and Gompper did not rush the investigation.   They did nothing over the next month, other than to wait for the results of Nodine's polygraph tests.

103.   Ms. Chase left several messages for Officer Gompper that were not returned.

104.   Ms. Chase finally reached Officer Gompper, and he indicated that they had interviewed Calvin Nodine, and that they needed several more weeks to investigate.  He gave no further details.

105.   Over one month passed, with no additional information from the Canton Police Department.

106.   On June 14, 2017, Calvin Nodine called Colangelo and advised he had not passed a private polygraph test.

107.   On June 19, 2017, Attorney Moraghan advised Colangelo that Nodine would not take a law enforcement polygraph test.

108.    On June 21, 2018, Nicole Chase was called down to the Canton Police Department.

109.    Ms. Chase was brought into an interview room that contained a recording device.

110.    She met with Detective John Colangelo.  She had never spoken to him before.

111.    Officer Gompper was not present.

112.    Detective Colangelo did not make any inquiries about how she was doing, or her well-being, or whether she had sought support.

113.    At no time did Detective Colangelo advise her that he now considered her to be a suspect and was contemplating criminal charges against her.

114.    The first thing that he told her was that the interview was going to be recorded.

115.    During the interview, Colangelo lied to Ms. Chase about several things.  First, he lied about having done a lot of work on the case and taking the case very seriously.  That is the exact opposite of what he actually had done and what he had told Nodine during Nodine's interview.

116.    During the interview, Colangelo told Ms. Chase that her statement and Alexandria Archer's statements about Nodine grabbing her buttocks earlier in the day contained almost the exact wording, implying that they both were contrived. In fact, the statements are not exact duplicates, only similar, and address a less significant point of Ms. Chase's story.  Moreover, Kyle Rouleau's statement provide further corroboration of Nodine's lewd behavior earlier in the day before

18

Nodine sexually assaulted Nicole Chase.

117.   During the interview, Colangelo told Ms. Chase that they were looking into whether or not there was probable cause to develop an arrest warrant for Nodine for a crime. This was false.  As Colangelo had previously told Nodine during the interview with Nodine, Colangelo was trying to turn the tables and obtain probable cause to secure an arrest warrant against the victim, Nicole Chase.

118.   During the interview with Ms. Chase, she told Colangelo that she had not even thought about getting a lawyer until Sgt. Penney, Colangelo and Gompper's supervisor, told Ms. Chase that she should get a lawyer. This statement could have easily have been corroborated by Sgt. Penney.  Yet Colangelo continued to recklessly assume that Ms. Chase had made the criminal complaint to get money from Nodine.

119.   He asked her to tell her story again.  She told the same story about a non-consensual sexual assault that she had told twice previously.

120.    He began to press her, implying that she was not telling the entire story.

121.   He tried to intimidate her by telling her that Calvin Nodine had taken a lie detector test.  Despite the fact that Nodine failed the polygraph test, and refused to take a second test, Colangelo completely mispresented to Ms. Chase Nodine's taking the polygraphs.  First, he implies that Nodine passed the polygraphs. Second, he lies and states that Nodine had taken two polygraphs, when he knew that Nodine had refused to take a second polygraph.

122.   He asked her whether she thought that Calvin Nodine would tell the

truth or lie if he took a lie detector test.[3]  She said she thought he would fail.

123.   During the interview, Colangelo lied to Ms. Chase about speaking with other witnesses.  Colangelo had not spoken to any witnesses.  Colangelo had already told Nodine and his attorney that he had no need to speak to other witnesses because it was not a serious case, and he was not going to rush things.

124.   During the interview, Colangelo repeatedly suggested to Ms. Chase that it was a consensual affair, which Ms. Chase repeatedly denied (similarly Calvin Nodine denied any flirtation or relationship prior to the sexual assault).

125.   He told her that Calvin Nodine had told him that he had oral sex with her and that it was consensual.

126.   Since the day of the sexual assault, Nicole Chase had not told anyone of the fact that Mr. Nodine had forced her to perform oral sex on him.  She had not told her family, any friend, her boyfriend or the police that aspect of what had taken place.

127.   Nicole Chase did not tell anyone about that part of the incident because she was ashamed, she did not want her boyfriend and her mother to know that detail, and she thought that she would not be believed.

128.   Despite the fact that he had done no work on the case, had no intention of charging Nodine with a crime, and was already angling to charge Ms. Chase with making a false statement, Colangelo bragged to Ms. Chase that his cases do not go to trial, because they are done so well enough that the lawyers know that they have to take an agreement.  He went on to brag about the outcome

---

[3]   Detective Colangelo failed to tell her that Calvin Nodine had actually failed a polygraph test, and refused to take a second polygraph test.

of one of his cases.

129.   During the interview, Colangelo stated to Ms. Chase:

people don't always tell me the truth even if they think to tell me the truth. . . either the perception is different, or they're embarrassed about something and, they leave something out, they didn't want to say something else- sometimes when they're embarrassed, it's not always criminal- it's just embarrassing. . . Or it can have an effect on their life.

130.   This statement to Ms. Chase was the ultimate in hypocrisy and application of double standards by Colangelo.  Colangelo readily excused Nodine's false denial of any sexual activity because it would be "embarrassing" if Nodine was caught by his wife engaging in sexual activity with someone else.  Yet, Colangelo does not even consider that Ms. Chase may have initially omitted that Nodine had forced her to perform oral sex on him not because of any intent to obstruct or mislead, but simply because she was traumatized, too embarrassed and very humiliated to state in front of her mother and did not want her boyfriend to think that she did not resist.

131.   During the interview, Ms. Chase states that Nodine used to brag about paying off the Torrington Police to get his niece out of trouble.  She expresses concern and anxiety that Nodine frequently drives around drunk in Canton, and never gets stopped nor receives a speeding ticket.  Colangelo immediately dismisses these concerns and responds, "I don't know who he paid off or didn't pay off.  I care about this case."

132.   As Colangelo continued to interrogate Ms. Chase, she became visibly emotional and started crying.  She then explained to Colangelo that Nodine had pulled her into the men's bathroom and put his penis into her mouth without her

consent.   Ms. Chase explained that she omitted that part because she did not want her boyfriend to know that she had performed oral sex without more resistance, and she certainly did not want her mother to know.  She also states that she did it, even though she did not want to, because she was "just so scared."

133.    Colangelo then tried to get Ms. Chase to admit that it was consensual, and she emphatically says no.

134.    Ms. Chase also expressed to Colangelo that after Nodine pulled her into the bathroom and exposed himself, she felt compelled to perform oral sex because she feared losing her job.  She decided to come forward, even though it meant losing her job, because she did not want it to happen ever again.  She was concerned about being protected.  Ms. Chase told Colangelo that she tried to go back to work even after the sexual assault because she hoped that either he would apologize or just not remember, and that it would never happen again.

