UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| NICOLE CHASE | : | NO.: 3:18-cv-00683 (VLB) |
| | : | |
| v. | : | |
| | : | |
| NODINE'S SMOKEHOUSE, INC., CALVIN | : | |
| NODINE, TOWN OF CANTON, JOHN | : | |
| COLANGELO, ADAM GOMPPER, MARK J. | : | |
| PENNEY AND CHRISTOPHER ARCIERO | : | OCTOBER 1, 2019 |

MEMORANDUM OF LAW IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT

The undersigned defendants, Town of Canton, John Colangelo, and Adam Gompper ("Canton Defendants"), hereby submit this memorandum of law in support of their Motion for Summary Judgment.

I.      BACKGROUND FACTS

   A.      PROCEDURAL BACKGROUND

The plaintiff, Nicole Chase ("plaintiff"), filed her Complaint in Connecticut Superior Court, on April 10, 2018.  Defendants Town of Canton, John Colangelo, Adam Gompper, Mark Penney, and Christopher Arciero removed the case to this Court on April 20, 2018.  [Doc. 1 (Notice of Removal and Compl.)].  Thereafter, on July 24, 2018, said defendants moved to dismiss all claims against them.  [Doc. 34 (Mot. to Dimiss)].  The Court granted the motion in part and denied it in part,

without prejudice to the plaintiff repleading some of the claims the Court dismissed.

Following the plaintiff's filing of an Amended Complaint, dated February 5, 2019, and Second Amended Complaint, dated June 19, 2019, which is the operative Complaint ("Complaint") [Doc. 116], Counts One through Thirteen are directed toward co-defendants Calvin Nodine and Nodine's Smokehouse, Inc. and counts Fourteen through Twenty toward the Canton defendants. All claims directed toward Canton defendants Penney and Arciero have been dismissed and not repleaded.

Counts Fourteen and Fifteen allege claims against John Colangelo and Adam Gompper in their individual capacities for false arrest in violation of the Fourth Amendment pursuant to 42 U.S.C § 1983 and state common law, respectively.

Counts Sixteen and Seventeen allege claims against John Colangelo and Adam Gompper in their individual capacities for malicious prosecution in violation of the Fourth Amendment pursuant to 42 U.S.C § 1983 and state common law, respectively.

Count Eighteen alleges claims against John Colangelo and Adam Gompper in their individual capacities for denial of equal protection in violation of the Fourteenth Amendment pursuant to 42 U.S.C § 1983.

Count Nineteen alleges a claim for intentional infliction of emotional distress against John Colangelo and Adam Gompper and alleges that the Town "is liable for the conduct [of the individual defendants]."  (Compl., Count Nineteen, ¶ 180.)

Count Twenty incorporates the statement of facts directed toward the Canton defendants as well as Counts Fourteen, Fifteen, and Eighteen and alleges that "[a]t all times mentioned herein, defendant John Colangelo was acting in the performance of his duties and within the scope of his [sic] with the Canton Police Department and the Town of Canton."  (Compl., Count Twenty, ¶ 202.)  Plaintiff makes the same allegation with respect to defendant Adam Gompper and goes on to allege that "[w]ritten notice of the intention to commence an action and of the time and the places were the damages were incurred or sustained has been filed with the clerk of the Town of Canton with in [sic] six months after the cause of action has accrued."  (Compl., Count Twenty, ¶ 204.)  "Defendant Town of Canton is obligated to pay on behalf of defendants Colangelo and Gompper all sums which they are obligated to pay by reason of the liability imposed upon them by the aforesaid laws for damages awarded for infringement of the plaintiff's civil rights and/or for physical damages to her person."  (Compl., Count Twenty, at ¶ 205.)

**B.   UNDISPUTED FACTS**

The plaintiff's lawsuit directed toward the Canton defendants stems from her arrest pursuant to a warrant, on September 8, 2017, on the charge of false statement in the second degree, in violation of Connecticut General Statutes § 53a-157b.  The defendants incorporate by reference the facts and documents set forth and attached to their Defendants' Local Rule 56(a)1 Statement.  Additional facts may be set forth below where necessary.

**II.   LAW AND ARGUMENT**

**A.   STANDARD OF REVIEW.**

**1.   Summary Judgment**

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed.R.Civ.P. 56(c).  A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505 (1986).  "The substantive law governing the case will identify those facts that are material, and 'only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'"  Bouboulis v. Transp. Workers Union of Am., 442 F.3d 55, 59 (2d Cir. 2006) (quoting Anderson, 477 U.S. at 248).

The moving party bears the burden of demonstrating the absence of a genuine issue as to any material fact.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323-25, 106 S.Ct. 2548 (1986).  In determining whether a material issue of fact exists, the court must resolve all ambiguities and draw all inferences against the moving party.  See Anderson, 477 U.S. at 255.  The party opposing summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 256.  Thus, once the moving party has satisfied its burden of identifying evidence which demonstrates the absence of a genuine issue of material fact, the non-moving party is required to go beyond the pleadings by way of affidavits, depositions, and answers to interrogatories in order to demonstrate specific material facts, which give rise to a genuine issue.  See Celotex, 477 U.S. at 324.  The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matasushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348 (1986).

The moving party seeking summary judgment satisfies their burden of demonstrating that there exists no genuine issue of material fact in dispute where they point to the absence of evidence to support an essential element of the non-moving party's claim.  See Celotex Corp. v. Catrett, 477 U.S. at 322-23. "A defendant need not prove a negative when it moves for summary judgment

on an issue that the plaintiff must prove at trial.  It need only point to an absence of proof on the plaintiff's part, and, at that point, plaintiff must designate specific facts showing that there is a genuine issue for trial."  <u>Parker v. Sony Pictures Entertainment, Inc.</u>, 260 F.3d 100, 111 (2d Cir. 2001) (internal quotation marks omitted)(citing <u>Celotex</u>, 477 U.S. at 324).

