UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **NICOLE CHASE** | : | **NO.: 3:18-cv-00683 (VLB)** |
| | : | |
| **v.** | : | |
| | : | |
| **NODINE'S SMOKEHOUSE, INC., CALVIN** | : | |
| **NODINE, TOWN OF CANTON, JOHN** | : | |
| **COLANGELO, ADAM GOMPPER, MARK J.** | : | |
| **PENNEY AND CHRISTOPHER ARCIERO** | : | **OCTOBER 1, 2019** |

## DEFENDANTS' LOCAL RULE 56(a)1 STATEMENT

1.    At all times mentioned herein, Adam Gompper was a Police Officer with the Canton Police Department, Town of Canton, Connecticut, assigned to the patrol division.  (Gompper Aff. ¶ 4, attached as **Exhibit A**.)

2.    At all times mentioned herein, John Colangelo was a Police Officer with the Canton Police Department, Town of Canton, Connecticut, assigned to the detective division.  (Colangelo Aff. ¶ 4, attached as **Exhibit B**.)

3.    On May 7, 2017, Officer Adam Gompper was dispatched to the lobby of the police department on a report of someone being sexually harassed at their place of employment.  (Gompper Aff. ¶ 5, attached as **Exhibit A**.)

4.    On that date, Nicole Chase walked into the Canton Police Department ("CPD") and told the dispatcher on duty, David Canny, that she wished to file a sexual harassment complaint against her boss.  (David Canny Depo. Trans., Nov. 29, 2018, T11:21-13:12, T15:15-16, attached as **Exhibit C**; CPD CAD Report dated May 7, 2017, attached as **Exhibit D**.)

5.    David Canny then dispatched Officer Adam Gompper to the lobby of the CPD.  Once Gompper reported to the lobby, Canny told him that Nicole Chase wanted to talk to an officer about sexual harassment.  (David Canny Depo. Trans., Nov. 29, 2018, T20:17-21:2, attached as **Exhibit C**.)

6.   Upon his arrival to the lobby, Officer Gompper met with Nicole Chase who
     was accompanied by her mother.  Chase reported that she worked at
     Nodine's Smokehouse restaurant, located at 192 Albany Turnpike in
     Canton, Connecticut, along with her mother.  She described to Gompper
     that she was being sexually harassed by the owner, Calvin Nodine.
     (Adam Gompper Aff. ¶ 6, attached as <u>Exhibit A</u>; Front Lobby Videotape,
     attached as <u>Exhibit E</u>.)

7.   Nicole Chase stated that Nodine has a drinking problem and had caused
     another worker (Jeremy Archer) to quit.  She stated she came in for her
     shift on May 6, 2017, and after being there for about ten minutes, Nodine
     asked her, "Did you get laid last night?"  Nodine was intoxicated and
     walked away after asking the question.  (Adam Gompper Aff. ¶¶ 7-8,
     attached as <u>Exhibit A</u>; Front Lobby Videotape, attached as <u>Exhibit E</u>.)

8.   Officer Gompper asked Nicole Chase how she knew Calvin Nodine was
     intoxicated, to which she responded that usually, in the morning, he has a
     few drinks.  Chase stated that Nodine keeps beer in a cooler in the back
     and serves customers alcohol.  (Adam Gompper Aff. ¶ 8, attached as
     <u>Exhibit A</u>; Front Lobby Videotape, attached as <u>Exhibit E</u>.)

9.   Nicole Chase stated that there was an employee who takes acid while
     working and was told by Calvin Nodine that he was no longer working
     there.  The employee then came into the restaurant and spoke about
     taking more acid.  (Adam Gompper Aff. ¶ 9, attached as <u>Exhibit A</u>; Front
     Lobby Videotape, attached as <u>Exhibit E</u>.)

10.  Nicole Chase stated that Calvin Nodine then said he did not want his girls
     to be scared and told the employee to leave.  Nodine proceeded to keep
     making statements about not wanting his girls to be scared and gave
     Chase a hug saying that she and her mother were his best employees.
     (Adam Gompper Aff. ¶ 10, attached as <u>Exhibit A</u>; Front Lobby Videotape,
     attached as <u>Exhibit E</u>.)

11.  Nicole Chase stated that she hugged Calvin Nodine back because she
     was so emotionally upset about everything going on at the workplace.
     Chase stated she felt that Nodine genuinely cared but that this exchange
     led up to an incident that occurred later on that night.  (Adam Gompper

Aff. ¶ 10, attached as <u>Exhibit A</u>; Front Lobby Videotape, attached as <u>Exhibit E</u>.)

12.    Officer Gompper then asked Nicole Chase what happened later that night and she said that she closed out the front cash register located at the front of the business.  Calvin Nodine then told two employees that they were closed for the night and they could leave.  (Adam Gompper Aff. ¶ 11, attached as <u>Exhibit A</u>; Front Lobby Videotape, attached as <u>Exhibit E</u>.)

13.    Officer Gompper asked if this was normal behavior to which Nicole Chase responded that it was normal behavior but she felt that Calvin Nodine was more dismissive than usual and wanted the employees to leave faster. (<u>Id.</u>)

14.    Nicole Chase stated to Officer Gompper that as she was walking towards the back of the business to leave for the night she saw Nodine standing near the bathroom/kitchen doors with his arms open saying, "We're going to make it through this, we're going to make this company better" while he was giving Chase a hug.  While this was happening a dishwasher, Kyle, came around the corner from the kitchen.  (Adam Gompper Aff. ¶ 12, attached as <u>Exhibit A</u>; Front Lobby Videotape, attached as <u>Exhibit E</u>.)

15.    Nicole Chase went on to state that Calvin Nodine must have already had his "stuff" out and she had no idea because it was dark and the lights were out.  Nodine then grabbed her and pulled her into the bathroom closing the door behind them.  (Adam Gompper Aff. ¶ 13, attached as <u>Exhibit A</u>; Front Lobby Videotape, attached as <u>Exhibit E</u>.)

16.    Nicole Chase stated that Kyle then said, "Uh, Calvin are you in the bathroom?  Goodnight."  Chase stated she wanted to say something but she froze.  (Adam Gompper Aff. ¶ 14, attached as <u>Exhibit A</u>; Front Lobby Videotape, attached as <u>Exhibit E</u>.)

17.    Nicole Chase stated that everything happened so quickly.  She looked down and Calvin Nodine said, "I know you must not get it at home so suck it," or something to that effect.  (Adam Gompper Aff. ¶ 15, attached as <u>Exhibit A</u>; Front Lobby Videotape, attached as <u>Exhibit E</u>.)

