UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| NICOLE CHASE | : | NO.: 3:18-cv-00683 (VLB) |
| | : | |
| v. | : | |
| | : | |
| NODINE'S SMOKEHOUSE, INC., CALVIN | : | |
| NODINE, TOWN OF CANTON, JOHN | : | |
| COLANGELO, ADAM GOMPPER, MARK J. | : | |
| PENNEY AND CHRISTOPHER ARCIERO | : | OCTOBER 1, 2019 |

**AFFIDAVIT OF ADAM GOMPPER**
**IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

I, Adam Gompper, having been duly sworn, hereby depose and say:

1. I am over eighteen (18) years of age.

2. I believe in the obligation of an oath and make the statements within this affidavit based upon my own personal knowledge.

3. I am familiar with the allegations made against me by Nicole Chase.

4. I was at all relevant times a Police Officer with the Canton Police Department ("CPD"), assigned to the Patrol Division. At all relevant times, I had over four (4) years of experience and training as a certified police officer in the State of Connecticut.

5. On May 7, 2017, I was dispatched to the lobby of the CPD on a report of someone being sexually harassed at their place of employment.

6. Upon my arrival to the lobby, I met with Nicole Chase who was accompanied by her mother. Chase reported that she worked at Nodine's Smokehouse restaurant, located at 192 Albany Turnpike in Canton,

**EXHIBIT A**

Connecticut, along with her mother. She described to me that she was being sexually harassed by the owner, Calvin Nodine.

7. Nicole Chase reported to me that Calvin Nodine has a drinking problem and has caused another worker, Nodine's stepson, Jeremy Archer, to quit.

8. Nicole Chase stated to me that she came in for her shift, on May 6, 2017, and after being there for about ten minutes, Calvin Nodine asked her, "Did you get laid last night?" She said that Nodine was intoxicated and walked away after asking the question. When asked how she knew Nodine was intoxicated, Chase stated that usually, in the morning, he has a few drinks. Chase stated that Nodine keeps beer in a cooler in the back and serves customers alcohol.

9. Nicole Chase stated that there was an employee who takes acid while working and she was told by Calvin Nodine that he was no longer working there. The employee subsequently came into the restaurant and spoke about taking more acid. Chase, at this point, said something to Nodine about workers coming to work high and intoxicated. Nodine then said he did not want his girls to be scared and told the employee to leave.

10. Nicole Chase stated that Calvin Nodine proceeded to keep making statements about not wanting his girls to be scared and gave Chase a hug saying that she and her mother were his best employees. Chase then hugged him back because she was so emotionally upset about everything going on at the work place. Chase felt that Nodine genuinely cared but that this exchange led up to an incident that occurred later on that night.

11. I next asked Nicole Chase what happened later that night and she said that she closed out the front cash register located at the front of the business. Calvin Nodine then told two employees that they were closed for the night and they could leave. I asked if this was normal behavior to which Chase responded that it was normal behavior but she felt that Nodine was more dismissive than usual and wanted the employees to leave faster.

12. Nicole Chase stated to me that as she was walking towards the back of the business to leave for the night she saw Calvin Nodine standing near the bathroom/kitchen doors with his arms open saying, "We're going to

**EXHIBIT A**

make it through this, we're going to make this company better," and he gave her a hug. While this was happening, a dishwasher, Kyle, came around the corner from the kitchen.

13. Nicole Chase went on to state that Calvin Nodine must have already had his "stuff" out and she had no idea because it was dark and the lights were out. Nodine then grabbed her and pulled her into the bathroom closing the door behind them.

14. Nicole Chase stated that Kyle then said, "Uh, Calvin are you in the bathroom? Goodnight." Chase wanted to say something but she froze.

15. Nicole Chase stated to me that everything happened so quickly. She looked down and Nodine said, "I know you must not get it at home so suck it," or something to that effect.

16. Nicole Chase stated that she had no proof of what happened and knows that Calvin Nodine is a rich man. She pushed past Nodine and he fell into a wall and hit his head. Chase stated that he (Nodine) may have an injury to the right side of his head.

17. Nicole Chase again stated that she froze but told Calvin Nodine that he needed to take his cash from the last few days of business and directed him toward the nightly deposit bags. She then left for the night.

18. Nicole Chase stated to me that she then spent two hours thinking about what she should do about this and that she had a five-year-old daughter and could not lose her job, that she was just getting by. She next texted Nodine's stepson (Jeremy) and told him what happened.

19. I next asked Nicole Chase what was exposed and she responded that Nodine was wearing a long thick flannel shirt and she did not initially notice anything. She stated that when they were in the bathroom there was no time for him to take his "stuff" out. In the bathroom, his pants were open and she was able to see that his underwear was pulled down and could see his "balls" and penis.

