### UNITED STATES DISTRICT COURT

### DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **NICOLE CHASE** | : | **NO.: 3:18-cv-00683 (VLB)** |
| | : | |
| **v.** | : | |
| | : | |
| **NODINE'S SMOKEHOUSE, INC., CALVIN** | : | |
| **NODINE, TOWN OF CANTON, JOHN** | : | |
| **COLANGELO, ADAM GOMPPER, MARK J.** | : | |
| **PENNEY AND CHRISTOPHER ARCIERO** | : | **OCTOBER 1, 2019** |

### AFFIDAVIT OF DETECTIVE JOHN COLANGELO
### IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

    I, John Colangelo, having been duly sworn, hereby depose and say:

1.    I am over eighteen (18) years of age.

2.    I believe in the obligation of an oath and make the statements within this affidavit based upon my own personal knowledge.

3.    I am familiar with the allegations made against me by Nicole Chase.

4.    I was at all relevant times and currently am a Police Officer with the Canton Police Department, with the rank of Detective.  At all relevant times, I had over twenty-four (24) years of experience and training as a certified police officer in the State of Connecticut.

5.    At some point in mid-May of 2017, I was asked to assist Officer Adam Gompper with the investigation of Nicole Chase's complaint concerning Calvin Nodine.  At that time, I reviewed the police case file (police case number 1700004762), including Officer Gompper's police reports and written witness statements, he had obtained in his investigation of the case.

**EXHIBIT B**

6.  I discussed the case with Adam Gompper who briefed me on the status of the investigation and Nicole Chase's complaint. I asked Adam Gompper, at this time, if he had sworn Chase to her written statement and he confirmed to me that he had.

7.  Prior to my involvement and review of the case file, it had been decided that Calvin Nodine needed to be interviewed and that I would assist Adam Gompper with the interview.

8.  Officer Adam Gompper contacted Calvin Nodine and arranged a time for him to come to the Canton Police Department ("CPD") and be interviewed. On May 18, 2017, Calvin Nodine presented to the CPD with his attorney, David Moraghan, per this arrangement.

9.  On May 18, 2017, I along with Adam Gompper interviewed Calvin Nodine in the presence of his attorney, David Moraghan. The interview was video and audio recorded on a Liberty Recording System, version 2.6, and maintained by the CPD in the police case file.

10. A true and accurate copy of the video and audio recording of the interview of Calvin Nodine, obtained on May 18, 2017, is attached to the Defendants' Local Rule 56(a)1 Statement as Exhibit N.

11. After formally introducing myself to Calvin Nodine and his attorney and engaging in some small talk to put Mr. Nodine at ease and gain a rapport with him and his attorney, I began the interview.

12. I asked Calvin Nodine if he had any complaints or issues with his staff to which he responded that he did not.

13. I then asked Calvin Nodine about Nicole Chase and he said he did not know what her deal was or what was going on. He stated that he went through a "shit storm" at his business and fired several employees for various reasons.

14. Calvin Nodine further stated to me that he had to completely clean house and start from scratch with his staff.

2

**EXHIBIT B**

15.     I then explained to Calvin Nodine that Nicole Chase had complained of inappropriate conduct and speech at work and asked him if he had made some joke while placing his hand on Chase's back.

16.     Calvin Nodine denied that this had occurred.  I then advised Nodine that, according to Nicole Chase or another witness, Nodine placed his hand on Chase's rear end.  Calvin Nodine stated to me, "No, I wouldn't have done that."

17.     I then attempted to put Calvin Nodine at ease and gain his trust by telling him that I knew he was married and that I was not going to tell his wife what he told me.  I advised him that some of Nicole Chase's statements were corroborated by others in an attempt to get him to tell me the truth.

18.     Calvin Nodine then stated to me, "I got a whole pile of bad shit going on and I just fired my whole crew.  So you know what, I got a pile of enemies right now."

