```
 1                IN THE UNITED STATES DISTRICT COURT

 2                    DISTRICT OF CONNECTICUT

 3      ------------------------------)

 4      NICOLE CHASE,                  ) NO.

 5               Plaintiff,            ) 3:18-cv-00683 (VLB)

 6          vs.                        )

 7      NODINE'S SMOKEHOUSE, INC.,     )

 8      CALVIN NODINE, TOWN OF CANTON, )

 9      JOHN COLANGELO, ADAM GOMPPER,  )

10      MARK J. PENNEY AND CHRISTOPHER )

11      ARCIERO,                       )

12               Defendants.           )

13      ------------------------------)

14                        VOLUME 1

15         VIDEOTAPED DEPOSITION OF NICOLE HEATHER CHASE

16                   DATE:  APRIL 15, 2019

17                        HELD AT:

18                    HOWD & LUDORF, LLC

19                 65 Wethersfield Avenue

20                  Hartford, Connecticut

21                         - - -

22      Reporter:  Sandra Semevolos, RMR, CRR, CRC, CSR #74

23                 HUSEBY GLOBAL LITIGATION
                        (800) 852-4589
24                      249 Pearl Street
                 Hartford, Connecticut  06103
25
```

**EXHIBIT F**

NICOLE CHASE vs NODINE'S SMOKEHOUSE, INC., ET AL.
Nicole Heather Chase on 04/15/2019

1   you into the men's room at Nodine's deli; correct?

2      A.    Yes.

3      Q.    And you reported that Mr. Nodine exposed

4   himself to you; correct?

5      A.    Yes.

6      Q.    And that he said to you, I know you must

7   not get it at home, so suck it, or something to that

8   effect?

9      A.    Yes.

10     Q.    And then you further reported that you

11  pushed past Mr. Nodine; Mr. Nodine fell into the

12  wall, and you exited the bathroom; correct?

13     A.    Yes.

14     Q.    On May 7, 2017, you did not report to Adam

15  Gompper any sex act or sexual activity between

16  yourself and Calvin Nodine.

17           MR. CHIMES:  Objection to form.

18     Q.    Is that right?

19           MR. CHIMES:  Objection to form.

20           You can answer.

21     Q.    Let me define sexual conduct for you, okay,

22  what I mean by that.  I'm defining sex as physical

23  contact for the purpose of sexual gratification,

24  okay?

25     A.    Okay.

```
 1      Q.    On May 7, 2017, did you report to Adam
 2  Gompper any sexual contact between yourself and
 3  Mr. Nodine?
 4                MR. CHIMES:  Objection to form.
 5                You can answer.
 6      A.    No, I did not on that day.
 7      Q.    Okay.  I understand you may have reported
 8  something else later, but we are just talking about
 9  May 7, 2017; okay?
10      A.    Yes.
11      Q.    Okay.  And Adam Gompper told you that if
12  you wanted to pursue a complaint that he would do a
13  complete investigation, didn't he?
14      A.    Yes.
15                MR. CHIMES:  Objection to form.
16      Q.    And --
17                MR. CHIMES:  Objection to form.  The
18  video speaks for itself.
19                You can answer.
20                MS. MACCINI:  She already did answer.
21  She said yes.
22                MR. CHIMES:  Wait for my objections,
23  please.
24                MS. SMITH:  Can we maybe stipulate
25  that your objection --
```

 1                    MR. CHIMES:  The document speaks

 2    for -- the video speaks for itself.

 3                    You can answer the question.

 4       A.    Can you repeat that?

 5       Q.    Did Officer Gompper tell you that if you

 6    were in fear for your safety or another similar

 7    incident occurred, to immediately contact 911 and

 8    report it to the police?

 9                    MR. CHIMES:  Objection to form.  The

10    document speaks for itself.  Or the video speaks for

11    itself.

12       A.    Yes.

13       Q.    And did he give you his contact information

14    in case you wanted to make a complaint, in case you

15    changed your mind and wanted to make a formal

16    complaint?

17                    MR. CHIMES:  Objection to form.  The

18    video speaks for itself.

19       A.    I actually don't recall that part, if he

20    gave me his information or just the card.

21       Q.    That's fine.

22             Did you find Officer Gompper to be

23    professional at all times during that lobby

24    interview?

25                    MR. CHIMES:  Objection to form.

1              You can answer.

2      A.    I don't -- I don't think it was

3  professional that he didn't take me to the side

4  without having my mother next to me.  But besides

5  that, he was -- did what I guess I would think an

6  officer would do.

7      Q.    He met your expectations of what a police

8  officer would do in that situation?

9              MR. CHIMES:  Objection to form.

10     A.    Mostly.  I mean, I think they would have

11  got, you know, brought me to a different room, not in

12  a lobby and not next to my mom, who I might not be

13  comfortable sharing stuff with.  But besides that --

14  those things, I would say he did a okay job.

15     Q.    Did he appear to be sensitive to what you

16  were telling him?

17              MR. CHIMES:  Objection to form.

18              You can answer.

19     A.    Yeah.  Not as sensitive as I think, but

20  yes, in a way.

21     Q.    What would you have wanted him to do

22  differently?  What could he have done better?

23     A.    I think he could have asked me if I felt

24  comfortable where we were or if I felt comfortable

25  speaking in front of my mother.  Besides that, I

1    mean, I think -- I think that was -- those were the

2    only things that might have changed that.

3        Q.    And I know you didn't have the benefit of

4    looking at the video the whole time I just played it

5    and I'm not going to play it again, but can you tell

6    me one way or another whether anybody walked through

7    the lobby while you were talking to Officer Gompper?

8        A.    I -- I wasn't watching.

9        Q.    Okay.

10       A.    I know that day that some point people did,

11   but I don't know if it was during the interview,

12   before, like I don't -- I couldn't tell you.

13       Q.    Okay.  And as you look up on the screen

14   here, we still have the end of the video on the

15   monitor, does this video show the entire lobby?

16              MR. CHIMES:  Objection to form.

17       A.    Yes.

18       Q.    Okay, thank you.

19              I want to turn now to dates subsequent to

20   May 7th, 12017 and your interactions with the Canton

21   Police Department.

22              When did you next have contact with any

23   officer from the Canton Police Department?

24       A.    That Mon -- that Monday or Tuesday, I'm

25   pretty sure it was Monday though.

1    Q.    Okay.  And who did you speak with?

2    A.    Sergeant Penney.

3    Q.    And what time did you speak with him on

4  Monday?

5    A.    I do not know.

6    Q.    And what was the substance of your

7  conversation with Sergeant Penney?

8    A.    To the best of my knowledge, I was going

9  back in to -- to complain about the Sunday and just

10  incidents and to see Officer Gompper, but Officer

11  Gompper wasn't in, I think.

12    Q.    And Officer Gompper had told you on May 7th

13  that he wouldn't be in again until Thursday; correct?

14    A.    Yes, but he said that if different things

15  happened that I could come in, so different things

16  did happen, so I did go in.

17    Q.    Okay.  And so you went in; you reported

18  these things to Sergeant Penney?

19    A.    I was going to, but -- or I was seeing what

20  I should do, and he said that because it kind of

21  still had to do with the same issue that basically to

22  go to Officer Gompper.

23    Q.    Okay.  Can you tell us what different

24  issues -- what different issues you reported to

25  Sergeant Penney on the Monday that you went into the

**EXHIBIT F**

 1   Canton Police Department?

 2                   MR. CHIMES:  Objection to form.

 3                   You can answer.

 4       A.   I don't know if I actually told him them

 5   all or if he, before I started talking that he, he

 6   might have just said, okay, well, you gotta wait for

 7   Officer Gompper.  So I'm not sure if I exactly told

 8   him.  But are you asking me if I did, what they would

 9   have been?

10                   MR. CHIMES:  Just --

11       Q.   No, no.  I -- to the best of your ability,

12   as you sit here today, I want you to tell me exactly

13   what you said to Sergeant Penney.

14       A.   I could not recall.  I remember having a --

15   just -- I just remember speaking to him, and then I

16   remember at the end of it him telling me to go get a

17   lawyer as soon as I left there.

