1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

------------------------------X

NICOLE CHASE                      :

       Plaintiff,          :

   VS.                            :   NO. 3:18-cv-00683(VLB)

NODINE'S SMOKEHOUSE, INC.,         :
CALVIN NODINE, TOWN OF             :
CANTON, JOHN COLANGELO,            :
ADAM GOMPPER, MARK J.              :
PENNEY, AND CHRISTOPHER            :
ARCIERO                            :

       Defendants.         :

------------------------------X



D E P O S I T I O N

   THE DEPOSITION OF MARK J. PENNEY, taken on behalf of the Plaintiff, before Kevin Lombino, Registered Professional Reporter, Notary Public within the State of Connecticut Certificate Number 191, on the 29th day of November, 2018, at 11:57 a.m., at the offices of Robert Fortgang Associates, LLC, 573 Hopmeadow Street, Simsbury, CT.

GOLDFARB AND AJELLO, LLC (203) 972-8320

**EXHIBIT H**

1  on a date and time and amended a police report?
2      A.   It does I believe.
3      Q.   Does each police officer or member of the Canton
4  Police Department who has access or authorized to use
5  that system, do they each have an individual log-in
6  information?
7      A.   They do and I believe it's password protected as
8  well.
9      Q.   Can you tell me for the Canton Police Department
10 what the procedure is for taking oaths for sworn
11 statements?
12     A.   You take your statement and then there's two
13 formats.  You can take it in a handwritten statement on a
14 preprinted form and then you can also take it on a, when
15 you are sitting down at a terminal entering data into the
16 computer.  And then when you print that form out it also
17 has an oath statement printed on that form as well.
18          So the officer should read the oath and swear
19 the victim to, I'm sorry, swear the person to the
20 statement.
21     Q.   And is it common for the officer who took the
22 statement and types it up to give the oath?
23     A.   I believe so.
24     Q.   I'm sorry, going back it Exhibit 5 which is the
25 sexual assault investigation general order.  It's Exhibit

1    A.   No.

2    Q.   On May 11, Nicole Chase came back to the police
3 department, right, with Alexandra Archer.

4         Are you aware of that?

5    A.   Yes.

6    Q.   And this report, Plaintiff's Exhibit 11,
7 describes that, describes other things but it does
8 describe that, right?

9    A.   Yes, it does.

10   Q.   Did you have any discussions with Ms. Chase on
11 May 11, 2017?

12   A.   I spoke to her but I don't know what day it was.
13 I think it was previous to May 11.

14   Q.   Okay.  I am just trying to figure out the
15 timeline.  So she came in May 7 with her mother.

16        You don't think you spoke to her that day?

17   A.   I did not.

18   Q.   Do you know if she came to the police department
19 between May 7 and May 11?

20   A.   She came back at another time.  Officer Gompper
21 wasn't there, I was there so I spoke to her and told her
22 she would need to speak to Gompper, but I did have a
23 conversation with her but I don't know what date that
24 was.

25   Q.   So it may have been after May 11 or before?

1    A.   I want to say it was before this report was
2  written, and it looks like she came back on the 11th, so
3  it would have either been the eighth, ninth or the tenth.
4    Q.   And this report does say, on his return
5  Wednesday, May 10 he learned that the victim had returned
6  to the police department, right?
7    A.   Yes.
8    Q.   So that is when you spoke to her you think, not
9  May 10 but before May 10?
10   A.   I think so, that's what I think.
11   Q.   Sometime between May 7 and May 10?
12   A.   Yes.
13   Q.   Can you tell me what she said to you first?
14   A.   I cannot recall the complete context of the
15  conversation.  What sticks out in my mind was she seemed
16  to want to know whether or not -- she was looking for
17  advice whether or not to report to work, what she should
18  do in the employment context which I told her is
19  something we don't handle and I referred her to speak to
20  an employment attorney.
21   Q.   You did tell her that you think she should speak
22  to an attorney?
23   A.   I did.
24   Q.   What did she say in response?
25   A.   I think she just kind of applied in the

