```
 1              UNITED STATES DISTRICT COURT
                  DISTRICT OF CONNECTICUT
 2

 3   NICOLE CHASE              :   NO.:  3:18-CV-00683(VLB)
              Plaintiff,       :
 4                             :
                               :
 5   VS.                       :
                               :
 6   NODINE'S SMOKEHOUSE, INC.,:
     CALVIN NODINE, TOWN OF CANTO:
 7   CANTON, JOHN COLANGELO,   :
     ADAM GOMPPER, MARK J. PENNEY:
 8   AND CHRISTOPHER ARCIERO   :
              Defendants.      :   May 16, 2019
 9

10

11          DEPOSITION OF:   ALEXANDRIA ARCHER

12

13      Taken on behalf of the Defendant, Town of
        Canton, John Colangelo and Adam Gompper, in
14      the hereinbefore-entitled action, pursuant
        to Federal Rules of Civil Procedure, before
15      Hilary O. Winslow, duly qualified Notary
        Public in and for the State of Connecticut
16      and Commonwealth of Massachusetts, held at
        HOWD & LUDORF, 65 Wethersfield Avenue,
17      Hartford, CT  06114, commencing at 10:08
        a.m. on Thursday, May 16, 2019.
18

19

20

21

22

23

24                    Hilary O. Winslow
                Certified Court Reporter, 00361
25
```

*NIZIANKIEWICZ & MILLER REPORTING SERVICES*
*ctcourtreporter@gmail.com*                    *(860)291-9191*

**EXHIBIT I**

```
 1         Q.    Did Ms. Chase object to him touching her
 2   that way?
 3               MS. M. SMITH:  Objection.
 4               You can answer.
 5               THE WITNESS:  Okay.  I mean, she didn't
 6         say anything, but I could tell she looked
 7         uncomfortable.  There was no words.
 8   BY MS. MACCINI
 9         Q.    Okay.  On May 11th, 2017, you went to the
10   police station with Nicole?
11         A.    Yes.
12         Q.    But at -- strike that.
13               Based on your prior testimony -- I just want
14   to make sure that I'm clear on your testimony.  Between
15   May 6th, 2017, and May 11th, 2017, when you went to the
16   police station --
17         A.    Uh-huh.
18         Q.    -- Nicole Chase did not tell you of any
19   sexual contact between herself and Mr. Nodine?
20         A.    No.  She told me that he had shown his
21   genitals.  She described it in detail to the officer,
22   which I remember because I was in the room for that.
23   But she did not say that it had physically happened.
24         Q.    She didn't describe any actual contact?
25         A.    No.
```

1  Q.  Okay.  Did she ever text you about what
2  happened on the evening of May 6th, 2017?
3  A.  No.  That was something that we were always
4  in person talking about.
5  Q.  Okay.  How did it come about that you went
6  to the police station with her on May 11th, 2017?
7  A.  I don't recall exactly how.  I do recall
8  that she had told me she texted my brother Jeremy that
9  night, and she said that Jeremy had told her to go to
10 the police.  That's the only thing that would -- yeah.
11 Q.  Well, what was your role in going with her
12 to the police department?  Were you there -- did you
13 know that you were going to be giving a statement
14 before you went?
15 A.  Not really, no.
16 Q.  Was it your expectation that you were just
17 giving her moral support?
18 A.  Yes.
19 Q.  Okay.  Did she ask you to say anything to
20 the police?
21 A.  No.
22 Q.  Did she discuss with you what she expected
23 you to say?
24 A.  No.
25 Q.  Did she ever text you about going to the

```
 1  BY MS. MACCINI
 2       Q.   Do you understand my question?
 3       A.   Yes.
 4       Q.   Is it possible that Ms. Chase was present
 5  while you gave your statement?
 6       A.   Yes.  I don't recall exactly, so it is
 7  possible.
 8       Q.   Okay.  Let me ask you something.  Did
 9  Attorney Chimes tell you to say that Ms. Chase was not
10  with you when you gave your statement?
11       A.   No.
12       Q.   Okay.  So at some point you go in and give
13  your statement.  You have to answer audibly.
14       A.   Yes.  Sorry.
15       Q.   And you can't tell me as you sit here today
16  whether Nicole was there with you when you gave your
17  statement or not?
18       A.   Correct.
19       Q.   Okay.  But you know that you were present
20  when Ms. Chase gave her statement?
21       A.   Yes.
22       Q.   Okay.  Can you describe for me the process
23  by which you gave your statement to Officer Gompper?
24       A.   Yes.  I pretty much just sat in the chair,
25  and he sat on the computer in the room.  And he asked
```

