1

```
 1              UNITED STATES DISTRICT COURT
                   DISTRICT OF CONNECTICUT
 2

 3   NICOLE CHASE              :   NO.:  3:18-CV-00683(VLB)
               Plaintiff,      :
 4                             :
                               :
 5   VS.                       :
                               :
 6   NODINE'S SMOKEHOUSE, INC.,  :
     CALVIN NODINE, TOWN OF CANTO:
 7   CANTON, JOHN COLANGELO,    :
     ADAM GOMPPER, MARK J. PENNEY:
 8   AND CHRISTOPHER ARCIERO    :
               Defendants.     :   May 16, 2019
 9

10

11            DEPOSITION OF:  KYLE ROULEAU

12

13        Taken on behalf of the Defendant, Town of
          Canton, John Colangelo and Adam Gompper, in
14        the hereinbefore-entitled action, pursuant
          to Federal Rules of Civil Procedure, before
15        Hilary O. Winslow, duly qualified Notary
          Public in and for the State of Connecticut
16        and Commonwealth of Massachusetts, held at
          HOWD & LUDORF, 65 Wethersfield Avenue,
17        Hartford, CT  06114, commencing at 12:55
          p.m. on Thursday, May 16, 2019.

18

19

20

21

22

23

24            Hilary O. Winslow
          Certified Court Reporter, 00361
25
```

*NIZIANKIEWICZ & MILLER REPORTING SERVICES*
*ctcourtreporter@gmail.com*                    *(860)291-9191*

**EXHIBIT L**

1      A.    Moved furniture -- laborer, I guess.

2      Q.    How long did you work for them?

3      A.    Like, a year.

4      Q.    And prior to that, what did you do for

5  employment?

6      A.    I worked at the Training School of Southbury

7  as a DDS worker for a little bit.

8      Q.    And from when to when if you recall?

9      A.    Probably from -- what was it -- September of

10  2019 -- 2018 to about March of 2019, yeah, right in

11  there.

12      Q.    Back in May of 2017, were you working for

13  Nodine's Smokehouse?

14      A.    Yes.

15      Q.    And when did you start working for Nodine's

16  Smokehouse?

17      A.    I'm not exactly sure.

18      Q.    Did you start working for Nodine's

19  Smokehouse when it first opened?

20      A.    Yes.

21      Q.    In November of 2016?

22      A.    Yes.

23      Q.    And what was your position?

24      A.    Dishwasher.

25      Q.    And when did you leave your employment at

1     Q.    Sir, I don't want you to guess.

2     A.    Oh, I'm sorry.  Yeah, it was before.

3     Q.    You've got to just tell us what you

4  remember.

5     A.    Yeah, what she said, it was before the

6  statement to -- yeah, it was before.

7     Q.    Okay.  So when you went to Nicole's house,

8  what did she tell the two of you, you and your

9  girlfriend Ally?

10    A.    Yeah, exactly what I said about her being

11  trapped in the bathroom with Calvin, and he took it out

12  and tried to make him [sic] do something.

13    Q.    When you spoke to Nicole, did she tell you

14  of any contact of a sexual nature between herself and

15  Mr. Nodine?

16    A.    No.

17    Q.    Okay.  And just so we're clear on the

18  record, I'm defining sexual contact as intentional

19  touching of the genitalia -- breast, inner thigh, butt,

20  or kissing.  Did she tell you anything about any

21  contact of that nature?

22    A.    No.

23    Q.    Okay.  On May 12th, 2017, you went to the

24  Canton Police Department?

25    A.    Correct.

**EXHIBIT L**

1    give to her lawyer?

2          A.    Yes.

3          Q.    Did you hear from her lawyer?

4          A.    No, I don't believe I did.

5          Q.    Are you sure that you didn't receive -- did

6    you ever communicate with her lawyer?

