```
 1                IN THE UNITED STATES DISTRICT COURT

 2                    DISTRICT OF CONNECTICUT

 3     ------------------------------)

 4     NICOLE CHASE,                  ) NO.

 5             Plaintiff,             ) 3:18-cv-00683 (VLB)

 6         vs.                        )

 7     NODINE'S SMOKEHOUSE, INC.,     )

 8     CALVIN NODINE, TOWN OF CANTON, )

 9     JOHN COLANGELO, ADAM GOMPPER,  )

10     MARK J. PENNEY AND CHRISTOPHER )

11     ARCIERO,                       )

12             Defendants.            )

13     ------------------------------)

14                         VOLUME 2

15             CONTINUED VIDEOTAPED DEPOSITION

16                 OF NICOLE HEATHER CHASE

17                 DATE:  MAY 1, 2019

18                 HELD AT:  LECLAIRRYAN

19         One Financial Plaza - 755 Main Street

20                 Hartford, Connecticut

21

22     Reporter:  Sandra Semevolos, RMR, CRR, CRC, CSR #74

23                 HUSEBY GLOBAL LITIGATION
                       (800) 852-4589
24                     249 Pearl Street
                   Hartford, Connecticut  06103
25
```

**EXHIBIT S**

NICOLE CHASE vs NODINE'S SMOKEHOUSE, INC., ET AL.
Nicole Heather Chase on 05/01/2019

```
 1       Q.    Okay.  Is there anything that you claim
 2   Detective Colangelo knowingly omitted from the
 3   affidavit that was pertinent?
 4                 MR. CHIMES:  Objection, asked and
 5   answered and same instruction, same direction.
 6                 You can answer the question.
 7                 MS. MACCINI:  I have not ever asked
 8   her this question before, Attorney Chimes.
 9                 MR. CHIMES:  You can answer.
10   BY MS. MACCINI:
11       Q.    Let me rephrase the question.
12             Do you claim that Detective Colangelo
13   knowingly omitted information from the arrest warrant
14   affidavit?
15                 MR. CHIMES:  Objection.  Same
16   objections.
17                 You can answer.
18       Q.    Do you understand my question, Miss Chase?
19       A.    I kind of understand it.  I just -- can you
20   just repeat it one more time.
21       Q.    Sure.  Do you claim that Detective
22   Colangelo knowingly omitted pertinent information
23   from the affidavit?
24                 MR. CHIMES:  Same instruction, same
25   objection.
```

**EXHIBIT S**

NICOLE CHASE vs NODINE'S SMOKEHOUSE, INC., ET AL.
Nicole Heather Chase on 05/01/2019

```
 1                You can answer.
 2      A.    This would be a -- I guess what I can say
 3   is this is another instance where I feel he could
 4   have added stuff that he talked -- that he said or
 5   talked to Calvin about in his interview with him.
 6      Q.    What do you think should have been added?
 7      A.    That he had no intention of investigating
 8   the case.  Also, in the video, I did mention where I
 9   felt like they were not taking it seriously, and I
10   felt they had not been investigating the case, where
11   he actually kind of snapped a little bit and said he
12   was taking it very seriously, which obviously he had
13   not been, since he had admitted that he had not been.
14                And I don't know if this would really be
15   part of it, but I feel like he should have contacted
16   me a lot sooner to speak with me 'cause I feel like I
17   might have still had clothing or I might have had
18   something that could have helped me instead of
19   waiting so long to contact me.
20      Q.    Okay.  Miss Chase, I'm going to give you an
21   opportunity later on in this deposition to tell me
22   everything that you believe Detective Colangelo did
23   wrong.
24      A.    Okay.
25      Q.    But right now the pending question is:  Are
```

1    there -- is there pertinent information that you

2    believe Detective Colangelo left out of this arrest

3    warrant application?  So whether he contacted you

4    earlier is not something that would be in the

5    warrant.

6            So focus on my question.  Is there anything

7    else that you believe was omitted from this warrant

8    that should have been in there?

9            MR. CHIMES:  Objection to form.  She's

10   answered the question.

11           If you have anything -- if you know of

12   anything else to add, you can answer, otherwise you

13   can tell her.

14   A.    No, I don't know.

15   Q.    So it's not, it's not whether -- as you sit

16   here today, this is your opportunity to tell me, is

17   there anything else other than what you've previously

18   testified to that you believe has been knowingly

19   omitted from this warrant that should have been in

20   there?

21           MR. CHIMES:  Same objection, asked and

22   answered now three times.

23           You can answer if you have anything to

24   add.

25   Q.    Let me rephrase the question.

**EXHIBIT S**

NICOLE CHASE vs NODINE'S SMOKEHOUSE, INC., ET AL.
Nicole Heather Chase on 05/01/2019

1                    Have you told me everything that you
2    believe was knowingly omitted from the warrant that
3    should have been in there?
4                         MR. CHIMES:  Objection to form.
5                         You can answer.
6                         Same objection, same instruction.  If
7    you have anything to add, you can say so.
8         A.    I would have to answer I don't know.
9    Because I just feel like there is a lot of stuff, but
10   I would have to go through lots of paperwork to point
11   out different things and I don't know.
12        Q.    Go ahead, review it right now, and tell me,
13   because I need to know what your answer is to that
14   question.  If you need to review the arrest warrant
15   affidavit again to answer that question, then go
16   ahead.
17                        MR. CHIMES:  No, I think she is
18   saying -- okay, you can do your deposition any way
19   you want, but can we go off the record?  I mean, I
20   don't really --
21                        MS. MACCINI:  Sure, we can go off the
22   record.
23                        MS. SMITH:  Is the question pending
24   then?
25                        THE VIDEO OPERATOR:  Going off the

**EXHIBIT S**

1   record at 10:39.

