Exhibit A

```
                                                        1


           UNITED STATES DISTRICT COURT
         FOR THE DISTRICT OF CONNECTICUT


----------------------------X
NICOLE CHASE                :

          Plaintiff,        :

     VS.                    :  NO. 3:18-cv-00683(VLB)

NODINE'S SMOKEHOUSE, INC.,  :
CALVIN NODINE TOWN OF       :
CANTON, JOHN COLANGELO,     :
ADAM GOMPPER, MARK J.       :
PENNEY, AND CHRISTOPHER     :
ARCIERO                     :

          Defendants.       :
----------------------------X


             D E P O S I T I O N


     THE VIDEO DEPOSITION OF CALVIN NODINE, taken

on behalf of the Plaintiff, before Kevin

Lombino, Registered Professional Reporter,

Notary Public within the State of Connecticut

Certificate Number 191, on the 7th day of

February, 2019, at 10:41 a.m., at the offices of

Robert Fortgang Associates, LLC, 573 Hopmeadow

Street, Simsbury, CT.



         GOLDFARB AND AJELLO, LLC (203) 972-8320
```

                                                              2

1                    A P P E A R A N C E S

2

3  FOR THE PLAINTIFF:
   Law Office of Lewis Chimes LLC
4  Lewis Chimes, Esq.
   Mary-Kate Smith, Esq.
5  45 Franklin Street
   Stamford, CT 06901
6

7

8  FOR THE DEFENDANTS:
   Howd & Ludorf, LLC
9  Kristan M. Maccini, Esq.
   65 Wethersfield Avenue
10 Hartford, CT 06114

11

12 LeClair Ryan
   Elizabeth Acee, Esq.
13 545 Long Wharf Drive
   New Haven, CT 07511
14

15
   Smith Keefe Moraghan & Waterfall LLC
16 David A. Moraghan, Esq.
   257 Main Street, 2nd Floor
17 Torrington, CT 06790

18

19

20 A L S O   P R E S E N T:

21 Antionette Caniesa, Videographer

22 Diana Borohorguez

23 Nicole Chase

24

25

                **GOLDFARB AND AJELLO, LLC (203) 972-8320**

1    Q.   Okay.  And this can be off the record but can
2  you give, it doesn't have to be on the record, your
3  Social Security number?
4              MR. MORAGHAN:  That would be off the record.
5              MR. CHIMES:  Right, um-hum.
6              (Discussion was held off record.)
7    Q.   Mr. Nodine, can you tell me what your education
8  has been?
9    A.   Graduated high school, some college.
10   Q.   Okay.  Where did you go to high school?
11   A.   Oliver Wilcott Tech in Torrington.
12   Q.   And where did you go to college?
13   A.   I went to Post University and I did some college
14  courses down in Kentucky.
15   Q.   Where in Kentucky?
16   A.   Fort Campbell.
17   Q.   And you don't have any degree?
18   A.   No.
19   Q.   And your current position?
20   A.   I am part owner and plant manager of Nodine's
21  Smokehouse.
22   Q.   Okay.  And was your position any different on
23  May 6 of 2017?
24   A.   Slightly.
25   Q.   What was your position then?

1  A.  Well, it was the same position but my father was
2  still alive, so I have --
3  Q.  Okay.  And have you worked at Nodine's your
4  entire adult life or have you done other things?
5  A.  I have done other things.
6  Q.  Can you tell me a little about your work
7  history?
8  A.  It's --
9  Q.  I'm not going to hold you to exact dates, but
10 just generally, go ahead?
11 A.  It's farm, it's 18 months in the Army and other
12 odd jobs before that but mainly at the smokehouse.
13 Q.  What type of odd jobs?
14 A.  Farm work.
15 Q.  And where?
16 A.  Equipment operator.
17 Q.  Where?
18 A.  At High Hill Farm.
19 Q.  Where is that?
20 A.  That was in Goshen.
21 Q.  When were you in the Army?
22 A.  Early '80s.
23 Q.  Um-hum.  And was that right after high school
24 or --
25 A.  Yes.

