UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **NICOLE CHASE** | : | **NO.: 3:18-cv-00683 (VLB)** |
| | : | |
| **v.** | : | |
| | : | |
| **NODINE'S SMOKEHOUSE, INC., et al** | : | **NOVEMBER 4, 2019** |

MEMORANDUM OF LAW IN OPPOSITION TO MOTION
<u>FOR SUMMARY JUDGMENT BY CANTON POLICE DEFENDANTS</u>

I.       PRELIMINARY STATEMENT

The behavior of the defendant police officers, Adam Gompper, and John Colangelo towards the plaintiff, Nicole Chase was disgraceful.  Ms. Chase was sexually assaulted by her employer Calvin Nodine on May 6, 2017.  She reported it to the police the following morning, although she initially omitted the details of the sexual contact.  She subsequently explained that she omitted it because she was embarrassed and humiliated that she not fought back.  This is not unusual for victims of rape.  The defendants never took Ms. Chase's complaint seriously, and never treated her with any sensitivity or respect.  From the outset, they never intended to prosecute Calvin Nodine, who they regarded and treated as a well-regarded business owner in town.  They never conducted a thorough and complete investigation.  When Ms. Chase told Detective Colangelo about the omitted detail, they arrested her for false statement.

The defendants Town of Canton, Adam Gompper, and John Colangelo have moved for summary judgment on Counts 14 (False Arrest Pursuant to 42 U.S.C. §1983), 15 (Common Law False Arrest), 16 (Malicious Prosecution Pursuant to 42

U.S.C. §1983), 17 (Common Law Malicious Prosecution), 18 (Denial of Equal Protection Pursuant to 42 U.S.C. §1983) and 20 (Indemnification Claim Against Town of Canton pursuant to Conn. Gen. Stat. § 7-465).

As discussed more fully below, the defendants' motion is meritless and should be denied in full.

## II.    STATEMENT OF FACTS

The plaintiff incorporates by reference the facts and supporting Exhibits set forth and attached to the plaintiffs' Local Rule 56(a)(2) Statement of Additional Material Facts.  Additional facts are set forth below where necessary.

## III.    LEGAL STANDARD

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be granted "only where, construing all the evidence in the light most favorable to the non-movant and drawing all reasonable inferences in that party's favor, 'there is no genuine issue as to any material fact' [. . .] " *McBride v. BIC Consumer Prods. Mfg. Co., 583 F.3d 92, 96 (2d Cir. 2009)* (quoting *Fed. R. Civ. P. 56(c)*). The moving party bears the heavy burden of proving that there is no genuine issue of material fact to be tried. *Gallo v. Prudential Residential Services, Ltd.*, 22 F.3d 1219, 1223 (2d Cir. 1994). Summary judgment is only proper "when no rational finder of fact could find in favor of the non-moving party." *Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 134 (2d Cir. 2000).  In determining whether there is a genuine issue of material fact, the court, on summary judgment, must resolve any and all inferences and ambiguities in favor of the party opposing summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986);

*Gallo,* 22 F.3d at 1223. If there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the non-moving party, summary judgment is improper. *Cronin v. Aetna Life Insur. Co.,* 46 F.3d 196, 203 (2d Cir. 1995).  Summary judgment is generally inappropriate where questions of the defendant's state of mind are at issue, *Gelb v. Bd. of Elections of the City of N. Y.,* 224 F.3d 149, 157 (2d Cir. 2000).

## IV.   FACTS

The plaintiff incorporates her Statement of Additional Material Facts filed herewith.

## V.   LEGAL ARGUMENT

### A.   ELEMENTS OF FALSE ARREST

Under Connecticut law, "[f]alse imprisonment, or false arrest, is the unlawful restraint by one person of the physical liberty of another." Outlaw v. City of Meriden, 43 Conn. App. 387, 392 (1996); Russo *v. City of Bridgeport,* 479 F.3d 196, 204 (2d Cir.2007).  Instigation of criminal proceedings through an arrest or an arrest warrant constitutes the deprivation of physical liberty.  In addition, the plaintiff must demonstrate that the defendants acted without probable cause to arrest the defendant.  *Stancuna v. Iovene,* 2009 WL 765558 *2 (Conn. Super. 2009).

In a Section 1983 claim for false arrest, the federal courts generally follow the law of the state where the false arrest occurred.   *Davis v. Rodriguez,* 364 F.3d 424, 433 (2d Cir.2004).

### B.   ELEMENTS OF MALICIOUS PROSECUTION

Under Connecticut law, a plaintiff asserting malicious prosecution must

prove that: "(1) the defendant initiated or procured the institution of criminal proceedings against the plaintiff; (2) the criminal proceedings have terminated in favor of the plaintiff; (3) the defendant acted without probable cause; and (4) the defendant acted with malice, primarily for a purpose other than that of bringing an offender to justice." *Brooks v. Sweeney*, 299 Conn. 196, 210-11, 9 A.3d 347 (2010).

The rule in the Second Circuit is that plaintiffs may bring what is in effect a state lawsuit for malicious prosecution in federal court under Section 1983, so long as they are able to demonstrate a deprivation of liberty amounting to a seizure under the Fourth Amendment.  *Spak* v. *Phillips*, 857 F.3d 458, 461 n.1 (2d Cir. 2017).

   **C.    PLAINTIFF HAS OVERCOME THE BURDEN OF DEMONSTRATING THAT THERE WAS NO PROBABLE CAUSE FOR THE ARREST OF NICOLE CHASE FOR THE CRIME OF MAKING A FALSE STATEMENT (Responding to Defendant's Section II B 1)**

   **1.    Determination of Probable Cause**

Probable cause to arrest exists when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime.'" Federal courts evaluate probable cause in light of the totality of the circumstances.  *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996) *Justin F.* v. *Maloney*, 476 F. Sup. 2d 141, 150 (D. Conn. 2007); When determining whether probable cause exists a court's inquiry must focus solely on the facts available to the officer at the time of arrest; facts subsequently learned, whether they tend to support or to negate the

existence of probable cause are irrelevant to the false arrest claim. *Panetta v. Crowley,* 460 F.3d 388, 395 (2d Cir.2006); *Ricciuti v. New York City Transit Auth.,* 124 F.3d 123, 128 (2d Cir.1997); *Rae v. County of Suffolk*, 693 F.Supp.2d 217, 223–24 (E.D.N.Y.,2010).

When a warrant is executed by a judge, there is a presumption of probable cause. *Walczyk v. Rio*, 496 F.3d 139, 155-56 (2d Cir. 2007).   In the context of qualified immunity analysis, this presumption of probable cause may be overcome by showing the following:

a.      That the affiants knowingly, recklessly or with reckless disregard for the truth made false or misleading statements, and/or omitted material information that was necessary to the finding of probable cause. *Soares v. Connecticut,* 8 F. 3rd 917, 920 (2d Cir. 2007); *Capasso v. Nappe*, 2017 WL 4167746 *3 (D. Conn. 2017); and

b.      The arrest warrant is so lacking in indicia of probable cause that no reasonably trained officer would rely upon it. *U.S. v. Leon,* 468 U.S. 897, 923 (U.S. 1984); *Malley v. Briggs*, 475 U.S. 335, 344–45, 106 S. Ct. 1092, 89 L.Ed.2d 271 (1986).  Conroy v. Caron, 275 F.Supp.3d 328, 351 (D. Conn., 2017).

2.    The Arrest Warrant is Facially Insufficient

Conn. Gen. Stat. §53a-157b(a) states in pertinent part:

A person is guilty of false statement when such person (1) intentionally makes a false written statement that such person does not believe to be true with the intent to mislead a public servant in the performance of such public servant's official function, and (2) makes such statement under oath or pursuant to a form bearing notice, authorized by law, to the effect that false statements made therein are punishable.

### a.  Nicole Chase Never Made a False Statement

A victim of sexual assault is not guilt of making a false statement when she initially omits a detail about the crime.  The False Statement statute is not intended to punish crime victims.  It is intended to punish persons who make false criminal accusations for personal gain.

Throughout her interactions with the Canton Police Department Nicole Chase consistently stated that she was pulled into the bathroom and sexually assaulted by Calvin Nodine.  Like many other victims of sexual assault, Ms. Chase initially omitted a humiliating and, in her mind, shameful detail of the sexual assault:  He forced his penis into her mouth, and she did not resist.  She was embarrassed, afraid to tell her family and friends and thought that nobody would believe her.   After she told Detective Colangelo the omitted detail, she never recanted.  She remained adamant that the sexual contact was not consensual.

This is not a case in which Nicole Chase recanted and stated that no sexual assault occurred. The false statement criminal statute is not applicable to victims of crimes who omit a detail.

### b.  Nicole Chase's Omitted an Aggravating Element of the Criminal Conduct

Individuals who falsely report criminal conduct for improper purposes generally overstate the conduct being reported as criminal.  When they subsequently recant or admit that their statement or report was false, the conduct is either non-existent or significantly less egregious.  Individuals who falsely report criminal conduct for improper purposes have a motive to paint the

accused in the worst possible light.

In contrast, Nicole Chase initially omitted a detail that would have made out a more serious crime (Sexual Assault v. Attempted Sexual Assault).  Victims of sexual assault sometimes omit details of the incident due to the trauma.

In contrast, someone who is making a false accusation of sexual assault to blackmail someone into paying money is hardly likely to harbor such reluctance. Nicole Chase's initial omission of details that made the accusation more serious was completely inconsistent with someone making a false accusation of sexual assault for monetary gain.

