1

               UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF CONNECTICUT


----------------------------X

NICOLE CHASE                    :

           Plaintiff,           :

      VS.                       :  NO. 3:18-cv-00683(VLB)

NODINE'S SMOKEHOUSE, INC.,      :
CALVIN NODINE TOWN OF           :
CANTON, JOHN COLANGELO,         :
ADAM GOMPPER, MARK J.           :
PENNEY, AND CHRISTOPHER         :
ARCIERO                         :

           Defendants.          :

----------------------------X


            D E P O S I T I O N


      THE DEPOSITION OF ADAM GOMPPER, taken on

   behalf of the Plaintiff, before Kevin Lombino,

   Registered Professional Reporter, Notary Public

   within the State of Connecticut Certificate

   Number 191, on the 20th day of December, 2018,

   at 10:41 a.m., at the offices of Robert Fortgang

   Associates, LLC, 573 Hopmeadow Street, Simsbury,

   CT.



         **GOLDFARB AND AJELLO, LLC (203) 972-8320**

                                            **EXHIBIT 1**

```
                                                              2

 1                    A P P E A R A N C E S

 2

 3  FOR THE PLAINTIFF:
    Law Office of Lewis Chimes LLC
 4  Lewis Chimes, Esq.
    45 Franklin Street
 5  Stamford, CT 06901

 6

 7
    FOR THE DEFENDANTS:
 8  Howd & Ludorf, LLC
    Kristan M. Maccini, Esq.
 9  65 Wethersfield Avenue
    Hartford, CT 06114
10

11
    Smith Keefe Moraghan & Waterfall LLC
12  David A. Moraghan, Esq.
    257 Main Street, 2nd Floor
13  Torrington, CT 06790

14

15

16

17

18

19

20

21

22

23

24

25

              GOLDFARB AND AJELLO, LLC (203) 972-8320
```

**EXHIBIT 1**

5

1     A.   Yup.
2     Q.   If there is something that you did not know at
3  the time for example but now know differently you can say
4  so, but I need you to articulate what you have learned
5  before and after the events, if you understood?
6     A.   Yes.
7     Q.   At any point you need a break, I think I said
8  you can take a break.
9     A.   Um-hmm.
10    Q.   There may be times where I asked you to answer
11 questions with either a yes or a no and that's generally
12 just to kind of move things quicker.
13         You have the right to say I can't answer that
14 yes or no, okay?  And you can answer that as well but if
15 I do ask you for a yes or no, I ask you to say either yes
16 or no or you can say I can't answer that with a yes or
17 no, that's fine.  Obviously if you don't know the answer,
18 you can also say I don't know.
19         Any questions for me?
20    A.   No, sir.
21    Q.   So your last employer was the Canton Police
22 Department?
23    A.   Yes.
24    Q.   And when was your last date of employment with
25 the Canton Police Department?

1    A.   October 2.
2    Q.   Of what year?
3    A.   This year.
4    Q.   And I take it your employment was terminated by
5  the Canton Police Department?
6    A.   No.
7         MS. MACCINI:  Objection to from.  You can
8         answer.
9    Q.   What were the circumstances of your leaving the
10 Canton Police Department?
11   A.   I resigned for personal reasons, not related to
12 this case.
13   Q.   In a very general way, can you tell me what
14 those personal reasons are?  I don't want details but was
15 it family, health, something else?
16        MS. MACCINI:  Objection.  He has said it was
17        for personal reasons not related to this case.
18        I am instructing him not to answer, he's not
19        going to answer that question.  You're prying
20        into his personal life, it's a privacy issue,
21        and that's the basis for the objection.
22        MR. CHIMES:  Okay.  I, I mean, I think he --
23        I'm certainly entitled to challenge that it's
24        not related to this case.  I asked it in a way
25        that as best I could to protect his privacy.

```
                                                                  96

 1       Q.   Okay.  Did you understand on May 7, 2017 --
 2            So when you used the term sexual harassment on
 3  May 7, 2017, you were characterizing what she was telling
 4  you as a civil matter?
 5       A.   Yes.
 6       Q.   Okay.  Now, she didn't have an attorney at that
 7  time, did she?
 8       A.   I don't believe so, no.
 9       Q.   She didn't talk about a civil lawsuit then, did
10  she?
11       A.   I don't believe so, no.
12       Q.   Okay.  And then do you think she knew the
13  difference between civil and criminal law?
14            MS. MACCINI:  Object to the form.
15       A.   I have no idea what she knew.
16       Q.   You knew the difference?
17       A.   Yes.
18       Q.   And you characterized it as a civil issue, not a
19  criminal issue?
20       A.   Yes.
21       Q.   Can conduct that constitutes sexual harassment
22  also violate criminal law?
23       A.   Can you give me a specific example?
24       Q.   I will ask you.  When you heard the term -- when
25  you used the term sexual harassment on May 7, 2017, did
```

