1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

---------------------------X

NICOLE CHASE                    :

              Plaintiff,   :

       VS.                     :   NO. 3:18-cv-00683(VLB)

NODINE'S SMOKEHOUSE, INC.,   :
CALVIN NODINE TOWN OF        :
CANTON, JOHN COLANGELO,      :
ADAM GOMPPER, MARK J.        :
PENNEY, AND CHRISTOPHER      :
ARCIERO                      :

            Defendants. :

---------------------------X


D E P O S I T I O N


    THE VIDEOTAPED DEPOSITION OF JOHN COLANGELO,

taken on behalf of the Plaintiff, before Kevin

Lombino, Registered Professional Reporter,

Notary Public within the State of Connecticut

Certificate Number 191, on the 29th day of

March, 2019, at 10:07 a.m., at the offices of

Shipman, Shaiken & Schwefel, LLC, 433 South Main

Street, West Hartford, CT.


**GOLDFARB AND AJELLO, LLC (203) 972-8320**

**EXHIBIT 19**

2

```
 1                      A P P E A R A N C E S

 2

 3  FOR THE PLAINTIFF:
    Law Office of Lewis Chimes LLC
 4  Lewis Chimes, Esq.
    Mary-Kate Smith, Esq.
 5  45 Franklin Street
    Stamford, CT 06901
 6

 7

 8  FOR THE DEFENDANTS:
    Howd & Ludorf, LLC
 9  Kristan M. Maccini, Esq.
    65 Wethersfield Avenue
10  Hartford, CT 06114

11

12  Smith Keefe Moraghan & Waterfall LLC
    David A. Moraghan, Esq.
13  257 Main Street, 2nd Floor
    Torrington, CT 06790
14

15
    LeClair Ryan
16  Elizabeth Smith, Esq.
    545 Long Wharf Drive
17  New Haven, CT 07511

18

19  Videotape operator:  Ross Allen

20

21

22

23

24

25
```

**EXHIBIT 19**

24

1 brings it to a judge?

2     A.   No.

3     Q.   If it's your warrant, do you go and appear

4 before the judge when that is sought?

5     A.   No, sir.

6     Q.   So that would be done exclusively by the State's

7 Attorney's office?

8     A.   Correct.

9     Q.   In this case, the warrant for Nicole Chase, was

10 it sent back by the State's Attorney and were any

11 revisions requested?

12     A.   No.

13     Q.   Do you know Assistant States Attorney Webber?

14     A.   I know who he is.

15     Q.   Did you ever speak to him about this warrant at

16 any time during the investigation of the case against

17 Calvin Nodine and Nicole Chase?

18     A.   No.

19     Q.   Did you ever speak to Inspector Hadas or any

20 inspector about the warrant involving Calvin Nodine,

21 Nicole Chase?

22     A.   About the warrant?

23     Q.   Yes.

24     A.   No.

25     Q.   Now, I believe in the IA investigation, you

**EXHIBIT 19**

25

1  indicated that Officer Gompper drafted the warrant but

2  you ended up signing it; is that correct?

3      A.   He wrote the warrant, yes.

4      Q.   And at some point there was an initial draft

5  that in your mind was unsatisfactory?

6      A.   Yes.

7      Q.   All right.  And you had him rewrite it?

8      A.   I had him correct it.

9      Q.   Is -- do you know whether that initial draft

10  still exists?

11      A.   No.

12      Q.   No, it doesn't or, no, you don't know?

13      A.   I don't know.

14      Q.   Okay.  Would he have done it on his computer in

15  the office?

16      A.   I would think he would have done it on a

17  department computer.

18      Q.   When I say his computer --

19      A.   He does have, he didn't have an assigned

20  computer.

21      Q.   All right.  So, but it would be on a department

22  computer.

23      A.   As far as I know.

24      Q.   Did, did he have a specific computer that he

25  would use when he wrote reports or drafted arrest

GOLDFARB AND AJELLO, LLC (203) 972-8320

**EXHIBIT 19**

27

1      Q.   -- than you signed it, right?

2      A.   No.

3      Q.   And the signature below that, is that Sergeant

4  Penney on every page?

5      A.   It appears to be.

6      Q.   And he swore -- you swore to him on July 7,

7  2017?

8      A.   If that's when it's signed, that's when it

9  happened.

10      Q.   Do you have any reason to think that the dates

11  that you and Sergeant Penney wrote down under oath are

12  inaccurate?

13      A.   No.

14      Q.   Okay.  Now, when you submit as the affiant an

15  arrest warrant, you're entitled to rely upon information

16  received from a brother officer; is that correct?

17      A.   Yes, sir.

18      Q.   Okay.  And again, if I go through -- you did not

19  initially start in the investigation of Nicole Chase's

20  complaint; is that correct?

