IA 18-01
Interview Transcript
Officer Adam Gompper

Date of Interview:        05/14/2018
Place of Interview:       Conference Room at Canton Police Department
Name of Interviewer:      Chief Christopher Arciero
Interviewee:              Officer Adam Gompper
Name of Others Present:   Sgt. Derek Messier, Union President

The interview was memorialized on a digital reorder, copied to a Compact Disk and attached to this investigative report (Exhibit D). A transcribed version of the interview follows:

**Key:**   CA   Chief Christopher Arciero
           AG   Officer Adam Gompper
           DM   Sgt. Derek Messier, Union President

CA: Its Monday, May 14, 2018 we're conducting the interview of Officer Adam Gompper in the matter of Canton Police Department Internal Investigation 18-01. Present at the interview are Union President Sgt. Derek Messier and Officer Adam Gompper. Can you guys both just site your names that you're here today. Both stated names.

CA: Adam, you were previously noticed that you were subject of an IA?

AG: Yes.

CA: And you were previously given the letter about this interview today?

AG: Yes.

CA: And you previously signed the Garrity warning for the purposes of having you answer questions during this internal investigation?

AG: Yes.

CA: Any question about those three documents you signed off on?

AG: No.

CA: I'm going to ask you a series of questions regarding your role and involvement in the investigation and arrest of Nicole Chase back last year.

AG: Yup.

CA: Did you know either Calvin Nodine or Nicole Chase prior to May 6, 2017?

AG: I knew Nicole Chase from going on different calls at her previous addresses. Yes.

CA: Can you explain those type of calls?

AG: They've been domestics, she's been a subject of larceny I believe an ex-roommate accused her of taking an item, I don't remember what it was, I found that unfounded and **the** domestics were with her then boyfriend at the time, LaRue was his last name, we were over there several times for domestics between the two of them.

CA: Were there ever any arrests made in any of the domestics involving Nicole Chase?

1

**EXHIBIT 24**                                                          DEF00694

AG: Maybe the Captain? I don't recall specifically, no. I know the Captains usually pretty astute as to what's going on with the Detective and what he's doing. I wouldn't be shocked if the Captain knew about it.

CA: But you don't have any recollection of discussing it with him?

AG: No. There were times I did talk about the case with -

CA: Up to that point.

AG: No. I don't recall.

CA: You were there when Nodine basically lied about every aspect leading up to the first break when he came back and then admitted that oral sex took place.

AG: Correct.

CA: I think he lied about the grabbing of the rear end. He lied about that he was even in the bathroom with Nicole. Do you recall all that?

AG: I recall that he had his version of events and then when he took a break and went out and discussed whatever he discussed with his Attorney he came back in and said, okay, listen I'm going to tell you guys - whatever his wording was - and then he said that it was consensual act.

CA: Was there, did you ever have a thought to talk to John during any of the breaks at that time that, listen he's lied about everything, including the grabbing of the butt. You have witnesses to the grabbing of the butt or at least a witness and maybe more - did you think about going back and requisitioning more in depth? Listen Calvin you've already lied about the oral sex part I'm going to go back and revisit the butt grabbing because that, I think you indicated, was a possible Sex Contact, and you had an opportunity with John to go back and revisit that issue?

AG: Not that I remember, no.

CA: Did you have any independent thought - I should go back and inquire more about the butt grabbing because he demonstratively lied about a certain number of facts I need to go back and maybe confront him with witness accounts of the butt grabbing.

AG: I don't remember thinking that.

CA: After the interview of Calvin Nodine which was Thursday, at least what I have in front of me, is that the next involvement was June 14th in this case, so we're talking almost a month.

AG: Mmmm (affirmative).

CA: Do you recall if during that month period you had any discussion with Nicole?

AG: I don't recall. No.

CA: If you did, would you have recorded it as a supplemental report?

AG: Yes.

CA: Can I assume because there's nothing documented that you probably didn't have any contact with her?

AG: Yes, it's possible, I don't remember having anything.

CA: Did you have any contact with Nodine between May 18th and June 14th?

AG: I don't believe so.

CA: Did you have any discussions with John about the case between May 18th and June 14th about what the next course of action was going to be?

AG: I'm sure we did. I don't remember a conversation specifically. A date or a time when it was talked about. I'm sure there was talk, just like there is every day about cases in this department.

20

**EXHIBIT 24**                                             DEF00713

CA: In the last full paragraph on the last page that's not part of the video.
AG: No, it's not.
CA: That was you're assessment of that you found there was no probable cause that Nodine forced her to perform the sex act.
AG: Correct.
CA: And then you basically talk about how Nicole admitted that she provided the false statement.
AG: Correct.
CA: And that an arrest warrant would be applied. Did you know that John was going to apply for the arrest warrant?
AG: We had talked about it.
CA: You knew that you couldn't file an arrest warrant.
AG: Correct.
CA: So did you know that John was going to file an arrest warrant?
AG: Yes.
CA: When? Before you wrote this report?
AG: I don't remember when.
CA: It had to have been before June 22nd, correct?
AG: Yeah.
CA: So either on the 21st or the 22nd John indicated to you that he was going to file an arrest warrant for her.
AG: Yes.
CA: Wasn't part of the interview with Nicole where she says can I get back and give another statement - did she ask for time to come back for another statement?
AG: I believe so.
CA: When you watched the video did you also hear John say how these cases can take sometimes up to a year?
AG: Yup.
CA: Were you watching the video where she says I have a bunch a text messages and I'll get you copies of everything.
AG: Yup.
CA: Have you looked at those text messages?
AG: No.
CA: Did John indicate he looked at the text messages when he got copies of them?
AG: To her?
CA: Yes.
AG: I believe so.
CA: Were you aware of the texts messages that night. She talked to at least three people, her friend, her mother and Jeremy about what took place?
AG: I knew about Jeremy. I believe that she indicated that she had contacted Nodines stepson after the night of the exposure.
CA: Were you also aware that in those text messages she spoke to a friend and her mother that night?

28

**EXHIBIT 24**                                                    DEF00721