**NICOLE CHASE vs NODINE'S SMOKEHOUSE, INC., ET AL.**
Catherine Garcia on 08/23/2019

1                    UNITED STATES DISTRICT COURT

2                      DISTRICT OF CONNECTICUT

3

4     NICOLE CHASE,              )
                                 )
5     v.                         )   No.  3:18-cv-00683(VLB)
                                 )
6     NODINE'S SMOKEHOUSE, INC.,)
      CALVIN NODINE, TOWN OF     )
7     CANTON, JOHN COLANGELO,    )
      ADAM GOMPPER, MARK J.      )
8     PENNEY AND CHRISTOPHER     )
      ARCIERO                    )
9     _____)

10

11

12

13             DEPOSITION OF CATHERINE GARCIA

14

15

16    DATE:        August 23, 2019 (Friday)

17

18    TIME:        8:50 A.M.

19

20    LOCATION:    333 H Street, Suite 5000
                   Chula Vista, California 91910
21
      DEPOSITION   Aletha Loftfield
22    REPORTER:    Certified Shorthand Reporter
                   License No. 13767
23

24

25

**EXHIBIT A**

**NICOLE CHASE vs NODINE'S SMOKEHOUSE, INC., ET AL.**
**Catherine Garcia on 08/23/2019**                                    Page 9

1  having.  Okay?

2          THE REPORTER:  Certainly.

3  BY MS. MACCINI:

4      Q    Sergeant Garcia, can you state your full name

5  for the record.

6      A    Yes.  It's Catherine Garcia, C-a-t-h-e-r-i-n-e

7  G-a-r-c-i-a.

8      Q    Okay.  And you're retired from the San Diego

9  Police Department; correct?

10     A    Yes, the San Diego Police Department and the

11 San Diego County District Attorney's office.

12     Q    Okay.  And when did you retire?

13     A    November 2017.

14     Q    And that was from the attorney's office;

15 correct?

16     A    It was from both -- yeah, it was from San Diego

17 police and the district attorney's office.  They're

18 reciprocal law enforcement agencies within our county;

19 so you actually technically retire from them both at the

20 same time.

21     Q    Okay.  Understood.

22          And are you aware that Attorneys Lewis Chimes

23 and Mary-Kate Smith have disclosed you as an expert

24 witness in this case?

25     A    Yes, I am.

**EXHIBIT A**

 1  record.

 2            (Off the record.)

 3            (Deposition Exhibit 1 was marked for

 4            identification by the Court Reporter.)

 5            THE REPORTER:  Back on the record.

 6  BY MS. MACCINI:

 7       Q    Ms. Garcia, we have marked your file, which

 8  appears to me to be a couple of black binders, as

 9  Defendant's Exhibit 1; is that correct?

10       A    Yes.

11       Q    Is that your file in front of you?

12       A    Yes.

13       Q    Okay.  I want you to look at your file and tell

14  me exactly what sections of the Connecticut Penal Code

15  you consulted in your review of this matter.

16            Are you able to tell me what sections of the

17  Connecticut statute you consulted, Ms. Garcia, in your

18  review?

19       A    Yes, I'm ready.

20       Q    Okay.  And what are those sections?

21       A    53a-49, criminal attempt:  Sufficiency of

22  conduct; renunciation as defense.

23            Do you just want me to read the titles to you?

24  Is that good?  Or just the numbers?  What would you

25  like?

**EXHIBIT A**

1      Q     Just the numbers is fine.

2      A     Okay.  53a-65, definitions of act or sexual

3   intercourse; 53a-70; 53a-157b; and the other one is

4   53a-186 that I only have on my telephone, for exposure.

5   I don't have a printout here.

6      Q     Okay.  And who sent you 53a-186 regarding

7   exposure?

8      A     I looked that one up myself on the Internet as

9   I was reading along.  As I was reading along one day, I

10  looked it up on the Internet, the Connecticut Penal Code

11  on that.

