July 1, 2019
EXPERT REPORT ON BEHALF OF THE PLAINTIFF NICOLE Chase
Submitted by:

Catherine Garcia
Supervising Investigator, retired

## I. SUBJECT OF EXPERT OPINION

I have been retained by Attorney Lewis Chimes on behalf of the plaintiff, Nicole Chase, in the matter of *Chase v. Calvin Nodine, et al*, No. 3:18-cv-00683 (VLB), currently pending in the District court of the Judicial District of Connecticut, with respect to generally accepted practices with respect to the investigation of complaints of sexual assaults, interviewing techniques for victims and suspects of sexual assault, appropriate treatment for victims of sexual assault, submission of arrest warrants, and their application as to the Canton Police Department's handling of Nicole Chase's report of sexual assault, and her arrest for making a false statement.

I have also been asked to comment as to the types of responses of victims of sexual assault, both during and after the assault as it pertains to Nicole Chase's response during and after the sexual assault.

## II. SUMMARY OF EXPERT OPINIONS

### As to Canton Police Department Defendants:

I.   An experienced sexual assault investigator, following generally accepted standards for the investigation of sexual assault cases would not have submitted an arrest warrant against Nicole Chase for the charge of Making a False Statement

II.  Officer Gompper and Detective Colangelo's Investigation of Nicole Chase's Complaint Failed to Meet Generally Accepted Standards for the investigation of Sexual Assault Complaints

III. Officer Gompper and Detective Colangelo's Treatment of Nicole Chase Failed to Meet Generally Accepted Standards for the Treatment of a Victim of Sexual Assault

### As to Canton Police Department Defendants and Calvin Nodine

IV. Nicole Chase's Reactions and Responses During and After the Assault Were Consistent with Those of Other Victims of Sexual Assault.

**EXHIBIT B**

III.  QUALIFICATIONS

I, Catherine Garcia, am a retired law enforcement officer from the state of California. I worked as a fully sworn police officer for approximately 30 years with the San Diego Police Department from July 1987 to March 2001; then with the San Diego County District Attorney's Office from March 2001 to November 2017. I achieved the rank of detective in 1992 and worked a variety of assignments at both agencies. I spent a large portion of my career investigating sexual assault allegations and have investigated well over 1000 sexual assault complaints. I have testified in criminal court in the state of California more than 100 times in my 30-year career. Approximately 70 percent were regarding a sexual assault or molest. I have testified in Federal court less than 10 times in my 30-year career. I have been deposed civilly less than ten times, none regarding sexual assault. I have never testified in court or at a deposition as a retained, independent expert witness but only in conjunction with my employment with the San Diego Police Department and the San Diego County District Attorney's Office.

I am part of the Cadre of Experts for End Violence Against Women International. I have training specific to cadre members. I have conducted training for law enforcement and community groups for 20 years on the topics of sexual assault, stalking, and family violence.

My curriculum vitae is attached to this report as Exhibit 1.

IV.  DOCUMENTS AND MATERIALS REVIEWED

A. Police Reports Relating to Nicole Chase and Calvin Nodine
    a. 2017.5.7 Police Call summary
    b. 2017.5.12 Gompper Police Report
    c. 2017.5.13 Gompper Police Report
    d. 2017.5.15 Gompper Email re Calvin Nodine
    e. 2017.5.25 Gompper Police Incident Report
    f. 2017.6.20 Police Incident Report
    g. 2017.6.21 Gompper Police incident Report
    h. 2017.9.8  Colangelo Police Incident Report

B. Written Statements
    a. 2017.5.11 Nicole Chase Written Statement
    b. 2017.5.11 Alexandria Archer Written Statement
    c. 2017.5.12 Kyle Rouleau Written Statement

C. Videotaped Interviews

**EXHIBIT B**

a. 2017.5.7 Nicole Chase Lobby Interview
    i. Transcript of Nicole Chase Lobby Interview
b. 2017.5.18 Calvin Nodine Lobby Interview
    i. Transcript of Calvin Nodine Lobby Interview
c. 2017.6.21 Nicole Chase Re-Interview
    i. Transcript of Nicole Chase re-interview

