NICOLE CHASE vs NODINE'S SMOKEHOUSE, INC., ET AL.
Elizabeth Donegan on 08/07/2019

```
 1              IN THE UNITED STATES DISTRICT COURT
                     DISTRICT OF CONNECTICUT
 2
   NICOLE CHASE                )
 3                             )
                               )
 4 vs.                         )  NO. 3:18-cv-00683 (VLB)
                               )
 5 NODINE'S SMOKEHOUSE,        )
   INC., CALVIN NODINE, TOWN   )
 6 OF CANTON, JOHN COLANGELO,  )
   ADAM GOMPPER, MARK J.       )
 7 PENNEY AND CHRISTOPHER      )
   ARCIERO                     )  JULY 17, 2019
 8

 9         *******************************

10              VIDEO CONFERENCE DEPOSITION

11                   ELIZABETH DONEGAN

12                    August 7, 2019

13         *******************************

14     VIDEO CONFERENCE DEPOSITION OF ELIZABETH DONEGAN,

15 produced as a witness at the instance of the Defendants

16 Town of Canton and Officer Adam Gompper and Detective

17 John Colangelo, and duly sworn, was taken in the

18 above-styled and numbered cause on the 7th day of

19 August, 2019, from 9:11 a.m. to 1:43 p.m., before April

20 Balcombe-Anderson, Certified Shorthand Reporter in and

21 for the State of Texas, reported by computerized

22 stenotype machine at the Regus located at 12600 Hill

23 Country Boulevard, Suite R-275, Bee Cave, Texas 78738,

24 pursuant to the Federal Rules of Civil Procedure and the

25 provisions stated on the record or attached hereto.
```

EXHIBIT C

1    A.    No, just me.

2    Q.    Any office staff at all?

3    A.    No.

4    Q.    Okay.  And how long have you been running that

5 business?

6    A.    I've trained off and on for probably 15 years.

7 That business, per se, is something that I put together

8 after I retired.

9    Q.    And you retired from the Austin Police

10 Department, correct?

11    A.    That's correct.

12    Q.    And how long did you work for the Austin Police

13 Department?

14    A.    For as sworn, almost 26 years.

15    Q.    And were you required to attend a police

16 academy --

17    A.    Yes, ma'am.

18    Q.    -- for training on your jobs throughout?

19    A.    Yes.

20    Q.    Have you had -- I assume you've had specific

21 training in investigations?

22    A.    I have.

23    Q.    Can you list for me those trainings?

24    A.    I couldn't tell you.  I don't have those

25 offhand.

EXHIBIT C

1 case clearance because we were not up to the exceptional

2 clearance to change the suspended cases to exceptional

3 because we were not up to the national average.

4          And that's what the ProPublica story

5 revealed, was that, when I was removed in 2011, there

6 was a spike -- this enormous spike in exceptional

7 clearance when I was removed from the unit.

8          And then when the police chief had the

9 Department of Public Safety go in and look at the

10 exceptional clearance because he was with the

11 understanding that the exceptional clearance -- they

12 were doing things correctly, it was revealed that they

13 were not doing things correctly, and that what I had

14 done, in saying I wasn't going to do that, was right.

15    Q.   Do you have any knowledge or understanding of

16 how police officers are certified or recertified in

17 Connecticut?

18    A.   No, I don't.

19    Q.   And the only municipal police department that

20 you were actively engaged in the duties of patrol

21 officer and sergeant in your professional career have

22 been with the Austin Police Department; is that correct?

23    A.   Yes, ma'am.

24    Q.   While an officer with the Austin Police

25 Department, have you ever dealt with a criminal case

1    A.   No, ma'am.

2    Q.   Do you know what you would need to obtain

3 certification in Connecticut to instruct regarding

4 sexual assault response?

5    A.   I don't.

6    Q.   In general, with respect to police response to

7 a sexual assault complaint, where would you as an expert

8 on the subject look to find current information

9 regarding this subject?

10              MR. CHIMES:  Objection.  Form.

11              You can answer.

12   A.   Can you -- I'm sorry, can you repeat that

13 again?

14   Q.   (BY MS. MACCINI) With respect to police

15 response to a sexual assault complaint, where would you

16 as an expert on the subject look to find the most

17 current best information regarding this subject?

18   A.   Okay.  I -- I would go to End Violence Against

19 Women International, the International Association of

20 Chiefs of Police, maybe even the Department of Justice

21 on their gender-bias piece that came out a couple of

22 years ago.

23              Those would be the primarily -- the

24 primary best places, I think, for the most current

25 information and response in investigation of sexual

1    A.    Yeah, I did have handwritten notes in that I --

2 it had to have been in my bag that was taken, that took

3 my computer and my bag that had my computer, my

4 thumb drives, my attachments, and everything else.

5    Q.    What was the substance of those notes?

6    A.    Just taking notes on stuff as I was going

7 through on -- primarily, you know, on the -- the

8 interview with Officer Gompper, the interview with

9 Detective Colangelo, and the interview with Nodine.

10    Q.    All right.  I'd like you to take a look at

11 Defendants' Exhibit 1, which, again, for the record, is

12 your Expert Disclosure, your report, and your -- the

13 report has your CV attached as Exhibit 1.

