UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| NICOLE CHASE | : | |
|     Plaintiff, | : | |
| | : | No. 3:18-cv-00683 (VLB) |
|   v. | : | |
| | : | |
| NODINE'S SMOKEHOUSE, INC., et | : | September 29, 2020 |
| al. | : | |
|     Defendants. | : | |
| | : | |
| | : | |
| | : | |

## MEMORANDUM OF DECISION ON TOWN DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, DKT. 141 AND RELATED MOTIONS

Plaintiff Nicole Chase ("Plaintiff" or "Ms. Chase") brings a twenty-count complaint against Nodine's Smokehouse, Inc. ("NSI"), Calvin Nodine ("Mr. Nodine"), the Town of Canton, Connecticut, John Colangelo, a detective in the Canton Police Department, and Adam Gompper, a former Canton police officer (collectively the "Town Defendants"). [Dkt. 116 (Sec. Am. Compl.)]. Plaintiff alleges that she was sexually assaulted by Mr. Nodine while she worked at NSI. *See generally id.* ¶¶ 27-59. The following day, she reported the alleged sexual assault to the Canton Police Department, which eventually resulted in them charging her criminally with making a false statement, in violation of Conn. Gen. Stat. § 53a-157b. *See generally id.* ¶¶ 60-176. At the conclusion of discovery, the Town Defendants moved for summary judgment on all claims. [Dkt. 141 (Town Defs. Mot. for Summ. J)].  For reasons set forth here, the Court DENIES the Town Defendants' Motion for Summary Judgment, except with respect to the Town of Canton's

Motion for Summary Judgment as to Count 19 for intentional infliction of emotional distress.

<u>Background</u>

The following facts are taken from the Local Rule 56 statements of material facts and evidence cited by the parties. The facts are read in the light most favorable to the non-movant, Ms. Chase. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 255 (1986).

Plaintiff began working at NSI's factory in September 2016 and started working at Nodine's Restaurant in Canton, Connecticut when it opened two months later. [Dkt. 162 (NSI Answer to Sec. Am. Compl.) ¶¶ 27-28]. Calvin Nodine is a part owner of NSI and managed operations at the restaurant. [Dkt. 146 (Pl. Local R. 56(a)(2)) ¶ 4]. Plaintiff alleges that Mr. Nodine drank alcohol at work and made crude comments to her, including comments of a sexual nature. [Dkt. 116 (Sec. Am. Compl.) ¶¶ 30, 36-38, 42]. Mr. Nodine and NSI generally deny these allegations. [Dkt. 162 (NSI Answer to Sec. Am. Compl.) ¶¶ 30, 33-38]; [Dkt. 161 (Nodine Answer to Sec. Am. Compl.) ¶¶ 30, 36, 38, 42]. Since Plaintiff settled her claims against NSI and Mr. Nodine, the Court need not consider the factual basis for Plaintiff's workplace-tort, harassment, and retaliation claims.

With respect to Plaintiff's claims against the Town Defendants for false arrest and malicious prosecution, Plaintiff argues that the only information relevant is evidence relied upon by the defendant-police officers when drafting the arrest warrant. [Dkt. 149 (Pl. Mem. in Opp'n) at 1](citing *Panetta v. Crowley*, 460 F.3d 388,

2

395 (2d Cir. 2006); *Ricciuti v. New York City Transit Auth.*, 124 F.3d 123, 128 (2d Cir.1997); *Rae v. County of Suffolk*, 693 F.Supp.2d 217, 223–24 (E.D.N.Y. 2010)). The Court agrees. "Courts evaluating probable cause for an arrest must consider those facts available to the officer at the time of the arrest and immediately before it." *Lowth v. Town of Cheektowaga*, 82 F.3d 563, 569 (2d Cir. 1996), *as amended* (May 21, 1996)

On May 7, 2017, Plaintiff and her mother went to the Canton police station to report that she was the victim of inappropriate sexual conduct by Mr. Nodine at the restaurant the prior evening. [Dkt. 150 Pl. Local R. 56(a)(2)) ¶¶ 3-6]. Plaintiff and her mother, who also worked at NSI, met with Officer Adam Gompper in the police station's front lobby. [*Id.*]. Officer Gompper conducted the entire interview in the front lobby of the police department which was visible from the street through large pane glass windows.  The Court viewed the video in its entirety, which Plaintiff and the Town Defendants both manually filed as an exhibit. [Dkt. 141 (Town Def. Exs.) Ex. E]; [Dkt. 150 (Pl. Exs.) Ex. 6](hereinafter 05/07/2019 video).

The Town Defendants characterize Plaintiff's statement to Officer Gompper as reporting sexual harassment. [Dkt. 141 (Town Defs. Local R. 56(a)(1)) ¶¶ 3-6]. Plaintiff never used the term "sexual harassment" during the meeting. Rather, her oral statement provided background, extraneous details about the tumultuous work environment at the Canton restaurant and a description of Mr. Nodine's alleged misconduct. According to Plaintiff, at the start of the workday, Mr. Nodine asked her, "did you get laid last night?" [05/07/2019 video at 2:25-2:34]. Plaintiff claimed that Mr. Nodine drank beer throughout the day and was intoxicated. [*Id.* at

3

2:35-3:05]. She said at the end of the night, Mr. Nodine told the other employees that they were closing, but the dishwasher was still mopping the floor. [*Id*. at 4:46-5:42]. Plaintiff told Officer Gompper that, at the end of the night, Mr. Nodine hugged her and told her that she was the best worker, which she thought was a genuine compliment. [*Id*. at 4:13-4:45]. As the dishwasher, Kyle [Rouleau], was leaving and saying goodbye, Mr. Nodine allegedly exposed his genitals to Plaintiff and then pulled her into the bathroom and shut the door. [*Id*. at 6:30-7:06, 10:19-11:15]. Plaintiff told Officer Gompper that Mr. Nodine said, "I know you must not get it at home so suck it, or something." [*Id*. at 7:26-7:35]. Plaintiff stated she exited the bathroom once she heard Kyle leave, at which point Mr. Nodine struck his head on the wall because he was intoxicated. [*Id*. at 7:48-8:16]. Plaintiff stood to demonstrate her proximity to Mr. Nodine and their movements. [*Id*. at 6:30-8:40].

During this initial meeting, Plaintiff was ambivalent about how she wanted to proceed.  She expressed that she "… just wanted a complaint because I know he's a rich man, and I can't do shit about it, and I have no proof…" [*Id*. at 7:38-7:45]. She later stated that she was "going up against a millionaire." [*Id*. at 13:02-13:06]. Officer Gompper told her that it "didn't make it right" and explained the investigative process to Plaintiff. [*Id*. at 13:09-13:38].

Officer Gompper told Plaintiff that he "doesn't think it reaches the level of a sex assault..." [*Id*. at 13:38-13:41]. Officer Gompper told her that she could come back and make a formal report later. [*Id.* at 18:21-18:48, 21:48-22:40]. He suggested that she could "… also try to tell him how he made you feel that way, like I don't need that stuff, I don't appreciate that, don't talk to me that way." [*Id*. at 22:55-

4

23:01]. At the conclusion of the meeting, Officer Gompper gave her a victim's services card. [*Id*. at 25:36-26:31]. Officer Gompper told her that if she wanted to make a complaint about the incident, she would have to wait until he returned to duty on Thursday, which was May 11, 2017. [*Id*. at 26:32-28:19].

Ms. Chase returned to the police station sometime before May 11, 2017 and Sergeant Mark J. Penney told her that she would need to speak with Officer Gompper. [Dkt. 141-11 (Town Defs. Exs), Ex. H (Penney Depo.) 48:20-49:12]. Sergeant Penney testified that he could not recall the specifics of the conversation except that he referred Plaintiff to her attorney because she was seeking legal advice about how to proceed with her employment at NSI. [*Id*. at 49:13-49:20, 51:12-51:23]. Plaintiff testified that Sergeant Penney suggested that she retain an attorney. [Dkt. 150-3 (Pl. Exs) Ex 2, (Chase Depo.) 67:14-67:17]. During Plaintiff's subsequent interview with Detective Colangelo, discussed *infra*, Plaintiff told the detective that Sergeant Penney told Plaintiff, "… I strongly, now I strongly suggest- you go and go talk to a lawyer," … "I was like, okay, so if he's saying, like, if this is a cop saying I should strongly go to a lawyer, so, I should go." [Dkt. 141 (Town Defs. Exs) Ex. O, (Chase interview, 06/21/2017) at 44:00-44:44].

Plaintiff returned to the police station on May 11th to lodge a formal complaint with Officer Gompper against Mr. Nodine. [Dkt. 141 (Town Defs. Local R. 56(a)(1)) ¶¶ 42-45]. Alexandria Archer, another NSI employee, accompanied Plaintiff to the police station and provided a sworn witness statement prior to Plaintiff's interview. [Dkt. 141 (Town Defs. Local R. 56(a)(1) ¶¶ 44, 48, 51]; [Dkt. 141-14 (Town Defs. Exs.), Ex. K (A. Archer Statement, 05/11/2017)]. In her short statement, Ms. Archer states

that she observed Mr. Nodine place his hand on Plaintiff's buttocks the day of the alleged assault, that he followed her around, and that she overheard him making sexual jokes/comments directed towards or at Plaintiff. [*Id.*]. Plaintiff was not present for Ms. Archer's interview. [Dkt. 150 (Pl. Exs.) Ex. 1, (Gompper Depo) 134:19-134:25].

In Plaintiff's written statement, she repeated her earlier statement about Mr. Nodine's alleged sexualized comments towards her on May 6th. [Dkt. 141-13 (Town Defs. Exs.), Ex. J (Chase Statement, 05/11/2017)]. She also alleges that Mr. Nodine placed his hand on her buttocks earlier that day. [*Id.*]. She repeated her earlier statement to Officer Gommper that, once other employees were leaving for the evening, Mr. Nodine hugged her and then pulled her into the bathroom where he exposed his erect penis to her. [*Id.*] She alleges that he said, "suck it cause I know you don't get it at home," and that "as he was saying this he grabbed his testicles and penis and lifted it up towards me." [*Id.*]. She claimed to have pushed Mr. Nodine, such that he struck his head, and she unlocked the door and walked out. [*Id.*]. According to her statement, she claimed that Mr. Nodine made additional sexualized comments the following day. [*Id.*]. The parties dispute whether Officer Gompper administered an oath to either Ms. Archer or Ms. Chase. [Dkt. 150 (Pl. Local R. 56(a)(2)) ¶¶ 47, 49-50].

