1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

------------------------------X

NICOLE CHASE                    :

          Plaintiff,   :

        VS.              :   NO.  3:18-cv-00683(VLB)

NODINE'S SMOKEHOUSE, INC.,      :
CALVIN NODINE TOWN OF           :
CANTON, JOHN COLANGELO,         :
ADAM GOMPPER, MARK J.           :
PENNEY, AND CHRISTOPHER         :
ARCIERO                         :

         Defendants. :

------------------------------X

D E P O S I T I O N

     THE VIDEOTAPED DEPOSITION OF JOHN COLANGELO,

taken on behalf of the Plaintiff, before Kevin

Lombino, Registered Professional Reporter,

Notary Public within the State of Connecticut

Certificate Number 191, on the 29th day of

March, 2019, at 10:07 a.m., at the offices of

Shipman, Shaiken & Schwefel, LLC, 433 South Main

Street, West Hartford, CT.

GOLDFARB AND AJELLO, LLC (203) 972-8320

**EXHIBIT A**

1          will set that out and then --

2                THE VIDEOGRAPHER:  Off the record 12:17.

3                (Discussion was held off record.)

4                MR. CHIMES:  Mark this.

5                (Plaintiff's Exhibit 50, transcript, marked

6          for identification, as of this date.)

7                (Plaintiff's Exhibit 51, tape, marked for

8          identification, as of this date.)

9                THE VIDEOGRAPHER:  On the record 1:11.

10     Q.   Detective Colangelo, we have, the town has

11     provided us with copies of the transcripts of the

12     interviews.  We've made transcripts of the interviews.

13          I don't know whether you've reviewed the

14     transcripts of the interviews in advance or not.

15     A.   I have.

16     Q.   I just want to confirm that, have you found

17     inaccuracies in the transcripts compared to the tapes?

18     A.   Yes.

19                MS. MACCINI:  Objection to form.  Just to be

20          clear, you are talking about your office's

21          transcripts?

22                MR. CHIMES:  You haven't given me any

23          transcripts.

24                MS. MACCINI:  That's correct, but there

25          could be more than one transcript so I want to

**EXHIBIT A**

1          make sure we are talking about the right one.

2               MR. CHIMES:  Do you know of a transcript?  I

3          don't have any other transcripts.

4               MS. MACCINI:  A transcription that was

5          transcribed by Jackson O'Braski (ph.)

6     Q.   Do you have any notations of -- do you have any

7  notes of what you written down or what's inaccurate?

8     A.   No.  It was just abysmal the job that was done

9  transcribing it, so I didn't spend days making notations.

10    Q.   So what we are going to do is we are going to go

11 through -- we are not going to go through the whole

12 thing, we are going to go through certain sections and

13 what I want you to do is look at it, read it and tell me

14 what's, whether it's accurate or inaccurate, okay?

15    A.   Okay.

16    Q.   All right.  We go to 85836 and, detective, it's

17 starting on the last two lines of page one.  And just so

18 you know, we are --

19               MS. MARY-KATE SMITH:  Your pages are a

20          little different because, and you told me not

21          to --

22               MR. CHIMES:  That's fine, all right.

23    Q.   So it's started Detective Colangelo, it's all

24 good.

25          Do you see that?

EXHIBIT A

89

1    A.   I do sir.

2    Q.   And then it's going to go through page four

3 where it says Nodine's attorney, I mean he doesn't look

4 old and he is still playing the triangle league.

5    A.   Okay.

6    Q.   So listen or watch and make sure it's on and the

7 sound is on.

8         MS. MARY-KATE SMITH:  Let's see.

9         MR. CHIMES:  So we start at 858 -- I don't

10       know.

11   Q.   Stop.  Okay.  Can you tell me what lines in this

12 are inaccurate?

13   A.   I know there is a few.  First of all, I didn't

14 say Joel Heath, I didn't say Heath and Morgan.

15   Q.   So what, what, what did you say?

16   A.   Keefe.

17   Q.   K-e-e-f-e?

18   A.   Um-hmm.

19   Q.   Okay.  So that would have been Joel Keefe?

20   A.   I don't think it's Joel.

21   Q.   What do you think?

22   A.   I can't -- I think I said it's Hugh Keefe or

23 Hugh maybe instead of Bruce is his brother, I don't

24 recall, but I was talking about Hugh Keefe.

25   Q.   Was Hugh his brother, Bruce's brother?

GOLDFARB AND AJELLO, LLC (203) 972-8320

**EXHIBIT A**

90

1     A.   I'm guessing that that's where Hugh is supposed

2  to be because I don't know a Bruce Keefe.  I know who

3  Hugh Keefe was, he's deceased, and that's where it comes

4  up two lines down.

5     Q.  But Hugh Keefe, well, Hugh Keefe is not dead so.

6     A.  Yes, he is.  There is one that is deceased I

7  believe, Ruth Keefe's brother.  Ruth instead of Bruce.

8  He must have gotten Bruce wrong.

9       Bruce was my math teacher.

10    Q.  So you think you said Hugh not Bruce when you

11  said Bruce's brother?

12    A.  Bruce was probably supposed to be.

13    Q.  No, no, I am just trying to -- where it says

14  Detective Colangelo, it says Bruce his brother, now you

15  think it says Hugh his brother?

16    A.  Ruth his brother.

17    Q.  R-u-t-h?

18    A.  Yes.

19    Q.  And then above that where it says Keefe, you

20  think it isn't Joel you said --

21    A.  Well, I didn't -- I said Keefe.  Where it says

22  which Heath is that.

23    Q.  Which Keefe?

24    A.  Keefe.

25        MS. SMITH:  Can we just clarify the record,

GOLDFARB AND AJELLO, LLC (203) 972-8320

**EXHIBIT A**

91

1      can you spell Keefe?

2          MR. CHIMES:  K-E-E-F-E.

3          THE WITNESS:  Yes.

4          MS. SMITH:  Okay, I wasn't sure which one

5      you were saying, okay.

6   Q.  And perhaps you can --

7          MR. MORAGHAN:  Oh, I see which one.

8          MR. CHIMES:  Yeah, this isn't a guessing

9      game.  I just want to get it accurate.

10         MR. MORAGHAN:  It's Hugh Keefe, it's Joe

11     Keefe, his sister was Ruth Keefe who was a

12     teacher.

13         MR. CHIMES:  Hold on, hold on.  Where it

14     says Nodine's attorney it says Joel Keefe.

15         MR. MORAGHAN:  Joe Keefe, j-o-e k-e-e-f-e.

16         MR. CHIMES:  And he says Ruth his brother.

17         MR. MORAGHAN:  Ruth, r-u-t-h which was his

18     sister, Joe was Ruth's brother.

19         MR. CHIMES:  Okay, all right, that's fine.

20         MR. MORAGHAN:  He's been dead for I don't

21     know how many years.  Ruth brother's oh, right,

22     he had a septic.

23         THE WITNESS:  I think I said he had sepsis.

24         MR. MORAGHAN:  Sepsis, and that's true.  I

25     don't know what the root canal is.

GOLDFARB AND AJELLO, LLC (203) 972-8320

**EXHIBIT A**

92

1          MR. CHIMES:  But that's wrong.

2          MR. MORAGHAN:  I don't know what that means

3      at all.

4          MR. CHIMES:  Okay.

5          MR. MORAGHAN:  But it was Ruth was my math.

6          MR. CHIMES:  Okay, great.  Thank you.

7          MR. MORAGHAN:  Okay.

8    Q.   We are on page two now.

9         Anything here?

10   A.   I couldn't really keep up, but it looked, it

11   looks pretty okay right now.

12   Q.   Page four?

13   A.   Again, I couldn't keep up with the video line

14   for line, but it looks like it's probably our general

15   conversation.

16   Q.   Okay.  Nine, nine, the next one nine, 55 please.

17   Should be on page seven, it says which Keefe was this,

18   it's just two lines.

19          MR. CHIMES:  That's fine.

20   Q.   So that was Joe not Joel, right J-O-E?

21   A.   He, he spoke it.

22   Q.   All right.  Next on page eight, you are saying

23   bottom of page eight, so you got all employees in an

24   uproar or something, which is --

25          MS. MARY-KATE SMITH:  This is the middle of

**EXHIBIT A**

93

1          the page.

2     A.   Oh, yeah, okay.

3     Q.   You got it?

4     A.   Yeah.

5     Q.   Then it goes to probably about ten lines.  So

6  what this girl's deal.

7     A.   Okay.

8     Q.   Okay.  Anything inaccurate about that part of

9  the transcript?