135.    Ms. Chase told Colangelo that, while Nodine trapped her in the bathroom, Nodine's wife called Nodine's cell phone numerous times to warn him about a DUI checkpoint before he finally answered.

136.    Ms. Chase also explained to Colangelo that she felt like if she complied, he would not hurt her.

137.    During the interview, Colangelo asked Ms. Chase if she wanted to give a statement that changed the original statement.  She stated that everything in her initial statement about a nonconsensual sexual assault was true except that she left out that she was forced to perform oral sex.  Colangelo then suggests that Ms. Chase consult with her attorney before deciding about revising her complaint.

138.    Chase was sincerely grateful that the entire story came out.  During the interview, Ms. Chase thanks Colangelo for helping her tell the entire truth.

139.    At no time during the interview, did Detective Colangelo tell her that she might be charged with making a false statement.

140.    During the interview, Nicole Chase told Detective Colangelo about the text messages that she had sent to her former General Manager shortly after the sexual assault.

141.    She showed them to him on her cell phone, and he requested that she provide copies.  He did not voucher her cell phone as evidence.

142.    A few days later, Ms. Chase called Detective Colangelo to come in to revise her statement. She was told that he was out on vacation.

143.    According to the Arrest Warrant, Detective Colangelo signed an arrest warrant that charged Nicole Chase with making a false statement, in violation of Conn. Gen. Stat. §53a-157b, making a false statement on July 7, 2017.

144.    Around July 13, 2017, Nicole Chase went to the Canton Police Department to drop off the printouts of the text messages from the night of the sexual assault.  She also asked to see Detective Colangelo to revise her statement.

145.    The dispatcher told her that Detective Colangelo was busy and that he would call back if he needed her.

146.    Ms. Chase telephoned several times.  Neither Detective Gompper nor Detective Colangelo contacted her.

147.    Nicole Chase had no knowledge that the Canton Police department were even considering charging her with a crime.

148.    On July 25, 2017, she emailed Detective Colangelo about coming in to revise her statement.

149.    Detective Colangelo did not respond to her email and never returned her calls.

150.    On July 31, 2017, Nicole Chase emailed Detective Colangelo a revised statement and asked that it be incorporated into her original statement.  She requested to come in to sign it.

151.    On August 10, 2017, Detective Colangelo finally responded to Ms. Chase's email and lied to her again.  He indicated that when Nicole Chase had come to the Canton Police Station [on July 13] that:

a.    He had no idea that she wanted to revise her statement.

b.    He had already sent the case court for review, but never told her that the warrant had been drafted against her.

c.    He had already documented the change in her account of the incident, when the warrant stated the exact opposite.

152.    Detective Colangelo's response was false and deceptive:

a.    Nicole Chase had called prior to July 7, 2017 indicating that she wanted to revise her statement.

b.    Nicole Chase had come to the Canton Police to see Detective Colangelo on July 13 to revise her statement.

c.    Detective Colangelo had not documented that she had revised her testimony in the warrant affidavit.

d.    Detective Colangelo gave her the impression that the warrant

**24**

application was for Calvin Nodine; he never indicated that he had drafted a warrant against her.

153.    Although the warrant had been signed and sworn to by Detective Colangelo on July 7, 2017, it was not signed by the Assistant State's Attorney until August 31, 2017.

154.    The warrant was signed by the Court on September 6, 2017.

155.    Colangelo had plenty of time to withdraw the warrant application after Chase had tried to revise her statement.

156.    Chase's revision of the warrant removed any inaccuracy or incompleteness from her original statement.

157.    On September 8, 2017, Detective Colangelo arrested Nicole Chase for Making a False Statement, in violation of Conn. Gen. Stat. §53a-157b.

158.    The Canton Police defendants communicated the fact of Nicole Chase's arrest to defendants Calvin Nodine and Nodine's Smokehouse before Nicole Chase was even aware that she was a criminal suspect.

159.    The Canton police defendants provided confidential investigative documents, i.e., Nicole Chase's May 11, 2017 statement to the defendants Calvin Nodine and Nodine's Smokehouse.

160.    Nicole Chase was arraigned on the charge in the Hartford Superior Court, G.A. #14, dkt. # HCR-17-0692973S.

161.    On November 6, 2017, the State's Attorney's Office entered an unconditional *nolle prosequi* and the case was dismissed by the Court.

162.    Police Officer Gompper provided information to Det. Colangelo that

was included in the Warrant.

163.    At all times mentioned herein, Detective Colangelo and Officer Gompper's supervisor, was Sgt. Mark J. Penney.  Penney reviewed and approved all of the police reports pertaining to the investigation of Nicole Chase.  According to the Arrest Warrant, Penney took Colangelo's oath as to the accuracy of the warrant and approved the Arrest Warrant on July 7, 2017.

164.    The warrant as submitted to the court was so lacking in the indicia to support the charge of Making a False Statement that no reasonable police officer trained in interviewing victims of sexual assault and investigating complaints of sexual assault could believe there was probable cause to arrest Nicole Chase for Making a False Statement.

165.    Every statement that Nicole Chase had made, including her sworn statement, was consistent about Calvin Nodine sexually assaulting her without her consent at Nodine's restaurant on the evening of May 6, 2017.

166.    An omission of a detail of the crime does not make the statement that a crime occurred false.  If every victim were prosecuted for omissions from their earlier statements during an investigation, it would become impossible to prosecute the underlying crimes.

167.    Nicole Chase never had the requisite intent required by Conn. Gen. Stat. §53a-157b.  Conn. Gen. Stat. §53a-157b states that the false statement must be made "with intent to mislead a public servant in the performance of such public servant's official function."   The statute is intended to penalize persons who make false criminal allegations, or persons make false statements to the police to

obstruct or provide false exculpatory information to assist a criminal suspect.  The warrant even as drafted, in paragraph 24 of the warrant makes clear that her omission was not intended to mislead the police in their investigation.  There is no evidence in the warrant to suggest that she had any intent to obstruct the police investigation.