### 2.   Qualified Immunity

Qualified immunity shields a police officer from suits for damages under 42 U.S.C. § 1983, unless his actions violate clearly established rights of which an objectively reasonable official would have known.  <u>See</u> <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818, 102 S.Ct 2727, 73 L.Ed.2d 396 (1982).  "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably. The protection of qualified immunity applies regardless of whether the government official's error is 'a mistake of law, a mistake of fact, or a mistake based upon mixed questions of law and fact.'"  <u>Pearson v. Callahan</u>, 555 U.S. 223, 231, 129 S.Ct. 808, 172 L.Ed.2d 565, 77 USLW 4068 (2009) (quoting <u>Groh v. Ramirez</u>, 540 U.S. 551, 567, 124 S.Ct. 1284, 157 L.Ed.2d 1068 (2004) (Kennedy, J., dissenting) (quoting <u>Butz v. Economou</u>, 438 U.S. 478, 507, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978), for the proposition qualified immunity covers "mere

mistakes in judgment, whether the mistake is one of fact or one of law")).  In

<u>Pearson</u>, the Supreme Court noted:

> Because qualified immunity is "an immunity from suit
> rather than a mere defense to liability … it is effectively
> lost if a case is erroneously permitted to go to trial."
> *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 86
> L.Ed.2d 411 (1985) (emphasis deleted). Indeed, we have
> made clear that the "driving force" behind creation of
> the qualified immunity doctrine was a desire to ensure
> that "'insubstantial claims' against government
> officials [will] be resolved prior to discovery."
> *Anderson v. Creighton,* 483 U.S. 635, 640, n. 2, 107
> S.Ct. 3034, 97 L.Ed.2d 523 (1987). Accordingly, "we
> repeatedly have stressed the importance of resolving
> immunity questions at the earliest possible stage in
> litigation." *Hunter v. Bryant,* 502 U.S. 224, 227, 112 S.Ct.
> 534, 116 L.Ed.2d 589 (1991) *(per curiam).*

<u>Pearson</u>, at 815.

In <u>Pearson</u>, the Supreme Court modified the two-step qualified immunity

test it set forth in <u>Saucier v. Katz</u>, 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272

(2001).  <u>See</u> <u>Pearson v. Callahan</u>, <u>supra</u>.  Under <u>Saucier</u>, a reviewing court would

first have to determine "whether there is even a wrong to be addressed in an

analysis of immunity."  "If, and only if, the court finds a violation of a

constitutional right, the court moves to the second step of the analysis and asks

whether immunity should nevertheless shield the officer from liability."  <u>DeLauri</u>

<u>v. New Jersey Division of State Police</u>, 2009 WL 222983 (D.N.J. 2009) (quoting

<u>Curley v. Klem</u>, 499 F.3d 199, 207 (3d Cir. 2007)).  "The second step of the

<u>Saucier</u> analysis asks whether a reasonable officer would have known his

conduct to be unlawful given the specific circumstances and facts of the case."
Id. (citing Saucier v. Katz, 533 U.S. 199).  "In other words, a defendant is not
entitled to qualified immunity if, at the time of the incident, the right that was
violated was clearly established."  Torisky v. Schweiker, 446 F.3d 438, 443 (3d
Cir. 2006) ("This second inquiry must be undertaken in light of the specific
context of the case.").

However, in Pearson, the Court relaxed the rigid two-step application of
the Saucier analysis.  Noting that, in many instances, a court need not reach
whether a constitutional violation is alleged to determine if qualified immunity is
appropriate, the Court stated that the first prong "sometimes results in a
substantial expenditure of scarce judicial resources on difficult questions that
have no effect on the outcome of the case.  There are cases in which it is plain
that a constitutional right is not clearly established but far from obvious whether
in fact there is such a right."  Pearson, supra, 129 S.Ct. 818.  In addition,
"[a]lthough the first prong of the Saucier procedure is intended to further the
development of constitutional precedent," the first prong "create[s] a risk of bad
decision making," specifically in those instances where a court decides a rather
nuanced constitutional claim early on in litigation where the factual basis for the
claims have not been fully developed through discovery.  Pearson, 129 S.Ct.
819-20.  Thus, courts are "permitted to exercise their sound discretion in
deciding which of the two prongs of the qualified immunity analysis should be

addressed first in light of the circumstances in the particular case at hand."  <u>Id.</u>
at 818.

In addressing the second prong, courts are mindful that "[t]he qualified
immunity inquiry concerns an officer's mistake as to what the law requires and
acknowledges that 'reasonable mistakes can be made as to the legal constraints
on particular police conduct.'"  <u>Stephenson v. Doe</u>, 332 F.3d 68, 79 (2d Cir.
2003); <u>Saucier v. Katz</u>, 533 U.S. 205.  In other words, the qualified immunity
inquiry determines "the objective reasonableness of the officer's belief in the
lawfulness of his actions.  If the officer reasonably believed that his actions did
not violate the plaintiff's rights, he is entitled to qualified immunity even if that
belief was mistaken."  <u>Loria v. Gorman</u>, 306 F.3d 1271, 1281 (2d Cir. 2002).

> The concern of the immunity inquiry is to acknowledge
> that reasonable mistakes can be made as to the legal
> constraints on particular police conduct.  It is
> sometimes difficult for an officer to determine how the
> relevant legal doctrine . . . will apply to the factual
> situation the officer confronts.  An officer might
> correctly perceive all of the relevant facts but have a
> mistaken understanding as to whether a particular
> amount of force is legal in those circumstances.  If the
> officer's mistake as to what the law requires is
> reasonable, however, the officer is entitled to the
> immunity defense.

<u>Saucier</u>, 533 U.S. 205.  In other words, "qualified immunity protects all but the
plainly incompetent or those who knowingly violate the law."  <u>Id.</u> at 202.

**B.    THERE EXISTS NO GENUINE ISSUE OF MATERIAL FACT AND PLAINTIFF'S CLAIMS FOR FALSE ARREST AND MALICIOUS PROSECUTION FAIL AS A MATTER OF LAW.**

The plaintiff's Fourth Amendment and state law claims for false arrest and malicious prosecution fail for the reason that the undisputed facts establish that the plaintiff's arrest was supported by probable cause.  In addition, the plaintiff's claim for malicious prosecution fails on the basis that there exists no genuine issue of material fact that she did not receive a favorable termination of the underlying criminal matter and there is no record evidence to support that either of the defendants acted with malice.  Accordingly, summary judgment should enter in favor of the defendants with respect to each of these claims, as more specifically set forth below.

> In analyzing a Section 1983 claim of false arrest or imprisonment, federal courts generally look to the law of the state where the arrest occurred. *Davis v. Rodriguez,* 364 F.3d 424, 433 (2d Cir.2004). Under Connecticut law, "[f]alse imprisonment, or false arrest, is the unlawful restraint by one person of the physical liberty of another." *Russo v. City of Bridgeport,* 479 F.3d 196, 204 (2d Cir.2007) (quoting *Outlaw v. City of Meriden,* 43 Conn.App. 387, 392, 682 A.2d 1112 (1996)). "The existence of probable cause to arrest constitutes justification and is a complete defense to an action for false arrest, whether that action is brought under state law or under § 1983." *Walczyk v. Rio,* 496 F.3d 139, 152 n. 14 (2d Cir.2007) (internal quotation marks and citation omitted). Connecticut law places the burden on the false arrest plaintiff to prove the absence of probable cause. *See Davis,* 364 F.3d at 433 (citing *Beinhorn v. Saraceno,* 23 Conn.App. 487, 491, 582 A.2d 208 (1990)); *Vangemert v. Strunjo,* No.