18.     Nicole Chase stated that she had no proof of what happened and knows that Calvin Nodine is a rich man.  She pushed past Nodine and he fell into a wall and hit his head.  Chase stated that he (Nodine) may have an injury to the right side of his head.  (Adam Gompper Aff. ¶ 16, attached as <u>Exhibit A</u>; Front Lobby Videotape, attached as <u>Exhibit E</u>.)

19.     Nicole Chase again stated that she froze but told Calvin Nodine that he needed to take his cash from the last few days of business and directed him toward the nightly deposit bags.  She then left for the night.  (Adam Gompper Aff. ¶ 17, attached as <u>Exhibit A</u>; Front Lobby Videotape, attached as <u>Exhibit E</u>.)

20.     Nicole Chase stated that she then spent two hours thinking about what she should do about this and that she had a five-year-old daughter and could not lose her job.  She stated that she was just getting by.  (Adam Gompper Aff. ¶ 18, attached as <u>Exhibit A</u>; Front Lobby Videotape, attached as <u>Exhibit E</u>.)

21.     Nicole Chase stated that she next texted Nodine's stepson (Jeremy Archer) and told him what happened.  (<u>Id.</u>)

22.     Officer Gompper asked Nicole Chase what was exposed and she responded that Nodine was wearing a long thick flannel shirt and she did not initially notice anything.  She stated that when they were in the bathroom there was no time for him to take his "stuff" out.  In the bathroom, his pants were open and she was able to see that his underwear was pulled down and could see his "balls" and penis.  (Adam Gompper Aff. ¶ 19, attached as <u>Exhibit A</u>; Front Lobby Videotape, attached as <u>Exhibit E</u>.)

23.     Officer Gompper asked Nicole Chase if Calvin Nodine had an erection to which she responded yes, Nodine was erect and told her that he was getting hard.  Gompper then asked if she could feel his genitals against her when they were hugging to which she said, no. (Adam Gompper Aff. ¶ 20, attached as <u>Exhibit A</u>; Front Lobby Videotape, attached as <u>Exhibit E</u>.)

24.     Officer Gompper next explained to Nicole Chase that if she wanted to make a complaint, he would take a written statement from her and would need to speak to the witness, Kyle.  Chase then said that Kyle did not

witness much, that he just said bye Calvin.  (Adam Gompper Aff. ¶ 21, attached as <u>Exhibit A</u>; Front Lobby Videotape, attached as <u>Exhibit E</u>.)

25.  Nicole Chase then made the comment that she is going up against a millionaire to which Officer Gompper responded, "that doesn't give him the right to do anything."  (Adam Gompper Aff. ¶ 22, attached as <u>Exhibit A</u>; Front Lobby Videotape, attached as <u>Exhibit E</u>.)

26.  Officer Gompper told Nicole Chase if she wanted to pursue charges he would investigate it and would need to speak with Calvin Nodine about the incident.  He explained that if probable cause was developed, he would forward a warrant to the court for review.  (Adam Gompper Aff. ¶ 23, attached as <u>Exhibit A</u>; Front Lobby Videotape, attached as <u>Exhibit E</u>.)

27.  Officer Gompper then asked Nicole Chase if she felt she was dragged into the bathroom as if she was being kidnapped.  She responded, no, that she felt that Nodine was nervous.  (Adam Gompper Aff. ¶ 24, attached as <u>Exhibit A</u>; Front Lobby Videotape, attached as <u>Exhibit E</u>.)

28.  Nicole Chase then went on to express she was not sure she wanted to make a formal complaint and wanted to go into work and see if Calvin Nodine recalled anything.  She said she was very concerned about money and her living situation.  (Adam Gompper Aff. ¶ 25, attached as <u>Exhibit A</u>; Front Lobby Videotape, attached as <u>Exhibit E</u>.)

29.  Officer Gompper again told her if she wanted to pursue a complaint he would do a complete investigation.  (Adam Gompper Aff. ¶ 26, attached as <u>Exhibit A</u>; Front Lobby Videotape, attached as <u>Exhibit E</u>)

30.  Officer Gompper provided Nicole Chase with a yellow Office of Victim Services card and explained that there were phone numbers on it with which she could reach out to counselors if need be.  He also explained that if she was in fear for her safety, or another incident occurred, to immediately call 911 or report the incident to the police department.  (<u>Id.</u>)

31.  Officer Gompper repeatedly advised Nicole Chase if she wanted to pursue a complaint about the incident she could come back to the department and speak to him about it.  Chase and her mother then left the lobby of the

police department.  (Adam Gompper Aff. ¶¶ 27-28, attached as <u>Exhibit A</u>; Front Lobby Videotape, attached as <u>Exhibit E</u>.)

32.  Based upon the fact that Nicole Chase did not want to pursue a criminal complaint or provide a written statement about the incident, Adam Gompper did not start an investigation at that time.  (Adam Gompper Aff. ¶ 29.)

33.  On May 7, 2017, Nicole Chase did not report to Adam Gompper any sexual contact between herself and Calvin Nodine.  (Nicole Chase Depo. Trans., April 15, 2019, Session I, T58:14-59:6, attached as <u>Exhibit F</u>.)

34.  Other than the fact that Adam Gompper did not interview her without her mother present, Nicole Chase found him to be professional in his interaction with her and would say "he did an okay job"—he did what she would think an officer would do in the situation.  (Nicole Chase Depo. Trans., April 15, 2019, Session I, T63:22-64:14, attached as <u>Exhibit F</u>.)

35.  Nicole Chase also found Adam Gompper to appear sensitive to what she told him.  (Nicole Chase Depo. Trans., April 15, 2019, Session I, T64:15-20, attached as <u>Exhibit F</u>.)

36.  The only thing Nicole Chase can point to that she feels Adam Gompper should have done differently was to have asked her if she felt comfortable speaking in the lobby area with her mother present.  (Nicole Chase Depo. Trans., April 15, 2019, Session I, T64:15-65:2, attached as <u>Exhibit F</u>.)

37.  When Nicole Chase went to the CPD, on May 7, 2017, she went to the department to report workplace sexual harassment.  (Nicole Chase Depo. Trans., April 15, 2019, Session I, T110:16-111:8, T117:4-12, T128:2-129:1, attached as <u>Exhibit F</u>.)