20. I then asked Nicole Chase if Calvin Nodine had an erection to which she responded yes, Nodine was erect and told her that he was getting hard. I

3

EXHIBIT A

then asked if she could feel his genitals against her when they were hugging to which she said, no.

21. I next explained to Nicole Chase if she wanted to make a complaint, I would take a written statement from her and would need to speak to the witness, Kyle. Chase then said that Kyle did not witness much, that he just said bye Calvin. I found this to be inconsistent and different from her initial description of events.

22. Nicole Chase then made the comment that she is going up against a millionaire to which I responded, "that doesn't give him the right to do anything."

23. I then told Nicole Chase if she wanted to pursue charges, I would investigate it, that I would take a statement from her and would need to speak with Calvin Nodine about the incident. I explained that if probable cause was developed, I would forward a warrant to the court for review.

24. I then asked Nicole Chase if she felt she was dragged into the bathroom as if she was being kidnapped. She responded, no, that she felt that Calvin Nodine was nervous.

25. Nicole Chase then went on to express that she was not sure she wanted to make a formal complaint and wanted to go into work and see if Calvin Nodine recalled anything. She said she was very concerned about money and her living situation.

26. I again told her if she wanted to pursue a complaint I would do a complete investigation which would require me to speak with Calvin Nodine. I ultimately provided her with a yellow Office of Victim Services ("OVS") card and explained that there were phone numbers on it with which she could reach out to counselors if need be. I also explained that if she was in fear for her safety, or another incident occurred, to immediately call 911 or report the incident to the police department.

27. I repeatedly assured Nicole Chase if she changed her mind and wanted to pursue a complaint about the incident she could come and speak to me about it. I advised her that I was working until 3:00 p.m. that day and let

4

**EXHIBIT A**

28. Nicole Chase and her mother then left the lobby of the police department.

her know when I would next be working if she were to change her mind and wanted to provide me with a written statement.

29. Based upon the fact that Nicole Chase did not want to pursue a criminal complaint or provide a written statement about the incident, I determined that the case would not be investigated but would be reopened should she change her mind.

30. A copy of Nicole Chase's conversation with me in the lobby was audio/video recorded on a CPD surveillance camera and was burned on a CD. I am familiar with the recording as I viewed it in drafting a police case incident report in the case (police case number 1700004762), and placed the CD of the recording in the police case file. A true and accurate copy of the recording is attached to the Defendants' Local Rule 56(a)1 Statement as Exhibit E.

31. My shift ended at 3:00 p.m., on May 7, 2017, and I did not return to work until May 10, 2017. Upon my return, I was advised that Nicole Chase had returned to the CPD to report that she was touched by Calvin Nodine and that someone had witnessed this incident.

32. As a result, I contacted Nicole Chase, the same day, by telephone, and arranged for her return to the CPD to give me a written statement along with the witness, on May 11, 2017.

33. On May 11, 2017, Nicole Chase returned to the CPD and provided a written statement to me. A true and accurate copy of the written statement Chase provided is attached to the Defendants' Local Rule 56(a)1 Statement as Exhibit J.

34. Prior to providing her written statement, Nicole Chase advised me that she wished to pursue criminal charges against Calvin Nodine for exposing himself to her and that he had also grabbed her butt earlier in the day.

35. The same day, Nicole Chase's co-worker, Alexandria Archer, provided a written statement to me. A true and accurate copy of Alexandria Archer's

**EXHIBIT A**

written statement is attached to the Defendants' Local Rule 56(a)1 Statement as <u>Exhibit K</u>.

36. Alexandria Archer provided her written statement to me in an interview room alone. I then took Nicole Chase's statement in the same room with Archer present at Chase's request.

37. Both Alexandria Archer and Nicole Chase provided their statements to me verbally while I typed the statement up on a department computer. Once the statement was complete, I allowed each of them to read it on the computer screen or printed it out so that they could make any corrections they wanted to. Before each of them signed their written statements, I administered an oath and each of them swore to the truth of the statement.

38. After taking Nicole Chase's and Alexandria Archer's written statements, I contacted Calvin Nodine by telephone and advised him that a complaint was made against him by one of his employees and told him not to contact Nicole Chase. I also made arrangements for Nodine to come into the CPD to speak with me. Nodine, ultimately, cancelled this appointment and rescheduled it to a later date so that he could come to the CPD with his attorney.