19.     I asked Calvin Nodine how the night ended on May 6, 2017, and he stated that he was in the bathroom when the last employees left for the evening.  He denied that anybody was in the bathroom with him.

20.     Ultimately, I advised Calvin Nodine that Nicole Chase had reported that he pulled her into the bathroom and exposed himself to her.  Nodine responded, "that's bullshit."

21.     After explaining to Calvin Nodine that a witness, Kyle Rouleau, was corroborating some of Nicole Chase's version of events, Nodine said that he did not know where she was when he was in the bathroom.

22.     I then asked Calvin Nodine why Nicole Chase would say this.  Nodine responded that he did not know why, that "maybe she thinks the business is going down, she's looking for money."

23.     I next suggested that Calvin Nodine could have been involved in a consensual encounter with Nicole Chase in a further attempt to elicit the truth from him.  This is a common technique in interviewing and interrogation to mitigate the severity of the conduct and allow a suspect to admit to participating in it.

3

**EXHIBIT B**

24.     At this point, Attorney Moraghan asked to speak with Calvin Nodine in private.  They were shown to a private room where there was no video or audio recordings.

25.     Upon returning to the interview room several minutes later, Calvin Nodine stated, "All right, look it, I'm going to open this all up."  He stated that Nicole Chase grabbed him and said, "I have something for you to see." Nodine stated that he figured there was a problem in the men's room.

26.     Calvin Nodine stated that Nicole Chase then took his pants down and gave him a "blow job."  He stated that it all happened so fast and his reaction was, "Ok, that fucking happened."

27.     I then pointed out to Calvin Nodine that he was changing his story and did not tell us from the beginning what happened.  Nodine responded that he had worked a long day on the date of the incident and that he was protecting himself as this was embarrassing.  He said he should have stopped Nicole Chase.

28.     I then asked Calvin Nodine what happened after Nicole Chase gave him fellatio and he said that Chase told him to walk out first to make sure no one was around.  Once it was clear, she came out of the bathroom and left.  I asked Nodine if Chase was a liar and he responded that the incident was consensual.

29.     Calvin Nodine was asked to take a polygraph test and, ultimately, Attorney Moraghan said that they would discuss it and get back to us.

30.     On June 14, 2017, Calvin Nodine called the police department and spoke to me with Officer Gompper also present for the call.  Nodine stated that he had taken a private polygraph test but did not pass it because he had not taken his medication.  He said he had a second polygraph test scheduled for Monday, June 19, 2017.

31.     On June 19, 2017, I received a fax from Attorney Moraghan stating that Nodine would not be submitting to a law enforcement polygraph examination.

**EXHIBIT B**

32. On June 21, 2017, Nicole Chase presented to the CPD and was interviewed by me.  The interview was video and audio recorded on the Liberty Recording System and maintained by the CPD in the police case file.  A true and accurate copy of the video and audio recording of the interview of Nicole Chase, obtained on June 21, 2017, is attached to the Defendants' Local Rule 56(a)1 Statement as Exhibit O.

33. Nicole Chase stated to me that she had ceased working at Nodine's Smokehouse, having turned in her key at the Torrington location.

34. Nicole Chase further stated that she worked her "butt off" and she remembers all of her customers.  She said, "I want him to give me his restaurant so I can run it right and for him to be gone and to not have the name Nodine's.  That's how much work I put into this place for this man."

35. After speaking with Nicole Chase for about an hour, I said to her "what if I told you" that Calvin Nodine took two polygraph tests and asked her if anything would come out that was truthful that she may have left out or forgot about.  This was an interview technique I used to get Chase to open up by considering what I might know that she did not tell me.

36. Nicole Chase responded that Calvin Nodine knew she was not "getting sex" at home.  When I asked how Nodine knew that, Chase explained that he overheard her talking to her coworker, Ali, about it.  She denied talking to Nodine about it directly.  I asked her if there was any flirtation between her and Nodine to which she responded, "Hell no."