18       Q.   Okay.  Did you report to Sergeant Penney

19   that Mr. Nodine touched you inappropriately?

20                   MR. CHIMES:  Objection to form.

21       A.   I don't know if I told him that or not.

22       Q.   Did you tell Sergeant Penney that you had

23   performed oral sex on Calvin Nodine on May 6th, 2017?

24                   MR. CHIMES:  Objection to form.

25                   You can answer.

www.huseby.com          Huseby, Inc. Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco     Page 67

EXHIBIT F

NICOLE CHASE vs NODINE'S SMOKEHOUSE, INC., ET AL.
Nicole Heather Chase on 04/15/2019

1      A.    No, I did not.

2      Q.    When was your next contact with anybody

3   from the Canton Police Department?

4      A.    I can't say for sure, but I'm almost

5   positive Thursday with Officer Gompper.

6      Q.    Did you have any telephone contact with

7   Officer Gompper before Thursday?

8      A.    I could not say for sure, no.

9      Q.    If the police reports indicate that you had

10  telephone contact with Officer Gompper on May 10th,

11  would you have any reason to dispute that?

12     A.    If the police report says it, then I might

13  have just to set up for the next day to come in so...

14     Q.    Okay.  I just want to go back to your

15  conversation with Sergeant Penney for a minute, and

16  you think you talked to Sergeant Penney on Monday

17  following the incident?

18     A.    Monday or Tuesday, yes.

19     Q.    And when I say "the incident," I'm

20  referring to what occurred at Nodine's Smokehouse on

21  the evening of May 6, 2017.

22          You understand what I'm talking about when

23  I say "the incident"?

24     A.    Well, now I do.  I mean, yes, I understand

25  what you're saying.

NICOLE CHASE vs NODINE'S SMOKEHOUSE, INC., ET AL.
Nicole Heather Chase on 04/15/2019

1    Q.    Okay.  So you believe that the Monday after
2    the incident, you went into the police department and
3    talked to Sergeant Penney?
4    A.    I talked to Sergeant Penney; I don't know
5    about what.  If it was -- I mean, I am -- I can't
6    assume things so --
7    Q.    I don't want you to assume things, but you
8    do recall that Sergeant Penney told you to go get a
9    lawyer immediately?
10   A.    Yes.  So I know I talked to him about
11   something.  I don't know if it was what my new issues
12   were or if it was the incident and new issues.  I'm
13   not -- I don't know.
14   Q.    But you -- in that conversation that you
15   had with Sergeant Penney, you did not talk about any
16   oral sex act; correct?
17   A.    No, I did not.
18   Q.    And you believe you came back to the Canton
19   Police Department on Thursday following the incident
20   to talk to Officer Gompper?
21   A.    To give a statement, I believe that was
22   that day, around that day.  I can't say for sure it
23   was that exact Thursday.
24   Q.    So you had made arrangements with Officer
25   Gompper to come in and give a written statement about

1   what had occurred on May 6th, 2017 and May 7th, 2017

2   when you returned to work?

3        A.   If that's what the -- whatever the

4   paperwork says that I called, then that's what I --

5   then that's when I called and then that's when I,

6   yes, went to go report what happened, if that's what

7   you're asking.

8        Q.   No, no.  I don't want you to guess.  I

9   mean, if you don't remember, just tell me.

10            Why did you go to the police department on

11   Thursday and speak with Officer Gompper --

12        A.   Well, I went to the police --

13        Q.   -- the Thursday after the incident?

14        A.   I went to the police because I had -- I --

15   I was sexually assaulted, and I needed to write a

16   statement and I -- I just -- I did not feel

17   comfortable, and I was ashamed, and I was

18   embarrassed, and I don't -- I went to, yes, make a

19   complaint, but I didn't make the complaint the way I

20   would have liked to make the complaint.

21        Q.   All right.  So between May 7th, 2017 and

22   the following Thursday, which was May 11th, 2017,

23   correct, you changed your mind, and you wanted to

24   make a complaint, a formal complaint?

25                 MR. CHIMES:  Objection to form.

NICOLE CHASE vs NODINE'S SMOKEHOUSE, INC., ET AL.
Nicole Heather Chase on 04/15/2019

```
 1                    But you can answer.

 2      A.    I think those are the dates, yes.

 3      Q.    Okay.  And you changed your mind, and you

 4   now wanted to make a formal complaint?

 5      A.    Yeah.

 6            MR. CHIMES:  Objection to form.

 7            You can answer.

 8      A.    Yes.

 9      Q.    Miss Chase, showing you what's been marked

10   as Defendants' Exhibit 3, take your time and skim

11   through that document.

12                    (Pause.)

13      A.    Okay.

14      Q.    Miss Chase, have you had time to review

15   Defendants' Exhibit 3?

16      A.    Meaning right now?

17      Q.    Yes.

18      A.    Yes.

19      Q.    And have you ever seen this document

20   before?

21      A.    Yes.

22      Q.    And do you recognize it?

23      A.    Yes.

24      Q.    And what do you recognize it as being?

25      A.    My statement.
```

www.huseby.com                Huseby, Inc. Regional Centers              800-333-2082
        Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco     Page 71

EXHIBIT F

1    Q.    Is this a written statement that you gave

2    to the Canton Police Department on May 11th, 2017?

3    A.    By "written statement," what do you like --

4    it's a statement; he typed it on a computer.

5    Q.    Okay.  I'm going to ask you about that, but

6    is that your signature in the middle of each page?

7    The bottom middle of each page.

8    A.    Yes.

9    Q.    Okay.  And can you describe the process by

10   which this document was typed, typed out?

11   A.    I spoke; he typed.  Then at the end, he had

12   me read it and print it out and sign it.

13   Q.    Did he ask you to make sure that it was

14   true and accurate when you read it?

15   A.    I mean, maybe not in those exact words, but

16   yes, he said something along those lines, to make --

17   to read it over on the computer so that he could

18   correct anything if it was wrong.

19   Q.    And before he -- you signed it, did he ask

20   you to attest that everything in the statement was

21   true and accurate?

22   A.    That I do not know.

23   Q.    You don't remember whether he swore you to

24   an oath before you signed?

25   A.    No.

1    Q.    So Officer Gompper typed this out as you

2    verbally gave a statement to him; correct?

3    A.    Yes.

4    Q.    And you reviewed it before signing it?

5    A.    Yes.

6    Q.    And did you read that notation above your

7    signature?  I'll read it into the record.  "By

8    affixing my signature to this statement, I

9    acknowledge that I have read it and/or have had it

10   read to me, and it is true to the best of my

11   knowledge and belief."

12   A.    I might have; I don't remember reading that

13   part, but yes, I might have.

14   Q.    Would you ever sign something without

15   reading it first?  Would you ever affix your name to

16   anything without reading it?

17   A.    Would I?

18   Q.    Especially a statement you are giving to

19   the police.

20   A.    Well, I mean, I did read it.  I might have

21   not read that little tiny piece, but no, usually I

22   read what I sign.

23   Q.    But you're telling me as you sit here

24   today, you don't know whether you swore to an oath as

25   to whether the content of this statement was true;

**EXHIBIT F**

```
 1                    MS. SMITH:  It's not advice; it's a

 2    fact.

 3                    MR. CHIMES:  No, this is a very

 4    common -- I'm instructing her not to answer to the

 5    extent it's something she learned from me.  That

 6    would be attorney work product and also

 7    attorney-client privilege.  She can answer the

 8    question from her own personal knowledge.

 9                    So I'm instructing, you can answer it

10    from what you yourself know as to whether it was true

11    or untrue, but not anything you've learned from me.

12         A.    I don't -- I'm very sorry, but I really

13    don't get what would be true or untrue about 2.

14         Q.    That's fine.  Let me start with that.

15    Maybe that's easier.  Thank you.

16                    Looking at paragraph 2, is there anything

17    in paragraph 2 that you believe is untrue or

18    incorrect?

19                    MR. CHIMES:  Objection to form.

20                    You can answer.

21         A.    I -- the only -- the only thing I see in

22    there is I, I never -- I never even said sexually

23    harassed, but I don't know if that -- if that's

24    something that would be -- do you hear what I'm

25    saying?  Like I never, when I went in there, that's
```

**EXHIBIT F**

1    not what I -- even though that is what I was

2    reporting, I never used those terms.