1    Q.   Okay.  Have you reviewed a video of your
2  conversation with Nicole Chase?
3    A.   I have not.
4    Q.   When you say "it may have been," why do you
5  think that?
6    A.   Because I believe that there is an ongoing
7  recording system that monitors the lobby.  I don't really
8  know the wherewithal of how that works.
9    Q.   Okay.  When you said Nicole Chase wanted, Nicole
10 wanted advice on whether or not to report to work, is
11 that what you said?
12   A.   Her, if I remember correctly, her questions were
13 along the lines of employment type questions which I
14 couldn't answer which is why I referred her to an
15 attorney.  She is asking questions about what her like
16 legal, his legal obligation of retaining her as an
17 employee was which I couldn't answer.
18   Q.   Okay.  Is it fair to say she was concerned of
19 keeping her job?
20   A.   Yes.
21   Q.   Do you recall having had any other conversations
22 with Ms. Chase at any other point in time?
23   A.   No.
24   Q.   Did you have any discussions with Ms. Archer at
25 any time?

GOLDFARB AND AJELLO, LLC (203) 972-8320

**EXHIBIT H**

```
 1  it possible to identify suspects.
 2          So I don't think they're ever completely closed
 3  out.  You may run out of material to work with so it
 4  remains a cold case.
 5      Q.  What if you found that there was not probable
 6  cause to the complaint, can you just close the case?
 7      A.  If there was no probable cause, the case could
 8  be closed.  However, because we close it doesn't mean it
 9  can't ever be re-investigated.
10      Q.  Okay.
11              MS. SMITH:  I am just going to do a quick
12           review and I think I covered everything.
13              (Short recess was taken.)
14      Q.  Did you have any communications or aware of any
15  communications relating to this case, Nicole Chase's case
16  other than what we discussed today or is contained in the
17  reports?
18      A.  No.
19      Q.  And in the IA investigation, aside from that?
20      A.  No.
21              MS. SMITH:  That's all I have.
22  EXAMINATION BY MR. MORAGHAN:
23      Q.  Sergeant, the false statement occurred in May of
24  2017, correct?
25      A.  I believe so, yeah, yes.
```

**EXHIBIT H**

1    Q.   And the information that was obtained after that
2  which confirmed the original statement was, in fact,
3  false and misleading would simply confirm that she
4  committed a crime, that Ms. Chase had commitment a crime
5  in May of 2017, correct?
6         MS. SMITH:  Objection, you can answer.
7    A.   Yes.
8    Q.   And we talked about a bond, there is 2,500
9  nonsurety bond in this case when she was arrested,
10 correct?
11   A.   That's correct.
12   Q.   Nonsurety bond means that the person arrested
13 does not have to put up any money or hire a bondman,
14 correct?
15   A.   Correct.
16   Q.   It's equivalent to a promise to appear, they
17 appear in court, if they don't appear in court they may
18 have to pay to the State of Connecticut $2,500, correct?
19   A.   That is correct.
20   Q.   Ms. Chase did not have to spend any money out of
21 her pocket to be released from the Canton Police
22 Department after she was arrested, correct?
23   A.   That's correct.
24   Q.   And in Exhibit 10 there's talk about the
25 supplemental report and how is it noted to have different

```
 1  STATE OF CONNECTICUT    )
 2                          )  ss:  WALLINGFORD
 3  COUNTY OF NEW HAVEN     )
 4
 5          I, Kevin Lombino, a Registered Professional
 6  Reporter and Notary Public within and for the State of
 7  Connecticut, do hereby certify that the within deposition
 8  of MARK J. PENNEY was held before me on the 29th day of
 9  November, 2018.
10          I further certify that the witness was first
11  sworn by me to tell the truth, the whole truth and
12  nothing but the truth, and was examined by counsel, and
13  his testimony was recorded stenographically by me, it was
14  reduced to typewriting under my supervision, and I hereby
15  submit that the within contents of said deposition are
16  true and accurate to the best of my ability.
17          I further certify that I am not a relative of
18  nor an attorney for any of the parties connected with the
19  aforesaid examination, nor otherwise interested in the
20  testimony of the witness.
21          Dated at Wallingford, Connecticut, the 15th day
22  of December, 2018.
23          _____
24              Kevin Lombino, CSR00191
25  (My commission expires October 31, 2021.)
```

GOLDFARB AND AJELLO, LLC (203) 972-8320

**EXHIBIT H**