1  me the events of the day, because prior to that, when I
2  was in the room with Nikki, she was talking about how
3  he had touched her, like, done that joke.  So I told
4  him about that, and that was pretty much -- that's
5  really all I can recall.
6      Q.  Bear with me for a moment.  I just want to
7  take a look at something.
8          All right.  The police records related to
9  the statements indicate that you gave your statement at
10 7:42, and Ms. Chase started giving her statement at
11 8:14.
12     A.  Okay.
13     Q.  Does that sound correct to you, that you
14 gave your statement first and then Nicole gave hers?
15     A.  Yes.  Was that in the morning or nighttime?
16     Q.  In the morning.
17     A.  Morning, okay.  I recall that, I think.
18     Q.  I'm going to show you what's been marked as
19 Defendant's Exhibit 2 and have you take your time and
20 look at that.
21             MR. MORAGHAN:  Which one is that?
22             MS. MACCINI:  This is Ms. Archer's
23        statement.
24             MR. MORAGHAN:  What number?
25             MS. MACCINI:  Two.

```
 1                    And let's go off the record for a
 2           moment.
 3
 4                    (Discussion was held off the record)
 5
 6                    (Defendant's Exhibit 4, marked for
 7           identification.)
 8
 9  BY MS. MACCINI
10      Q.   Ms. Archer, I've handed you what's been
11  marked as Defendant's Exhibit 4.  And, for the record,
12  it is a copy of Nicole Chase's statement that she
13  provided on May 11th, 2017.  And I just want you to
14  take a look at the top where it says the time started
15  and compare it to Defendant's Exhibit 2, which is your
16  statement.  And do you see that the time started for
17  your statement is 7:42, and the time started for
18  Ms. Chase's is 8:14?
19      A.   Yes.
20      Q.   Does that refresh your recollection as to
21  the order of -- the order in which the statements were
22  given?
23      A.   Yes.
24      Q.   Okay.  So it's correct that you gave your
25  statement first?
```

1  A.  Yes.
2  Q.  And is it also correct that Ms. Chase was
3  present when you gave your statement?
4  A.  I don't recall that.
5  Q.  Okay.  Did you have any issue with Ms. Chase
6  being present in the room while you gave your
7  statement?
8       MS. M. SMITH:  Objection.
9  BY MS. MACCINI
10  Q.  Do you understand my question?
11  A.  Yes.  I don't recall if she was in the room
12  for my statement.  If she was, I would not have had an
13  objection, I don't think.
14  Q.  Okay.
15  A.  But I don't recall if she was or not.
16  Q.  Okay.  Do you recall Nicole giving a
17  statement after you?
18  A.  Yes.
19  Q.  And what was the process by which she gave
20  her statement?
21  A.  We all sat in the room together, and she,
22  basically, just told him step by step what had
23  happened.  He had helped her put it into actual words.
24  I do remember that he let us -- or he let Nikki see
25  everything afterwards.  That's the -- yeah.

1  Q. You recall Officer Gompper giving a copy of
2  what he had typed out to Ms. Chase and having her
3  review it?
4  A. Yes, and same with mine.
5  Q. And when he did the same thing with you, did
6  he ask you if everything was true and correct?
7  A. Yes.
8  Q. Do you recall whether he swore you to an
9  oath before you signed off on the statement?
10 A. I don't recall.
11 Q. Okay. But you do recall him showing you the
12 statement and asking you to make sure if everything was
13 true and correct?
14 A. Yes.
15 Q. And you recall him doing the same thing with
16 Ms. Chase?
17 A. Yes.
18 Q. And did Ms. Chase agree with what was set
19 forth on the written statement that Officer Gompper had
20 typed out was true and correct?
21 A. Yes.
22 Q. When you say he helped her with the wording,
23 what do you mean by that?
24 A. He -- she was very stuttery and all over the
25 place. So when her words were trying to come out, she

```
 1  was trying to say, like, oh, I was over -- like, trying
 2  to think of an example.  He pretty much asked
 3  questions, like, oh, did he grab you?  Did he put his
 4  hand here?  Where did he put his hand, kind of.  That
 5  was basically it.
 6       Q.   So he helped her to be more specific in her
 7  description of what --
 8       A.   Yes.
 9       Q.   -- occurred?
10       A.   Yes.
11       Q.   When Nicole gave her statement, did Officer
12  Gompper ask her if she wanted you to stay in the room?
13       A.   Yes.
14       Q.   Okay.  And did Nicole respond to him that
15  she wanted you to stay with her?
16       A.   I don't recall, but I think so.
17       Q.   It would make sense because otherwise you
18  wouldn't have been in the room when she gave her
19  statement.
20       A.   Yeah.
21       Q.   Okay.  You don't recall her objecting to you
22  being present?
23       A.   No.
24       Q.   And your purpose was to be there for moral
25  support.  Correct?
```