7          A.    No, I did not.

8          Q.    Did you meet with her lawyer in Waterbury --

9          A.    No.

10         Q.    -- or anywhere else?

11         A.    Nope.

12         Q.    So you've never had any communication with

13   Attorney Lew Chimes?

14         A.    Correct.

15         Q.    Okay.

16         A.    You did say it so convincing that I kind of

17   believed it.  I was like, wait, did I?

18         Q.    When did you -- when did you give Ms. Chase

19   your phone number to give to her lawyer?

20         A.    About two to three months ago.

21         Q.    And then you never heard from Mr. Chimes?

22         A.    Correct.

23         Q.    Okay.  How did it come about that you went

24   to the police station on May 12th, 2017?

25         A.    How did it come about?

**EXHIBIT L**

1      Q.   Yeah.  How did it come about?

2      A.   Nicole wanted to press charges and asked if

3  -- or -- and thought it would be a good idea, because I

4  was there, and asked if we -- if anybody saw anything

5  and would want to say something.  And I said, Sure.

6      Q.   And did this occur when you and Ally went to

7  her house and she relayed to you what occurred?

8      A.   No.

9      Q.   Well, when did she ask you to go to the

10  police department?

11      A.   Probably within the first couple -- within

12  the first week of the incident, I want to say, she

13  brought it up.

14      Q.   Did she ask you in person, over the phone?

15      A.   In person.

16      Q.   And where were you when she asked you?

17      A.   I don't know.

18      Q.   Because, sir, you've testified to one

19  meeting that you and Ally and Ms. Chase had --

20      A.   Yeah, yeah.

21      Q.   -- at her home.  And you told me that that's

22  the only time you remember speaking to her --

23      A.   Yeah.

24      Q.   -- between May 6th and May 12th.  So is that

25  when she asked you to go to the police department, or

**EXHIBIT L**

1  was there another time that you met with her that

2  you're just now recalling?

3       A.   To be honest, I don't recall a hundred

4  percent if Nicole -- I know, it was, like -- a big

5  portion of it was through my girlfriend, and we were

6  talking about that.  I'm -- I will put on the record

7  Nicole never asked me to go down and testify.  It was

8  me and Ally.  Like, we had talked.  We were dating.  It

9  was, like, Hey, are you going to testify, and blah,

10  blah, blah.

11       Q.   So Ally wanted you to help Nicole out?

12       A.   Maybe -- well, I guess so.  I wouldn't put

13  it in those words, to help her out.

14       Q.   Okay.  How would you describe it?  What

15  words would you put it in?

16       A.   Yeah, I guess help her out.  It just --

17  using those words just make it sound like, I'm doing it

18  just for that, just to get at somebody.

19       Q.   Well, again, I'm not trying to trick you.  I

20  don't want to put words in your mouth.  The question

21  was:  How did it come about that you went to the police

22  station?  So what's your answer to that question?

23       A.   Everything I said prior to this is off the

24  record?

25       Q.   No, it's all on the record.  Listen --

1      A.   I'm sorry.

2      Q.   -- we've been here for a while, and it's

3  getting kind of light hearted, but this is a serious --

4  this is a serious procedure here.  We're taking your

5  deposition.

6      A.   Yeah.  When --

7      Q.   I need you to answer my question.  Let me --

8  don't cut me off.  I need you to truthfully answer my

9  questions.  And if you don't understand my question,

10 tell me.

11          So the question was:  How did it come back

12 about that you went to the police station?  And you

13 said in speaking with Ally you decided that that was

14 what you should do.

15     A.   Yes.

16     Q.   Okay.  Why?

17     A.   Why?  Because I believe her and -- or

18 because I was there.  And if she thinks this or if she

19 believes this actually occurred to her or happened to

20 her and I could be some piece of the puzzle, then -- to

21 help out.

22     Q.   Okay.

23     A.   That's why.

24     Q.   Okay.  But for the record, on the evening of

25 May 6th, 2017, you didn't hear anything that led you to

**EXHIBIT L**

1 believe that Ms. Chase was in need of your assistance

2 or...?

3     A.    Correct.

4     Q.    Okay.  Before you went to the police station

5 on May 12th, 2017, did you discuss with Ms. Chase what

6 you would be telling the police?