2       (Recess taken from 10:39 a.m. to 10:49 a.m.)

3                 THE VIDEO OPERATOR:  We are on the

4   record at 10:49.

5   BY MS. MACCINI:

6       Q.   Miss Chase, before we took a recess, I had

7   asked you whether there was anything that you claim

8   Detective Colangelo knowingly omitted from the arrest

9   warrant affidavit, and you explained some things to

10  me, and then I asked you if you had told me

11  everything that you claim that was omitted and you

12  said I don't know, I'd need to -- a detailed review

13  of the arrest warrant affidavit.

14                MR. CHIMES:  No, that's not what --

15  read it back.  That's not what the question was.  She

16  could -- she didn't say --

17                MS. MACCINI:  I'm giving her a review.

18  I don't have a question yet.

19                MR. CHIMES:  No, but --

20                MS. MACCINI:  I'm giving her a review

21  of what transpired.

22                MR. CHIMES:  No, the question was, she

23  is going have to review all of the documents.  That

24  was the last question.  If you are going to --

25                MS. MACCINI:  Review all of the

www.huseby.com          Huseby, Inc. Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco     Page 201

EXHIBIT S

```
 1  documents?
 2              MR. CHIMES:  Look, I don't want --
 3  that was what you said.  That was the question that
 4  stopped us.
 5              MS. MACCINI:  Well, let's just start
 6  anew.
 7  BY MS. MACCINI:
 8      Q.   Miss Chase, is there anything else that you
 9  claim was knowingly omitted from the affidavit other
10  than what you have already told me?
11              MR. CHIMES:  Objection to perform.
12  Same instruction.
13              You may answer again.
14      A.   I don't know.
15      Q.   You don't know whether there is anything
16  else that's been omitted from the arrest warrant
17  affidavit other than what you've already told me?
18      A.   No.
19      Q.   Please review the arrest warrant and let me
20  know if you see anything that's been omitted.
21              MR. CHIMES:  Objection, asked and --
22      A.   From the actual arrest warrant?
23      Q.   Yes.  The question is:  Is there anything
24  that you claim -- is there any information that you
25  claim has been omitted knowingly from the arrest
```

1   warrant affidavit?

2          Do you understand that question?

3   A.   I understand it, but I'm saying I don't

4   know.  I don't --

5   Q.   You don't know whether you claim that

6   there's been information knowingly omitted from the

7   warrant?

8          MR. CHIMES:  Well, she doesn't know.

9   She is not a lawyer so she doesn't know her claims,

10  but she can answer whether she knows whether anything

11  else is omitted from the arrest warrant.  I mean,

12  that --

13  A.   The aff -- no, this is the arrest warrant,

14  never mind.

15         I don't -- my answer is I don't know.  I

16  don't.

17         MR. CHIMES:  Let me -- may I just try

18  to get some closure?

19         MS. MACCINI:  Sure.

20         MR. CHIMES:  Other than what you've

21  already testified about, are you aware of any other

22  omissions in the warrant?

23         THE WITNESS:  No, I am not aware of

24  any other.

25  BY MS. MACCINI:

**EXHIBIT S**

NICOLE CHASE vs NODINE'S SMOKEHOUSE, INC., ET AL.
Nicole Heather Chase on 05/01/2019

```
 1      Q.    I can take the arrest warrant affidavit,
 2   Miss Chase.
 3      A.    (Handing.)
 4      Q.    After June 21st, 2017, when is the next
 5   time you had any contact with anyone from the Canton
 6   Police Department?
 7      A.    June 21st, I don't -- I don't know.
 8   June 21st was -- can you tell me, was that a date --
 9   the date that I met Officer Colangelo?
10      Q.    Yes.
11      A.    When was the next time I had any contact?
12   I'm not sure of the exact date.
13            I remember Detective Colangelo telling me
14   he was going on vacation, so that I couldn't -- I
15   wouldn't be able to bring the documents or revise my
16   statement because he'd be gone for like the next
17   week.  And then I remember going back to the police
18   station and trying to revise my statements, and I
19   handed him like a stack of texts from Jeremy Archer,
20   my old manager, between me and him.  I gave that to
21   the dispatcher.  I said, I'm here to revise my
22   statement, and Detective Colangelo asked me for this
23   information.  The dispatcher then went away.  He came
24   back and he said, okay, I gave that to him.  He is
25   working on something right now.  If he needs you, he
```