1     A.   Yes.
2     Q.   All right.  Was there a time when you began to
3  work there full-time as your primary or exclusive source
4  of income?
5     A.   Um, that I would definitely say right when I got
6  back out of the service.
7     Q.   When you are doing the firearms you are also
8  working at Nodines?
9     A.   Yes.
10    Q.   And so I know your father passed away last year.
11    A.   Yes.
12    Q.   Were you an owner before he passed away?
13    A.   Yes.
14    Q.   Okay.  And was, what was -- what was the share
15 of ownership between you and was it you, your mother and
16 your father?
17    A.   Yes, 30 percent.
18    Q.   And what was your position, corporate position?
19    A.   General manager, plant manager.
20    Q.   At some point did you become the president of
21 the corporation?
22    A.   Yes.
23    Q.   Okay.  When was that?
24    A.   Not too long ago.  I don't know the exact date.
25    Q.   Are you still the president?

1    A.   Yes.
2    Q.   All right.  And how old is your mother?
3    A.   82.
4    Q.   Does she still work in the business?
5    A.   Yes, she does.
6    Q.   You are the plant manager and the president?
7    A.   Yes.
8    Q.   How many employees does Nodines currently have
9  in the Torrington facility?
10   A.   In the Torrington?
11   Q.   Yes.
12   A.   That would be including the family?
13   Q.   Yes.  General, just doesn't have to be --
14   A.   12.
15   Q.   Okay.
16   A.   11, 12, something like that.
17   Q.   Okay.  And who besides your mother and you from
18 the family are in the business?
19   A.   That's it and, well, my wife is.
20   Q.   She works, all right.
21        Now, the, the, the property at or the plant,
22 where the plant is located is 65 Fowler Avenue,
23 Torrington, Connecticut?
24   A.   Yes.
25   Q.   And do you own that property?

1    A.   No, I do not.
2    Q.   Who owns that?
3    A.   My mother does.
4    Q.   And going back.  Has your father's estate been
5  settled?
6    A.   No.
7    Q.   Do you know where the shares, will the shares be
8  split evenly between you and your mother, if you know?
9    A.   No.
10   Q.   You don't know or they will not?
11   A.   I'm not sure where that was going at this point.
12   Q.   Now, there's another property at 668 Riverside
13 Avenue?
14   A.   Yes.
15   Q.   And what is that property?  Let me -- withdrawn.
16        Who owns that property?
17   A.   I do.
18   Q.   Okay.  And is that property used by Nodine's
19 Smokehouse?
20   A.   Yes, it is.
21   Q.   For what purposes?
22   A.   Warehouse.
23   Q.   Okay.  And is there any other use of that
24 property?
25   A.   There's a small seafood restaurant --

22

1  A. Yes, it is.
2  Q. And what's your current role in that business?
3  A. I just oversee it.
4  Q. Do you have a manager?
5  A. Yes, I do.
6  Q. Who is that?
7  A. Anthony.
8  Q. Anthony what?
9  A. Oh, good Lord, you had to ask me that.  I'm not
10 good at last names.  That I don't know.
11 Q. Okay.  What's your role in overseeing it now?
12 A. Just checking out, making sure seeing, you know,
13 checking the books.
14 Q. Uh-uh.
15 A. Maintenance, clogged drains.
16 Q. How often are you over there now?
17 A. Maybe once every other week.
18 Q. And Nodines, you don't own that property?
19 A. No.
20 Q. You rent that property?
21 A. Yes.
22 Q. Okay.  And there's another Nodines entity in, I
23 believe in --
24 A. That would be Goshen.
25 Q. Okay.  What's the name of that?

**GOLDFARB AND AJELLO, LLC (203) 972-8320**

1    A.   That's still just under Nodine's Smokehouse.
2    Q.   And is that on the property owned by your
3 mother?
4    A.   Yes.
5    Q.   So her house is also in that same location, same
6 property or not?
7    A.   Yes.
8    Q.   Okay.  What role do you have in that?
9    A.   Same thing, oversee it, maintenance.
10   Q.   Um-hum.  There is another entity called Nodine
11 Realty, Calvin Nodine Realty LLC?
12   A.   Right.
13   Q.   What is that?
14   A.   That's technically the company that owns the
15 Riverside plant.
16   Q.   Does it own any other property?
17   A.   No.
18   Q.   Was it set up entirely for the Riverside
19 property?
20   A.   Yes.
21   Q.   Are you the sole shareholder in there?
22   A.   Yes.
23   Q.   And there's another company you identify called
24 Relatively Stable?
25   A.   Relatively Stable.  Yes.