### c. Nicole Chase Was Never Asked Whether Calvin Nodine Put His Penis in Her Mouth Until After She Had Written Out Her Statement

It is a fundamental duty of police investigating a crime to ask questions related to the crime.  This necessarily includes asking questions about the elements of the crime.  See Canton Police Sexual Assault Report Review Checklist, attached as Exhibit 42.[1]

Sexual contact is an element of the crime of sexual assault.  In the initial lobby discussion on May 7, Officer Gompper never asked Nicole Chase for any details of what took place.  Specifically, he never asked Nicole Chase whether any sexual contact, oral or intercourse, took place.  Pl's. Stmt. Add'l Material Facts,

---

[1]  **For example, trespass is an element of the crime of burglary.  Conn. Gen. Stat. § 53a-103.  Any investigation of a burglary would include questions about whether the accused had permission from the owner or person in control of the premises to enter the premises involved in the alleged burglary.  Possessing or using a weapon is a necessary element of an armed robbery.  Conn. Gen. Stat. §§ 53a-134 and 53a-135.  Any investigation of a robbery would involve questions about whether a weapon was used and a description of the weapon.**

¶114.

When Nicole Chase came in and gave a written report, Officer Gompper never asked whether any sexual contact, oral or intercourse took place.  Pl's. Stmt. Add'l Material Facts, ¶114.

In her May 11, 2017 written statement, Ms. Chase made note that during the sexual assault in the bathroom, she could "smell his sweat and semen."  Chase's reference to the smell of semen should have indicated to a trained police officer that a sexual encounter had occurred.  It should have prompted more questions that would have disclosed the sexual contact had occurred prior to the execution of the alleged "false" statement.   Pl's. Stmt. Add'l Material Facts, ¶¶115, 116. Despite this, Officer Gompper never followed up.

Prior to giving her written statement, Nicole Chase was never questioned with specificity about the specific elements of the potential charges, particularly whether there had been any sexual contact.  She could not be charged with omitting a detail that she had never been specifically asked about.

> **d. Nicole Chase Corrected Her Earlier Written Statement During Her June 21, 2017 Videotaped Interview with Detective Colangelo**

According to Officer Gompper, the decision to take a written statement from Ms. Chase on May 11, 2017, instead of videotaping it, was fortuitous.  He testified that the office where the videotape equipment was maintained was locked, and he did not know how to use it.  Pl's. Stmt. Add'l Material Facts, ¶118.

Between May 11, 2017 when she gave the written statement and June 21, 2017, when she was interviewed by Detective Colangelo, neither Officer Gompper

nor Detective Colangelo had any discussions with her.    Pl's. Stmt. Add'l Material Facts, ¶119.

June 21, 2017 was Chase's first meeting with Detective Colangelo and the first opportunity since she had given the written statement to provide the omitted detail about the sexual contact.   When she spoke to Detective Colangelo on videotape on June 21, 2017, she was specifically asked about sexual contact for the first time and corrected her omission.   Pl's. Stmt. Add'l Material Facts, ¶119. Any omission in the earlier statement had been corrected and the investigation could have moved forward.  There was no basis to charge her with making a false statement moving forward.

e.  **Detective Colangelo Refused to Permit Nicole Chase to Provide a Revise Her Written Statement**

Even assuming *arguendo,* that Nicole Chase's omitted detail constituted a "false statement," she repeatedly sought to fix the issue by providing a revised statement.  The revised statement would have fixed any omission in her original written statement.

On Wednesday, June 21, 2017, at the conclusion of the interview, Detective Colangelo offered Ms. Chase the opportunity to fix her statement.  He offered her the opportunity to consult with her attorney before revising her statement. Detective Colangelo responded that would be fine, but also informed her that he would be on vacation on the following week.  Pl's. Stmt. Add'l Material Facts, ¶71, 72.

Detective Colangelo returned to work on July 5, 2017.  Pl's. Stmt. Add'l Material Facts, ¶85.   Detective Colangelo signed the arrest warrant charging

**9**

Nicole Chase with Making a False Statement, in violation of Conn. Gen. Stat. §53a-157b on July 7, 2017.  See Arrest Warrant.

On July 11, 2017 the signed arrest warrant for Nicole Chase was forwarded to the State's Attorney's Office.   Pl's. Stmt. Add'l Material Facts, ¶93.  The Arrest Warrant was not reviewed and signed by Assistant State's Attorney Weber until 8/31/2017.  Pl's. Stmt. Add'l Material Facts, ¶94.

Sometime in early July, after Detective Colangelo had returned from vacation, Nicole Chase went to the Canton Police department to revise her statement, and to provide copies of her texts with Jeremy Archer.  Pl's. Stmt. Add'l Material Facts, ¶95. She gave the text messages to the dispatcher and asked to speak with Detective Colangelo.  The dispatcher left and returned and said that he [Colangelo] is busy, and if he needs you, he will call you.  Pl's. Stmt. Add'l Material Facts, ¶96.

On July 25, 2017, Nicole Chase emailed Detective Colangelo about revising her statement.  Pl's. Stmt. Add'l Material Facts, ¶97.   On July 31, 2017, Nicole Chase sent a copy of her revised statement to Detective Colangelo.  Ms. Chase asked to come in to sign the revised statement.  The attached revised statement corrected the omission from the earlier written statement.   Pl's. Stmt. Add'l Material Facts, ¶98

On August 10, 2017, Detective Colangelo responded to Nicole Chase via email:

> Nicole, I apologize for the delay as I was on vacation. I did ask Officer Gompper to reach out to you, but he said he could not make phone contact. I understand you came down as dispatch told me you were here. I was asked if I needed to talk to you not that you were there to

**revise you statement. I was tied up on a different investigation at that moment and had no idea your intent was to give a new statement. Also at that point I had already documented the change in your recount of the incident and had already sent the case to court for review. It is still with the States Attorney's office and I should hopefully have some direction of the next step shortly.**

Pl's. Stmt. Add'l Material Facts, ¶100.

A reasonable jury could infer that Colangelo's email was false and deceptive in numerous respects:

1.      Colangelo stated that he had no idea that she was there to revise her statement.  But he was the one who had told her to come back to revise her statement.  There was no other reason for her to see him.

2.      Colangelo stated that he had already sent the case court for review. But the email is silent about the fact that the warrant had been drafted against her.

3.      Colangelo stated he had already documented the change in her recount of the incident.  In fact, the warrant stated the exact opposite: "¶17 of the Arrest Warrant indicated that "it was explained to Chase that she could call and speak to affiant Colangelo about her decision to provide a written statement.  As of 7/7/17 Chase has not called to speak to Affiant Colangelo [or] Officer Gompper."  See Ex. 3.

The warrant was not executed by the Judge until September 6, 2017.  Pl's. Stmt. Add'l Material Facts, ¶103.  As soon as Nicole Chase had indicated her desire to add the omitted detail to her statement, Detective Colangelo should have immediately withdrawn the warrant and permitted her to revise her statement.  Any discrepancy in her written statement would have been fixed and

Nicole Chase was unquestionably innocent of the charge.  Moreover, neither Assistant State's Attorney Weber nor Judge Nguyen, who ultimately signed the warrant, was ever made aware of these changed circumstances. Pl's. Stmt. Add'l Material Facts, ¶104.

Defendants argue that the proposed revised statement is "yet another version of events provided to police officers . . . and confirms that the plaintiff made a material omission in her May 11, 2017 written statement."  Defts.' Memorandum of Law, p. 20.  This a gross mischaracterization of what transpired. Nicole Chase's proposed revision was not "another version" of events.  In her email she states: "attached is the supplemental information that I would like added to my May 11, 2017 Voluntary Statement."  Pl's. Stmt. Add'l Material Facts, ¶120.  She was not giving a different version; she was adding the omitted detail as requested by Detective Colangelo.  Individuals who omit details from written statements are permitted to make corrections, as long as the fact of the revision and the date of revision are probably documented.  Once Nicole Chase sought to correct the omission from her statement, she should have been permitted to do so, and Colangelo was under a duty to withdraw the warrant application and not process the arrest.

4.  **The Arrest Warrant Was Filled with Lies, Contained Misleading Statements, and Omitted Material Evidence**

Nearly every paragraph of the Arrest Warrant contained false statements or distortions of the truth.  Twenty paragraphs (out of thirty-two) of the Arrest Warrant are inaccurate.  *See,* Chart of Inaccuracies in the Arrest Warrant ("Inaccuracy Chart"), attached as Exhibit 5 to Pl's. Stmt. Add'l Material Facts.

a. **Defendants Distorted the Allegations in the Warrant to Make the Sexual Assault appear to be Consensual**

Nicole Chase never recanted that she had been sexually assaulted.  In order to justify her arrest for making a false statement, many paragraphs of the Arrest Warrant were distorted to make the incident appear more consensual.  See Inaccuracy Chart, ¶ 8,9,15,21,22,25,26,27, 28, 31, Exhibit 5,  Pl's. Stmt. Add'l Material Facts,¶121, 122, 123.   For example, ¶15 of the warrant glosses over Calvin Nodine's statements to the Canton Police.  Pl's. Stmt. Add'l Material Facts ¶ 89.  Nodine's initial statement to the police was a lie.  His second version of the encounter with Nicole Chase was patently unbelievable and make a consensual sexual encounter in the bathroom improbable.  The details of his two false statements tended to make Nicole Chase's accusation of a sexual assault look much more credible.   Ex. 5, Inaccuracy Chart, ¶15, pp. 9-12.

¶25 of the warrant references Chase and Calvin Nodine hugging and holding hands in the hallway.  This completely distorts what Nicole Chase said in an effort to make it look consensual.  Nicole Chase told Detective Colangelo that when she came into the hallway to leave, and hugged her, she felt uncomfortable and was concerned that something was going to happen.  Inaccuracy Chart, ¶25.  Although Nicole Chase did use the term "holding hands" in her interview with Detective Colangelo, she immediately clarified that he had her by the arm and pulled her into the bathroom.  Ex. 5, Inaccuracy Chart, ¶25, pp. 17-19.

¶27 of the warrant states that Nicole Chase said that Calvin Nodine "guided" her into the bathroom.  This is false.  Nicole Chase never used term

"guided," which implies something consensual.  Nicole Chase consistently stated that Calvin Nodine pulled her into the bathroom, locked the door and told her to be quiet.  Ex. 5, Inaccuracy Chart, ¶25 pp. 17-19.