GOLDFARB AND AJELLO, LLC (203) 972-8320

**EXHIBIT 1**

```
                                                               129

 1             Was there any discussion between you and
 2   Ms. Chase or her mother that took place not on the video
 3   camera?
 4        A.   On this day, no.
 5        Q.   So everything was recorded?
 6        A.   Yes.
 7        Q.   All right.  Now, let's go to Exhibit Number 11.
 8             MS. MACCINI:  Can you provide --
 9             MR. CHIMES:  I'm sorry.
10             MS. MACCINI:  -- the deponent with Exhibit
11        Number 11?
12             MR. CHIMES:  Sure.
13             MS. MACCINI:  Attorney Chimes, before you
14        start talking about this report, I want to check
15        on my client.
16             Do you need more water, Officer Gompper,
17        before we continue?
18             THE WITNESS:  I'm good right now.
19             MS. MACCINI:  Okay.  Off the record.
20             (Discussion was held off record.)
21             MR. CHIMES:  Mark these.
22             (Plaintiff's Exhibit 24, voluntary statement
23        Archer, marked for identification, as of this
24        date.)
25             (Plaintiff's Exhibit 25, voluntary statement
```

**GOLDFARB AND AJELLO, LLC (203) 972-8320**

**EXHIBIT 1**

133

1  there be other officers if you are working days?
2       A.   It depends on the day.  For instance on a
3  Thursday at the time, it would have been myself, Sergeant
4  Penney and another patrolman and then you have the
5  administration there as well.
6       Q.   Um-hum, okay.  Is Thursday a particularly busy
7  day for some reason?
8       A.   No, it's just --
9       Q.   The schedule?
10      A.   No.  On Mondays we are heavy.  If you go through
11 Canton on Monday, you will see cops everywhere.  No one
12 has Mondays off.  It's just the way the days all fall.
13      Q.   Good to know.
14      A.   There's cops everywhere on Mondays.
15      Q.   Goods to know.  And so you met them in the lobby
16 I take it?
17      A.   Yes.
18      Q.   Now, how come these statements were not
19 recorded?
20      A.   I don't have -- I have access to the computer
21 system because there's a master key.  That day I don't
22 believe Detective Colangelo was there, he was out of the
23 office and his door was locked so I don't make a habit to
24 go into a locked office.  Also I don't have training on
25 that equipment to start it, to use it basically.

```
                                                          134

1       Q.   Is the typical procedure to take a recorded
2  statement as a opposed to a written statement?
3       A.   Taking someone's statement, they prefer for us
4  to give us a written statement.
5       Q.   Okay.  And where did you sit with them when you
6  took the statements?
7       A.   The front interview room we call it.
8       Q.   From what we saw -- is it still up?
9       A.   No.
10      Q.   From what we saw there was that door, I think
11 you called that the community room?
12      A.   Yes.
13      Q.   Is that the front interview room?
14      A.   No.  That door I came in and out of when I left
15 and came back, you walk in there.  When you walk in
16 literally there's a very short hall, probably the width
17 of this table and if I came in the front door, the door
18 for the interview room is right where you are sitting.
19      Q.   Did you speak with Ms. Archer and Ms. Chase
20 together when you took the statements or separately?
21      A.   I spoke to Ms. Archer first alone, and then when
22 Nicole came in Ms. Archer stayed in the room.
23      Q.   Was anyone else present when you took the
24 statements?
25      A.   No.
```

```
                                                               135
```