21      A.   Correct.

22      Q.   So if I go through paragraphs two through 13,

23  this would seem to be information that was obtained from

24  Officer Gomper based on the May 7 communication with

25  Nicole Chase.

**EXHIBIT 19**

28

1          If you can just look at that and just confirm

2  that?

3      A.   It appears to be.

4      Q.   Okay.  And so you were not present for that

5  interview is my understanding?

6      A.   Correct.

7      Q.   And my understanding is that you never reviewed

8  that tape of that interview prior to the drafting of the

9  arrest warrant; is that correct?

10      A.   Correct.

11      Q.   Have you now reviewed it or have you ever

12  listened to that tape?

13      A.   Yes.

14      Q.   Okay.  Now, under paragraphs two and three, I'm

15  going to read those into the record.  On May 17 at

16  approximately 857 hours a.m., Officer Gompper was

17  dispatched to the lobby of the police department on

18  report of someone being sexually harassed at their place

19  of employment.

20          Three, that on his arrival, Officer Gompper met

21  with the complaint slash victim, Nicole Chase.  She

22  explained that she works at Nodine's Smokehouse located

23  at 192 Albany turnpike in Canton, Connecticut along with

24  her mother.  Chase said that she was being sexually

25  harassed by the owner and her boss, Calvin Nodine.

**GOLDFARB AND AJELLO, LLC (203) 972-8320**

**EXHIBIT 19**

106

1      A.   Um-hum.

2      Q.   What were you talking -- what was the story --

3      A.   I was probably making an analogy.

4      Q.   What was the analogy you were trying to make?

5      A.   I don't recall.

6      Q.   Was it about a black male wanting to work at a

7   store and claiming discrimination?

8      A.   No.  I don't recall.

9      Q.   Okay.  And in it you say that she is talking

10  about you being a millionaire.

11          So I take it that you got that either from a

12  report or from Officer Gompper because you hadn't spoken

13  to Ms. Chase then?

14     A.   Correct.

15     Q.   All right.

16          MR. CHIMES:  923.

17          MS. MARY-KATE SMITH:  So this is the bottom

18          of page 31 Detective Colangelo, I don't know if

19          she's.

20          MR. CHIMES:  Finish it.

21          MS. MARY-KATE SMITH:  Okay.

22          MR. CHIMES:  It's okay.

23     Q.   Anything inaccurate in that?

24     A.   Yeah, could you play it again because with the

25  breaks in it, I couldn't follow it completely.

**EXHIBIT 19**

147

1      Q.   Why didn't you want to bring Ms. Chase in for a

2  while?  Why didn't you bring Ms. Chase for --

3      A.   Why didn't I want to?

4      Q.   Yeah.  Well, you said I'm not going to request a

5  re-questioning of her for a while.

6      A.   Let me see where I said that.

7      Q.   Let me go back.  Between -- in the transcript

8  reflecting 95919 through 95942, is there any inaccuracies

9  in this section that we just listened to?

10     A.   Not that I can recall from listening to this.

11     Q.   Here you say, I'm not going to request a

12  re-questioning of her for a while.  And you saw this is

13  not a case -- this case doesn't have to be pushed

14  through.  You are not a menace to society.

15     A.   Um-hmm.

16     Q.   Why, why, why did you want to put off

17  reinterviewing the victim?

18     A.   I was hoping to get a polygraph test done.

19     Q.   Okay.  Well, why would that -- how would that

20  change the interview?

21     A.   Polygraph tests are a tool for further

22  questioning.

23     Q.   Did the, did the results of the polygraph change

24  any of the re-questioning?

25     A.   I didn't get the results of the polygraph.

**EXHIBIT 19**

148

1     Q.   Why didn't you ask for the results of the
2   polygraph?
3     A.   I knew I wouldn't get them.
4          MR. CHIMES:  If you can go to 100254 through
5          100331.
6          MS. MARY-KATE SMITH:  It's page 82 towards
7          the bottom.
8     Q.   Anything in here inaccurate?
9     A.   Yeah, there's an issue where your, whoever you
10  have do this put no I served this town.  I don't think I
11  put, I said the word no, I think I said something else
12  but I couldn't catch the whole thing.
13    Q.   Okay.
14    A.   I don't think I said the word no.  I just said I
15  serve this town.
16    Q.   Anything else?
17    A.   Not that I could hear.
18         MR. CHIMES:  This will be 52.
19         (Plaintiff's Exhibit 52, transcript 6/21/17,
20         marked for identification, as of this date.)
21         (Plaintiff's Exhibit 53, tape, marked for
22         identification, as of this date.)
23    Q.   Detective Colangelo, between the interview of
24  Calvin Nodine on May 18 and the re-interview of Nicole
25  Chase on June 21, you received a phone call from Calvin

GOLDFARB AND AJELLO, LLC (203) 972-8320

**EXHIBIT 19**

149

1 Nodine about the polygraph?

2     A.   Yes.

3     Q.   And you received a letter from Attorney Moraghan

4 about their position on the polygraph?