12     Q     Okay.  Do you have 53a-186 handy on your phone?

13           Can you read it to me?

14     A     Certainly.  Can I disappear for one second?  Or

15  she'll hand me my purse.

16     Q     Yeah.  Yeah, you can disappear.

17           MS. SMITH:  She got it.

18           THE WITNESS:  53a-186, public indecency:  Class

19  B misdemeanor.

20           Would you like me to read you the content?

21  BY MS. MACCINI:

22     Q     Yes, please.  Well, you know what?  I can look

23  it up on a recess.

24           Have you -- have you listed for me all the

25  Connecticut statutes that you reviewed in your -- or

www.huseby.com          Huseby, Inc.  Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

EXHIBIT A

1   consulted in your review of the case?

2       A    All that come to mind at the moment and that I

3   see in my file at the moment.  I may have researched

4   some other things that are just in my head that I could

5   recall at a later time.  I may have researched some

6   things as I was going along, just like this.  But when I

7   looked up the exposure one, I remembered to take a photo

8   of it, at least.

9       Q    Okay.  Did you review any case law in your

10  determination -- well, let me ask you this -- strike

11  that.

12          Did you come to a determination of how the

13  crime of sexual assault is defined under Connecticut

14  law?

15      A    A determination?  I guess it's very similar to

16  laws in other states across the country, very generally

17  accepted, reasonable statute, very similar.  California,

18  they're divided out a little more separately, each --

19  the oral copulation, et cetera.  It's not a general

20  sexual assault law, but many, many states have a general

21  sexual assault law.

22      Q    Well, all states don't have the same law

23  related to sexual assault.

24          Would you agree with me on that?

25          There's a distinction across states, are there

**EXHIBIT A**

```
 1           third person."

 2           And then it goes on about the 13 years of age

 3   and the 10 years of age.

 4   BY MS. MACCINI:

 5      Q    Thank you.

 6           Is it correct that you did not review

 7   Connecticut General Statute 53a-73(a) in your analysis?

 8   I didn't hear you list that statute.

 9      A    Yes, 73(a), the definition of sexual assault in

10   the fourth degree.

11      Q    Okay.  So you did review that statute?

12      A    I did.  If I did not list it, I did.

13      Q    Okay.  All right.  Do you have your file in

14   front of you that we've marked as Defendant's Exhibit 2?

15           I would ask that Plaintiff's counsel --

16   Sergeant Garcia, you're going to get to keep your file.

17   I don't want you to worry that we're going to take your

18   file.  But we've marked -- I believe the court reporter

19   has marked -- I don't know if she's marked one or both

20   binders Defendant's Exhibit 2?

21           But for the record, you have two binders.

22   We're marking those as Defense Exhibit 2.

23           MS. MACCINI:  I would ask Plaintiff's counsel

24   to make me a complete copy of your file, whether that's

25   electronically or by paper.  It doesn't matter to me.
```

EXHIBIT A

1   counsel has agreed to make me a complete copy of the

2   entire file.

3            So moving along, Sergeant Garcia, I'd like to

4   now mark your notice of deposition as Defense Exhibit 2.

5            If the court reporter could do that for me.

6            (Deposition Exhibit 2 was marked for

7            identification by the Court Reporter.)

8   BY MS. MACCINI:

9    Q    Sergeant Garcia, before we go over Defense

10  Exhibit 2, I have a couple of follow-up questions.

11           Did you review any Connecticut case law in your

12  analysis of this matter?

13   A    No.

14   Q    Did you consult the Connecticut field manual,

15  otherwise known as "The Original Red Book"?

16   A    No.

17   Q    Okay.  Did you talk to any state prosecutors

18  here in Connecticut?

19   A    No.

20   Q    Did you talk to any police officers here in

21  Connecticut in your review of the matter?

22   A    No.

23   Q    All right.  Turning to the depo notice, which

24  has been marked as Defense Exhibit 2, can you take a

25  look at this exhibit and tell me if you've ever seen it

 1   to interview Nicole Chase where Adam Gompper already had

 2   interviewed her and taken her statement?