D. Texts/Emails
   a. 2017.5.6 – 2017.5.17 Texts Nicole Chase – Jeremy Archer
   b. 2017.7.25 Chase email Colangelo
   c. 2017.7.31 Chase email with attached proposed supplementary statement
   d. 2017.8.10 Colangelo Response

E. Canton Police Policies
   a. Canton Police Policy Manual
   b. Sexual Assault Review Checklist
   c. Domestic & Sexual Assault Violence Review Checklist
   d. General Checklist Re: Sexual Assault
   e. 2013.3.1 Chief Arciero Email re Checklists

F. Training
   a. Colangelo Training Records
   b. Gompper Training Records

G. Arrest Warrant for Nicole Chase

H. Adam Gompper Deposition
   a. Day I
   b. Day II
   c. Exhibits from Gompper Deposition

I. Mark Penney Deposition
   a. Exhibits from Mark Penney Deposition

J. Dispatcher David Canney Deposition
   a. Exhibits from Canney Deposition

K. Calvin Nodine Deposition
   a. Exhibits from Calvin Nodine Deposition

L. Canton Police Internal Affairs Investigation
   a. Internal Affairs Report
   b. All exhibits attached to Internal Affairs Report

**EXHIBIT B**

M.  Original Complaint

N.  Proposed Amended Complaint

O.  Gompper Interrogatory Responses

P.  Colangelo Interrogatory Responses

Q.  Town of Canton Interrogatory Responses

R.  Colangelo Deposition, Day I and II
    a. Colangelo Deposition Exhibits

S.  Assistant State's Attorney Weber Deposition
    a. Weber Deposition Exhibits

T.  Nicole Chase Deposition, Days I, II, III
    a. Exhibits from Nicole Chase Deposition

U.  Connecticut Statutes
    a. Conn. Gen. Stat. 53a-49 Definition of Attempt
    b. Conn. Gen. stat. §53a-72 Sexual assault in the First Degree
    c. Conn. Gen. Stat. §53a-73a Sexual assault in the Fourth Degree
    d. Conn. Gen. Stat. §53a-65 Pertinent Definitions Re Sexual Assault
    e. Conn. Gen. Stat. §53a-157b False Statement
    f. Conn. Gen. Stat. §53a-96 Definitions re restraint

V.  Literature Re sexual Assault Investigations
    a. International Association of Chiefs of Police, *Investigating Sexual Assault,*(2005 updated 2017)
    b. Department of Justice, *Identifying and Preventing Gender Bias in Law Enforcement Response to Sexual assault and Domestic Violence* (2016)
    c. International Association of Chiefs of Police, *Trauma Informed Interviewing*

V.  **EXPERT OPINION**

As used in this report, my opinions about generally accepted police practices are derived from my experience and training as a police officer including specific training in sexual assault investigation; my attendance at continuing education seminars; practical knowledge of sexual assault investigation and interviewing victims, including the understanding of ramifications and aftermath to the victim of being sexually assaulted.

**EXHIBIT B**

Background

The plaintiff, Nicole Chase, has alleged that she was sexually assaulted by the defendant, Calvin Nodine, on May 6, 2017 at Nodine's Restaurant in Canton, Connecticut. Chase worked at the restaurant, and Nodine was the owner. (Amended Complaint). Nodine had been drinking all day. Chase alleged that around closing time, Calvin Nodine pulled her into the bathroom, locked the door and forced her to put his penis into her mouth. (Amended Complaint)

Nicole Chase was uncertain of how to respond. She texted her former general manager Jeremy Archer, that evening, and he told her that she should tell her mother and go to the police. (Amended Complaint). After speaking to Archer, she told her mother. The following morning, Nicole Chase went to the Canton Police Department, accompanied by her mother. (Amended Complaint). She spoke to Police Officer Adam Gompper in the lobby of the Police Department. (Amended Complaint). She was unsure how she wanted to proceed, and went to work at Nodine's Restaurant that day after reporting the incident to the police. (Amended Complaint). Nodine behaved inappropriately that day, and Chase decided to pursue charges against Nodine. (Amended Complaint). She did not return to work.