14    A.    Yep.

15    Q.    Do you have that in front of you?

16    A.    I do.

17    Q.    Have you ever seen the first three pages of

18 Exhibit 1 before today?

19    A.    Yep.  Yes, ma'am.

20    Q.    When did you first see the first three pages of

21 Exhibit 1?

22    A.    Probably in June -- well, I don't know.  I

23 guess when it -- when they sent it to me.  In June,

24 maybe, I think, the end of June.

25    Q.    All right.  Turning to page 2, I'd like to

1 direct your attention to the last paragraph.  I'm going

2 to read it into the record.

3                    "Sergeant Donegan will testify

4 concerning the opinions and bases for her opinions in

5 her report attached hereto, including inter alia,

6 that; an experienced sexual assault investigator

7 following generally accepted standards for the

8 investigation of sexual assault cases would not have

9 submitted an arrest warrant against Nicole Chase for

10 the charge of making a false statement; Officer

11 Gompper and Detective Colangelo's response and

12 investigation of Nicole Chase's complaint failed to

13 meet generally accepted standards and practice for law

14 enforcement officers in their response/investigation

15 of sexual assault complaints; Officer Gompper and

16 Detective Colangelo's response to Nicole Chase failed

17 to meet generally accepted law enforcement standards

18 in the appropriate response to victims of

19 trauma/sexual assault; and Nicole Chase's reactions

20 and responses during and after the assault were

21 consistent with having experienced a traumatic

22 incident; in this case, a sexual assault."

23                    What I just read into the record, are

24 you in agreement with that, Ms. Donegan?

25     A.   Yes, ma'am.

1          Ms. Donegan, do you understand my

2 question?

3     A.   Yes, I do.

4          Looking at --

5     Q.   Can you tell me specifically what standards you

6 contend Officer Gompper did not follow?

7     A.   Looking at IACP and their response to sexual

8 assault, as well as End Violence Against Women

9 International in what is the appropriate response to

10 victims of sexual assault.

11    Q.   Are those authorities that you just listed

12 something that the police departments are mandated to

13 subscribe to?

14    A.   They -- they're not mandated, but they are

15 certainly what would be looked at as the most current

16 relevant practices working towards best practice in

17 response to sexual assault.

18    Q.   And the Austin Police Department adopted either

19 the IACP or the Violence Against Women International

20 protocol?

21    A.   Yes, ma'am.  They take classes on the online

22 training institute, and certainly with the IACP sexual

23 assault and the supplemental as well.

24    Q.   So is the Austin Police Department mandated to

25 follow IACP?

NICOLE CHASE vs NODINE'S SMOKEHOUSE, INC., ET AL.
Elizabeth Donegan on 08/07/2019

1    Q.   Do you know what -- go ahead.  Finish what you
2 were saying.

3    A.   Well, no, I didn't mean to interrupt you.  I'm
4 sorry, go ahead.

5    Q.   Do you know whether the Canton Police
6 Department had adopted anything from IACP?

7    A.   I do know that when I was going through the
8 documents, that they had the IACP supplemental
9 checklist, but that's only part of it.  So, yeah, they
10 did have part of it.

11    Q.   (BY MS. MACCINI) How about with the VAWI, did
12 you see that the --

13    A.   EVAWI?

14    Q.   -- Canton Police Department adopted that?

15          MR. CHIMES:  Let her finish.  Let her
16 finish.

17    Q.   (BY MS. MACCINI) Did you find in your review
18 that the Canton Police Department adopted the VAWI
19 protocol with respect to investigating sexual assaults?

20    A.   No, I didn't see any indication of that.

21    Q.   Okay.  Sticking with just the IAPP [sic]
22 response, what does IAPP recommend that -- that Officer
23 Gompper did not follow?

24    A.   I think in -- just in the general sense, where
25 she was being interviewed, first and foremost.  You

1 (indicating.)

2            To move things along, can I bring her

3 the whole sexual assault investigation policy?  I

4 mean, I gave her the whole general orders.  Do you

5 want me to help her get it?

6            MS. MACCINI:  Yes.

7            MR. CHIMES:  Thank you.

8            MS. MACCINI:  Sorry about that.

9            It's only a small section.

10            MR. CHIMES:  Here you go (indicating.)

11            For the record, I've directed her to

12 Section 6.6 and -- but, obviously, you want to look

13 for others.

14    Q.   (BY MS. MACCINI) All right, Ms. Donegan, you

15 have the Canton Police Department's General Order 6.6 --

16    A.   I do.

17    Q.   -- with an issue date of April 30, 2011, in

18 front of you?

19    A.   I do.

20    Q.   Is there an issue date -- okay, issue date of

21 April 30th of 2011?

22    A.   April 30th, 2011, yes, ma'am.

23    Q.   So the question that was pending was:  In what

24 manner did one or both of these officers break with this

25 general order?  How did they not follow it?

1    A.   I think it --

2    Q.   And if you can specify as to each officer.

3    A.   I think the sensitive professional behavior

4 toward the victim in order to minimize trauma is the

5 biggest one.

6              And then the detective, the

7 investigators, responding to reported sexual assault

8 shall -- we had a crime scene potentially, not only at

9 the restaurant but also, potentially, with evidence

10 that could have been collected, both on the victim and

11 on the suspect and in the bathroom.

12   Q.   Is that everything?

13   A.   "All personnel involved in the investigation of

14 a sexual assault case will perform their appointed

15 function efficiently, professionally, and humanely,

16 giving first priority to the physical and emotional

17 condition of the victim."