Just above the witness/victim's signature block on the Canton Police Department's Voluntary Statement Form, DPS-633-C (Rev. 11/05/13) it states "By affixing my signature to this statement, I acknowledge that I have read it and / or have had it read to me and it is true to the best of my knowledge & belief." Nothing

in the form states that the witness is swearing that the statement is complete, nor is the witness affirming that they took an oath before making the statement, i.e. an oath to tell the whole truth. Comparatively, the police officer's signature block states that they administered the victim or witness's oath. [Dkt. 141-13 (Town Defs. Exs.) Ex. J., (Chase Statement, 05/11/2017)].

Kyle Rouleau, the dishwasher at the restaurant, provided a sworn written statement the following day to Officer Gompper. [Dkt. 141-16 (Town Defs. Exs.), Ex. M (Rouleau Statement, 05/12/2017)]. Like Ms. Archer, Mr. Rouleau stated that he observed Mr. Nodine following Ms. Chase around on May 6th. [*Id*]. A reasonable jury could find that his statement to police corroborated Ms. Chase's initial oral statement to Officer Gompper in the police station lobby.  Like Plaintiff, he swore that he called out to Mr. Nodine and Plaintiff as he was leaving the restaurant for the evening and then he heard a bathroom door slam. [*Id*.]. He also alleged that Mr. Nodine makes crude remarks and provided additional examples unrelated to Ms. Chase. [*Id*.]. There are no video recordings of Ms. Chase, Mr. Rouleau, or Ms. Archer making their written statements.

Thereafter, on May 18, 2017, Canton Detective John Colangelo, assisted by Officer Gompper, interviewed Calvin Nodine in the presence of his attorney, David Moraghan. [Dkt. 150-21 (Pl. Exs.) Ex. 18, (Gompper Police Report, 05/19/2017)]. The Court has reviewed the video recording of this interview in its entirety from both vantage points. [Dkt. 141 (Town Defs. Exs.) Ex. O, 05/18/2017 video)]; [Dkt. 150 (Pl. Exs.) 20](same) (hereinafter 05/18/2017 video). The discussion is markedly different than Officer Gompper's meeting with Plaintiff about two weeks prior.

The interview occurs in a private room. [05/18/2017 video, 0:52-3:50]. It is fraternal and opens with a jovial conversation between Detective Colangelo and Attorney Moraghan regarding mutual acquaintances golfing and a private golf club. [*Id*.]. Mr. Nodine confirmed that on the day in question, he was at the restaurant with Plaintiff, Ms. Archer, and Mr. Rouleau. [*Id*. at 9:02-9:10]. Mr. Nodine stated that he was in the bathroom when Mr. Rouleau said goodbye and departed for the evening. [*Id*. at 12:29-13:12]. Detective Colangelo then asked Mr. Nodine whether anyone was in the bathroom with him; Mr. Nodine said no. [*Id*. at 13:01-13:07.]. That was untrue.

Detective Colangelo then confronted Mr. Nodine with his summary of Plaintiff's statement that Mr. Nodine pulled her into the bathroom and that he exposed himself to her. [*Id*. at 14:12-15:09]. Mr. Nodine responded that her allegation was "bullshit." [*Id*. at 15:10-15:12]. Detective Colangelo confronted Mr. Nodine with the fact that Mr. Rouleau's statement corroborated that Ms. Chase was likely still in the restaurant when Mr. Rouleau said goodbye that evening because her backpack was there. [*Id*. at 15:25-16:23]. In response, Mr. Nodine volunteers that "she could have been out front having a cigarette, I don't know where she was." [*Id*. at 16:21-16:29]. That statement was also false.

In response to Detective Colangelo's next question, Mr. Nodine speculates that Ms. Chase made a false accusation because she is looking for money, to which Detective Colangelo responds that "that's one of the angles I'm looking at." After that, Detective Colangelo then suggests that:

**but if you were fooling around with Nicky consensually, that's a whole different story, and it's a tough question but it might open up why she's already gotten an attorney, and come down here, and all that kind of stuff. Like I said, I'm not going out, calling your wife, saying- guys do what guys do, trust me. I mean, you know, enough cops get divorced because of it and all that kind of stuff, but, if that's the thing that was happening, that's, that, maybe starts to explain some of this stuff.**

[*Id*. at 17:03-17:32].

In response, Attorney Moraghan requested the opportunity to speak privately with Mr. Nodine and they did so for about six minutes. [*Id*. at 17:34-24:18]. Before resuming questioning, Detective Colangelo suggested again that Plaintiff had a financial motivation. [*Id*. at 25:09-25:28, 26:15-27:21]. Then, Mr. Nodine changed his story to state that Ms. Chase pulled him into the bathroom, lowered his pants, and that she spontaneously performed fellatio on him. [*Id*. at 27:40-28:10]. Mr. Nodine claimed that he was surprised by Ms. Chase's spontaneous act, denied that there was any other contact with Ms. Chase or any other employees, and claimed they were not previously flirting. [*Id*. at 30:00-31:11]. Detective Colangelo never asked Mr. Nodine whether he struck his head or asked to see whether he had an injury.

When Detective Colangelo pointed out that Mr. Nodine's story changed, he replied that he was "trying to protect himself." [*Id*. at 28:55-29:08]. Detective Colangelo then commiserates with Mr. Nodine and his attorney about being the subject of a potential civil action, citing an example of a citizen who attempted unsuccessfully to find a lawyer to assert a claim of police brutality against Detective Colangelo. [*Id*. at 28:18-29:55]("everyone wants a slice of someone else's pie").

About ten minutes later, Detective Colangelo initiates discussion about polygraph tests. He states that he cannot ask Ms. Chase to take a polygraph test, which he characterizes as a "problem with sex assault cases." [*Id.* at 38:25-39:09]. Later Detective Colangelo states that, "I'd ask her, but I can't, legally. I want to know what happened- and, and you know that there's a civil aspect to this, which is none of my- dealings with, I don't care, I'm not part of it- well, I care if she rips somebody off, of course." [*Id.* at 41:35-41:55].

After Attorney Moraghan and Mr. Nodine speak privately again, Mr. Nodine asks for a courtesy notice if a warrant is issued to avoid having a SWAT team deployed, which Detective Colangelo agrees to. [*Id.* at 45:12-46:12]. Detective Colangelo goes on to state that he could have written a warrant already, but that he was trying to find out the truth and who "…seeing who the victim may really be…" [*Id.* at 46:18-46:40]. The following exchange occurred next:

> DETECTIVE COLANGELO:  …I'll tell you my theory behind it is, if you pass a polygraph, she can be brought in and now she can be really [unintelligible]. It gives us leverage, to see if the story changes. And that's a big thing. And I had a case, and it was a sex assault complaint,
>
> I could prove pretty substantially that it was a fake. And she put the whole town on this girl's - you know - it was a tactic. She put the whole town on - you know how these things can be, can go - once I knew it was a fake complaint, in my - in my writings, in what I wrote to the state's attorney, she's no longer a victim of sex assault. Because I've proven it's not real. Now she's a suspect in a false statement investigation. In a false police report. Now she can be asked if she can take a polygraph. Completely different animal. So, we switched the case. That's, all-
>
> NODINE'S ATTORNEY:  Mm-hmm.
>
> DETECTIVE COLANGELO:  Okay. And that was okay by the state's attorney at the time. That's probably going back seven or eight years, but and it's a different supervising state's attorney up there, with Roseanne Wagner, and Carl and Joe, and who's the D.A.?

**NODINE'S ATTORNEY:  [Unintelligible.]**

**DETECTIVE COLANGELO:  Do you know Carl? He's a good guy. Um, so. So, that's where we sit.**

[*Id*. at 47:10-48:30].

Detective Colangelo told Mr. Nodine that "…so do I give you a bit of a little, uh, a base on balls [i.e. a walk] on that first, like, false statement? Yeah, kind of, because I know it's hard. I mean, some people come up, like, [mimics a crying voice] oh, how could I let this happen, [normal voice] you know, [crying voice] we were having an affair, [normal voice] and, and that's fine, but I don't know you yet, and like I said, you don't know me. So, and, and you got a lot to lose. And, I guess, some guys want to lose that…." [*Id*. at 56:46-57:10]. Attorney Moraghan indicated that a former colleague vouched that Detective Colangelo is "absolutely honorable, and absolutely trustworthy." [*Id*. at 59:49-1:00:10]. After telling Mr. Nodine he will go easy on him, Detective Colangelo asks Attorney Moraghan to invite him to his private golf club stating:

> That's very nice of Billy. I did tell him that  we were going to work on a case, and I always call it together, because we're on the same path- I'm like - because he's talking about golf, he plays at the same country club, well, maybe you could invite me up. Because I only get invited up once a year, by my father, so. [Laughter].

 [*Id*. at 1:00:37-1:00:59].

After asking Attorney Moraghan to invite him to his private club, Detective Colangelo then assured Mr. Nodine that this case "…doesn't have to be pushed through, you're not a menace to society- know, that's not, you're not the Green River Killer type thing where we gotta, we're gonna try to follow every lead, if we

don't, well, we're remiss in our duties." [*Id*. at 1:01:47-1:02:03]. The meeting ended seven minutes later in the same fraternal tone in which it began.

The parties agree that on June 14, 2017, Mr. Nodine called the Canton Police Department and spoke to Detective Colangelo with Officer Gompper also present for the call. Mr. Nodine stated that he had taken a private polygraph test but did not pass because he had not taken his medication. He said he had a second polygraph test scheduled for Monday, June 19, 2017. Attorney Moraghan faxed a letter to Detective Colangelo stating that Mr. Nodine refused to undertake a police polygraph.  [Dkt. 141 (Town Defs. Local R. 56(a)(1) ¶¶ 71-72]. Detective Colangelo testified that he did not conduct any additional investigation while he awaited a decision about whether Mr. Nodine would undergo a polygraph. [Dkt. 150-22 (Pl. Exs.) Ex. 19, (Colangelo Depo.) 148:23-149:08].