10     A.   No, it seems correct.

11     Q.   Okay.  And when you said what is this girl's

12  name again, the transcript shows you looking at the file.

13     A.   I was reading.  I couldn't see.

14     Q.   That's fine.  Okay.  So when asked what is this

15  girl's name here you looked at the file?

16     A.   I looked at something, I don't know what it was.

17  I can't tell.

18     Q.   Okay, page 13.  It starts top of page 13, I

19  mean, I mean jobs?

20          MS. MARY-KATE SMITH:  It's 12 for them.

21          MR. CHIMES:  Second to last line, middle of

22       page 12.

23          MS. MACCINI:  Bottom.

24          MR. CHIMES:  Detective Colangelo, I mean, I

25       mean jobs.  We are going to go probably about 15

GOLDFARB AND AJELLO, LLC (203) 972-8320

**EXHIBIT A**

94

1          lines.  Okay.

2               MS. MARY-KATE SMITH:  Sorry I cut it off.

3     Q.   Anything in --

4               MS. MARY-KATE SMITH:  Sorry.

5               MR. CHIMES:  Okay, stop.

6     Q.   Anything inaccurate in that section of the

7   transcript?

8     A.   No, it seems normal.

9     Q.   Okay.

10              MS. MARY-KATE SMITH:  14.

11    Q.   It says can't you tell I'm my father's son.

12  Then we are going to go through about a page and a half,

13  okay.

14         Anything inaccurate about that?

15    A.   It's very difficult to tell.  I mean, nothing of

16  substance.

17    Q.   You want to go back?  I want --

18    A.   No, I'm fine.

19    Q.   Is this fairly -- the question is does this

20  fairly and accurately, fairly and accurately describe

21  what you and in this case Attorney Moraghan and Calvin

22  Nodine said?

23         I don't, you know, do you want to listen to it

24  again, it's fine?

25    A.   No, I was just looking for something.

**EXHIBIT A**

1  Q. You want to listen to it again?

2  A. No, I don't.  I just want to, I just want to

3 find the line that I was looking for.

4  Q. Um-hum.

5  A. I don't think I -- where it says you can't go to

6 dinner with him because everyone will see him, want to

7 talk.  I couldn't understand that with that so.

8  Q. Well, let's listen and see if we can get it.

9    Before I do it, anything else in this part of

10 the transcript?

11  A. Not that I, not that I could see.  I was fixated

12 on that.

13     MR. CHIMES:  Okay, Mary-Kate, can you do it?

14     MS. MARY-KATE SMITH:  I'm going, 904 --

15     MR. CHIMES:  Stop.

16  A. I don't really know what I said, I couldn't hear

17 it but that's probably good enough.

18  Q. I mean, do you think everyone will see him and

19 think he but then something talk, want to talk the --

20  A. I couldn't hear it, sir, I just --

21  Q. No.

22  A. It's not clear enough for me to hear.

23  Q. Okay.  I'm going to cross out one and just put

24 unless --

25  A. Okay.

**EXHIBIT A**

96

1     Q.   When you said on there I just wanted him to know

2  that I wasn't being a doofus, who were you -- who were

3  you saying you didn't want -- who were you saying you

4  wanted to know wasn't a doofus?

5     A.   Me, I didn't want to be a doofus.

6     Q.   Who were you worried about --

7     A.   I wasn't worried about anyone.

8     Q.   When you say I wanted him to know I wasn't being

9  a doofus, was that Nodine or was the Attorney Moraghan --

10    A.   Probably Attorney Moraghan.

11    Q.   90659.  Where it says, yeah, did you make some

12  bad joke.

13         MS. MARY-KATE SMITH:  It's 17 for them.

14    Q.   Page 17, and it goes probably a page and a half.

15  Keep going through 90750.

16         MS. MARY-KATE SMITH:  Okay, okay.

17    Q.   And anything inaccurate on --

18    A.   No.

19    Q.   What?

20    A.   No.

21    Q.   Okay, 90852.  Starting at look, I just, I got a

22  whole pile of bad shit going on.

23         MS. MARY-KATE SMITH:  So it's 20.  You guys

24         start at the top.

25    Q.   And it's just four lines.

GOLDFARB AND AJELLO, LLC (203) 972-8320

**EXHIBIT A**

97

1          Anything inaccurate about that?

2      A.   No, it seems right.

3      Q.   Okay.  Did you ever do any follow up on this

4   statement that he fired his whole crew?

5      A.   In what sense?

6      Q.   Talk to anybody on his crew other than Nicole.

7      A.   Adam Gompper talked to Allie and Kyle.

8      Q.   Right, but that was before this.  I'm talking

9   about after he said this, I just fired my whole crew, did

10  you do any follow up with anybody other than Nicole?

11     A.   No.

12     Q.   Did you ever talk to anybody but Nicole in

13  connection with this investigation?

14     A.   Yes.

15     Q.   Who?

16     A.   Calvin.

17     Q.   This date, on June 21, the date of this

18  interview.

19          MS. MACCINI:  Objection to form.

20     Q.   I'm sorry, May, May, May --

21          MS. MACCINI:  18th.

22     Q.   -- 18th, you talked to Calvin on May 18?

23     A.   Right.

24     Q.   Did you talk to Calvin on any other dates?

25     A.   Yes.

**EXHIBIT A**

98

1      Q.   When?

2      A.   When he called.

3      Q.   Okay.  When did he call?

4      A.   I don't recall the date.

5      Q.   And what did he tell you?

6      A.   Told me they took a polygraph and I think he

7  failed it because of medication and -- I can't remember

8  the entire conversation.

9      Q.   Okay.  Anything, any other times you talked to

10  Calvin?

11     A.   I don't think.

12     Q.   Did you talk to him before you executed the

13  warrant?

14     A.   No.

15     Q.   Okay.  Did you talk to anyone else, any other

16  potential witnesses in this case other than Calvin and --

17     A.   No.

18     Q.   Okay, okay.  90915.  My page 21 and it goes to

19  the next page, full page.

20          MS. MARY-KATE SMITH:  Your 20 starts at Niki

21          is kind of whatever.

22          You got it?

23          THE WITNESS:  Um-hmm.

24     Q.   Okay.  So there's a part where it says

25  unintelligible, Nodine and Colangelo talk at once.

GOLDFARB AND AJELLO, LLC (203) 972-8320

**EXHIBIT A**

99

1          Other than that part, was there anything
2   inaccurate in this section of the transcript?
3      A.   No.
4      Q.   Can I ask you just again to see if we can figure
5   out what -- maybe you will recognize it, the part where
6   there's some talking that the transcript should -- go
7   back, Mary-Kate.
8              MS. MACCINI:  I'm here, I'm trying to --
9              MR. CHIMES:  Go back to the beginning of --
10             MS. MARY-KATE SMITH:  The beginning of it.
11             MR. CHIMES:  Yeah, it will be that's what I
12         meant lying on the floor doing everything.  Go
13         back, stop.
14     A.   No, I can't understand what I said.
15     Q.   Give it another shot.  You can't tell me?
16  Anything?
17     A.   I think I was saying you could do a bunch of
18  jobs or something like that.  I can't really give you a
19  verbatim total of what I said.
20     Q.   You definitely hear a bunch of jobs?
21     A.   No, I was just paraphrasing what I thought.
22     Q.   So we can't really improve what's on it?
23     A.   No, I just, I can't hear it.
24             MS. MARY-KATE SMITH:  So we are on so nine
25         and ten so it's your 22 and it's start Detective

                GOLDFARB AND AJELLO, LLC (203) 972-8320

**EXHIBIT A**

100

1          Colangelo um-hmm, so Allie and Kyle leave.

2     Q.   It goes about a page.

3          MR. CHIMES:  Okay.

4     Q.   Anything inaccurate about that?

5     A.   I don't think the thing started at the two lines

6   you said it did, it started like, it started with the

7   um-hmm so Allie and Kyle left first.  I had you saying

8   about somewhere in the middle it was Kyle and Allie.  So

9   it starts at um-hmm so Allie and Kyle leave.

10    Q.   So see if you can go a little bit before that,

11  just want to make sure.  Okay, so is that --

12    A.   Yeah.

13    Q.   So anything between?

14    A.   Yeah, no, that was good.

15    Q.   All right.  If you could go to my bottom of 25?

16         MS. MARY-KATE SMITH:  It's the bottom of 24

17         where it says Detective Colangelo, well, she

18         said that day.

19         MR. CHIMES:  Um-hum.

20    Q.   Anything inaccurate about those lines?

21    A.   No.

22         MR. MORAGHAN:  Can you turn that up a little

23         bit, if you can?