168.   The Arrest Warrant was filled with lies, innuendoes, and distortions. For example:

a.      ¶ 31 of  the arrest Warrant states that "Chase was asked if she wanted to provide a new statement. . . Chase was told that she had the opportunity to put the truth in writing."

b.      ¶33 of the arrest warrant stated: "That, Chase thanked affiant for letting her tell the truth.  It was explained to Chase that she could call and speak to Affiant Colangelo about her decision to provide a written statement. As of 7/7/17 [Date Colangelo signed the warrant], Chase has not called to speak to Affiant Colangelo of [sic] Officer Gompper."

c.      These statements completely misrepresent the facts presented to the reviewing court.  Nicole Chase attempted to contact defendant Colangelo numerous times.  She tried to revise her complaint before he drafted and signed the warrant, and after he had signed the warrant, but before it had been presented to the reviewing State's Attorney, or the court. Chase even emailed the revised version of her statement to Detective Colangelo one month before it was signed or reviewed by the State's Attorney or Judge.

      d.      Chase's revision of the signed statement would have removed the remaining omission from her earlier statement, and there would have been absolutely no basis for a warrant for making a false statement to issue against her.

      e.      Detective Colangelo and Officer Gompper's refusal to permit her to revise her Statement and go forward with the arrest warrant constituted egregious misconduct.

169.    Detective Gompper grossly misrepresented material evidence.  For example:

      a.      In paragraph 9 of the arrest warrant Detective Colangelo wrote that after the incident, "Chase then left for the night and then spent two hours thinking about it."

      b.      Paragraph 10 goes on to state: "That, Chase said she texted Nodine's step son (Jeremy), and told him what happened but did not give full details about Nodine telling her to suck it."

      c.      In fact, the texts to Jeremy constituted highly probative evidence of her prompt and immediate outcry relating to the assault and her state of mind at the time.  Contrary to the warrant, Ms. Chase reached out to Jeremy Archer, who had previously been the General Manager at the restaurant approximately one hour after the sexual assault.

      d.      Her initial text gives significant insight into what goes through the mind of a young woman who has just been sexually assaulted and provides strong corroboration of her credibility.

**e.     Detective Colangelo misrepresented this highly probative evidence.**

170.    Another example of the blatant lie and misrepresentation of evidence in the Arrest Warrant was in paragraph 19 where Colangelo state "it was eluded to the fact that Nodine took two polygraph tests."  What Detective Colangelo failed to mention in the warrant was that Calvin Nodine had failed one polygraph test and refused to take a second test.

171.    The arrest warrant omitted significant material evidence.  During the investigation Alexandra Archer and Kyle Rouleau both gave statements that corroborated that Calvin Nodine had previously been making sexual comments about Nicole Chase and following her around.  Archer's statement also corroborated that earlier in the day, Calvin Nodine had made unwanted sexual advances towards Nicole Chase. The warrant omitted the corroborating statements by Archer and Rouleau.

172.    The warrant created the false impression that Ms. Chase's complaint was financially motivated.  It repeats references to a "civil case" and her statement that she was going up against a millionaire.  But Ms. Chase had no attorney when she reported the sexual assault to the police.  Sgt. Penney, Gompper's supervisor, had been the one who recommended to Ms. Chase that she see an attorney.

173.     Ms. Chase's millionaire reference was because of the imbalance in power and resources, not going after his money.

174.    Nothing in the warrant addressed the fact that it is very difficult for victims of sexual assault to come forward and tell their story.  Sexual assault

victims are often traumatized, reluctant to tell the complete story, have difficulty telling the entire story, and are inconsistent.  The Town and its police officers should have known this and understood that Nicole Chase's delay in telling the full story had absolutely nothing to do with Calvin Nodine's guilt or innocence.

175.    Detective Colangelo, with assistance from Officer Gompper, knowingly and intentionally, and/or with reckless disregard for the truth submitted false, misleading, and biased information that was material to the finding of probable cause.

176.    The warrant submitted by Detective Colangelo, with assistance from Officer Gompper, was submitted with malice, bias, in bad faith, and the product of corruption.

II.    **LEGAL CLAIMS**

A.    **Sexual Assault Defendants**

**COUNT ONE**          **(VIOLATION OF CONNECTICUT FAIR EMPLOYMENT PRACTICES ACT – SEXUAL HARASSMENT & HOSTILE WORK ENVIRONMENT - CONN. GEN. STAT. §46a-60(b)(8))(***Against Nodine's Smokehouse, Inc.***)**

1-59.  Paragraphs 1 through 59 of the Statement of Facts are hereby incorporated by reference as paragraphs 1-59 of Count One.

60.    Calvin Nodine's sexual assault constituted unwelcome sexual conduct.

61.    Calvin Nodine's unwelcome conduct substantially interfered with Nicole Chase's work performance and created an intimidating, hostile and offensive working environment.

62.     As a result of Calvin Nodine's behavior, Nicole Chase was constructively discharged.

63.     Calvin Nodine was Nicole Chase's supervisor.

64.     Calvin Nodine was Nodine's Smokehouse' agent.

65.     As a result of Nodine's sexual assault on Nicole Chase, she suffered a tangible employment action, to wit, she was constructively discharged.

66.     Defendant Nodine's Smokehouse, Inc. is legally responsible for Mr. Nodine's conduct in the workplace, as Mr. Nodine is an agent and/or representative of Nodine's Smokehouse.

67.     Defendant's conduct violated Conn. Gen. Stat. §46a-60(b)(8) of the Connecticut Fair Employment Practices Statute.

68.     As a result of defendant's conduct, has suffered and will continue to suffer economic damages, medical expenses, pain, humiliation, loss of enjoyment of life activities, and emotional distress.

**COUNT TWO**          **(VIOLATION OF TITLE VII – SEXUAL HARASSMENT & HOSTILE WORK ENVIRONMENT -  42 USC §2000e, *et al*)(*Against Nodine's Smokehouse, Inc.*)**

1-59.   Paragraphs 1-59 of the Statement of Facts are hereby incorporated by reference as Paragraphs 1-59 of Count Two.

60.     Calvin Nodine's sexual assault constituted unwelcome sexual conduct.

61.     Calvin Nodine's unwelcome conduct substantially interfered with Nicole Chase's work performance and created an intimidating, hostile and offensive working environment.

62.     As a result of Calvin Nodine's behavior, Nicole Chase was constructively discharged.

63.     Calvin Nodine was Nicole Chase's supervisor.

64.     Calvin Nodine was Nodine's Smokehouse' agent.

65.     As a result of Nodine's sexual assault on Nicole Chase, she suffered a tangible employment action, to wit, she was constructively discharged.

66.      Defendant Nodine's Smokehouse, Inc. is legally responsible for Mr. Nodine's conduct in the workplace, as Mr. Nodine is an agent and/or representative of Nodine's Smokehouse.

67.     Defendants' conduct violated Title VII of the Civil rights act of 1964, as amended.

68.     As a result of defendants' conduct, has suffered and will continue to suffer economic damages, pain, humiliation, loss of enjoyment of life activities, and emotional distress.