3:08CV00700 (AWT), 2010 WL 1286850, at *4 (D.Conn. Mar.29, 2010).

Rosen v. Alquist, No. 3:10-CV-01911 VLB, 2012 WL 6093909, at *6 (D. Conn. Dec. 7, 2012).

"In order to prevail on a § 1983 claim against a state actor for malicious prosecution, a plaintiff must show a violation of rights under the Fourth Amendment, and establish the elements of a malicious prosecution claim under state law."  Id. (quoting Fulton v. Robinson, 289 F.3d 188, 195 (2d Cir. 2002) (internal quotation marks omitted)).  Under Connecticut law, "[a]n action for malicious prosecution . . . requires a plaintiff to prove that: (1) the defendant initiated or procured the institution of criminal proceedings against the plaintiff; (2) the criminal proceedings have terminated in favor of the plaintiff; (3) the defendant acted without probable cause; and (4) the defendant acted with malice, primarily for a purpose other than that of bringing an offender to justice."  McHale v. W.B.S. Corp., 187 Conn. 444, 447, 446 A.2d 815 (1982). "Therefore, the existence of probable cause constitutes an affirmative defense against a malicious prosecution claim."  Rosen v. Alquist, supra, at *6.

      1.    The Plaintiff Cannot Prove The Absence Of Probable Cause

Because the plaintiff cannot prove the absence of probable cause, her claims for false arrest and for malicious prosecution set forth in Counts Fourteen through Eighteen fail as a matter of law.

"[P]robable cause to arrest exists when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime."  Jenkins v. City of New York, 478 F.3d 76, 84-85 (2d Cir. 2007) (quoting Weyant v. Okst, 101 F.3d 845, 852 (2d Cir. 1996) (alteration in original)).  Federal courts evaluate probable cause in light of the totality of the circumstances.  Id. at 90-91.  Likewise, under Connecticut law, probable cause "comprises such facts 'as would reasonably persuade an impartial and reasonable mind not merely to suspect or conjecture, but to believe' that criminal activity has occurred."  State v. Barton, 219 Conn. 529, 548, 594 A.2d 917 (1991) (quoting Stone v. Stevens, 12 Conn. 219, 230 (1837)); see also, State v. Heinz, 193 Conn. 612, 617, 480 A.2d 452 (1984) (defining probable cause as a standard "less demanding than that which attends an inquiry into whether there has been a prima facie showing of criminal activity. Instead, all that is required is that the affidavit, read in a common-sense manner, gives objective evidence of a fair probability that proscribed activity has occurred." (citations omitted)).

> The Second Circuit has explained that "probable cause is a fluid concept ... not readily, or even usefully, reduced to a neat set of legal rules ... While probable cause requires more than a mere suspicion of wrongdoing, its focus is on probabilities, not hard certainties." Walczyk, 496 F.3d at 156 (internal quotation marks and citation omitted). "In assessing

> probabilities, a judicial officer must look to the factual
> and practical considerations of everyday life on which
> reasonable and prudent men, not legal technicians,
> act." *Id.* In sum, probable cause "requires only such
> facts as make wrongdoing or the discovery of evidence
> thereof probable." *Id.* at 157.

Rosen v. Alquist, supra, at *7 (D. Conn. Dec. 7, 2012).

Further, "probable cause does not require a police officer to be certain
that the individual arrested will be prosecuted successfully." Krause v. Bennett,
887 F.2d 362, 371 (2d Cir. 1989).  Also, "[n]ormally, the issuance of a warrant by
a neutral magistrate, which depends on a finding of probable cause, creates a
presumption that it was objectively reasonable for the officers to believe that
there was probable cause . . . and a plaintiff who argues that a warrant was
issued on less than probable cause faces a heavy burden."  Golino v. City of
New Haven, 950 F.2d 864, 870 (2d Cir. 1991).  Such a plaintiff may carry this
burden if she can demonstrate that the defendant officer "knowingly and
intentionally, or with reckless disregard for the truth, made a false statement in
his affidavit or omitted material information, . . . [where] such false or omitted
information was necessary to the finding of probable cause."  Soares v.
Connecticut, 8 F.3d 920 (citations and internal quotation marks omitted).
Furthermore, even where a misrepresentation or an omission is included in an
affidavit, the affidavit may nevertheless support the valid warrant if information
contained in the affidavit, independent of the defective portion, supports a

probable cause finding.  <u>United States v. Frost</u>, 999 F.2d 737, 742-743 (3d Cir.1993), <u>cert</u>. <u>denied</u>, 510 U.S. 1001 (1993).  This determination is a mixed question of law and fact, and "implicates what, in [the Second Circuit], has come to be known as the 'corrected affidavits doctrine.'"  <u>Escalera v. Lunn</u>, 361 F.3d 737, 743 (2d Cir. 2004).

Under the "corrected affidavits doctrine," the court must construct what a hypothetical, "corrected" warrant application would contain, based on the facts as they were known to the applicant, and must decide whether this corrected affidavit would support probable cause to arrest.  <u>See</u> <u>Smith v. Edwards</u>, 175 F.3d 99, 105 (2d Cir. 1999).  In so doing, the court also must "put aside allegedly false material, supply any omitted information, and then determine whether the contents of the 'corrected affidavit' would have supported a finding of probable cause."  <u>Martinez v. City of Schenectady</u>, 115 F.3d 111, 115 (2d Cir. 1997) (quoting <u>Soares</u>, 8 F.3d at 920).  If the corrected warrant application also objectively supported probable cause, "no constitutional violation of the plaintiff's Fourth Amendment rights has occurred." <u>Soares</u>, <u>supra</u>, 8 F.3d at 920.

Detective Colangelo requested an arrest warrant be issued for the plaintiff for the charge of violation of General Statutes § 53a-157b, false statement in the second degree, and his affidavit was reviewed by both a state prosecutor and judge who found probable cause for the offense charged.  (Rule 56(a)1 Statement ¶¶ 104-05.)  General Statutes § 53a-157b provides in pertinent part:

> (a)     A person is guilty of false statement when such person (1) intentionally makes a false written statement that such person does not believe to be true with the intent to mislead a public servant in the performance of such public servant's official function, and (2) makes such a statement under oath or pursuant to a form bearing notice, authorized by law, to the effect that false statements made therein are punishable.

Applying the corrected affidavits doctrine to the instant matter, the corrected affidavit would have supported a finding of probable cause for the plaintiff's arrest on the charge of false statement.