38.  Adam Gompper understood the plaintiff to be seeking advice about workplace sexual harassment.  (Adam Gompper Depo. Trans., Dec. 20, 2018, Session I, T26:9-27:12, T97:6-13; attached as <u>Exhibit G</u>.)

39.  Nicole Chase's next contact with anyone with the CPD was on Monday or Tuesday following the incident (May 8, 2017 or May 9, 2017).  She went to the police station to complain about incidents that occurred at work on

Sunday, May 7, 2017.  She spoke to Sergeant Mark Penney because Adam Gompper was not working.  (Nicole Chase Depo. Trans., April 15, 2019, Session I, T65:22-68:1, T69:14-17, attached as <u>Exhibit F</u>; Mark Penney Depo. Trans., Nov. 29, 2018, T48:20-49:23, attached as <u>Exhibit H</u>.)

40.     Nicole Chase does not recall what specifically she told Sergeant Penney but knows she did not tell him that she had performed oral sex on Calvin Nodine on May 6, 2017.  Sergeant Penney told her to return to speak with Adam Gompper the next time he was on duty.  (Nicole Chase Depo. Trans., April 15, 2019, Session I, T65:22-68:1, T69:14-17, attached as <u>Exhibit F</u>.)

41.     Mark Penney recalls of the conversation that Nicole Chase was looking for advice concerning whether or not to report to work—what she should do in the context of her employment.  Penney told her that this was not something the CPD could handle and suggested that she speak to an employment attorney.  Chase was asking him "employment type questions" that he couldn't answer.  (Mark Penney Depo. Trans., Nov. 29, 2018, T48:20-49:23, T51:9-17, attached as <u>Exhibit H</u>.)

42.     Between May 7, 2017 and May 11, 2017, Nicole Chase changed her mind and decided she wanted to make a formal complaint with the CPD about Calvin Nodine's conduct.  (Nicole Chase Depo. Trans., April 15, 2019, Session I, T70:21-71:5, attached as <u>Exhibit F</u>.)

43.     Nicole Chase's next contact with the CPD was on Thursday, May 11, 2017, when she went to the department to make a formal complaint about Calvin Nodine's conduct and to provide Adam Gompper with a written statement.  (Nicole Chase Depo. Trans., April 15, 2019, Session I, T69:18-71:5, attached as <u>Exhibit F</u>.)

44.     Nicole Chase's friend, Alexandria Archer, went with her to the police station to provide her with morale support.  (Alexandria Archer Depo. Trans., May 16, 2019, T28:9-11, T30:5-18, attached as <u>Exhibit I</u>.)

45.     Nicole Chase advised Adam Gompper that she wished to pursue criminal charges against Calvin Nodine for exposing himself to her and that he had also grabbed her butt earlier in the day.  (Adam Gompper Aff. ¶ 34, attached as <u>Exhibit A</u>.)

46.    The written statement Nicole Chase provided is as follows:

I was standing at the pizza counter while Allie, (Alexandria), was making us a BLT sandwich at the sandwich counter, talking about what had happened about the employee being fired. Calvin came behind the counter and came up behind me. As he did this he put his arm across my back and put his hand on my shoulder. I don't recall exactly what he was saying but it was a joke or a story he was trying to tell about something that happened with a girl.

As he was telling me the story/joke he would move his hand lower and lower each time with each part of the story he'd tell. Each time he'd pulled [sic.] me into his body he squeezed my arm and back with his hand. As he finished the story he placed his hand on my butt cheek grabbing it. Calvin had his hand on my butt for less than thirty seconds. He then chuckled and walked away.

Sometime later on in the day, Calvin's wife gave me an air cast, because of an injury that I've had for some time, to help me with the pain. Someone asked me what happened and Calvin made the comment that I had my legs behind my back too much. Also during the day Calvin made a comment that blondes are like butter, they're easy to spread. Calvin makes this same statement on a daily basis. I am the only blonde that works there.

Throughout the day I saw Calvin drinking alcohol with his wife. Throughout the day I could tell Calvin was intoxicated. By the end of the day he wasn't able to walk straight.

Saturday night around 8:45 p.m., (we close at 9:00 p.m.), Calvin said to Allie and Kyle to clock out your [sic.] good. Calvin told me to close out the cash

register for the evening because I knew how to do it.  I finished closing out the cash drawer and shut off the lights to the front of the business.  I then walked to the back of the business and turned the corner.  I then saw Calvin standing there.  Most of the lights were off so it was very dimly lit.

Calvin was standing there with his arms out.  I knew he wanted a hug, (which I assumed was like the one he gave me earlier).  I kind of walked into him as I turned the corner and he hugged me.  I describe the hug as very emotional.  Calvin said to me, "We're going to get through this.  We're going to make the company better."  As he hugged me he was asking if I had any thoughts or questions.  I told him no, I hope everything gets better.  He then said to me is there anything you want to do.  I told him no.

At this point Kyle came back into the building through the kitchen.  Kyle yelled Calvin.  That's when Calvin grabbed my hand/arm and pulled me into the mens bathroom.  Calvin locked the bathroom door and held his finger up to his mouth as to tell me to be quiet.  At this point I froze not knowing what to do.

I heard Kyle again ask Calvin if he was in the bathroom and calling my name.  Calvin then very abruptly and shortly answered Kyle saying, "Yup, have a good night."  I then looked down and saw that Calvin had fully exposed himself to me.  I was able to see Calvin's penis, testicles, pubic hair and he had his boxers pulled completely below his genitals.  I saw that the boxers were a dark blue color.  When he did this I could smell the odor of sweat and semen.

At this time I saw that his penis was erect.  I did not feel it initially when he was hugging me but assumed that he already had it out because there was no time

9

> from when he hugged me to pulling me into the
> bathroom he could have taken it out.
>
> Calvin then said to me, "Suck it cause I don't know you
> get it at home [sic.]."  As he was saying this he
> grabbed his testicles and penis and lifted it up towards
> me.  I then pushed Calvin and he stumbled in [sic.] the
> wall as he struck his head.  I then unlocked the door
> and walked out.
>
> I saw that the money bags were left on the counter and
> said to Calvin don't forget your money bags and
> walked out of the building.