39. The next day, on May 12, 2017, Kyle Rouleau, another employee, came to the CPD to speak with me about the incident. Rouleau provided me with a written statement and a true and accurate copy of said statement is attached as <u>Exhibit M</u> to the Defendants' Local Rule 56(a)1 Statement. Rouleau also made an oath before me to the truth of his statement before signing it.

40. On May 18, 2017, I along with John Colangelo interviewed Calvin Nodine in the presence of his attorney, David Moraghan. The interview was recorded and placed in the police case file. I am familiar with the recording as I viewed it in drafting a case/incident report concerning the interview of Nodine. A true and accurate copy of the video and audio recording of the interview of Calvin Nodine is attached to the Defendants' Local Rule 56(a)1 Statement as <u>Exhibit N</u>.

**EXHIBIT A**

41. Calvin Nodine stated to us that Nicole Chase gave him oral sex in the bathroom and that it was consensual.

42. Subsequently, we (myself and Detective Colangelo) had some back and forth with Calvin Nodine and/or his attorney as to whether he would submit to a law enforcement polygraph. Ultimately, Nodine's attorney indicated he would not submit to such a polygraph test.

43. On June 20, 2017, I contacted Nicole Chase and requested that she come to the CPD for a follow-up interview. She agreed to come to the department the next day.

44. At this time, Nicole Chase was not a suspect. Rather, additional follow-up with her was needed based upon Calvin Nodine's interview and indication that the encounter in the bathroom was consensual and that Chase had performed fellatio on him.

45. On June 21, 2017, Nicole Chase presented to the CPD and was interviewed by Detective Colangelo. I was not present in the interview room but observed the interview from a video monitor in a remote location in Colangelo's office.

46. I did not participate in the interview of Nicole Chase, on June 21, 2017, because, on June 9, 2017, I was involved in a police shooting and was the subject of a corresponding Internal Affairs investigation. As a result, I was on administrative status.

47. The June 21, 2017 interview of Nicole Chase was recorded. I am familiar with the recording because I viewed it in progress and in drafting a case/incident report concerning the June 21, 2017 interview of Chase. A true and accurate copy of the video and audio recording of this interview is attached to the Defendants' Local Rule 56(a)1 Statement as <u>Exhibit O</u>.

48. During this interview, Nicole Chase for the first time stated that while in the bathroom she performed fellatio on Calvin Nodine. She acknowledged that her written statement she provided to me on May 11, 2017 was not truthful because she omitted this detail.

**EXHIBIT A**

49. Based upon the facts and evidence obtained throughout the course of the investigation of police case number 1700004762, I believed Nicole Chase violated Connecticut General Statutes § 53a-157b, making a false statement, where she intentionally made a false written statement that she did not believe to be true with the intent to mislead officers of the CPD in the performance of their official functions, and made such statement under oath.

50. Subsequent to the June 21, 2017 interview of Nicole Chase, I assisted Detective Colangelo in drafting an Affidavit and Application for Arrest Warrant for the arrest of Nicole Chase for the charge of making a false statement, in violation of Connecticut General Statutes § 53a-157b.

51. Based upon my training and experience, I believed we had probable cause to believe Nicole Chase committed the crime charged in the warrant.

52. I did not leave any information out of the affidavit, which would have negated, in any way, probable cause for Nicole Chase's arrest.

53. Because I was on administrative status, I could not be an affiant on arrest warrants and I did not make the decision as to whether to seek the warrant for Nicole Chase's arrest.

54. At no time was my investigation of Nicole Chase's complaint motivated by any animus towards her based upon her gender or any other improper consideration. Rather, my investigation and investigative course of action was based upon the facts and evidence obtained in the case, my observations, along with my law enforcement training, in the exercise of my discretion and duties as a police officer serving the Town of Canton.

55. Prior to May 7, 2017, while a Patrol Officer with the CPD, I responded to Nicole Chase's residence on at least three occasions for domestic incidents between Chase and her boyfriend. Chase was not arrested on any of these occasions. On at least one of these occasions, in 2013, I took Chase's boyfriend into custody for a mental health evaluation and applied for a warrant for his arrest. The arrest warrant application was granted and I arrested Chase's boyfriend.

**EXHIBIT A**

Dated at __1st__, Connecticut, on this 1st day of October, 2019.

_____
**Adam Gompper**

**STATE OF CONNECTICUT  )**
                                             **)  ss: Hartford**
**COUNTY OF HARTFORD )**

Subscribed and sworn to before me on this 1st day of October, 2019.

_____
**Michelle A. Oliveira**
**Notary Public**
**My commission expires: 05/31/2023**

Michelle A. Oliveira
Notary Public
State of Connecticut
My Commission Exp. May, 31 2023
9

**EXHIBIT A**