37. I then told Nicole Chase that if she had consensual contact with Nodine that it was very important to the investigation that it is known.

38. Nicole Chase then became emotional, crying and placing her face in the palm of her hands.  She stated to me that there was nothing ever consensual.  She said that when Calvin Nodine pulled her into the bathroom and told her to do it, she did it because she did not know what to do.

39. I asked Nicole Chase if she gave Nodine oral sex.  Chase responded, "Yes."  She then said that everything else she told us (myself and Adam Gompper) was completely true.  She said that she had wanted to come

**EXHIBIT B**

back and tell us this but that she was in fear it would go against her story and that she did not want her boyfriend to know.

40.   Nicole Chase further stated to me that she was scared and did not even want to tell her own mother about this.  She said that she was suicidal and had been to the doctor.

41.   Nicole Chase stated that she had spoken to an attorney, but not about this, and did not want to come back and tell what really happened because she knew it would affect her civil case.

42.   Nicole Chase stated in response to further questioning that she and Nodine were standing near the bathrooms when an employee, Kyle, came back into the restaurant (who they thought had left).  She stated that she stayed silent because she did not want Kyle to know and she did not know what to do; that she did it to get it over with.

43.   Nicole Chase stated that she and Calvin Nodine were standing in the hallway near the bathroom and he had her arm.  Nodine did not force her into the bathroom but he led her into it by the arm, locking the door behind them.

44.   Nicole Chase further stated to me that she wanted to go home and did not want to lose her job.  As soon as they entered the bathroom she performed oral sex on Calvin Nodine as Kyle was calling out for him and her.

45.   Nicole Chase stated that she thought if she just did it she could leave and would not get hurt.  She further stated that Calvin Nodine's wife kept calling his cell phone to alert him of a police spot check while they were in the bathroom.  His wife "kept blowing up his phone," and called at least six times before Nodine answered.

46.   Nicole Chase stated that Calvin Nodine leaned against the sink and was hard at first but then was not; that Nodine kept bashing her face into his "junk."

**EXHIBIT B**

47.     I asked Nicole Chase where Nodine's hands were and she said that he was "pulling himself up" and demonstrated for me that Nodine had his hands in his genital region holding up his genitals.

48.     Nicole Chase stated to me that because Calvin Nodine was so intoxicated it took between ten to fifteen minutes for him to finish.  She stated that Nodine ejaculated into her mouth and that she had thrown out all of her clothing.

49.     At this point, I asked Nicole Chase if she wanted to provide a supplemental statement.  She asked me if it would screw up her civil case. I responded that I did not know, that I was not an attorney.

50.     Nicole Chase then stated to me that she wanted to provide a statement so the truth is known but did not want her boyfriend and whole family to know what happened.  I then again told her that she had the opportunity to put the truth in writing.

51.     Nicole Chase then acknowledged to me that she was aware that the written statement she provided to us was "not the truth" but said she wanted to consult with her attorney before providing another written statement.

52.     Based upon the facts and evidence obtained throughout the course of the investigation of police case number 1700004762, I believed Nicole Chase violated Connecticut General Statutes § 53a-157b, making a false statement, where she intentionally made a false written statement that she did not believe to be true with the intent to mislead officers of the CPD in the performance of their official functions, and made such statement under oath.

53.     Thereafter, I submitted an Affidavit and Application for Arrest Warrant for the arrest of Nicole Chase for the charge of making a false statement, in violation of Connecticut General Statutes § 53a-157b, to the State's Attorney's Office.  A true and accurate copy of the Affidavit and Application for Arrest Warrant is attached to the defendants' Local Rule 56(a)1 Statement as Exhibit P.

7

**EXHIBIT B**

54.   Based upon my training and experience, I believed I had probable cause to believe Nicole Chase committed the crime charged in the warrant.

55.   I did not leave any information out of my affidavit, which would have negated, in any way, probable cause for Nicole Chase's arrest.