3         Q.   So you would agree with me that what you

4    reported on May 7, 2017 to Officer Gompper was sexual

5    harassment?

6               MR. CHIMES:  Objection to form.

7               You may answer.

8         A.   Yes.

9         Q.   Okay.  So I have to go back to my initial

10   question, and I understand your difficulty.  You're

11   asking me -- I'm not trying to trick you here.  I

12   mean, maybe you'll look at these paragraphs and there

13   is nothing untrue or incorrect so you don't

14   understand why I am asking you was there any reason

15   for Detective Colangelo to believe it was untrue or

16   incorrect, so I understand where you're coming from,

17   Miss Chase.

18              But again, I need to ask you, do you have

19   any knowledge as you sit here today that Detective

20   Colangelo knew what was stated in paragraph 2 to be

21   untrue or incorrect when he submitted his warrant?

22              MR. CHIMES:  And again, I'm going to

23   object to the form of the question.

24              I'm also going to instruct you that

25   you can answer from your own personal knowledge, but

```
 1   were complaining about sexual harassment, but you

 2   never used the word --

 3               MR. CHIMES:  Objection to form.

 4      Q.   -- when you came and made your report on

 5   May 7, 2017.

 6               MR. CHIMES:  You've mischaracterized

 7   her testimony.

 8               But you can answer.

 9      Q.   Was that your testimony, Miss Chase?

10               MR. CHIMES:  Objection to form.

11      A.   That I was going in to report sexual

12   harassment, just never used the word?

13      Q.   Yes.

14      A.   Yes.

15      Q.   Okay.

16      A.   That is -- that's all you're looking for?

17      Q.   Yes.

18      A.   Okay.

19      Q.   So do you perceive anything in paragraph 2

20   to be untrue?

21      A.   No --

22               MR. CHIMES:  Objection to form.

23               You can answer.

24      A.   No.

25      Q.   Why don't we do it this way, because your
```

```
 1   and I'll continue the instruction, don't give

 2   information related to attorney-client information

 3   from attorney-client privilege or work product.  I

 4   have a general objection to the form of the question.

 5   But you could answer.  I won't be continuing to

 6   object.

 7   BY MS. MACCINI:

 8       Q.   All right.  Miss Chase, again, I don't want

 9   you to answer any question that you don't understand,

10   so if you don't understand my question, just tell me,

11   okay?

12            So again, with paragraph 2, that statement

13   which I have read into the record, is there any

14   reason for you to believe or do you have any

15   knowledge that Detective Colangelo would have known

16   at the time he drafted the warrant that that

17   statement was incorrect or untrue?

18       A.   I don't know.

19       Q.   That's fine, that's fine.  And would that

20   be the same answer for Officer Gompper?

21       A.   Yes.

22       Q.   Okay.  I don't want you to be upset.  I see

23   that you're upset.  These questions are not meant to

24   trick you, so I'm going to try a different approach.

25       A.   I know they're not meant to trick me.
```

1    It's, I just feel stupid, like I don't understand.

2        Q.    Okay.  Let's try something different.  I'm

3    going to read paragraph 3 into the record:  That, on

4    his arrival, Officer Gompper met with the

5    complainant/victim, Nicole H. Chase -- I'm not going

6    to read your date of birth into the record.  She

7    explained that she works at Nodine's Smokehouse

8    restaurant, located at 192 Albany Turnpike in Canton,

9    Connecticut, along with her mother.  Chase said that

10   she was being sexually harassed by the owner and her

11   boss, Calvin Nodine.

12            Is there anything in paragraph 3 that you

13   believe to be incorrect or untrue?

14       A.    The only thing would be that at that

15   time -- I mean, yes, it's true.  I guess, yes.

16       Q.    I don't want you to guess.  It's either

17   accurate or it's not accurate.  So you've got to tell

18   me if you see an inaccuracy in paragraph 3.

19       A.    I didn't personally say sexually harassed,

20   but yes, that's what I was there for, so I don't know

21   how to answer that.

22       Q.    And I understand what you're telling me.

23   You did not use the word "sexual harassment" when you

24   went to the police department on May 7th, 2017, but

25   that's what you were describing to Officer Gompper?

NICOLE CHASE vs NODINE'S SMOKEHOUSE, INC., ET AL.
Nicole Heather Chase on 04/15/2019

```
 1      A.    Yes.

 2      Q.    Okay.  Now, looking at paragraph 4:  That,

 3   Chase began to give Officer Gompper a back story

 4   about her boss, Nodine, and that he has a drinking

 5   problem and has caused another worker, Nodine's

 6   stepson, to quit.  Chase said that she came in for

 7   her shift on 5/6/17 and after being there for about

 8   10 minutes, Nodine asked her, Did you get laid last

 9   night?  Chase said that Nodine was intoxicated at

10   this point and walked away.  When asked how she knew

11   Nodine was intoxicated, she said that usually in the

12   morning time he has a few drinks.

13           Is anything in paragraph 4 that I've just

14   read into the record untrue or incorrect?

15                 MR. CHIMES:  Objection to form.

16      A.    No, that's true.

17      Q.    So moving on to paragraph 5:  That, Officer

18   Gompper asked Chase what happened later that night.

19   She explained that she closed the front drawer down

20   at the end of the night located at the front of the

21   business.  Chase said that Nodine told two employees

22   that they were closed for the night and they could

23   leave.  Officer Gompper asked if this was normal

24   behavior for Nodine.  She said it was normal

25   behavior, but she felt Nodine was more dismissive and
```

1    wanted them to leave faster.

2          Miss Chase, is there anything incorrect or

3    inaccurate -- inaccurate -- inaccurate in paragraph

4    5?

5                MR. CHIMES:  Objection -- same

6    objections.

7       A.    No.

8       Q.    Okay.  Moving on to paragraph 6:  That,

9    Chase said as she was walking towards the back of the

10   business to leave for the night, she saw Nodine

11   standing near the bathroom/kitchen doors with his

12   arms open saying, We're going to make it through

13   this, we're going to make this company better, while

14   he was giving her a hug.  She said while it was

15   happening, a dishwasher, Kyle, came from around the

16   corner.  Chase then stopped her explanation of the

17   incident to Officer Gompper, standing up and saying

18   that it happened so quickly and that she had shut

19   down.

20          Is there anything in paragraph 6 of this

21   arrest warrant affidavit that is inaccurate or

22   incorrect?

23                MR. CHIMES:  Same objections.

24      A.    I don't personally remember, like, stand --

25   that stopping my ex -- my ex -- I don't personally

NICOLE CHASE vs NODINE'S SMOKEHOUSE, INC., ET AL.
Nicole Heather Chase on 04/15/2019