**EXHIBIT I**

```
 1        A.    Yes.
 2        Q.    And Ms. Chase wanted you with her?
 3        A.    Yes.
 4        Q.    Okay.  Taking a look at Defendant's Exhibit
 5   2, your statement dated May 11th, 2017, can you take a
 6   moment and read -- did you read the entire document
 7   while we were off the record?
 8        A.    I did, yes.
 9        Q.    Okay.  And do you recognize that as being
10   your written statement?
11        A.    I do, yes.
12        Q.    And is that your signature at the bottom,
13   middle of the page?
14        A.    Yes.
15        Q.    And did you read this document before
16   signing it?
17        A.    I did, yes.
18        Q.    And you read that by affixing your signature
19   to this statement, "I acknowledge that I have read it
20   and/or have had it read to me, and it is true to the
21   best of my knowledge and belief"?
22        A.    Yes.
23        Q.    And then Officer Gompper witnessed that you
24   appeared before him and signed off on the statement.
25   Correct?
```

1    A.   Yes.
2    Q.   Is there anything in this statement that you
3 believe is incorrect?
4    A.   No.
5    Q.   Okay.  And your recollection on May 11th,
6 2017, five days after May 6th, would be clearer than it
7 is today.  Right?
8    A.   Yes.
9    Q.   Did you make any other statements to anyone
10 concerning the events of May 6th, 2017?
11   A.   No.
12   Q.   Did you ever meet with a private
13 investigator who asked you to give a statement?
14   A.   No.
15   Q.   Did Mr. Chimes ask you to put anything in
16 writing when you met with him a couple weeks ago --
17   A.   No.
18   Q.   -- or the last week?  Did you say you met
19 with him last week?
20   A.   I believe it was last week, yes.
21   Q.   What was the exact day or date?
22   A.   Can I look in my phone and see?
23   Q.   Sure.  Sure.
24   A.   It was May 9th, and I met him at D'Amico &
25 Pettinicchi in Watertown, Connecticut.

**EXHIBIT I**

```
 1   give a statement?
 2        A.   Not that I know of.
 3        Q.   You don't know if Nicole Chase told her --
 4   told Officer Gompper that you were going to give a
 5   statement?
 6        A.   No, I don't know that.
 7        Q.   Okay.  Your presence in the room when
 8   Ms. Chase was giving her statement was at her request?
 9        A.   Yes, if I recall correctly.
10        Q.   Would it be fair to say that you were sure
11   that she never asked you to leave the room?
12        A.   Yes.
13        Q.   And would it be fair to say she was never
14   uncomfortable with you being in the room?
15        A.   Correct.
16        Q.   Would it be fair to say she was very
17   comfortable with you while she was discussing this with
18   a male police officer?
19        A.   Yes.
20        Q.   Again, how did it come to be that you gave a
21   statement to Officer Gompper?
22        A.   I believe it was just -- I don't recall
23   exactly.  I think it's just after seeing that one
24   incident of him touching her on the side, I think that
25   that was just something that -- I don't recall exactly
```

**EXHIBIT I**

# CERTIFICATE

I, Hilary O. Winslow, License #00361, a Notary Public for the State of Connecticut and Commonwealth of Massachusetts, do hereby certify that the deposition of ALEXANDRIA ARCHER was taken before me pursuant to Connecticut Practice Book, at HOWD & LUDORF, 65 Wethersfield Avenue, Hartford, CT 06114, commencing at 10:08 a.m. on Thursday, May 16, 2019.

I further certify that the witness was first sworn by me to tell the truth, the whole truth, and nothing but the truth, and was examined by counsel, and her testimony was stenographically reported by me and subsequently transcribed as hereinbefore appears.

I further certify that I am not related to the parties hereto nor their counsel, and that I am not in any way interested in the events of said cause.

Witness my hand this 28th day of May, 2019.

*Hilary O. Winslow*
_____
Hilary O. Winslow, CSR, Notary

My Commission expires:          My Commission expires:
February 28, 2022 (in MA)       February 28, 2021 (in CT)

**EXHIBIT I**