7     A.    No.

8     Q.    Did you discuss with Ally, you know, what

9 you should say to the police?

10     A.    No.

11     Q.    Okay.

12     A.    If it falls under that, I told her what --

13 what occurred and what happened on my side.  So I

14 guess, yes, we discussed it, but not -- or just me

15 telling her what happened.  That's all for on that one.

16     Q.    Before you went to the police station, did

17 you hear any rumors from anybody about what had

18 occurred on the evening of May 6th, 2017?  Any other

19 Nodine's employees tell you that they had heard certain

20 things about what happened?

21     A.    No.

22     Q.    Okay.  What happened once you arrived at the

23 police station?

24     A.    They brought me in there.

25     Q.    Did any police officer reach out to you to

34

```
 1  arrange for you to come in on May 12th?

 2      A.   No.

 3      Q.   You just decided to go to the police

 4  department?

 5      A.   Oh -- I'm sorry, I answered that a little

 6  hastily.  Yes, the cop did call me and reach out to me.

 7  And we set up the date and everything to go there, so,

 8  yes.  I'm sorry.

 9      Q.   Is that because Ms. Chase gave the officer

10  your name?

11      A.   Yeah.  Yeah, I don't voluntarily give my

12  name to cops.

13      Q.   Once you arrived at the police station, did

14  you go up to the window that's there in the lobby and

15  ask for an officer, or how did you -- how did it come

16  about that you met with the officer?

17      A.   I went there with Ally, and, I believe,

18  Nicole.  We went at the same time.

19      Q.   Okay.  All three of you drove to the police

20  department together?

21      A.   Yeah.

22      Q.   Okay.  And then what happened once you went

23  inside the police department?

24      A.   They took my statement down.  We sat in a

25  room, and me one on one with the officer talked
```

**EXHIBIT L**

1   about -- and I gave him my statement.  And that was it.

2       Q.   And only you were in the room with the

3   officer when you gave the statement?

4       A.   Right.

5       Q.   And was it just one officer?

6       A.   Right.

7       Q.   Okay.  Can you specifically describe for me

8   the process by which you gave your statement to that

9   officer?

10       A.   What, like, exactly what I said to him?

11       Q.   No, how he took the statement.  Did you tell

12   him what you observed, and he typed it?

13       A.   Oh, yeah.

14       Q.   Did you write it out?

15       A.   Yeah, he typed it out.  Actually, I'm not --

16   let me remember.  I don't see why they wouldn't type

17   it.

18       Q.   Sir --

19       A.   I don't know.

20       Q.   -- if you don't remember --

21       A.   I don't remember.

22       Q.   -- just tell me you don't remember.

23       A.   I don't remember.

24       Q.   Again, I don't want you to guess.  Do you

25   remember the process --

**EXHIBIT L**

```
 1          A.   No, I don't remember.
 2          Q.   -- by which you gave the statement?
 3          A.   No, I don't.
 4          Q.   Okay.  Do you recall whether or not the
 5     officer asked you if you swore to the truth of your
 6     statement?
 7          A.   Yes.
 8          Q.   He did do that?
 9          A.   Yeah.
10          Q.   You recall that?
11          A.   Yes.
12          Q.   Okay.  Did he read an oath to you and ask
13     you to swear that you had read the statement or that
14     you had had the statement read to you and that it was
15     true to the best of your knowledge and belief?
16          A.   Yes.
17          Q.   The officer did that?
18          A.   Yes.
19          Q.   Okay.
20               THE WITNESS:  Yeah, isn't that
21          protocol?
22
23               (Defendant's Exhibit 2, marked for
24          identification.)
25
```

**EXHIBIT L**

37

1    BY MS. MACCINI

2        Q.   Mr. Rouleau, so I went off the record, but I

3    didn't say I was going off the record, to mark an

4    exhibit.  And I'm marking your statement as Exhibit 2.

5    But as I was off the record, you said, "Isn't that

6    protocol?"