NICOLE CHASE vs NODINE'S SMOKEHOUSE, INC., ET AL.
Nicole Heather Chase on 05/01/2019

```
 1   will call you.
 2           At that time, I kinda stood there a little
 3   confused because I knew he wanted me to revise my
 4   statement and I wanted to, but he said he'd call, so
 5   I kinda just walked out.  And then I remember trying
 6   to email a couple of times, but I can't tell you the
 7   exact dates of those things.  I mean, I have the
 8   emails which I'd be able to say what date the emails
 9   are, but obviously I don't have them with me.
10      Q.   We're going to go through the emails.
11           Can you give me a physical description of
12   the dispatcher you handed the texts to?
13      A.   I feel bad saying this, but he was -- he
14   was much larger, but besides that, I don't really --
15   there wasn't much.  I think he was kinda bald.  I
16   don't remember whether he wore glasses or not.  I
17   feel like he might have wore glasses.
18      Q.   Was he white, black?
19      A.   He was white.
20      Q.   Okay.  Can you give me an approximate age?
21      A.   Oh, between 50, 60.  I'd say probably 50s
22   somewhere.
23      Q.   And you provided this dispatcher with the
24   texts from -- between you and Kyle?
25      A.   No, me and Jeremy.
```

**EXHIBIT S**

NICOLE CHASE vs NODINE'S SMOKEHOUSE, INC., ET AL.
Nicole Heather Chase on 05/01/2019

```
 1     Q.    Texts between you and Jeremy?

 2     A.    Yes.

 3     Q.    Did you provide the dispatcher with

 4  anything else?

 5     A.    No, besides me physically saying I was

 6  there to revise my statement, but no.

 7     Q.    You told the dispatcher that?

 8     A.    Yes.

 9     Q.    Okay.  And the dispatcher disappeared and

10  he came back and said that he had given the texts to

11  Detective Colangelo and that if he needed anything

12  further from you he would contact you?

13     A.    That, yes, that Detective Colangelo was

14  working on something else and that if he needed

15  something, he would contact me.

16               (Exhibit 6, previously marked.)

17  BY MS. MACCINI:

18     Q.    All right.  Miss Chase, showing you what

19  has been marked as Defendant's Exhibit 6.  These are

20  email communications between yourself and Detective

21  Colangelo that he or the Canton Police Department was

22  able to locate.  There are six pages.  Please review

23  these six pages.

24               (Pause.)

25               THE WITNESS:  Somehow I got the
```

www.huseby.com          Huseby, Inc. Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco   Page 206
EXHIBIT S

```
 1   same -- I got like two of the same pages.
 2                 MR. CHIMES:  Which ones?
 3                 THE WITNESS:  I have two that say --
 4   hold on.  I would like to revise my statement, okay.
 5   And then it like has the statement, but then it goes
 6   to, I apologize for the delay, I was on vacation.
 7   But then it goes back to, I would like to revise my
 8   statement.
 9                 MR. CHIMES:  Okay, if you're gonna --
10   just so the record is clear, read by the number so we
11   know what page you're talking about.
12                 THE WITNESS:  This number or that?
13                 MR. CHIMES:  That number.
14                 THE WITNESS:  This?  (Pointing.)
15                 MR. CHIMES:  Yeah.
16                 THE WITNESS:  Okay, so DEF00864 goes
17   back to, I would like to revise my voluntary
18   statement, which was also on the page DEF00862.
19                 MR. MORAGHAN:  Not to interrupt, but I
20   think he is just responding to your original email,
21   and that's why it's done like that.
22                 MS. MACCINI:  Right.
23                 MR. MORAGHAN:  I don't want to
24   interrupt, but I think to move things along.
25                 MR. CHIMES:  I would have said that,
```

**EXHIBIT S**

```
 1   but I was afraid I was going to get yelled at.
 2                   MR. MORAGHAN:  You can yell.
 3                   MR. CHIMES:  I'm not going to yell.
 4                   THE WITNESS:  Okay, I have it three
 5   times, but maybe it's like that for --
 6                   MS. MACCINI:  The reason is it's
 7   showing, there is some that are just your email and
 8   then there's others that have Detective Colangelo's
 9   response to your email, and that's why it appears to
10   be a duplicate, but it's not.  It's different because
11   it's his -- it's your email and then his response.
12                   THE WITNESS:  Okay.  And I also have
13   the, Nicole, I apologize --
14                   MR. CHIMES:  Again, go by, read by
15   Bates stamp so we know.
16                   THE WITNESS:  On DEF00864, it says,
17   Nicole, I apologize for the delay; I was on vacation.
18   I would like to revise my statement, underneath that.
19                   Then on DEF00865, it says, Nicole, I
20   apologize for the delay; I was on vacation.  I would
21   like to revise my statement.
22                   There is one thing in-between though,
23   so maybe it is what you're saying.  There is one
24   thing that wasn't -- it says, okay, sorry for the
25   misunderstanding; I thought the dispatcher told you.
```