76

1    A.   It was another friend of Jeremys.
2    Q.   How about Jarvis, how did Jarvis come in?
3    A.   Jarvis was a friend of mines daughter's
4 boyfriend.  He just needed some part-time work that was
5 flexible around his school schedule.
6    Q.   Okay.  And do you know when Toby left?
7    A.   No.  That was, that was a mutual.  He says there
8 is, really I come over here on Sunday afternoons and
9 there is really not that much to do so.
10   Q.   Did he leave around the time after Nicole went
11 to the police?
12   A.   I'm not sure.  I would have to check the records
13 on that.
14        MR. CHIMES:  What time is it?
15        MR. MORAGHAN:  12:35.
16        MR. CHIMES:  Why don't we take a lunch
17     break.  This is a good time to break.
18        THE VIDEOGRAPHER:  Off the record at 12:35.
19        (Discussion was held off record.)
20        THE VIDEOGRAPHER:  On the record at 1:34.
21   Q.   Mr. Nodine, you had -- in the interview with the
22 police, you had asked him about some things that you
23 might have said in the workplace and you answered by
24 saying I'm a meat guy.
25   A.   Um-hmm.

**GOLDFARB AND AJELLO, LLC (203) 972-8320**

1    Q.   What did you mean, what did you mean by that?
2    A.   Maybe sometimes I can get a little crude.
3    Q.   Okay.  But, and was the -- I understand the
4 reference.
5         Are people who work with meat crude?
6    A.   Well, part of the work when you are down in the
7 loading docks in New York City or Fulton Fish Market at
8 2:00 in the morning or Hunt's Point, there is a rough set
9 of guys down there.
10   Q.   But are you down there for --
11   A.   Now and then, yeah.
12   Q.   How often?
13   A.   I used to have to go to Manhattan every week.
14   Q.   When was the last time?
15   A.   It was last fall, yeah.
16   Q.   And did you go every week or just --
17   A.   No, no, our driver was sick.
18   Q.   So you, you know, you have had a driver who
19 would do the deliveries for a while, right?
20   A.   Right.
21   Q.   But I mean, you understand there are rules about
22 behavior in the workplace?
23   A.   Yes.
24   Q.   Okay.  So can you give me examples prior to May
25 6 of things that were crude that you might have said?

1  Q. Okay. And so, so for example, Nicole has
2 suggested that there were times that you dropped your
3 reading glasses when she was around to get her to pick it
4 up, the inference being so you could look down her shirt.
5       Did you ever do that?
6  A. No, that was, that was an incident my glasses
7 fell off. She was nice enough to pick them up. I was
8 working on something, I don't recall what I was working
9 on. They fell off again, then she was nice enough to
10 pick them up, and then there was just one of those stupid
11 jokes, they are going there anyway so I just threw them
12 on the floor.
13       It was nothing more than that.
14  Q. So it wasn't to look down her shirt?
15  A. No.
16  Q. But you are saying it happened like three times,
17 you just described at least three times?
18  A. Well, it was all one incident. They were just
19 an old pair of glasses and they were stretched out and --
20  Q. So they fell accidentally twice?
21  A. Yes.
22  Q. And then the third time you did it
23 intentionally?
24  A. Right, just as a joking around.
25  Q. Were there any, any comments by you or her?

1  A.  No.
2  Q.  No reference to her breasts or anything like?
3  A.  No.
4  Q.  Okay.  Was anyone else present when that
5  happened?
6  A.  That I don't recall.
7  Q.  Now, the, the, the cooler area is off the
8  kitchen?
9  A.  Yes.
10 Q.  Okay.  I think both, I think Ms. Archer and also
11 Nicole had suggested that there were times that you would
12 follow Nicole into the cooler area without really any
13 reason.
14     Did that ever happen?
15 A.  Not for not having a reason.  Either that or,
16 you know, or I'm trying to talk to her.
17 Q.  Okay.  And like what, what would be the reasons
18 Nicole would go into the cooler area?
19 A.  Do whatever she had to grab to set up, many of
20 the meats.
21 Q.  What were the reasons you would be going in
22 there would be?
23 A.  Some parts I'm thinking she couldn't find
24 something.
25 Q.  Okay.  Nicole had indicated that on one