Nicole Chase was always consistent that she had been sexually assaulted. Defendants inaccurately described the incident in a manner in the arrest warrant to suggest that the incident was consensual in order to persuade the Prosecutor and the Judge to approve the warrant.

   b.  Distortions in the Warrant to Attack Nicole Chase's Credibility

Since Nicole Chase had never recanted that a sexual assault had taken place, the defendants made numerous false statements and misrepresentations in the warrant application to attack her credibility to make her story appear false in order to justify her arrest for making a false statement.  See Ex. 5, Inaccuracy Chart, ¶ 2,3,4,6,8,9,10, 12, 25, 28, 30, 32, 33. Pl's. Stmt. Add'l Material Facts,¶123.

¶ 2 and 3 of the warrant application state that Ms. Chase stated that she came to the Canton Police Department to make a sexual harassment complaint. This is contradicted by the lobby videotape of Nicole Chase.  Nicole Chase never used the term sexual harassment in her conversation with Officer Gompper.  Ex. 5, Inaccuracy Chart, ¶ 2 and 3, pp. 1-2.

¶12 of the Arrest Warrant describes (parenthetically) a statement that Nicole Chase made to Officer Gompper in the lobby as being inconsistent with an earlier statement that she made about what Kyle Rouleau was able to see. Although she initially described Kyle Rouleau coming around the corner before she described Calvin Nodine pulling her into the bathroom, she subsequently

14

clarified that she heard Kyle Rouleau coming back into the building, Calvin Nodine pulled her into the bathroom, and she never saw Rouleau.  This is entirely consistent with her written statement and statements to Detective Colangelo, as well as Rouleau's statement and Calvin Nodine's statement.  Nobody acting in good faith would ever describe this an inconsistency.  Ex. 5, Inaccuracy Chart, ¶ 12, p.6-9.

¶19 of the warrant states "it was eluded to the fact that Nodine took two polygraph tests."  Polygraphs are inadmissible and should never be referred to in a warrant.  The improper reference to the polygraph is compounded because the context in which it is mentioned erroneously implies that Nodine passed the polygraph tests.  The truth was that Nodine failed one and possibly two polygraphs and refused to take a law enforcement polygraph. Pl's. Stmt. Add'l Material Facts,¶57, 58. This false portrayal of the facts improperly bolstered Calvin Nodine's credibility.

¶ 28 states that Nicole Chase performed oral sex on Calvin Nodine as soon as they entered the bathroom.  This statement falsely attempts to portray the incident as being consensual, consistent with Nodine's false story.  Pl's. Stmt. Add'l Material Facts,¶122.  What Nicole Chase said was that "he did the shush thing (telling her to stay quiet), he was exposed, but I didn't know at that point what he was trying to do.  And, uh, and then you just hear him say bye, and he's like, oh, uh, bye -."   Ex. 5, Inaccuracy Chart, ¶ 28, p.20-21.

The multiple inaccuracies in the arrest warrant gave a false picture of Nicole Chase's version of events, in an attempt to cast doubt that she was the

victim of a sexual assault.

### c. The Arrest Warrant Portrays Nicole Chase as Having a Financial Motivation for Making A False Complaint

The defendants make the false assumption that a woman who pursues her civil remedies is less trustworthy than one who foregoes or does not have the option to pursue their civil claims.  This reflects a longstanding and unfounded stereotype in cases involving acquaintance rape that women make false accusations of sexual assault against men for money.

The warrant makes several serious distortions of the evidence to play to that stereotype.  Ex. 5, Inaccuracy Chart, ¶ 2,3, 8, 12,18,23, 31.

¶ 8 of the Arrest Warrant states in pertinent part: "Mrs. Chase made a comment to Adam Gompper about Calvin Nodine being a *rich man*."  Pl's. Stmt. Add'l Material Facts,¶14; Ex. 5, Inaccuracy Chart, ¶8, p.3.

¶ 12 of the Arrest Warrant states in pertinent part: "Nicole Chase then made a comment that's she's going up against a *millionaire*.  (Nodine owns a meat packaging business which distributes nationally as well as having this restaurant)."  Ex. 5, Inaccuracy Chart, ¶12, p.8.

These statements within the arrest warrant are plainly intended to suggest that Nicole Chase was pursuing her accusation for financial gain.  But the actual statements that she to Officer Gompper show that she meant something entirely different:

> I could literally, if I wasn't trying to press charges and I just wanted a complaint because I know he's a *rich man*, and I can't do shit about it, and I have no proof . . .

Pl's. Stmt. Add'l Material Facts,¶14.

**NICOLE CHASE:  By the time he was able to pull me, that's when I was already in there, and Kyle, said, like, "Good bye, Calvin?" and, almost, almost like he, like, knew something, but I don't know if he did and that's why I don't want to talk to him, but I really didn't want to, I mean, yeah, I'm going up against a *millionaire*, and...**
**ADAM GOMPPER:  Well, that doesn't give him a right to do anything-**
**NICOLE CHASE:  Oh no, I know it doesn't give him the right-**

Pl's. Stmt. Add'l Material Facts,¶14.

Calvin Nodine, the owner of Nodine's, had done a terrible thing to Nicole Chase.   After it happened, she was confused and did not know what to do.  See Chase – Jeremy Archer Texts, attached as Exhibit 47; Pl's. Stmt. Add'l Material Facts,¶68.  Chase perceived Nodine as being rich and powerful.  She felt powerless to do anything about his actions.  Her statements had nothing to do with pursuing a lawsuit.

Officer Gompper clearly understood what Nicole Chase meant when he spoke to her on May 7 in the lobby, and acknowledged her perception of the power imbalance, and responded that being rich did not give him a right to do anything. Ex. 5, Inaccuracy Chart, ¶12, p. 8-9.  Despite this, Officer Gompper knowingly twisted her words to falsely portray her in the warrant to persuade the prosecutor and judge to approve the warrant.

Defendants' focus on her civil lawsuit in the arrest warrant is even more egregious since the Canton Police Department were the ones who recommended that she go get a lawyer.  When Nicole Chase went to the police on May 7, 2019, she did not have a lawyer.  Pl's. Stmt. Add'l Material Facts,¶16.  Indeed, Chase had no idea that that someone could bring a civil case for a sexual assault by their employer.  Pl's. Stmt. Add'l Material Facts,¶16.  Chase returned to the

Canton Police Department on Monday, May 8 to pursue the criminal matter, but was told that she had to wait until Officer Gompper returned to duty.  Pl's. Stmt. Add'l Material Facts,¶17.  Sergeant Penney advised her to go get an attorney. Pl's. Stmt. Add'l Material Facts,¶18.

Finally, as an experienced Detective, Detective Colangelo knew or reasonably should have known that it makes no sense for individuals who are attempting to blackmail or extort money from a wealthy individual by making an accusation of sexual assault to go to the police first. They may threaten to go to the police to try to get money, but once they report it to the police, they lose control of the matter. The leverage comes from the potential of public disclosure or arrest.  Once the case is reported to the police that leverage is lost.

Defendants' gross distortion of her statements and the facts to falsely portray Nicole Chase as reporting the sexual assault for financial gain to persuade the prosecutor and judge to approve the warrant is disgraceful police work.

### d. The Arrest Warrant Omitted and Distorted Nicole Chase's Statements that Indicated That She Lacked Any Intent to Mislead A Public Servant in The Performance of Their Official Function

Conn. Gen. Stat. 53a-157b(a) states that an individual who makes a false statement must do so "with the intent to mislead a public servant in the performance of such servant's official function."

Nicole Chase's visible emotional reaction when she told the details of the sexual contact to Detective Colangelo clearly revealed that her hesitancy to discuss the details of the sexual contact had nothing to do with obstructing any

police investigation.    Pl's. Stmt. Add'l Material Facts,¶124.

During the interview,

- Ms. Chase told Colangelo that she did not tell her boyfriend that she had acquiesced to the sexual contact without resistance because she feared that she would not understand why she did not fight back;

- She stated that she did not "want people to ask her why she did it when she did not want to do it,"

- She says that she was scared to fight back or resist Nodine, and could not understand her own passivity;

- She was so ashamed of her response that she could not even tell her mother;

-  The trauma of the sexual assault had made her suicidal;

-  She told Detective Colangelo that the rest of the statement about the sexual assault was true except the part that she was ashamed for people to know; she never recanted or ever indicated that any of the sexual contact was consensual.

- She felt a great deal of emotional distress from the fact that she had not fully disclosed the details of the sexual contact, and it was difficult to hide it from her friends and family.

- She did not tell anyone about the details sexual contact because she was embarrassed and ashamed, but she was worried that once those details come out, her family, boyfriend, and friends would think that she was lying about it being nonconsensual.