1     Q.   And again, I noticed there's a box at the bottom
2  of each of the statements for a witness.  If you look at
3  I think Exhibit 25 which --
4     A.   I don't have that.
5     Q.   Okay.
6     A.   This is 24.
7     Q.   Is the typical procedure to have a statement
8  witnessed?
9     A.   No, I don't always do that, no.  I tend to do
10 them more with juveniles.
11    Q.   Also you have to, right?
12    A.   Yes.
13    Q.   You have to have somebody present, right?
14    A.   Yes, right, so.
15    Q.   And there were no women sworn officers in May of
16 2017 in Canton?
17    A.   No, sir.
18    Q.   Was there any concern or discussion that having
19 a woman, a female officer present or maybe a victim's
20 advocate or something, a counselor present might have
21 made Ms. Chase more comfortable?  I asked that a little
22 bit --
23         Did you discuss that possibility or did anyone
24 discuss that possibility with you prior to taking the
25 statement?

136

1    A.   No.
2    Q.   And are you familiar with your training about
3 the idea of that it's important, or from any policies
4 that it's important to make a victim of sexual assault
5 comfortable when you are trying to get them to talk?
6    A.   Yes.
7    Q.   And when you, let's start with Ms. Archer.
8         Can you tell me how the process of actually
9 taking and recording the statement?
10   A.   I sit down with them in there.  I explain to
11 them, type it out.  I either given them -- normally I sit
12 in front of the computer and type to kind of guide the
13 statement so we are not talking about what they did last
14 Thursday at, you know, the grocery store.
15        But I sit down, I say okay, explain to me what
16 happened and what you know.  They will usually give me a
17 version of it or a summery of things.  I say okay, so
18 what we are going to do, now we are doing to go line by
19 line.  Again start from the beginning, I will type it
20 out.  Then what happened, type it out and continue until
21 we finish the statement.
22        I then give them the chance to either,
23 physically I print out the statement and let them
24 physically read it or I sit them right in front of the
25 computer.  I said, go ahead, make any changes you want,

1  I'm not going to get mad about punctuation or spelling, I
2  don't care about that.
3           So once they preview the statement either in the
4  computer or on the forms they say it's good, I print out
5  this draft and have them swear to it.
6      Q.   So do you have -- with Mr. Archer, did you have
7  a set of prepared questions?
8      A.   No, I do not.
9      Q.   And for talking with -- you spoke to Ms. Chase
10 before she came in.
11          Did she say anything about what she thought
12 Ms. Archer could tell you?
13     A.   I think if I recall, it was just about
14 witnessing the inappropriate stuff at the restaurant.
15     Q.   During the day?
16     A.   Yes.
17     Q.   So that's what -- did she tell you specifically
18 what she thought she was going to say, if you know?
19     A.   I don't remember.
20     Q.   Okay.  And so you spoke to Ms. Archer, and did
21 she speak sort of generally and then you went through it
22 and started to write line by line?  I am trying to
23 understand how the Q and A works.
24     A.   Yeah, I am just trying to read it, read quick.
25     Q.   Yeah, you can.

1     A.   So the first couple of sentence I am like okay,
2  I work in Nodine's restaurant.  What do you do there.
3  Tell me your activities and I said, okay.  On Saturday,
4  the day in question, you know, tell me what time you got
5  to work, what you were doing, set up what was happening
6  that you're witnessing it.
7          So then, you know, so the first couple of
8  sentences would be me setting up the statement as far as
9  why she was there, what she's doing there.  And I wrote
10 on Saturday May 6 I said, is that accurate.  Yup, I got
11 to work at 11, okay.  What did you guys do.  Tell me the
12 incident and then she would just tell me.
13    Q.   Now, did, did you print out the statement for
14 her to review or did she just look at the computer and
15 review, if you know?
16    A.   I believe I printed it.
17    Q.   Did she make any corrections?
18    A.   I don't remember.
19    Q.   And whatever the initial draft was, I take it
20 you did not save that?
21    A.   No, shredded it.
22    Q.   You said that you went through it line by line
23 with her?
24    A.   Yes.
25    Q.   Now, were you aware that Alexandria Archer was