5     A.   I received a fax.

6     Q.   Other than that, did you do any other additional

7 work in the investigation of this matter?

8     A.   No.  We were waiting for polygraphs.

9     Q.   And did the information you received from the

10 poly -- about the polygraphs change in any way the

11 approach to the re-interview with Nicole Chase?

12    A.   It's hard to say.

13    Q.   All right.  We are going to go with, we are now

14 going to go through the videotape interview of Nicole

15 Chase on June 21, 2017.

16         Have you had a chance to review that --

17    A.   Yes.

18    Q.   -- that transcript, that video?

19         Have you looked at any transcript of it?

20    A.   I looked at the transcript that your office

21 prepared.

22    Q.   All right.  And were there any inaccuracies in

23 this one?

24    A.   Yes, sir, they were.

25    Q.   Well, we are going to go through the same thing.

**GOLDFARB AND AJELLO, LLC (203) 972-8320**

**EXHIBIT 19**

154

1   even know what they would call, a different duty.

2   Administrative -- not administrative but changed his duty

3   status and probably the basic reason.

4      Q.   Would you -- all right.  If but for that, would

5   he have been in there or was there some strategic reason

6   not to --

7      A.   No, there was no strategic reason.

8      Q.   And this was the -- had you spoken to Ms. Chase

9   on the phone between May 18 and June 21, if you know?

10     A.   I don't know.  I don't think I did but I don't

11  know.

12     Q.   Have you -- and do you know if Officer Gompper

13  had spoken to her?

14          MS. SMITH:  Object to the form.

15     Q.   If you know.

16     A.   I don't know who spoke to her.

17     Q.   Um-hmm, um-hum.  And is the only reason that you

18  didn't re-interview Ms. Chase because, because you wanted

19  to get the polygraph?

20     A.   I did interview her, re-interview her.

21     Q.   Right.  But the only, the only reason you waited

22  to re-interview Ms. Chase is because you wanted to get

23  the polygraph result?

24     A.   That was the main reason.

25     Q.   Was there any other reasons?

**EXHIBIT 19**

155

```
1       A.   What date was she interviewed?  I was on
2  vacation there for a while so.
3       Q.   Was that vacation after Ms. Chase, the interview
4  with Ms. Chase was it -- I mean, were you also on
5  vacation in May?
6       A.   I thought it was June I took a vacation but I
7  couldn't remember.
8       Q.   Any other reasons?
9       A.   Not that I can think of.
10           MR. CHIMES:  Okay.  We can go to 102, 103.
11           And this is going to go to probably the 104,
12           106.
13           MS. MARY-KATE SMITH:  So it's the middle of
14           the first page.  Oh, what happen? sorry.  Uh-oh.
15           MS. MACCINI:  While you are trying to get
16           your equipment to work, we are going to take a
17           five-minute recess since you are starting a new
18           line of questioning.
19           THE VIDEOGRAPHER:  Off the record 3:44.
20           (Discussion was held off record.)
21           THE VIDEOGRAPHER:  On the record 3:54.
22           MS. MACCINI:  We started this deposition at
23           10:00 this morning.  Detective Colangelo is on
24           vacation and he came in today in response to the
25           depo notice to get this done today.
```

**GOLDFARB AND AJELLO, LLC (203) 972-8320**

**EXHIBIT 19**

166

1  STATE OF CONNECTICUT  )

2                       )  ss:  WALLINGFORD

3  COUNTY OF NEW HAVEN   )

4

5          I, Kevin Lombino, a Registered Professional

6  Reporter and Notary Public within and for the State of

7  Connecticut, do hereby certify that the within deposition

8  of JOHN COLANGELO was held before me on the 29th day of

9  March, 2019.

10          I further certify that the witness was first

11  sworn by me to tell the truth, the whole truth and

12  nothing but the truth, and was examined by counsel, and

13  his testimony was recorded stenographically by me, it was

14  reduced to typewriting under my supervision, and I hereby

15  submit that the within contents of said deposition are

16  true and accurate to the best of my ability.

17          I further certify that I am not a relative of

18  nor an attorney for any of the parties connected with the

19  aforesaid examination, nor otherwise interested in the

20  testimony of the witness.

21          Dated at Wallingford, Connecticut, the 7th day

22  of April, 2019.

23                  _____

                        Kevin Lombino, CSR00191
24

25  (My commission expires October 31, 2021.)

**GOLDFARB AND AJELLO, LLC (203) 972-8320**

**EXHIBIT 19**