 3       A    Yes.  Because in no way was a complete

 4   statement taken from Nicole Chase.  This was her first

 5   opportunity to kind of be able to sit down in a quiet

 6   setting and talk to somebody, which, in my opinion, is

 7   why more information came out.  So yes.

 8       Q    Are these notes on page 3 based on a transcript

 9   that you reviewed, the videotape, or something else?

10       A    Well, again, they're based on the transcript,

11   but then later when I watched the video, I looked at my

12   notes to make sure that it all seemed like my initial

13   impression.  A picture is a thousand words.  And so the

14   video's a lot more telling of what occurred or didn't

15   occur.  But this was my initial impression when I read

16   through and then watched the video at a -- couple days

17   later, whenever that was.

18            MS. MACCINI:  I would ask the court reporter to

19   mark the plaintiff transcript of the interview of the

20   plaintiff with Detective Colangelo as Defense Exhibit 5.

21   It's a 102 pages.  And at the top, it says:  "6/21/2017

22   Nicole Chase interview with Detective Colangelo."

23            (Deposition Exhibit 5 was marked for

24            identification by the Court Reporter.)

25

**EXHIBIT A**

1    BY MS. MACCINI:

2        Q    Sergeant Garcia, do you have in front of you

3    Defense Exhibit 5?

4        A    Yes.

5        Q    Do you recognize it?

6        A    Yes, I do.

7        Q    And what do you recognize it as being?

8        A    The interview with Nicole Chase and Detective

9    Colangelo on 6/21/2017 -- as a transcript of that

10   interview that was provided to me.

11       Q    And this is a transcript of the interview

12   prepared by Plaintiff's counsel office; correct?

13       A    It was provided to me by Plaintiff's counsel's

14   office, yes.

15       Q    Okay.  You don't know who prepared it?

16       A    Correct.

17       Q    Is that what you're telling me?

18       A    Yes.

19       Q    Okay.  Did you try and match up this transcript

20   with the actual audio of the videotape as to this

21   interview?  And now we're talking about the June 21,

22   2017, interview of Nicole Chase by Detective Colangelo.

23       A    No.

24       Q    Okay.  Do you have any idea whether this

25   transcript is accurate?

**EXHIBIT A**

1     A    It's generally accurate.  Like I said, a few

2  things probably missing or that they couldn't -- the

3  audio couldn't hear.

4     Q    Did you review Detective Colangelo's deposition

5  transcript?

6     A    Yes.

7     Q    And did you see that there was an

8  exhibit marked and he had literally hundreds of

9  corrections to his transcript?

10         Did you see that in your review?

11         MS. SMITH:  Objection.

12         THE WITNESS:  I don't know how many corrections

13  he had.  I did see -- I remember reading where he -- or

14  watching where he corrected some of the transcript, yes.

15  BY MS. MACCINI:

16     Q    Did that give you pause -- strike that.

17         Did the fact that he had so many corrections

18  and issues with this particular transcript that I've

19  marked as Defendant's Exhibit 5, did that cause you any

20  pause in relying on this transcript in your expert

21  review of the matter?

22         MS. SMITH:  Objection.

23         THE WITNESS:  No, because I relied on the

24  videotaped interview as well as this.  This was just a

25  piece of what I reviewed.  This was not the only thing I

EXHIBIT A

1   reviewed.  I reviewed this as an initial thing and wrote

2   down initial impressions.  But this was not the only

3   piece of paper that I reviewed or video I reviewed for

4   this entirety.

5   BY MS. MACCINI:

6       Q    Understood.

7            But these notes, pages 1 through 11, were taken

8   in conjunction with your review of the transcript

9   provided by Plaintiff's counsel's office; correct?

10      A    Yes, initial impressions, yes.

11      Q    Okay.  So if the transcripts provided to you by

12  Plaintiff's counsel's office were inaccurate with

13  respect to what was said in the video interview, then

14  your notes are inaccurate as well; correct?