Chase returned to the Canton Police Department on May 11, 2017, and Officer Gompper prepared a written statement. In both her initial discussion with Officer Gompper and in the written statement that she provided to Office Gompper on May 11, she described the sexual assault, but omitted details of the actual sexual contact. (Amended Complaint).

Officer Gompper also took statements from two other employees, Alexandria Archer, and Kyle Rouleau.

On May 19, 2017, Detective John Colangelo interviewed Calvin Nodine. Nodine was accompanied by his Attorney, David Moraghan. Nodine initially denied that anything took place between himself and Nicole Chase. He took a break in the interview to confer with his attorney, and returned and then told Detective Colangelo that he had consensual oral sex with Nicole Chase in the bathroom that evening. He stated that Nicole Chase had taken him into the bathroom and initiated the sexual contact.

On June 21, 2017, Detective Colangelo interviewed Nicole Chase. During the interview, Nicole Chase told Detective Colangelo that he had pulled her into the bathroom, locked the door, and forced her to put his penis into her mouth. She reiterated that everything else in her story was true. She said that she omitted the sexual act because she was humiliated, ashamed that she had

allowed him to do what she did not want him to do, and was afraid that she would not be believed. Detective Colangelo told her that she could revise her statement if she wanted to do so.

On July 7, 2017, Officer Gompper and Detective Colangelo drafted an arrest warrant for Nicole Chase for making a false statement. It was sent to the State's Attorney's Office on July 11, 2017. Around the same time, Nicole Chase came into the Canton Police Department to see Detective Colangelo to revise her statement. Detective Colangelo did not see her. Several weeks later, Nicole Chase emailed Detective Colangelo to come in to revise her complaint. She received no response. Finally, Nicole Chase emailed a draft revised statement to Detective Colangelo.

The warrant had not yet been reviewed by the State's Attorney's Office or a Judge. Detective Colangelo never revised the statement, and never told the State's Attorney that Ms. Chase had attempted to revise the omission in her statement.

I. An Experienced Sexual Assault Investigator, following generally accepted standards for the investigation of sexual assault cases would not have submitted an arrest warrant against Nicole Chase for the charge of Making a False Statement.

Detective Colangelo and the Canton Police Department failed to interview possible witnesses and obtain evidence, limiting the investigation of this matter. Colangelo selected information to put in the arrest warrant of Nicole Chase. The information in no way portrayed the totality of the events or of Colangelo's limited investigation. Many of the statements were false, taken out of context or were misleading. Colangelo's slant on the events was different than what a reasonable officer would have concluded after a thorough investigation.

Colangelo focused on the omission by Chase as a "lie." It is very common for a sexual assault victim to give an incomplete or inconsistent statement. There are many reasons this can happen, some examples are: memory and brain trauma formation of statement, alcohol or drug use, embarrassment, not interviewing in private, trauma informed interviewing skills, time delay, the relationship to the perpetrator, a witness being present, the victim not wanting others to find out what happened, and gender bias.

An experienced investigator or one that properly used an advocate for assistance would not conclude a victim gave an intentionally false statement because pieces were omitted. If Chase were afforded proper treatment and questioning from the Canton Police Department from the outset, perhaps more details of the assault would have been known by the officers at an earlier time.

**EXHIBIT B**

Chase's reaction of crying during her interview with Colangelo is common. Many victims feel relief when a sexual assault act is revealed. Sexual assault is a horribly personal crime. It can take time for the entirety of the crime to be discovered. Colangelo never asked Chase details about Nodine putting his penis in her mouth. Colangelo used language in his conversation with Chase suggesting she consented. Never did Colangelo ask her what she felt during this sexual assault (force, fear, coercion). All questions a reasonable officer would ask any victim, witness, or suspect.