18   Q.   (BY MS. MACCINI) Anything else?

19   A.   I think those are the biggest ones that I saw,

20 is the lack of understanding about how trauma impacts a

21 victim and making a victim feel safe in order to

22 ascertain the information that we need to move the case

23 forward and to identify is there something that we need

24 to do immediately; you know, is there something that can

25 wait.  And so I think when we -- when we don't --

NICOLE CHASE vs NODINE'S SMOKEHOUSE, INC., ET AL.
Elizabeth Donegan on 08/07/2019

1     Q.   Okay.

2     A.   -- when we don't --

3          MR. CHIMES:  Are you finished?

4          Go ahead.  I think she jumped in.

5          Are you done?

6     A.   Well, when we don't minimize trauma, we often

7 don't get the information that we need in order to make

8 the best possible decisions about the case moving

9 forward, so that's a really big piece.

10    Q.   (BY MS. MACCINI) Okay.  All right.  Turning

11 back to Defendants' Exhibit 1, the plaintiff's Expert

12 Disclosure of you along with your report, do you have

13 that in front of you?

14    A.   Yes, ma'am.

15    Q.   So turning to the actual report, which is

16 Exhibit A to the Disclosure, do you see the actual

17 report dated July 1st, 2019?

18    A.   Yes, I do.

19    Q.   Did you -- did you draft that report?

20    A.   Yes, ma'am, I did.

21    Q.   Did anyone assist you in drafting that report?

22    A.   No.

23    Q.   Neither Attorney Chimes or Attorney Smith

24 assisted you in drafting the report?

25    A.   They didn't help me draft it.  They just put

**EXHIBIT C**

1          In having done the work both statewide,

2 nationally, and internationally on sexual assault, all

3 of that stuff played a part into -- I guess my level

4 of expertise in sexual assault.

5     Q.   Okay.  And did you review the warrant for

6 Mr. Chase's arrest?

7     A.   Yes, I did.

8          MS. MACCINI:  I will ask the court

9 reporter to mark that as Defendants' Exhibit 3.

10          (Defendants' Exhibit 3 marked).

11     Q.   (BY MS. MACCINI) Do you have the affidavit

12 marked?

13     A.   Yep, I do.

14     Q.   You have it -- you have it in front of you?

15     A.   Yes, ma'am.

16     Q.   Are you offering any opinion concerning the

17 warrant other than the opinion that it should not have

18 been submitted?

19     A.   I mean, is there something specific, like,

20 you're asking me about the warrant; or just that in

21 general, like, I don't think it should have been?

22     Q.   Well, it's my understanding based on my review

23 of the Disclosure in your expert report, the only

24 opinion you're offering with respect to the warrant is

25 that Detective Colangelo should not have submitted it;

1 is that right?

2    A.   I think in general, yeah, yeah.  I think in

3 general, that's accurate.

4    Q.   Well, did you find anything in the warrant to

5 be inaccurate based on your review of the matter?

6    A.   I wouldn't say it was necessarily inaccurate as

7 I don't think it was a full and thorough accounting of

8 what transpired; that there was information --

9    Q.   What else should have been in --

10    A.   Well, I think --

11    Q.   What else should have been in the warrant?

12    A.   Sorry.  I am so sorry I keep interrupting you.

13         That he had a -- conducted an interview

14 with Nicole in which she did tell him that the suspect

15 had sexually assaulted her, and although it wasn't

16 written, it was verbal, and that's -- that was a huge

17 piece of evidence that should have been included.

18    Q.   When you say "he," are you referring to

19 Detective Colangelo?

20    A.   Yes, ma'am.  Yes.

21    Q.   When did Nicole Chase tell Detective Colangelo

22 that she was sexually assaulted?

23         MR. CHIMES:  Objection to form.

24    A.   When they were conducting the videotaped

25 interview with her.

www.huseby.com          Huseby, Inc. Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco   Page 74

EXHIBIT C

1    Q.   (BY MS. MACCINI) Tell me what facts you rely on

2 to say that she expressed to Detective Colangelo that

3 she was sexually assaulted?

4    A.   I would have to go back and look at the video

5 for the exact wording, but when she said that the

6 suspect had pulled her into the bathroom and forced his

7 [sic] head down onto her [sic] penis -- or thereabouts,

8 you know.  I don't know the exact wording.  Like I said,

9 I don't want to tell you something that's not accurate,

10 but the general --

11   Q.   Let me ask you something that --

12   A.   Sure.

13   Q.   Go ahead.  I don't want to cut you off.  Go

14 ahead.

15   A.   No, just go ahead.  I apologize.

16   Q.   Did you actually review that video?

17   A.   I did.

18   Q.   Did you review the video of the interview?

19   A.   Yes.

20   Q.   And it's your memory that Ms. Chase told

21 Detective Colangelo that Mr. Nodine put his hands on her

22 and forced her to his genital region?  Is that what you

23 remember from that videotape?

24   A.   I don't know if it said that he put his hands

25 on her, I don't know the exact wording, but just that

**EXHIBIT C**

1 the -- the sexual contact that took place was not

2 consensual.

3     Q.    And what did Ms. Chase tell Detective Colangelo

4 that would have led to the conclusion that it was not

5 consensual?

6     A.    I think that she said that it was not something

7 that she wanted to or that it wasn't consensual, but

8 there needed to be additional follow-up by the detective

9 to -- there just needed to be more investigation that

10 needed to be done.