Detective Colangelo initiated an interview of Ms. Chase two days after learning of Mr. Nodine's refusal to undergo a police polygraph. The Court reviewed the video of this interview from both vantage points. [Dkt. 141 (Town Defs. Exs) Ex. O, (Chase interview, 06/21/2017)]. As was the case with Ms. Chase's initial police interview and Mr. Nodine's interview, an oath was not administered. At the beginning of the interview, Ms. Chase discussed workplace dynamics at the restaurant. [*Id*.  at 1:28-13:14.]. Ms. Chase told Detective Colangelo that Mr. Nodine told people that they had sex and that Ms. Chase performed oral sex on him. [*Id*. at 13:14-14:10]. Ms. Chase neither affirmed nor denied that she performed oral sex on Mr. Nodine and Detective Colangelo did not ask whether Mr. Nodine's statements to others were true.

Ms. Chase explained she did not initially press charges because she wanted to see whether Mr. Nodine would apologize and if he was so intoxicated, he did not remember the incident. She pressed charges after Mr. Nodine's stepson, who formerly worked at NSI, encouraged her to do so and Mr. Nodine allegedly made another sexualized comment to her. [*Id*. at. 19:01-27:05]. Upon Detective Colangelo's request, Ms. Chase retrieved her cell phone to provide him with employees' phone numbers and offered him additional names and then showed him corroborating text messages exchanged between her and Mr. Nodine's stepson. [*Id*. at 29:49-32:45, 32:21-45:20]. Detective Colangelo asked whether her attorney knew she was speaking with him and confirmed that they were filing a civil suit on her behalf. [*Id*. at 34:24-34:44]. He also asked Ms. Chase when she first talked to a lawyer and she indicated it was a week or two after the incident at what she understood to be the suggestion of another Canton police officer. [*Id*. at 40:02-40:44, 44:00-44:44].

Detective Colangelo then told Ms. Chase that he interviewed Mr. Nodine. [*Id*. at 53:10-53:15]. He asked her, "whether there were any relations between you and Calvin that were consensual prior to that Saturday," which she denied. [*Id*. at 55:09-55:17]. Detective Colangelo then falsely stated that Mr. Nodine took two polygraphs and then asked Ms. Chase: "Is there anything that would have come out, that would come out as true, that, that you may have left out? Truthful from him, that you may have forgotten about? Because I don't want to make you look bad in the long run, that, that's the last thing I want to do." [*Id*. at 57:53-59:31]. Ms. Chase states that

Mr. Nodine overheard her discussing her sex life with Ms. Archer and she denied flirting with Mr. Nodine. [*Id.* at 59:31-1:00:20].

Detective Colangelo then asked her:

So, I need you to think hard. Is there anything that you think will come up - or has come up, in this investigation that I should know about? Because I don't want his attorney to read an arrest warrant application and go, okay, there's some time and then this goes to court, we get put on the stand and the detectives are asked, did you know about this or not?... That's why I'm asking a very open question…I'm not asking for something specific.

[*Id.* at 1:01:09-1:01:40].

After Ms. Chase stated that Mr. Nodine tried to kiss her, Detective Colangelo followed up with, "[y]ou understand how important it is, like, if you have any kind of consensual, physical contact with him, that night or prior - it's very important that that the truth is known to us." [*Id.* at 1:03:52-1:04:00]. She then became very emotional and stated that she was "trying to get herself to this point" and begins crying and stated that there was never anything consensual. She stated that that "it was just him, he pulled me in there and dropped them, as soon as he told me to do it I just did it" and confirmed that she "gave" Mr. Nodine oral sex. [*Id.* at 1:04:00-1:04:57]. She then stated:

But everything else is completely true. I know that story's a lie but I wanted to come back and actually tell that but I was afraid it would go against my story. And I just don't want my boyfriend to know, I don't want people to ask me why I did it when I didn't want to do it, but - I was just so scared. I don't even know what happened. I couldn't even tell my own mom.

[*Id.* at 1:05:00-1:05:28].

She told Detective Colangelo that she was suicidal. [*Id.* at 1:05:29-1:05:30]. Later during the interview, Plaintiff told Detective Colangelo that she was struggling with

her emotions relative to the alleged assault: "I've been trying to hide it and all the emotions from everybody because they all don't understand why I'm so stressed out, well, like, nothing happened, so - but, in my head, like, if you only knew." [*Id.* at 1:24:49-1:25:00].

Detective Colangelo asked if she told her lawyer about the oral sex, she said "No. No, that's the problem, because I, I, I didn't want to come to you guys, you know, without my lawyer, or make my lawyer's case look bad, you know, because I didn't want to admit to doing something I didn't want to do." [*Id.* at 1:05:40-1:05:52].

Detective Colangelo then reviewed Ms. Chase's original complaint with her and she told him that "everything is true except the one part she didn't want people to know," and she explained her movements through the restaurant leading up to the alleged assault. [*Id.* at 1:07:58-1:18:29]. She explained that "I stayed silent, not because I didn't want Kyle to know, I stayed silent because I didn't know what to do, I thought that if I just did it and got it over with I could keep my job, but the next, when I realized, I called Jeremy, because I didn't want that to ever happen to me again…. And I was hoping it was just because he was so, so intoxicated that day." [*Id.* at 1:13:56-1:14:17]. She described the alleged assault in the bathroom in detail, including the color of Mr. Nodine's boxers and that his wife had tried to call him at least six times while they were in the men's bathroom to warn him about a DUI checkpoint. [*Id.* at 1:15:57-1:19:10]. She said it could have been ten to fifteen minutes and Mr. Nodine had difficulty maintaining an erection and was bashing his genitals into her. [*Id.* at 1:18:58-1:19:09].

Detective Colangelo asked if she "wanted to give a statement that changes this [May 11, 2017] statement." [*Id*. at 1:20:56-1:20:59]. Ms. Chase said "yea, but that screws up my whole civil case, right?" [*Id*. at 1:21:00-1:21:05]. After explaining that he was not a lawyer, and that it was completely up to her, she stated "I want to, because I want the truth to be known, but I don't want my mom, my family, my boyfriend and all of my friends to think that I was lying because I didn't want to tell them." [*Id*. at 1:21:06-1:21:59]. Plaintiff was still crying intermittently.

After discussing it further with Detective Colangelo, Ms. Chase stated "I mean, I want to tell the truth, so, I don't know-" to which Detective Colangelo replied, "Well, you've told the truth, and you know, there's, you know, we've sat in here and you've told me-all my conversations in here are recorded, just like any other P.D., but I could give you an opportunity if you want to put it in writing." [*Id*. at 1:23:12-1:23:35]. Detective Colangelo and Ms. Chase then discussed amending her statement, with Detective Colangelo explaining that a false statement under oath is a crime. [*Id*. at 1:23:35-1:25:25]. Detective Colangelo stated that the "letter of that statement, it's not true" and "…the problem with these things, when they're not...true, is they make our jobs way harder. And that's what they really try to avoid, is people, you know, using us as, you know, the hammer to spike, type of thing." [*Id*. at 1:25:28-1:25:54]. The interview ended with Detective Colangelo telling Ms. Chase she could consult her attorney about whether she would amend her statement; adding that either decision would be fine, but he wanted to know either way because he would like to move forward. [*Id*. at 1:27:47-1:28:20]. Detective Colangelo told her that he was going to be on vacation the following week. [*Id*.]

A few hours after Ms. Chase's second interview concluded, Officer Gompper prepared a six-page police report. [Dkt. 150-29, (Pl. Exs.), Ex. 25, (06/21/2017, Police Report)]. At the end of the report, Officer Gompper concluded that there was not probable cause to arrest Mr. Nodine because: (1) Ms. Chase had a chance to call for help, (2) she spent 15 minutes performing oral sex on Mr. Nodine, (3) Ms. Chase said "Nodine was hard initially but then wasn't and he was then "hard" again and he ejaculated in her mouth" (quotations in original), (4) Ms. Chase said that Mr. Nodine's wife called his cell phone at least six times while they were in the bathroom, and (5) Ms. Chase provided a false statement. [*Id*.]. The report concludes that "An arrest warrant will be applied for the VICTIM, AKA Nicole Chase (DOB [redacted]), for the charge of 53a-157b, False Statement." *Id*. (capitalization in original).

On July 7, 2017, Detective Colangelo signed the affidavit in support of an arrest warrant for Ms. Chase, charging her with making a False Statement in the Second Degree. [Dkt. 141-19 (Town Defs. Exs) Ex. P, (Colangelo Aff. in Supp for App. for Arrest Warrant]. The warrant generally summarizes the police investigation from May 6th through June 21, 2017, but a jury could reasonably perceive that it omitted salient details:

- Chase said that she was being sexually harassed by the owner and her boss, Calvin Nodine. However, Ms. Chase never used that term. ¶ 3.

- The affidavit states "Chase made a comment to Officer Gompper about Nodine being a rich man during this part of her story." ¶ 8. This sentence is misleading because Ms. Chase was clear that she felt powerless because she perceived him to be a rich man.  Thus, she made clear his wealth discouraged her from, rather than motivated her to, lodge her complaint.