24         MS. MARY-KATE SMITH:  The problem is -- I

25         should have brought my speaker, I'm sorry.

GOLDFARB AND AJELLO, LLC (203) 972-8320

**EXHIBIT A**

101

1        MR. CHIMES:  Hold on, there's a way going.

2        MS. SMITH:  Keep going, don't worry.

3        MR. CHIMES:  91402 page 28, my 28.  She

4    could have been out from having a cigarette.

5        MS. MARY-KATE SMITH:  So it's bottom of 26.

6        MR. CHIMES:  Okay.

7   Q.   Anything inaccurate in that?

8   A.   I couldn't tell who said this from the angles

9   I'm looking at, it was Gompper or me.

10  Q.   Why don't you take a look.

11       MS. MARY-KATE SMITH:  One of them you can

12   see.

13  A.   It's tough for me to look and read at the same

14   time.

15       MS. MARY-KATE SMITH:  I am just saying -- I

16   understand.

17  A.   I said it, Adam didn't say it.

18  Q.   Are you sure?

19       MS. MARY-KATE SMITH:  I can see his arm

20   move.

21       MR. CHIMES:  I think it's him but if it

22   isn't, that's fine.

23       MS. MARY-KATE SMITH:  Make it bigger?

24       MR. CHIMES:  That would be good.

25  A.   It's me.

**EXHIBIT A**

102

1          MS. MACCINI:  You are going to disagree with

2      him?

3          MR. CHIMES:  Let's go back and do it again.

4          MS. MACCINI:  He says it, it's his voice.

5          MS. MARY-KATE SMITH:  We just want it right,

6      that's all.  We're not --

7          MS. MACCINI:  We want it right as well.

8   A.   It's me.

9   Q.   Okay, okay.  Again, so the point of this is to

10  get it right not to get -- make sure the transcript is

11  accurate compared to what was, what actually happened.

12  A.   That's why I'm telling you where I see it.

13  Q.   I'm not sure we see it the same way but if

14  there's a disagreement we will each reach a resolution.

15  I'm just telling you what's going on.

16          MS. MACCINI:  I'm going to object because

17      you are trying to indicate that the actual

18      witness who is making the statement would not

19      have more knowledge than you, the attorney,

20      would.  He's told you three times that he is the

21      one that said it.  I don't --

22          MR. CHIMES:  There is no need.

23          MS. MACCINI:  -- think it's debatable.

24          MR. CHIMES:  There is no need to debate.

25      The video shows who is talking so --

**EXHIBIT A**

103

1          MS. MACCINI:  And the audio speaks for

2     itself as well.  And maybe if you had an actual

3     speaker so everyone can hear, this would be much

4     easier but you don't.

5          MR. CHIMES:  I don't know why we are

6     arguing.

7          MS. MACCINI:  So we are doing the best we

8     can.

9          MR. CHIMES:  I don't know why we are arguing

10    about this.  I really don't understand what your

11    point was there, so --

12         MS. MACCINI:  That nobody can hear what

13    you're playing was the point, I think we have

14    said that.  The two attorneys at the other end

15    of the table are not hearing any of this.

16         MS. SMITH:  I can hear some of it, I can't

17    see any of it.

18         MR. CHIMES:  Well, you can move.  I don't

19    have a problem.  You know, we are doing the best

20    we can so, so.

21         So is there any other complaints you have

22    before we move on?

23         MS. MACCINI:  I just, we want to get through

24    this deposition and complete it today so let's

25    move on.

**EXHIBIT A**

104

1          MR. CHIMES:  Okay.  Well, I just wanted to
2      make sure you didn't have anything else to
3      object about.
4          We will go to 91438.
5          MS. MACCINI:  What page are we on now?
6          MS. MARY-KATE SMITH:  27, sorry.
7    Q.  Anything inaccurate about what you said in that?
8    A.  No.
9    Q.  As of June 21 or as May 18, 2017, do you believe
10   that Ms. Chase had already obtained a lawyer?
11   A.  I was told she spoke to a lawyer.  I don't know
12   if she retained one.
13   Q.  Who told you, who told you prior to May 18, 2017
14   that she had already gotten an attorney?
15   A.  I don't know if she had gotten an attorney.  I
16   think I was told she was talking to an attorney.
17   Q.  Who told you that?
18   A.  I can't recall.
19   Q.  Officer Gompper?
20   A.  I said I couldn't recall.
21   Q.  Sergeant Penney?
22   A.  I said I couldn't recall.
23   Q.  Okay, just trying to refresh your recollection.
24   A.  Doesn't help.
25   Q.  Are you offended by me saying --

GOLDFARB AND AJELLO, LLC (203) 972-8320

**EXHIBIT A**

105

1  A. No, I just said I doesn't help.

2  Q. Are you offended by me trying to refresh your

3 recollection?

4  A. No, sir, I'm not.  But I'm just going to -- when

5 I can't recall, I can't recall.  I'm just trying to help

6 you move this along.

7    MR. CHIMES:  922.

8    MS. MARY-KATE SMITH:  This is on --

9    MR. CHIMES:  Page three of mine.

10    MS. MARY-KATE SMITH:  -- 29 Nodine saying we

11    were talking about a claim.

12    MR. CHIMES:  Stop.

13  Q. Anything inaccurate about that?

14  A. No.

15  Q. The next one.

16    MS. MARY-KATE SMITH:  So you go to the next

17    page it's starts Detective Colangelo I'm just

18    trying to figure out.

19    MR. CHIMES:  Keep going.

20    MS. MARY-KATE SMITH:  Oh.

21    MR. CHIMES:  Okay, stop.

22  Q. Anything inaccurate in that?

23  A. No, it seems accurate.

24  Q. Okay.  You started to say like if a black male

25 wants to say work at a, and then you were interrupted.

**EXHIBIT A**

106

1      A.   Um-hum.

2      Q.   What were you talking -- what was the story --

3      A.   I was probably making an analogy.

4      Q.   What was the analogy you were trying to make?

5      A.   I don't recall.

6      Q.   Was it about a black male wanting to work at a

7   store and claiming discrimination?

8      A.   No.  I don't recall.

9      Q.   Okay.  And in it you say that she is talking

10  about you being a millionaire.

11          So I take it that you got that either from a

12  report or from Officer Gompper because you hadn't spoken

13  to Ms. Chase then?

14     A.   Correct.

15     Q.   All right.

16          MR. CHIMES:  923.

17          MS. MARY-KATE SMITH:  So this is the bottom

18          of page 31 Detective Colangelo, I don't know if

19          she's.

20          MR. CHIMES:  Finish it.

21          MS. MARY-KATE SMITH:  Okay.

22          MR. CHIMES:  It's okay.

23     Q.   Anything inaccurate in that?

24     A.   Yeah, could you play it again because with the

25  breaks in it, I couldn't follow it completely.

GOLDFARB AND AJELLO, LLC (203) 972-8320

**EXHIBIT A**

107

1      Q.   Sure, also if you can recognize what he said
2   when it's unintelligible, um.
3           MR. CHIMES:   Okay.
4      Q.   Anything?
5      A.   In the line where I said, yeah, but again her
6   calculation of your wealth, I don't think it's from a
7   comic book, it's from looking at your business.   I
8   actually said looking at your family business.
9      Q.   And where it says did you tell her then it says
10  unintelligible?
11     A.   I couldn't understand that either.
12     Q.   I thought it said how much is it worth.
13     A.   That would just be speculation.
14     Q.   I don't want to you speculate.
15          MR. CHIMES:   Go down to 92427.
16          MS. MARY-KATE SMITH:   It's on your page 33
17          in the middle.
18          MR. CHIMES:   All I'm saying is.
19     Q.   Anything inaccurate about that?
20     A.   Where I say, um, you know that's what people
21  look at.   You left out you know after that's your name or
22  that's how your name is already recognized.
23     Q.   So it's that's what people look at, you know,
24  that's how your name?
25     A.   Yup, that's what I said.