**COUNT THREE        (VIOLATION OF CONNECTICUT FAIR EMPLOYMENT PRACTICES ACT –RETALIATION - CONN. GEN. STAT. § 46a-60(b)(4))(*Against Nodine's Smokehouse, Inc.* )**

1-59.   Paragraphs 1-59 of the Statement of Facts are hereby incorporated by reference as Paragraphs 1-59 of Count Three.

60.     Calvin Nodine retaliated against Nicole Chase for reporting his conduct to the Canton Police department by making false statements to the police that she consented to the sexual assault.  Nodine knew he was lying at the time that he made the statement to the police.

61.     As a result of his false accusation, Ms. Chase was charged with filing

a false statement and arrested.  Ms. Chase's arrest aggravated her emotional distress and caused her to incur additional costs and legal fees to get the case dismissed.

62.     Calvin Nodine was Nicole Chase's supervisor.

63.     Calvin Nodine was Nodine's Smokehouse' agent.

64.     Defendants retaliated against Ms. Chase for reporting the sexual assault to the police and making a claim for sexual harassment against them by making false claims to the Connecticut Department of Labor, Employment Security division (Unemployment) that her application for unemployment benefits was fraudulent.

65.     As a result of the defendants' false claim, her receipt of unemployment benefits was delayed for several weeks.

66.     Defendants did these retaliatory acts because Nicole Chase had opposed defendants' discriminatory practice.

67.     Defendants did these retaliatory acts because Nicole chase had made a complaint to the police and threatened to file a complaint with the Connecticut Commission on Human Rights and Opportunities.

68.     Defendants' conduct caused Ms. Chase further aggravation of her emotional distress, and additional costs, to wit, attorney's fees.

69.     Defendants conduct was in violation of the Connecticut Fair Employment Practices Act, § 46a-60(b)(4).

**COUNT FOUR         (VIOLATION OF TITLE VII – RETALIATION)(*Against Nodine's Smokehouse, Inc.*)**

1-59    Paragraphs 1-59 of the Statement of Facts are hereby incorporated by

reference as Paragraphs 1-59 of Count Four.

60. Calvin Nodine retaliated against Nicole Chase for reporting his conduct to the Canton Police department by making false statements to the police that she consented to the sexual assault. Nodine knew he was lying at the time that he made the statement to the police.

61. As a result of his false accusation, Ms. Chase was charged with filing a false statement and arrested. Ms. Chase's arrest aggravated her emotional distress and caused her to incur additional costs and legal fees to get the case dismissed.

62. Calvin Nodine was Nicole Chase's supervisor.

63. Calvin Nodine was Nodine's Smokehouse' agent.

64. Defendants retaliated against Ms. Chase for reporting the sexual assault to the police and making a claim for sexual harassment against them by making false claims to the Connecticut Department of Labor, Employment Security division (Unemployment) that her application for unemployment benefits was fraudulent.

65. As a result of the defendants' false claim, her receipt of unemployment benefits was delayed for several weeks.

66. Defendants did these retaliatory acts because Nicole Chase had opposed defendants' discriminatory practice.

67. Defendants did these retaliatory acts because Nicole chase had made a complaint to the police and threatened to file a complaint with the Connecticut Commission on Human Rights and Opportunities.

68.    Defendants' conduct caused Ms. Chase further aggravation of her emotional distress, and additional costs, to wit, attorney's fees.

69.    Defendants conduct violated Title VII, 42 USC §2000e-3(a).

**COUNT FIVE**        **(VIOLATION OF CONNECTICUT FAIR EMPLOYMENT PRACTICES ACT – AIDING AND ABETTING - CONN. GEN. STAT. § 46a-60(b)(5))(*Against Calvin Nodine, Individually*)**

1-59.    Paragraphs 1-59 of the Statement of Facts are hereby incorporated by reference as Paragraphs 1-59 of Count Five.

60.    Defendant Calvin Nodine has aided, abetted, incited, compelled or coerced the creation of a discriminatory employment practice, to wit, a sexually harassing work environment, on the basis of the Plaintiff's sex in violation of C.G.S. § 46a-60(b)(5) with Nodine's Smokehouse.

61.    As a result of Defendant Nodine's conduct, the Plaintiff has suffered economic damages, pain and suffering, and other emotional distress; and she has incurred attorneys' fees and costs.

**COUNT SIX**        **(NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS)*(Against Calvin Nodine and Nodine's Smokehouse)***

1-59.    Paragraphs 1-59 of the Statement of Facts are hereby incorporated by reference as Paragraphs 1-59 of Count Six.

60.    The outrageous and unreasonable conduct set forth in above occurred during the termination of plaintiff's employment, which led to her constructive discharge from Nodine's Smokehouse.

61.    Nodine's Smokehouse, through its agents, servants, and/or employees, knew or should have realized that its conduct towards the plaintiff involved an unreasonable risk of causing emotional distress.

62.     Nodine's Smokehouse, through its agents, servants, and/or employees, knew or should have realized that such distress might result in illness or bodily harm.

63.     The defendants' conduct created an unreasonable risk of causing emotional distress to plaintiff, and defendant Nodine knew or should have known that such conduct was likely to result in emotional distress that might cause illness or bodily harm.

64.     The plaintiff's emotional distress was foreseeable to the defendants.

65.     Calvin Nodine's sexual assault on Ms. Chase caused her constructive discharge and was undertaken in the termination process.

66.     The plaintiff was not an employee when defendants' post-termination behavior, as described above, took place.

67.      As a result of the negligent conduct of the defendant, the plaintiff suffered and will continue to suffer in the future severe emotional distress.

68.      As a result of defendants' conduct, has suffered and will continue to suffer economic damages, pain, humiliation, loss of enjoyment of life activities, and emotional distress.


**COUNT SEVEN        (INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS)**
**                        *(Against Calvin Nodine and Nodine's Smokehouse)***

1-59.  Paragraphs 1-59 of the Statement of Facts are hereby incorporated by reference as Paragraphs 1-59 of Count Seven.

60.     Defendant Calvin Nodine's conduct toward the plaintiff was intentional.

61.     Defendant Calvin Nodine intentionally engaged in conduct that was substantially certain to cause emotional distress injuries.

62.     Calvin Nodine's conduct was extreme and outrageous.

63.     Defendant Nodine's Smokehouse's post-termination conduct towards Nicole Chase was extreme and outrageous.

64.     As a result of the defendant's conduct, the plaintiff suffered severe emotional distress.

65.     Defendant Nodine's Smokehouse is legally responsible for Calvin Nodine's conduct.

**COUNT EIGHT        (INTENTIONAL AND/OR RECKLESS ASSAULT AND BATTERY)**
                          *(Against Calvin Nodine)*

1-59.   Paragraphs 1-59 of the Statement of Facts are hereby incorporated by reference as Paragraphs 1-59 of Count Eight.