Plaintiff contends that the following statements within Detective Colangelo's arrest warrant affidavit are untrue or she does not know if they are true:

> 1)     *Paragraph 6*, "Chase then stopped her explanation of the incident to Officer Gompper, standing up and saying that it happened so quickly and that she had shut down."
>
> (The plaintiff testified that she does not recall standing up and stopping her explanation of the incident so she does not know if this statement is correct.)
>
> 2)     *Paragraph 7*, "Chase said Nodine then grabbed her and pulled her into the bathroom, closing the door behind them."
>
> (The plaintiff believes she told one of the officers that Nodine locked the bathroom door.)
>
> 3)     *Paragraph 10*, "That Chase said she texted Nodine's stepson, Jeremy, and told him what happened but did not give full details about Nodine telling her to suck it."

 (The plaintiff testified that she does not know if she told Officer Gompper this because she did, in fact, tell Jeremy about Nodine telling her to "suck it.")

4)      *Paragraph 12*, where it states that Chase's statement that Kyle didn't witness much was inconsistent and different than the initial description given to Gompper.

(The plaintiff testified that she does not know how there is an inconsistency because "the whole time she said Kyle did not witness much.")

5)      *Paragraph 14*, "Nicole Chase came back to the Canton Police Department and provided the below sworn written statement to Officer Gompper."

(The plaintiff does not recall if Gompper swore her to her statement while Gompper recalls that he did.)

6)      *Paragraph 18*, 'She then said, 'That it's not happening Nodine's, that is how much work I put into that place.'"

(The plaintiff testified that she did not say this to Detective Colangelo during interview with him on June 21, 2017.  It appears to be a typo in the warrant. Detective Colangelo's affidavit and review of the video indicate that the plaintiff stated, "I want him to give me his restaurant so I can run it right and for him to be gone and to not have the name Nodine's.  That is how much work I put into this place for this man."  Rule 56(a)1 Statement ¶ 74.)

7)      *Paragraph 22*, "Chase then said that everything else is completely true.  She explained that she wanted to come back and say this, but she was in fear it would go against her story and she doesn't want her boyfriend to know."

16

(The plaintiff testified that she said that she did not want her boyfriend, friends, and mother to know.)

8)      *Paragraph 23*, "She said that she spoke to her attorney but did not tell the attorney about this and didn't want to come back and tell what really happened because she knew it would affect her civil case."

(The plaintiff testified that she did not say that she knew it would affect her civil case but rather she asked Colangelo if what really happened would affect her civil case.)

9)      *Paragraph 27*, "That Affiant Colangelo asked how they ended up from the hallway to the bathroom. She said that Nodine had her arm in the hallway and it wasn't forceful, but she knew that he wanted her in the bathroom, so he guided her in, closing the door and locking it behind them."

(The plaintiff testified that she did not say that it wasn't forceful.)

10)      *Paragraph 29*, "She said that because Nodine was so intoxicated, it took between 10 to 15 minutes for him to finish."

(The plaintiff testified that she told one of the officers that it could have been two minutes or five minutes; it felt like it was 10 or 15 minutes.)

The plaintiff is unable to point to any material omission from the warrant affidavit, necessary to a finding of probable cause.

The statements the plaintiff contends to be untrue, or that she is unsure whether or not they are true, are generally confirmed by the audio and/or video of her taped interviews with the CPD, (Defs.' **Exhibits E** and **O**), with the

exception of her indication that she does not recall whether Adam Gompper swore her to an oath when she signed her written statement.  Regardless, the only statement or omission at issue that could impact whether the corrected affidavit would support probable cause is paragraph 14, concerning whether the plaintiff gave her statement under oath.  Because the plaintiff does not contend that the statement is false, but only that she cannot remember whether she was sworn to an oath, the statement should not be put aside under the corrected affidavits doctrine.

Further, Adam Gompper confirms that the plaintiff was sworn to an oath. (Rule 56(a)1 Statement ¶ 50.)  Most significantly, Detective Colangelo asked Adam Gompper whether he swore the plaintiff to an oath and Gompper responded to him in the affirmative.  (Colangelo Aff. ¶ 6, Defs' <u>Exhibit B</u>.)  Thus, Colangelo, the affiant would have no reason to know that paragraph 14 was false.  Under the corrected affidavits doctrine, the statements should not be put aside where the plaintiff fails to set forth evidence showing the defendant affiant knew the statements to be false.

In any event, whether or not the above statements are set aside, the remaining statements in the warrant and evidence in the case establish that the plaintiff's May 11, 2017 statement provided under oath was false, in that she omitted that she provided Calvin Nodine with fellatio, and that she knew her written statement was not true.  Further, the plaintiff's statements to the officers

supported that she made the false statement with the intent to misled them in their investigation.  Providing false statements or omissions under oath is a violation of General Statutes § 53a-157b.  <u>See</u> Conn. Gen. Stat. § 53a-157b.

The defendants anticipate that the plaintiff will argue that an email she sent to Detective Colangelo, on July 31, 2017, stating that she wished "to revise" her written statement and attaching the "supplemental information" she wanted to add is information omitted from the arrest warrant affidavit that would have negated probable cause.  (<u>See</u> Rule 56(a)1 Statement ¶ 98, Defs.' <u>Exhibit U</u>.) Colangelo had a duty to provide exculpatory evidence to the prosecutor.  (<u>Id.</u> at ¶ 102.)  Exculpatory evidence is defined as evidence "favorable to an accused" and "material to either guilt or punishment."  <u>Brady v. Maryland</u>, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 1194 (1963).  The plaintiff's email and supplemental information, however, does not negate probable cause—it is not exculpatory. The supplemental information provided by the plaintiff is yet another version of events provided to officers (the first version provided on May 7, 2017, the second via her written statement provided on May 11, 2017, and the third at her recorded interview on June 21, 2017, and the fourth version with her July 31, 2017 email).[1]  The supplemental information confirms that the plaintiff made a

---

[1] It should be noted, at this point, the defendant Colangelo had more than sufficient reason to question the plaintiff's veracity.  The plaintiff herself acknowledges, that her "stories were everywhere with everybody," even when under oath.  (Rule 56(a)1 Statement at ¶¶ 122-124.)

material omission in her May 11, 2017 written statement.  Further, it is not competent evidence, as it is not a statement given under oath.  (Exhibit U.) Rather, it a paragraph drafted by the plaintiff's lawyer.  Rule 56(a)1 Statement ¶ 99.)  As such, Detective Colangelo did not need to notify the reviewing prosecutor of same.

In sum, none of the false statements or omissions claimed by the plaintiff negate probable cause.  Application of the corrected affidavits doctrine to the instant matter supports a finding of probable cause for the plaintiff's arrest on the charge of false statement in the second degree.  Accordingly, the plaintiff's federal and state law claims for false arrest and for malicious prosecution against the defendants Adam Gommper and John Colangelo fail as a matter of law, entitling them to summary judgment in their favor.

       1.      Adam Gompper and John Colangelo Acted Without Malice

The plaintiff's malicious prosecution claim against the defendants, Adam Gompper and John Colangelo, must also be rejected because there is absolutely no evidence suggesting that either defendant acted with malice toward the plaintiff.