**(Nicole Chase Written Statement, May 11, 2017, attached as <u>Exhibit J</u>.)**

47.  **Nicole Chase verbally provided the statement as Adam Gompper typed it on a computer.  When she was finished giving her statement, he asked her to read over what he had typed out so that he could correct anything if she found an error or mistake.  Chase does not recall whether or not Gompper swore her to an oath before she signed her written statement. (Nicole Chase Depo. Trans., April 15, 2019, Session I, T71:9-72:25, T73:1-5, T139:2-14, attached as <u>Exhibit F</u>.)**

48.  **Alexandria Archer also provided a written statement to Gompper.  Archer states that she witnessed Nodine move his hand down the plaintiff's back as he told a joke and move his hand down "step by step" until his hand was on plaintiff's butt.  (Alexandria Archer Depo. Trans., May 16, 2019, T35:12-42:4, attached as <u>Exhibit I</u>; Alexandria Archer Written Statement, May 11, 2017, attached as <u>Exhibit K</u>.)**

49.  **Alexandria Archer also does not recall whether Adam Gompper swore her to an oath but agrees that when she signed the statement she attested that she had read it, that it was true to the best of her knowledge and belief, and there is nothing in her statement that she believes to be incorrect.  (Alexandria Archer Depo. Trans., May 16, 2019, T39:1-42:3, attached as <u>Exhibit I</u>; Alexandria Archer Written Statement, May 11, 2017, attached as <u>Exhibit K</u>.)**

50.     Adam Gompper administered an oath to both Nicole Chase and
        Alexandria Archer before each of them signed their written statements
        and each of them at that time swore to the truth of the statement. (Adam
        Gompper Aff. ¶ 37, attached as <u>Exhibit A</u>.)

51.     Alexandria Archer gave her statement first, in the front interview room,
        and then stayed in the room while Nicole Chase gave her statement.
        Adam Gompper asked Chase if she wanted Archer to stay in the room and
        Archer believes Chase responded in the affirmative otherwise she would
        not have stayed.  Chase wanted Archer to stay with her and was
        comfortable discussing the matter with Gompper while Archer was
        present.  (Alexandria Archer Depo. Trans., May 16, 2019, T40:11-20, T68:7-
        19, attached as <u>Exhibit I</u>; Adam Gompper Depo. Trans., Dec. 20, 2018,
        Session I, T133:18-22, attached as <u>Exhibit G</u>.)

52.     The next day, on May 12, 2017, Kyle Rouleau, another Nodine's employee,
        came to the police department to speak with Gompper about the incident.
        (Adam Gompper Aff. ¶ 39, attached as <u>Exhibit A</u>; Kyle Rouleau Depo.
        Trans., May 16, 2019, T11:12-21, T27:23-25, T33:25-34:12, T34:22-35:1,
        attached as <u>Exhibit L</u>.)

53.     Sometime after May 6, 2017 but before May 12, 2017, Kyle Rouleau went
        with his girlfriend, Alexandria Archer, to Nicole Chase's house and Chase
        told them her version of her encounter with Calvin Nodine.  Either Chase
        or Archer asked Rouleau to give a statement to the police because Chase
        wanted to press charges against Nodine and Rouleau "was there" and
        was "some piece of the puzzle."  (Kyle Rouleau Depo. Trans., May 16,
        2019, T29:23-32:21, attached as <u>Exhibit L</u>.)

54.     Alexandria Archer drove Kyle Rouleau to the Canton Police Department to
        provide a statement and Nicole Chase accompanied them and the three
        discussed "[t]he day's events."  (Kyle Rouleau Depo. Trans., May 16,
        2019, T69:16-70:6, attached as <u>Exhibit L</u>.)

55.     Kyle Rouleau provided a written statement to Adam Gompper in which he
        states that when he clocked out and left for the night on May 6, 2017, he
        searched for Nicole Chase and Calvin Nodine.  He heard the door to the
        men's bathroom slam closed, called out to Calvin and Nicole, and stated
        that he was leaving.  He heard Calvin say, "All right," to his comment that

he was leaving.  (Kyle Rouleau Written Statement, May 12, 2017, attached as **Exhibit M**.)

56. Kyle Rouleau recalls that the officer who took his written statement swore him to an oath before he signed it.  (Kyle Rouleau Depo. Trans., May 16, 2019, T36:4-37:23, attached as **Exhibit L**.)

57. The practice or procedure within the CPD for taking written statements is for the officer to either, take a handwritten statement on a preprinted form, or to type the data on a computer terminal and then print it out on the form.  The form has an oath statement on it and the officer taking the statement should read the oath to the person giving the statement and swear the person to the statement.  (Mark Penney Depo. Trans., Nov. 29, 2018, T38:9-20, attached as **Exhibit H**.)

58. After Nicole Chase made a formal complaint, Adam Gompper called Calvin Nodine and advised him of same, and that he was not to contact Chase. He arranged for Nodine to come to the department and speak with him. (Adam Gompper Aff. ¶ 38, attached as **Exhibit A**.)

59. Calvin Nodine presented to the police department on May 18, 2017 with his Attorney, David Moraghan.  He was interviewed by Detective John Colangelo and Officer Gompper.  (John Colangelo Aff. ¶ 8, attached as **Exhibit B**; Calvin Nodine Videotaped Interview, May 18, 2017, attached as **Exhibit N**.)

60. Nodine was asked if he had any complaints or issues with his staff to which he responded that he did not.  When asked about Nicole Chase he said he did not know what her deal was or what was going on.  He stated that he went through a "shit storm" at his business and fired several employees for various reasons.  (John Colangelo Aff. ¶¶ 12-13, attached as **Exhibit B**; Calvin Nodine Videotaped Interview, May 18, 2017, attached as **Exhibit N**.)

61. Ultimately, Detective Colangelo advised Calvin Nodine that Nicole Chase had reported that he pulled her into the bathroom and exposed himself to her.  Nodine responded, "that's bullshit."  (John Colangelo Aff. ¶ 20, attached as **Exhibit B**; Calvin Nodine Videotaped Interview, May 18, 2017, attached as **Exhibit N**.)

62.     After Detective Colangelo explained to Calvin Nodine that a witness, Kyle Rouleau, was corroborating some of Nicole Chase's version of events, Nodine said that he did not know where she was when he was in the bathroom.  (John Colangelo Aff. ¶ 21, attached as <u>Exhibit B</u>; Calvin Nodine Videotaped Interview, May 18, 2017, attached as <u>Exhibit N</u>.)

63.     Detective Colangelo then asked Calvin Nodine why Nicole Chase would say this.  Nodine responded that he did not know why, that "[m]aybe she thinks the business is going down, she's looking for money."  (John Colangelo Aff. ¶ 22, attached as <u>Exhibit B</u>; Calvin Nodine Videotaped Interview, May 18, 2017, attached as <u>Exhibit N</u>.)