56.   I am a sworn police officer in the Town of Canton and obligated to investigate crimes that occur in my jurisdiction and make arrests when I receive credible information that a crime has been committed.

57.   At no time, was my investigation of Nicole Chase's complaint and/or decision to submit an affidavit and application for her arrest motivated by any animus towards her based upon her gender or any other improper consideration.

58.   On at least one occasion, prior to May 7, 2017, while a Patrol Officer with the CPD, I responded to Nicole Chase's residence, in 2013, with Officer Adam Gompper on a reported domestic incident.  As a result of our response and investigation of this incident, Chase's boyfriend was involuntarily committed and a warrant was applied for, for his arrest.  The arrest warrant was signed by a prosecutor and judge and Chase's boyfriend was arrested.

59.   At all times, my decision to submit an affidavit and application for Nicole Chase's arrest and not for Calvin Nodine, was based upon the facts and evidence obtained throughout the course of the investigation of police case number 1700004762.  I determined that there was probable cause to believe that Chase had committed a crime while there was not probable cause to support that Nodine had.  In addition, I determined that Chase was not a credible witness.

60.   At all times, I employed my training and experience in conducting interviews and interrogations and the questions I asked and the manner in which I interviewed Calvin Nodine as well as Nicole Chase was based upon this training and experience.

61.   Upon my submission to the State's Attorney's Office, the Affidavit and Application for Arrest Warrant was reviewed and executed by both an Assistant State's Attorney and a Judge of the Superior Court, who both

**EXHIBIT B**

found there was probable cause to believe the offense of making a false statement in the second degree had been committed by Nicole Chase.

62.    A true and accurate copy of the executed warrant returned to the CPD is attached to the Defendants' Local Rule 56(a)1 Statement as <u>Exhibit W</u>.

63.    Sometime after I submitted the Affidavit and Application for Arrest Warrant to the State's Attorney's Office but before it was returned to the CPD, Nicole Chase presented to the department with copies of text messages I had previously asked her to provide me with.

64.    A police dispatcher asked me if I wanted to see Nicole Chase.  At the time, I was in a meeting related to another investigation and did not have any need to speak with Chase, so I advised the dispatcher that I did not need to see her.  I had previously reviewed the text messages, between Chase and Jeremy Archer, on Chase's cellphone at her interview on June 21, 2019.

65.    The copies of the text messages Chase left at the department were placed in the police case file.  A true and accurate copy of the text messages maintained in the file is attached to the Defendants' Local Rule 56(a)1 Statement as <u>Exhibit T</u>.

66.    Subsequently, I received e-mails from Nicole Chase in which she stated that she wished to "revise" her written statement and attached "supplemental information" she wished to add to the statement.  True and accurate copies of the e-mails and the attachment are attached to the Defendants' Local Rule 56(a)1 Statement as <u>Exhibit U</u>.

67.    I did not forward Nicole Chase's attachment to the State's Attorney's Office or attempt to advise the reviewing prosecutor of Chase's wish to add to her statement because it was not a statement given under oath and it was not exculpatory evidence.

68.    I did not ask Chase to come in and provide a supplemental statement because the information she wished to add was inculpatory and would be something to be pursued if the prosecutor decided to prosecute the case.

**EXHIBIT B**

69.   Nicole Chase was arrested on September 8, 2017, and subsequently released on a $2,500.00 dollar non-surety bond.


Dated at Canton, Connecticut, on this 1st day of October, 2019.


_____
John Colangelo


STATE OF CONNECTICUT   )
                       )   ss: Hartford
COUNTY OF HARTFORD     )


Subscribed and sworn to before me on this 1st day of October, 2019.


_____
**Michelle A. Oliveira**
**Notary Public**
**My commission expires: 05/31/2023**


Michelle A. Oliveira
Notary Public
State of Connecticut
My Commission Exp. May, 31 2023


10


**EXHIBIT B**