1    remember stopping my explanation of the incident, so
2    I would have to say I don't know, I guess.
3        Q.    Okay, that's fine.  That's the one thing
4    that you believe may not be correct in paragraph 6?
5        A.    Yes.
6        Q.    Do you have any knowledge that Detective
7    Coangelo would have known that to be inaccurate when
8    this warrant was submitted in July of 2017?
9        A.    I mean, the only thing would be if he --
10   if, if he watched the, the video.
11       Q.    Okay, okay.  You believe if we watched the
12   video, we won't see you stopping your explanation of
13   the incident and standing up as described in
14   paragraph 6?
15       A.    I don't think so.
16       Q.    Okay.
17       A.    I don't know.
18       Q.    Okay, that's fine, that's fine.
19             Moving on to paragraph 7:  That, she then
20   said that she doesn't even think her boss, Nodine,
21   would remember what happened.  She said that Nodine
22   must of already had his stuff out and she had no idea
23   because she was walking, it was dark, the lights were
24   off, and Nodine gave her a hug when the dishwasher
25   walked around the corner and said goodnight.  Chase

```
 1   said Nodine then grabbed her and pulled her into the

 2   bathroom, closing the door behind them.  Kyle then

 3   says, Uh, Calvin, are you in the bathroom?

 4   Goodnight.

 5              Is there anything in paragraph 7 of the

 6   affidavit that you find to be incorrect or

 7   inaccurate?

 8                   MR. CHIMES:  Same objections.

 9                   You can answer.

10      A.    I mean, there is one thing I noticed, but I

11   don't know if that would be technically what you're

12   asking.  It's missing that he locked the door.

13      Q.    Okay.  That's missing from paragraph 7?

14      A.    Yes.

15      Q.    But otherwise paragraph 7 is accurate?

16      A.    Yes.

17      Q.    Do you believe when you spoke with Adam

18   Gompper on May 7th, 2017 that you told him that

19   Mr. Nodine locked the bathroom door?

20      A.    I might not have.

21      Q.    Okay.  Do you have any knowledge that

22   Detective Colangelo knew on July 7, 2017 when he

23   submitted this warrant that there was information

24   that the bathroom door was locked or that you had

25   indicated that the bathroom door was locked?
```

1     A.    I did to Officer Colangelo.

2     Q.    You told Officer Colangelo that the

3   bathroom door was locked?

4     A.    You know what, I'm gonna go with I don't

5   know.

6     Q.    Okay, that's fine.  You don't know whether

7   you told either officer that the bathroom door was

8   locked?

9     A.    I know that I did tell an officer; I just

10  don't know when or whom, so I'm going to go with I

11  don't know.

12    Q.    Okay.  Moving on to paragraph 8:  That,

13  Chase said she wanted to say something to Kyle, but

14  she froze because it happened so quickly.  She said

15  she looked down and that's when Nodine said, I know

16  you must not get it at home, so suck it, or

17  something.  She said she opened the door and pushed

18  past Nodine and saw that Nodine had fallen into a

19  wall and hit his head.  Chase made a comment to

20  Officer Gompper about Nodine being a rich man during

21  this part of her story.

22          Is there anything in paragraph 8 that is

23  incorrect or inaccurate?

24          MR. CHIMES:  Objection to form, same.

25    A.    On my part, see it says -- this is where I

**EXHIBIT F**

```
 1   would get confused how to answer.  On my part, I -- I
 2   said that I opened the door and pushed past Nodine
 3   and saw Nodine fall into the wall and hit his head,
 4   and I made the comment to Nodine about being a rich
 5   man, but I didn't -- I think that it's out of, out of
 6   context, that this is -- this is -- do you get what
 7   I'm --
 8               MR. CHIMES:  You just do the best you
 9   can.  Don't get upset.  Just, you know, just do the
10   best you can.  And if you need to take a break, tell
11   me.
12       Q.    Miss Chase, when I get through going
13   through these paragraphs with you, I'm going to ask
14   you if anything is out of context, but right now, I
15   just want to know, is what's stated in paragraph 8
16   true and correct?
17               MR. CHIMES:  Objection to form.
18       A.    Yes.
19       Q.    Okay.  Paragraph 9, I'll read into the
20   record:  That, Chase said that Nodine may have an
21   injury to the right side of his head from her pushing
22   him.  Chase again said she froze but told Nodine that
23   he needed to get his cash from the last days and
24   directed him towards the nightly deposits.  She said
25   that she then left for the night and then spent two
```

www.huseby.com          Huseby, Inc. Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco     Page 134

EXHIBIT F

```
 1   hours thinking about what she should do about this.

 2           Is what is stated at paragraph 9 true and

 3   correct --

 4               MR. CHIMES:  Objection to form.

 5               You can answer.

 6   Q.    -- Miss Chase?

 7   A.    Yes.

 8   Q.    Paragraph 10, I'll read into the record:

 9   That, Chase said she texted Nodine's stepson, Jeremy,

10   and told him what happened but did not give full

11   details about Nodine telling her to suck it.  Officer

12   Gomper asked Chase what was exposed.  Chase said

13   Nodine was wearing a long, thick flannel shirt and

14   didn't initially -- and she -- there is no she

15   there -- and didn't initially notice anything.  She

16   said when there -- they were in the bathroom there

17   was no time for him to take his stuff out.  She said

18   in the bathroom Nodine's pants were open and she was

19   able to see that his underwear was pulled down and

20   could see his balls and penis.

21           Is what's stated at paragraph 10 of the

22   affidavit true and correct?

23               MR. CHIMES:  Objection to form.

24               You can answer.

25   A.    When I texted Jeremy, I did tell him for,
```

**EXHIBIT F**

NICOLE CHASE vs NODINE'S SMOKEHOUSE, INC., ET AL.
Nicole Heather Chase on 04/15/2019

```
 1   for -- that, that Calvin said to suck it.

 2        Q.    Okay.  Did you -- do you think you told

 3   Officer Gompper that you did not tell Jeremy that,

 4   that you didn't give Jeremy the full details?

 5        A.    I -- during my --

 6        Q.    Initial interview.

 7        A.    Initial interview?

 8        Q.    The lobby interview.

 9        A.    I -- I don't -- I don't know.

10        Q.    Is there anything else in paragraph 10 that

11   you believe may not be correct?

12        A.    No.  It would be correct, everything else.

13        Q.    Everything else is correct?

14        A.    Yes.

15        Q.    Okay.  Do you need a break for any reason?

16        A.    No, I'm just trying to -- I don't -- I

17   don't know.

18        Q.    Do you need water or coffee?

19        A.    No, thank you.

20        Q.    Okay.  Paragraph 11, I'll read into the

21   record:  That, Officer Gompper asked Chase if Nodine

22   had an erection.  She said yes, Nodine was erect and

23   he told her that he was getting hard.  Officer

24   Gompper asked if she was able to feel his genitals

25   against her when they were hugging.  She said no.
```

www.huseby.com          Huseby, Inc. Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco     Page 136

**EXHIBIT F**

1                Is what's stated in paragraph 11 of the

2    affidavit true and correct?

3        A.    It's true.

4        Q.    Okay.  Paragraph 12:  That, Chase said she

5    had never been in a situation like this before and

6    told her mom that she'd talk to the police about

7    this.  Officer Gompper explained to Chase if she

8    wanted to make a complaint, Officer Gompper would

9    take a written statement from her and would need to

10   speak to the witness, Kyle.  Chase then said that

11   Kyle didn't witness much, he just said bye Calvin.

12   There, in parentheses, it's stated, This is

13   inconsistent and different than the initial

14   description of the event Chase told Officer Gompper.

15   Chase then made a comment that she's going up against

16   a millionaire.  And in parentheses, it says, Nodine

17   owns a meat packing business which distributes

18   nationally as well as having this restaurant.

19               Is there anything in paragraph 12 that's

20   inaccurate or untrue, to your knowledge.

21       A.    I mean, I don't know it was inconsistent

22   and different than the initial description, so I

23   wouldn't know how to answer that, 'cause I don't, I

24   don't -- I don't know what would be -- the whole time

25   I said Kyle didn't witness much, so I don't know how

1   that would be inconsistent.

2       Q.    Okay, okay.  I understand what your

3   testimony is.  Is there anything else that may not be

4   correct in paragraph 12?

5       A.    No.  No.

6       Q.    All right.  Paragraph 13:  That, Chase was

7   told if she wanted to pursue charges, it would be

8   investigated and all parties involved would need to

9   be spoken to.  Officer Gompper explained that if

10  probable cause is developed Officer Gompper would

11  forward a warrant to the court.  Officer Gompper

12  asked Chase if she felt she was dragged in the

13  bathroom forcefully or if she felt she was being

14  kidnapped.  She said no, she felt that Nodine was

15  nervous and was worried that the other employees --

16  other employee would see them.  Chase said that she

17  wanted it noted that she came to the police

18  department and she doesn't think that she could face

19  that man in court.  She then said that she doesn't

20  want to go to work but hopes that he doesn't remember

21  what happened.  She began to say she wanted to see

22  how he was acting when she got into work before

23  deciding on making a formal complaint.