7             I just want to make sure we have a clear

8    record here and that you understand that when we're off

9    the record, the court reporter can't type.  So she

10   can't get down what you're saying.

11       A.   Uh-huh.

12       Q.   And the second thing is, if there's no

13   question pending -- you know, the attorneys here are

14   asking the questions.  You don't ask the questions.

15   But what I want to ask you is:  Do you recall the

16   officer swearing you to an oath, or are you just

17   telling me he swore you --

18       A.   No, no -- yes.

19       Q.   -- to an oath because it's protocol?

20       A.   Yes.

21       Q.   You have a memory of him swearing you to an

22   oath?

23       A.   Yes.

24       Q.   Okay.  Thank you.  I'm showing you what's

25   marked as Defendant's Exhibit 2.

**EXHIBIT L**

1   fact that Nicole Chase was still in the restaurant.

2   Why were you curious?

3        A.   Because I saw her book bag.

4        Q.   Okay.  Did you think maybe something was

5   going on between her and Mr. Nodine?

6                  MS. M. SMITH:  Objection.

7                  THE WITNESS:  No, I didn't.

8   BY MS. E. SMITH

9        Q.   Okay.  You had no thought about why they

10   would both be still in the restaurant but not anyplace

11   you could see them?

12        A.   Correct.  That didn't pop into my head at

13   that time.

14        Q.   Did it pop into Ally's head?

15        A.   I can't speak for her.

16        Q.   Okay.  The day you went to provide your

17   statement to the police, you testified you went with

18   Ally and Nicole.  They drove you there.  Is that

19   correct?

20        A.   Yes.

21        Q.   Okay.  Did they discuss with you what you

22   were going to say to Officer Gompper when you arrived?

23        A.   No.

24        Q.   Were you completely silent in the car for

25   the trip there?

**EXHIBIT L**

1    A.    No.

2    Q.    Okay.  What did you discuss?

3    A.    They didn't discuss what I'm going to say to

4  them.

5    Q.    What did you discuss?

6    A.    The day's events.  I'm not sure what.

7    Q.    I'm not trying to trick you.  So you think

8  you talked about what Ally -- I'm sorry, what Nicole

9  said happened that day?  Is that what you think you

10  discussed?

11    A.    No.  I don't know what we discussed.

12    Q.    Okay.

13    A.    We drove there.  I don't know what we

14  discussed.

15    Q.    You ever see Mr. Nodine throw his glasses on

16  the floor and ask an employee to pick them up?

17    A.    No.

18    Q.    Okay.  While you were walking through the

19  restaurant in the dark on May 6th, did you call out

20  Nikki's name?

21    A.    I don't recall.

22    Q.    Okay.  I just want to clarify.

23    A.    I know --

24    Q.    Okay.  Let me just finish.  When did you see

25  her backpack?  Was it before you clocked out or after

**EXHIBIT L**

1          **CERTIFICATE**

2          I, Hilary O. Winslow, License #00361, a

3     Notary Public for the State of Connecticut and

4     Commonwealth of Massachusetts, do hereby certify that

5     the deposition of KYLE ROULEAU was taken before me

6     pursuant to Connecticut Practice Book, at HOWD &

7     LUDORF, 65 Wethersfield Avenue, Hartford, CT  06114,

8     commencing at 12:55 p.m. on Thursday, May 16, 2019.

9          I further certify that the witness was first

10    sworn by me to tell the truth, the whole truth, and

11    nothing but the truth, and was examined by counsel, and

12    his testimony was stenographically reported by me and

13    subsequently transcribed as hereinbefore appears.

14         I further certify that I am not related to

15    the parties hereto nor their counsel, and that I am not

16    in any way interested in the events of said cause.

17         Witness my hand this 28th day of May, 2019.

18

19    _____

20         Hilary O. Winslow, CSR, Notary

21

22

23

24    My Commission expires:     My Commission expires:
      February 28, 2022(in MA)   February 28, 2021 (in CT)
25

**EXHIBIT L**