NICOLE CHASE vs NODINE'S SMOKEHOUSE, INC., ET AL.
Nicole Heather Chase on 05/01/2019

```
 1   BY MS. MACCINI:

 2       Q.    Yeah, exactly.  The very last email on

 3   Defendant's 00865 through 866 -- well, actually, 866

 4   is not a part of it.  865 shows the entire chain of

 5   communication between yourself and Detective

 6   Colangelo.  You send an email; it appears on

 7   July 31st; he responds to that email on August 10th,

 8   and then you respond to him on August 16th.

 9             Do you see that?

10       A.    Yes.

11       Q.    Okay.  Have you had a chance to review the

12   six pages that are marked as Defendant's Exhibit 6?

13       A.    Let me just review the last page.

14       Q.    Okay.

15                    (Pause.)

16       A.    Yes.

17       Q.    Okay.  And again, Defendant's Exhibit 6 are

18   copies of emails provided by the Canton Police

19   Department; they are not emails taken from you, okay.

20       A.    Uh-huh.

21       Q.    So they are from John Colangelo's email

22   account; okay?

23       A.    Yes.

24       Q.    That said, do they look familiar to you?

25   Do these communications look familiar?
```

**EXHIBIT S**

NICOLE CHASE vs NODINE'S SMOKEHOUSE, INC., ET AL.
Nicole Heather Chase on 05/01/2019

```
 1     A.    Yes.

 2     Q.    Are there any email communications you had

 3  with Detective Colangelo that appear to be missing?

 4     A.    No, I do not think so.

 5     Q.    Did you have any email communication with

 6  anybody else at the Canton Police Department with

 7  respect to the events that occurred in May -- in June

 8  of 2017?

 9     A.    No.

10     Q.    In the very first email, on the top page,

11  Defendant's 00861 it's marked at the bottom, this

12  email is dated July 25th, 2017; correct?

13     A.    Yes.

14     Q.    And the subject line is Revised Statement,

15  Nicole Chase; right?

16     A.    Yeah.

17     Q.    And you indicate to Detective Colangelo

18  that you came into the department about two weeks

19  ago; right?

20     A.    Yes.

21     Q.    So if we take a look at the July 2017

22  calendar, two weeks prior to the 25th would be

23  Tuesday, July 11th.

24     A.    The 11th, yes.

25     Q.    Is that when you came in, do you think?
```

www.huseby.com                Huseby, Inc. Regional Centers                800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco    Page 210

EXHIBIT S

NICOLE CHASE vs NODINE'S SMOKEHOUSE, INC., ET AL.
Nicole Heather Chase on 05/01/2019

```
 1              MR. CHIMES:  Objection to the form.

 2              You can answer.

 3      A.    It could have been.  I'd -- like I said, I

 4   don't -- I said about two weeks, so I don't really

 5   know the date, but it could have been the 11th.

 6      Q.    Okay.  So your interview with John

 7   Colangelo was on June 21st, 2017; right?

 8      A.    Yes.

 9      Q.    So the next time you went into the

10   department to speak with him was on or about

11   July 11th, 2017?

12      A.    Around there sometime.

13      Q.    Okay.  You can't nail down the exact date,

14   but approximately the 11th?

15              MR. CHIMES:  Objection to form.

16              You can answer.

17      A.    Approximately, yes.

18      Q.    Is there anything that would help you other

19   than this email to determine what the date was that

20   you went into the department?

21      A.    No.  I've actually even tried looking

22   through emails with my lawyers to see when I --

23              MR. CHIMES:  Let's not get into what

24   you and I did.

25              THE WITNESS:  Okay.
```

**EXHIBIT S**

```
 1   he was still gonna be there, and I know I didn't go

 2   then, and then I know he was on vacation, so I made

 3   sure I didn't go in when he was on vacation, and then

 4   I just remember collecting all the texts and all the

 5   stuff and figuring out how to print them out in

 6   order, and I just remember going in, but I don't

 7   remember exactly the date.

 8       Q.   Okay.  On the third page of what has been

 9   marked as Defendant's Exhibit 6, this is supplemental

10   information you provided to Detective Colangelo via

11   email; correct?

12       A.   Yes.

13       Q.   And you indicated that you wanted to add

14   this to your May 11th, 2017 statement?

15              MR. CHIMES:  No.

16       A.   I wanted to revise my -- this was the part

17   I wanted to revise, if that's what you're asking me.

18       Q.   So flip to page 2 of Defendant's Exhibit 6.

19   This is an email from you to Detective Colangelo

20   dated July 31st, 2017; right?

21       A.   Hold on, I'm sorry.  To -- I would like to

22   be added to...please let me know when you would like

23   me to come in and sign.  Yes.

24       Q.   Okay.  And I'll read it into the record.

25   The email states, Good afternoon, Detective
```

**EXHIBIT S**

1  Colangelo.  I would like to revise my voluntary

2  statement.  Attached is the supplemental information

3  that I would like to add to my May 11th, 2017

4  voluntary statement.  Please let me know when you

5  would like me to come in so that I may sign the

6  revised statement.  Thank you, Nicole Chase.

7          So again, flipping to page 3, there is a

8  paragraph on page 3, and it's titled Nicole Chase,

9  Events on Saturday, May 6th, 2017.

10         Is this the supplemental information that

11  you wanted to add to your statement, your May 11th,

12  2017 statement?

13     A.   Yes, I wanted to add it.  I don't know what

14  supplemental means so I might be getting confused by

15  that.

16     Q.   Okay, I apologize.  This is information you

17  wanted to add to that statement?