1  occasion, you made a comment that you brought a black dog
2  to court to show that you were not racist.
3           Did you say that?
4      A.   Yes.
5      Q.   Did you bring a black dog to court to show you
6  were not racist?
7      A.   Yes.
8      Q.   Was that in the case against Mr. Johnson?
9      A.   Yes.
10     Q.   How does bringing in a black dog -- so you
11 really did that?
12     A.   Yes.
13     Q.   How does bringing a black dog to court show that
14 you are not racist?
15     A.   Because one of the reasons why I run Gordon
16 Setters is that the people I get them from also worked
17 with Jacky Robinson to bring the breed back, the baseball
18 player.
19     Q.   So, so explain how bringing -- is the dog a
20 black colored dog?
21     A.   Yes.
22     Q.   And did you -- and you actually brought it to
23 the CHRO hearing?
24     A.   Yes.
25     Q.   To show that you bought a black dog from Jacky

1  Robinson's relatives?
2      A.   The breeder, that that --
3      Q.   The breeder is Jacky Robinson?
4      A.   No, no, no.  The breeder worked with Jacky
5  Robinson to bring the Gordons back.
6      Q.   Okay.  Is the breeder white or black?
7      A.   White.
8      Q.   So, so, so did you believe that by showing that
9  you had that type of dog proved that you were not racist
10 or were you making a joke?  I'm not understanding.
11     A.   I just figured it couldn't hurt.
12     Q.   Okay.  And how did -- was that a fact-finding
13 hearing when you did that or something or did you have to
14 testify that day?
15     A.   Yeah, I think -- may have been.  We had a bunch
16 of people down there so I'm not -- I can't remember if it
17 was a fact finding, fact finding or -- it may have been a
18 fact finding.
19     Q.   Did you address the CHRO investigator about this
20 black dog?
21     A.   Yes.
22     Q.   And what did the investigator say?
23     A.   I don't recall offhand.
24     Q.   Did you ever tell a joke in the office, how many
25 niggers to shingle a roof, it depend on how thin you

1  those over.
2      Q.   Okay.  And was there anyone else working that
3  day on May 6 that you can remember?
4      A.   Not that I recall.
5      Q.   So Jarvis, he didn't work that day, he worked
6  that Sunday, right?
7      A.   Right.
8      Q.   But not --
9      A.   I'm not sure if he worked that day or not.
10     Q.   What does Jarvis do?
11     A.   Basically washing dishes.
12     Q.   And Toby?
13     A.   Toby would just come in on Sundays and clean.
14     Q.   Okay, all right.  And did you have anything to
15 drink that day?
16     A.   I had a couple of beers that day, yeah.
17     Q.   Where would you keep the beers?
18     A.   In the cooler in the back.
19     Q.   Okay.  And you don't have a liquor license,
20 right?
21     A.   No.
22     Q.   You didn't then, I don't know if you do now.
23     A.   No, don't have a liquor license.
24     Q.   All right.  And when did you start drinking that
25 day?

172

1  STATE OF CONNECTICUT    )
2                          ) ss:   WALLINGFORD
3  COUNTY OF NEW HAVEN     )
4
5          I, Kevin Lombino, a Registered Professional
6  Reporter and Notary Public within and for the State of
7  Connecticut, do hereby certify that the within deposition
8  of CALVIN NODINE was held before me on the 7th day of
9  February, 2019.
10         I further certify that the witness was first
11 sworn by me to tell the truth, the whole truth and
12 nothing but the truth, and was examined by counsel, and
13 his testimony was recorded stenographically by me, it was
14 reduced to typewriting under my supervision, and I hereby
15 submit that the within contents of said deposition are
16 true and accurate to the best of my ability.
17         I further certify that I am not a relative of
18 nor an attorney for any of the parties connected with the
19 aforesaid examination, nor otherwise interested in the
20 testimony of the witness.
21         Dated at Wallingford, Connecticut, the 24th day
22 of February, 2019.
23              _____
                  Kevin Lombino, CSR00191
24
25 (My commission expires October 31, 2021.)

**GOLDFARB AND AJELLO, LLC (203) 972-8320**