- **It was clear that making disclosure of the sexual contact was a relief for Nicole Chase; She thanked Detective Colangelo for assisting her to tell the full story.   Pl's. Stmt. Add'l Material Facts,¶124.**

**Both Detective Colangelo and Officer Gompper acknowledged that they had been trained about the fact that victims of sexual assault do not always tell the complete story initially.  Pl's. Stmt. Add'l Material Facts,¶112.  But Officer Gompper stated during his internal affairs interview that neither he nor Colangelo ever considered whether Nicole Chase's omission of the details of the sexual contact could have been due to the trauma of the sexual assault.  Pl's. Stmt. Add'l Material Facts,¶131.  Experienced sexual assault investigators should know better and understand the dynamics of speaking with victims of assault and conducting appropriate interviews with them.  Pl's. Stmt. Add'l Material Facts,¶¶112, 125, 126, 127, 128, 129, 130, 131.**

**Nicole Chase never had any intent to mislead the police in the investigation of the case.  She was a victim of sexual assault who was trying to deal with the fallout.  Defendants Gompper and Colangelo intentionally distorted and failed to accurately this clearly exculpatory evidence that negated any criminal intent in order to get the warrant signed against her.**

5. **Evidence of Bias Malice and Bad Faith (Responding to Defendants Section II B 2)**

   a. **Failure to Follow Basic Police Practices When Interviewing a Victim of Sexual Assault/Investigating a Sexual Assault Complaint**

**The defendants in this matter repeatedly failed to follow standard police practices in the investigation of sexual assault cases and the treatment of victims**

of sexual assault.  The inescapable conclusion is that these egregious and repeat violations were not the product of poor training or incompetence; they were intentional and directed against the plaintiff.  The plaintiff's two experts on sexual assault investigations, Elizabeth Donegan and Catherine Garcia, have identified the following deficiencies:

1.  **Nicole Chase' initial meeting with Officer Gompper on 5/7/2017**

- **Officer Gompper initially spoke with Nicole Chase in the lobby.**

- **Officer Gompper spoke to Nicole Chase in front of her mother.**

- **Officer Gompper did not gather any physical evidence, such as Ms. Chase's clothing, or evidence of alcohol consumption by Nodine at the crime scene.**

- **Officer Gompper did not refer Ms. Chase for a forensic examination;**

- **Officer Gompper did go to the crime scene.**

- **Officer Gompper showed no sensitivity to Nicole Chase:  His first question was "so what's going on."**

- **Officer Gompper showed a complete lack of knowledge of the law and minimized the incident:  During the lobby interview, Chase described how Calvin Nodine pulled her into the bathroom, shut the door, exposed his penis to her, and demanded that she suck it.  Gompper told Nicole chase that he did not think that it reached the level of a sexual assault, if anything.**

Pl's. Stmt. Add'l Material Facts,¶125.

2.  **Officer Gompper's second meeting with Nicole chase on May 11, 2019**

- **Officer Gompper spoke with Nicole Chase with Alexandria Archer in the room.**

- **Officer Gompper never got the details of what happened.**

- **After Ms. Chase mentioned "the smell of semen," Officer Gompper never followed up to determine what she was referring to. Ms. Chase's visceral recollection of 'the smell of semen" was a clear indication that there had been physical contact that Chase had not yet discussed. Officer Gompper should have pursued this with Ms. Chase.**

**Pl's. Stmt. Add'l Material Facts,¶126.**

### 3.  Calvin Nodine Interview on May 19, 2019

- **Detective Colangelo never spoke to Nicole Chase prior to interviewing Calvin Nodine.**

- **After Calvin Nodine admitted that he put his penis into Nicole Chase's mouth, Detective Colangelo never got specific details about what happened in the bathroom and the events leading up to the encounter in the bathroom from Calvin Nodine.**

- **Detective Colangelo never reviewed the details from the other witnesses or the details of what took place that day with Calvin Nodine.**

**Pl's. Stmt. Add'l Material Facts,¶127.**

### 4.  After Nodine Interview

- **Defendants intentionally delayed the investigation.**

- **Defendants did no further investigation except to wait for Nodine's polygraph results.**

- **Defendants never communicated with Nicole Chase about status of the investigation.**

**Pl's. Stmt. Add'l Material Facts,¶128.**

    5.  **During Nicole Chase Interview**

- **Detective Colangelo never told Nicole Chase that she was a suspect for a False Statement arrest.**

- **Defendant Colangelo lied to Nicole Chase about taking the case seriously.**

- **Defendant Colangelo lied to Nicole Chase about having interviewed other witnesses;**

- **Defendant Colangelo gave Nicole Chase the false impression that Calvin Nodine had passed two polygraph tests.**

**Pl's. Stmt. Add'l Material Facts,¶129.**

    6.  **After Chase Interview**

        **After Nicole Chase told Detective Colangelo that she had been sexually assaulted in the bathroom by Calvin Nodine, Detective Colangelo closed down the investigation and drafted the warrant against Chase.  It was premature to draft a warrant against either party.  Further investigation was necessary.  An investigator's duty is to follow the evidence.  Detective Colangelo and Officer Gompper failed to do this.  Instead, they drew conclusions to match their preconceived biases in the case.  Pl's. Stmt. Add'l Material Facts,¶130.**

A reasonable factfinder, viewing all of the evidence in favor of the plaintiff, could find that the defendants failed to follow basic police procedures for investigating accusations of sexual assault and in their treatment of Nicole Chase.   A reasonable factfinder could infer that these errors were intentional and done in bad faith for an improper motive:  corruption, bias, or misogyny.

**b.   Direct Evidence of Bias, Bad Faith, and Malice**

Officer Gompper and Detective Colangelo's behavior during the course of this investigation revealed evidence of bias, bad faith, and malice directed against Nicole Chase.

There was a marked difference between Detective Colangelo's tone and body language in his interview with Calvin Nodine and his interview with Nicole Chase.   He treated Chase as the suspect and Nodine as the victim.  He spent more than one-half of the interview talking about himself and directing his conversation to Nodine's attorney, David Moraghan.  Pl's. Stmt. Add'l Material Facts,¶35.  Colangelo even suggested that Nodine's attorney invite him to play golf at his Country Club.   Pl's. Stmt. Add'l Material Facts,¶35.

In contract, Colangelo's behavior towards Nicole Chase was terse.  He never asked her how she was doing or whether she was receiving appropriate support.  Compare Nodine Interview and Nicole Chase Interview, Exhibits 20 & 20a; Exhibits 8 & 8a.

At the commencement of the interview with Calvin Nodine, Detective Colangelo could not even remember Nicole Chase's name. Pl's. Stmt. Add'l Material Facts,¶36.  Before he had even started questioning Nodine, he indicated

to him that he had doubts about her story.  Pl's. Stmt. Add'l Material Facts,¶37.

Colangelo is dismissive of Nicole Chase, stating "what's this girl's deal," even though Ms. Chase is an adult and a mother.  Pl's. Stmt. Add'l Material Facts,¶38.  Referring to an adult woman as a girl in 2017 is a stereotype that diminishes Ms. Chase's standing.

Colangelo ignores the other evidence of Nodine's crude behavior and accepts Nodine's explanation that he is a "meat guy."  Pl's. Stmt. Add'l Material Facts,¶39.  Colangelo dismisses Nodine's crude or sexually inappropriate conduct in the workplace as "flirtation."  Pl's. Stmt. Add'l Material Facts,¶40.  Colangelo characterizes the complaints as "bitching."  Pl's. Stmt. Add'l Material Facts,¶41.  Colangelo fails to perceive or understand that this evidence of Nodine's crude behavior, corroborated by other witnesses is relevant as to the sexual assault and to Calvin Nodine's assertion that what took place in the bathroom was consensual.  Pl's. Stmt. Add'l Material Facts,¶42.  A reasonable juror could interpret Colangelo's attitude as misogynistic.

After Calvin Nodine initially falsely denied that anything had happened during the interview, Detective Colangelo suggested to him a better defense:

> You know, some people can't handle this type of question, but if you were fooling around with Nicky consensually, that's a whole different story, and it's a tough question but it might open up why she's already gotten an attorney, and come down here, and all that kind of stuff. Again, I'm not going out, calling you wife, saying- *guys do what guys do, trust me. I mean, you know, enough guys get divorced because of it* and all that kind of stuff, but, if that's the thing that was happening, that's, what, maybe starts to explain some of this stuff.

(Emphasis added).  Pl's. Stmt. Add'l Material Facts,¶¶46-47.   A reasonable juror might infer that Colangelo's reference to "guys do what guys do" suggests a bias

against women who make accusations in acquaintance rape cases and a bias towards believing that it was a consensual affair.

After Calvin Nodine changed his story, Colangelo appeared to immediately accept Calvin Nodine's second version of the story of a consensual sexual encounter.  Colangelo stated "I understand it's embarrassing, but I've heard worse."   Pl's. Stmt. Add'l Material Facts,¶50.  Instead of continuing to question his story or elicit further facts relating to the accusation, Colangelo immediately addresses her financial motivation and tells a story about how someone that he arrested tried to sue him twenty years ago.  Colangelo stated "probably more than the ones that are cases, everybody wants a slice of somebody else's pie."  Pl's. Stmt. Add'l Material Facts,¶51.  Detective Colangelo is suggesting to Calvin Nodine arguments for his defense.

Detective Colangelo's predisposition to believe that the incident in the bathroom was consensual leads him to give Nodine a "base on balls" (a pass) for initially lying.

> So do I give you a bit of a little, uh, a base on balls [?] on that first, like, false statement? Yeah, kind of, because I know it's hard. I mean, some people come up, like, [mimics a crying voice] oh, how could I let this happen, [normal voice] you know, [crying voice] we were having an affair, [normal voice] and, and that's fine, but I don't know you as yet, and like I said, you don't know me. So, and, and you got a lot to lose. And, I guess, some guys want to lose that. Some guys are, like, oh thank God I'm caught. You know? I want to get out of that marriage anyway. It's true! I mean, you can't believe what people tell us.

Pl's. Stmt. Add'l Material Facts,¶52.  Detective Colangelo's assumption that Nodine's second version of the sexual assault is true contrasts with his immediate assumption that Nicole's omission of the details of the sexual contact

is culpable.  This double standard is outrageous.  A reasonable juror could infer that Detective Colangelo applied this double standard because he was sexist or corrupt.

During the interview with Calvin Nodine, Detective Colangelo sought to curry favors with Nodine and his Attorney, by talking about how he drafted an arrest warrant in another sexual assault investigation that was very favorable to Attorney Moraghan's former law partner, who was defending the accused. Colangelo stated that he put every piece of exculpatory evidence favorable to the defendant into the warrant.  Colangelo bragged: "I built a defense for him in my arrest warrant. He- because it was there, because it existed. So, he's not going to leave it out. That's how it works. In my world." Pl's. Stmt. Add'l Material Facts,¶43.  A reasonable juror could infer that Detective Colangelo was telling Nodine and his attorney that he would do everything possible to slant the investigation their way.  A reasonable juror could infer that this was due to malice, misogyny, or corruption.