15           MS. SMITH:  Objection.

16           THE WITNESS:  Well, my notes are notes of my

17  impression.  So an impression --

18  BY MS. MACCINI:

19      Q    These are notes of your impression based on

20  your review of these transcripts that I marked as

21  Defense Exhibits 4 and 5 -- right -- if I'm

22  understanding your testimony correctly?

23      A    Yes.  But they're -- yes.

24      Q    On page 3, you state that Detective Colangelo

25  puts words in the defendant's mouth; is that right?

www.huseby.com            Huseby, Inc.  Regional Centers            800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

EXHIBIT A

1    A    Yes, it says puts words in Defendant's mouth,

2    consent.  So he was -- that was the part where he was

3    talking to Calvin and saying, you know, well,

4    everybody -- if it's -- this is that you guys have a

5    relationship or if something happened, the nature of

6    that piece of the conversation.

7    Q    And I don't have the transcript with respect --

8    strike that.

9         I don't have Plaintiff's counsel's transcript

10   generated with respect to the videotaped interview of

11   Calvin Nodine.

12        But is it safe to say that any notes that you

13   have related to that interview also were -- you were

14   reviewing a transcript provided to you by the plaintiff?

15   A    Yes.  And then later saw the video, yes.  But

16   the notes are from my first impression, yes.

17   Q    All right.  Turning to page 7 of your notes, at

18   the bottom it says "Miranda/" and then it's

19   B-e-h-e-l-e-r.

20   A    Yes.

21   Q    What is that in reference to?

22   A    I -- that's Beheler.  There's a warning that

23   you can use when you're interviewing somebody and you

24   think it may turn someone into a suspect.  Or when

25   someone turns into your suspect, you can give a them a

EXHIBIT A

1    Q    And what do you recognize it as being?

2    A    The Expert Disclosure that's filed by the

3  attorney, and then my report on the summary of the

4  opinions.  My report, what I looked over is listed.  And

5  then my CV.

6    Q    Have you ever seen the first three pages of

7  Defense Exhibit 6 before today?

8    A    Hold on one second.  Yes.  Yes.

9    Q    And when did you first see the first three

10  pages of Defense Exhibit 6?

11    A    After I did my report; so...

12    Q    Sometime after July 1, 2019?

13    A    Yeah.  A month or so ago.

14    Q    Okay.  The plaintiff's attorney states:

15         "Ms. Garcia will testify regarding

16         generally accepted practices with

17         respect to the investigation of

18         complaint of sexual assault,

19         interviewing techniques for the victims

20         and suspects of sexual assault,

21         appropriate treatment for victims of

22         sexual assault, submission of arrest

23         warrants and their application as to

24         the Canton Police Department's handling

25         of Nicole Chase's report of sexual

1   assault, and her arrest for alleging

2   making a false statement.

3       "She will testify to the setting the

4   opinions and basis for opinions in her

5   report attached hereto, including,

6   inter alia, that an experienced sexual

7   assault investigator following

8   generally accepted standards for the

9   investigation of sexual assault cases

10  would not have submitted an arrest

11  warrant against Nicole Chase for the

12  charge of making a false statement.

13      "Officer Gompper and Detective

14  Colangelo's investigation of Nicole

15  Chase's complaint failed to meet

16  generally accepted standards for the

17  investigation of sexual assault

18  complaint.  Officer Gompper and

19  Detective Colangelo's treatment of

20  Nicole Chase failed to meet generally

21  accepted standards for the treatment of

22  a victim of sexual assault.  And Nicole

23  Chase's reactions and responses during

24  and after the assault were consistent

25  with those of other victims of sexual

**EXHIBIT A**

1          assault."

2          Is what I just read into the record accurate?

3          Is that what you're prepared to testify to at

4    trial if this case were to go to trial?

5    A    Yes.

6    Q    Is it your opinion that it was not reasonable

7    for Detective Colangelo to seek a warrant for Nicole

8    Chase's arrest for giving a false statement in the

9    second degree?

10   A    Yes.

11   Q    What are the generally accepted standards for

12   the investigation of sexual assault cases that you're

13   going to testify to?  What standards are we talking

14   about?