There was insufficient evidence for a trained sexual assault investigator to conclude that Nicole Chase had intent to mislead a public servant in his official function as required for the crime of Making a False Statement.

Colangelo avoided Chase and did not return her calls or emails when she attempted to clarify her statement. Police officers are by description public servants. To avoid a victim or suspect or delay an investigation in this manner is not the reasonable action or accepted practice of a police officer. If Detective Colangelo had permitted her to revise her statement, as she requested, the omission in the statement would have been corrected.

Colangelo based an arrest warrant on a fraction of information that he obtained during a portion of an investigation. Colangelo put misleading statements in the warrant about Nodine and Chase holding hands. This did not occur. Colangelo withheld specifics of the investigation from the warrant affidavit. Some of the withheld specifics if known may have caused the reviewing sergeant or other parties to question the information put forward by Colangelo. Specifics like the victim's statements being taken out of context. A reasonable police officer would not have obtained an arrest warrant in this manner.

II.   Officer Gompper and Detective Colangelo's Investigation of Nicole Chase's Complaint Failed to Meet Generally Accepted Standards for the investigation of Sexual Assault Complaints

A.   Officer Gompper Initial Interview

Nicole Chase went to the Canton Police Department with her mother to report a sexual assault. Chase was contacted by Officer Gompper, but was not fully interviewed or properly handled at the time of her report. The assault occurred the previous night just hours before Chase went to the police.

Officer Gompper did not interview Chase in private nor ask her any details about the crime. Officer Gompper did not ask Chase anything to determine if a

**EXHIBIT B**

crime occurred, much less conduct any type of investigation. Gompper characterized the complaint as a "sexual harassment." Gompper spoke to Chase as she sat in an open hallway with other people nearby. Gompper told Chase he was going on days off, so she should come back after his time away from work if she wanted to pursue a report.

Gompper did not conduct a witness interview with Chase's mother who accompanied Chase to the Canton Police Department. Chases mother could have had valuable information important to the investigation of the sexual assault. Chase's mother was at the very least a witness to whom Chase disclosed needing to go to the police.

Gompper did not follow the Canton Police Department's sexual assault victim guidelines. The word "sexual" should have triggered Gompper to handle Chase and her complaint in an appropriate and more private manner. Sexual assault crimes are very personal in nature. It is the preferred training and practice of police officers across the United States to interview the victim in a private setting, afford her an advocate, and make her as comfortable as possible to hear her account of the events that occurred. Had Gompper contacted Chase in this manner, he would have learned that Nodine's penis made physical contact with Chase's mouth. An evidentiary swab of Chase' mouth could have been obtained. The swab may have yielded potentially important biological evidence, such evidence that is routinely gathered when investigating complaints of a sexual nature.

Gompper did not arrange a forensic or sexual assault examination for Chase which may have yielded valuable evidence, as the crime occurred just the previous day. A forensic examination is an important step in evidence collection. DNA swabs are taken and clothing is collected as part of this examination. The assault was the previous night, well within the optimal time period for evidence collection. Gompper did not collect a DNA swab. Gompper did not ask if Chase was wearing the same clothing as during the attack or attempt to collect Chase's clothing worn the previous night.

Officer Gompper did not ask any details about the sexual conduct or if Chase felt force or fear. These are important questions any reasonable police officer would ask regarding a sexual assault and in determining what crimes were committed.

Officer Gompper did not obtain the text messages between Chase and Jeremy Archer. Text messages are routinely documented by police officers as evidence during an investigation.

Officer Gompper did not go to the crime scene, photograph the bathroom

**EXHIBIT B**

where the assault took place, or contact the suspect Nodine. Gompper did not ask any history of that relationship, or times of unwanted contact or grooming behavior by Nodine. Gompper did not take any steps to document the injury to Nodine's head. Gompper did not pursue any evidence as to Nodine's intoxication level at the time of the attack.