11             Nodine needed to be brought back in.

12 There was a lot of investigation, I think, that could

13 have been completed to determine exactly what had

14 occurred, but to the best of my recollection, it was

15 that this was an act that was not consented by Nicole.

16 It was perpetrated by Nodine.

17     Q.    Okay.  Let me -- let me -- let me read

18 something to you.  Okay?

19     A.    Okay.  Sure.

20     Q.    From a transcript of that interview.

21             Detective Colangelo says to Ms. Chase:

22 "You understand how important it is if you had any

23 kind of consensual physical contact with him that

24 night or prior, it's very important that the truth is

25 known to us?

1               "Ms. Chase:  I know.  I think I'm trying

2 to get myself to this point because --

3               "Detective Colangelo:  Take a deep

4 breath.  There's tissues right there.

5               "Ms. Chase:  Okay.  So, yeah, no, there

6 was never any -- there was no hugging, kissing,

7 anything sexual, any type of, 'Oh, I'd love you to try

8 to touch me.'

9               "Detective:  Okay.

10               "Ms. Chase:  It was just him.  He pulled

11 me in there and dropped them, and as soon as he told

12 me to do it, I just did it because I just didn't know

13 what to do.

14               "Detective Colangelo:  So you did give

15 him oral sex?

16               "Ms. Chase:  Yes."

17               What is described by Ms. Chase that

18 constitutes a forcible sexual assault?

19               MR. CHIMES:  Objection.  The quote that

20 you listed leaves out many other aspects of what she

21 said in the transcript, so...

22               But you can answer it under -- I object

23 to the form of the question.

24     Q.   (BY MS. MACCINI) Did you understand my

25 question?

**EXHIBIT C**

1    A.   I -- I did.

2            So it's the totality of the encounter

3 itself with bringing everything in, who he is.  She

4 said -- when she stated that, "He pulled me in there,"

5 that is not a consensual or agreeable act, and

6 Detective Colangelo needed to explore that more.

7            He used the words "oral sex."  When

8 consent is an issue, it's not oral sex.  So I think --

9 there was just -- clearly, in my opinion, she's using

10 language that she is used to, that most people are

11 used to, who are not experienced in working in this

12 space.  So she used consensual language along with

13 what Detective Colangelo had said.

14            But clearly when you have done a

15 complete and thorough investigation, it's clear to me

16 that this was not a consensual encounter.

17    Q.   You have to tell me, Ms. Donegan, you've been

18 disclosed as an expert witness in this case.  We're here

19 at the deposition.

20    A.   Uh-huh.

21    Q.   I've only read you a portion of the transcript.

22    A.   Uh-huh.

23    Q.   The interview went on for a long time after

24 that, and Detective Colangelo asked Ms. Chase where were

25 his hands and other specific questions to get to what

1 down his pants and performed oral sex on him, and that's

2 what occurred.

3     A.    Uh-huh.

4     Q.    So in reaching your conclusions in this case,

5 you have to discredit that, right?  You discredited what

6 Mr. Nodine told the police?

7     A.    You don't discredit it.  You support it by

8 corroborating evidence.  Other people she might have

9 told what happened.  You go out to the crime scene.  You

10 look, does he have a bump on his head.  You gather his

11 clothing, you gather her clothing.

12            I mean, there's other -- there's other

13 evidentiary investigative techniques that you pull

14 into an investigation so you can determine what

15 happened.  So you don't dismiss people out of hand.

16 You can't do that.

17    Q.    The crux of your opinion in this case is that

18 the defendant police officers did not appropriately

19 investigate a reported attempted sexual assault or

20 sexual assault; is that -- do I have your opinion

21 correct?

22    A.    Yes.

23    Q.    Okay.  In order to reach that opinion or

24 conclusion, you have to discredit Mr. Nodine's assertion

25 that it was a consensual encounter; am I right?

**EXHIBIT C**

1 in Connecticut is what it looks like.

2    Q.   (BY MS. MACCINI) What are the elements -- I

3 mean, there is different degrees of sexual assault,

4 correct?

5    A.   Right, and I understand that, but that varies

6 from state to state and all I'm saying is whatever

7 that --

8    Q.   Right.  So this --

9           MR. CHIMES:  Let her finish, Kristan.

10 Stop interrupting her.

11           "Police officers..."  Go ahead.

12    A.   Most police officers are going to go to their

13 Penal Code to determine what level of sexual assault it

14 is that they will need to follow up on, and it's only

15 relevant when you're writing your probable cause

16 affidavit.

17    Q.   (BY MS. MACCINI) What level of sexual assault

18 did Ms. Chase describe to Officer Gompper on May 6,

19 2017, in your opinion?

20    A.   I don't know what it is in Connecticut.  My

21 answer is I don't know what it is in the Connecticut

22 statute.

23           MR. CHIMES:  Again --

24    Q.   (BY MS. MACCINI) I'm not asking you what it is

25 in the Connecticut statutes, I'm asking you Texas law,

1 what -- you said that it's pretty much uniform.

2    A.   Right.

3    Q.   Under Texas law, what level of sexual

4 assault --

5    A.   That would have been an attempted sexual

6 assault --

7    Q.   -- would it have been.

8    A.   -- a third-degree felony.

9    Q.   Sexual assault in the third degree --

10            (Overlapping speakers.)