17

- **The affidavit omits that Ms. Chase stated that Sergeant Penney's advice was the impetus for her decision to obtain legal representation.**

- **The affidavit omits that Canton Police interviewed Mr. Rouleau and Ms. Archer, the only other two employees at NSI that night and both independently corroborated aspects of Ms. Chase's account.**

- **The affidavit states that Mr. Nodine initially denied that anything happened between him and Ms. Chase and that after speaking with his attorney, Mr. Nodine explained that Ms. Chase had performed oral sex on him and it was consensual. The affidavit omits other false statements made by Mr. Nodine.  It omits that Mr. Nodine falsely denied knowing where Ms. Chase was when Mr. Rouleau said goodbye, when he knew she was in the bathroom with him. The paragraph further omits Mr. Nodine's explanation of how Ms. Chase spontaneously initiated oral sex with him, without any prior flirtation or contact with him. ¶ 16.**

- **The affidavit omits that Mr. Nodine called Canton Police to volunteer that he failed a polygraph test and his attorney's letter that he refused to undergo a police polygraph test.**

- **The affidavit states that she said she stayed quiet because "she didn't want Kyle [Rouleau] to know and because she didn't know what to do. She said she did it to get it over with." However, Ms. Chase explicitly stated that she did not stay quiet so that Mr. Rouleau did not hear her. ¶ 26.**

- **The affidavit states that "as of 7/7/2017, Chase has not called to speak to Affiant Colangelo of Officer Gommper" (sic). However, the affidavit omits that Detective Colangelo told Ms. Chase that he was going to be on vacation the week following her June 21, 2017 interview. ¶ 33.**

- **The affidavit omits that Ms. Chase repeatedly told Detective Colangelo that she wanted to tell the truth, but she was uncertain about how to proceed.**

The warrant application was received on July 11, 2017 by the State's Attorney's Office. [Dkt. 141 (Town Defs. Local R. 56(a)(1)) ¶ 94]. Connecticut Superior Court Judge Tammy Nguyen signed the arrest warrant on September 6, 2017. [Dkt. 141 (Town Defs. Local R. 56(a)(1)) ¶ 105]. Detective Colangelo then informed Ms. Chase of the active arrest warrant and she presented to the police

station, was processed, charged and released on a $2,500 non-surety bond on September 8, 2017. [Dkt. 141 (Town Defs. Local R. 56(a)(1)) ¶ 108]; [Dkt. 150-37 (Pl. Exs.) Ex. 35 (09/08/2017, Police Report)].

Ms. Chase testified that, after her June 21, 2017 interview with Detective Colangelo, she returned to the police station with the copies of the text messages he had requested. She testified that she told the dispatcher that she was there to revise her statement, but the dispatcher told her that Detective Colangelo was busy and that he would call her if he needed her. [Dkt. 141 (Town Defs. Local R. 56(a)(1)) ¶¶ 95-97]. On July 25, 2017, Ms. Chase sent an email to Detective Colangelo, titled "Revise Statement/Nicole Chase" to tell him that she came to the police station two weeks earlier to provide him the requested text messages and to revise her statement. [Dkt. 141-24 (Town Def. Exs.), Ex. U (07/25/2017 Chase email to Colangelo)]. After Detective Colangelo did not reply, Ms. Chase emailed him again on July 31, 2017, this time attaching a supplemental statement, adding the details that she described in her June 21, 2017 interview. [Dkt. 141-24 (Town Def. Exs.), Ex. U (07/31/2017 Chase email to Colangelo)]. Detective Colangelo did not respond until August 10, 2017 and indicated that he did not know she wanted to revise her statement and that he had "already documented the change in your recount of the incident and had already sent the case to court for review. It is still with the States Attorney's-office and I should hopefully-have some direction of the next step shortly." [Dkt. 141-24 (Town Def. Exs.), Ex. U (08/10/2017 Colangelo email to Chase)]. Detective Colangelo's email is misleading because it provided Ms. Chase

with the false impression that the police were pursuing criminal charges against Mr. Nodine, not that she was the subject of a false statement investigation.

Detective Colangelo never contacted Ms. Chase to see whether she wanted to change her statement before applying for the warrant, he never updated his affidavit in support of the arrest warrant to reflect her revised statement and the corroborating text messages, and he never forwarded any additional information to the prosecutor. [Dkt. 141 (Town Defs. Local R. 56(a)(1)) ¶ 102].

The parties dispute how the criminal charges lodged against Plaintiff were resolved. Plaintiff had an initial appearance on October 8, 2017 and the prosecutor moved for a continuance, then *nolle prosequi* on November 8, 2017. The Town Defendants submit the affidavit of Senior Assistant State's Attorney Robert Diaz which avers that "it was agreed that Miss Chase would receive a diversionary marking or continuance of her criminal case for eight weeks' time and, if she did not have any new arrests during that time period, a *nolle* would be entered." [Dkt. 141-27 (Town Def. Exs.), Ex. U (Diaz Aff.) ¶ 5]. Attorney John Ritson, who represented Plaintiff in the criminal proceeding, averred that he told Assistant State's Attorney Jesse Giddings that Ms. Chase's arrest was "outrageous," and that ASA Giddings stated that "the case would be continued, and if nothing else happened, the state would enter a *nolle prosequi*. I did not object to the continuance. There was no negotiations or conditions imposed. The continuance was unilateral by the state. There was no agreement between Chase and the State." [Dkt. 150-13 (Pl. Exs.) Ex. 10 (Ritson Aff.) ¶¶ 4-6]. The transcript of the November 8, 2017 proceeding before Judge Nguyen states only:

20

Atty. Diaz: Nicole Chase on that same docket on line 8 was diverted. There been no further problems. Enter a nolle for Miss Chase on line 8.

The Court: Nolle noted.

[Dkt. 141-28 (Town Defs. Exs.) Ex. Y, (*State v. Nicole Chase*, No. H14H-CR17-0692973-S, 11/08/2017 Tr.)].

## Legal Standard

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of proving that no genuine factual disputes exist. *See Vivenzio v. City of Syracuse*, 611 F.3d 98, 106 (2d Cir. 2010). "In determining whether that burden has been met, the court is required to resolve all ambiguities and credit all factual inferences that could be drawn in favor of the party against whom summary judgment is sought." *Id*. (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). This means that "although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000); *see Welch-Rubin v. Sandals Corp.*, No. 3:03-cv-00481, 2004 WL 2472280, at *4 (D. Conn. Oct. 20, 2004) ("At the summary judgment stage of the proceeding, [the moving party is] required to present admissible evidence in support of their allegations; allegations alone, without evidence to back them up, are not sufficient.") (citing *Gottlieb*, 84 F.3d at 518); *Martinez v. Conn. State Library*, 817 F. Supp. 2d 28, 37 (D. Conn. 2011).   Put another way, "[i]f there is any evidence in the record that could reasonably support a jury's verdict for the nonmoving party, summary judgment must be denied." *Am.*

*Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH*, 446 F.3d 313, 315–16 (2d Cir. 2006) (internal quotation marks and citation omitted).

A party who opposes summary judgment "cannot defeat the motion by relying on the allegations in his pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible." *Gottlieb v. Cnty of Orange*, 84 F.3d 511, 518 (2d Cir. 1996). Where there is no evidence upon which a jury could properly proceed to find a verdict for the party producing it and upon whom the onus of proof is imposed, such as where the evidence offered consists of conclusory assertions without further support in the record, summary judgment may lie. *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 726–27 (2d Cir. 2010).

### Parties Arguments

### A.  Town Defendants' Arguments and Plaintiff's Opposition

First, the Town Defendants argue that Plaintiff's false arrest claims and malicious prosecution claims (Counts 14-17) fail because her arrest was supported by probable cause and Detective Colangelo and Officer Gompper acted without malice. [Dkt. 141-1 (Town Defs. Mem. in Supp. Mot. for Summ. J) at 11-21].

Next, the Town Defendants argue that Plaintiff cannot establish that the *nolle* of the criminal charges constitutes a favorable termination for purposes of Plaintiff's malicious prosecution claims. [*Id*. at 21-24].

22

Third, the Town Defendants move to dismiss Plaintiff's Equal Protection Claim because they argue there is a lack of any evidence to suggest that either of the defendant officers denied the plaintiff police services on the basis of any discriminatory animus towards her on account of her sex or any other improper basis. [*Id.* at 24-32]. The Town Defendants argue that, even if Plaintiff were to prevail on her constitutional claims, they are subject to qualified immunity because the officers reasonably believed that Ms. Chase's omission of the oral sex act from her statements constituted probable cause. [*Id.* at 32-33]. The Town Defendants argue that it is not clearly established that "because an individual makes a complaint of workplace sexual harassment and a later claim of unwanted sexual contact, that the individual cannot be arrested and prosecuted for making a false statement to law enforcement officers upon a finding of probable cause." [*Id.* at 34].

Finally, the Town Defendants argue that the officers' conduct is not extreme and outrageous for purposes of Plaintiff's intentional infliction of emotional distress claim, the Town is immune from intentional torts, and the Town is not liable for indemnification because the officers themselves are not liable. [*Id.* at 35-38].

Plaintiff argues that she can overcome the presumption of probable cause that attaches when a judge authorizes a warrant because she can show that the Defendants acted knowingly, recklessly or with reckless disregard for the truth by making false or misleading statements, and/or omitting material information that was necessary to the finding of probable cause. [Dkt. 149 (Pl Mem. in Opp'n) at 4-20]. Plaintiff also argues that the arrest warrant was so lacking in indicia of probable cause that no reasonably trained officer would rely upon it. [*Id.* at 4-12].

23

As to the malice component, Plaintiff argues that the Defendants failed to follow basic police practices employed when police interview a sexual assault victim and investigate their complaint. [*Id.* at 20-24]. Plaintiff also argues that Officer Gompper and Detective Colangelo's behavior during the investigation reveals direct evidence of favoritism, gender bias, bad faith, and malice. [*Id.* at 24-32].

Next, Plaintiff argues that the Defendants do not satisfy their burden of proving the elements of qualified immunity because their actions were objectively unreasonable. [*Id.* at 32-36]. Plaintiff argues, *inter alia*, that Connecticut common law governmental immunity is inapplicable because she establishes sufficient evidence of malice. [*Id.* at 36-37].

As to the favorable termination element, Plaintiff argues that the Town Defendants' reliance *on Lanning v. City of Glens Falls*, 908 F.3d 19, 22 (2d Cir. 2018) is misplaced as the Second Circuit has held that a *nolle* entered by a prosecutor in Connecticut generally constitutes a favorable termination. *Id.* at 37 (citing to *Spak v. Phillips*, 857 F.3d 458 (2d Cir. 2017).