GOLDFARB AND AJELLO, LLC (203) 972-8320

**EXHIBIT A**

108

```
 1      Q.   Did you say you know in the beginning too?

 2      A.   No, I said it between, right where I said it,

 3  that's what people look at, you know, that's how your

 4  name is already recognized.

 5      Q.   So the um, you know, at the beginning is not

 6  there?

 7      A.   Oh, I -- yeah, that's there I think because --

 8      Q.   You said it twice?

 9      A.   Yeah, I wasn't putting two in is what I'm

10  saying, I was only adding one.  And there might be a line

11  missing between where I said so and Adam said, just

12  blurted it out.  He might have said something but I

13  couldn't tell.  It's very hard to tell.

14      Q.   Adam said no, no she just said it and you said

15  so and Adam said just blurted it out?

16      A.   No, okay, then that's right, then I missed that

17  there, I'm sorry.

18      Q.   All right.  Okay, let's -- from -- there was a

19  time at which point during this interview you, you

20  stopped to speak to your lawyer.

21           Do you remember that?

22                MS. MACCINI:  Objection to form.

23      Q.   Not you, that Ms. Nodine stopped to speak to his

24  attorney, do you remember that?

25      A.   Yes.
```

**EXHIBIT A**

109

1    Q.   Okay.  And what happened, what happened, what

2  did you guys do, you and Officer Gompper do while that

3  was happening?

4    A.   Probably went to the hallway or dispatch to see

5  what was going on.  I don't recall.

6    Q.   Did you have any conversations with Attorney

7  Moraghan off camera?

8    A.   No.

9    Q.   Did you have any conversations with attorney --

10  with Mr. Nodine off camera?

11    A.   No.

12    Q.   Okay.  Did you speak to anyone else in the

13  department about the case while you were off camera?

14    A.   I don't recall.  Most likely we just went to

15  dispatch because dispatch is right there.

16    Q.   Um-hum.  Before you went on camera with

17  Mr. Nodine and Mr. Moraghan, did you have any

18  conversations with either of them?

19            MS. SMITH:  Objection to form.

20            MS. MACCINI:  I join the objection.

21    A.   No.  I think Adam was the one who made contact

22  but I'm not positive.

23    Q.   Okay.  And had you spoken to Attorney Moraghan

24  about the case before he came in that day?

25    A.   No.

GOLDFARB AND AJELLO, LLC (203) 972-8320

**EXHIBIT A**

110

1      Q.   And you had not spoken to Attorney Nodine -- you

2  had not spoken to Mr. Nodine before he came in that day?

3      A.   No.

4      Q.   Do you know when you first became involved in

5  the case before the interview, like how long before?

6      A.   No, I can't recall.

7      Q.   And when the statements were taken on May 11, at

8  that point you were not yet involved in the case?

9      A.   Correct.

10     Q.   And so do you know how you -- did Officer

11 Gompper ask for your assistance, did some other senior

12 officer ask you to get involved?  How did it happen?

13     A.   I don't recall.

14     Q.   Okay.  Is there any -- when you started to work

15 on the case, is there any paperwork generated that you

16 are now working on the case?

17     A.   No, not that I recall.

18     Q.   Did you speak to anyone besides Adam Gompper

19 about the case before the interview on May 18?

20     A.   I don't recall.

21          MR. CHIMES:  Okay, let's go to 92504.

22          MS. MARY-KATE SMITH:  So that's on page 34.

23      It starts all right, look it, that's Calvin.

24          MR. CHIMES:  Okay.

25     Q.   Anything about those lines that is inaccurate

GOLDFARB AND AJELLO, LLC (203) 972-8320

**EXHIBIT A**

111

1    from what was stated?

2        A.   Right, so where it said, well, not the

3    conversation, you have but the actions before, I actually

4    said probably the actions before.

5              MR. CHIMES:  Can you play is again, Mary, so

6         we can hear that.  Okay, thanks.

7              MS. MACCINI:  You said what is done is done

8         as my mom would say.

9        A.   Probably, you are right.

10       Q.   Did you say as my mom would say?

11             MS. MACCINI:  As my mom would say, let John

12        confirm that.

13       A.   Yeah, as my mom would say.

14       Q.   You said as my mom would say let's move on?

15       A.   No, no let's move on, just as my mom would say.

16   What is done is done as my mom would say.  I never said

17   let's move on.

18       Q.   Thank you, okay.  Anything else in that section

19   that we went through?

20       A.   No, it seemed normal after that.

21             MS. MARY-KATE SMITH:  Ready?

22             MR. CHIMES:  No, if we can go to page 37.

23             MS. MARY-KATE SMITH:  It's your 35 at the

24        bottom.  It starts --

25             MR. CHIMES:  I know I got my father's

                 GOLDFARB AND AJELLO, LLC (203) 972-8320

**EXHIBIT A**

112

1          height.  Okay.

2      Q.   Anything in those lines that is inaccurate?

3      A.   I said this was 20 years ago when people were

4  spitting at us.  I said something about spit masks but he

5  doesn't have it in here.

6      Q.   Okay, if you can go to that to try and get it

7  right.

8          MS. MARY-KATE SMITH:  Should I go to the

9          beginning or --

10          MR. CHIMES:  No, trying to get to where it

11          says in the civil part.  Wore spit masks or

12          things like that, is that --

13      A.   I can't exactly say what it's --

14      Q.   Go back.

15      A.   It's people were and then I said spit masks or

16  things like that.  I think I interrupted my own thought

17  process.

18      Q.   Let's try to get it.  Go head, just.

19      A.   It sounds like before spit masks.

20      Q.   Um-hum.  And this case, is this the Doyle case

21  that you referred to earlier?

22      A.   No.

23      Q.   Okay.  I take it you never got sued in this

24  case?

25      A.   No, I only knew who the young man was.

GOLDFARB AND AJELLO, LLC (203) 972-8320

**EXHIBIT A**

113

1      Q.   Why did you mention this case at this point when

2   you are in the interview?  What was your, what

3   interrogation technique were you using that you would

4   talk about a frivolous lawsuit against yourself?  What

5   was, what was your thinking?

6      A.   It wasn't a frivolous lawsuit, I wasn't sued.

7      Q.   No, you were saying that the case, his claim

8   would be frivolous, right?  If you brought a claim, he

9   was trying to bring a claim, right?

10     A.   I believe I was talking about I don't know

11  whether she has a lawyer at this point or not.  She can

12  go talk to lawyers just like this young man did but she

13  might not have one because she might not have a case.  I

14  don't know.

15     Q.   Why would, why would in the middle of an

16  interview with a, somebody who has just changed their

17  story completely, why would you suggest that her case

18  might be frivolous at this point in the interview?

19          MS. MACCINI:  Objection to form.

20     A.   I didn't, I didn't.

21     Q.   Then why did you mention -- what's the point in

22  the interrogation of raising this story?

23     A.   I was discussing whether she had a lawyer or not

24  and I didn't know if she had a lawyer.  And I explained

25  you could go talk to a lawyer like this young man did but

GOLDFARB AND AJELLO, LLC (203) 972-8320

**EXHIBIT A**

114

1  it doesn't mean they are going to take your case.

2      Q.   So, okay.   So then why, why, did you use that

3  analogy about whether she had a lawyer or not?

4      A.   It's not an analogy whether she had a lawyer or

5  not.

6      Q.   Why did you tell this -- I'm just trying to

7  understand why in an interrogation of somebody who is

8  accused of sexual assault who just lied and admitted they

9  lied you would talk about a 20-year-old person who was

10 trying to sue you but had no case.

11          I'm trying to understand:   Why, what was going

12 through your brain while you were --

13          MS. MACCINI:   Objection to form.

14     Q.   What was going through your brain when you told

15 that story?

16          MS. MACCINI:   Objection to form.

17     A.   What was going through my brain as I -- I was

18 explaining whether, I don't know whether she had a lawyer

19 at that point.

20     Q.   That's it, that's the only thing in your brain

21 at that point?   You weren't trying to suggest anything by

22 telling the story of a person who wanted to sue but had

23 no basis for a lawsuit?

24     A.   No.

25          MR. CHIMES:   Go to 928.

GOLDFARB AND AJELLO, LLC (203) 972-8320

**EXHIBIT A**

1          MS. MARY-KATE SMITH:  Okay, so this is on

2     page 38 at the top.

3   Q.   Anything inaccurate about that?

4   A.   No.

5   Q.   Were you aware during your investigation that

6  Nicole Chase does not drive, doesn't have a license?

7   A.   No.

8   Q.   Do you know -- during the course of your

9  investigation did you determine how she got home that

10  night?

11   A.   No.

12          MR. CHIMES:  92826 which is my page 41.

13          MS. MARY-KATE SMITH:  It's your page 38

14     towards the top.

15          MR. CHIMES:  Adam Gompper, was there any

16     kind of talk.

17          MR. CHIMES:  Hold up.

18          MS. MACCINI:  You weren't in the right

19     location when you started please because you

20     said 38 but it's actually page 39.