60.      The plaintiff was very distraught and humiliated, and she felt violated as a result of the defendant Nodine's conduct.

61.     Defendant Nodine intended to cause harmful or offensive contact with plaintiff without her consent and he intentionally placed the plaintiff in a position of imminent apprehension of harmful or offensive contact and/or to fear for her safety.

62.     Defendant Nodine willfully or voluntarily and intentionally committed the alleged conduct, and/or did so recklessly or under circumstances showing a reckless disregard of the consequences and of the plaintiff's rights and safety.

63.     As a result of Defendant Nodine's conduct, Ms. Chase has suffered bodily harm.

64.     The plaintiff suffered personal embarrassment and humiliation, physical violation, emotional upset and anxiety, feelings of intimidation, invasion of her privacy, and extreme emotional distress as result of defendant Nodine's conduct.

65.     As a result of defendant Nodine's conduct, the plaintiff has suffered physical pain, suffering, and permanent disability.

66.     As a result of defendant Nodine's conduct, the plaintiff has incurred and will continue to incur medical expenses, and other damages.

67.     As a result of defendant Nodine's conduct, the plaintiff has suffered an impairment of her ability to enjoy life's activities.

**COUNT NINE     (NEGLIGENT ASSAULT AND BATTERY)***(Against Calvin Nodine)*

1-59.   Paragraphs 1-59 of the Statement of Facts are hereby incorporated by reference as Paragraphs 1-59 of Count Nine.

60.     The defendant negligently caused offensive contact with the plaintiff without her consent and he negligently placed the plaintiff in a position of imminent apprehension of harmful or offensive contact or fear for her safety and caused her harm thereby.

61.     The plaintiff suffered personal embarrassment and humiliation, emotional upset and anxiety, feelings of intimidation, invasion of her privacy, and extreme emotional distress as result of the defendant's conduct.

62.     The plaintiff was very distraught and humiliated, and she felt violated as a result of the defendant's conduct.

63.      As a result of defendant's conduct, Ms. Chase has suffered bodily

harm.

64.    As a result of the defendant's conduct, the plaintiff has suffered physical pain, suffering, and permanent disability.

65.    As a result of the defendant's conduct, the plaintiff has incurred and will continue to incur medical expenses, and other damages.

66.    As a result of the defendant's conduct, the plaintiff has suffered an impairment of her ability to enjoy life's activities.

**COUNT TEN        (INVASION OF PRIVACY)***(Against Calvin Nodine)*

1-59.  Paragraphs 1-59 of the Statement of Facts are hereby incorporated by reference as Paragraphs 1-59 of Count Ten.

60.    Defendant Nodine's conduct invaded the plaintiff's privacy in that he intentionally intruded upon her physical and psychological solitude and seclusion in a highly offensive manner.

61.    As a result of defendant Nodine's conduct, the plaintiff has suffered physical pain and suffering.

62.    As a result of defendant Nodine's conduct, the plaintiff has incurred and will continue to incur medical expenses, and other damages.

63.    As a result of defendant Nodine's conduct, the plaintiff has suffered an impairment of her ability to enjoy life's activities and emotional distress.

**COUNT ELEVEN    (FALSE IMPRISONMENT)***(Against Calvin Nodine)*

1-59.  Paragraphs 1-59 of the Statement of Facts are hereby incorporated by reference as paragraphs 1-59 of Count Eleven.

60.    During the sexual assault, defendant Calvin Nodine unlawfully

restrained Nicole Chase, to wit, by pulling her into the men's bathroom and locking the door without her consent.

61.     As a result of defendant Nodine's conduct, the plaintiff has suffered physical pain and suffering.

62.     As a result of defendant Nodine's conduct, the plaintiff has incurred and will continue to incur medical expenses, and other damages

63.     As a result of defendant Nodine's conduct, the plaintiff has suffered an impairment of her ability to enjoy life's activities and emotional distress.

**COUNT TWELVE    (INTIMIDATION BASED ON BIGOTRY OR BIAS IN VIOLATION OF CONN. GEN. STAT. § 52-571c)*(Against Calvin Nodine and Nodine's Smokehouse)***

1-59.   Paragraphs 1-59 of the Statement of Facts are hereby incorporated by reference as Paragraphs 1-59 of Count Twelve.

60.     Defendant Calvin Nodine maliciously and with specific intent intimidated or harassed Ms. Chase because of Ms. Chase's sex and caused physical injury to her.

61.     Defendant Nodine maliciously, and with specific intent to intimidate or harass Ms. Chase because of Ms. Chase's sex, threatened to and did cause physical contact with her.

62.  Defendant Nodine injured the plaintiff as a result of the above alleged conduct in violation of Conn. Gen. Stat. §53a-181j, 53a-181k and/or 53a-181l.

63.  As a result of the defendant Nodine's conduct, plaintiff suffered injury.

64.  Defendant Nodine's Smokehouse, LLC is legally responsible for Calvin Nodine's conduct.

**COUNT THIRTEEN          (MALICIOUS PROSECUTION)** *(Against Calvin Nodine and Nodine's Smokehouse, Inc.)*

**1-59.   Paragraphs 1-59 of the Statement of Facts are hereby incorporated by reference as Paragraphs 1-59 of Count Thirteen.**

**60.    On May 18, 2017, defendant Nodine lied to the Canton Police that his forcing the plaintiff to perform oral sex on him in the bathroom of a restaurant was consensual.**

**61.    Defendant Nodine caused the plaintiff to be arrested and charged with the crime of False Statement, Conn. Gen. Stat. § 53a-157b upon the false information and request of Defendant Nodine.**

**62.    Defendant Nodine that the alleged crime of false statement did not take place but requested the arrest of plaintiff and participated in the continuing prosecution of Ms. Chase despite the fact that defendant knew and/or had knowledge that the plaintiff was innocent of the charges.**

**63.    The criminal proceedings have terminated in favor of the plaintiff.**

**64.    Defendant Nodine acted without probable cause.**

**65.    Calvin Nodine acted with malice, primarily for a purpose other than of bringing an offender to justice; his actions were in retaliation for Ms. Chase's complaint of sexual harassment and sexual assault, which were in fact true.**

**66.    Defendant Nodine knew the information he gave to the police was false and knew that plaintiff was innocent, but defendant nevertheless persisted in the prosecution and the arrest.**

**67.    Defendant Nodine's actions were approved and ratified by defendant Nodine's Smokehouse in that it through its agents, did not conduct its own inquiry**

into the facts pertaining to the incidents complained of herein, did thereafter continue the membership, employment, and agency of defendant Nodine, did nothing to discipline or reprimand defendant Nodine, and adopted defendant Nodine's conduct and acts as its own.