The Second Circuit defines malice as "wrong or improper motive, something other than a desire to see the ends of justice served."  Lowth v. Town of Cheektowaga, 82 F.3d 563, 573 (2d Cir. 1996); see also, Fulton v. Robinson, 289 F.3d 188,198 (2d Cir. 2002).  There exists no evidence in this case that would

permit a trier of fact to conclude that either defendant acted with malice in connection with investigating the plaintiff's complaint and/or applying for a warrant for her arrest.  In the absence of such evidence, the defendant officers are entitled to summary judgment as a matter of law.  See Khan v. Costco Wholesale, Inc., 2001 WL 1602168, *10 (S.D.N.Y. Dec. 13, 2001) (the existence of probable cause and the absence of malice warranted grant of summary judgment); Jenkins v. City of New York, 1992 WL 147647 7 (S.D.N.Y. June 15, 1992) ("Since under no view of [the] facts could probable cause be considered totally lacking, plaintiff still bears the burden of coming forward with some evidence of malice on the defendants' part in order to survive a motion for summary judgment.  This they have not done, and the malicious prosecution claims must be dismissed.").

> 2. The Underlying Criminal Proceeding Did Not Terminate In The Plaintiff's Favor

Plaintiff's malicious prosecution claim fails as matter of law on the additional basis that the underlying criminal charge against her did not terminate in her favor as the criminal proceeding did not end in a manner that affirmatively indicates innocence.  Rather, a *nolle prosequi* was entered in the plaintiff's criminal case when she met the State's Attorney's condition that she not have any new arrests.

The Second Circuit has held "that a plaintiff asserting a malicious prosecution claim under § 1983 must still show that the underlying criminal proceeding ended in a manner that affirmatively indicates innocence."  <u>Lanning v. Glens Falls</u>, 908 F.3d 19, 22 (2d Cir. 2018).  In so holding, the court clarified the favorable termination element of a § 1983 action as follows:

> We now clarify that federal law defines the elements of a § 1983 malicious prosecution claim, and that a State's tort law serves only as a source of persuasive authority rather than binding precedent in defining these elements.  Our prior decisions requiring affirmative indications of innocence to establish "favorable termination" therefore continue to govern § 1983 malicious prosecution claims . . . .

<u>Lanning v. Glens Falls</u>, 908 F.3d 25.  The <u>Lanning</u> court went on to state,

> In arriving at the conclusion that we are not bound to apply New York law in this case, we recall "the values and purposes of the [federal] constitutional right at issue." <u>Manuel</u>, 137 S.Ct. at 921. A § 1983 claim for malicious prosecution essentially alleges a violation of the plaintiff's right under the Fourth Amendment to be free from unreasonable seizure. <u>Swartz</u>, 704 F.3d at 112. "The touchstone of the Fourth Amendment is reasonableness," <u>Florida v. Jimeno</u>, 500 U.S. 248, 250, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991); <u>see</u> <u>United States v. Lambus</u>, 897 F.3d 368, 402 (2d Cir. 2018), which "is measured in objective terms by examining the totality of the circumstances," <u>Ohio v. Robinette</u>, 519 U.S. 33, 39, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996). When a person has been arrested and indicted, absent an affirmative indication that the person is innocent of the offense charged, the government's failure to proceed does not necessarily "impl[y] a lack of reasonable grounds for the prosecution." <u>Conway v. Village of Mount Kisco</u>, 750 F.2d 205, 215 (2d Cir. 1984).

**Lanning v. City of Glens Falls**, at 27.

In considering the defendants' motions for judgment on the pleadings, the **Lanning** court reviewed the plaintiff's allegations and concluded that he did not adequately plead that the termination of the prosecutions[2] against him affirmatively indicated his innocence.  Specifically, the plaintiff alleged with respect to one prosecution that the charges against him "were dismissed" at some point after a jury trial, without specifying on what grounds.  **Lanning**, at 27. The court observed, "[t]his vague allegation is consistent with dismissal on any number of procedural and jurisdictional grounds, all of which fail to affirmatively indicate innocence."  **Id.**  With respect to the plaintiff's claims related to a subsequent arrest, the court observed that "none of the reasons the Glens Falls City Court stated on the record for dismissing the charges arising from [plaintiff's] arrest indicate [plaintiff's] innocence.  To the contrary, the City Court stated . . . that the dismissal of those charges in the interest of justice was 'neither an acquittal of the charges nor any determination on the merits,' but rather 'le[ft] a question of guilt or innocence unanswered'."  **Id.**

---

[2] The plaintiff in **Lanning** appealed, **inter alia**, the district court's granting of the defendants' motion for judgment on the pleadings with respect to plaintiff's claims for malicious prosecution premised upon two separate arrests.  **Lanning**, at *1-3.

Based upon the foregoing, the <u>Lanning</u> court concluded that the plaintiff had not "plausibly alleged that any of the criminal proceedings against him were terminated in a manner indicating his innocence." <u>Lanning</u>, at 29.  In so holding, the court stated, "where a dismissal in the interest of justice 'leaves the question of guilt or innocence unanswered[,] . . . it cannot provide the favorable termination required as the basis for [that] claim.'" <u>Id.</u> (quoting <u>Hygh v. Jacobs</u>, 961 F.2d 359, 367-68 (2d Cir. 1992)).

As set forth above, the underlying prosecution of the plaintiff was terminated by means of a *nolle prosequi*.  (Rule 56(a)1 Statement ¶ 109.)  The plaintiff received a diversionary marking or continuance of the matter and when she did not have any new arrests, the prosecutor entered a *nolle*.  (<u>Id.</u> ¶ 110.) The termination of the proceeding does not affirmatively indicate the plaintiff's innocence—rather, it is indicated that the plaintiff met the prosecutor's condition of not having any new arrests for the entry of a nolle.  As such, following <u>Lanning</u>, as a matter of law, the dismissal of the plaintiff's underlying criminal matter cannot provide the favorable termination required as the basis for her malicious prosecution claim and the claim fails on this additional basis.

C.   THERE EXISTS NO GENUINE ISSUE OF MATERIAL FACT AND PLAINTIFF'S CLAIM FOR DENIAL OF HER RIGHT TO EQUAL PROTECTION FAILS AS A MATTER OF LAW.

Plaintiff's claim for denial of equal protection in Count Eighteen is based upon allegations of discriminatory denial of police protective services.  The

claim fails as a matter of law because there is a lack of any evidence to suggest that either of the defendant officers denied the plaintiff police services on the basis of any discriminatory animus towards her on account of her sex or any other improper basis.