64.     Detective Colangelo next suggested that Calvin Nodine could have been involved in a consensual encounter with Nicole Chase in an attempt to elicit the truth from him.  (John Colangelo Aff. ¶ 23, attached as <u>Exhibit B</u>; Calvin Nodine Videotaped Interview, May 18, 2017, attached as <u>Exhibit N</u>.)

65.     At this point, Attorney Moraghan asked to speak with Nodine in private. They were then shown to a private room where there was no video or audio recordings.  (John Colangelo Aff. ¶ 24, attached as <u>Exhibit B</u>; Calvin Nodine Videotaped Interview, May 18, 2017, attached as <u>Exhibit N</u>.)

66.     Upon returning to the interview room several minutes later, Calvin Nodine stated, "All right, look it, I'm going to open this all up."  He said Nicole Chase grabbed him and said, "I have something for you to see."  Nodine figured there was a problem in the men's room.  (John Colangelo Aff. ¶ 25, attached as <u>Exhibit B</u>; Calvin Nodine Videotaped Interview, May 18, 2017, attached as <u>Exhibit N</u>.)

67.     Calvin Nodine stated that the plaintiff then took his pants down and gave him a "blow job."  He stated that it all happened so fast and his reaction was, "Ok, that fucking happened."  (John Colangelo Aff. ¶ 26, attached as <u>Exhibit B</u>; Calvin Nodine Videotaped Interview, May 18, 2017, attached as <u>Exhibit N</u>.)

68.     It was then pointed out to Calvin Nodine that he was changing his story and did not tell the officers from the beginning what happened.  Nodine responded that he had worked a long day the day of the incident and that he was protecting himself as this was embarrassing.  He said he should

have stopped Nicole Chase.  (John Colangelo Aff. ¶ 27, attached as **Exhibit B**; Calvin Nodine Videotaped Interview, May 18, 2017, attached as **Exhibit N**.)

69.     Calvin Nodine was asked what happened after Nicole Chase gave him fellatio and he said that Chase told him to walk out first to make sure no one was around.  Once it was clear, she came out of the bathroom and left.  Nodine was asked if Chase was a liar and he responded that the incident was consensual.  (John Colangelo Aff. ¶ 28, attached as **Exhibit B**; Calvin Nodine Videotaped Interview, May 18, 2017, attached as **Exhibit N**.)

70.     Calvin Nodine was asked to take a polygraph test and, ultimately, Attorney Moraghan said that they would discuss it and get back to the officers.  (John Colangelo Aff. ¶ 29, attached as **Exhibit B**; Calvin Nodine Videotaped Interview, May 18, 2017, attached as **Exhibit N**.)

71.     On June 14, 2017, Calvin Nodine called the CPD and spoke to Detective John Colangelo with Officer Adam Gompper also present for the call.  Nodine stated that he had taken a private polygraph test but did not pass because he had not taken his medication.  He said he had a second polygraph test scheduled for Monday, June 19, 2017.  (John Colangelo Aff. ¶ 30, attached as **Exhibit B**.)

72.     On June 19, 2017, Detective Colangelo received a fax from Attorney Moraghan stating that Calvin Nodine would not be submitting to a law enforcement polygraph examination.  (John Colangelo Aff. ¶ 31, attached as **Exhibit B**.)

73.     On June 21, 2017, Nicole Chase presented to the CPD and was interviewed by Detective Colangelo.  At this point, she had ceased working at Nodine's Smokehouse, having turned in her key at the Torrington location.  (John Colangelo Aff. ¶¶ 32-33, attached as **Exhibit B**; Nicole Chase Videotaped Interview, June 21, 2017, attached as **Exhibit O**.)

74.     Nicole Chase stated, at this time, that she worked her "butt off" and she remembers all of her customers.  She said, "I want him to give me his restaurant so I can run it right and for him to be gone and to not have the name Nodine's.  That is how much work I put into this place for this man."

(John Colangelo Aff. ¶ 34, attached as <u>Exhibit B</u>; Nicole Chase Videotaped Interview, June 21, 2017, attached as <u>Exhibit O</u>.)

75.   After speaking with Nicole Chase for about an hour, Detective Colangelo alluded to the fact that Calvin Nodine took two polygraph tests and asked her if anything would come out that was truthful that she may have left out or forgot about.  (John Colangelo Aff. ¶ 35, attached as <u>Exhibit B</u>; Nicole Chase Videotaped Interview, June 21, 2017, attached as <u>Exhibit O</u>.)

76.   Nicole Chase responded that Calvin Nodine knew she was not "getting sex" at home.  When asked how Nodine knew that, Chase explained that he overheard her talking to her coworker, Ali, about it.  She denied talking to Nodine about it directly.  Detective Colangelo asked her if there was any flirtation between her and Nodine to which she responded, "Hell no." (John Colangelo Aff. ¶ 36, attached as <u>Exhibit B</u>; Nicole Chase Videotaped Interview, June 21, 2017, attached as <u>Exhibit O</u>.)

77.   Detective Colangelo then told Nicole Chase that if she had consensual contact with Calvin Nodine it was very important to the investigation that it is known.  (John Colangelo Aff. ¶ 37, attached as <u>Exhibit B</u>; Nicole Chase Videotaped Interview, June 21, 2017, attached as <u>Exhibit O</u>.)

78.   Nicole Chase then became emotional, crying and placing her face in the palm of her hands.  She stated that there was nothing ever consensual.  She said that when Nodine pulled her into the bathroom and told her to do it, she did it because she didn't know what to do.  (John Colangelo Aff. ¶ 38, attached as <u>Exhibit B</u>; Nicole Chase Videotaped Interview, June 21, 2017, attached as <u>Exhibit O</u>.)

79.   Detective Colangelo asked Nicole Chase if she gave Calvin Nodine oral sex.  Nicole Chase responded, "Yes."  She then said that everything else she told the police was completely true.  She said that she had wanted to come back and tell the police this but that she was in fear it would go against her story and that she did not want her boyfriend to know.  (John Colangelo Aff. ¶ 39, attached as <u>Exhibit B</u>; Nicole Chase Videotaped Interview, June 21, 2017, attached as <u>Exhibit O</u>.)