24          Is what's stated in paragraph 13,

25  Miss Chase, to your knowledge true and correct?

NICOLE CHASE vs NODINE'S SMOKEHOUSE, INC., ET AL.
Nicole Heather Chase on 04/15/2019

```
 1      A.    Yes.

 2      Q.    Okay.  Paragraph 14:  That, on May 11,

 3   2017, Nicole Chase came back to the Canton Police

 4   Department and provided the below sworn written

 5   statement to Officer Gomper.

 6            Is what's stated there initially true and

 7   correct to your knowledge?

 8            Did you go to the police department on

 9   5/11/17 and provide a sworn statement?

10      A.    Well, a sworn statement, I would have to

11   know if he actually swore me to it, right?

12      Q.    Yes.

13      A.    So then I don't know because I don't

14   remember if he did or not.

15      Q.    Okay.  That's fine.

16      A.    Okay.

17      Q.    I'm not going to read your statement into

18   the record, but I do want you to --

19                  MR. CHIMES:  Let's stipulate that --

20                  MS. MACCINI:  Okay.

21                  MR. CHIMES:  -- he accurately typed in

22   her statement

23                  MS. MACCINI:  I appreciate that,

24   Attorney Chimes.

25                  THE WITNESS:  So I don't have to read
```

**EXHIBIT F**

1    that?

2                  MS. MACCINI:  Correct.

3                  THE WITNESS:  Okay.

4        Q.    We are now at paragraph 15 on page 6 of the

5    affidavit.  I'll read paragraph 15 into the record:

6    That, based on Chase's complaint and sworn statement,

7    Calvin Nodine was called and requested to come to the

8    Canton Police Department to speak to Officer Gompper

9    and Affiant Colangelo about the allegations.  On

10   5/18/17, Nodine came to the police department with

11   his attorney.  After speaking with Nodine, Nodine

12   initially denied anything happening between them.

13   After Nodine spoke privately to his attorney, Nodine

14   explained that Chase had performed oral sex on him in

15   the bathroom and it was consensual.

16               So this involves Mr. Nodine and not

17   yourself, so I'll ask you, do you have any reason to

18   believe that anything is incorrect in paragraph 15?

19       A.    I mean, obviously that it wasn't

20   consensual.

21       Q.    Do you have any basis to believe that

22   Mr. Nodine did not report that to the police when he

23   came in and gave a statement?  In other words, do you

24   have any reason to believe that he didn't report that

25   to the police, that that wasn't his version of

```
 1   events?

 2       A.    Oh, that he -- that this isn't what he

 3   said?

 4       Q.    Correct.

 5       A.    I don't have -- I don't know.  I mean --

 6       Q.    You don't know what Mr. Nodine reported to

 7   the police?

 8       A.    Yes.

 9       Q.    So you don't know whether what's stated in

10   paragraph 15 is correct?

11       A.    Yes.

12       Q.    But you have no basis to say it's

13   incorrect?

14       A.    No.  I don't know.

15       Q.    Okay.  You don't know one way or another

16   whether it's correct?

17       A.    I don't know --

18       Q.    Okay.

19       A.    -- one way or another.

20       Q.    Okay.  Moving on to paragraph 16:  That,

21   based on the interview with Nodine, it was decided to

22   re-interview Chase.  On June 21st, 2017, at

23   approximately 1000 hours, Chase came to the lobby of

24   the police department and was brought into the front

25   interview room by Affiant Colangelo.  Affiant
```

www.huseby.com          Huseby, Inc. Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco   Page 141

EXHIBIT F

1    Colangelo began by explaining he had read over the

2    reports and statements and asked Chase to tell him

3    about Nodine's restaurant.

4              Based on your own personal knowledge,

5    Miss Chase, is there anything in paragraph 16 that's

6    inaccurate or untrue?

7        A.    No.

8        Q.    Paragraph 17:  That, Chase said how much

9    she loved working at Nodine's restaurant and didn't

10   have too many problems initially.  Chase gave Affiant

11   Colangelo the back story about internal business

12   issues, employees, problem employees and issues with

13   how Nodine ran his business.  She spoke about

14   Nodine's drinking, poor management and rude jokes

15   that were sexual in nature.

16             Is there anything in paragraph 17 that I

17   just read into the record that you find to be untrue

18   or incorrect?

19       A.    No.

20       Q.    That, during the course of the interview,

21   Chase said that she worked her butt off and she

22   remembers all her customers.  She said that it hurt

23   her to leave.  Chase said I want him to give me his

24   restaurant so I can run it right and for him to be

25   gone.  She then said that it's not happening -- that

**EXHIBIT F**

1   it's not happening Nodine's, that's how much work I

2   put into that place.

3       A.   The ending, I did not say.  I don't know

4   what that's even referring to.

5       Q.   I'm not sure about that, that paragraph --

6   that sentence myself.  I think there must be a typo

7   there.  But other than that, is there anything

8   that's --

9               MR. CHIMES:  Objection to the

10  character --

11      Q.   -- untrue or inaccurate --

12              MR. CHIMES:  Objection to the

13  characterization.

14      Q.   -- in paragraph 18?

15              MR. CHIMES:  It's an error so --

16      Q.   Other than the sentence that you've pointed

17  out and you said that you did not state that, is

18  there anything in paragraph 18 that's untrue or

19  inaccurate?

20      A.   No.

21      Q.   That, Affiant Coangelo explained to Chase

22  that he had interviewed Nodine.  She was asked if

23  they ever had any relations prior to the incident in

24  the bathroom.  She said there was not.  It was

25  alluded to the fact that Nodine took two polygraph

NICOLE CHASE vs NODINE'S SMOKEHOUSE, INC., ET AL.
Nicole Heather Chase on 04/15/2019

```
 1   tests.  Chase was asked if anything would come out
 2   that was truthful that she may have left out or
 3   forgot about.  She said that Nodine knew she wasn't
 4   getting sex at home.  When asked how Nodine knew
 5   that, she explained that Nodine overheard her talking
 6   to her coworker, Allie, about it.  She denied talking
 7   to Nodine about it directly.  Chase was asked if
 8   there was any flirtation between her and Nodine.  She
 9   replied, Hell no.
10           Miss Chase, is there anything stated in
11   paragraph 19 that is untrue or inaccurate?
12       A.    No.
13       Q.    Paragraph 20:  That, Chase was asked if
14   there was anything that Affiant Colangelo needed to
15   know for this investigation.  She said that Nodine
16   tried to kiss her after the incident in the bathroom.
17   She said it happened when she grabbed the money bags
18   that were left on the counter.  Chase said Nodine
19   leaned in to kiss her and touch her lips, but she
20   didn't kiss him back.  Chase mentioned forgetting to
21   put that in her statement.  This is a direct
22   contradiction to her initial statement.  In her
23   initial statement, she wrote, I saw the money bags
24   were left on the counter and said to Calvin, don't
25   forget your money bags, and walked out of the
```

**EXHIBIT F**

1    building.

2            Is there anything that's untrue or

3    inaccurate in paragraph 20, Miss Chase?

4        A.   I don't know because I got very confused

5    about, which I guess is in there, but I don't know

6    what I ended up saying and what ended up -- I got

7    very confused where the moneybag was, but I

8    remembered giving, like letting him know, take your

9    moneybag 'cause I -- do you get what I'm saying?

10       Q.   I understand what you're saying, but isn't

11   it true, Miss Chase, that when you reported the

12   events of the evening of May 6, 2017 to Officer

13   Gompper, you left out that Nodine leaned in to kiss

14   you?

15       A.   Yes.

16       Q.   You didn't mention that to Officer Gompper?

17       A.   Yes, that --

18       Q.   You agree with me that you did not tell

19   Officer Gompper that?

20       A.   Yes.

21       Q.   Okay.  Moving on to paragraph 21:  That, it

22   was told to Chase that if she had consensual contact

23   with Nodine that it was very important to this

24   investigation that it's known.  She then said, I

25   know, I'm trying to get myself to this point.  At

1  this point, Chase became emotional, crying and

2  placing her face into the palm of her hands.