18     A.   Yes.

19     Q.   Okay.  When did you prepare the paragraph

20  that's set forth on page 3 of Defendant's Exhibit 6?

21     A.   I can't say exactly when.  I just knew that

22  he wasn't getting back to me, and I was advised to

23  email him if he wasn't going to get back to me about

24  revising my statement.

25     Q.   Who advised you to email him?

NICOLE CHASE vs NODINE'S SMOKEHOUSE, INC., ET AL.
Nicole Heather Chase on 05/01/2019

```
 1      A.    One of my lawyers.

 2      Q.    Okay.

 3            MR. CHIMES:  Let me just -- that's not

 4  a waiver of the privilege obviously.

 5            MS. MACCINI:  Understood.

 6      Q.    Did you type this statement yourself?

 7      A.    No.

 8      Q.    Strike that.

 9            Did you type -- did you type the paragraph

10  set forth on page 3 of Defendant's Exhibit 6

11  yourself?

12      A.    No.

13      Q.    Did anyone assist you to prepare the

14  paragraph set forth on Defendant's Exhibit 6, page 3?

15      A.    Did anybody --

16            MR. CHIMES:  Answer yes or no.

17      A.    Did anybody help me?

18      Q.    Yes.

19      A.    Yes.

20      Q.    Okay.  Who helped you to prepare the

21  paragraph set forth on page 3 of Defendant's

22  Exhibit 6?

23            MR. CHIMES:  Just identify it without

24  getting into any details.

25      A.    One of my lawyers.
```

**EXHIBIT S**

1   Q.   Okay.  Can you identify that individual?  I

2   don't want to know about any communications between

3   yourself and your lawyer, but can you identify the

4   lawyer?

5   A.   Katie Roy and Robert Fortgang.

6   Q.   When did Katie Roy and Robert Fortgang

7   assist you in preparing what's set forth on page 3 of

8   Defendant's Exhibit 6?

9   A.   Probably around the time that I sent it

10  after I reviewed it.

11  Q.   I don't want you to guess, I mean, so

12  probably.  If you recall as you sit here today, tell

13  me.

14       I mean, approximately when did you meet

15  with them to prepare what's set forth on Defendant's

16  Exhibit 6, page 3?

17  A.   It was -- I can't say exactly, but it would

18  have been Friday or that Monday.

19  Q.   The Friday before you sent the email?

20  A.   Yes.

21  Q.   And the email is dated July 31st, 2017, so

22  you believe you may have met with your lawyers to

23  work on the paragraph on July 28th, 2017?

24  A.   Yes, or I might have met with them on

25  July 31st.

NICOLE CHASE vs NODINE'S SMOKEHOUSE, INC., ET AL.
Nicole Heather Chase on 05/01/2019

1      Q.    Okay.

2      A.    And then sent it.

3      Q.    Okay.  Were there any other drafts of this

4   paragraph set forth on page 3 to your knowledge?

5                MR. CHIMES:  All right.  I think this

6   is going to get into attorney-client privilege, so

7   I'm going to instruct her not to answer.  I'm going

8   to instruct you not to answer.

9   BY MS. MACCINI:

10     Q.    Did your attorneys type the statement or

11  did you type it?

12     A.    My attorneys.

13     Q.    All right.  So taking a look at this

14  paragraph that is page 3 of Defendant's Exhibit 6,

15  you sent this to Detective Colangelo as an

16  attachment, correct, with your email?

17     A.    Yes.

18     Q.    So taking a look at this paragraph, if we

19  go -- if we go to the sixth sentence, it starts with

20  He then took one hand.

21           Do you see that?

22     A.    He -- hold on.

23     Q.    Do you see where I am?

24     A.    He then took one hand?

25     Q.    Yes.

**EXHIBIT S**

NICOLE CHASE vs NODINE'S SMOKEHOUSE, INC., ET AL.
Nicole Heather Chase on 05/01/2019

1    whether you told Detective Colangelo --

2         A.    Yes.

3         Q.    -- what's set forth in that sentence?

4         A.    Yes.

5         Q.    Thank you, Miss Chase.  I can take

6    Defendant's Exhibit 6.

7         A.    (Handing.)

8         Q.    Thanks.  You were arrested on

9    September 7th, 2017 on the charge of false statement

10   in the second degree; right?

11                MR. CHIMES:  Objection.  I mean, I

12   think you misstated.  September 8th.

13                MS. MACCINI:  Okay.  Let me rephrase

14   the question.

15                MR. CHIMES:  Yeah.

16        Q.    Were you subsequently arrested for the

17   charge of false statement in the second degree?

18        A.    Yes.

19        Q.    And when did that arrest occur?

20        A.    I'm almost positive on September 8th.

21        Q.    Okay.  And did you have to go in court in

22   Hartford with respect to those charges?

23        A.    Yes.  I'm sorry, just when you said that, I

24   remembered something.  I don't think the email was in

25   all the emails where Detective Colangelo told me that

www.huseby.com          Huseby, Inc. Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco     Page 220

EXHIBIT S

1    I had to go in for -- there is an email.

2              MR. CHIMES:  Just answer the

3    questions; she'll ask you.