During the interview with Calvin Nodine, Detective Colangelo laid out his plan to trap Nicole Chase and charge her with making a false statement.  He told Nodine about how he had a complainant who he believed was making a false accusation of sexual assault and he had the defendant and turned the tables by making her the suspect in a false statement prosecution.  Pl's. Stmt. Add'l Material Facts,¶54, 55.  As part of this plan to turn the tables on Nicole chase, he suggested to Calvin Nodine that he should take a polygraph as a tool to obtain leverage.  Pl's. Stmt. Add'l Material Facts,¶53.   The evidence showed that

Colangelo and Gompper followed out this plan exactly as they described to Nodine and his attorney. They did absolutely nothing but wait for the results of Nodine's polygraph.  Pl's. Stmt. Add'l Material Facts,¶56.  After Nodine failed either one or two polygraphs and refused to take an official polygraph, they drew no adverse conclusions against Nodine.  They behaved as if he had passed the polygraph, misrepresented it to Nicole Chase, and ultimately charged her with Making a False Statement as promised to Nodine.  A reasonable juror could conclude that these actions constituted malice against Nicole Chase, sexism and/or corruption.

During the interview with Calvin Nodine, Detective Colangelo elaborated on his plan turn the tables on Nicole Chase.  He told Nodine that he did not plan to rush the investigation or question additional witnesses.  He told Nodine: "[T]his case does not have to be pushed through, you're not a menace to society. . . You know, that's not, you're not the Green River Killer thing where we gotta, we're gonna try to follow every lead, if we don't, well, we're missing arguments" Pl's. Stmt. Add'l Material Facts,¶55.   Between the May 19, 2017 interview of Calvin Nodine and receiving word from Nodine on June 14, 2017 that he had failed the polygraph, neither Colangelo nor Gompper did any work on the case for approximately six weeks.  Pl's. Stmt. Add'l Material Facts,¶56, 60, 61.  A reasonable juror could infer that Detective Colangelo telling the accused, Calvin Nodine, and his attorney that his plan was to intentionally delay the investigation and not conduct a full and complete investigation was malicious, biased, or corrupt.

After Nicole Chase's interview on 6/21/2017, Officer Gompper prepared a police report documenting the interview. Pl's. Stmt. Add'l Material Facts,¶¶59, 73.

 In the interview he put certain words that Chase used that had a sexual connotation in quotations:

- **VICTIM GAVE NODINE "oral;"**

- **She worked her "butt off;"**

- **She wasn't "getting sex at home;"**

- **He was "hard" again**

- **Nodine kept bashing her face into his "junk."**

C Pl's. Stmt. Add'l Material Facts,¶73. Emphasizing these words stated by Nicole Chase in quotation marks was unprofessional, mocking and belittling.  It demonstrated that Colangelo and Gompper did not take her seriously.  A reasonable juror could infer from this disparaging treatment of Nicole Chase that the defendants were biased and acted with malice.

Nicole Chase's June 21, 2017 interview with Detective Colangelo was completed at 11:29:54 am.  Pl's. Stmt. Add'l Material Facts,¶74.    Officer Gompper's June 21, 2017 police report was typed up on June 21, 2017 at 13:34 (1:34 pm) *two hours* after Chase's interview and signed by Gompper on June 22, 2017. Pl's. Stmt. Add'l Material Facts,¶75.  Gompper's report indicated that a decision had already been made to arrest Nicole Chase for making a false statement:

> An arrest warrant will be applied for the VICTIM, AKA Nicole Chase (DOB 8/2/90), for the charge of 53a-157b, False Statement.

Pl's. Stmt. Add'l Material Facts,¶76.    Gompper memorialized the decision to

arrest Nicole Chase for making a false statement in *1-2 hours* after Colangelo

had interviewed Nicole Chase.  Detective Colangelo made the decision to

arrest Nicole Chase for making a false statement and told Officer Gompper to

include it in the police report.  Pl's. Stmt. Add'l Material Facts,¶77.  A

reasonable juror could conclude that Gompper and Colangelo had already

made the decision to arrest Nicole Chase before Colangelo had even

interviewed her. A reasonable juror could further conclude that Detective

Colangelo had lied to Nicole Chase about her opportunity to revise the

omitted detail in her statement; defendants' intention was always to

exonerate Calvin Nodine and arrest Nicole Chase.  A reasonable juror could

conclude that this rush to judgment constituted malice, misogyny, and/or

corruption.

     In addition to deciding to arrest Nicole Chase, defendants also made

the decision to exonerate Calvin Nodine *2 hours* after they had interviewed

Nicole Chase.  Gompper wrote in his police report:

> I do not find probable cause to believe that Nodine forced the
> VICTIM to perform a sexual act on him. The VICTIM had the
> chance to call for help when the other employee, Kyle, was calling
> out to them. The VICTIM stated she spent 15 minutes performing
> oral sex on Nodine in the bathroom. The VICTIM also said that
> Nodine was hard initially but then wasn't and he was then "hard"
> again and he ejaculated in her mouth. The VICTIM also said that
> Nodine's wife called his cell phone at least 6 times while they
> were in the bathroom together. The VICTIM also admitted that she
> provided me with a false sworn statement.

Pl's. Stmt. Add'l Material Facts,¶78.  Officer Gompper testified that he wrote

this section of the report, but Detective Colangelo reviewed it and agreed with

it. Pl's. Stmt. Add'l Material Facts,¶79.

Defendants justifications for exonerating Calvin Nodine were all based upon antiquated myths about rape victims.   Exonerating someone accused of sexual assault because the victim did not "cry out" improperly relies upon and perpetuates a sexist stereotype that sexual assault victims who acquiesce or fail to resist are untruthful or that the failure to cry out indicates consent. Pl's. Stmt. Add'l Material Facts,¶80.

Exonerating someone accused of sexual assault because of the length of time the victim states the sexual assault took place also relies upon and perpetuates a sexist stereotype that lengthier encounters somehow connote consent.   Victims of acquaintance sexual assault acquiesce out of fear, and simply to get it over with and get away.  In addition, victims of all types of trauma frequently perceive the events as lasting far longer than the actual time lapse.  A trained investigator would understand this and not use it as a justification to exonerate someone accused of sexual assault and to use it against the victim.  Pl's. Stmt. Add'l Material Facts,¶81.

Exonerating someone accused of sexual assault based upon the assumption that the victim's testimony that the perpetrator had an erection, stopped being erect and then became erect again until he ejaculated somehow demonstrates consent ignores well-documented evidence that victims will acquiesce to sexual assaults, despite the lack of consent.  Pl's. Stmt. Add'l Material Facts,¶82.

Finally, Nicole Chase's statement that Calvin Nodine's wife called numerous times while they were in the bathroom could easily have been

31

corroborated by obtaining Calvin Nodine's and his wife's cell phone records.
Neither Officer Gompper nor Detective Colangelo ever obtained or sought to
obtain the cell phone records from Calvin Nodine or his wife prior to drafting
the warrant or exonerating Nodine.  Pl's. Stmt. Add'l Material Facts,¶83.
Investigation would have revealed that Calvin Nodine's wife called Calvin
Nodine at 9:11 pm on May 6, 2017.   Pl's. Stmt. Add'l Material Facts,¶84.  A
reasonable jury could conclude that based upon the time of the call this was
the call that Nicole Chase was telling the truth.  Calvin Nodine finally took his
wife's call while they were in the bathroom. A reasonable juror could
conclude that Colangelo and Gompper failed to conduct a full and thorough
investigation prior to exonerating Calvin Nodine.  They improperly relied upon
a truthful statement by Nicole Chase about the phone calls from Nodine's wife
while they were in the bathroom as justification for exonerating Calvin
Nodine.

A reasonable juror could conclude that this improper exoneration of
Calvin Nodine was the product of malice, bias, or corruption.

6. **Defendants Have Not Met Their Burden of Proving Their Affirmative Defense of Qualified Immunity (Responding to Defendants' Argument Section II B 1 and II D)**

a. **Federal Qualified Immunity (Counts 14, 16)**

Government actors have qualified immunity to § 1983 claims 'insofar as
their conduct does not violate clearly established statutory or constitutional
rights of which a reasonable person would have known.  *Bolmer v. Oliveira*, 594
F.3d 134, 141 (2d Cir. 2010) (quoting *Okin v. Vill. of Cornwall—on—Hudson Police*

*Dep't*, 577 F.3d 415, 432 (2d Cir. 2009)).

A qualified immunity defense is established if (a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." *Salim v. Proulx*, 93 F.3d 86, 89 (2d Cir. 1996).

Qualified immunity is an affirmative defense.  The burden of proof rests on the defendants asserting the defense to demonstrate that it was objectively reasonable to believe that their conduct did not violate a federal right of plaintiffs. *Green v. City of New York*, 465 F.3d 65, 83 (2d Cir. 2006).

The right to be free from arrest without probable cause was unquestionably a clearly established constitutional right under the Fourth and Fourteenth Amendments at the time of Nicole Chase's arrest.  *Jenkins v. City of New York*, 478 F.3d 76, 87 (2d Cir. 2007); *Martinez v. Simonetti,* 202 F.3d 625, 634 (2d Cir.2000).

An officer's determination is objectively reasonable if there was "arguable" probable cause at the time of arrest.   Arguable probable cause exists when a reasonable police officer in the same circumstances and possessing the same knowledge as the officer in question *could* have reasonably believed that probable cause existed in the light of well-established law.  J*enkins v. City of New York*, 478 F.3d 76, 87 (2d Cir. 2007); *Lennon v. Miller,* 66 F.3d 416, 423–24 (2d Cir.1995); *see also Escalera v. Lunn,* 361 F.3d 737, 744 (2d Cir.2004); *Golino v. City of New Haven,* 950 F.2d 864, 870 (2d Cir.1991); *Weiner* v. *McKeefery*, 90 F. Sup. 3d 17, 39 (E.D.N.Y. 2015).  A court must evaluate the objective

reasonableness of the defendants' conduct "in light of clearly established law and the information the ... officers possessed." *Cerrone v. Brown*, 246 F.3d 194, 202 (2d Cir. 2001).