15   A    Standards that are -- they're in Canton Police

16   Department's policy.  They're set by the Department of

17   Justice.  The IACP teaches on them.  They are:  First

18   and foremost, make the victim comfortable, afford her

19   time to talk, make sure nobody needs medical attention.

20         So the basic function even of, like, a patrol

21   officer that would be called to a scene, that's part of

22   the standard.

23         Giving the victim an advocate; giving her

24   privacy; of course, gathering any evidence; realizing

25   that a victim's statement can be all over the board, and

EXHIBIT A

1      Q    Documents and materials reviewed.

2           Did you prepare this portion of the report or

3    did someone else?

4      A    I prepared it off a list that I had gotten, and

5    when stuff was sent to me, I'd write down, like what it

6    was, police report, that kind of thing.  So off of a

7    list.  And that list -- the lists were not all

8    inclusive.  Like, I'd look up, oh, I got these things

9    too.  So -- and then -- out of this book.  So I'm hoping

10   it's all inclusive.

11     Q    Okay.  Under "videotaped interviews" -- that's

12   Subsection c, and then it's further divided into a, b,

13   and c.  Under b, it says:  "2017.5.18 Calvin Nodine

14   Lobby Interview."

15     A    Correct.  The lobby is incorrect.  It's a typo.

16   I typed it in after Chase lobby and then I did, oh,

17   Calvin's -- blah.  It's a typo.

18     Q    Okay.

19     A    I apologize.

20     Q    Do you have an opinion, Sergeant Garcia, as to

21   whether it was reasonable for Detective Colangelo to

22   believe that the plaintiff had committed a crime?

23          MS. SMITH:  Objection.

24          THE WITNESS:  Again, it's not -- in my head, it

25   wasn't necessarily about crimes committed.  It was about

**EXHIBIT A**

1   words and things stated in statements that should have

2   led to an investigation, to a police report, to an

3   inquiry, to further investigation being taken and steps

4   being taken.

5        So can I sit here today and say, "Oh, Calvin's

6   guilty; Nicole's guilty"?  No, absolutely not.  Because

7   there was no complete, thorough investigation.  Nobody

8   went to the crime scene.  Nobody took a photo.  So no,

9   that's not part of my opinion.

10       My opinion is that --

11  BY MS. MACCINI:

12       Q    Well, would you agree -- I'm sorry.  Go ahead.

13       A    I was just going to say my opinion is that if

14  right off the get-go, Nicole was separated from her mom,

15  sat in an interview room, and those buzz words happened,

16  perhaps an investigation would have ensued and things

17  would have panned out very, very differently.

18       But between that and then the subsequent

19  things, there were many opportunities for Detective

20  Colangelo, Officer Gompper, whoever, the Canton Police

21  Department, to rectify, to get this fully investigated.

22  Who knows what the outcome would have been?  I don't

23  know and you don't know because it didn't occur.

24       That's the point of my review.  It's not a

25  matter of who's guilty, who's innocent.  I don't know.

EXHIBIT A

1          But initially, set her aside alone, interview

2    the mom alone, and at least do some computer checks.  At

3    least -- at least take it seriously that, oh, this could

4    be an investigation.

5          It's those kinds of things that can turn into

6    really big things later and you go, oh, man, I wish I

7    would have got that guy's ID, you know.  So it's just --

8      Q    What is your experience in Connecticut criminal

9    law?  Is it limited to this case?

10     A    Criminal law in Connecticut?

11     Q    Yes.

12     A    Specifically Connecticut, yes, I would --

13          (Speaking simultaneously.)

14          THE WITNESS:  I would have to say that, yes.

15    Yes.

16    BY MS. MACCINI:

17     Q    Okay.  Would you agree that the state's

18    attorney here in Connecticut and the Hartford D.A. that

19    signed the warrant would know more about Connecticut law

20    than you?

21     A    Absolutely.

22     Q    And the same is true for the judge that signed

23    the warrant -- correct -- superior court judge?