Gompper eventually spoke with Chase and obtained her initial statement. Gompper was later aided by Detective Colangelo in handling Chase's complaint. No one from the Canton Police Department went to the crime scene. No photographs of any kind were taken. As previously stated, no biological or physical evidence was obtained. These are normal routine investigative steps that are taken after the complaint of any crime, especially that of a sexual assault. Nicole Chase was not taken seriously and was treated disrespectfully by Officer Gompper and the Canton Police Department.

    B. Officer Gompper Taking Written Statement from Nicole Chase on May 11, 2017

Officer Gompper had an opportunity to correct some of his previous conduct during his contact with Nicole Chase on May 11, 2017. However, Gompper again contacted Chase in front of a witness (Alexandra Archer). Gompper again did not question Chase about details of the sexual conduct of Nodine. Gompper again did not question Chase about force, coercion, threats or fear regarding her assault.

    C. Officer Gompper interviews of Alexandria Archer/Kyle Rouleau 5/11 and 5/12

Gompper obtained statements from Alexandra Archer and Kyle Rouleau. Gompper failed to follow up on any other relevant evidence pertaining to Nodine with either witness. No further details were elicited by Gompper, despite the fact that both of the statements suggested other relevant evidence.

    D. Colangelo/Gompper interview of Calvin Nodine on May 19, 2017

Detective Colangelo interviewed the suspect Nodine prior to speaking with Chase. Generally, a victim should be contacted by the Detective prior to interviewing a suspect. This enables the detective to have a better understanding of the crimes that occurred and the relationship (if any) between the victim and suspect. The victim may require medical care or counselling. Colangelo spoke to Chase in a delayed manner, taking away many of her rights as a crime victim and a victim of sexual assault in particular.

During the Nodine interview, Colangelo shared with Nodine what Chase

told the police. Colangelo misrepresented what Chase told the police and was dismissive of Chase and her statements to the police. At this point, Colangelo had not spoken to Chase to even evaluate her statements. Additionally, sharing the statement of a victim with a suspect in a criminal investigation can taint the statement or testimony obtained from that suspect.

Colangelo spent the interview time bragging to Nodine and describing how he handled a previous sexual assault allegation. Colangelo told Nodine he made the previous allegation into a false report by the victim. Colangelo suggested to Nodine that this too could be a false allegation.

Colangelo described the polygraph examination process as a way for Nodine to leverage the situation with Chase. Colangelo suggested Nodine and Chase have an intimate type of relationship. Colangelo generally spoke to Nodine in a friendly manner as opposed to Colangelo's dismissive tone about Chase.

Colangelo spoke to Nodine: Colangelo did very little questioning or listening. Colangelo spent a portion of the interview posturing and talking about his narcotic arrests and knowledge to Nodine and Nodine's attorney. Colangelo discussed golf and a country club with Nodine's attorney in a familiar manner, angling for an invite to the club. Colangelo bragged about building exculpatory evidence into a case of someone known to the attorney.

Colangelo did not ask detailed questions about what occurred in the bathroom. Colangelo did not question Nodine about his grabbing Chase's buttocks, other physical contact, or his making crude remarks. Colangelo minimized the sexual assault allegation to Nodine and his attorney. Colangelo discussed suggested to Nodine that Chase wanted money in regards to her complaint.

Nodine changed his story regarding the sexual assault. Colangelo encouraged Nodine, saying it's okay that he was not truthful right away. Colangelo did not ask Nodine about what happened in the bathroom.

Nodine told Colangelo he had weapons at his residence and did not want SWAT coming to arrest him. Colangelo told Nodine not to worry. A reasonable officer that obtained this information about weapons during questioning a suspect, witness or victim would be alerted. Colangelo ignored the information seemingly not alarmed.

More than one month after Nodine's interview, Colangelo met with the sexual assault victim, Nicole Chase. By this time more than six weeks have passed since the actual crime occurred. Delaying contact with a sexual assault

**EXHIBIT B**

victim is widely regarded as bad practice in sexual assault investigation.