11   A.   Attempted sexual assault.

12            If he had done his job to explore what

13 exactly had transpired in that initial interaction

14 with Nicole as -- as this entire incident played

15 out -- what transpired was actually a sexual assault,

16 which is a second-degree felony.  An attempted sexual

17 assault in Texas is a third-degree felony.

18   Q.   All right.  If you can turn back to your

19 report, which is part of Defendants' Exhibit 1.

20            If you can turn to page 3.

21   A.   Okay.

22   Q.   You list the Calvin Nodine lobby interview as

23 something that you reviewed.  That's not correct, right?

24   A.   Where are you looking?

25   Q.   On page 3, see "Videotaped Interviews"?  Item

www.huseby.com            Huseby, Inc. Regional Centers            800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco    Page 105

EXHIBIT C

1    A.   Well, I mean, I think the language in relation

2 to sexual assault is not accurate.  That's -- that's --

3 that's what I'm saying.  So she -- she did not -- there

4 was -- she did not consent to that -- if you understand

5 about sexual assault, that was not a consensual

6 encounter.  So that's -- that's all that I'm trying to

7 convey to you.

8    Q.   (BY MS. MACCINI) From a criminal standpoint,

9 what force did she ever describe to officers --

10    A.   He grabbed her --

11    Q.   -- that would -- I'm sorry.  Let me finish my

12 question.

13           What force did she ever describe that

14 would -- that would be to the conclusion that it was

15 forced and not consensual?

16    A.   He grabbed her by the arm and pulled her in the

17 bathroom.

18    Q.   Anything else?

19    A.   The sexual assault itself was she acquiesced

20 out of fear.  He's in a position of authority to

21 potentially impact every aspect of her life as her

22 employer, coupled with the fact that her mom also worked

23 there.  There's lots of issues that --

24    Q.   What you're describing, is that -- what you're

25 describing, is that a civil or a criminal matter?

**EXHIBIT C**

NICOLE CHASE vs NODINE'S SMOKEHOUSE, INC., ET AL.
Elizabeth Donegan on 08/07/2019

1   A.   That's a criminal matter.  It's criminal.

2 That's all a part --

3   Q.   So because -- because she -- because she may

4 have acquiesced and performed oral sex on this man

5 because she was in fear of losing her job --

6   A.   That's absolutely --

7   Q.   -- there's probable cause on her to arrest

8 Mr. Nodine for sexual assault?

9           MR. CHIMES:  Objection.  Form.

10           You can answer.

11   A.   In -- yes.  In my professional opinion, he

12 would have been arrested for sexual assault.  There's no

13 question.

14   Q.   (BY MS. MACCINI) Sexual assault in the third

15 degree?

16   A.   Whatever it -- what that would be, whatever the

17 officer or the detective would file, that would be up to

18 the investigation.

19   Q.   Can you tell me what the elements of that crime

20 are that you have in your mind?

21   A.   It's a nonconsensual sexual encounter, which is

22 a sexual assault.

23   Q.   Well, when you started your deposition, you

24 told me that your definition of "sexual assault" was

25 "forcible sex without consent," right?

**EXHIBIT C**

```
 1    A.   Right.

 2              He forced his penis into her mouth.

 3    Q.   I'm sorry, what?

 4    A.   He forced his penis --

 5    Q.   What?

 6    A.   -- into her mouth.

 7              He forced his penis into her mouth.

 8    Q.   Okay.  That is not in the record of anything

 9 that was described to any officer that I have reviewed.

10              MR. CHIMES:  Okay.  Well, you -- is

11 that -- is that a question?

12    Q.   (BY MS. MACCINI) If you want to point out with

13 me where that is in the record that it was -- that was

14 told to an officer, I'd appreciate it.

15    A.   Okay.  Well, I mean, that is not the language,

16 but she acquiesced out of fear.  She did not

17 consensually engage in this encounter.

18              And that's -- you know, that's for law

19 enforcement to prove those elements of a crime, you

20 know, and that's why you conduct a victim-centered

21 investigation that is offender-focused, and you do a

22 complete and thorough investigation to determine the

23 truth, you know, whether or not you can file charges

24 or you can't.

25              And in many of these instances, we
```

1 cannot file charges because we can't overcome the

2 consent defense.  But that's incumbent upon law

3 enforcement to make that determination as they follow

4 the evidence through their investigation.

5     Q.   Once an officer commences an investigation and,

6 ultimately, the complainant describes an encounter in

7 which she tells the officer that the suspect had his

8 hands on a sink or in other places but not anywhere near

9 her, and she described an encounter in which she

10 willingly performed oral sex because she didn't want to

11 lose her job and she didn't know what else to do -- I

12 just want to make sure I'm clear on the record -- you

13 would describe that -- that is a criminal act and this

14 man could have been described with sexual assault?

15               MR. CHIMES:  Object --

16               Hold on.

17               I need to object to that.  It's a

18 misstatement of the evidence.

19               But you can answer the question.

20     A.   If they conducted a thorough investigation and

21 they determined that it met the elements of a sexual

22 assault, then, yes.  But that is on the police to ensure

23 that they conduct a thorough investigation.

24               And like I said, wherever the evidence

25 leads us, that's where we go, you know, but she --

1 that was not, as described by Nicole, a consensual

2 encounter.