Plaintiff argues that her Equal Protection Clause claim based on the alleged discriminatory enforcement of law because of her gender should survive summary judgment because Officer Gompper and Detective Colangelo applied the police department's facially neutral policies in a discriminatory manner, citing specifically to Detective Colangelo's interview of Mr. Nodine. [*Id.* at 41-48]. The Plaintiff further cites Detective Colangelo's testimony in an internal affairs investigation into the handling of Ms. Chase's complaint, which occurred after the *nolle*. [*Id.* at 47-48].

24

Plaintiff omitted discussion of her intentional infliction of emotional distress claim in her opposition brief.

### B.  Plaintiff's false arrest and malicious prosecution claims

#### a.  Probable Cause

The Fourth Amendment protects individuals against "unreasonable searches and seizures." U.S. Const. amend. IV. A plaintiff seeking to recover for false arrest under 42 U.S.C. § 1983 must establish that "(1) the defendant intentionally arrested him or had him arrested, (2) the plaintiff was aware of the arrest, (3) there was no consent to the arrest, and (4) the arrest was not supported by probable cause." *Weinstock v. Wilk*, 296 F. Supp. 2d 241, 246 (D. Conn. 2003). The only element that the Town Defendants contest is the fourth: they argue that they had probable cause.

The Town Defendants also argue probable cause as a defense on the malicious prosecution claim. To prevail on a § 1983 claim for malicious prosecution, a plaintiff must show "a seizure or other perversion of proper legal procedures implicating his personal liberty and privacy interests under the Fourth Amendment," as well as that "criminal proceedings were initiated or continued against him, with malice and without probable cause, and were terminated in his favor." *Lanning*, 908 F.3d at 24 (citations and quotations omitted). "[T]he existence of probable cause is a complete defense to a claim alleging false arrest or malicious prosecution." *Garcia v. Gasparri*, 193 F. Supp. 2d 445, 449 (D. Conn. 2002); *Escalera v. Lunn*, 361 F.3d 737, 743 (2d Cir. 2004) ("Because probable cause to arrest

constitutes justification, there can be no claim for false arrest where the arresting officer had probable cause to arrest the plaintiff.")

Where, as in this case, a neutral magistrate issues an arrest warrant, there is a "presumption that it was objectively reasonable for the officers to believe that there was probable cause." *Golino v. City of New Haven*, 950 F.2d 864, 870 (2d. Cir. 1991); *see Mara v. Rilling*, 921 F.3d 48,73 (2d Cir. 2019) (same). "[A] plaintiff who argues that a warrant was issued on less than probable cause faces a heavy burden." *Golino*, 950 F.2d at 870. "To urge otherwise, a plaintiff must show ... that defendants misled a judicial officer into finding probable cause by knowingly or recklessly including material misstatements in, or omitting material information from, the warrant affidavits." *Mara*, 921 F.3d at 73; *see Golino*, 950 F.2d at 870. "Recklessness may be inferred where the omitted information was critical to the probable cause determination." *Golino*, 950 F.2d at 871.

To determine whether the information was material "[u]nder the [corrected affidavits] doctrine, [the Court] look[s] to the hypothetical contents of a "corrected" application to determine whether a proper warrant application, based on existing facts known to the applicant, would still have been sufficient to support arguable probable cause to make the arrest as a matter of law." *Escalera*, 361 F.3d at 743–44. Arguable probable cause exists "if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met." *Figueroa v. Mazza*, 825 F.3d 89, 100 (citations omitted).

Where, as here, a plaintiff argues that "material omissions infected the issuing magistrate's probable cause determination," "the materiality of these omissions presents a mixed question of fact and law." *Walczyk v. Rio*, 496 F.3d 139, 157-58 (2d. Cir. 2007) (citing *Velardi v. Walsh*, 40 F.3d 569, 574 (2d Cir. 1994)). "The legal component depends on whether the information is relevant to the probable cause determination under controlling substantive law. But the weight that a neutral magistrate would likely have given such information is a question for the finder of fact, so that summary judgment is inappropriate in doubtful cases." *Velardi*, 40 F.3d at 574 (citing *Golino*, 950 F.2d at 871), quoted in *McColley v. County of Rensselaer*, 740 F.3d 817, 823 (2d Cir. 2014).

Additionally, a police officer is not entitled to absolute reliance on a neutral detached magistrate's determination of probable cause. "'Our good-faith inquiry is confined to the objectively ascertainable question whether a reasonably well-trained officer would have known that the search was illegal despite the magistrate's authorization.' The analogous question in this case is whether a reasonably well-trained officer in petitioner's position would have known that his affidavit failed to establish probable cause and that he should not have applied for the warrant." *Malley v. Briggs*, 475 U.S. 335, 345 (1986)(quoting *U.S. v. Leon*, 468 U.S. 897, 922, n. 23 (1984)).

Under Connecticut law, a person is guilty of making a false statement, a Class A misdemeanor, when such person:

(1) intentionally makes a false written statement that such person does not believe to be true with the intent to mislead a public servant in the

> performance of such public servant's official function, and (2) makes such statement under oath or pursuant to a form bearing notice, authorized by law, to the effect that false statements made therein are punishable.

Conn. Gen. Stat. Ann. § 53a-157b.

The Court seriously questions whether probable cause could *ever* exist for the offense charged under the relevant circumstances, where the claimed falsity of a victim's sworn written statement is the *omission* of the details of an entirely different crime. During Plaintiff's first meeting with Officer Gompper and in her first written statement, Plaintiff alleged that she was the victim of a criminal sex offense, irrespective of the Defendants' characterization of the allegations as "sexual harassment."

Under Connecticut law a "person is guilty of public indecency when he performs any of the following acts in a public place…(2) a lewd exposure of the body with intent to arouse or to satisfy the sexual desire of the person. For the purposes of this section, "public place" means any place where the conduct may reasonably be expected to be viewed by others." Conn. Gen. Stat. § 53a-186. Indecent exposure is a Class B misdemeanor. *Id*. At a minimum, Plaintiff's statement to the Town Defendants' provided them sufficient information to believe

that Mr. Nodine committed each element of Connecticut's indecent exposure statute.[1] [2]

By comparison, Plaintiff's subsequent allegations plausibly alleged sexual assault in the fourth degree in violation of Conn. Gen. Stat. § 53(a)-73(a)(2). "A person is guilty of sexual assault in the fourth degree when (2) such person subjects another person to sexual contact without such other person's consent." Sexual assault in the fourth degree under these circumstances would be a Class A misdemeanor. *Id.*

Ms. Chase's omitted information, that unwanted sexual contact occurred, means that she omitted and was subsequently reporting a different offense. The

---

[1] This assumes that Mr. Nodine did not make "sexual contact" with Ms. Chase when he hugged her before pulling her into the bathroom. Ms. Chase stated that, although she could not feel Mr. Nodine's penis against her because of his shirt, she believes that he was disrobed when he hugged her because he would not have had time to undress once they were in the bathroom. *See* [Dkt. 141-13 (Def. Exs.) Ex. J, (Chase written statement, 05/11/2017) at 2-3].

[2] Since Ms. Chase alleged that Mr. Nodine grabbed her wrist, pulled her to a secluded area in the restaurant when he heard an employee, locked the bathroom door and then told her to "suck it," and that she was able to escape by her own use of force, it is plausible that the conduct alleged may have constituted attempted sexual assault. *See State v. Green*, 194 Conn. 258, 274 (1984)("A person is guilty of sexual assault in the first degree when such person compels another person to engage in sexual intercourse by the use of force against such other person ... or by the threat of use of force against such other person ... which reasonably causes such person to fear physical injury to such person ...." General Statutes § 53a–70(a). A specific intent to commit sexual assault in the first degree is an essential element of that [attempted sexual assault] and on the evidence the jury could find that proven."). The statutory definition of "sexual intercourse" expressly includes fellatio. § 53a–65(2).

failure to report the second crime is not a material omission of the facts constituting the first offense allegedly committed against her.

Put another way, Plaintiff was criminally charged for failing to report a separate and distinct offense. Plaintiff had no duty to report the alleged second and more serious offense. As a matter of common sense and judicial experience, reporting a crime is a heavy task, particularly for a sexual assault victim. At a minimum, an individual reporting a crime subjects themselves to inconvenience, stigma, and at worse, personal safety risks. This is borne out by social science research. A Bureau of Justice Statistics survey estimated that only 22% of female victims (135,600) reported their completed assault to the police. Callie Marie Rennison, *Rape and Sexual Assault: Reporting to the Police and Medical Attention*, 1992-2002, Bureau of Justice Statistics, U.S. Dep't of Justice, at Fig. 2 (Aug. 2002). The study also found that "[t]he closer the relationship between the female victim and the offender, the greater the likelihood that the police would not be told about the rape or sexual assault." *Id.* at 3. When the perpetrator was a friend or relative, 82% of sexual assaults went unreported.

Aside from the risk of repeat victimization, as a matter of human behavior, the consequences of collective failure to report crimes can be profound. *See 37 Who Saw Murder Didn't Call the Police; Apathy at Stabbing of Queens Woman Shocks Inspector*, New York Times, Mar. 27, 1964 (initial reporting on the Kitty Genovese case).

At common law, the failure to report a felony could be charged as "misprision of a felony." *See State v. Wilson*, 80 Vt. 249, 252, (1907) ("misprision of felony is an offence at common law and is described as a criminal neglect either to prevent a felony from being committed, or to bring the offender to justice after its commission, but without such previous concert with or subsequent assistance of him, as will make the concealer an accessory before or after the fact."). The United States Code retains a distant remnant in 18 U.S.C. § 4, which is interpreted to require proof that the defendant took affirmative steps to conceal the crime of the principle. *See United States v. Ciambrone*, 750 F.2d 1416, 1417 (9th Cir. 1984)("The elements of the crime of misprision of felony are: (1) the principal committed and completed the felony alleged [there, the possession and concealment of counterfeit money]; (2) the defendant had full knowledge of that fact; (3) the defendant failed to notify the authorities; and (4) the defendant took an affirmative step to conceal the crime."). *See also United States v. Brantley*, No. 8:10-CR-298-T-30MAP, 2013 WL 452023, at *3 (M.D. Fla. Feb. 6, 2013), *aff'd*, 803 F.3d 1265 (11th Cir. 2015) ("Misprison of a felony is a rarely charged crime. When it is charged, the act of concealment is usually obvious, such as giving a ride to one known to have just robbed a bank, or helping hide the loot…. Mere silence, without some affirmative act of concealment is insufficient. And where a defendant answers some questions, but not all, that too fails to constitute misprison of a felony as long as the answers that are given are truthful.")(footnotes omitted). The Court is unaware of any cases where a crime victim was charged with misprison for failing to report a separate, related offense or for failing to provide all the details of an offense

committed against them. Nor has any Defendant cited any authority to support such a charge or claim.