21          MS. MARY-KATE SMITH:  I beg your pardon.

22          MS. MACCINI:  Thank you.

23   Q.   Look likes there was some things.

24   A.   Um-hmm.

25   Q.   Okay.  Tell me what you heard that was --

                GOLDFARB AND AJELLO, LLC (203) 972-8320

**EXHIBIT A**

116

1     A.   Under Adam Gompper he said any type of you have

2  a relation, it's relationship.

3     Q.   Okay.  Was that the first line?

4     A.   Was there any kind of talk or type of relation.

5     Q.   It's relationship?

6     A.   Correct.

7     Q.   Um-hmm.

8     A.   And then you have transcribed here that Calvin

9  Nodine said no it was totally dash and I think he says

10  spur of the moment.

11     Q.   Okay.  Anything else?

12     A.   No.

13          MR. CHIMES:  Where -- if we go five lines

14         down where it has Calvin Nodine saying no, I

15         didn't, I didn't hear that.  So let's, let's

16         just go through it again so we can make sure we

17         all agree on.  Start again.  Stop, stop.

18     Q.   But did you hear or anything like that?

19     A.   Yeah.

20     Q.   Okay.

21          MR. CHIMES:  Go ahead.

22          MS. MARY-KATE SMITH:  The same thing?

23          MR. CHIMES:  No.  Wait, go back because I

24         want to hear where it says Nodine said no, it

25         was totally where we heard spur of the moment.

**EXHIBIT A**

117

1          Okay.

2     Q.   So is it Nodine says totally spur of the moment

3   and Gompper doesn't say spontaneous?

4     A.   I was listening to the Nodine part.  He says,

5   no, he says no it was totally spur, spur of the moment

6   and then I have to, you have to play it again for me to

7   listen to see what was Adam's response was.

8               MR. CHIMES:  Okay.  Hold on.

9     Q.   I hear, I think he is asking is there any

10  flirtation and things like that, am I right and somebody

11  says, yeah, but I don't think it was Nodine.

12    A.   It says, was it completely out of the blue.  I

13  think it's Adam saying that, not me.

14    Q.   Okay, so let's go back because I think you say,

15  I think he is asking any flirtation or things like that,

16  am I right.  Somebody I assume, I wasn't looking but

17  somebody, I assume Gompper says yes.

18              MS. MACCINI:  Objection.

19              MR. CHIMES:  Why, why?

20              MS. MACCINI:  That's not what it says, you

21        are just --

22              MR. CHIMES:  I'm just asking.

23              MS. MACCINI:  But there was no question.

24        Attorney Chimes, you have to ask a question.

25              MR. CHIMES:  Listen.

GOLDFARB AND AJELLO, LLC (203) 972-8320

**EXHIBIT A**

118

1          MS. MACCINI:  What's the question that's

2          pending?

3          MR. CHIMES:  All right, put it off for a

4          second.  Turn it off.

5          MS. MARY-KATE SMITH:  It is.

6          MR. CHIMES:  Look, I'm trying to get,

7          authenticate the transcript.

8          MS. MACCINI:  I understand.

9          MR. CHIMES:  So I'm just doing it.

10         MS. MACCINI:  But you're, you're suggesting

11         what the, what the answer is.

12         MR. CHIMES:  I'm asking -- any time I

13         suggest I'm asking the witness so.

14         MS. MACCINI:  So that we are all on the same

15         page, what's the questions that's pending?

16         MR. CHIMES:  I don't even know because I

17         don't even know why you said what you said.  We

18         are just trying to get the transcript.

19         Maybe you haven't noticed what we have been

20         trying to do but I think it's fairly obvious and

21         I think it's pretty clear.  I'm not trying in

22         any way to mislead the witness.  I'm trying to

23         get an accurate transcript.

24         MS. MACCINI:  Understood but --

25         MR. CHIMES:  And if you want to interfere

**EXHIBIT A**

119

1          with that process, you could do it and you could

2          object but we will get done faster if we just

3          get through it.

4              MS. MACCINI:  Attorney Chimes, at the same

5          time we need to have a clear record and I sense

6          that the court reporter is struggling a little

7          bit.

8              MR. CHIMES:  I don't think he is struggling

9          right now.

10             MS. MACCINI:  So go ahead and replay it.

11             MR. CHIMES:  Okay, okay.  I think where it

12         says Detective Colangelo, I think he's asking is

13         there any flirtation, things like that.  Am I

14         right?  And then again I heard somebody say yes

15         but I don't know who that was or whether it

16         was --

17             MS. MACCINI:  I didn't, I didn't hear that

18         at all but let's just play the audio.

19             MR. CHIMES:  Okay, we will just play the

20         audio.

21             MS. MARY-KATE SMITH:  I don't know how far

22         back it goes.

23             MR. MORAGHAN:  I think we are pretty clear

24         where Gompper says was there any talk of type of

25         relationship.

                GOLDFARB AND AJELLO, LLC (203) 972-8320

EXHIBIT A

120

1          MR. CHIMES:  No, I think it's.

2          MR. MORAGHAN:  And then it's gets --

3          MR. CHIMES:  If you go four lines down --

4          MS. MARY-KATE SMITH:  I can't do it, I have

5      to just guess so I'm just going to guess.

6          MR. CHIMES:  That's fine.

7          MS. MARY-KATE SMITH:  Okay, so I think I'm

8      close.

9          MR. CHIMES:  Go ahead.  Stop.

10   Q.   Somebody said yeah, or I heard somebody say.

11   That's what I --

12        Did you hear that?

13   A.   I can't, I can't make heads or tails of it.

14   Q.   Okay.

15   A.   And I think Gompper is the one that says like it

16   was completely out of the blue I'm pretty sure.

17   Q.   Okay.

18          MR. CHIMES:  Let's just play if you can from

19      here one last time, see if everybody hears the

20      yeah but otherwise it's fine.  Stop it.

21   A.   Two people are talking on each other.  I can't

22   understand what's happenings.

23          THE REPORTER:  Now you know how I feel.

24   Q.   Page 42, line --

25          MS. MARY-KATE SMITH:  It's page 40 at the

GOLDFARB AND AJELLO, LLC (203) 972-8320

**EXHIBIT A**

121

1          top after um-hum.

2      Q.   Anything inaccurate about that?

3      A.   No, we worked out the day, it was the end.

4  Yeah, it's fine.

5               MR. CHIMES:  921.

6               MS. MARY-KATE SMITH:  It's your page 40.

7      Q.   Detective Colangelo says she's saying.

8      A.   Page what?

9               MS. MARY-KATE SMITH:  41.

10     Q.   Anything inaccurate about that?

11     A.   Right at the top it said what happened that.  I

12 said what happened from prior night not that prior night.

13              MR. CHIMES:  Play it again, just to make

14          sure.

15              MS. MARY-KATE SMITH:  I'm sorry?

16              MR. CHIMES:  Play it again.  Okay.

17     A.   I said what happened from the prior, prior night

18 before.

19     Q.   Um-hum, okay.  Anything else on that one, that

20 section?

21     A.   Not that I can see.

22              MS. MARY-KATE SMITH:  It's 42 the next one.

23          The second Detective Colangelo, 42.

24     Q.   Anything inaccurate about that?

25     A.   No.

                GOLDFARB AND AJELLO, LLC (203) 972-8320

**EXHIBIT A**

122

1    Q.   So you decide that you don't have to go through

2  with the statements that she or any of the witnesses

3  allege that he has said in this portion of the interview?

4           MS. SMITH:   Object to the form.

5    Q.   Is that accurate?

6    A.   No.

7    Q.   Well, it says, I don't think we have to go

8  through all of them because it's just in general I'm a

9  meat guy I don't know what I said kind of, and you know,

10 covers it.   And I don't know if you'd remember all of

11 them.   I don't remember all the swears that I said and

12 I'm a cop.   I say a lot of swears, it's unfortunate, we

13 talk to people we swear all the time.   The swears are

14 what they understand.   Answer from Nodine, yeah.

15           So, and you didn't, in this interview you didn't

16 go through the specific allegations of inappropriate

17 statements, is this a fair statement?

18    A.   No.

19    Q.   Now, in a civil sexual harassment case, those

20 kinds of statements can be the basis of a claim, you

21 probably -- maybe you know that, maybe you don't.

22           I don't know if you know that.

23    A.   No.

24    Q.   And certainly, but isn't the types of things

25 that he was saying in the workplace to Nicole Chase and

GOLDFARB AND AJELLO, LLC (203) 972-8320

**EXHIBIT A**

123

1   to other people, isn't that relevant to the issue of

2   whether it's realistic that Nicole Chase would have

3   consensually had sex with him?