68. Defendant Nodine's Smokehouse, LLC is legally responsible for Calvin Nodine's conduct.

**B. Police Misconduct Defendants**

**COUNT FOURTEEN        (FALSE ARREST – 42 USC §1983)(*Against John Colangelo and Adam Gompper, in their Personal Capacity*)**

1-176. Paragraphs 1-176 of the Statement of Facts are incorporated herein by reference as Paragraphs 1-176 of Count Fourteen.

177. At all times mentioned herein, defendants were acting under color of law.

178. Defendant Colangelo arrested Nicole Chase without probable cause.

179. Defendant Adam Gompper contributed false and misleading information, omitted material exculpatory information, and distorted the context of the information used by Defendant Colangelo in the warrant to have Nicole Chase arrested.

180. The criminal case brought against Nicole Chase as a result of the arrest warrant terminated in her favor.

181. Defendants unlawfully restrained Nicole Chase's liberty in violation of the Fourth Amendment of the United States Constitution.

182. Defendants conduct towards Nicole Chase was in reckless or

deliberate disregard of her rights.

183.   As a result of the defendants' conduct, Nicole Chase has suffered

damages.

**COUNT FIFTEEN**          **(FALSE ARREST)(***Against Officer Gompper, Det.***
                          *Colangelo, and the defendant Town of Canton***)**

1-176. Paragraphs 1-176 of the Statement of Facts are incorporated herein by

reference as Paragraphs 1-176 of Count Fifteen.

177.   Defendants unlawfully restrained Nicole Chase's liberty.

178.   Defendants' conduct towards Nicole Chase was in reckless and/or

deliberate disregard of her rights.

179.   As a result of the defendants' conduct, Nicole Chase has suffered

damages.

**COUNT SIXTEEN**          **(MALICIOUS PROSECUTION 42 USC §1983)(***Against Det.***
                          *John Colangelo and Officer Adam Gompper, in their***
                          *Personal Capacity)***

1-176. Paragraphs 1-176 of the Statement of Facts are incorporated herein by

reference as Paragraphs 1-176 of Count Sixteen.

177.   At all times mentioned herein, defendants were acting under color of

law.

178.   Defendants initiated criminal proceedings against Nicole Chase

without probable cause.

179.   The criminal case brought against Nicole Chase terminated in her

favor.

180.   Defendants conduct violated her rights under the Fourth Amendment

of the United States Constitution.

181.    Defendants conduct towards Nicole Chase was in reckless or deliberate disregard of her rights.

182.    As a result of the defendants' conduct, Nicole Chase has suffered damages.

**COUNT SEVENTEEN**          **(MALICIOUS PROSECUTION – COMMON LAW)(***Against Det. John Colangelo, Officer Adam Gompper and defendant Town of Canton)*

1-176. Paragraphs 1-176 of the Statement of Facts are incorporated herein by reference.

177.    Defendants initiated criminal proceedings against Nicole Chase without probable cause.

178.    The criminal proceedings terminated in Nicole Chase's favor.

179.    Defendants acted with malice.

180.    Defendants acted with malice and deliberate and/or reckless disregard of her rights.

181.    As a result of the defendants' conduct, Nicole Chase has suffered damages.

**COUNT EIGHTEEN**          **(DENIAL OF EQUAL PROTECTION – 42 USC §1983)(***Against Det. John Colangelo, and Police Officer Adam Gompper, in their personal capacities)*

1-176. Paragraphs 1-176 of the Statement of Facts are incorporated herein by reference as Paragraphs 1-176 of Count Eighteen.

177.    All times relevant to this complaint, defendants Gompper and Colangelo were acting under the color of law.

178.    The defendants unlawfully discriminated against Ms. Chase in

violation of the equal protection clause of the Fourteenth Amendment to the United States Constitution.

179.   The defendants discriminatorily applied facially neutral laws in violation of the Fourteenth Amendment by failing to afford Ms. Chase the rights and protections offered to all victims of sexual assault and violence, because of, at least in part, an animus against her because of her gender.

180.   Defendants Gompper and Colangelo applied the laws requiring them to provide protective services to victims of sexual assault (such as under Conn. Gen. Stat. sections 53a-70, 53a-72a, 53a-73a, and/or 53a-96) and to investigate complaints of sexual assault in a non-discriminatory manner.

181.   Defendants Colangelo and Gompper failed to apply in a nondiscriminatory manner the constitution of Connecticut, article first, Section 8b which provides crime victims with the right to be treated with fairness and respect throughout the criminal justice process.  These defendants also failed to apply in a nondiscriminatory manner the Canton Police Department's general orders, including the Canons of Police Ethics, General Order 1.7, sections III. A, B, D, F, I, L; Sexual Assault Investigation, General Order 6.6 sections III.A.1, 3, 4, 5, 7 and B.1, 3, 4, 5, 6; and the Canton's Sexual Assault Report Checklists.

182.   Defendants Gompper and Colangelo failed to failed to apply in a nondiscriminatory manner that section of the Canton Police Department's General Order 6.6 which requires "[a]ll personnel involved in the investigation of a sexual assault case [to] perform their appointed function efficiently, professionally, and humanely, giving first priority to the physical and emotional condition of the

victim."

183.    The defendant officers' comments and behavior indicate that they were motivated by gender animus and that their denying Nicole Chase law enforcement protective services was based upon their bias against her because of her sex.