"The state may not . . . selectively deny its protective services to certain disfavored minorities without violating the Equal Protection Clause." DeShaney v. Winnebago County Dept. of Soc. Servs., 489 U.S. 189, 197 n. 3 (1989). Plaintiffs pursuing denial of protective services claims "are not required to plead similarly situated comparators." White v. City of New York, 206 F.Supp.3d 920, 931 (S.D.N.Y. 2016) (citing Pyke v. Cuomo, 258 F.3d 107, 110 (2d Cir. 2001).

> But "[p]roof that discriminatory intent was a motivating factor is required to show a violation of the Equal Protection Clause," even in cases where comparators are not required. *Okin v. Village of Cornwall-On-Hudson Police Dept.*, 577 F.3d 415, 438 (2d Cir. 2009) (citing *Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265–66 (1977)). "*Any* equal protection claim is grounded on a comparison between the treatment the state gives similarly situated individuals." *Id.* at 439 (emphasis added). Where a plaintiff did not "attempt[ ] to show that she *and other women* were discriminated against by defendant police departments, ... at the very least she has to show that it was her gender, and not some other characteristic, that motivated the treatment she received." *Id.* (emphasis in original). In fact, "[s]howing that one officer or even the police department as a whole acted slowly in response to [a plaintiff's] complaints is not sufficient, in and of itself, to show discriminatory intent." *White*, 206 F. Supp.3d at 931–32 (internal quotation marks and alteration omitted). "Nor do [a plaintiff's] allegations

> that [defendant] officers deviated from ... guidelines by
> declining to take his complaint support an inference of
> discriminatory intent on their own." *Id.* at 931–32
> (dismissing claims against certain officers who were
> allegedly "not as responsive to White's concerns as he
> wishes they had been" where plaintiff "did not offer
> specific facts supporting an inference that those
> officers were motivated by discriminatory animus" and
> citing *Okin*, 577 F.3d at 438–39).

Golodner v. Martinez, No. 3:15-CV-1515 (MPS), 2017 WL 6540269, at *4 (D. Conn.

Dec. 21, 2017).

"[P]laintiffs may show discriminatory intent by pointing to animus on the

part of individual officers. . . . '[A] simple failure of diligence, perception, or

persistence in a single case involving minority victims,' on its own, will not

suffice.'" White v. City of New York, 206 F.Supp.3d 920, 931 (2016) (quoting

Carmichael v. City of New York, 34 F.Supp.3d 252, 262 n. 8 (E.D.N.Y. 2014).

In Goldner, the male plaintiff, Daniel Golodner, claimed that the defendant

Town of Groton police officers refused to investigate his complaints concerning

his ex-girlfriend, Baez Rivera, while thoroughly investigating her claims against

him.  Id. at *1.  Golodner alleged, inter alia, that his treatment by the defendant

officers was motivated by discriminatory animus based on gender in violation of

his Fourteenth Amendment right to equal protection.  Id.

In ruling on the defendants' motion for summary judgment, the Golodner

court reviewed the evidence in the record in the light most favorable to the

plaintiff and found no evidence to support a finding that any of the defendant

officers acted with discriminatory intent based upon gender.  Id. at *4.  With

regard to defendants Martinez and Kenyon, the court found that the evidence

suggested, at most, that Martinez and Kenyon refused to investigate the

plaintiff's complaints that Rivera was violating a protective order by making

false complaints to the police about him and that Kenyon laughed at and was

rude to the plaintiff while another officer, who was not a defendant, investigated

Rivera's complaints and identified the plaintiff as possible suspect in

vandalizing Rivera's car.  Id.  The court held,

> Although Golodner's criminal order of protection does
> state that Baez Rivera must not contact "others with
> whom the contact would be likely to cause annoyance
> or alarm to the protected person" . . . and although
> Golodner claims Baez Rivera's contact with the GTPD
> annoyed and alarmed him, declining to take a
> complaint is insufficient, on its own, to show the
> discriminatory intent necessary for an equal protection
> violation, and there are no facts suggesting that
> Kenyon's allegedly boorish conduct was based on
> Golodner's gender. . . . It is not an equal protection
> violation to fail to take allegations seriously, and there
> is no indication that Kenyon's alleged rudeness was
> gender-based.

Golodner, at *4.  The court found that not only did the plaintiff fail to present

other facts to support the conclusion that discriminatory intent motivated the

treatment that he received, but also,

> [T]he evidence [made] clear that the defendants treated
> Golodner differently from Baez Rivera because, while
> she showed the police evidence that her car had been
> vandalized and identified him as a possible suspect, he

provided them (1) no evidence that a crime had been committed, (2) no evidence the complaints she made against him were false, (3) and no evidence that she had violated the protective order, under a reasonable interpretation of its terms.  *In other words, the undisputed facts show[ed] that the defendants treated Golodner's and Baez Rivera's complaints differently based on the content of those complaints and the supporting facts, not on the gender of complainant.*

Id. at *5 (emphasis added).

In contrast, in Grenier v. Stratton, 44 F.Supp.3d 197 (D.Conn. 2014), the court found genuine issues of material fact precluded summary judgment in favor of a defendant police officer and dispatcher on plaintiffs' equal protection claim based upon police failure to protect the decedent victim and her children from domestic violence by her husband, because of her race.  The decedent victim was shot to death by her husband before he turned the gun on himself to commit suicide.  Grenier, 44 F.Supp.3d 199.  The decedent's estate and representatives of her two children brought action against the defendants for, inter alia, violation of equal protection and bystander emotional distress related to the West Haven police department's response to the decedent's and work colleague of her husband's 911 calls.  Id.  The court found, viewing the facts in a light most favorable to the plaintiffs, both the dispatcher and officer communicated in explicit terms about the perceived race, ethnicity, and national origin of the plaintiffs' decedent in terms that a reasonable jury could find were derogatory, Grenier, 44 F.Supp.3d 197.

Specifically, the record facts indicated that the decedent was a Turkish women with limited English skills, that the dispatcher had difficulty understanding her and spoke to her in a derisive manner, and that the dispatcher and officer engaged in a communication on the department's CAD system concerning whether the decedent was Spanish or Turkish that could be construed as racist. Id. at 201, 206. In this regard, the officer advised the dispatcher that the decedent was "Turkish not Spanish, LOL" to which the dispatcher responded, "r u sure?" Id. at 201. The officer replied, "yes been there sooo many times already." Id. The dispatcher asked, "so how is your Turkish? to which the dispatcher replied, "sucks by [sic] I get by, LOL." Id.

The court held that a reasonable jury might well conclude that the defendants' race-related comments were indicative of a dehumanizing attitude toward persons of the decedent's ethnicity and that this attitude prompted the defendant officer "to give short-shift to his duty to locate [the assailant husband] immediately . . . ." Grenier, at 205.