80.   Nicole Chase further stated that she was scared and did not even want to tell her own mother about this.  She said that she was suicidal and had

been to the doctor.  Further, she had spoken to an attorney, but not about this, and did not want to come back and tell what really happened because she knew it would affect her civil case.  (John Colangelo Aff. ¶¶ 40-41, attached as <u>Exhibit B</u>; Nicole Chase Videotaped Interview, June 21, 2017, attached as <u>Exhibit O</u>.)

81.     Nicole Chase stated in response to further questioning that she and Calvin Nodine were standing near the bathrooms when an employee, Kyle, came back into the restaurant (who they thought had left).  She stayed silent because she did not want Kyle to know and she did not know what to do; that she did it to get it over with.  (John Colangelo Aff. ¶ 42, attached as <u>Exhibit B</u>; Nicole Chase Videotaped Interview, June 21, 2017, attached as <u>Exhibit O</u>.)

82.     Nicole Chase stated that she and Calvin Nodine were standing in the hallway near the bathroom and that he had her arm.  Nodine did not force her into the bathroom but he led her into it by the arm, locking the door behind them.  (John Colangelo Aff. ¶ 43, attached as <u>Exhibit B</u>; Nicole Chase Videotaped Interview, June 21, 2017, attached as <u>Exhibit O</u>.)

83.     Nicole Chase further stated that she wanted to go home and didn't want to lose her job.  As soon as they entered the bathroom she performed oral sex on Calvin Nodine as Kyle was calling out for him and Chase.  (John Colangelo Aff. ¶ 44, attached as <u>Exhibit B</u>; Nicole Chase Videotaped Interview, June 21, 2017, attached as <u>Exhibit O</u>.)

84.     Nicole Chase stated that she thought if she just did it she could leave and would not get hurt.  Nodine's wife kept calling his cell phone to alert him of a police spot check while they were in the bathroom.  The wife, "kept blowing up his phone," and called at least six times before Nodine answered.  (John Colangelo Aff. ¶ 45, attached as <u>Exhibit B</u>; Nicole Chase Videotaped Interview, June 21, 2017, attached as <u>Exhibit O</u>.)

85.     Detective Colangelo then asked Nicole Chase if Nodine was sitting or standing to which she responded that he leaned himself against the sink and demonstrated for Colangelo how Nodine was leaning back during the encounter.  (John Colangelo Aff. ¶ 46, attached as <u>Exhibit B</u>; Nicole Chase Videotaped Interview, June 21, 2017, Position 1:18:07, attached as <u>Exhibit O</u>.)

86.     Detective Colangelo next asked Nicole Chase where Calvin Nodine's
        hands were and she responded that he was holding his genitals and
        "was trying to really . . . pull himself up.  It looked like it hurt."  As she
        stated this, she attempted to demonstrate for Colangelo how Nodine had
        his hands at his groin region, "pulling himself up."  (John Colangelo Aff. ¶
        47, attached as <u>Exhibit B</u>; Nicole Chase Videotaped Interview, June 21,
        2017, Position 1:18:38, attached as <u>Exhibit O</u>.)

87.     Nicole Chase stated that Calvin Nodine leaned against the sink and was
        hard at first but then was not.  Nodine kept bashing her face into his
        "junk."  Because Nodine was so intoxicated it took between ten to fifteen
        minutes for him to finish.  (John Colangelo Aff. ¶¶ 46, 48, attached as
        Exhibit B; Nicole Chase Videotaped Interview, June 21, 2017, attached as
        <u>Exhibit O</u>.)

88.     Nicole Chase stated that Nodine ejaculated into her mouth and that she
        had thrown out all of her "Nodine's" clothing.  (John Colangelo Aff. ¶ 48,
        attached as <u>Exhibit B</u>; Nicole Chase Videotaped Interview, June 21, 2017,
        attached as <u>Exhibit O</u>.)

89.     At this point, Detective Colangelo asked Nicole Chase if she wanted to
        provide a supplemental statement.  She asked him if it would screw up her
        civil case.  Colangelo responded that he did not know, that he was not an
        attorney.  (John Colangelo Aff. ¶ 49, attached as <u>Exhibit B</u>; Nicole Chase
        Videotaped Interview, June 21, 2017, attached as <u>Exhibit O</u>.)

90.     Nicole Chase then stated that she wanted to provide a statement so the
        truth is known but did not want her boyfriend and whole family to know
        what happened.  Detective Colangelo then again told her that she had the
        opportunity to put the truth in writing.  (John Colangelo Aff. ¶ 50, attached
        as <u>Exhibit B</u>; Nicole Chase Videotaped Interview, June 21, 2017, attached
        as <u>Exhibit O</u>.)

91.     Nicole Chase then acknowledged that she was aware that the written
        statement she provided was "not the truth" but said she wanted to
        consult with her attorney before providing another written statement.
        (John Colangelo Aff. ¶ 51, attached as Exhibit B; Nicole Chase Videotaped
        interview, June 21, 2017, Position 1:25:06-16, attached as <u>Exhibit O</u>.)

92.  **Thereafter, Detective Colangelo submitted an arrest warrant application for Nicole Chase's arrest on the charge of Making a False Statement in the Second Degree, in violation of Connecticut General Statutes § 53a-157b. (John Colangelo Aff. ¶ 53, attached as Exhibit B; Affidavit and Application for Arrest Warrant, attached as Exhibit P.)**

93.  **Both Detective Colangelo and Adam Gompper believed they had probable cause to believe Nicole Chase committed the charge in the warrant.  No information was left out of the arrest warrant affidavit which would have negated probable cause for Nicole Chase's arrest.  (John Colangelo Aff. ¶¶ 54-55, attached as Exhibit B; Adam Gompper Aff. ¶¶ 51-52, attached as Exhibit A.)**

94.  **The warrant application prepared by John Colangelo was received on July 11, 2017 by the State's Attorney's Office.  (Michael Weber, Jr. Depo. Trans., April 9, 2019, T20:24-21:12, attached as Exhibit Q; Warrant Detail, attached as Exhibit R.)**

95.  **Around this time or a few days later, Nicole Chase presented to the CPD and spoke with a dispatcher.  She gave the dispatcher a "stack" of texts between her and Jeremy Archer, her old manager.  She told the dispatcher, "I'm here to revise my statement and Detective Colangelo asked me for this information."  (Nicole Chase Depo. Trans., May 1, 2019, Session II, T204:11-211:17, attached as Exhibit S; Text Messages, attached as Exhibit T.)**