3         Is there anything in paragraph 21,

4  Miss Chase, that's untrue or inaccurate?

5     A.   Well, it's saying consensual.  It's not

6  saying consensual or not consensual.

7     Q.   So what it -- the sentence says, Detective

8  Colangelo is stating that he told you that if she had

9  consensual contact with Nodine that it was important

10 for him to know that.

11        We saw that on the video, didn't we, today?

12             MR. CHIMES:  Objection to form.

13             You can answer.

14    A.   Yes.

15    Q.   So there is nothing untrue about that;

16 right?  He is not saying that it was consensual; he

17 is saying that he told you that if you had consensual

18 contact with Nodine he needed to know.

19             MR. CHIMES:  Objection.  The video

20 speaks for itself.

21    Q.   Go ahead and read paragraph 21 to yourself,

22 Miss Chase, just so there is no confusion.

23                  (Pause.)

24    A.   There is nothing not true about the --

25    Q.   Is there anything untrue or inaccurate in

www.huseby.com          Huseby, Inc. Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco     Page 146

**EXHIBIT F**

1   paragraph 21?

2       A.    I don't -- I don't know how to answer this.

3   I mean, I don't -- I don't know.

4       Q.    You seem to be struggling with your

5   response to whether there is anything untrue or

6   incorrect in paragraph 21.

7             What's the issue?  Why are you struggling?

8       A.    'Cause the way he put it is like I said it

9   after he said consensual, and to me, that's not true.

10  To me, I just eventually got to a point that I --

11  yes, became emotional, but I feel that I don't -- I

12  don't -- I don't know.

13      Q.    So you don't know one way or another

14  whether what's stated in paragraph 21 is true and

15  accurate?

16      A.    No.

17      Q.    As you sit here today, do you have any

18  knowledge or information that Detective Colangelo

19  knew at the time he drafted the arrest warrant

20  affidavit in July of 2017 that's what's stated in

21  paragraph 21 was untrue or inaccurate?

22      A.    Can you repeat that one more time?

23      Q.    Do you have any reason to believe or any

24  knowledge that Detective Colangelo knew at the time

25  he drafted the arrest warrant affidavit that

**EXHIBIT F**

NICOLE CHASE vs NODINE'S SMOKEHOUSE, INC., ET AL.
Nicole Heather Chase on 04/15/2019

1   paragraph 21 was inaccurate or false in any way?

2        A.   I don't know.

3        Q.   Okay, that's fine.  Paragraph 22, I'll read

4   into the record:  That, Chase said there was nothing

5   ever consensual.  She said when Nodine pulled her

6   into the bathroom and told her to do it, she did it.

7   Affiant Colangelo asked if she gave Nodine oral sex.

8   She said yes.  Chase then said that everything else

9   is completely true.  She explained that she wanted to

10  come back and say this, but she was in fear it would

11  go against her story and she doesn't want her

12  boyfriend to know.

13            Is there anything stated in paragraph 22,

14  Miss Chase, that is untrue or inaccurate?

15       A.   I said my boyfriend and friends and mother.

16       Q.   Okay.

17       A.   I didn't just say just my boyfriend.

18       Q.   Okay.

19       A.   But besides that, it's true.

20       Q.   Okay, thank you.  Moving on to

21  paragraph 23:  That, Chase said she didn't want

22  people -- there is a missing word, a typo there --

23  that Chase said she didn't want people know why she

24  did it because she didn't want to.  She said she was

25  scared and didn't even want to tell her own mother.

www.huseby.com          Huseby, Inc. Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco     Page 148

**EXHIBIT F**

1   She explained that she has been suicidal and has been

2   to the doctor.  She said she had spoke to her

3   attorney but did not tell the attorney about this and

4   didn't want to come back and tell what really

5   happened because she knew it would affect her civil

6   case.

7           Is there anything untrue or inaccurate in

8   paragraph 23, Miss Chase?

9       A.   I didn't say I knew it would affect my

10  civil case.  I -- I asked if it might.  But besides

11  that, that's -- besides that, it's true.

12      Q.   Okay.  Paragraph 24:  That, Affiant

13  Colangelo told Chase that he had Chase's original

14  statement.  She said that everything was the same

15  except the part where she said no.  She said she made

16  sure to tell the truth except for the one part

17  because she didn't want people to know.

18          Is there anything in paragraph 24,

19  Miss Chase, that's untrue or inaccurate?

20      A.   No.

21      Q.   Paragraph 25:  That, Affiant Colangelo then

22  drew a picture with Chase of the layout of the

23  business to get a better idea where Chase and Nodine

24  were during the night of the alleged incident.  As

25  she was explaining where they were standing and how

NICOLE CHASE vs NODINE'S SMOKEHOUSE, INC., ET AL.
Nicole Heather Chase on 04/15/2019

1   she was pulled into the bathroom, she began to

2   hesitate.  As she was trying to explain where they

3   were standing, she said out loud, well, that doesn't

4   make sense, and then began to talk about them hugging

5   in the hallway and how Nodine was holding her hand.

6           Is what's stated in paragraph 25 true and

7   correct, Miss Chase?

8       A.   Yes, it is true.  I just still to this day

9   don't, even when I watch the video, don't understand

10  what I wasn't getting, but yes, that is true.

11      Q.   Okay.  Paragraph 26:  That, she said they

12  were standing in the hallway near the bathrooms when

13  the employee, Kyle, came back into the restaurant,

14  and in parentheses, it says, who they thought had

15  left.  She said she stayed silent because she didn't

16  want Kyle to know and she didn't know what to do.

17  She said she did it to get it over with.

18          Is there anything in paragraph 26 that's

19  untrue or inaccurate?

20      A.   I don't know if I said the words "I did it

21  to get it over with," like exactly those words, but

22  besides that, it seems true.

23      Q.   Okay.  Paragraph 27:  That, Affiant

24  Colangelo asked how they ended up from the hallway

25  into the bathroom.  She said that Nodine had her arm

**EXHIBIT F**

1    in the hallway and it wasn't forceful, but she knew

2    that he wanted her in the bathroom, so he guided her

3    in, closing the door and locking it behind them.  She

4    said she wanted to go home and wanted to keep her

5    job.

6              Is what's stated in paragraph 27 true and

7    accurate, Miss Chase?

8        A.    I didn't say that he wasn't forceful.  I

9    said that I didn't feel like he was kidnapping me.

10       Q.    So paragraph 27 has to do with your

11   interview with Detective Colangelo, so I want to make

12   sure you realize that.

13       A.    Okay.  So, Affiant Colangelo asked how they

14   ended up in the bathroom.  She said that Nodine had

15   her arm in the hallway and it wasn't forceful, but

16   she knew that he wanted her...guided her in.

17             I'm going to have to go with I don't know

18   or that I don't think that that's a true -- I don't

19   remember saying any of that or that he guided me into

20   the bathroom.

21       Q.    Okay.  That's fine.

22       A.    But I did say I wanted to go home and I

23   wanted to keep my job.

24       Q.    Okay.  As you sit here today, do you have

25   any knowledge that Detective Colangelo when he

**EXHIBIT F**

```
 1   drafted the warrant in July of 2017 knew that that
 2   statement that it wasn't forceful was untrue or
 3   incorrect?
 4       A.    Well, he's the one who took it, so he would
 5   know if it was untrue, right?
 6       Q.    Do you have any basis to -- do you know
 7   that you indicated to him that it was forceful?
 8              MR. CHIMES:  Objection to form.
 9       Q.    Do you believe you indicated that you
10   were --
11       A.    Not -- I mean, I -- well, I know I
12   definitely didn't say that it wasn't forceful.
13       Q.    Okay.
14       A.    So I don't know what I said, but it
15   definitely wasn't like -- I don't know how to explain
16   it.  I don't know.  So I guess I don't know.
17       Q.    Okay.  So you don't -- just to make sure
18   the record is clear, you believe that you never used
19   the words "It wasn't forceful," that's fair; correct?
20       A.    Yes.
21       Q.    But you don't know exactly what you
22   described to Detective Colangelo on June 21st, 2017
23   with respect to how Mr. Nodine got you in the
24   bathroom?
25       A.    I'm pretty sure that he -- that I said he
```

1   grabbed my arm and dragged me into the bathroom.  I'm

2   pretty sure that's how I said it, but I can't say for

3   sure that that's how I said it.