4              THE WITNESS:  Okay.  All right.  Yes,

5    I did have to go to Hartford.

6       Q.   Okay.  You were trying to tell me something

7    about Defendant's Exhibit 6, I believe, the emails

8    that we just reviewed; is that right?

9       A.   Yes.

10      Q.    Is there something missing from those

11   emails?

12      A.    I was just saying that I don't -- I think

13   that he reached out to me by email that I needed to

14   come down to the station or that he needed to speak

15   with me about the case, but maybe I missed that and

16   it was in there.

17      Q.    He reached out to you and told you that you

18   had to come down to the station with respect to --

19      A.    He needed to speak to me.

20      Q.    And were you arrested when you went down?

21      A.    Yes.

22      Q.    Did you know that that was going to happen?

23      A.    I then called the Canton police station,

24   and then that's when he told me, yes, and then I went

25   down right away.

www.huseby.com            Huseby, Inc. Regional Centers            800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco    Page 221

**EXHIBIT S**

1      Q.    Okay.  You believe that Detective Colangelo

2   emailed you to tell you that there was a warrant for

3   your arrest?

4      A.    He didn't tell me there was a warrant for

5   my arrest.  It was more like -- it was I needed to

6   contact him or come down to the station or something.

7      Q.    And when you received that email, you

8   called him?

9      A.    Yes.

10     Q.    And he told you over the phone that there

11  was a warrant for your arrest?

12     A.    Yes.

13     Q.    Okay.  Did you have to go to court in

14  Hartford with respect to the criminal charges against

15  you?

16     A.    Yes.

17     Q.    And how many times did you have to go to

18  the criminal court?

19     A.    I think twice.  I'm not positive, but I'm

20  pretty sure twice.

21     Q.    And do you recall when the first date was

22  that you had to go to court in Hartford?

23     A.    I have no idea.

24     Q.    Do you recall who the prosecutor was

25  handling it at that time?

**EXHIBIT S**

```
 1              MS. MACCINI:  Yes.

 2                   (Exhibit 7, previously marked.)

 3   BY MS. MACCINI:

 4      Q.    Miss Chase, showing you what's been marked

 5   as Defendant's Exhibit 7, do you recognize it?

 6      A.    Before reading it all, I -- I -- I'm

 7   assuming this is from -- or unemployment of some

 8   sort.

 9      Q.    Well, I don't want you to assume anything.

10   I want you to -- if you need to review it, review it.

11      A.    Okay, so -- okay.

12                   (Pause.)

13      A.    So it is unemployment.  I just don't know

14   who -- what document.

15      Q.    All right.  So the question is:  Have you

16   ever seen this, what's been marked as Defendant's

17   Exhibit 7 before?

18      A.    I might have, but I don't recognize it now.

19      Q.    All right.  For the record, this was

20   provided to us in discovery, and it's a verbal

21   statement you gave to the Connecticut Department of

22   Labor on July 11, 2017.

23      A.    Okay.

24      Q.    Do you recall giving a verbal statement to

25   the Connecticut Department of Labor on --
```

www.huseby.com          Huseby, Inc. Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco     Page 246

EXHIBIT S

NICOLE CHASE vs NODINE'S SMOKEHOUSE, INC., ET AL.
Nicole Heather Chase on 05/01/2019

```
 1     A.    Yes.

 2     Q.    -- July 11, 2017?

 3     A.    I don't know what date, but yes, I do

 4  remember.

 5     Q.    Okay.  Is what is set forth here in three

 6  paragraphs here in the center of what's been marked

 7  as Defendant's Exhibit 7, is that what you stated to

 8  the representative from the Department of Labor?

 9     A.    Most likely since it's here, I probably

10  did.  During that time, I remember being a little

11  confused on what to say to them.  I don't think I

12  came out to anybody yet about what happened or that I

13  knew that I was meeting with Detective Colangelo and

14  that I was going to, so I don't -- I don't remember

15  exactly what I said to them, but I know that some

16  things were not -- I was trying to get my point

17  across, but not tell the actual story.  That's all I

18  remember.  I don't remember exactly what I told them.

19     Q.    So you didn't want to tell the Department

20  of Labor the truth of what happened?

21           MR. CHIMES:  Objection to form.

22     A.    I -- no, I'm saying I did want to tell

23  them, but I don't think I had told anybody else yet

24  what had happened or what had -- I don't -- I don't

25  know.  I don't remember.
```

**EXHIBIT S**

1    Q.    Well, this -- this fact finding report,

2   claimant's statement, indicates that you gave your

3   verbal statement to the adjudicator, the person

4   considering your claim for unemployment benefits.

5   You gave her this statement on July 11th, 2017, okay?

6    A.    Okay.

7    Q.    Do you see that?

8    A.    Yeah.

9    Q.    Do you see at the bottom where it says date

10  taken 07/11/2017?

11   A.    Yes.

12   Q.    Okay.  So that is -- that is weeks after

13  you had already sat for an interview with Detective

14  Colangelo and told him about the oral sex; right?

15   A.    Okay.  Yes.

16   Q.    So you had already told your full story to

17  Detective Colangelo?

18   A.    Yes.

19   Q.    So why not tell this individual at the

20  Department of Labor the full story?

21   A.    I don't know.

22   Q.    Taking a look at this verbal statement, you

23  state, He took my hands and put it in his area.