In considering qualified immunity, "a court should put aside allegedly false material, supply any omitted information, and then determine whether the contents of the 'corrected affidavit' would have supported a finding of probable cause." *Soares*, 8 F.3d 917, 920. "In determining whether omitted information was necessary to the finding of probable cause, 'we look to the hypothetical contents of a 'corrected' application to determine whether a proper warrant application, based on existing facts known to the applicant, would still have been sufficient to support arguable probable cause to make the arrest as a matter of law. *McColley v. Cty. Of Rensselaer*, 740 F.3d 817, 823 (2d Cir. 2014); *Escalera v. Lunn*, 361 F.3d 737, 743 (2d Cir. 2004). In performing the 'corrected affidavit' analysis, the court examines all the information the officers possessed when they applied for the arrest warrant. While the law does not demand that an officer applying for a warrant volunteer every fact that arguably cuts against the existence of probable cause, he must not omit circumstances that are critical to its evaluation. *McColley,* 740 F. 3rd, at 823; *Escalera*, 361 F.3d at 743; *Walczyk*, 496 F.3d 139, 161 (2d Cir. 2007); *Boccanfuso v. Zygmant*, 2019 WL 1115839, at *5 (D.Conn., 2019).

As outlined, *supra,* the record in this case was utterly devoid of even arguable probable cause by any standard, and no corrected affidavit can save it. The record shows:

1.      Nicole Chase never made a false accusation of sexual assault.  She never wavered on her accusation that Calvin Nodine forcibly sexually assaulted her.   She omitted a detail that she corrected it the first time that she was questioned by Detective Colangelo on June 21, 2019. She provided a revised statement that corrected the omitted detail over one month prior to her arrest. Detective Colangelo lied to her about it and never should have arrested her.

2.      The arrest warrant contained false and misleading statements, and inaccurate distortions of Nicole Chase's actual recorded statements and facts at the time of her arrest.  Twenty-two out of thirty-two paragraphs of the arrest warrant are inaccurate.  See Inaccuracy Chart.

3.      The warrant falsely attacked Nicole Chase's credibility and blatantly took statements from her out of context to falsely portray her as having a financial motive to make a false statement.

4.       The warrant intentionally omitted and distorted the evidence that negated any intent by Ms. Chase to mislead the officers.  Ms. Chase's initial omission of the details of the sexual contact were consistent with the experiences of many victims of sexual assault who omit details due to trauma, shame and fear of not being believed.  No reasonable officer with any experience in the investigation of sexual assault complaints would have believed that she had any intent to mislead a police officer in their official function.

Qualified immunity is intended to provide protection to all but the plainly incompetent or those who knowingly violate the law.  *Malley,* 475 U.S. at 341. The substantial evidence of malice submitted, *supra,* amply demonstrate that the

defendants false arrest of Ms. Chase, was intentional, malicious, willful and/or the product of illegal discrimination, or corruption to protect Calvin Nodine.  Qualified immunity protection is not intended to protect these defendants under these circumstances.  The arrest warrant in this case is so lacking in indicia of probable cause that no reasonably trained officer would rely upon it.  *U.S. v. Leon,* 468 U.S. 897, 923 (U.S. 1984); *Malley v. Briggs*, 475 U.S. 335, 344–45, 106 S. Ct. 1092, 89 L.Ed.2d 271 (1986).  Conroy v. Caron, 275 F.Supp.3d 328, 351 (D. Conn., 2017).

### b.  Common Law Governmental Immunity (Counts 15, 17)

Connecticut employs a different standard of immunity for state common false arrest and malicious prosecution claims than federal Section 1983 claims.  A municipal official is generally immune from liability for discretionary—as opposed to ministerial—acts, unless the plaintiff can show that the circumstances fit under one of three exceptions: "first, where the circumstances make it apparent to the public officer that his or her failure to act would be likely to subject an identifiable person to imminent harm ... second, where a statute specifically provides for a cause of action against a municipality or municipal official for failure to enforce certain laws ... and third, where the alleged acts involve malice, wantonness or intent to injure, rather than negligence."  *Fleming v. City of Bridgeport*, 284 Conn. 502, 531–32 (2007); *Mulligan v. Rioux,* 229 Conn. 716, 728 (1994); *Huaman v. Sirois*, 2015 WL 5797005, at *10 (D. Conn., 2015).

The defendants' arrest of Ms. Chase was a discretionary act.  However, the facts of this case fit two of the three exceptions to the application of governmental immunity.

In this case, there is sufficient evidence of malice, as discussed *supra,* to meet the third exception for malicious conduct.  In addition, the evidence demonstrates that Ms. Chase was an identifiable person subjected to imminent harm.   The facts of this case thus also meet the first exception.   Governmental immunity is inapplicable to the plaintiffs' state false arrest and malicious prosecution claims in the instant case.

### D.   NICOLE CHASE'S CRIMINAL PROSECUTION TERMINATED IN HER FAVOR (Responding to Defendants Section II B 3)

The defendants rely upon certain language in the Second Circuit case of *Lanning v. Glens Falls,* 908 F. 3rd 19, 22 (2d Cir. 2018), for their argument that the *nolle prosequi* entered in the instant case did not constitute a favorable termination of the criminal prosecution in order to meet that element of a malicious prosecution lawsuit.  Defendants' reading of *Lanning* is overly expansive.

In *Spak v. Phillips,* 857 F. 3rd 458, (2d Cir. 2017), the Second Circuit held that the entry of a Nolle Prosequi by Connecticut State's Attorney generally constituted a "favorable termination" for purposes of determining when a 42 U.S.C. §1983 malicious prosecution claim accrues.

A *nolle prosequi* is a discretionary act by the prosecutor that terminates the prosecution and that criminal proceeding is closed.   If the prosecutor decides to proceed against a defendant following the entry of a *nolle prosequi*, a new prosecution must be initiated.   Connecticut Rules of Crim. Proc. §39-29, 39-21.  After the entry of a *nolle prosequi*, the criminal statute of limitations continues to run, and the prosecutor must file the new charging document prior to the expiration of the statute of limitations.  *Spak,* 857 F. 3rd at 463.

Nicole Chase was arrested on September 8, 2017 and charged with False Statement in violation of Conn. Gen. Stat. §53a-157b, which is a Class A misdemeanor.  The statute of limitations for a Class A misdemeanor is one year.

Attorney John Ritson represented Nicole Chase in the criminal case. During his initial discussions with the Assistant State's Attorney, on October 8, 2017, Attorney Ritson emphasized that the prosecution of Nicole chase was outrageous and that she had been the victim of a sexual assault.  He stated that Calvin Nodine was the one who should have been prosecuted.  The State's Attorney requested a continuance and indicated his intention to enter a *nolle prosequi.*  Chase did not object to the continuance.  There was no agreement between the parties, no plea bargain, and no court-sponsored program, such as Accelerated Rehabilitation.  Chase did not agree to perform community service or seek mental health treatment.   There were no conditions imposed upon Nicole Chase.  Pl's. Stmt. Add'l Material Facts,¶109a.  One month later, the State's Attorney entered a *nolle prosequi* in Ms. Chase's case on November 8, 2017.  Pl's. Stmt. Add'l Material Facts,¶109a.   There were no conditions imposed upon Nicole Pl's. Stmt. Add'l Material Facts,¶109a.  The statute of limitations deadline to prosecute Ms. Chase for the alleged false statement expired on May 11, 2018.[2] Neither the Canton Police nor the State's Attorney's office filed new charging documents prior to the expiration of the statute of limitations.

In *Spak,* the Second Circuit also recognized that there were circumstances

---

[2]  Conn. Gen. Stat. §53-157b is a misdemeanor.  The statute of limitations for misdemeanors is one year.  Conn. Gen. Stat. §54-193(d).

where the entrance of a *nolle prosequi* does not constitute a favorable determination for purposes of that element of a malicious prosecution lawsuit, when it is entered for reasons that are not indicative of the defendants' innocence.  It defined the exception narrowly, such as when the defendant makes himself unavailable for trial or delays a trial through fraud, or when a nolle is in exchange for some type of consideration by the accused.  *Spak,* 857 F. 3rd at 458.

The court also pointed out that preventing plaintiffs from suing for malicious prosecution once a *nolle* is entered is inconsistent with purposes of §1983 claims:

> When the state institutes criminal charges maliciously and without probable cause and requires a defendant to appear before a court and answer those charges, it violates the Fourth Amendment's guarantee against unlawful seizure. [Citation omitted] The accused is entitled to seek recovery for such a wrongful seizure as soon as the charges are vacated. His day in court should not be delayed merely because the state remains free to bring a similar prosecution in the future.

*Spak,* 857 F. 3rd at 456.

Contrary to defendants' assertions, *Lanning* is consistent with *Spak* and does not overrule its holding.

In *Lanning,* the plaintiff had been arrested and charged with several criminal charges arising out of a bitter custody dispute with his estranged wife. The charges were dismissed in the interest of justice pursuant to New York Criminal Procedure Law §170.40.[3]  The plaintiff subsequently filed claims of

---

[3] Plaintiff filed her malicious prosecution claim against the Canton Police defendants on April 12, 2018.  *Lanning* was decided seven months later.  Ms. Chase relied upon the Second Circuit decision in *Spak* when she did not object to the *nolle prosequi* in her criminal case in order to preserve her malicious

malicious prosecution against the police officers who arrested him, and the District court dismissed the complaint pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.  On appeal the Second Circuit affirmed and held that the plaintiff had not adequately pled that the termination of the prosecutions against him affirmatively indicated his innocence.  908 F. 3rd at 25.

As an initial matter, *Lanning* involved an appeal from a dismissal on the pleadings.  The court's review was limited to "the complaint, the answer, any written documents attached to them, and any matter of which the court can take judicial notice."  908 F.3d at 28.  The instant case, in contrast, involves a summary judgment motion and a more fully developed factual record.  *Lanning's* holding is limited; it addresses the sufficiency of the pleadings in a complaint.