24     A    Absolutely.  Yes.

25     Q    All right.  Turning back to your report,

**EXHIBIT A**

```
 1   Defense Exhibit 6.  On page 5 of your report -- if you
 2   turn to page 5.
 3        A    Yes.
 4        Q    Give me a moment.  I'm just trying to find
 5   where I want to point you to, where I want you to look
 6   at the document.
 7             I can't find it, but let me ask you, at the
 8   bottom of page 5, the second-to-last paragraph --
 9   actually, no.  I'm sorry.
10             The very bottom last paragraph:
11                 "On June 21, 2017, Detective
12             Colangelo interviewed Nicole Chase.
13             During the interview, Nicole Chase told
14             Detective Colangelo that he had pulled
15             her into the bathroom, locked the door,
16             and forced her to put his penis into
17             her mouth."
18             Where did you get that fact from?
19        A    That was from the videotape, the interview --
20   the videotaped interview.
21        Q    Is that your interpretation of the videotape?
22        A    It's what I saw on the videotape.
23        Q    Okay.  Under Connecticut law, how can you have
24   a sexual assault or describe something as a sexual
25   assault if you make no mention of sexual contact?  I
```

**EXHIBIT A**

1   If you see that and somebody's masturbating in front of

2   you, that would be described as an assault or attached

3   to this type of crime.

4          But I understand what you're saying, the actual

5   sexual assault crime says "contact."  But there are many

6   types of crimes that could be grabbing one's butt, may

7   not be a skin to skin or a -- but it's a lesser type of

8   sexual assault crime.  Although I understand that still

9   involves contact.  That's a bad example.

10  BY MS. MACCINI:

11      Q    Your first opinion that you're offering in this

12  case on page 6 is set forth.  Your first opinion is:

13          "An experienced sexual assault

14          investigator following generally

15          accepted standards for the

16          investigation of sexual assault cases

17          would not have submitted an arrest

18          warrant against Nicole Chase for the

19          charge of making a false statement."

20          Do you see that written in your report?

21      A    Yes.

22      Q    Is that your first opinion you're offering in

23  this case?

24      A    Yes.

25      Q    And this opinion concerns only Detective

1    Colangelo's conduct; correct?

2           Officer Gompper did not write the warrant.  He

3    didn't sign off -- well, actually, he did write it.  But

4    in any event, Detective Colangelo is the one that signed

5    off on it and sent it to the judge; correct?

6           MS. SMITH:  Objection.

7           THE WITNESS:  As to what I know, yes.  And

8    this -- my opinion does mostly focus on Detective

9    Colangelo, as I felt he was the one that made the

10   determining factor.  Right in their interview and on the

11   videotape, you can almost see where it turns into him

12   pinning her down to say it was a lie.  And so she became

13   a suspect at that point.  And yes, because his name is

14   on the warrant.  Absolutely, because his name is on the

15   warrant.

16   BY MS. MACCINI:

17       Q    Okay.  And we have talked about the standard

18   that you are referencing previously.  And when you say

19   "generally accepted standards," you're talking about the

20   International Association of Police Chiefs [sic]?

21       A    Yeah, standards set -- standards of law

22   enforcement agencies that are monitored by Department of

23   Justice -- U.S. Department of Justice kind of leads the

24   way with the standards of law enforcement agencies.

25   They are by constitution, but also by state law.  They

EXHIBIT A

1    are by state law, as well, and by their own department

2    policies and procedures.

3              So generally accepted standards are pretty

4    similar.  They're very similar across the entire

5    country.  The Canton Police Department's policy and

6    procedure, as I said earlier, is very on spot with most

7    police department's policy and procedure on dealing with

8    sexual assault and sexual assault victims and how to

9    investigate those crimes.

10    Q    Your opinion is predicated on Detective

11    Colangelo having investigated a sexual assault; correct?

12    A    Not necessarily, but that knowing in any crime,

13    that you go to a scene, you take a photo, you talk to

14    witnesses, you get corroborating evidence, which he even

15    talked about, that you need corroborating evidence,

16    which means other people or physical evidence.