Colangelo's manner toward Nodine and his lack of communication to Chase suggest a bias in his investigation.

E. Colangelo interview of Nicole Chase on June 21, 2019

Colangelo spoke with Chase at the police station more than a month after her initial complaint and after speaking with Nodine. Colangelo did not advise Chase that she is a suspect in a false statement case. Colangelo did not Mirandize Chase. Colangelo interrogated Chase as opposed to his friendly demeanor with Nodine.

Colangelo lied to Chase about Nodine passing a polygraph examination. It is generally unacceptable for an investigating officer to misrepresent evidence or statements to a victim of sexual assault. This undermines the relationship that should be forming between the victim and the police. Using fabrication when speaking to a witness suggests a "set up" type of interrogation. Putting an idea out to the witness as "bait." This approach is more likely used on a suspect than on a victim.

In Detective Colangelo's conversation with Chase, Chase cried and admitted Nodine put his penis in her mouth. Chase never said it was voluntary, only that it happened. Colangelo did not ask details like if she did this voluntarily or if she felt coerced or forced. The employer/ employee relationship itself lends to the idea of coercion and should have been clarified and explored further during questioning.

The mechanics of the actual acts, whether the act is forced, coerced or wanted, these are questions that clarify intent on both the part of the victim and the suspect. A victim's or suspect's intent is instrumental in developing probable cause in an investigation. A reasonable officer would have asked these questions in detail, addressing intent and the victim's thoughts at the time of the crime. Not doing so is poor investigative technique and leads to an improper investigation as a whole.

Detective Colangelo focused on Chase telling a "lie" by not disclosing that Nodine put his penis in her mouth in her first statement. Witnesses often leave out critical information. It is the job of the police officer to ask appropriate questions and conduct all interviews in an appropriate manner.

Colangelo pressured Chase to say the omission meant her previous statement was a lie. Chase's previous statement was correct but lacked the information about Nodine putting his penis in her mouth. That omission did not

**EXHIBIT B**

make the entire statement a lie. It is a truthful statement with more information available. Colangelo portrayed the written statement as a lie in the warrant affidavit.

Colangelo questioned why Chase didn't call for help when Nodine's wife called. Often during a sexual assault, victims feel threatened or coerced and are unable to call for help. The victim sometimes physically and mentally freezes. Sometimes the victim feels there are later ramifications of the situation and complies to get through the assault. This is especially true when the victim and the suspect have a superior/subordinate type of relationship. Victims at times feel embarrassment for landing in the situation to start. Victims self-blame for a variety of reasons and this lends to the stigma of sexual assault. A reasonable police officer would ask follow up questions to clarify the thoughts of the victim at the time of the attack.

Colangelo softened his questioning approach to have Chase admit her "lie." This approach is often used on a suspect during an interrogation. This is widely considered to not be a proper questioning technique to use with a victim of sexual assault.

Colangelo categorized Chase as a "suspect." Chase should have been notified as such.

Colangelo told Chase her statement and that of Alexandra Archer are too similar, suggesting collusion. Suggesting a victim is conspiring with a witness is generally not a proper interviewing technique for a sexual assault investigation.

Colangelo never took a photograph, went to the crime scene, reviewed text messages, asked for or warranted cellular phone data, or gathered any type of evidence. Colangelo had Chase draw a diagram of the business during his interrogation of her. The diagram was not placed in evidence or preserved.

F.   After Interview with Nicole Chase

Colangelo heard many statements from both Nodine and Chase that should have triggered a more thorough investigation. Chase told the police she was pulled into the bathroom and Nodine locked the door. Chase told the police Nodine grabbed her buttocks. These are crimes or acts that at least should have been pursued in further questioning. Colangelo eluded to a prior intimate relationship between Nodine and Chase during his interview with Nodine. If an intimate relationship existed, domestic violence protocols should have prevailed, and a more thorough investigation should have been done in following the police department protocol on domestic violence response.