3           It's much like if you're raped by your

4 husband:  People can argue that, well, you're lying in

5 bed with him.  You performed sexual acts with him

6 previously.  If your husband controls everything in

7 your life, including your ability to make a living, or

8 it's an emotional, violent relationship, those acts

9 are not consensual.

10           95 percent of sexual assaults are

11 committed by a perpetrator who is known to the victim.

12 And victims are targeted.  And because of her

13 vulnerability that he was her boss and that he -- he

14 was able to basically control everything in her life

15 through the paycheck, that's -- that is what I'm

16 counting.

17           Now, whether or not they could have

18 filed charges, we don't know because there wasn't a

19 thorough and a complete investigation.  There's a lot

20 of evidence that was lost early on that might have

21 helped corroborate Nicole's account or might have

22 helped Nodine, but we don't know because that wasn't

23 done.

24     Q.   (BY MS. MACCINI) All right.  Turn to page 10 of

25 your report -- actually, turn to the first page of your

www.huseby.com          Huseby, Inc. Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco     Page 114

EXHIBIT C

1 coordinate that.

2            MS. MACCINI:  I'm sorry.  What?  What?

3            MR. CHIMES:  Our secondhand is at

4 25 seconds now, just so you can be exact.

5            MS. MACCINI:  Okay.

6            THE REPORTER:  Off the record.

7            What is your order while we are on the

8 record?

9            MS. MACCINI:  I will take an E-tran,

10 condensed copy, and hard copy.

11            (Recess from 12:28 p.m. to 12:46 p.m.)

12    Q.   (BY MS. MACCINI) Back on the record.

13            Ms. Donegan, if you could turn to

14 page 10 of your expert report that has been marked as

15 Exhibit 1.  Are you on page 10?

16    A.   Yes, ma'am.

17    Q.   All right.  So it's entitled, "Officer Gompper

18 and Detective Colangelo's investigation of Nicole

19 Chase's complaint failed to meet generally accepted

20 standards for investigation of sexual assault

21 complaints."

22            And then under Number 1, you have

23 "Officer Gompper Initial Interview."

24    A.   Uh-huh.

25    Q.   And then you have "Response should have

NICOLE CHASE vs NODINE'S SMOKEHOUSE, INC., ET AL.
Elizabeth Donegan on 08/07/2019

1 included," and you have a number of bullet points that

2 you have listed what Officer Gomper's response should

3 have included, correct?

4     A.   Page 9?

5              MR. CHIMES:  For the record, this is

6 page 9.  I'm sure that was --

7              MS. MACCINI:  Oh, I'm sorry.  Did I say

8 page 10?

9              MR. CHIMES:  Yes.

10              MS. MACCINI:  Oh, I'm sorry, page 9.

11     A.   Yes, I've got it.

12     Q.   (BY MS. MACCINI) Page 9.  Do you see what I'm

13 talking about?

14     A.   I do.

15     Q.   Under B1, Section B1 on page 9, all those

16 bullet points that you have listed there, Officer

17 Gompper's response should have included this had he been

18 dealing with a sexual assault complaint, correct?

19     A.   Yes.

20     Q.   Okay.  And it's your opinion that, based on the

21 information he was provided with by Nicole Chase on

22 May 7th, 2017, that he should have known she was

23 complaining of a sexual assault.  That's your opinion,

24 right?

25     A.   That's my opinion.

**EXHIBIT C**

NICOLE CHASE vs NODINE'S SMOKEHOUSE, INC., ET AL.
Elizabeth Donegan on 08/07/2019

1    Q.   And under what Connecticut statute would

2 Officer Gompper have been -- what crimes would he have

3 been investigating, under what Connecticut statute?

4              MR. CHIMES:  Objection to form.

5              Do you want me to show her the statutes?

6    A.   I'll look it up.

7              MS. MACCINI:  No, I don't want you to show

8 her the statute.  I want to know what she thinks.

9    A.   It would have come across as an attempted

10 sexual assault.

11   Q.   (BY MS. MACCINI) You're the expert witness here

12 and you're an expert in sex crimes and I understand that

13 you -- Connecticut is not your jurisdiction, but you've

14 been offering -- you're telling me that he should have

15 done these -- one, two, three, four, five, six, seven,

16 eight, nine, ten, eleven, twelve things --

17   A.   Uh-huh.

18   Q.   -- because he was dealing with a sexual

19 assault.  Do you have -- articulate for me under what

20 Connecticut statute.

21   A.   Well, I'll tell you --

22              MR. CHIMES:  Do you want me to show her

23 the list of things that we provided her, or not?

24 Because it's in -- it's in the -- it's in the

25 Disclosure.  I mean, if you don't want me to do that, I

**EXHIBIT C**

1 won't do that.

2            MS. MACCINI:  Whatever she needs to do to

3 answer the question, but I think that she needs to tell

4 us what that is, not you.

5    A.   Okay.  Let me give you the exact statute and

6 I'll tell you what it is.

7    Q.   (BY MS. MACCINI) Okay.

8    A.   It's going to be 53a-65 that you had mentioned

9 previously.

10   Q.   Well, 53a-65 is the definition.

11   A.   Right.

12   Q.   The definition.

13            So what -- what is the actual statute

14 that describes the elements that you have in mind?

15            MR. CHIMES:  You can answer if you know.

16   A.   I don't know exactly because I don't know, I'm

17 not familiar with the statutes without looking at the

18 Texas -- at the Connecticut Penal Code.  Just like most

19 police officers.