In the Court's review of the issue, it appears that Connecticut has never recognized the crime of misprision of a felony nor a general duty to report a crime. Rather, Conn. Gen Stat. § 17a-101(b), provides a comprehensive list of forty-one categories of persons with an affirmative obligation to report a crime.  The only crime required to be reported under Connecticut law is suspected child abuse or neglect, ranging from police officers (15) to chiropractors (22). The Court can infer from the absence of any case law establishing an affirmative duty to report a crime and the comprehensive list of mandatory reporters of child abuse that there is no general duty under state law to report a crime.

An analysis of the offense charged yields the same conclusion. The Town Defendant's argue that "providing false statements or omissions under oath is a violation of General Statutes § 53a-157b." [Dkt. 141 (Town Defs. Mem. in Supp.) at 19]. The statute makes no reference to omissions. The Town Defendants cite no cases to show that the statute has ever been interpreted to apply to an omission, particularly where there was no pre-existing duty to disclose. Statements and omissions are not functional equivalents. Connecticut has long recognized the bedrock principle of strictly construing the meaning of criminal statutes. *See State v. Skakel*, 276 Conn. 633, 674 (2006). The reason for this rule is twofold: "First, the public is entitled to fair notice of what the law forbids. Second, legislatures and not courts are responsible for defining criminal activity." [*Id*. at 675]; *see also Bouie v. City of Columbia*, 378 U.S. 347, 352 (1964)("There can be no doubt that a deprivation

of the right of fair warning can result not only from vague statutory language but also from an unforeseeable and retroactive judicial expansion of narrow and precise statutory language.").

A jury reviewing the affidavit could find that this is the rare case where no reasonable police officer would have thought probable cause existed to show that Ms. Chase made "a false written *statement* that such person *does not believe to be true* with the intent to mislead [the Canton Police]." Because the Court concludes that a jury may find no reasonable police officer would have proceeded in arresting Ms. Chase on the face of the judicially authorized warrant, the Court need not consider a line by line analysis of omitted information in the warrant application.

The Court notes, briefly, that apart from the omitted information in the arrest warrant affidavit, which was suggestive that Plaintiff truthfully believed that she was sexually assaulted, Detective Colangelo did not update his affidavit to reflect Plaintiff's attempts to supplement her statement or the supplement itself. Had he done so, it could have reasonably negated the existence of probable cause for the specific intent elements of the charged offense, namely, that she did not believe her earlier statement to be true (as opposed to merely incomplete) and that the false "statement" was made with the intent to mislead the police.

      b.  <u>Malice</u>

The Town Defendants' argument on the malice prong is conclusory and they do not respond to Plaintiff's assertion about the existence of direct evidence of malice in their reply brief. [Dkt. 141-1 (Town Defs. Mem. in Supp.) at 20-21]; [Dkt.

157 (Town Defs. Repl. Br.)]. In Connecticut, "[a] party may demonstrate malice by showing that a prosecution was undertaken for "improper or wrongful motives, or in reckless disregard of the rights of the plaintiff," including initiating proceedings without probable cause." *Turner v. Boyle*, 116 F. Supp. 3d 58, 85 (D. Conn. 2015) (quoting *Pinsky v. Duncan*, 79 F.3d 306, 313 (2d Cir. 1996)). It suffices to say that Plaintiff has presented ample evidence to show an improper or wrongful motive, or reckless disregard for Plaintiff's rights, apart from the genuine question of material fact as to whether her arrest was supported by probable cause.

The most striking example of an instance where a jury could find an improper motive stem from Detective Colangelo and Officer Gompper's interview of Mr. Nodine. After Mr. Nodine denies the allegations, claiming it was "bullshit," Detective Colangelo posits that, perhaps Mr. Nodine and Ms. Chase had a consensual relationship. Then, after consulting his lawyer, Mr. Nodine changes his story to claim that they had a single consensual sexual encounter initiated by Ms. Chase and he admits to lying to protect himself. In response to Mr. Nodine's revelation and their speculation about Plaintiff's financial motive, Detective Colangelo provides an example of a situation where he "switched the case" against another woman who claimed she was sexually assaulted by charging her with making a false statement. By doing so, Detective Colangelo claimed that he could ask the complaining witness to undertake a polygraph test, which he would otherwise be unable to request. This conversation occurred before Detective Colangelo knew how Ms. Chase would respond to Mr. Nodine's claim if he ever asked. Detective Colangelo never asked Mr. Nodine whether he struck the right

side of his head, which would have corroborated Plaintiff's account of some physical altercation in the bathroom.

Given the timing and context of the conversation, a jury could infer that Detective Colangelo's decision to give Mr. Nodine a "base on balls" for his "first false statement" and then "switch the case" on Ms. Chase by charging her with making a false statement without probable cause was motivated by an improper purpose, be it bias or to curry favor. Indeed, Detective Colangelo suggested that Mr. Nodine's attorney take him golfing at his private country club which Detective Colangelo only rarely had the fortune to visit. Moreover, a reasonable jury could conclude from the conversation taken as a whole and compared to that with Ms. Chase that Officer Colangelo offered to go easy of Mr. Nodine as a *quid pro quo* or a professional courtesy for a friend of a friend.

Mr. Nodine voluntarily called Detective Colangelo to inform him that he failed a polygraph test, suggestive of Mr. Nodine's belief that Detective Colangelo would not see him prosecuted. Only then did Detective Colangelo contact Ms. Chase for a re-interview. The decision to prosecute her was made immediately after her second interview, before she had the opportunity to amend her statement as they had discussed. The tenor of the interview of Mr. Nodine compared with the interview of Ms. Chase could be enough for a reasonable jury to conclude Officer Colangelo interviewed Ms. Chase to assist Mr. Nodine.

While Detective Colangelo directed the final two interviews, Officer Gompper was present for Mr. Nodine's interview, asked some questions, and then prepared

the police report knowing all this information. Accordingly, Plaintiff presents sufficient evidence to survive summary judgment on the malice prong of her malicious prosecution claim.

c. **Whether the criminal proceeding against Ms. Chase terminated in her favor**.

A claim for malicious prosecution requires a plaintiff to prove that the charge against her was terminated in her favor. *See, e.g., Mitchell v. City of New York*, 841 F.3d 72, 79 (2d Cir. 2016). The Town Defendants argue that Plaintiff cannot establish that the criminal proceedings terminated in her favor because the *nolle* was entered on the condition that Ms. Chase not have further arrests. Therefore, they argue, under *Lanning*, 908 F.3d at 28, the *nolle* of the charges upon satisfaction of the prosecutor's condition does not "affirmatively indicate [her] innocence," and "leaves the question of guilt or innocence unanswered." (quoting *Hygh v. Jacobs*, 961 F.2d 359, 367-68 (2d Cir. 1992)).

In opposition, Plaintiff argues that the issue is controlled by *Spak v. Phillips*, 857 F.3d 458, 461 (2d Cir. 2017). In *Spak*, the Second Circuit affirmed the district court's decision that a plaintiff's malicious prosecution claim was time-barred because it was brought over three years after the Connecticut state charges were *nolled*. *Id.* A "favorable termination" for purposes of claim accrual is analyzed under federal common law whereas a "favorable termination" as an element of plaintiff's substantive claim is interpreted by reference to state common law. *Id* at 462-63; *see, e.g. Roberts v. Babkiewicz*, 582 F.3d 418, 422 (2d Cir. 2009)("The majority of cases from Connecticut courts interpret Connecticut law so that a *nolle*

*prosequi* satisfies the "favorable termination" element as long as the abandonment of the prosecution was not based on an arrangement with the defendant.")

As *Spak* explains, "under Connecticut law, a prosecutor may decline to prosecute a case by entering *a nolle prosequi*. Conn. Practice Book § 39-31 (2017). The effect of a nolle is to terminate a particular prosecution against the defendant. However, a *nolle prosequi* is not the equivalent of a dismissal of a criminal prosecution with prejudice, because jeopardy does not attach." *Spak*, 857 F.3d at 463 (citing *Roberts*, 582 F.3d at 420). *Spak*, like *Roberts* explains that some *nolles* do not constitute a favorable termination as a matter of substantive law, narrowly, situations where they are " ….caused by the defendant—either by his fleeing the jurisdiction to make himself unavailable for trial or delaying a trial by means of fraud. It also includes any nolle entered in exchange for consideration offered by the defendant (e.g., cooperation)." *Id*. at 464.

In *Butler v. Sampognaro*, No. 3:18-cv-00545 (JAM), 2019 WL 3716595, at 4 (D.Conn. Aug. 7, 2019) the district court (Meyer, J) explained how *Lanning* and *Spak* may be inconsistent and noted that *Lanning* did not cite *Spak*. Judge Meyer's second point is applicable here:

> *Spak* generally presumes a nolle prosequi to be a favorable termination, unless there are shown "reasons that are not indicative of the defendant's innocence." 857 F.3d at 464. By contrast, *Lanning* declines to presume any termination of a prosecution is a favorable termination absent "affirmative indications of innocence." 908 F.3d at 25. This distinction in formulation may prove significant in the not-uncommon situation where the state court record of a nolle proceeding does not clearly establish the reason for the disposition.

*Id*., 2019 WL 3716595, at *4.