4        A.   No, it's not relevant.

5        Q.   Why not?

6        A.   People can speak all sorts of ways to each other

7   and not have sex or consensual sex.

8        Q.   Do you think that a man who's -- a woman is more

9   likely to have sex with a man who's vulgar and crude and

10  makes inappropriate contexts than someone who doesn't?

11            MS. SMITH:  Objection.

12            MS. MACCINI:  Objection to form.

13            MR. MORAGHAN:  Objection.

14       Q.   That seems to me -- you don't think that the way

15  a person treats a woman is relevant to the later question

16  of whether the woman's sexual contact with him was

17  consensual?

18            MS. MACCINI:  Objection to form.

19            MS. SMITH:  Objection to the form.

20            MR. MORAGHAN:  Objection.

21       A.   That's an unanswerable question.

22       Q.   To me it's a very easily answered question, but

23  could you answer that question?

24       A.   Because, because you want to use generalizations

25  and I have to use specifics and individualities on my

GOLDFARB AND AJELLO, LLC (203) 972-8320

**EXHIBIT A**

124

1   cases.

2       Q.   And in this specific case, you made a decision,

3   a specific decision in this case not to get his specific

4   answers to some of the specific accusations she made

5   about his behavior; is that correct?

6       A.   No.

7       Q.   Well, you didn't ask him -- you didn't follow up

8   on any of these accusations?

9       A.   Yes, I did.

10      Q.   On the specific inappropriate statements, you

11  didn't ask him any specific questions --

12      A.   Yes, I did.

13      Q.   -- about it in this interview?

14           MS. SMITH:   Object to the form again.

15      Q.   In this interview?

16      A.   Yes.   The boner statement.

17      Q.   What?

18      A.   I asked him about the boner statement.

19      Q.   Right, okay.   And we have gone through that?

20      A.   You said in this interview.

21      Q.   All right.   Any -- okay.

22           Any other places in this interview besides --

23      A.   I don't recall if there is any other places.

24      Q.   Okay.   Well --

25      A.   You couldn't recall the boner statement.

**EXHIBIT A**

125

1       Q.   No, I recall it.   It came earlier in the case
2   and I think your, the way you brought out the boner
3   statement speaks for itself.

4                MS. MACCINI:   Objection, and Attorney
5            Chimes, it's 2:23.   We took a 40-minute break
6            for lunch.   We've been here since ten and I am
7            going to tell you that Detective Colangelo is
8            prepared to be here as long as he needs to be
9            here to finish this deposition, but how you use
10           your time is how you use your time and I will
11           object to him coming back another day.

12               So I ask that you stop giving speeches and
13           ask questions and finish this deposition, thank
14           you.

15               MR. CHIMES:   I am asking question.

16               MS. MACCINI:   There's no question pending
17           right now.   We will wait for the next question.

18               MR. CHIMES:   Do you have any further
19           speeches to make?

20               MS. MACCINI:   I just want you to move this
21           along and finish the deposition.

22               MR. CHIMES:   Okay.   I will go as fast as I
23           can, but I will ask all the questions I want and
24           if we can finish the deposition, it's great.
25               And your objection is noted and your position is

GOLDFARB AND AJELLO, LLC (203) 972-8320

**EXHIBIT A**

126

1          noted and you don't have to say it again because

2          I've heard it 15 times.

3               MS. MACCINI:  Stop arguing with my client

4          and move this deposition along.

5               MS. SMITH:  If I may interject.  I would

6          object to not having the witness appear again to

7          the extent that Attorney Chimes has taken up so

8          much of the deposition time, I do think that the

9          other defendants in this case should have an

10         opportunity.

11              So I can certainly understand an

12         objection --

13              MS. MACCINI:  And I agree --

14              MS. SMITH:  Let me finish.  And I can

15         certainly understand to an objection to Attorney

16         Chimes having more time, but for the record we

17         will push for more time for us.

18              MS. MACCINI:  I recognize that the Nodine

19         defendants deserve a chance to examine Detective

20         Colangelo and can, if it comes to the point that

21         there needs to be a notice on the Nodine

22         defendants' part that is fine, but I would like

23         everybody to finish today if we can.

24              MR. CHIMES:  Let's go to 93441.

25              MS. MARY-KATE SMITH:  That's your page 47

              GOLDFARB AND AJELLO, LLC (203) 972-8320

**EXHIBIT A**

127

1             where Detective Colangelo is asking, would you

2             drink at work.

3       Q.    Anything inaccurate about that?

4       A.    No.

5                   MR. CHIMES:  Go through the last two pages.

6                   MS. MARY-KATE SMITH:  So this is starting at

7             the bottom of page 48.

8                   MR. CHIMES:  Okay.

9       Q.    Anything about those two pages that is, any

10   inaccuracies in any of those two pages?

11      A.    No, I didn't hear any.

12      Q.    Let's just go, see if you can get to this where,

13   maybe Mr. Moraghan can help us if he knows what he said,

14   page where it says unintelligible.

15                  MS. SMITH:  Sorry, where are we?

16                  MR. MORAGHAN:  49 I think.

17                  MS. MARY-KATE SMITH:  So that's, yeah, the

18            bottom of 49, unintelligible, yeah.

19                  MR. CHIMES:  Yeah, I think it's Attorney

20            Moraghan, it's Detective Colangelo says okay so

21            that becomes an issue.  No, got to be back.  The

22            one before.

23      Q.    Did you -- okay.  And I think on the next lines

24   I think you said court liaison and --

25      A.    Where am I?

                GOLDFARB AND AJELLO, LLC (203) 972-8320

**EXHIBIT A**

128

1      Q.   In where it says Detective Colangelo and I mean
2  I would, I have no problem.  Okay.  Right under the
3  unintelligible part.
4      A.   I think I said court liaison.  I don't see it
5  here.
6      Q.   So let's get to that.
7      A.   Yeah, yeah, I haven't been to court since is not
8  in there.  And it's like I'm the court liaison should
9  replace it.
10     Q.   It looks like you said I'm the court liaison
11 since and then sort of went into a different.  We can
12 listen to it again to make sure.  Just that line.
13          MS. MACCINI:  I am the court liaison.
14     A.   I said I mean I have no problem, I am the court
15 liaison.
16     Q.   No since, no --
17          MS. MACCINI:  I am the court liaison, he's
18          told you twice.
19          MR. CHIMES:  Play it one more time because I
20          heard since.
21          MS. MACCINI:  I'm sorry?
22          MR. CHIMES:  I heard court liaison since.
23          MS. MACCINI:  Does it matter what you are
24          hearing or what he is telling you he said,
25          that's the difficulty I'm having here, Attorney

**EXHIBIT A**

129

1          Chimes.  It's not appropriate.

2              Are you tying to get the accurate transcript

3          from him or do you want it to say what you are

4          hearing?

5              MR. CHIMES:  I --

6              MS. MACCINI:  We are never going to get

7          through this this way.

8              MR. CHIMES:  I agree, we are never going to

9          get through this way but I disagree as to why.

10         Go ahead.

11             MS. MARY-KATE SMITH:  I'm playing.

12             MR. CHIMES:  Go ahead.

13     A.  I didn't say the word since.  I said court

14 liaison (indicating) and there is like an extra lisp at

15 the end maybe.

16     Q.  Okay.  Anything else in that section that is

17 inaccurate?

18     A.  Not that I saw.

19             MR. CHIMES:  Page my 56.

20             MS. MACCINI:  Would this be a good time for

21         a five-minute recess?

22             MR. CHIMES:  I think it would a good time

23         for a ten-minute recess.

24             MS. MACCINI:  Ten minutes?

25             MR. CHIMES:  Yeah.

**EXHIBIT A**

130

1          THE VIDEOGRAPHER:  All right, just a second.

2      Off the record 2:36.

3          (Discussion was held off record.)

4          THE VIDEOGRAPHER:  On the record at 2:48.

5          MS. MARY-KATE SMITH:  You want the next one,

6      so this is page 53 at the bottom.

7          MR. CHIMES:  Okay.

8      Q.   Okay, anything inaccurate about that?

9      A.   I said I never go into an interview not knowing

10  what, as much, as much as I can.  You don't have the word

11  what in there.

12     Q.   Not knowing what, as much?

13     A.   What, probably a comma.  I interrupted my own

14  speech.

15     Q.   Okay.

16         MS. MARY-KATE SMITH:  The next one is on the

17      next page, it's page 54 in the middle.