184.    The facts leading to these inferences, in addition to those already alleged, include, but are not necessarily limited to the following:

a.    As an experienced investigator, Detective Colangelo knew that female victims of sexual assault often do not initially tell the entire story; they omit certain facts because they are traumatized, fearful, embarrassed, and afraid that they will not be believed.  Yet Detective Colangelo rushed to judgment against Nicole Chase following her providing more complete details of her story and brought charges against her.

b.    Based upon his POST recertification training, Officer Gompper knew that female victims of sexual assault often do not initially tell the entire story; they omit certain facts because they are traumatized, fearful, embarrassed, and afraid that they will not be believed.  Yet he also rushed to judgment against Nicole Chase following her providing more complete details of her story and brought charges against her.

c.    Detective Colangelo and Officer Gompper discounted the testimony of a female victim in favor of male aggressor.

d.    Detective Colangelo and Officer Gompper had applied a double standard to Nicole Chase and Calvin Nodine.  Nodine admitted that he

initially lied to the police to protect himself.  Yet Gompper and Colangelo did not draw negative inferences against Calvin Nodine for his lie and did so against Chase.  Colangelo specifically stated that there was no need to have Calvin Nodine sign a written statement. Their respective genders played a role in these conclusions.

e.     In his initial meeting with Nicole Chase, she told Officer Gompper that Calvin Nodine pulled her into the men's bathroom, closed the door and tried to put his penis into her mouth without her consent.  She told defendant Gompper that she pushed him away and fled the bathroom. Despite this clear indication of a sexual encounter, Officer Gompper told Nicole Chase, "I do not think that this reaches the level of a sexual assault." Officer Gompper was applying a heightened requirement of force and resistance not required under the law that reflects a stereotypical bias against female victims, i.e., a woman who does not resist is at fault.

f.     Officer Gompper described Ms. Chase's initial complaint as "sexual harassment," despite the fact that Ms. Chase had never used those words in that initial interview or any other time.  Defendant Gompper believed that "sexual harassment" was a civil matter, between a woman and her employer.  He was unaware that conduct constituting sexual harassment could also violate criminal law.  This perception reflected a stereotypical bias against female victims of acquaintance rape; minimizing its seriousness and treating it as a civil, not a criminal matter.

g.     After the initial interview with Nicole Chase, Officer Gompper

repeatedly made statements in his police reports and his arrest warrant that mischaracterized her statements in a way that made her actions seem more consensual and/or contrived:

     i.     He wrote that Nodine and Chase engaged in a "mutual hug" despite the fact that Chase stated that it was not mutual.

     ii.     He wrote that as Chase described the sexual assault she "stopped her explanation of the incident" and said she "shut down;" the recording clearly showed that she did not stopped her explanation of the incident.

     iii.     Defendant Gompper refused to acknowledge that Nodine dragged Ms. Chase into the men's room against her will, despite her clear statement to the contrary.

An inference can be drawn that defendant Gompper's tendency to draft his reports in a manner that cast Ms. Chase's story in a negative light were the product of gender bias against female victims of acquaintance rape.

     h.     After Detective Colangelo re-interviewed Nicole Chase on June 21, 2017, defendant Gompper's report of the interview, which was reviewed and approved by Colangelo, mocked Chase's statements in the interview by putting words stated by Chase that had a sexual connotation in quotation marks:  VICTIM gave Calvin Nodine "oral";  worked her "butt off;" she wasn't "getting sex" at home; he was "hard" again and ejaculated in her mouth. This ridicule was clearly sexist.

     i.     At the conclusion of defendant Gompper's June 21, 2017

report, which was approved by Detective Colangelo, he indicated that "no probable cause existed to believe that defendant Nodine forced the victim to perform a sexual act." This conclusion improperly applies a heightened standard to this female victim of acquaintance rape, that is likely based upon improper sexual stereotypes. Force is not an element of sexual misconduct. The standard is lack of consent.

       j.     In the June 21, 2017 report, which was written by defendant Gompper and approved by defendant Colangelo, the rationale for the no probable cause finding is:

       i.     The victim had a chance to call for help;

       ii.     The victim spent fifteen minutes performing (nonconsensual) oral sex on defendant Nodine in the bathroom;

       iii.     The victim said defendant Nodine was hard initially, then wasn't and then "hard " again and he ejaculated in her mouth.

These rationales, aside from being factually inaccurate, reflect stereotypical assumptions about female victims of acquaintance rape.  When Ms. Chase told defendant Gompper that Calvin Nodine had been arrested for beating up cops and drives drunk often, he ignored these comments and walked away to get a piece of paper.  Despite these comments, defendant Gompper still suggests that Nicole Chase go back to work with a man who is crude and abusive.

       k.     Detective Colangelo's interview of Calvin Nodine was conducted in an easy, familiar, jocular and casual manner about the people

they knew, Detective Colangelo's father, country clubs, golf and other "old boy" comments.   Defendant Colangelo even asks to be invited to the country club of which defendant Nodine's attorney is a member. In contrast, his demeanor when he interviewed Nicole Chase was cold, dismissive, and bored.  An inference can be drawn that gender bias against female victims of acquaintance rape explained this disparate treatment between the female complainant/victim and the male accused.

l.      Defendant Colangelo spoke about Nicole Chase to defendant Nodine and his attorney in a sexist and demeaning manner that minimized the seriousness of her complaint of acquaintance rape:

      i.       He could not even remember Nicole Chase's name and referred to her as a "girl."

      ii.      Defendant Colangelo is dismissive of Nicole Chase's complaint and again refers to her as a girl, saying "what's this girl's deal," even though Ms. Chase was an adult and a mother.

      iii.      Defendant Colangelo referred to defendant Nodine's employees' complaints as "bitching."

m.      During the interview, Defendant Colangelo used terms that implicitly and explicitly signaled that he was more than willing to excuse males who behaved inappropriately and did not take female victims of acquaintance rape seriously:

      i.      Defendant Colangelo gives Calvin Nodine a pass for being crude because he is a "meat guy", meaning he is in the meat

business, where apparently it is acceptable to be misogynistic and talk crudely about women.

  ii.  Defendant Colangelo dismisses the crude or sexual conduct in the workplace as "flirting."

  iii.  Defendant Colangelo repeatedly encouraged defendant Nodine to say that he was in a relationship with Ms. Chase, despite the fact that both defendant Nodine and Ms. Chase adamantly denied a prior relationship.  Defendant Colangelo told defendant Nodine that he knows "guys do what guys do" in reference to married men having sex with other women, in order to encourage defendant Nodine to suggest that he was having an affair with Nicole Chase.

  iv.  Defendant Nodine could not provide any rationale for why Ms. Chase would make a false accusation of acquaintance rape against him.  But defendants Colangelo and Gompper repeatedly suggested to defendant Nodine that Ms. Chase had made the complaint for financial gain.  They then repeated this baseless accusation in the Arrest Warrant.  Defendants Colangelo and Gompper were repeating a classic sexist stereotype that woman falsely accuse wealthy and powerful men of sexual assault.

  n.  During the interview with defendant Nodine, defendant Colangelo clearly manifested his disdain for female victims of acquaintance rape and made clear to the male accused, that he was not taking the case seriously:

      i.        **He did not ask for defendant Nodine's response to Ms. Chase's other allegations or the witness statements;**

      ii.       **He told defendant Nodine and his attorney that they were not going to rush the investigation;**

      iii.      **He told defendant Nodine and his attorney that there was no need to "track down every lead;" and**

      iv.      **He stated that defendant Nodine was not a "menace to society."**

**185.   During the interview with defendant Nodine, Detective Colangelo set out a plan to "turn the tables" on Ms. Chase and arrest her for making a false statement.  He suggested that defendant Nodine take a polygraph and that it could be used to pressure Ms. Chase.**

**186.   Defendant Colangelo bragged to defendant Nodine and his attorney that in a prior sexual assault case, he flipped it and made the female victim a suspect in a false statement case.**

**187.   Defendant Colangelo also bragged about a time when he included exculpatory evidence in arrest warrant for a male accused of sexual assault.  The accused was represented by Attorney Moraghan's former law partner.  Defendant Colangelo says he did it to build in a defense for him.**

**188.   These actions, on Defendant Colangelo's part, manifest a bias against female victims of sexual assault.**

**189.    On information and belief, Detective Colangelo has only drafted arrest warrants for making a false statement against female victims of sexual**

assault.  He has never drafted false statement warrants against male complainants.