The instant matter is akin to Golodner rather than Grenier. The undisputed facts show that ultimately the defendants did not pursue the plaintiff's criminal complaint directed toward Calvin Nodine based upon their conclusion that there was a lack of probable cause and that the plaintiff was not a credible witness, rather than on the basis of the plaintiff's gender. Moreover, the investigation of the plaintiff's complaint led the defendant officers to the

conclusion that they had probable cause to seek a warrant for her arrest for making a false statement, in violation of General Statutes § 53a-157b.

There is no evidence in the record from which a reasonable jury might conclude that the defendants were motivated by a negative attitude or bias towards women and that this attitude or bias effected the outcome of their investigation.  Rather, the facts show that the plaintiff' complaint was treated appropriately by the officers based upon evidence developed in their investigation.

Specifically, with regard to Adam Gompper's treatment of the plaintiff, during his thirty minute meeting with her in the lobby, he asked her if she wanted to file a complaint and told her that he had "no problem" investigating the case.  (Defs.' <u>Exhibit E</u>.)  Several times during the meeting, he told her that she could come back later to file a complaint.  (<u>Id.</u>)  He demonstrated a level of caring for the plaintiff, telling her that he believed her and understood the difficult position that she was in.  (<u>Id.</u>)  He offered advice and potential solutions for how to deal with Nodine upon her return to work since she did not wish at that time to make a complaint.  (<u>Id.</u>)  He explained the process of an investigation and provided the plaintiff with an "Office of Victim Services" ("OVS") card.  (<u>Id.</u>)  At no time did he accuse the plaintiff or blame her.

The plaintiff, herself, acknowledges that Gompper acted as she would expect any officer in the situation to act and that he was sensitive to what she

was communicating to him.  (Rule 56(a)1 Statement ¶ 34.)  The only issue she

has with Officer's Gompper's conduct is that she believes that he should have

not spoken to her and the lobby in the presence of her mother.  (<u>Id.</u> ¶ 36.)

Otherwise, she feels that Gompper "did an okay job."  (<u>Id.</u> at ¶ 34.)  Both the

plaintiff and Gompper construed her complaint to concern work-place sexual

harassment and not sexual assault.  (<u>Id.</u> at ¶¶ 37-38.)

Detective Colangelo's treatment of the plaintiff on June 21, 2017 and

thereafter, was, likewise, at all times professional and lacking in any indication

of discriminatory intent or motivation based upon her gender.  He explained to

the plaintiff that investigations take time and that he had to look to see if there

was probable cause to apply for a warrant for Calvin Nodine's arrest.  (<u>Exhibit</u>

<u>O.</u>)  He was sensitive to the plaintiff once she disclosed to him "the one part

[she] didn't want people to know" and continued to ask her questions to

determine if there was probable cause for Nodine's arrest and attempted to have

her draw a picture of the inside of the building where the incident occurred that

would assist in recounting events.  (<u>Exhibit O.</u>)  When she became frustrated, he

told her that just because her story had changed didn't mean he wasn't listening

to her, encouraging her to continue in her recounting of events so he could

make a probable cause determination as to Nodine's conduct.  Detective

Colangelo advised the plaintiff that by providing a written statement under oath

that was not truthful she had committed a crime.  (<u>Id.</u>)  At the conclusion of the

interview, he showed concern for the plaintiff's wellbeing, asking her if she was thinking of hurting herself to which she responded, no, and confirming that she had a support system of friends and family.  (Id.)

Accordingly, as there is no evidence that discriminatory intent motivated either of the defendant officer's actions, they are both entitled to summary judgment in their favor as to the plaintiff's claim for denial of equal protection.

### D.   THE DEFENDANTS ARE OTHERWISE ENTITLED TO QUALIFIED IMMUNITY WITH REGARD TO THE PLAINTIFF'S CONSTITUTIONAL CLAIMS.

In the alternative, even if this Court finds that disputed factual issues remain on the plaintiff's Constitutional claims, the defendant officers are entitled to summary judgment in their favor because the doctrine of qualified immunity bars these claims.  Specifically, the defendant officers had, at a minimum, arguable probable cause to seek a warrant for the plaintiff's arrest.  Further, it is was reasonable for them to believe that probable cause did not exist to seek a warrant for Calvin Nodine's arrest and that their actions did not violate plaintiff's right to equal protection.

 "The essential inquiry in determining whether qualified immunity is available to an officer accused of false arrest is whether it was objectively reasonable for the officer to conclude that probable cause existed."  Jenkins v. City of New York, 478 F.3d 76, 87 (2d Cir. 2007) (citing Anderson v. Creighton, 483 U.S. 635, 644, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)).

> "Arguable probable cause exists if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met." *Id.,* quoting *Escalera v. Lunn,* 361 F.3d 737, 743 (2d Cir.2004). "In deciding whether an officer's conduct was objectively reasonable ..., we look to the information possessed by the officer at the time of the arrest, but we do not consider the subjective intent, motives, or beliefs of the officer." *Amore v. Novarro,* 624 F.3d 522, 536 (2d Cir.2010) (internal quotation marks omitted).

<u>Garcia v. Does</u>, 779 F.3d 84, 92 (2d Cir. 2015).

Here, it was objectively reasonable for the defendant officers to believe that probable cause existed for the plaintiff's arrest on the charge of making a false statement in the second degree.  The plaintiff acknowledged that she provided a false written statement to Adam Gompper, by omitting from the statement the fact that she performed oral sex on Calvin Nodine, and that she knew by omitting this fact her statement was untrue.  She provided the written statement under oath.  Omission of the completed oral sex act was a material omission in that it completely altered the nature of the plaintiff's complaint.  The plaintiff made many statements to the officers that suggested that she had motivation to be untruthful and to mislead them in their investigation for financial gain (i.e. "I am going up against a millionaire," "I want him to give me his restaurant so I can run it right and for him to be gone and [for it] to not have the name Nodine's," "[He] shot down everybody's ideas . . .[s]o we kind of

stopped caring . . . [I] didn't feel that he was doing what he needed to with his company," "all [the Nodine's employees] collected unemployment because of this situation," "because this happened to a co-worker . .. they all got to collect," "[If I give a supplemental statement] that screws up my civil case right.", see Exhibits E and O).  Moreover, plaintiff's "revised statement" or supplemental information drafted by her lawyer and emailed to Detective Colangelo did not in any way alter the probable cause analysis, as previously set forth above.

With regard to plaintiff's equal protection claim, it was not and is not clearly established that because an individual makes a complaint of workplace sexual harassment and a later claim of unwanted sexual contact, that the individual cannot be arrested and prosecuted for making a false statement to law enforcement officers upon a finding of probable cause.

Accordingly, the defendants are entitled to summary judgment in their favor as to Counts Fourteen and Sixteen.