96.  **The dispatcher then left the dispatch area for a moment and then returned and told Nicole Chase that Detective Colangelo was working on something at that time.  The dispatcher told her that if Colangelo needed her he would call her.  Chase was confused by this statement as she knew that Colangelo wanted her to revise her statement but she, nevertheless, walked out of the department.  (Nicole Chase Depo. Trans., May 1, 2019, Session II, T204:11-211:17, attached as Exhibit S.)**

97.  **Subsequently, Miss Chase e-mailed Colangelo about revising her statement on July 25, 2017.  Her e-mail states, "I came in about 2 weeks ago to hand in the text from Jeremy and try to set up a time to revise my statement.  The dispatcher said u were busy and if you needed me youd [sic.] call.  That kind of confused me.  Am I able to come in and revise it or**

was it to [sic.] late?  I just want to know what my next step is I guess. Thanks, Nicole Chase."  (Nicole Chase Depo. Trans., May 1, 2019, Session II, T206:18-211, attached as <u>Exhibit S</u>; E-mail communications between Nicole Chase and John Colangelo entered as defendants' exhibit 6 at Nicole Chase Deposition, attached as <u>Exhibit U</u>.)

98.  When she did not hear back from Colangelo, on July 31, 2017, she sent another e-mail to him stating that she wanted to "revise" her statement and attaching "supplemental information" she wanted "added to her May 11, 2017 written statement."  (Nicole Chase Depo. Trans., May 1, 2019, Session II, T213:8-215:1, attached as <u>Exhibit S</u>; E-mail communications between Nicole Chase and John Colangelo entered as defendants' exhibit 6 at Nicole Chase Deposition, attached as <u>Exhibit U</u>.)

99.  Nicole Chase's attorneys drafted the document she attached to the July 31, 2017 e-mail which document contained the supplemental information she wanted to add to her May 11, 2017 written statement.  (Nicole Chase Depo. Trans., May 1, 2019, Session II, T215:9-25, T216:21-217:12, attached as <u>Exhibit S</u>; E-mail communications between Nicole Chase and John Colangelo entered as defendants' exhibit 6 at Nicole Chase Deposition, attached as <u>Exhibit U</u>; Nicole Chase Depo. Trans., May 22, 2019, Session III, T495:20-496:2, attached as <u>Exhibit V</u>.)

100.  On August 10, 2017, Detective Colangelo provided the following response to Nicole Chase via e-mail:

> Nicole, I apologize for the delay as I was on vacation.  I did ask Officer Gompper to reach out to you but he said he could not make phone contact.  I understand you came down as dispatch told me you were here.  I was asked if I needed to talk to you not that you were there to revise you [sic.] statement.  I was tied up on a different investigation at that moment and had no idea your intent was to give a new statement.  Also at that point I had already documented the change in your recount of the incident and had already sent the case to court for review.  It is still with the States [sic.] Attorney's office and I should hopefully have some direction of the next step shortly.

**Any questions feel free to contact me.**

**(E-mail communications between Nicole Chase and John Colangelo entered as defendants' exhibit 6 at Nicole Chase Deposition, attached as <u>Exhibit U</u>.)**

101. **Nicole Chase responded to John Colangelo's e-mail on August 16, 2017 as follows:  "Ok sorry for this misunderstanding.  I thought the dispatcher told you thats [sic.] why I was confused.  Also thank you for the response! Hopefully good news will come soon!  Please keep me posted if possible. Thanks, Nicole Chase."  On August 22, 2017, Chase sent Colangelo a follow-up e-mail stating that she was "[j]ust checking in to see if there was any news on the case yet whether good or bad."  (E-mail communications between Nicole Chase and John Colangelo entered as defendants' exhibit 6 at Nicole Chase Deposition, attached as <u>Exhibit U</u>.)**

102. **Detective Colangelo did not forward Nicole Chase's attachment to the State's Attorney's Office or attempt to advise the reviewing prosecutor of Chase's wish to add to her statement because it was not a statement given under oath and was not exculpatory evidence.  (John Colangelo Aff. ¶ 67, attached as <u>Exhibit B</u>.)**

103. **Rather, the attachment or "supplemental information" confirmed that Nicole Chase committed the charge at issue.  (Mark Penney Depo. Trans., Nov. 29, 2018, T102:23-103:7, attached as <u>Exhibit H</u>.)**

104. **The warrant application was assigned to Senior State's Attorney Michael Weber, Jr. for review.  Attorney Weber reviewed the four corners of the warrant and found probable cause to believe that Nicole Chase had committed the offense of Making a False Statement in the Second Degree, in violation of Connecticut General Statutes § 53a-157b.  As a result, he signed the warrant on August 31, 2017.  (Michael Weber, Jr. Depo. Trans., April 9, 2019, T9:19-10:2, T13:1-14:3, T16:19-25, T34:3-7, T35:13-36:5, attached as <u>Exhibit Q</u>.)**

105. **Judge Tammy Nguyen signed the warrant on September 6, 2017, and it was returned to the State's Attorney's Office on September 7, 2017. (Arrest Warrant, attached as <u>Exhibit W</u>; Warrant Detail, attached as <u>Exhibit R</u>.)**

106.   On September 8, 2017, the active arrest warrant was returned to the CPD for Nicole Chase for the charge of making a false statement.  (Warrant Detail, attached as <u>Exhibit R</u>.)

107.   Detective Colangelo contacted Chase and let her know of the warrant and she agreed to turn herself in that afternoon.  (Nicole Chase Depo. Trans., May 1, 2019, Session II, T220:8-222:12, attached as <u>Exhibit S</u>.)

108.   Nicole Chase subsequently presented to the police station and was processed, charged, and released on a $2,500.00 non-surety bond.  (John Colangelo Aff. ¶ 69, attached as <u>Exhibit B</u>.)

109.   On November 8, 2017, a nolle was entered in Nicole Chase's criminal case, <u>State v. Nicole Chase</u>, Docket No. H14H-CR17-0692973-S, pursuant to an agreement with the State's Attorney's Office.  (Robert Diaz Aff. ¶¶ 4-6, attached as <u>Exhibit X</u>; Criminal Court Transcript, attached as <u>Exhibit Y</u>.)

110.   Specifically, Nicole Chase's criminal case received a diversionary marking or continuance for eight weeks' time and if she did not have any new arrests during that time, the State's Attorney agreed to enter a nolle.  (<u>Id.</u>)

111.   Nicole Chase has no information or knowledge indicating that Detective Colangelo knew that the facts set forth in paragraphs 2-33 of his warrant affidavit were untrue at the time he drafted the affidavit.  (Nicole Chase Depo. Trans., April 15, 2019, Session I, T127:8-164:21, attached as <u>Exhibit F</u>.)