4        Q.   Okay.  All right.  Turning to paragraph 28:

5   That, Chase said that Nodine's wife kept calling his

6   cell phone to alert him of a police spot-check while

7   they were in the bathroom.  She said the wife kept

8   blowing up his phone.  She continued on saying that

9   his wife called at least six times before Nodine

10  answered.  Chase said as soon as they entered the

11  bathroom, she performed oral sex on Nodine as Kyle

12  was calling out for Nodine and Chase.

13       Is there anything in paragraph 28 of the

14  arrest warrant affidavit that is untrue or

15  inaccurate, Miss Chase?

16       A.   No.

17       Q.   Paragraph 29:  That, Chase said she thought

18  if she just did it, she could leave and wouldn't get

19  hurt.  She said Nodine leaned against the sink and

20  was hard at first but then wasn't.  She said Nodine

21  kept bashing her face into his junk.  She said that

22  because Nodine was so intoxicated, it took between 10

23  to 15 minutes for him to finish.

24       Is there anything in paragraph 29 that is

25  untrue or inaccurate, Miss Chase?

www.huseby.com          Huseby, Inc. Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco     Page 153

EXHIBIT F

```
 1       A.    On my part, which I don't know if it would
 2   have anything that -- why they would put it in there
 3   or not or whatever, but it could have been -- I know
 4   that to one of the officers I said it could have been
 5   two minutes or five minutes; it felt like it was 10
 6   or 15 minutes.  So I don't know if that's something
 7   or not to point out.  Do you hear what I'm saying?
 8   Like with inaccuracy.
 9       Q.    I do understand what you're saying.  In
10   paragraph 29, Detective Colangelo is making a
11   statement related to what you told him.
12            So is it true that you told him that it
13   took between 10 and 15 minutes?
14       A.    I don't know, 'cause I don't know if he's
15   the one who I said it felt like 10 to 15 minutes but
16   could have been two, so I don't know.
17       Q.    Okay.  Paragraph 30:  That, Chase said that
18   Nodine ejaculated in her mouth and that she had
19   thrown out all of the clothes she was wearing that
20   night.  She said she kicked herself for not reporting
21   the incident that night and that she didn't have her
22   mouth swabbed.
23            Is that a true and accurate statement set
24   forth there in paragraph 30?
25       A.    I think I said that I -- everything that I
```

```
 1   was wearing the next day I threw out, but besides

 2   that, yes, that is true.

 3        Q.    Paragraph 31:  That, Chase was asked if she

 4   wanted to provide a new statement.  She asked if it

 5   would screw up her civil case.  Affiant Colangelo

 6   told her that he didn't know and wasn't an attorney.

 7   She said she wanted to provide a statement so the

 8   truth is known but didn't want her boyfriend or whole

 9   family to know what happened.  She was again told she

10   had the opportunity to put the truth in writing.

11           Is what's stated in paragraph 31 of the

12   affidavit correct -- true and correct, Miss Chase?

13        A.    Let me just read it again.

14        Q.    Yes.  Go ahead and read it to yourself.

15                       (Pause.)

16        A.    Yes.

17        Q.    What's stated in paragraph 31 is true and

18   correct?

19        A.    Yes.

20        Q.    Paragraph 32:  That, Chase acknowledged

21   that she was aware that the sworn written statement

22   she provided to Officer Gompper was not truthful.

23   She said she wanted to consult with her attorney

24   prior to providing another written statement.

25           Is what's stated in paragraph 32 true and
```

**EXHIBIT F**

NICOLE CHASE vs NODINE'S SMOKEHOUSE, INC., ET AL.
Nicole Heather Chase on 04/15/2019

```
 1   correct, Miss Chase?

 2       A.    Yes, even though by "not truthful" I didn't

 3   mean that.  I just meant that I left something out,

 4   but yes, that is a true statement.

 5       Q.    Okay.

 6             MS. SMITH:  I'm sorry, could you

 7   repeat that; I couldn't hear you.

 8             MR. MORAGHAN:  Same.

 9             THE WITNESS:  That yes, that that is a

10   true statement even though that not truthful, it was

11   truthful; that's just not what I meant.  I meant that

12   I left something out, but yes, that is a true

13   statement.

14       Q.    Paragraph 33:  That, Chase then thanked

15   Affiant Colangelo for letting her tell the truth.  It

16   was explained to Chase that she could call and speak

17   to Affiant Colangelo about her decision to provide a

18   written statement.  As of July 7, 2017, Chase has not

19   called to speak to Affiant Colangelo or Officer

20   Gompper.

21             And I'll stipulate for the record it says

22   "of Officer Gompper," but it should be "or."

23             Is there anything untrue or inaccurate in

24   paragraph 33, Miss Chase?

25       A.    7/7/17.  When did I see -- I'm pretty sure
```

**EXHIBIT F**

```
 1   this is not -- not -- not true.
 2       Q.    Okay.  What's not true about paragraph 33?
 3       A.    I had gone in to hand in a bunch of texts
 4   between me and Jeremy.  And when I went in, the --
 5   what is it called? -- the dispatcher told me that
 6   he -- I went in saying I would like -- I came in to
 7   revise my statement.  Officer Colangelo was on
 8   vacation, and I said, I came in to revise my
 9   statement and hand in these texts that he wanted me
10   to give him.  And the dispatcher said, okay.  He
11   walked away with my texts and the pile of them to
12   Jeremy back and forth, and then he came back and told
13   me that Officer Colangelo didn't need me and if he
14   needed me, he would call me.  And then I kind of
15   stood there confused, like, wait a minute, because
16   that's what I was there for was to really revise the
17   statements, and I just happened to bring the things
18   he wanted.  And then he never called me.
19       Q.    Can you tell me what date that was that
20   this occurred?
21       A.    I don't know exactly when, but I know that
22   it was -- it was pretty close to -- I don't know the
23   exact date.
24       Q.    Is there anything that would help you
25   identify the date?  Do you have any personal notes,
```

**EXHIBIT F**

```
1   diaries or anything of that nature related to this
2   case?
3       A.    I know there's emails, but even the emails
4   were after I had already gone in twice -- or gone in
5   and then called once to change -- revise my
6   statement, and then I sent him an email like two
7   weeks after that and so that email --
8       Q.    Are you telling me that you're certain that
9   you went into the police department before July 7th,
10  2017 with the texts to Jeremy and a revised
11  statement?
12      A.    I'm pretty sure, but I can't say for
13  positive.  I -- if I -- okay.  When was -- what was
14  the date that I -- 6/21, right?
15      Q.    You gave --
16      A.    June 21st is when I gave my statement or,
17  sorry, when I talked to Colangelo, right?
18      Q.    Yes.
19      A.    And then he was on vacation for -- all
20  right.  So then I don't know exactly when.  It would
21  have been either within those few days or maybe a day
22  or two after that, but -- so I don't know if that is
23  true or not.
24      Q.    You don't know whether what's stated in
25  paragraph 33 is true or not?
```

 1     A.    No.

 2     Q.    Okay.  It's possible that you went into the

 3   police department to give the texts and the statement

 4   after July 7th, 2017?

 5     A.    After?  It is possible that I did after,

 6   but it's also possible that I did before.

 7     Q.    As you sit here today, you can't nail down

 8   a date for me?

 9     A.    No.  I remember I saw him; he asked me to

10   get him the texts; he asked me about the revised.  I

11   spoke to my lawyer, which was not -- well, Lewis, I'm

12   not sure when we got involved with that.  Okay,

13   ignore that.

14           I talked to my lawyer; I --

15           MR. CHIMES:  Don't say anything about

16   what you said to your lawyer, but okay.