24   A.    That did not happen.

25   Q.    That did not happen?

NICOLE CHASE vs NODINE'S SMOKEHOUSE, INC., ET AL.
Nicole Heather Chase on 05/01/2019

```
 1   pretty sure two steaks.

 2       Q.    When was that?

 3       A.    That I have no idea.

 4       Q.    Was it the night before the incident that

 5   you allege occurred in the bathroom?

 6       A.    I can't say that it was, but I also can't

 7   say that it wasn't.  I really don't remember.

 8       Q.    Do you recall telling Mr. Nodine that you

 9   wanted to make a good dinner for your boyfriend so

10   you could get laid that night?

11       A.    Absolutely not.

12       Q.    Did you ever make that statement to anyone

13   else?

14       A.    No.

15               (Plaintiff's Exhibit 17, previously

16               marked.)

17   BY MS. SMITH:

18       Q.    I'll ask you to look at Plaintiff's 17

19   again.  Those are the text messages between you and

20   Jeremy.

21               Got that in front of you?

22       A.    Yes.

23       Q.    Okay.  The first message says, Jer, if I

24   told you something that would hurt your mom and you

25   might not want to believe it, would you not tell
```

**EXHIBIT S**

1    anyone yet and just give me advice before I do

2    anything or can record it if I get the balls to do

3    anything?

4            Is that what you sent to Jeremy?

5        A.    Yes.

6        Q.    Why were you worried about whether it would

7    hurt his mom?

8        A.    Once again, Kelly and me spent a lot of

9    time together.  She drove me to work.  She drove me

10   to Torrington.  She gave me extra money because they

11   didn't have the hours for me and wanted to help me

12   with my rent.  She would talk to me about -- I guess

13   I would talk to her about personal things too, and I

14   felt very close to her.  She --

15       Q.    What types of personal things would you

16   discuss with Kelly?

17       A.    Oh, I mean, I honestly don't know.

18   Anything I was feeling, I guess.  We had a half-hour

19   car ride there and back almost every day to

20   Torrington, so I assume I told her plenty of things.

21   She -- she was -- I really -- I told everybody that

22   she was like a mom to me and Calvin's mom, I really

23   enjoyed, and I don't know; I just didn't want her to

24   be hurt.  I -- I think she deserves the world.

25       Q.    And yet you felt it was appropriate to

**EXHIBIT S**

```
 1   contact her son and inform him of an inappropriate

 2   encounter with her husband that very night?

 3       A.    Yes, 'cause I wasn't thinking about oh,

 4   it's her son.  I was thinking more that he is very

 5   responsible and he wasn't gonna, you know, blow it

 6   out of proportion.  Or if I told my boyfriend, you

 7   know, try to go hurt somebody or, you know, even

 8   though my boyfriend is not -- to get the wrong

 9   impression -- but, you know, like Kelly she would

10   have came and picked me -- brought me to the police

11   station.  Jeremy is the only one I could talk to that

12   would give me a -- a clear headed, you know, you

13   know, you are right, or no, you know, you're not

14   wrong or, you know, you should do this, but not do

15   this.

16       Q.    Okay.

17       A.    I don't know.

18       Q.    How often had you texted with Jeremy prior

19   to that night?

20       A.    Not -- I'm pretty sure like probably never.

21   Maybe -- I think there was a few texts and one of

22   them was like, hey, Skylar can't come into work

23   today; can you come into work?  And then I know when

24   Calvin -- or no, when Jeremy quit that there was a

25   night we were -- me and my partner were eating at
```

**EXHIBIT S**

```
 1  Feng Restaurant, and there were some fancy plates,
 2  and I texted him something like, I'm at a restaurant
 3  and that -- you know, Feng, and they have really
 4  fancy plates that make me think of you, because he
 5  was always into buying really cool shaped and cool
 6  things.  But no, he was just the guy at work that
 7  would come in and even if everybody was down or if
 8  Calvin was in a bad mood or something, he would come
 9  to the workers and be like, smile, you know, we are
10  all here together.
11     Q.   Okay.  So have you ever contacted Jeremy
12  for advice before?
13     A.    No, I don't think so.  I mean, I might
14  have -- yeah, I can't recall.  I mean, I might have
15  asked him for advice, you know, at the store, in
16  person, since we both were always there, but I don't
17  think I ever had texted him for any advice, no.
18     Q.    Okay.  So your next statement to him is
19  about Calvin being really drunk, and it says, we were
20  walking through the hall; right?
21     A.    Yeah.
22     Q.    So why did your story the next day change
23  to you were standing in the hall getting a hug?
24     A.    Because really at this moment I didn't -- I
25  couldn't even tell you what I said to him.  I was
```