The Second Circuit pointed out that the complaint's allegations about the reasons for the dismissal of the criminal charges against the plaintiff were "vague" and "consistent with any number of procedural or jurisdictional grounds, all of which fail to affirmatively indicate innocence."  908 F. 3rd at 28.  The court pointed out that the plaintiff conceded that the dismissals were based in part on "lack of jurisdiction."  *Id.*  In addition, the records indicated the City Court Judge explicitly stated on the record that the dismissal of those charges in the interest of justice was "neither an acquittal of the charges nor any determination of the merits," but rather "le[ft] a question of guilt or innocence unanswered."  *Id.*  In their Motion to Dismiss, the defendant-Appellees claimed that the dismissal was

prosecution claim.  Even assuming arguendo, that *Lanning* overruled *Spak*, it would be inequitable to apply *Lanning* retroactively to Ms. Chase.

made based on a jurisdictional issue that arose out of where plaintiff's estranged wife was physically located.  908 F. 3rd at 23.

The pleading defect in *Lanning* was the type of procedural dismissal discussed in *Spak,* which was insufficient indication of innocence to constitute a favorable termination for purposes of filing a malicious prosecution lawsuit.

The *nolle prosequi* entered in the instant case was not due to jurisdictional or procedural issues.  The State's Attorney unilaterally chose not to prosecute the case and entered an unconditional *nolle*.  The State's Attorney certainly could have prosecuted the case or forced Ms. Chase to file for a court-sponsored diversionary program, such as accelerated rehabilitation.  The State's Attorney never re-filed the False Statement charge against Nicole chase prior to the expiration of the statute of limitations and constitutional jeopardy has attached as to those charges.   This is sufficient indication of innocence to constitute a favorable termination for purposes of Ms. Chase's malicious prosecution claim.

### E.   THERE IS SUBSTANTIAL EVIDENCE FROM WHICH A FACTFINDER COULD CONCLUDE THAT DEFENDANTS VIOLATED NICOLE CHASE'S RIGHT TO EQUAL PROTECTION

The Fourteenth Amendment to the United States Constitution provides that "[n]o State shall ... deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.   *see also* Doe *v. Calumet City*, 161 Ill. 2d 374, 398 (1994).

The Equal Protection Clause of the U.S. Constitution prohibits discriminatory enforcement of the law based upon status, such as race, gender, national origin.  *Whren v. United States*, 517 U.S. 806, 813 (1996); *DeShaney v.*

*Winnebago County Dep't of Social Servs.*, 489 U.S. 189, 197 n. 3 (1989);  *Pyke v.*

*Cuomo,* 567 F.3d 74, 77 (2d Cir.2009);*Hayden v. County of Nassau,* 180 F.3d 42, 48

(2d Cir.1999).

 The Equal Protection Clause applies to affirmative enforcement decisions

that police officers make. *See, e.g., Whren v. United States,* 517 U.S. 806, 813

(1996).  It also applies to police *inaction*—if the police decline to perform their

duties because of the race, ethnicity, or sex of the member of the public to be

protected.  *Bell v. Maryland*, 378 U.S. 266, 310 n. 31 (1964);  *Pyke v. Cuomo,* 567

F.3d 74, 77 (2d Cir. 2009); *Grenier v. Stratton*, 44 F. Supp. 3d 197, 203-04 (D. Conn.

2014).

 A plaintiff may prove that a facially neutral law or policy has been applied

in a discriminatory manner under the Equal Protection Clause under 42 U.S.C.

§1983 in several ways.  Plaintiff may present evidence that similarly situated

individuals who are not in the protected class have not been similarly treated.

Alternatively, plaintiff may present evidence of discriminatory animus.  *Pyke v.*

*Cuomo,* 567 F.3d 74, 77 (2d Cir.2009); *White v. City of New York*, 206 F. supp. 3rd,

920, 926 (S.D.N.Y. 2016); *Chase v. Nodine's Smokehouse, Inc.* 2019 WL 146412 (D.

Conn. 2019).

 Evidence of discriminatory animus may be demonstrated in several ways.

It can be proven by direct evidence, i.e., statements of the defendants.  This can

include references to and reliance upon sexist stereotypes.  *Price Waterhouse v.*

*Hopkins,* 490 U.S. 228, 251–52, 109 S. Ct. 1775, 104 L.Ed.2d 268 (1989); *Alfaro v.*

*Labador*, 300 Fed. Appx. 85, 87, (2d Cir. ,2008); *Grenier v. Stratton,* 44 F. Supp. 3d

at 205 n.4; *Balistreri v. Pacifica Police Dep't.*, 901 F.2d 696, 701 (9th Cir. 1990);

*Doe v. Calumet City*, 161 Ill. 2d 374, 398 (1994).  "Blaming the victim" in sexual

assault cases is one such insidious stereotype.  *Motley v. Smith*, 2016 WL

3407658*8 (E.D. Cal. 2016).

Evidence that constitutes a pattern of deliberate indifference to the victim

over a period of time permits an inference of a violation of a constitutional right

based upon hostility towards a suspect class.  *Thurman v. City of Torrington,* 595

F. Supp. 1521, 1530 (D. Conn. 1984).

Discriminatory animus can also be demonstrated through circumstantial

evidence.   Credibility discounting, in the sexual assault context, is a form of

discrimination based on sex:

> In some cases, a police officer may discriminate against victims of
> sexual assault or domestic violence because of a general bias
> against women …. More commonly, discrimination may be based on
> explicit stereotypes about women …. Acting on stereotypes about
> why women … are sexually assaulted, or about how a victim of
> domestic violence or sexual assault should look or behave, can
> constitute unlawful discrimination and profoundly undermine an
> effective response to these crimes. For example, if an officer
> believes a sexual assault to be less severe because the victim was
> assaulted by an acquaintance … that is gender bias and may
> constitute unlawful discrimination.

U.S. Dep't Of Justice, *Identifying and Preventing Gender Bias in Law Enforcement*

*Response to Sexual Assault and Domestic Violence*, p. 7 (2016).

A factfinder may also infer discriminatory animus when the defendants do

not follow established procedures.  *Vill. of Arlington Heights v. Metro Hous. Dev.*

*Corp.*, 429 U.S. 252, 265-66 (1977); *United States v. City of Yonkers*, 96 F.3d 600,

611 (2d Cir. 1996); *Stern v. Trustees of Columbia University*, 131 F.3d 305, 313 (2d

Cir. 1997); *Nurse v. Lutheran Med. Ctr.*, 854 F. Supp. 2d 300, 317 (E.D.N.Y. 2012);

*Bagley v. J.P. Morgan Chase & Co.*, 2012 U.S. Dist. LEXIS 97045 (S.D.N.Y. 2012).

If a factfinder determines that the defendants' justifications for its actions

are false, then it is permissible to infer that the true reasons for the actions were

illegal discrimination.  *Reeves v. Sanderson Plumbing Products, Inc.* 530 U.S. 133,

147 (2000); *Walsh v. New York City Hous. Auth.*, 828 F. 3rd 70, 76 (2d Cir. 2016).

Plaintiff need not demonstrate that a discriminatory purpose was the sole,

motivation.  *Vill. of Arlington Heights v. Metro Hous. Dev. Corp.*, 429 U.S. 252, 265-

66 (1977); *United States v. City of Yonkers*, 96 F.3d 600, 611 (2d Cir. 1996).  It

requires that a defendant's action was motivated at least in part because of

animus towards the protected class. *Hayden v. Paterson,* 594 F. 3rd 150, 163 (2d

Cir 2010). *Grenier v. Stratton*, 44 F. Supp. 3d 197, 204 (D. Conn. 2014).

At all relevant times, the Canton Police Department maintained certain

General Orders and policies that its police officers were obligated to follow.

General Order 1.7 (Canton Police Department Code of Ethics) stated in

pertinent part:

> III. A.  The law enforcement officer always represents the whole of the
> community and its legally expressed will and is never the arm of any
> political party or clique.
>
> III. D.  LIMITS OF DISCRETION
> Officers of the Canton Police Department shall exercise discretion fairly
> and impartially in enforcing the law and performing their duties. Such
> discretion shall be guided by, and limited by, state statutes, case law,
> Department policy and lawful orders of supervisors.
>
> III. F   UTILIZATION OF PROPER MEANS TO GAIN PROPER ENDS
> Officers shall be mindful of their responsibility to pay strict heed to the
> selection of means in discharging the duties of their office. Violations
> of the law or disregard for public safety and property on the part of an

officer are intrinsically wrong; they are self-defeating in that they instill in the public mind a like disposition. The employment of illegal means, no matter how worthy the end, is certain to encourage disrespect for the law and its officers. If the law is to be honored, it must first be honored by those who enforce it.

**III. I CONDUCT TOWARD THE PUBLIC**
Officers will give service where they can and require compliance with the law. They will do neither from personal preference nor prejudice, but rather as duly appointed officers of the law discharging their sworn obligation.

**Pl's. Stmt. Add'l Material Facts,¶132.**

General Order 6.6 (Sexual Assault Investigations) states in pertinent part:

**III. PROCEDURE:**
A. The responding officer to reported sexual assaults shall:
1. Show sensitive, professional behavior towards the victim in order to minimize trauma.
2. . . . conduct preliminary interview.
3. Make notification for specialized investigative personnel to respond in order to assist in crime scene search, photographs, fingerprint processing, etc.
4. During course of preliminary investigation, identify time frame and obtain a description of any subject(s) involved and broadcast that description to other patrol units.
5. Request that victim does not bathe, and that the victim not wash or destroy the clothing which they were wearing at the time of the assault.
6. Insure that the victim is transported to a hospital by ambulance accompanied by a police officer.
7. Take notes describing the general condition and appearance of the victim and the
location of the attack. . . .Make detailed notes on everything that comes to the officer's attention as they could become vital evidence in the case.