17    Q    I just want to stick with your opinion is that

18    he should not have submitted the arrest warrant; right?

19              Can we just stay on track of that?  Stay on

20    track of the -- your first opinion is that Detective

21    Colangelo should not have submitted an arrest warrant

22    for Nicole Chase's arrest for making a false statement

23    in the second degree; right?

24              That's your first opinion?

25    A    That's correct.  Because he didn't do any kind

**EXHIBIT A**

1   of investigation.

2      Q    Okay.  Okay.  You have set forth the facts that

3   form the basis of that opinion at pages 6 and 7;

4   correct?

5      A    Yes.  Maybe later in the report when I'm

6   talking about other things, it may talk about that as

7   well.  But for that particular opinion, yes.

8      Q    I believe you state somewhere at pages 6 or 7

9   that Colangelo's interpretation of what Nicole Chase

10  told him was unreasonable -- that it was not in line of

11  what a reasonable officer would have concluded after a

12  thorough investigation.

13         Do you recall -- actually, I can see it at

14  page 6.  In the last sentence of the -- in the last

15  sentence of the first paragraph under your opinion, you

16  state:

17         "Colangelo's slant on the events was

18         different than what a reasonable

19         officer would have concluded after a

20         thorough investigation."

21         Do you see that?

22      A    Yes.

23      Q    That's a -- that's a speculative statement,

24  isn't it?

25         MS. SMITH:  Objection.

www.huseby.com          Huseby, Inc.  Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

**EXHIBIT A**

```
 1              THE WITNESS:  It's an opinion.
 2    BY MS. MACCINI:
 3       Q    But is it speculative?
 4              MS. SMITH:  Objection.
 5              THE WITNESS:  Opinion can be speculative.  It's
 6    an opinion.
 7    BY MS. MACCINI:
 8       Q    But can you answer my question?  Again, the
 9    sentence:
10              "Colangelo's slant on the events was
11              different than what a reasonable
12              officer would have concluded after a
13              thorough investigation."
14              Is that -- Sergeant, is that a speculative
15    statement?
16              MS. SMITH:  Objection.
17              THE WITNESS:  Not knowing -- for the past
18    30 years, and being involved in and doing my own sexual
19    assault investigations and having information come out
20    piece by piece by piece by piece, and training on that
21    topic nationally, it is an opinion, it's not a
22    speculation.  It's an opinion that he used his own
23    biases in his thought process.
24    BY MS. MACCINI:
25       Q    Isn't the crux of the opinion that you have
```

**EXHIBIT A**

1   nothing atypical about this.  But certainly, refer to my

2   report.

3        Q    Is this report final?

4        A    Yes.

5             MS. MACCINI:  I'd like to ask the court

6   reporter to mark the consulting agreement as the next

7   exhibit.

8             (Off the record.)

9             (Deposition Exhibit 1-A was marked for

10            identification by the Court Reporter.)

11            MS. MACCINI:  Back on the record.

12   BY MS. MACCINI:

13        Q    Sergeant, do you see -- have you found your

14   contract with Attorney Chimes in your files?

15        A    Yes.

16        Q    And the court reporter has marked it as Defense

17   Exhibit 1-A?

18        A    Yes.

19        Q    Who prepared this agreement, if you know?

20        A    I did.

21        Q    You did?

22        A    Yes.

23        Q    You prepared it?

24        A    Yes.

25        Q    Okay.  And is this the first time you've ever

 1   entered into a contract for the provision of expert

 2   witness services?

 3       A    Yes.

 4       Q    Okay.

 5            MS. MACCINI:  I'd like to mark the invoice for

 6   consulting work done by Sergeant Garcia as Exhibit 9, if

 7   that's where we're at.

 8            (Deposition Exhibit 9 was marked for

 9            identification by the Court Reporter.)

10   BY MS. MACCINI:

11       Q    Sergeant, do you have Defense Exhibit 9 in

12   front of you?