**EXHIBIT B**

There were many opportunities to investigate further but Colangelo did not do so. What Colangelo did was use select information for his warrant affidavit on Nicole Chase. Colangelo ignored the rest of the information provided to him. Colangelo did not re-interview Nodine after speaking with Chase. Colangelo failed to meet with Chase and revise her statement when she tried to do so. Colangelo told Chase he would put the revision in the warrant, leading Chase to believe a warrant was coming for Nodine. Colangelo failed to communicate with Chase and did not return her inquiries. Colangelo told Nodines' attorney about Chase's warrant but did not tell Chase. Colangelo never withdrew or revised the warrant although he had time to do so. Colangelo was not upset at Nodine for lying to him in his interview; yet Colangelo obtained an arrest warrant on an omission by Chase. Colangelo did not treat Nodine and Chase equally or consider their statements equally.

III. Officer Gompper and Detective Colangelo's Treatment of Nicole Chase Failed to Meet Generally Accepted Standards for the Treatment of Sexual Assault Victims

There were multiple opportunities for Gompper and Colangelo to treat Nicole Chase with dignity and respect as a sexual assault victim. They failed in the most basic aspects of police work that are recognized as reasonable in the United States. They failed to communicate with Chase and provide information about the status of the investigation. In fact, they delayed the investigation and lied to Chase during their duties.

Gompper and Colangelo did not use trauma-informed investigative techniques. Gompper and Colangelo did not treat Chase as a sexual assault victim should be treated according to their own police department guidelines. Chase was not afforded privacy, an advocate, or compassion. A reasonable officer conducting any type of sexual assault investigation would not have treated Chase as she was treated by Gompper and Colangelo. Gompper and Colangelo disregarded Chase's complaint, delayed her initial report, and later turned her into a suspect. This in no way is a generally accepted standard of how a sexual assault victim should be treated. The protocols followed and training provided across our nation are in place to prevent sexual assault victims from being treated like Nicole Chase was treated in Canton.

IV. Nicole Chase's Responses during and after the assault were not atypical of victims of sexual assault

Nicole Chase's responses during the assault and after the assault are not atypical. Many times, reports are delayed. Chase tried to report the assault the very next morning, she was put off by Officer Gompper. This was actually a fairly quick initial report when considering averages of sexual assault reporting across

**EXHIBIT B**

the United States. A failure to cry out, resist, or freezing during an assault are not atypical. A victim who is forced to put her mouth on a suspect's penis may not bite that penis. The victim may not lash out at all during an attack. This is not atypical.

In a case where the victim and suspect know each other it is not atypical for the victim to say goodnight or speak to the assailant during or after the assault. A victim showing concern for her job or school responsibilities is not atypical, in fact, it can be part of the power dynamic in a boss/ employee situation. A victim going back to work or school where an assault took place is not atypical.

After an assault, it is not atypical for a victim to delay in outcry or reporting to police. It is not atypical for a victim to be uncertain how to proceed, especially if she fears job loss. It is not atypical to omit details of the assault or have inconsistencies in statements to police or others. It is not atypical to have memory lapses about all or part of the assault.

It is very common for a sexual assault victim to give an incomplete or inconsistent statement. There are many reasons this can happen, some examples are: memory and brain trauma formation of statement, alcohol or drug use, embarrassment, not interviewing in private, trauma informed interviewing skills, time delay, the relationship to the perpetrator, a witness being present, the victim not wanting others to find out what happened, and gender bias.

A victim feeling guilt, embarrassment, and humiliation are not atypical. A victim not wanting to tell the details of the attack to an intimate partner are not atypical. A victim hiring an attorney is not atypical, whether the investigation moved forward for prosecution or not. Every single victim of sexual assault has her own way of processing the attack. The path from victim to survivor is unique for each victim of sexual assault.

It is law enforcement's duty to treat sexual assault victims humanely, with dignity and respect, and in accordance to their protocols.


Respectfully submitted,

*Cathy Garcia*

Cathy Garcia,
Supervising Investigator (retired)

**EXHIBIT B**