20   Q.   (BY MS. MACCINI) Have you ever looked at the

21 Connecticut Penal Code?

22   A.   I looked at whatever documents I was sent, yes,

23 ma'am.  If it was in the documents, I looked at it.

24   Q.   So your opinions in this case are based off

25 portions of the Connecticut Penal Code that plaintiff's

**EXHIBIT C**

1    Q.    But can you tell me what you would -- you would

2 be investigating an attempted sexual assault; that's

3 your opinion, right?

4    A.    I would say it was more than an attempted

5 sexual assault, but, yes, that's what he would be

6 looking at initially.

7              It's like any crime type:  People come

8 in and they say, "Hey, I was robbed," when, in fact,

9 it's a burglary.  That's incumbent upon the police to

10 do their job to determine what occurred.

11             And that's all he had to do, was just

12 ask a few more questions in a setting that was

13 conducive for extrapolating that information from her.

14 That's all that I'm saying.  At the very least, he had

15 that --

16    Q.    So now --

17             (Overlappings speakers.)

18    A.    -- stated, and he didn't hear it.

19    Q.    (BY MS. MACCINI) So now I'm -- now I'm

20 confused.  Did he need to ask more questions in order

21 for there to be further investigation, or did he have

22 enough information that there should have been further

23 investigation?

24    A.    There should have been further investigation.

25 He would have determined if he would have asked

**EXHIBIT C**

1 additional questions that, according to Nicole, what

2 happened was a sexual assault.  So you then had several

3 crime scenes that should have been responded to that day

4 and search warrants written.

5     Q.   Okay.  So I think I'm understanding you.

6     A.   Okay.

7     Q.   In order to get to the twelve things that you

8 have bulleted here that he had to do next, first he had

9 to ask Ms. Chase more questions to get more information

10 from her in order to get the information he needed for

11 there to be an attempted sexual assault that he could

12 investigate?

13          MR. CHIMES:  Objection.  Form.

14     A.   No, it was an attempted sexual assault with the

15 information that he was given.  But, yes, if he had

16 asked additional --

17     Q.   (BY MS. MACCINI) What made --

18          MR. CHIMES:  Let her -- let her finish.

19          Wait, hold on, stop.  Let her finish.

20          Finish your answer.

21     A.   If he had asked additional information, he

22 would have learned that he had all of this to do that

23 day, but he neglected to ask additional information that

24 would have led him in the direction of a more thorough

25 investigation being conducted that day.  I mean, he did

1 have information that Nodine had a potential injury to

2 his head.  So, I mean, that, at the very least, could

3 have been done.

4                 And so that's what I am conveying to

5 you, is after that initial interview and asking the

6 appropriate questions, which would have been done in a

7 private room, he would have been able to follow all of

8 these additional steps which is required in this

9 particular case.

10     Q.   (BY MS. MACCINI) On the bottom of page 9, you

11 say "Officer Gompper's written statement from Nicole

12 Chase on May 11, 2017," and then you list a number of

13 things he should have done with respect to that --

14     A.   Yes.

15     Q.   -- the taking of that statement.

16                 And you indicate that Officer Gompper

17 should have videotaped his interview of Chase.

18     A.   Uh-huh.

19     Q.   What is your basis for that opinion?

20     A.   That's the most accurate account of what

21 transpired.

22                 What we know is that we often take what

23 we think might be important at the time and put that

24 into a written statement form, and it's not

25 necessarily an accurate account of what transpired.

**EXHIBIT C**

1 believe that an attempted sexual assault or a sexual

2 assault, whatever they had determined at that point, has

3 occurred.

4            And you have -- you're asking for his

5 phone records so you can corroborate Nicole stating

6 that the wife had called during the time of the sexual

7 assault.  It's corroboration, is that -- what you are

8 consistently looking for.

9     Q.   Would you agree with me, Ms. Donegan, that

10 Ms. Chase never mentioned any sexual contact between

11 herself and Mr. Nodine when she spoke with Officer

12 Gompper in the lobby.

13     A.   Yes, I agree.

14     Q.   And did you review the report that she

15 complained to the dispatcher when she came in to the

16 police department that day?

17     A.   I did, but, I mean, I don't know, necessarily,

18 if that's what she had reported or that's what that was

19 interpreted as.

20     Q.   Okay.  According to the dispatcher, she

21 indicated she wanted to complain about workplace sexual

22 harassment, right?

23     A.   Right.

24     Q.   And Officer Gompper was told that the nature of

25 her complaint was workplace sexual harassment?

```
 1     Q.   (BY MS. MACCINI) Ms. Donegan --

 2     A.   Yes.

 3     Q.   Ms. Donegan --

 4     A.   I said "yes," I'm sorry.  Yes.

 5               Did you hear me?

 6     Q.   I'm just -- yeah.  I'm just trying to

 7 understand what your opinion is, and it could vary based

 8 on the day -- you know, it could vary from May 7, 2017,

 9 when she made her first report, to her last exchange

10 with Detective Colangelo.  I just want to make sure that

11 it's clear for the record.

12               Is it your opinion that Ms. Chase

13 reported a sexual assault or an attempted sexual

14 assault or both?

15     A.   With all -- it would be a sexual assault, is

16 what she would have reported.

17     Q.   At the end of --

18     A.   At the end of -- at the end of the day --

19     Q.   Okay.

20     A.   -- it was a sexual assault.

21     Q.   Okay.  And that -- the sexual assault -- it is

22 your opinion that she reported a sexual assault in the

23 June 21st, 2017, interview with Colangelo?

24     A.   Yes.

25     Q.   Her last interview.  Okay.
```