Here, there is a genuine dispute of material fact about whether the *nolle* of Plaintiff's charges was predicated on a bargain struck with the prosecutor. The Court finds that this case is distinguishable from *Lanning* where, as a matter of pleading rules, the "vague allegation [concerning the post-trial *nolle*] is consistent with dismissal on any number of procedural or jurisdictional grounds, all of which fail to affirmatively indicate innocence" and the plaintiff conceded that the post-trial nolle was, at least in part, predicated on a jurisdictional issue. *Lanning*, 908 F.3d at 28. In this case, there is no suggestion that the *nolle* was based on jurisdictional or procedural issues. Here, the only issue is whether the *nolle* was the result of a bargain struck. The parties submit competing affidavits about whether there was an agreement, or any conditions placed on Plaintiff.

The Town cites a conditional clause in Attorney Rittson's affidavit stating "Assistant State's Attorney Giddings stated that the case would be continued, and **if nothing else happened**, the state would enter a nolle prosequi" and the diversionary marking to show that a bargain was struck. [Dkt. 157 (Town Defs. Repl. Br.) at 7-8](underling added). However, there remains a question about whether any conditions were imposed on Plaintiff and whether the purported condition, no arrests during the short continuance, evidences guilt because there is no relationship between the conditions and the alleged criminal conduct. *Compare to Allen v. Harkins*, No. 3:20CV964 (JAM), 2020 WL 4369125, at *2 (D. Conn. July 30, 2020 ("This is especially clear from the fact that the consideration given (completion of a DUI education program) is linked to the ground for which Allen was arrested (driving under the influence)."); *compare also to Lupinacci v.*

*Pizighelli*, 588 F. Supp. 2d 242, 249 (D. Conn. 2008) (denying summary judgment where Plaintiff presented evidence to pass that test, as his deposition testimony was that the prosecutor declared him "an innocent bystander," and that he did not have to pay any fine or perform community service as a condition of the *nolle*.).

Typically, a conditional *nolle* imposes an affirmative condition on the defendant triggered after the *nolle* is entered, such that the charges will not be reinstated if the defendant satisfies the condition before the statute of limitations expires. The purported condition, "no new arrests" during the pendency of the continuance, may be a promise in consideration for the continuance, not in exchange for the disposition of the case. Considered another way, since jeopardy does not attach to a charge following a *nolle,* the prosecutor could simply re-charge Ms. Chase after the *nolle* was entered. Rather, it would show that the prosecutor simply gave up, which would suggest that the criminal proceedings were terminated in Ms. Chase's favor. That is clearly the case here.  The only condition imposed by the prosecutor was that Ms. Chase not be rearrested between the date and the planned *nolle*. No condition was imposed whatsoever for the period following entry of the *nolle* and thus the *nolle* was unconditional. The Court finds the disposition was favorable on the date the unconditional *nolle* entered.

Accordingly, the Court DENIES the Town Defendants' Motion for Summary Judgment as to Plaintiff's False Arrest and Malicious Prosecution Claims, Counts 14-17.

C. <u>Qualified Immunity</u>

Qualified immunity shields a police officer from suits for damages under 42 U.S.C. § 1983 where "(a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." *Russo v. City of Bridgeport*, 479 F.3d 196, 211 (2d Cir. 2007) (internal quotation marks and citations omitted); s*ee also Lennon v. Miller*, 66 F.3d 416, 421 (2d Cir. 1995). "The right not to be arrested or prosecuted without probable cause has, of course, long been a clearly established constitutional right." *Golino*, 950 F. 2d at 870. Therefore, the question at hand is whether "it was objectively reasonable" for Detective Colangelo and Officer Gompper "to believe that [their] action[s] did not violate such law."

Qualified immunity is an affirmative defense and the burden is on the defendants to establish both elements. *See McKenna v. Wright*, 386 F.3d 432, 437 (2d Cir. 2004). "The purpose of qualified immunity is to protect officials when they must make difficult "on-the-job" decisions." *Palmieri v. Kammerer*, 690 F. Supp. 2d 34, 46 (D. Conn. 2010). As a matter of public policy, qualified immunity provides ample protection to all but the plainly incompetent or those who knowingly violate the law." *Malley*, 475 U.S. at 335. In this case, a jury could find that the individual officers had a lapse of judgment and were thereby either plainly incompetent or knowingly violated the law or both.

In this case, a reasonable jury could find that it was objectively unreasonable for Officer Gompper and Detective Colangelo to proceed with arresting Plaintiff for making a false statement when they knew that: (1) the alleged "false statement" was an omission of a completed sex act that Plaintiff was not under any duty to

disclose and that she had not affirmatively denied and (2) that, Detective Colengelo told her she could supplement her statement and Plaintiff stated her likely intention to do so, but the officers failed to inform prosecutors of her supplemental statement before the warrant issued, nearly two months later. "Only where the warrant application is so lacking in indicia of probable cause as to render official belief in its existence unreasonable will the shield of immunity be lost." *Malley*, 475 U.S. at, 344–45 (internal citation omitted). Here Ms. Chase recounted facts and presented corroboration constituting probable cause that Mr. Nodine committed at least indecent exposure and likely attempted sexual assault in the first degree. No reasonable officer would have concluded she had a duty to disclose a separate offense, even if it occurred on the same day during the same incident because no such duty exists.

Simply reading at the statute and applying the ordinary meaning to the words in the statute would have revealed to the officers that it only applies to false statements, not omissions, particularly Detective Colangelo who professed to being an expert in criminal law.

Accordingly, Detective Colangelo and Officer Gompper's motion for summary judgment on the grounds that they are immune from suit because of qualified immunity is DENIED.

D. Connecticut Common Law Immunity

"Under Connecticut common law, the test to determine whether a municipal employee is entitled to governmental immunity for discretionary acts is distinct

from the federal inquiry and requires separate consideration.*" Fleming v. City of Bridgeport*, 284 Conn. 502, 531–32, (2007) (citing *Mulligan v. Rioux*, 229 Conn. 716, 728, 643 A.2d 1226 (1994), *on appeal after remand*, 38 Conn.App. 546, 662 A.2d 153 (1995)). Common law immunity applies to the government official's discretionary act, like an arrest, unless one of three exceptions applies. *Id.* One exception is "…a discretionary act when the alleged conduct involves malice, wantonness or intent to injure." *Northrup v. Witkowski*, 175 Conn. App. 223, 234, 167 A.3d 443, 452 (2017), *aff'd*, 332 Conn. 158, 210 A.3d 29 (2019); Conn. Gen. Stat.§ 52–557n(a)(1)(" (A) Acts or omissions of any employee, officer or agent which constitute criminal conduct, fraud, actual malice or willful misconduct."

Plaintiff argues that she can overcome common law governmental immunity because she has sufficient evidence of malice and that she was an identifiable person subjected to imminent harm. [Dkt. 149 (Pl. Mem. in Opp'n to Town Defs.) at 36-37]. The Court agrees with Plaintiff that she has presented amble evidence of malice to survive summary judgment on her false arrest and malicious prosecution claim. Again, the Town Defendants' argument as to why Plaintiff cannot establish the malice prong of her malicious prosecution claim is conclusory.

### E.  Plaintiff's Equal Protection Claims

Plaintiff alleges that Detective Colangelo and Officer Gompper unlawfully discriminated against her because of gender animus, in violation of the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution by

intentionally denying Plaintiff police protective services and then arresting and charging her with a crime. [Dkt. 116 (Second Am. Compl.) ¶¶ 176-95].

As the Court explained in its January 2019 decision granting the Town Defendants' motion to dismiss as to Plaintiff's Equal Protection claim,

> …the Second Circuit has recognized that the Equal Protection Clause may be violated by selective enforcement or selective adverse treatment. *See Bush v. City of Utica*, 558 Fed.Appx. 131, 134 (2d Cir. 2014). "To state such a claim, a plaintiff must allege (1) that he or she was treated differently from other similarly situated individuals, and (2) that the 'treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.' " *Id.* (quoting *LeClair v. Saunders*, 627 F.2d 606, 609-10 (2d Cir. 1980). The second element requires the plaintiff to allege that there is no rational basis related to a legitimate governmental purpose for different treatment based on the alleged classification. *Id.*

[Dkt. 66 at 21-22](reported at *Chase v. Nodine's Smokehouse*, Inc., 360 F. Supp. 3d 98, 115 (D. Conn. 2019)).

After the Court granted the Town Defendants' motion to dismiss, Plaintiff amended her complaint, over their objection, to allege that the defendants applied facially neutral laws and policies in an intentionally discriminatory manner by failing to take her complaint seriously because of her sex. *See* [Dkt 87 (Order granting Pl. Mot. to Amend)](reported at *Chase v. Nodine's Smokehouse*, Inc., No. 3:18-CV-00683 (VLB), 2019 WL 1469412, at *1 (D. Conn. Apr. 3, 2019)). As the Court noted in its prior decision, Plaintiff's claim is not that she was denied due process by the Defendants' refusal to protect her from Mr. Nodine, but rather that they did not take her complaint seriously because she is a woman alleging that she was sexually assaulted. *Id.* at 3.

The Town Defendants argue that Officer Gompper and Detective Colangelo both acted in a professional manner and there is no evidence upon which a reasonable jury could find a discriminatory animus. [Dkt. 141 (Town Def. Mem. in Supp.) at 30-32]. In opposition, Plaintiff cites case law and Justice Department guidance on preventing gender bias in law enforcement response to sexual assault and domestic violence. [Dkt. 149 (Pl. Mem. in Opp'n to Town Def.) at 42-43]. The Justice Department guidance that Plaintiff cites provides that: "Similarly, officers should not make statements or engage in acts that indicate to the victim that they doubt the victim's credibility, or that otherwise exhibit any bias towards the victim based on gender. Such statements and judgments could include: stereotyped assumptions about the truth of a reported assault …automatically believing the alleged assailant's claim that the sex was consensual…" U.S. Dep't of Justice, *Identifying and Preventing Gender Bias in Law Enforcement Response to Sexual Assault and Domestic Violence*, 14 (2015), https://www.justice.gov/opa/pr/justice-department-issues-guidance-identifying-and-preventing-gender-bias-law-enforcement.