18     Q.   Okay, anything inaccurate about that?

19     A.   No.

20         MR. CHIMES:  Page, we are on my page 59.

21         MS. MARY-KATE SMITH:  We are on page 57 at

22      the top.

23         MR. CHIMES:  This is going to go about a

24      page and a half, so if you hear something and

25      you want to stop, say so.  We will address it

GOLDFARB AND AJELLO, LLC (203) 972-8320

**EXHIBIT A**

131

1           and then we will keep going just to try to make

2           this move quick.

3      A.   It's I'm able not I may able.

4           MR. CHIMES:  Okay.  Stop for a second.

5           Okay.

6           MS. SMITH:  Let me ask you a question, I'm

7           sorry to interrupt.  But there's at lot of noise

8           coming from, it sounds like next door.

9           Is there any way to quiet the noise from

10          next door?  I don't know if there's another

11          conference room.  So, no?

12          MR. CHIMES:  I can find out what's going on

13          but --

14          THE VIDEOGRAPHER:  We are going off the

15          record at 2:52.

16          (Discussion was held off record.)

17          THE VIDEOGRAPHER:  On the record at 2:53.

18     Q.   So I want to ask you some questions about this

19  sexual assault case.

20          Who was the woman who was the complainant?

21     A.   I don't recall.

22     Q.   Did you bring -- did you arrest her for making a

23  false statement?

24     A.   Don't believe so.

25     Q.   You don't recall her name?

GOLDFARB AND AJELLO, LLC (203) 972-8320

**EXHIBIT A**

132

1     A.   No.

2     Q.   Would there be any record of this case?   When

3  did it take place?

4     A.   Many years ago.

5     Q.   How many years?

6     A.   Ten, maybe 12.

7     Q.   Was there any record of this complaint?

8     A.   I don't know, I don't know what the record

9  retention is on different things so I couldn't be honest

10 and tell you yes or no.

11    Q.   Was a warrant brought for sexual assault in this

12 case?

13    A.   No.

14    Q.   Was a warrant brought for making a false

15 statement in this case?

16    A.   No.

17    Q.   Have you ever arrested anyone other than Nicole

18 Chase for making a false statement?

19    A.   I may, I can't recall.

20    Q.   You don't recall.   How would I find out whether

21 you made other arrests for making a false statement?

22    A.   I would guess you would ask the department for

23 records.

24    Q.   Well, I have and I'm waiting for them.

25         So you don't, you don't have any recollection of

GOLDFARB AND AJELLO, LLC (203) 972-8320

**EXHIBIT A**

133

1   whether you ever arrested anybody besides Nicole Chase

2   for making a false statement?

3        A.   No.

4        Q.   And so in this case that you described, she

5   became a suspect in a false statement case is what you

6   say and then she can be asked to take a polygraph?

7        A.   That's what I said.

8        Q.   Did she take a polygraph?

9        A.   No.

10       Q.   Did you bring a false statement claim?

11       A.   No.

12       Q.   Okay.  Did you just drop charges or drop her

13   complaint?

14       A.   Can't remember how it resolved.

15       Q.   And as you sit here today, there are no

16   additional -- you have no other memories of bringing

17   false report, false statement claims against -- arrests

18   in any other cases besides Nicole Chase?

19       A.   False report or false statement?

20       Q.   Either one.

21       A.   I believe I worked on it, but I don't know if I

22   was the affiant on the warrant or not.

23       Q.   Tell me about that one.

24            Is it a false report case?

25       A.   No, I don't recall.  It was 20 years ago I just

GOLDFARB AND AJELLO, LLC (203) 972-8320

**EXHIBIT A**

134

1   remember --

2        Q.   Was it a sexual assault case?

3        A.   It was.

4        Q.   Do you remember the name of the victim?

5        A.   No.

6        Q.   Was there an arrest made?

7        A.   Yes.

8        Q.   And you may or may not have been the affiant in

9   that?

10       A.   I don't think I was the affiant.

11       Q.   What was your role in it?

12       A.   I don't recall.  In small departments you have

13  many roles.

14       Q.   Well, 20 years ago you weren't a detective so --

15       A.   Correct.

16       Q.   -- so would you be part of the investigating

17  team?

18       A.   I can't remember.  It's been a long time ago.

19       Q.   Okay.  Any other cases that you can recall

20  involving false statement or false arrest?

21       A.   I can't recall.

22       Q.   But any of those arrests would be in the records

23  of the Canton Police Department?

24       A.   Unless they have been expunged.

25            MR. CHIMES:  Okay, keep going.  Stop.

GOLDFARB AND AJELLO, LLC (203) 972-8320

**EXHIBIT A**

135

1      Q.   There's a couple.  Do you get anything different

2  on that?

3      A.   I can't get the unintelligible stuff if that's

4  what you are asking.

5      Q.   That's what I'm asking, okay.  Keep going.

6           MR. CHIMES:  Okay.

7      Q.   Anything in that part that was inaccurate?

8      A.   No.

9           MR. CHIMES:  Okay.  We are now going,

10          starting at 94751 --

11          MS. MARY-KATE SMITH:  This is page 59.

12          MR. CHIMES:  -- in the transcript and we are

13          going to 94832 from the videotape starting with

14          Detective Colangelo, yeah, it's true.

15          MS. MARY-KATE SMITH:  You want to go back?

16          MR. CHIMES:  Hold on.

17     Q.   Did you hear but if this is the way?  Did you

18  hear something after, yeah, but before it certainly does?

19     A.   I have to hear it again because --

20          MR. CHIMES:  Okay, yeah.  Okay.

21     Q.   Anything there inaccurate?

22     A.   I can't hear anything that is different.  There

23  might be a but between yeah but it certainly does but I'm

24  not sure.

25          MR. CHIMES:  Go to 94848 on the videotape

           GOLDFARB AND AJELLO, LLC (203) 972-8320

**EXHIBIT A**

136

1          through 9519 on the videotape.  Does it say what

2          page it is?

3               MS. MARY-KATE SMITH:  Oh, okay.  It's

4          starting on towards the top of 61.  Detective

5          Colangelo, you know what I'm saying.

6               MR. CHIMES:  Okay.

7     Q.   Anything there?

8     A.   Yeah.

9     Q.   Okay.

10    A.   There's pieces missing.

11    Q.   All right.

12    A.   Well, I have Allie's now and in front of me you

13 have a dash, your person put a dash in there and there's

14 like a phrase in there, I have Kyle's or something like

15 that I said.  I can't keep up writing, I'm sorry as quick

16 as it goes.

17          And then it seems like there is something as I

18 am trying to wright that that Calvin Nodine's statement

19 right after that doesn't seem to jibe but I have to

20 listen to it again.

21    Q.   Anything before that?

22    A.   Not that I could hear.

23               MR. CHIMES:  Okay, so let's go to 94959.

24          Stop.

25    Q.   So we agree that you say, and I have Kyle's?

                GOLDFARB AND AJELLO, LLC (203) 972-8320

EXHIBIT A

137

1    A.   Yeah, I say then I have Kyle's so in front of
2   me.
3            MR. CHIMES:  Okay.  Keep going.  Okay.
4    Q.   Anything?
5    A.   Yeah, Calvin says which Jer -- is Jeremy's
6   brother or Jeremy's sister or half sister and your person
7   put in the word and which isn't even said, it says that
8   you know Jeremy.
9    Q.   Thank you.  Why did you feel you didn't have to
10  go through the statements of Alexandria Archer or Kyle
11  Rouleau with Calvin?  I mean, I'm reading from this where
12  it says, I'm not bringing out the actual statements.  We
13  don't need to go through them I think, do you?  And
14  Calvin says no.
15           Why, why didn't you feel that it was good
16  investigative technique to confront with him with those
17  statements?
18   A.   Because we've discussed the, the substance of
19  those statements already.
20           MR. CHIMES:  Okay.  Next 1-C.
21           MS. MARY-KATE SMITH:  We are on page 64 at
22        the top.
23           MR. CHIMES:  95031 to 46.  Okay, stop.
24   Q.   Anything?
25   A.   Yeah, you got to play that again because I -- it

GOLDFARB AND AJELLO, LLC (203) 972-8320

**EXHIBIT A**

138

1    didn't start --

2                    MS. MARY-KATE SMITH:  It's 64.

3                    THE WITNESS:  I was on 64.

4        Q.   Honest, you say honestly, to be honest with you.

5        A.   Okay.  You need to play that again.

6        Q.   Um-hum.  Anything there?

7        A.   Instead of you know it's but you know.

8        Q.   After the statement he made?

9        A.   Where I said detective, it says Detective

10   Colangelo and it says you know what I'm saying, I said

11   but you know what I'm saying.