190.    Against the backdrop of these defendants' treatment of Nicole Chase, their comments and actions demonstrate that they discriminated against the plaintiff based upon her gender.

191.    Because of Officer Gompper's and Detective Colangelo's bias, they believed that Nicole Chase's claim was less deserving of their attention and they selectively denied their protective services to Nicole Chase on the basis of her sex.

192.    The defendants' actions or inactions were motivated by discriminatory animus and their application resulted in a discriminatory effect on Nicole Chase because of her gender.

193.    As a result of the defendants' discrimination against Ms. Chase on the basis of her sex, Nicole Chase suffered injury.

194.    As a result of Officer Gompper's and Detective Colangelo's violation of the Fourteenth Amendment by failing to afford Ms. Chase the rights and protections offered to all victims of sexual assault and violence, they treated her with disrespect,  failed to take her case seriously and investigate her complaint properly, failed to disclose that she was being treated as a criminal suspect and arrested her and charged her with a crime.

195.    This conduct was in deliberate and/or intentional disregard of Ms. Chase's rights.

**COUNT NINETEEN**          **(Intentional Infliction of Emotional Distress)** *(Against Detective Colangelo, Officer Gompper, Town of Canton)*

1-176. Paragraphs 1-176 of the Statement of Facts are incorporated herein by reference as Paragraphs 1-176.

177.    The behavior of defendants Colangelo and Gompper towards Nicole

Chase was extreme and outrageous.

178.    The behavior of defendants Colangelo and Gompper was deliberate

and with reckless disregard to the likelihood that it would cause Nicole Chase

extreme emotional distress.

179.    As a result of their behavior, Nicole Chase has suffered extreme

emotional distress.

180.    The defendant town of Canton is liable for the conduct of Defendants

Gompper and Colangelo.

COUNT TWENTY    (Assumption of Liability for Damage Caused by Employees of
                Municipality - Pursuant to Conn. Gen. Stat. §§ 7-465 )(*Against
                Town of Canton*)

1-176.  Paragraphs 1-176 of the Statement of Facts are incorporated herein by

reference as Paragraphs 1-176 of Count Twenty.

177- 181.  Paragraphs 177 to 181 of Count Fourteen are incorporated herein

by reference as Paragraphs 177 to 181 of Count Twenty.

182.    Paragraph 177 of Count Fifteen is incorporated herein by reference as

Paragraph 182 of Count Twenty.

183-200.  Paragraphs 183 to 200 of Count Eighteen are incorporated herein by

reference as Paragraphs 183 to 200 of Count Twenty.

201.    As a result of defendant Colangelo's and defendant Gompper's

conduct, Nicole Chase has suffered damages.

202.    At all times mentioned herein, defendant John Colangelo was acting

in the performance of his duties and within the scope of his with the Canton Police

Department and the Town of Canton.

203.   At all times mentioned herein, defendant Adam Gompper was acting in the performance of his duties and within the scope of his employment with the Canton Police Department and the Town of Canton.

204.   Written notice of the intention to commence an action and of the time when and the places where the damages were incurred or sustained has been filed with the clerk of the Town of Canton with in six months after the cause of action has accrued.  (See Exhibit A attached hereto).

205.   Defendant Town of Canton is obligated to pay on behalf of defendants Colangelo and Gompper all sums which they are obligated to pay by reason of the liability imposed upon them by the aforesaid laws for damages awarded for infringement of the plaintiff's civil rights and/or for physical damages to her person.

### REQUEST FOR JURY TRIAL

The Plaintiff requests a trial by jury as to all counts.

## PRAYER FOR RELIEF

**WHEREFORE the plaintiff claims:**

**(a) Economic damages;**

**(b) Compensatory damages for emotional distress, loss of enjoyment of**

**life's activities, pain, and humiliation;**

**(c) punitive damages pursuant to plaintiff's §1983, Title VII and Connecticut**

**common law claims;**

**(d) treble damages fee pursuant to Conn. Gen. Stat. § 52-571c;**

**(e) prejudgment and post judgment interest at the statutory rate;**

**(f) attorneys' fees, costs and expenses;**

**(g) Injunctive relief enjoining the defendants from discriminating against**

**female victims of sexual assault and other crimes of violence; and**

**(h) such other and further relief as to the Court deems just and proper under**

**the circumstances.**

**THE PLAINTIFF,**
**NICOLE CHASE**

**By:___*Mary-Kate Smith*_____**
**Lewis Chimes (ct07023)**
**Mary-Kate Smith (ct26820)**
**Law Office of Lewis Chimes LLC**
**45 Franklin Street**
**Stamford, CT 06901**
**Phone:  (203)32407744**
**Facsimile: (203)969-1319**
**Email: lchimes@chimeslaw.com**
**        msmith@chimeslaw.com**

**<u>CERTIFICATION</u>**

     **I HEREBY CERTIFY that on the 19th day of June, 2019 a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by email to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the court's CM/ECF System.**

**Elizabeth K. Acee**
**LeClair Ryan, PLLC**
**545 Long Wharf Drive, 9th Floor**
**New Haven, CT  06511**

**David A Moraghan**
**Smith Keefe Moraghan & Waterfall LLC**
**P.O Box 1146**
**257 Main Street, 2nd floor**
**Torrington, CT 06790**

**Kristan M. Maccini**
**Christopher A. Clark**
**Howd & Ludorf, LLC**
**65 Wethersfield Avenue**
**Hartford, CT 06114-1190**

**Elizabeth M. Smith**
**LeClair Ryan, PLLC**
**One Financial Plaza**
**755 Main Street, Suite 2000**
**Hartford, Connecticut 06103**

                         ***/s/ Mary-Kate Smith***
                           **Mary-Kate Smith**