E.    THE COURT SHOULD DECLINE TO EXERCISE JURISDICTION OVER THE STATE LAW CLAIMS.

The plaintiff's states law claims for false arrest and malicious prosecution fail for all the reasons set forth above.  In addition and in the alternative, should this Court grant summary judgment in the defendants' favor on any of the above grounds as to plaintiff's federal claims, it should decline to exercise jurisdiction over the pendant state law claims, including the plaintiff's claim for intentional

infliction of emotional distress.  See United Mine Workers of America v. Gibbs, 383 U.S. 715, 726 (1966) ("[I]f the federal claims are dismissed before trial, even though not insubstantial in the jurisdictional sense, the state claims should be dismissed as well."); First Capital Asset Mgmt., Inc., 385 F.3d 159, 183 (2d Cir. 2004) (same); Travelers Ins. Co. v. Keeling, 996 F.2d 1485, 1490 (2d Cir. 1993) ("in the usual case in which all federal-law claims are eliminated before trial, th[e] balance of factors to be considered . . . will point toward declining to exercise jurisdiction over the remaining state-law claims") (quoting Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 n. 7 (1988)).

**F. PLAINTIFF'S CLAIMS FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS FAIL AS A MATTER OF LAW.**

In order to prevail on a cause of action for intentional infliction of emotional distress, the plaintiff must establish four elements: "(1) that the actor intended to inflict emotional distress; or that he knew or should have known that the emotional distress was a likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe."  Petyan v. Ellis, 200 Conn. 243, 253 (1986).

The defendants deny that there exists a genuine issue of material fact as to any of the elements of the claim but focus on the second element.

"The standard in Connecticut to demonstrate extreme and outrageous

conduct is stringent."  Huff v. West Haven Bd. of Educ., 10 F.Supp.2d 117, 122

(D. Conn. 1998).  The conduct must be "especially calculated to cause, and does

cause, mental distress of a very serious kind."  DeLaurentis v. New Haven, 220

Conn. 225, 267 (1991); W. Prosser and W. Keeton, Torts, § 12, p. 64 (5th Ed.

1984).  Whether the defendants' actions rise to the level of extreme and

outrageous conduct is a question of law for the Court, and only where

reasonable minds can differ does it become a matter for the jury. See Mellaly v.

Eastman Kodak Company, 42 Conn.Supp. 17, 18 (1991).

      "In a case involving a public official enforcing the law, public policy

dictates that a valid arrest should not be the basis for intentional infliction of

emotional distress against the official."  Brooks v. Sweeney, 2008 WL 5481203,

at 4 (Nov. 28, 2008).  Put another way, "[a]s a matter of law—absent other factors

that may constitute 'extreme and outrageous' conduct—an arrest will not be

considered intentional infliction of emotional distress if the arresting officer has

probable cause to make the arrest."  Zalaski v. City of Hartford, 704 F.Supp.2d

159, 176-77 (D. Conn. 2010).

      For all the reasons set forth above, the defendant officers had probable

cause to seek a warrant for the plaintiff's arrest and, thus, same may not be the

basis for her claim for emotional distress.

      Further, the record evidence establishes, contrary to the plaintiff's

assertions within her Second Amended Complaint, that the defendants took her

36

complaint seriously with defendant Adam Gompper repeatedly telling her that he would investigate her complaint if she decided to make one (see Defs.' Exhibit E) and Detective Colangelo informing her that the CPD took her complaint "very seriously" (see Defs.' Exhibit O).  When the plaintiff presented to the CPD on June 21, 2017, the defendants did not consider her to be a suspect and did not know what she was going to tell them.  The competent record evidence establishes that the defendants investigated the plaintiff's complaint and found that she made a material omission from her May 11, 2017 written statement that not only provided probable cause for her arrest on the charge of false statement in the second degree, but also changed the nature of her complaint and damaged her credibility such that criminal charges could not be pursued for Calvin Nodine.  In short, there exists not genuine issue of material fact that the plaintiff was not denied police protective services based upon her gender and such a claim may not serve as the foundation for her claim of intentional infliction of emotional distress.

With regard to the claim directed toward the Town, Connecticut municipalities cannot be held liable for intentional torts.  Pane v. City of Danbury, 267 Conn. 669 (2004)(claim for intentional infliction of emotional distress barred by General Statutes § 52-557n(a)(2).

Accordingly, there exists no genuine issue of material fact and the defendants are entitled to summary judgment in their favor as to plaintiff's claim

for intentional infliction of emotional distress set forth in Count Nineteen.

G.   PLAINTIFF'S CLAIM PURSUANT TO GENERAL STATUTES § 7-465 FAILS AS A MATTER OF LAW.

"Conn Gen. Stat. § 7-465 provides that a municipality shall indemnify its employees acting within the scope of their employment for all infringement of civil rights for damage to person or property . . . ." Ramos v. Town of E. Hartford, No. 3:16-CV-166 (VLB), 2019 WL 2785594, at *25 (D. Conn. July 2, 2019). While § 7-465 provides an indemnity to a municipal employee from his municipal employer in the event the former suffers a judgment . . . it is quite clear that the municipality does not assume the liability in the first instance." Kaye v. Manchester, 20 Conn.App. 439, 443-444 (1990) (citations omitted). "The municipality's liability is derivative." Id. at 444 (citations omitted).

As the defendant officers are not liable for any infringement of the plaintiff's civil rights as set forth above, there exists not genuine issue of material fact and the plaintiff's derivative claim for indemnification set forth in Count Twenty fails as a matter of law.

III.   CONCLUSION

WHEREFORE, for all of the foregoing reasons, the defendants request that the Court grant them summary judgment on all claims set forth in the plaintiff's Complaint directed toward them.  In the alternative, the defendants request that the Court review each of the plaintiff's claims individually and grant

partial summary judgment as to those claims it finds the defendants are entitled

to judgment as a matter of law.


                                     **DEFENDANTS,**
                                     **TOWN OF CANTON, JOHN**
                                     **COLANGELO AND ADAM GOMPPER**


                                   **By /s/ Kristan M. Maccini**
                                          Kristan M. Maccini
                                          ct25121
                                          Howd & Ludorf, LLC
                                          65 Wethersfield Avenue
                                          Hartford, CT  06114-1190
                                          (860) 249-1361
                                          (860) 249-7665 fax
                                          kmaccini@hl-law.com

## CERTIFICATION

      This is to certify that on OCTOBER 1, 2019, a copy of the foregoing **MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.

Lewis H. Chimes, Esq.
Mary-Kate Smith, Esq.
Law Office of Lewis Chimes, LLC
45 Franklin Street
Stamford, CT  06901

David A. Moraghan, Esq.
Smith, Keefe, Moraghan & Waterfall, LLC
32 City Hall Avenue, # C
Torrington, CT  06790

Elizabeth K. Acee, Esq.
Barclay Damon
545 Long Wharf Drive, 9th Floor
New Haven, CT  06511

/s/ Kristan M. Maccini
Kristan M. Maccini