112.   Nicole Chase takes issue with paragraph 6 of the affidavit which states that at one point while explaining the incident to Adam Gompper on May 7, 2017, she stopped her explanation and stood up.  She believes this statement may not be correct because she does not recall this happening.  (Nicole Chase Depo. Trans., April 15, 2019, Session I, T130:8-131:5, attached as <u>Exhibit F</u>.)

113.   Nicole Chase maintains that paragraph 7 of the affidavit is inaccurate in that it states, "Nodine . . . grabbed her and pulled her into the bathroom closing the door behind them," while Chase believes she told one of the officers that Nodine locked the bathroom door.  (Nicole Chase Depo.

Trans., April 15, 2019, Session I, T131:18-133:11, attached as <u>Exhibit F</u>.)

114.    Nicole Chase maintains that paragraph 10 of the affidavit is inaccurate in that it states, "That, Chase said she texted Nodine's step son, (Jeremy), and told him what happened but did not give full details about Nodine telling her to suck it," while she maintains that she did tell Jeremy that detail.  Chase, however, is not sure what she told Adam Gompper in this regard.  (Nicole Chase Depo. Trans., April 15, 2019, Session I, T135:8-9, attached as <u>Exhibit F</u>.)

115.    Nicole Chase maintains that paragraph 12 of the affidavit is inaccurate where it states Chase's statement that Kyle didn't witness much was inconsistent and different than her initial description given to Gompper. Chase testified that she does not know how there is an inconsistency because "the whole time she said Kyle did not witness much."  (Nicole Chase Depo. Trans., April 15, 2019, Session I, T137:4-138:1, attached as <u>Exhibit F</u>.)

116.    Nicole Chase is not sure if paragraph 14 of the affidavit is accurate because she does not recall whether or not Adam Gompper swore her to an oath when she provided her written statement.  (Nicole Chase Depo. Trans., April 15, 2019, Session I, T139:2-14, attached as <u>Exhibit F</u>.)

117.    Nicole Chase maintains that the statement in paragraph 18, "[s]he then said, 'That it's not happening Nodine's, that's how much work I put into that place,'" is inaccurate.  She does not know what this refers to and it is not something she said. (Nicole Chase Depo. Trans., April 15, 2019, Session I, T142:20-143:4, attached as <u>Exhibit F</u>.)

118.    Nicole Chase maintains that the statement in paragraph 22, "[s]he explained that she wanted to come back and say this but she was in fear it would go against her story and she doesn't want her boyfriend to know," is inaccurate in that she actually said she did not want her boyfriend, friends, and mother to know.  (Nicole Chase Depo. Trans., April 15, 2019, Session I, T148:3-17, attached as <u>Exhibit F</u>.)

119.    Nicole Chase maintains that the statement in paragraph 23, "[s]he said she spoke to her attorney but did not tell the attorney about this and didn't want to come back and tell what really happened because she knew

it would affect her civil case," is inaccurate because she did not say that she knew it would affect her civil case but rather she asked Detective Colangelo if what really happened would affect her civil case. (Nicole Chase Depo. Trans., April 15, 2019, Session I, T148:20-149:11, attached as <u>Exhibit F</u>.)

120. Nicole Chase maintains that the statement in paragraph 29, "[s]he said that because Nodine was so intoxicated it took between 10 to 15 minutes for him to finish," is inaccurate because she told one of the officers that it could have been two minutes or five minutes; it felt like it was ten to fifteen minutes. She is not sure, however, if Detective Colangelo is the officer she told this to. (Nicole Chase Depo. Trans., April 15, 2019, Session I, T153:17-154:16, attached as <u>Exhibit F</u>.)

121. Nicole Chase is unable to point to any pertinent information she claims Detective Colangelo knowingly omitted from the arrest warrant affidavit. (Nicole Chase Depo. Trans., May 1, 2019, Session II, T197:1-203:22, attached as <u>Exhibit S</u>.)

122. On July 11, 2017, Nicole Chase provided a statement under oath to a representative of the Connecticut Department of Labor for the purpose of applying for unemployment benefits. With the statement she "tr[ied] to get her point across, but not tell the actual story." (Nicole Chase Depo. Trans., May 1, 2019, Session II, T246:2-247:18; Fact Finding Report Claimant Statement, July 11, 2017, attached as <u>Exhibit Z</u>.)

123. Nicole Chase acknowledges that she did not tell the representative about the fact that she performed oral sex on Calvin Nodine despite having previously disclosed this detail to John Colangelo. She, further, admits that she stated to the representative, "[h]e took my hands and put it in his area" and that this, in fact, did not happen. (Nicole Chase Depo. Trans., May 1, 2019, Session II, T248:1-14; Fact Finding Report Claimant Statement, July 11, 2017, attached as <u>Exhibit Z</u>.)

124. Nicole Chase candidly acknowledges that she told "different stor[ies]" as to what occurred on the evening of May 6, 2017, and that the version of events she provided to Jeremy Archer via text was not accurate. She testified, "My stories were everywhere with everybody." (Nicole Chase

Depo. Trans., May 1, 2019, Session II, T378:15-384:4, attached as **Exhibit S**.)

> **DEFENDANTS,**
> **TOWN OF CANTON, JOHN**
> **COLANGELO AND ADAM GOMPPER**
>
>
> By **/s/ Kristan M. Maccini**
>   **Kristan M. Maccini**
>   **ct25121**
>   **Howd & Ludorf, LLC**
>   **65 Wethersfield Avenue**
>   **Hartford, CT  06114-1190**
>   **(860) 249-1361**
>   **(860) 249-7665 fax**
>   **kmaccini@hl-law.com**

## CERTIFICATION

This is to certify that on OCTOBER 1, 2019, a copy of the foregoing DEFENDANTS' LOCAL RULE 56(a)1 STATEMENT was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.

Lewis H. Chimes, Esq.               David A. Moraghan, Esq.
Mary-Kate Smith, Esq.               Smith, Keefe, Moraghan
Law Office of Lewis Chimes, LLC     & Waterfall, LLC
45 Franklin Street                  32 City Hall Avenue, # C
Stamford, CT  06901                 Torrington, CT  06790

Elizabeth K. Acee, Esq.
Barclay Damon
545 Long Wharf Drive, 9th Floor
New Haven, CT  06511


/s/ Kristan M. Maccini
Kristan M. Maccini

**25**