17     A.    Okay.  My -- and then I went to go bring in

18   the texts when he was back from vacation and to talk

19   to him.  So I don't know when he got back from

20   vacation, but it was the next week after I talked to

21   him and he went on vacation.  So I assume it was

22   literally the week of that week.

23     Q.    Okay.

24     A.    I don't --

25     Q.    Okay.  Paragraph 34:  That, based upon the

**EXHIBIT F**

NICOLE CHASE vs NODINE'S SMOKEHOUSE, INC., ET AL.
Nicole Heather Chase on 04/15/2019

1    facts and circumstances contained herein, I have

2    probable cause to believe -- I don't need you to

3    answer for 34.  That's legalese that we don't need to

4    get into.

5             Do you need to take a break for any reason,

6    Miss Chase?  That was a little lengthy, I understand.

7    Do you want a five-minute recess?

8                    MR. CHIMES:  Yes, let's take 10?

9                    THE WITNESS:  Could I, please?

10                   MS. MACCINI:  Okay.

11                   THE VIDEO OPERATOR:  Okay, off the

12   record.  Watch your microphone please.  The time is

13   3:21.

14       (Recess taken from 3:21 p.m. to 3:33 p.m.)

15                   THE VIDEO OPERATOR:  This is the

16   beginning of Media Number 4.  We are back on the

17   record.  The time is 3:33.

18   BY MS. MACCINI:

19       Q.   Miss Chase, we just went through

20   Defendants' Exhibit 5, the arrest warrant affidavit.

21             Is there anything in that affidavit that

22   you believe is misleading?

23                   MR. CHIMES:  Objection to the form.

24   Same objections, same instructions.

25                   You can answer.  Instructions will

www.huseby.com                Huseby, Inc. Regional Centers              800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco    Page 160

**EXHIBIT F**

```
 1   go --

 2       A.    Misleading?

 3             THE VIDEO OPERATOR:  Excuse me.  It's

 4   kind of hard to hear with the machine.

 5             THE REPORTER:  Yeah, thank you.

 6             MR. CHIMES:  For the record, same

 7   objections, same instructions, which will go for any

 8   other questions.  I won't repeat the instructions and

 9   objection for the warrant, but go ahead.

10       A.    Misleading, meaning like what I would think

11   is misleading to a judge reading this?

12       Q.    Yes.

13       A.    Okay.  Well, I don't remember it all,

14   but...

15                   (Pause.)

16       A.    One little thing is that, like I said, I

17   don't -- I don't remember stopping my explanation of

18   something, which kind of makes it seem -- but that's

19   just something little.

20       Q.    Where are you?

21       A.    On paragraph 6.

22       Q.    Okay.  And we discussed that.

23       A.    Yeah, so that's what I'm saying, it's

24   just --

25       Q.    Okay.
```

**EXHIBIT F**

1      A.     -- that.

2      Q.     Anything else that you believe to be

3   misleading in the arrest warrant affidavit?

4      A.     I made a comment to Officer Gompper about

5   Nodine being a rich man.  The way that's said makes

6   it seem like -- I don't know, I feel like it makes it

7   seem, 'cause it's made like -- the comment is

8   actually made like two or three times in here, rich

9   man or millionaire, when it really meant I was afraid

10  of just bringing like a regular criminal case against

11  him because I knew that he could afford lawyers and

12  that I do not have money for lawyers and stuff.  And

13  it makes it seem like -- I don't know, that like I

14  want his money or something.  I mean, yes, now we are

15  in a civil case, but I -- I never knew about a civil

16  case when I came to report this.

17     Q.     Okay.

18     A.     Sergeant Penney is actually the one who

19  told me that -- that I could make it a civil case.  I

20  thought civil cases were only meant for like people

21  who got in car accidents.  So that I feel is

22  misleading because it's not like the context that I

23  said it.

24     Q.     Okay.

25     A.     I feel like it's a little misleading that

NICOLE CHASE vs NODINE'S SMOKEHOUSE, INC., ET AL.
Nicole Heather Chase on 04/15/2019

```
 1   the -- the text to Jeremy not giving the full details
 2   about Nodine, about Calvin telling me to suck it.  I
 3   feel it's a little misleading 'cause, yes, I didn't
 4   say that he succeeded in making me do something I
 5   didn't want to do, but I did tell Jeremy that he did
 6   tell me to do that.  So I feel like that's a little
 7   misleading 'cause it makes it seem like I didn't even
 8   tell Jeremy that at all, if you get what I'm saying.
 9       Q.   Yes, I understand what you're saying.
10       A.   Okay.
11            Yeah, once again, the going up against the
12   millionaire, I just meant I didn't think I had a
13   chance of even --
14       Q.   Where are you now, Miss Chase?
15       A.   Paragraph 12.  Once again, I just meant
16   that I felt I had no chance and that there was no
17   reason to really report it.
18       Q.   Okay.
19            MR. CHIMES:  Can you try to read to
20   yourself.
21            THE WITNESS:  Sorry.
22            MR. CHIMES:  So we don't have to put
23   it on the record.
24                (Pause.)
25       A.   Like I said, I don't know if he -- for
```

**EXHIBIT F**

1  number 14, I don't know if he -- like if it was a

2  sworn statement or not.  I'm not sure.

3      Q.    Okay.  We've been through what you think

4  might, you know, be inaccurate.  I'm just asking, is

5  there anything that is misleading?

6                  (Pause.)

7      A.    I don't know if this counts or not, and I

8  know I mentioned it before, but the whole like me

9  wanting him to give me his restaurant and all that.

10  I mean, I did say that, but I do feel like the -- I

11  mean, I guess -- I guess that's just not what I

12  meant, so I guess that's not -- never mind.

13      Q.    Where are you, Miss Chase, in the warrant?

14  What paragraph are you at?

15      A.    The 18, where it hurt me to leave, and I

16  said I want him to give me his restaurant and all

17  that.

18      Q.    And you explained to me --

19      A.    Yeah.

20      Q.    -- your issues with that.

21      A.    Yes.

22      Q.    And I understand.

23              MR. CHIMES:  Objection.  I think

24  you --

25              MS. MACCINI:  I'm just letting her

NICOLE CHASE vs NODINE'S SMOKEHOUSE, INC., ET AL.
Nicole Heather Chase on 04/15/2019

```
 1              C E R T I F I C A T E

 2   STATE OF CONNECTICUT

 3            I, SANDRA SEMEVOLOS, a Registered Merit
     Reporter and Notary Public within and for the State
 4   of Connecticut, do hereby certify that I reported the
     videotaped deposition of NICOLE HEATHER CHASE on
 5   APRIL 15, 2019, at the offices of HOWD & LUDORF, LLC,
     65 Wethersfield Avenue, Hartford, Connecticut.
 6
              I further certify that the above-named
 7   deponent was by me first duly sworn to testify to the
     truth, the whole truth and nothing but the truth
 8   concerning her knowledge in the matter of the case of
     NICOLE CHASE vs. NODINE'S SMOKEHOUSE, INC., CALVIN
 9   NODINE, TOWN OF CANTON, JOHN COLANGELO, ADAM GOMPPER,
     MARK J. PENNEY AND CHRISTOPHER ARCIERO, now pending
10   in the UNITED STATES DISTRICT COURT, for the DISTRICT
     OF CONNECTICUT.
11
              I further certify that the within testimony
12   was taken by me stenographically and reduced to
     typewritten form under my direction by means of
13   COMPUTER ASSISTED TRANSCRIPTION; and I further
     certify that said deposition is a true record of the
14   testimony given by said witness.

15            I further certify that I am neither counsel
     for, related to, nor employed by any of the parties
16   to the action in which this deposition was taken; and
     further, that I am not a relative or employee of any
17   attorney or counsel employed by the parties hereto,
     nor financially or otherwise interested in the
18   outcome of the action.

19
              WITNESS my hand this 25th day of April,
20   2019.

21

22

23   _____
     Sandra Semevolos, RMR, CRR, CRC, CSR #74
24   Notary Public
     My Commission Expires:  September 30, 2020
25
```

**EXHIBIT F**