**EXHIBIT S**

```
 1  just kind of -- like I said, I was in shock and I

 2  just -- I wanted to get the point across that

 3  something had happened, but I didn't know who to

 4  tell, what to tell, if anybody was gonna believe me,

 5  and I just kinda -- I mean, I told a total different

 6  story to my best friend and then --

 7       Q.    Well, so you're contacting this person for

 8  advice.

 9       A.    Yes.

10       Q.    But you're not giving him accurate details

11  to give you advice on; correct?

12                 MR. CHIMES:  Objection.  Objection to

13  form.

14                 You could -- you can answer that.

15       A.    Correct.  I was giving him -- Calvin was

16  really drunk and, I mean, and in a way he was

17  touching me, and he did pull out his dick and --

18  sorry, I don't mean to use that language; I was just

19  reading it.  So there is truth, just yes, I -- I

20  don't know.  I can't tell you.  I can't tell you.  My

21  stories were everywhere with everybody.

22       Q.    So your next statement was, I said no, I

23  ran out, and he was so drunk he fell on the tile and

24  bumped his head real good, then I just very calmly

25  said goodbye.
```

www.huseby.com                Huseby, Inc. Regional Centers                800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco    Page 382

**EXHIBIT S**

NICOLE CHASE vs NODINE'S SMOKEHOUSE, INC., ET AL.
Nicole Heather Chase on 05/01/2019

```
1              So why did you change your story about
2     shoving him to say that he was drunk and fell?
3         A.    I couldn't tell you.
4         Q.    Okay.  But you agree that the next day you
5     told Officer Gomper a different version of that;
6     correct?
7         A.    Yes.
8         Q.    Okay.  And it also says, I just very calmly
9     said goodbye.
10             That's different from what you told Officer
11    Gomper the next day; correct?
12        A.    Yes.
13        Q.    Okay.  So the next sentence is, I wouldn't
14    tell anyone this so I'm really trusting you.  I'm
15    just really F'ed up by tonight and my friend said I
16    really shouldn't ignore it 'cause it will keep
17    happening.
18             So what friend are you referring to?
19        A.    That's Kelly, the one I told a completely
20    different story to.
21        Q.    Well, what story did you tell Kelly?
22        A.    I think I told her I was cleaning the
23    bathroom.
24        Q.    And what happened?
25        A.    I have no idea what I told her.  I think
```

**EXHIBIT S**

1  along the same lines of Jeremy.  I didn't say that

2  anything happened; I said that -- I really don't know

3  what I told her.  I remember her being upset and

4  asking me why and I told --

5       Q.   Did you call her?

6       A.   I'm pretty sure I called her.  That would

7  make sense.

8       Q.   What time did you call her?

9       A.   I don't -- I don't know.

10      Q.   Was it before or after you texted Jeremy?

11      A.   It would have been before.  I -- I don't

12  remember it being before.  I always thought that

13  Jeremy was the first person that I texted until I

14  reviewed these -- I don't know, a few months ago and

15  then was like, oh, well, look at that.  I must have

16  texted my friend before I talked to Jeremy.  Texted,

17  called, whatever.

18      Q.   Okay.  Have you checked to see if you sent

19  her any texts regarding this incident?

20      A.   Well, I have not checked only for the mere

21  fact that my phone deletes after a certain -- kinda

22  like with Allie -- after a certain amount of texts

23  are stored into one thing, it will just start

24  deleting the oldest text and me --

25      Q.   How long does it -- how far back do the

**EXHIBIT S**

NICOLE CHASE vs NODINE'S SMOKEHOUSE, INC., ET AL.
Nicole Heather Chase on 05/01/2019

```
 1                C E R T I F I C A T E

 2   STATE OF CONNECTICUT

 3           I, SANDRA SEMEVOLOS, a Registered Merit
     Reporter and Notary Public within and for the State
 4   of Connecticut, do hereby certify that I reported the
     continued videotaped deposition of NICOLE HEATHER
 5   CHASE on MAY 1, 2019, at the offices of LECLAIRRYAN,
     One Financial Plaza, 755 Main Street, Hartford,
 6   Connecticut.

 7           I further certify that the above-named
     deponent was by me first duly resworn to testify to
 8   the truth, the whole truth and nothing but the truth
     concerning her knowledge in the matter of the case of
 9   NICOLE CHASE vs. NODINE'S SMOKEHOUSE, INC., CALVIN
     NODINE, TOWN OF CANTON, JOHN COLANGELO, ADAM GOMPPER,
10   MARK J. PENNEY AND CHRISTOPHER ARCIERO, now pending
     in the UNITED STATES DISTRICT COURT, for the DISTRICT
11   OF CONNECTICUT.

12           I further certify that the within testimony
     was taken by me stenographically and reduced to
13   typewritten form under my direction by means of
     COMPUTER ASSISTED TRANSCRIPTION; and I further
14   certify that said deposition is a true record of the
     testimony given by said witness.
15
             I further certify that I am neither counsel
16   for, related to, nor employed by any of the parties
     to the action in which this deposition was taken; and
17   further, that I am not a relative or employee of any
     attorney or counsel employed by the parties hereto,
18   nor financially or otherwise interested in the
     outcome of the action.
19

20           WITNESS my hand this 13th day of May, 2019.

21

22

23   _____
     Sandra Semevolos, RMR, CRR, CRC, CSR #74
24   Notary Public
     My Commission Expires:  September 30, 2020
25
```

www.huseby.com            Huseby, Inc. Regional Centers            800-333-2082
          Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco   Page 437

**EXHIBIT S**