B. Detective/investigators responding to reported sexual assaults shall:
1. Conduct on-scene investigation involving the obtaining of statements, locating witnesses, and collecting and preserving evidence in accordance with accepted evidence collection techniques.
    * * *
3. Gather and process all evidence - clothing worn by victim at time of the sexual assault, fingerprints, photographs, scene search resulting in foreign items (i.e. - buttons, hair, pieces of torn clothing, etc.). . .
* * *

.

**All personnel involved in the investigation of a sexual assault case will perform their appointed function efficiently, professionally, and humanely, giving first priority to the physical and emotional condition of the victim.**

Pl's. Stmt. Add'l Material Facts,¶132.

In addition, General Order 6.10 set forth the procedures when information

is discovered after an arrest when the basis for probable cause has been

negated.  Pl's. Stmt. Add'l Material Facts,¶102.

Chief Arciero had also provided checklists for use in sexual assault and

domestic violence investigations.  Pl's. Stmt. Add'l Material Facts,¶109a.

**The Canton Sexual Assault Kit states:**

**Approach the victim in a gentle, supportive manner. Be patient and remain non-judgmental. Be prepared to see the effects of trauma (memory loss, confused thoughts, events out of order, inconsistencies, numbness, or even hostility).**

**If a detective or investigator is going to do a follow-up interview, conduct an interview designed to get only that information needed to commence the investigation (suspect information, and potential witnesses or evidence)**

**Explain what to expect, and whenever possible allow the victim to have control (where to conduct the interview, who to have present, etc ... )**

**Pl's. Stmt. Add'l Material Facts,¶102.**

As documented in Section C.5, Evidence of Bias Malice and Bad Faith,

*supra,* the evidence demonstrates that defendants Gompper and Colangelo

applied these facially neutral policies in a discriminatory manner based upon

Nicole Chase's gender.

One need only view the behavior, demeanor, and attitude of Detective

Colangelo during his videotaped interview of Calvin Nodine and interplay with

Nodine's attorney to comprehend his sexist bias.  See Nodine Interview Video.

Detective Colangelo was interviewed by Police Chief Arciero as part of an internal affairs investigation of the handling of Nicole Chase's complaint and arrest.   During the interview, Detective Colangelo stated:

> I go back to the #Me Too thing, you know it's people who don't tell the truth who make it so people who actually get sexually assaulted aren't believed.  So if police departments don't do anything to dissuade people from coming in making false statements then that is going to continue to make it more difficult on women and men who have been sexually assaulted and then reporting it.

Pl's. Stmt. Add'l Material Facts,¶134.

Detective Colangelo suggested that it was his "duty" to file the false arrest warrant, but "the Weinstein thing" has made his "duty" more difficult.[4]

> I had an oath to put that in. I've sworn to an oath to follow through and sex assault is such a difficult subject. It's gotten more difficult since the Weinstein whole thing, but it's such a difficult subject, sometimes they're not signed, but it's my duty to put in false statements because the other victims, real women who've been sexually assaulted don't need to be afraid to come to us.

Colangelo IA Interview, p. 52.   Detective Colangelo statement implies that Nicole Chase is not a "real woman," is revelatory about his view of women, and which women should and should not be taken seriously.  The revelations about the behavior of Harvey Weinstein, others, and the rise of the #Me Too movement have shed light on the treatment of victims of acquaintance rape and sexual assault historically, and the need to take these victims more seriously.  A reasonable juror might conclude that Detective Colangelo's lament about impact of the

---

[4] Plaintiff requests the court to take judicial notice that "the Weinstein thing" is a flip reference to Harvey Weinstein, who used his power and authority to sexually assault or coerce sex from numerous women

revelations of the behavior of Harvey Weinstein making his job more difficult reveals his bias against women who make complaints about acquaintance rape.

Defendants attempt to analogize the facts of this case to *Golodner v. Martinez,* 2017 WL 6540269 (D. Conn. 2017) strongly suggests that the defendants are not fully familiar with or are willfully blind to the facts of this case.  There is much more evidence of bias, sexism and misogyny in this case than *Golodner,* as set forth in detail *supra.*  There is much more evidence of sexism, misogyny and bias than existed in *Grenier v. Stratton,* 44 F. Supp. 3d 197, cited by defendants as a case where summary judgment on an Equal Protection was appropriately denied.

There is plainly sufficient evidence for a factfinder to infer that defendants improper treatment of Nicole chase was motivated by gender bias.

1. **Defendants Have Failed to Meet Their Burden of Demonstrating That There Are No Disputed Issues of Material Fact as to the Existence of Qualified Immunity as to Plaintiff's Equal Protection Claim**

The obligation of police departments to perform their duties, including the investigation of criminal complaints, the discretion to make criminal arrests, and the treatment of crime victims must be done without regard to race, national origin, or gender.  This is a clearly established right protected by the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution.   *Whren,* 517 U.S. at 813; *DeShaney,* 489 U.S. at 197 n. 3; *Bell, v.* 378 U.S. at 310 n. 31 (1964); *Pyke,* 567 F.3d at 77; *Grenier*, 44 F. Supp. 3d at 203-04; *Thurman v. City of Torrington,* 595 F. Supp. at 1530.

As set forth in detail, *supra,* there is substantial evidence of intentionally

discriminatory conduct toward Nicole Chase based upon her gender for a
reasonable juror to conclude that defendants conduct was not objectively
reasonable.

**F.   THERE ARE DISPUTED ISSUES OF MATERIAL FACTS THAT
DEFENDANTS VIOLATED THE PLAINTIFF'S CIVIL RIGHTS TRIGGERING
THE DEFENDANT TOWN OF CANTON'S OBLIGATION TO INDEMNIFY
PURSUANT TO CONN GEN STAT § 7-465.**

Count Twenty of the plaintiff's Second Amended Complaint states a claim

for indemnification against the Town of Canton.  Pursuant to General Statutes §

7-465, the Town of Canton is required to assume the liability for damage caused

by defendant John Colangelo and defendant Adam Gompper for violating the

plaintiff's civil rights.  Section 7-465 "requires a city to indemnify all liabilities

imposed upon a municipal employee for infringement of any person's civil rights

if the employee was acting in the performance of his duties and within the scope

of his employment."  *Belanger v. City of Hartford*, 578 F. Supp. 2d 360, 368 (D.

Conn. 2008) (VLB).

As set forth above, there are genuine issues of material fact that Colangelo

and Gompper violated the plaintiff's civil rights, including false arrest, violation of

42 USC § 1983 and denial of equal protection, while acting in the performance of

their duties and within the scope of their employment.  Thus, Summary Judgment

on Count 20 must be denied.

**G.  THE COURT SHOULD RETAIN JURISDICTION OVER THE PLAINTIFF'S
STATE LAW CLAIMS.**

The Canton defendants invoked the jurisdiction of this Court under 28

U.S.C. § 1441 and 28 U.S.C. § 1443, based upon the controversy involving a

federal question and the deprivation of constitutionally protected civil rights. Under the provisions of 28 U.S.C. § 1367, this Court exercised supplemental jurisdiction over all state law claims, because they share a common nucleus of operative facts with the claims for violation of 42 U.S.C. § 1983.

As set forth in detail above, the defendants' summary judgment motion should be denied in its entirety.  However, even if all federal claims were to be removed from this lawsuit, which they should not, "the court … retains discretion to exercise supplemental jurisdiction, pursuant to § 1367, over pendent state-law claims*." Del–Ray Battery Co. v. Douglas Battery Co.*, 635 F.3d 725, 731 (5th Cir.2011).  In deciding whether to exercise supplemental jurisdiction, the Court must weigh "the values of judicial economy, convenience, fairness, and comity." *Carnegie–Mellon Univ. v. Cohill,* 484 U.S. 343, 350 (1988).

At this stage of the litigation, it would be inconvenient, unfair, and uneconomical to remand the state claims to state court. The parties have conducted discovery and depositions, disclosed experts, and engaged in motion practice.  Motions for summary judgment are pending and jury selection has been scheduled. This litigation is nearing the end, rather than in its "infancy."  *See, e.g. Nowak v. Ironworkers Local 6 Pension Fund,* 81 F.3d 1182, 1191–92 (2d Cir.1996); *Raucci v. Town of Rotterdam,* 902 F.2d 1050, 1055 (2d Cir.1990); *MTA Bus Non-Union Employees Rank & File Comm. v. Metro. Transp. Auth.*, 899 F. Supp. 2d 256, 263–64 (S.D.N.Y. 2012).

The interests of judicial economy, fairness, convenience, and the need for a speedy resolution of disputes weigh strongly in favor of this Court retaining

supplemental jurisdiction over all of plaintiffs' pendant state law claims.

## VI.    CONCLUSION

For the reasons stated herein, the defendants' Motion for summary

Judgment should be denied in its entirety.


Respectfully submitted,


THE PLAINTIFF,
NICOLE CHASE


By:   *Lewis Chimes*_____
Lewis Chimes (Juris No. 07023)
Mary-Kate Smith (Juris No. 26820)
Law Office of Lewis Chimes LLC
45 Franklin Street
Stamford, CT 06901
Phone: (203)324-7744
Facsimile: (203)969-1319
Email: lchimes@chimeslaw.com
         msmith@chimeslaw.com

## CERTIFICATION

**I HEREBY CERTIFY that on the 4th day of November 2019 a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by email to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the court's CM/ECF System.**

**Elizabeth K. Acee**
**LeClair Ryan, PLLC**
**545 Long Wharf Drive, 9th Floor**
**New Haven, CT  06511**

**David A Moraghan**
**Smith Keefe Moraghan & Waterfall LLC**
**P.O Box 1146**
**257 Main Street, 2nd floor**
**Torrington, CT 06790**

**Kristan M. Maccini**
**Howd & Ludorf, LLC**
**65 Wethersfield Avenue**
**Hartford, CT 06114-1190**


                              ___*/s/ Lewis Chimes*
                              **Lewis Chimes**