13       A    Yes.

14       Q    Do you recognize it?

15       A    Yes.

16       Q    What do you recognize it as being?

17       A    The hours so far that I had spent prior to this

18   month -- well, part of August is there.

19       Q    So in total, you spent 21 hours on this matter?

20       A    No, not to date.  Now I've spent a whole lot

21   more this week preparing for this, but prior to that,

22   those are the hours that I billed for, yes.

23       Q    How much time did you spend preparing for this

24   deposition?

25       A    Well, deposition prepare yesterday, probably

1   happening.  Not that I know of.  I've reviewed, I

2   believe, everything that's up to date.

3       Q    Is your analysis of this matter complete based

4   on the materials that have been provided to you so far?

5       A    Yes.

6       Q    And you have not reviewed any other cases for

7   Attorney Chimes' office?  This is the first case you've

8   reviewed for anybody; correct?

9       A    Correct.  Well -- yes.

10      Q    Okay.  Are you currently employed?

11      A    No.  I'm retired.

12      Q    Are you running an expert consulting service in

13  your retirement or running any sort of business?

14      A    I'm mostly doing training things for End

15  Violence Against Women, the center for crimes against

16  women in Dallas.  The former Public Assistance Fraud

17  people reached out to me to do a training program for

18  new hires.

19           So I'm doing some things like that.  Almost

20  everything is not at charge.

21           The other -- especially attorneys -- like

22  district attorneys in California may call with a

23  question because they can't get ahold of an expert

24  somewhere.  And they'll say, oh, so-and-so from sex

25  crimes gave me your name.  And we'll chitchat about the

**EXHIBIT A**

1   POST training and Connecticut POST training is similar?

2       A     There's a minimum.

3       Q     Or is it --

4       A     I think the POST entities of the states are

5   very similar.  Each state you ask, they'll tell you

6   they're the better POST -- right -- just because of

7   pride.  They'll be like, oh, no, California's way

8   better.  We need this, you know.  But they're similar.

9   They're similar how they lay out their training records

10  and what they teach in an academy and that kind of

11  thing.

12          So Peace Officer Standardized Training is what

13  POST stands for.

14      Q     Okay.  And you have never been qualified as a

15  police liability expert in any case; right?

16      A     No.  Correct.

17      Q     Okay.  Have you ever been retained as an expert

18  in any other case?

19      A     No.  I've had a lot of attorneys call and ask

20  me questions.  Prosecutors, in particular, in our state

21  just that may have met me or gotten my name, and we'll

22  talk and brainstorm about a case or about a training,

23  but, no, not officially.

24      Q     Is this the first time you've ever been asked

25  to serve as expert in this type of case or is this the

**EXHIBIT A**

**NICOLE CHASE vs NODINE'S SMOKEHOUSE, INC., ET AL.**
Catherine Garcia on 08/23/2019                                    Page 154

```
 1   STATE OF CALIFORNIA      )
                              )     ss
 2   COUNTY OF SAN DIEGO      )

 3

 4          The witness, CATHERINE GARCIA, in the foregoing
     deposition appeared before me, Aletha Loftfield, a
 5   Certified Shorthand Reporter in and for the State of
     California.
 6
            Said witness was then and there at the time and
 7   place previously stated, by me placed under oath to tell
     the truth, the whole truth, and nothing but the truth in
 8   the testimony given on the date of the within
     deposition.
 9
            The testimony of the witness and all questions
10   and remarks requested by Counsel and reported
     thereafter, under my direction and control, caused to be
11   Computer-Aided Transcription.

12          I am a certified Shorthand Reporter licensed by
     the State of California.  I further certify that I am
13   not of counsel or attorney for either or any of the
     parties to the case named in the within caption, and
14   that I am not related to any party thereto.

15          IN WITNESS WHEREOF, I have hereunto affixed my
     signature this 10th day of September, 2019.
16

17

18

19   _____

20   Aletha Loftfield, CSR
     Certified Shorthand Reporter No. 13767
21

22

23

24

25
```

**EXHIBIT A**