**EXHIBIT C**

NICOLE CHASE vs NODINE'S SMOKEHOUSE, INC., ET AL.
Elizabeth Donegan on 08/07/2019

```
 1    A.   Well, I mean, he didn't go into enough detail

 2 to -- he should have done a better interview to

 3 determine whether or not we could file charges for the

 4 sexual assault, which he did not.

 5    Q.   Okay.

 6    A.   He stopped way too soon.

 7    Q.   Okay.  And that is with respect to the

 8 June 21st, 2017, interview?

 9    A.   Yes, ma'am.

10    Q.   That's your opinion.

11              With respect to the May 7th, 2017,

12 conversation with Officer Gompper, is it your

13 contention or opinion that Ms. Chase described to him

14 an attempted sexual assault on that date?

15    A.   Yes.  There was semen -- semen that she smelled

16 and it probably -- it doesn't -- go ahead.

17    Q.   If she didn't report smelling semen on May 7th,

18 2017, then, in that case, would she -- would it not have

19 risen to the level of an attempted sexual assault in

20 your mind?

21    A.   No.  I mean, I think -- they didn't ask the

22 right questions nor go into any further details, which

23 would have helped us at that time to help us understand

24 what had transpired, but what little she did say should

25 have piqued his interest to understand that, at the very
```

www.huseby.com          Huseby, Inc. Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco     Page 156

EXHIBIT C

1 I mean, like, again, they would have to do more

2 investigation, which they didn't.

3    Q.   (BY MS. MACCINI) So you would agree with me

4 that these officers never had information sufficient to

5 charge Mr. Nodine with any crime --

6             MR. CHIMES:  Objection.

7    Q.   (BY MS. MACCINI) -- of a sexual assault nature?

8             MR. CHIMES:  Objection.  Form.

9    A.   Well, they didn't --

10    Q.   (BY MS. MACCINI) Or that they didn't have

11 enough information to charge him with sexual assault in

12 any degree?

13             MR. CHIMES:  Objection.

14    Q.   (BY MS. MACCINI) For first, second, third,

15 fourth.

16             MR. CHIMES:  Wait.

17    A.   They didn't do their investigation to determine

18 that, so that's -- that's wherein lies the problem.  If

19 they had done an appropriate investigation, they would

20 have been able to determine whether or not they had

21 enough to charge Nodine with a crime or not; but since

22 they did not conduct a complete and thorough

23 investigation, I mean, you can't -- on -- in any

24 particular kind, write a probable cause affidavit if you

25 haven't done a complete and thorough investigation and

**EXHIBIT C**

1 it meets the elements of the crime.

2     Q.    (BY MS. MACCINI) So all of your opinions in

3 this case are contingent on the officers doing further

4 information what you believe would have led them to find

5 probable cause for sexual assault or attempted sexual

6 assault?

7                   MR. CHIMES:  Objection to form.

8                   That's not what she said.

9     Q.    (BY MS. MACCINI) Is that your opinion?

10    A.    My opinion -- what I'm telling you is that they

11 didn't do their job, which would lead us to believe that

12 a sexual assault or an attempted sexual assault

13 occurred; but at every step of the response in the

14 investigation, they didn't do what was necessary to

15 determine whether or not a sexual assault had occurred.

16    Q.    You would agree with me that false reports

17 happen in sexual assault cases, right?

18    A.    They do.

19    Q.    And they happen in all crimes, right?

20    A.    They do.

21    Q.    False reports happen in all investigations,

22 right, from time to time?

23    A.    That's correct.

24    Q.    And it's part of your job as a member of law

25 enforcement to uncover the truth, whatever that may be,

NICOLE CHASE vs NODINE'S SMOKEHOUSE, INC., ET AL.
Elizabeth Donegan on 08/07/2019

```
 1 FOR DEFENDANTS TOWN OF CANTON AND OFFICER ADAM GOMPPER
   AND DETECTIVE JOHN COLANGELO:
 2
        MS. KRISTAN M. MACCINI (VIA VIDEO CONFERENCE)
 3      Howd & Ludorf, LLC
        65 Wethersfield Avenue
 4      Hartford, Connecticut 06225-1190
        Telephone: 860.249.1361
 5      E-mail: kmaccini@hl-law.com

 6

 7      That $_____ is the deposition officer's charges

 8 to the Defendants for preparing the original deposition

 9 and any copies of exhibits;

10      I further certify that I am neither counsel for,

11 related to, nor employed by any of the parties in the

12 action in which this proceeding was taken, and further

13 that I am not financially or otherwise interested in the

14 outcome of this action.

15      Certified to by me on this 22nd day of

16 August, 2019.

17

18

19      _____

20                         April Balcombe, CSR, RPR, CRR, CRC
                           Expiration Date: 12/31/19
21
                           Huseby Global Litigation Support
22
                           1230 West Morehead Street
23                         Suite 408
                           Charlotte, North Carolina 28208
24                         (T) 800.332.2082
                           (F) 800.442.2082
25
```

**EXHIBIT C**