The Town Defendants analogize the case to *Golodner v. Martinez*, No. 3:15-CV-1515 (MPS), 2017 WL 6540269 (D. Conn. Dec. 21, 2017), where the district court (Shea, J) granted summary judgment on a male-plaintiff's claim that municipal police officers denied him equal protection of the law because of his sex when they responded less favorably to his claim than his former partner's while investigating accusations that they both violated cross-protective orders. [Dkt. 141 (Town Defs. Mem. in Supp.) at 25-27]. The Court agrees with Plaintiff that *Golodner*, as

44

persuasive precedent, is clearly distinguishable. There, the district court held that the factual pattern explained why police took the initial complaining victim's allegation that her vehicle may have been vandalized and her identification of plaintiff as a potential suspect more seriously than his allegation that her purportedly false complaints violated the cross-protective order derivatively. *Golodner*, 2017 WL 6540269, at *5. Plaintiff in that case did not show that the complaining witness's statement was false and had admitted that he presented no evidence that the complaining witness violated the protective order to at least one of the defendants. *Id*.

In this case, the Court finds that a reasonable jury could reach different conclusions as to whether Detective Colangelo and Officer Gompper's actions were motivated by gender bias. First, after Mr. Nodine admitted to falsely claiming that he never had sexual contact with Ms. Chase and after they speculated as to her financial motive for making an allegation, Detective Colangelo refers to the inability to request a polygraph from a sexual assault victim as a "problem" and offers a potential solution: "switching the case" to make a false statement investigation against the complaining witness. After additional commiserating with Mr. Nodine and his lawyer, Detective Colangelo explicitly told Mr. Nodine not to worry and that he was not going to chase down every lead, even though he had not yet heard Ms. Chase's recollection of events. He made this promise in the midst of what could be perceived, in comparison to his meeting with Ms. Chase, as a fraternal conversation and after asking Mr. Nodine's attorney for an invitation to

play golf at the attorney's private club, following their conversation about a mutual friend.

A month later Mr. Nodine voluntarily disclosed that he failed a polygraph test: yet neither officer re-interviewed nor conducted further investigation into Mr. Nodine. Instead, Detective Colangelo initiated an interview of Ms. Chase. During this second interview, he falsely told her Mr. Nodine took two polygraph tests, suggesting that he passed the tests. Afterward he exacted her admission that Mr. Nodine violated her in a manner constituting a crime she had not reported.

The fact that Mr. Nodine reported that he failed the polygraph test to Officer Colangelo could be perceived as an indication that Mr. Nodine believed Officer Colangelo had promised to help him discredit Ms. Chase's claims.

However, Detective Colangelo and Officer Gompper both made oral statements to Plaintiff reassuring her that they were taking her allegations seriously. During their initial meeting, which oddly occurs in a public area, Officer Gompper explained the complaint procedure and provided her with an Office of Victims Services Card. Later, during her interview with Detective Colangelo, he told her repeatedly that even a past consensual encounter did not make sexual contact during a subsequent encounter necessarily consensual.

A reasonable jury could find that Detective Colangelo's questioning of both witnesses amounted to a "good cop" questioning tactic and permissible deception or it could evident pre-judgment and inaction based on gender bias, including automatically believing the alleged assailant's claim of consensual sexual contact

and immediately suggesting a financial motive to fabricate allegations. Because either situation presents a reasonable resolution to the factual dispute before the Court, summary judgment on the equal protection claim as to Detective Colangelo is DENIED.

Summary judgment is also denied as to the Equal Protection Claim against Officer Gompper as he observed in and participated in Mr. Nodine's May 18, 2017 interview and was aware of the facts of Ms. Chase's final interview when he prepared the police report indicating that she would be charged with making a false statement and the investigation against Mr. Nodine would be closed. Accordingly, summary judgment on the Equal Protection claim asserted against Officer Gompper is also DENIED.

F.  <u>Plaintiff's intentional infliction of emotional distress claims</u>

"In order for the plaintiff to prevail in a case for liability under ... [intentional infliction of emotional distress], four elements must be established. It must be shown: (1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe." *Appleton v. Board of Education*, 254 Conn. 205, 210, (2000) (internal quotation marks omitted).

The Town Defendants argue that Plaintiff cannot establish any of the elements of her intentional infliction of emotional distress (hereinafter "IIED")

claim, but only address the second element. The Plaintiff did not respond to the Town Defendants' motion for summary judgment on this claim, then sought leave to file a sur reply, arguing, *inter alia*, that the omission was inadvertent. [Dkt. 158 (Pl. Mot. for Leave to File Sur-Reply)]. The Court finds good cause lacking as Plaintiff also sought, *nunc pro tunc*, to expand briefing for their opposition of summary judgment. Granting permission to file a sur reply would protract briefing and could have been avoided by the exercise of careful diligence.

As Plaintiff notes in their motion to file a sur reply, D. Conn. L. R. Civ. P. 7(a)(2) provides, in relevant part, "failure to submit a memorandum in opposition to a motion may be deemed sufficient cause to grant the motion, except where the pleadings provide sufficient grounds to deny the motion." This rule does not, however, place a burden on the district court to ferret out every potential argument that could have been made on summary judgment. See *Ferraresso v. Town of Granby*, 646 F. Supp. 2d 296, 305 (D. Conn. 2009).

"Federal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way." *Ferraresso*, 646 F. Supp. 2d at 305 (quoting *Coltin v. Corp. for Justice Mgmt., Inc.*, 542 F.Supp.2d 197, 206 (D.Conn.2008)); *Ramos v. Town of E. Hartford*, No. 3:16-CV-166 (VLB), 2019 WL 2785594, at *5 (D. Conn. July 2, 2019)(same). This Court has found no authority that it must rule against the non-responsive party where the record does not warrant the entry of judgment in favor of the moving party.  Thus, the Court holds it has discretion to rule on this issue.

The Town Defendants' first argument is that under Connecticut law, "in a case involving a public official enforcing the law, public policy dictates that a valid arrest should not be the basis for intentional infliction of emotional distress against the official." *Brooks v. Sweeney*, No. CV 06 5005224S, 2008 WL 5481203, at *1 (Conn. Super. Ct. Nov. 28, 2008), *aff'd*, 299 Conn. 196, 9 A.3d 347 (2010). "As a matter of law—absent other factors that may constitute "extreme and outrageous" conduct—an arrest will not be considered intentional infliction of emotional distress if the arresting officer has probable cause to make the arrest." *Zalaski v. City of Hartford*, 704 F. Supp. 2d 159, 176 (D. Conn. 2010). But, the Town Defendants' argument presumes that the arrest was supported by probable cause. As discussed *supra*, whether Plaintiff's arrest was based on arguable probable cause remains a genuine issue of material fact.

At the pleading stage, the Court held that Plaintiff stated a claim for IIED where she alleged:

> that the Town of Canton police chose not to take her claims against Mr. Nodine seriously, treated Ms. Chase as though she was the assailant rather than a victim of sexual assault, willfully or recklessly ignored her attempts to clarify her statement of the events of her sexual assault, knowingly misrepresented the facts surrounding her statement in a sworn affidavit to the State's Attorney and a judge in order to obtain a warrant for her arrest for making a false statement, and then arrested her for initially leaving a salacious detail out of the recounting of her assault. Ms. Chase alleges more than the simple fact of her arrest; she alleges improper conduct leading up to an arrest which caused her significant emotional distress.

[Dkt. 66 at 29], reported at 360 F. Supp. 3d at 119.

Now, after the conclusion of evidence and after the Court has viewed the videos at issue in this case, Plaintiff has adduced sufficient evidence to raise a

genuine issue of material fact as to whether Detective Colangelo and Officer Gompper acted in an "extreme and outrageous" manner. A reasonable jury could find that knowingly and falsely "switching the case" on a sexual assault victim, who is visibly upset when she voluntarily discloses the prior omission of a completed sex act, then repeatedly states her suicidality and history of trauma "is conduct beyond all possible bounds of decency, and [is] regarded as atrocious, and utterly intolerable in a civilized community." *Appleton*, 254 at 210-11.

In short, because a reasonable jury could believe that Plaintiff's allegation, as summarized above, is true and constitutes "extreme and outrageous conduct," summary judgment must be DENIED as to Plaintiff's IIED claims against Detective Colangelo and Officer Gompper.

The Court agrees with Plaintiff that the Town of Canton cannot be liable if Detective Colangelo and/or Officer Gommper are held liable for IIED. Connecticut law is clear that municipalities are liable for damages caused by its employees, officers and agents acting within the scope of their duties, except that the municipality is not liable for  "(A) [a]cts or omissions of any employee, officer or agent which constitute criminal conduct, fraud, actual malice or willful misconduct." Conn. Gen. Stat. § 52-557n(a)(2)(A). The operative complaint does not state any direct basis for the Town of Canton to be held liable for intentional torts of its police officers. See e.g. *Cronin v. EASTCONN*, No. CV196017482S, 2019 WL 4733424, at *2 (Conn. Super. Ct. Aug. 30, 2019)(dismissing IIED claim against state entity because  "§ 52-557n(a)(2) bars such recovery based on the wil[l]ful and

malicious conduct of its staff." Accordingly, the Court GRANTS summary judgment for the Town of Canton on Plaintiff's IIED claim, Count 19.

Finally, since Plaintiff's claims against Officer Gompper and Detective Colangelo are proceeding, the Court DENIES the Town of Canton's motion for summary judgment as to indemnification pursuant to Conn. Gen. Stat. § 7-465.

## Conclusion

For the foregoing reasons, the Town Defendants' Motion for Summary Judgment is DENIED, except with respect to the Town of Canton's Motion for Summary Judgment as to Count 19, IIED. The Court GRANTS the Town Defendants' and Plaintiff's *nunc pro tunc* motions to file excess pages. [Dkts. 152 and 151, respectively]. The Court DENIES Plaintiff's Motion to File a Sur-Reply for failure to show good cause. [Dkt. 158].

IT IS SO ORDERED

_____/s/_____

Hon. Vanessa L. Bryant
United States District Judge

Dated at Hartford, Connecticut: September 29, 2020

51