12                   MS. MARY-KATE SMITH:  Okay.

13                   MR. CHIMES:  Okay.

14       Q.   Anything above that?

15       A.   No.

16                   MR. CHIMES:  95 --

17                   MS. MARY-KATE SMITH:  We are on the same

18           page at the bottom.

19                   MR. CHIMES:  95111 page 67 to 95136.  Okay.

20       Q.   Anything inaccurate about that?

21       A.   Where she started it said but, but.  I only

22   heard one but.

23       Q.   Okay, so let me ask you:  Did you -- at any

24   point in this investigation, did you ever interview

25   Jeremy Archer?

                    GOLDFARB AND AJELLO, LLC (203) 972-8320

**EXHIBIT A**

139

1      A.    No.

2      Q.    Neither just taking a statement or doing this

3  more initial interview with a series of questions before

4  taking the statement, you didn't do either of those

5  things?

6      A.    No.

7      Q.    Okay.

8            MS. MARY-KATE SMITH:   Page 67.

9            MR. CHIMES:   Before you do that.

10     Q.    Why did you explain your technique in how you

11  would interview Jeremy to Mr. Nodine --

12     A.    I don't think it was an explanation of

13  technique.

14     Q.    Well, you were saying how you would go about

15  interviewing --

16     A.    It depends, it depends on where the case takes

17  you.

18     Q.    Why in this case would you do this the way you

19  described in those pages?

20     A.    Well, this case took a turn after this

21  interview.

22     Q.    But why at this point did you say this is the

23  way you would interview Jeremy?

24     A.    A lot of the talk I do during an interview is a

25  tactic to keep people relaxed and calm and talking to me.

GOLDFARB AND AJELLO, LLC (203) 972-8320

**EXHIBIT A**

140

1      Q.   Okay.  So you are saying you never had any

2   intention of interviewing Jeremy?

3      A.   No, that's not what I'm saying.

4           MR. CHIMES:  95257.

5           MS. MARY-KATE SMITH:  Top of 67.

6      Q.   Anything inaccurate there?

7      A.   I started after I said I'm not so stupid I,

8   I said I again.

9      Q.   I'm sorry, I'm not --

10     A.   I said I'm not so stupid in the top paragraph,

11  full paragraph and I said I.  I actually say I again

12  according to the video.

13     Q.   You said I twice?

14     A.   Kind of like a stutter I guess or just a repeat.

15     Q.   Sure.  When you say I'm not -- I mean, I am not

16  so naive or new at this that I, I, I look at somebody,

17  did I figure out something out with you without telling

18  me, what does that mean?

19     A.   It's just planting a seed that I have or I

20  understand maybe more than people realize.

21     Q.   Well, are you saying that you think he's not

22  telling you the whole truth but you think you got enough

23  to understand what really happened?  That's what it

24  sounds like.

25     A.   If you take it out of context --

                GOLDFARB AND AJELLO, LLC (203) 972-8320

**EXHIBIT A**

141

1     Q.   No, I don't want to take it out.  You tell me

2  what you were thinking, I am just asking.

3     A.   You can't take a statement out of a hour and a

4  half interview and separate it and say it's not in

5  context.

6     Q.   So, okay.  So --

7     A.   It's out of context.

8     Q.   -- what did you mean by that?

9     A.   Well, through the whole statement I use a

10  technique and different techniques depending on who I'm

11  talking to.  It's just a technique to keep people talking

12  and give me as much information toward the truth as I can

13  get.

14     Q.   And that's great except you didn't really ask

15  him any details for the rest of the interview.

16              MS. MACCINI:  Object to the form.  There is

17          no question pending --

18     Q.   Did you ask him -- I mean it seems like it's a

19  wonderful idea this technique.

20          It appears from this interview that you never

21  got any additional information from him.

22              MS. MACCINI:  Objection, there no question

23          pending, John.  There is still not a question.

24     Q.   Did you get any additional information from

25  using these techniques after 951 that you interviewed?

**EXHIBIT A**

142

1      A.   I don't know, I have to look but --

2      Q.   Okay.

3           MR. CHIMES:   Where are we?

4           MS. MARY-KATE SMITH:   So this is page 68.

5           MR. CHIMES:   This is going to go through

6      95653 which is about three pages in on the

7      video.  So if you -- there's stuff earlier then

8      we will stop so you can, we can go over that so

9      we can get it done as efficiently.  It starts

10     whether he agrees with it or not.  Stop.

11     Q.   Anything in this up to now that is inaccurate?

12     A.   No, it seems right.

13          MR. CHIMES:   Okay.  The record should

14     reflect that more than 80 percent of Attorney

15     Moraghan's clients lie.

16          Let me stop there, okay.

17     Q.   Anything inaccurate in that?

18     A.   Yeah.

19     Q.   Okay.

20     A.   I said, yeah, I didn't say he was in Lake Tahoe,

21 I said he was in town.

22     Q.   That's a pretty significant difference.  Thanks

23 for pointing that out.

24     A.   And five more sentences down I said, yeah,

25 he's -- you have he's on the island.  I think I said he's

                    GOLDFARB AND AJELLO, LLC (203) 972-8320

**EXHIBIT A**

143

1   in Ireland most of the time.

2       Q.  Okay.

3       A.  Where he lives.

4       Q.  Which is an island, which is an island but --

5           Okay, those two switches change the whole tenure

6   of this guy so, so.

7       A.  I can't afford to go to Lake Tahoe for a

8   birthday party.

9       Q.  Anything else on that up to there?

10      A.  Not that I can see.

11          MR. CHIMES:  Okay, keep going.  Okay.

12      Q.  Anything inaccurate in that section?

13      A.  No, it seemed fine.

14          MR. CHIMES:  Okay.  Um, now we are going to

15          go from 9705 to, 95705 to 95743.

16          MS. MARY-KATE SMITH:  So it's on 71 where

17          Detective Colangelo starts, so that's where we

18          stand.

19      Q.  Anything inaccurate in that section?

20      A.  I have to listen to it again but I thought, I

21  thought that -- let me just go back.  Adam says, yeah,

22  Attorney Moraghan says I think he said I assumed a

23  detective first, not a detective I assume but I could be

24  wrong.

25          Yeah, he says I assume the detective was going

                GOLDFARB AND AJELLO, LLC (203) 972-8320

**EXHIBIT A**

144

1   to be here.

2       Q.   Okay.  Anything else in this section?

3       A.   No.

4       Q.   95810?

5            MS. MARY-KATE SMITH:  It's page 74 towards

6            the top.

7            MR. CHIMES:  We are going to go from 95810

8            to 95832.

9       Q.   Anything, anything in there?

10      A.   No.

11      Q.   Okay.  Anything inaccurate?

12      A.   Not that I see.

13           MR. CHIMES:  95849 to my page 78 and it goes

14           through 95914.

15           MS. MARY-KATE SMITH:  It's page 75 starting

16           with he did well with that.

17      Q.   Tell me, was the case with Attorney Conti, was

18  that a sexual assault case?

19      A.   You want to know the mistakes first?

20      Q.   Let's do that first.

21      A.   It says so he's not going to leave without it,

22  it really says so I'm not going to leave without it.

23      Q.   Anything else?

24      A.   No.

25      Q.   Okay.  So tell me about this case involving

**EXHIBIT A**

166

```
 1    STATE OF CONNECTICUT  )

 2                          )  ss:  WALLINGFORD

 3    COUNTY OF NEW HAVEN    )

 4

 5           I, Kevin Lombino, a Registered Professional

 6    Reporter and Notary Public within and for the State of

 7    Connecticut, do hereby certify that the within deposition

 8    of JOHN COLANGELO was held before me on the 29th day of

 9    March, 2019.

10           I further certify that the witness was first

11    sworn by me to tell the truth, the whole truth and

12    nothing but the truth, and was examined by counsel, and

13    his testimony was recorded stenographically by me, it was

14    reduced to typewriting under my supervision, and I hereby

15    submit that the within contents of said deposition are

16    true and accurate to the best of my ability.

17           I further certify that I am not a relative of

18    nor an attorney for any of the parties connected with the

19    aforesaid examination, nor otherwise interested in the

20    testimony of the witness.

21           Dated at Wallingford, Connecticut, the 7th day

22    of April, 2019.

23           _____

                  Kevin Lombino, CSR00191

24

25    (My commission expires October 31, 2021.)
```

                    GOLDFARB AND AJELLO, LLC (203) 972-8320

**EXHIBIT A**