

## CORRECTED AFFIDAVIT: REDLINED VERSION

The undersigned affiant, being duly sworn, deposes and says:

1. That, I Detective John Colangelo, have been a certified police officer in the State of CT since May 1992. I have been employed by the Town of Canton as a Police Officer since March 1997. I am currently assigned to the detective division. I have received specialized training in the investigation of criminal and other matters. The facts and circumstances contained in this affidavit are from personal knowledge, investigation and information supplied by brother and/or sister officers, or others acting in their official capacity.

2. That, on 5/7/17 at approximately 0857 hours, Officer Gompper was dispatched to the lobby of the police department on a report of someone being sexually harassed at their place of employment.

3. That, on his arrival, Officer Gompper met with the complainant/victim, Nicole H Chase (DOB · ) and her mother Cathy Poirier. Officer Gompper spoke with Ms. Chase and her mother in the lobby of the Canton Police Department, which is enclosed by glass and visible to pedestrian and vehicular traffic—. She explained that she works at Nodine's Smokehouse restaurant,

**EXHIBIT B**

located at 192 Albany Turnpike in Canton, CT, along with her mother. Chase

said that the owner of the restaurant, Calvin Nodine, grabbed her and forcibly

pulled her into the men's room after the restaurant closed where he tried to get

her to put his penis in her mouth.  was being sexually harassed by the owner

and her boss, Calvin Nodine.

4.  That, Chase began to give Officer Gompper a back story about her boss,

Nodine, and that he has a drinking problem and has caused another worker,

(Nodine's step son), to quit. Chase said that she and her mother came in for her

shift on 5/6/17, he began saying things that she subsequently believed

indicated that he was making advances upon her.  He told her that her hair

looked very nice and after being there for about 10 minutes, Nodine asked her,

"Did you get laid last night?" and then Nodine walked away.  Chase said that

Nodine was intoxicated that he was always drunk and observed him drinking

that day.  at this point and walked away. When asked how she knew Nodine

was intoxicated she said that usually in the morning time he has a few drinks.

5.  That, Officer Gompper asked Chase what happened later that night. She

explained that she closed the front drawer down at the end of the night located

at the front of business. Chase said that Nodine told two employees that they

**EXHIBIT B**

were closed for the night and they could leave. Officer Gompper asked if this was normal behavior for Nodine. She said it was normal behavior but she felt Nodine was more dismissive and wanted them to leave faster.

6. That, Chase said as she was walking towards the back of the business to leave for the night, she saw Nodine standing near the bathroom/kitchen doors with his arms open, asking her for a hug, saying "We're going to make it through this, we're going to make this company better." He then suggestively asked if there was anything else that she wanted and she said no.   she felt that this was weird, and because he was so intoxicated, she was afraid that something was going to happen.

She said while this was happening, they heard the a dishwasher, Kyle Rouleau came from around the corner. coming back into the restaurant.  Chase then stopped her explanation of the incident to Officer Gompper standing up and saying stood up to demonstrate her movements during the incident.  She says that Nodine grabbed her and pulled her to the bathroom. Ms. Chase also demonstrated how Nodine had forcefully pulled her into the bathroom, and she was saying "what the F***!"  As she said this Chase physically demonstrated to Gompper how forcefully he had grabbed her and pulled her. – Chase explained that that when Nodine suddenly did this, she was in shock,  that it happened so quickly and that she had shut down.

**EXHIBIT B**

7. That, she then said that she doesn't even think her boss, Nodine, would remember what happened. She said that Nodine must ~~of~~have already had his "stuff" out and she had no idea cause she was walking, it was dark, the lights were off and Nodine gave her a hug when the dishwasher walked around the corner and said goodnight. Chase said Nodine then grabbed her and pulled her into the bathroom closing the door behind them. Kyle then says, "Uh, Calvin are you in the bathroom? Goodnight."

8. That, Chase said she wanted to ~~say something~~ cry out to ~~to~~ Kyle, ~~but she froze because it happened so quickly.~~ but it happened so quickly and Nodine was right there and she was afraid of what he was going to~~-~~ do to her and if Nodine was going to tell her she was fired. She said she looked down and that's when Nodine said, "I know you must not get it at home so suck it, or something." She said she opened the door and pushed past Nodine and saw that Nodine had fallen into a wall and hit his head. ~~Chase made a comment to Officer Gompper about Nodine being a rich man during this part of her story.~~ As she described the incident, she described that she felt powerless to do anything about it because Nodine was a rich man and she believed she had no proof.

**EXHIBIT B**

9.  That, Chase said that Nodine may have an injury to the right side of his head

from her pushing him. Chase again said she froze but told Nodine that he

needed to take his cash from the last days and directed him towards the nightly

deposits. She said that she then left for the night and then spent 1-2 ~~two~~ hours

thinking about what ~~she should do about this~~ to do.  She said that she was

worried about losing her job, that she was just getting by.  She decided to

contact Jeremy Archer, Nodine's stepson, because she felt that he was the only

person that she could trust.

OMITTED EVIDENCE:  At no point did Officer Colangelo attempt to confirm

Nodine's injury by following up by seeing Nodine before his injuries healed.

OMITTED EVIDENCE: ~~.~~ Ms. Chase's mother's boyfriend was waiting in the

parking lot to give her a ride home after the sexual assault occurred. The police

never interviewed him.

10.  After Ms. Chase got home that night, she texted Jeremy Archer asking for

advice as to what she should do.   She described the event to Archer in the text:

> Calvin Nodine was really drunk had everyone leave to supposedly cut
> the drawer then we were walking down the hall and he pushed me into
> the bathroom and started touching me and pulled out his dick and told
> me I wanted it cause I don't get it at home. . .I ran out and he was so
> drunk he fell on the tile and bumped his head real good then I just very
> calmly said goodbye...I wouldn't tell anybody this, so I am really
> trusting you.

   Ms. Chase asked Archer advice about reporting it to the police, telling her

**EXHIBIT B**

(Chase's) mother, telling Jeremy's mother (Calvin Nodine's wife), and
whether to report it to the police.  Jeremy Archer recommended to Ms. Chase
that she tell her mother what happened, and also to report it to the police.  That,
Chase told Officer Gompper that when they were in the bathroom, his penis
and testicles were completely exposed.

10. That, Chase said she texted Nodine's step son, (Jeremy),and told him what
    happened but did not give full details about Nodine telling her to suck it.
    Officer Gompper asked Chase what was exposed. Chase said Nodine was
    wearing a long thick flannel shirt and.didn't initially notice anything. She
    said when they were in the bathroom there was no time for him to take his
    "stuff" out. She said in the bathroom Nodine's pants were open and she was
    able to see that his underwear was pulled down and could see his "balls"
    and penis.

11.  Officer Gompper asked Chase if Nodine had an erection. She said yes, Nodine
    was erect and he told her that he was getting hard. Officer Gompper asked if
    she was able to feel his genitals against her when they were hugging. Chase
    said no.

**EXHIBIT B**

12.  ~~That, Chase said she had never been in a situation like this before and told her mom that she'd talk to the police about this.~~ Chase then expressed uncertainty to Gompper as to how she should proceed, whether she should pursue the matter with the police or go back to work.  Officer Gompper explained to Chase if she wanted to make a complaint, Officer Gompper would take a written statement from her and would need to speak to the witness, Kyle.  ~~Chase then said that Kyle didn't witness much, he just said bye Calvin, (Nodine). (This is inconsistent and different than the initialdescription of the event Chase told Officer Gompper). Chase then made a comment that's she's going up against a millionaire. (Nodine owns a meat packaging business which distributes nationally as well as having this restaurant).~~Chase expressed reluctance about pursuing charges against Nodine because he was a millionaire, suggesting that she would be powerless against him. Officer Gompper told Ms. Chase that the fact that Calvin Nodine was wealthy and powerful did not give him the right to sexually assault her.

13.  That, Chase indicated that she was afraid to face Nodine in court, but that she wanted it noted by the police that she was reporting his behavior in case it happened again.  She wanted to make sure that she was being protected by the police.   Chase was told if she wanted to pursue charges it would be investigated and all parties involved would need to be spoken to, ~~whether~~

**EXHIBIT B**

Officer Gompper told her that she could come back if she wanted to press

charges.    Officer Gompper asked Chase if she felt like he was kidnapping

her, and Chase said no.  Ms. Chase visually demonstrated to Officer Gompper

that he pulled her into the bathroom suddenly and forcefully and shut the door

to make sure that Kyle did not see them.    .

OMITTED EVIDENCE:   Officer Gompper minimized Ms. Chase's complaint. He

repeatedly characterized in his police report as sexual harassment, even though

Chase never used that term.  Officer Gompper told Ms. Chase that he did not

believe that Calvin Nodine's grabbing Ms. Chase, forcefully pulling her into the

bathroom, shutting the door to avoid being caught in there with her, exposing

himself to her and demanding oral sex " did not reach the level of a sexual assault.

OMITTED EVIDENCE:  Nicole Chase returned to the Canton Police Department

the following Monday, May 9 and spoke to Sgt. Mark Penney.  She told Sgt.

Penney about Nodine's subsequent behavior and that she wanted to pursue the

matter against Nodine.  Sgt. Penney told her that she had to wait until Thursday,

May 11, 2017, when Officer Gompper was back on duty.  Nicole Chase also asked

Sgt. Penney about what to do about her employment, and he told her to contact an

employment attorney.


14. That, on 5/11/17, Nicole Chase came back to the Canton Police Department.

**EXHIBIT B**

She was accompanied by Alexandria Archer, a co-worker at Nodine's

Smokehouse, Inc.  Officer Gompper initially interviewed Ms. Archer, who

stated that on the day of the sexual assault, Mr. Nodine grabbed Chase's

buttocks and that he followed her around in the restaurant.  She also stated that

Mr. Nodine frequently made inappropriate sexual comments.

When Nicole Chase gave her statement, Officer Gompper did not engage in

any detailed questioning about the events Specifically, he asked no questions

about sexual contact or the use of force, or whether she felt physically

threatened by Nodine.

Ms. Archer remained in the room.  Gompper typed up the statement as Chase

recounted it as follows:


STATEMENT


I work at Nodine's located in Canton, CT. On Saturday morning May 6th, I

came into work ·at 9:00 a.m. I began to prep for food service for the day. A

few hours later my mom came into work. I was standing at the cash register

and Calvin was standing on the other side of the cash register. Calvin just said,

"So did you get laid last night." l just ignored because this is normal behavior

for Calvin

**EXHIBIT B**

A group of us at the restaurant were having a meeting about an employee who was taking illegal drugs, acid, and Calvin wasn't firing. After we spoke to Calvin about it the employee was terminated. At that point Calvin said he wanted his girls to feel safe and not uncomfortable. The way he said "my girls" was weird. Calvin gave me a hug and kiss on the cheek. I didn't think much of it because his wife was right there and she also gave me a hug.

I was standing at the pizza counter while Allie, (Alexandria), was making us a BLT sandwich at the sandwich counter, talking about what had happened about the employee being fired. Calvin came behind the counter and came up behind me. As he did this he put his arm across my back and put his hand on my shoulder. I don't recall exactly what he was saying but it was a joke or a story he was trying to tell about something that happened with a girl.

As he was telling me the story/joke he would move his hand lower and lower each time with each part of the story he'd tell. Each time he'd pulled me into his body he squeezed my arm and back with his hand. As he finished the story he placed his hand on my butt cheek grabbing it. Calvin had his hand on my butt for less than thirty seconds. He then chuckled and walked away.

**EXHIBIT B**

Sometime later on in the day, Calvin's wife gave me an air cast, because of an injury that I've had for some time.to help me with the pain. Someone asked me what happened, and Calvin made the comment that I had my leg's behind my back too much. Also during the day Calvin made a comment that blondes are like butter they're easy to spread. Calvin makes this same statement on a daily basis. I am the only blond that works there.

Throughout the day I saw Calvin drinking alcohol with his wife. Throughout the day I could tell Calvin was intoxicated. By the end of the day he wasn't able to walk straight.

Saturday night around 8:45 p.m., (we close at 9:00 p.m.), Calvin said to Allie and Kyle to clock out your good.  Calvin told me to close out the cash register for the evening because I knew how to do it. I finished closing out the cash drawer and shut off the lights to the front of the business. I then walked to the back of the business and turned the corner. I then saw Calvin standing there. Most of the lights were off so it was very dimly lit. · Calvin was standing there with his arms out. l knew he wanted a hug, (which I assumed was like the one he gave me earlier). I kind of walked into him as I turned the corner and he hugged me. I describe the hug as very emotional. Calvin said to me, "We're

**EXHIBIT B**

going to get through this. We're going to make the company better." As he hugged me he was asking if I had any thoughts or questions. I told him no, I hope everything gets better. He then said to me is there anything you want to do. I told him no.

At this point Kyle came back into the building through the kitchen. Kyle yelled Calvin. That's when Calvin grabbed my hand/arm and pulled me into the men's bathroom. Calvin locked the bathroom door and held his finger up to his mouth as to tell me to be quiet. At this point I froze not knowing what to do. I heard Kyle again ask Calvin if he was in the bathroom and calling my name. Calvin then very abruptly and shortly answer Kyle saying .. ... "Yup, have a good night." I then looked down and saw that Calvin had fully exposed himself to me. I was able to see Calvin's penis, testicles, pubic hair and that he had his boxers pulled completely below his genitals. I saw that the boxers were a dark blue color. When he did this I could smell the odor of sweat and semen.

At this time I saw that his penis was erect. I did not feel it initially when he was hugging me but assumed that he already had it out because there was no time from when he hugged me to pulling me into the bathroom he could have taken it out.

**EXHIBIT B**

Calvin then said to me, "Suck it cause I don't know you get it at home." As he was saying this he grabbed his testicles and penis and lifted it up towards me. I then pushed Calvin and he stumbled in the wall as he struck his head. I then unlocked the door and walked out. I saw that the money bags were left on the counter and said to Calvin don't forget your money bags and walked out of the building.

I then came to the Canton Police Department Sunday morning with my mom and spoke to Officer Gompper. After speaking to Officer Gompper I wasn't sure what exactly how I wanted to proceed with this so I went into work to collect all of my belongings and to see if Calvin acknowledged what he did or apologized to me for his behavior. I helped build that business before it opened and put a lot of time and energy into helping because I wanted to have a good job and provide for my daughter.

When I went in Sunday after leaving the police department Calvin said that I was late. I told him that I wasn't late, Calvin said, "Your here after Jarvis and now I have to deal with this raging boner all day." I took it as Calvin wanting me to give him sex or relieve him sexually. I didn't say anything and walked away. We were very slow that day and only one other employee was working

**EXHIBIT B**

other than Calvin and myself.

Calvin said to me that he was going to have the other employee watch the front while me and Calvin go into the office, lock the door and clean the office. Calvin has never told any of the employees to do this and the office is the a small closet. That has never been one of my duties. I told him nervously no. Calvin then said, "What can you think of something else better to do than fuck me?" I then walked away from him. Calvin followed me around for the rest of the day and asked me to drive me home. I told him no. I then left for work the day.

Monday Calvin called me and said that he closed the store until the following Tuesday. He told me that I was going to be the only employee helping him cleaning. I told him I couldn't come until my next shift. Which I only said because I didn't want him to know that I was speaking to the police or anyone about what happened.

I want to pursue criminal charges against Calvin.


End Statement

OMITTED EVIDENCE:  The following day, Officer Gompper interviewed

**EXHIBIT B**

another co-worker, Kyle Rouleau.  Rouleau corroborated that Nodine and Chase were still in the building just before he left for the evening, but he did not see either of them.  He heard the bathroom door slam shut, and Calvin call out to him from inside the men's bathroom.

‾‾‾‾‾

  Rouleau also told Officer Gompper that, on the day of the assault, Nodine was hovering and following Chase around the restaurant. He confirmed that Nodine frequently made inappropriate sexual comments.

15. 15. That, based on Chase's complaint and sworn statement, Calvin Nodine was called and requested to come to the Canton Police Department to speak to Officer Gompper and Affiant Colangelo about the allegations. Officer Gompper told Nodine the specifics about the allegations before he came to the meeting. On 5/18/17, Nodine came to the police department accompanied by his attorney, David Moraghan. . After speaking with Nodine, Nodine initially denied anything happening between them. After Nodine spoke privately to his attorney, Nodine explained that Chase had performed oral sex on him in the bathroom and it was consensual.

OMITTED EVIDENCE:  The discussion with Nodine was markedly different than Officer Gompper's meeting with Plaintiff about two weeks prior.  The interview occurs in a private room. It is fraternal and opens with a jovial

**EXHIBIT B**

conversation between Detective Colangelo and Attorney Moraghan regarding mutual acquaintances golfing and a private golf club.[1]

At the commencement of the interview with Calvin Nodine, Detective Colangelo could not even remember Nicole Chase's name.  Before he had even started questioning Nodine, Detective Colangelo indicated to him that he had doubts about her story.  Colangelo is dismissive of Nicole Chase, stating "what's this girl's deal," even though Ms. Chase is an adult and a mother.

Mr. Nodine stated that on the evening in question, he was the last one in the building.  That was untrue.  Mr. Nodine stated that he was in the bathroom when Mr. Rouleau said goodbye and departed for the evening. Detective Colangelo then asked Mr. Nodine whether  anyone was in the bathroom with him; Mr. Nodine said no.

Detective Colangelo then confronted Mr. Nodine with his summary of Plaintiff's statement that Mr. Nodine pulled her into the bathroom and that he exposed himself to her. Mr. Nodine responded that her allegation was "bullshit." That was also untrue.

Detective Colangelo confronted Mr. Nodine with the fact that Mr. Rouleau's statement corroborated that Ms. Chase was still in the restaurant when Mr. Rouleau said goodbye. that evening because her backpack was there.  In

---

[1]      Attorney Moraghan's father is a well-known retired state court judge.

response, Mr. Nodine attempts to change his story:  "she could have been out front having a cigarette, I don't know where she was." That statement was also false.

When Detective Colangelo asked why she would say that he pulled her into the bathroom Mr. Nodine speculates that Ms. Chase made a false accusation because she is looking for money, to which Officer Gompper  responds that "that's one of the angles I'm looking at."  Officer Gompper made this statement despite the fact that he knew that when she initially came to the police station on -May 7, she did not want to press charges and told Gompper that she just wanted to know that she was protected, and that the only reason that she went to see an attorney is because Gompper' s supervisor, Sgt. Penney had recommended it.

After that, Detective Colangelo tells Mr. Nodine that his denial is the wrong defense and that he should argue that the conduct was consensual:

> You know, some people can't handle this type of question, but if you were fooling around with Nicky consensually, that's a whole different story, and it's a tough question but it might open up why she's already gotten an attorney, and come down here, and all that kind of stuff. Like I said, I'm not going out, calling your wife, saying- *guys do what guys do, trust me. I mean, you know, enough cops get divorced because of it and all that kind of stuff*, but, if that's the thing that was happening, that's, that, maybe starts to explain some of this stuff.

Attorney Moraghan picked up on the coaching provided by Detective

**EXHIBIT B**

Colangelo and requested the opportunity to speak privately with Mr. Nodine. Nodine, his attorney, Detective Colangelo, and Officer Gompper then went off camera  for about six minutes.

Before resuming questioning, Detective Colangelo engaged in an extended discussion in which he strongly suggested to Calvin Nodine that Nicole Chase had a financial motivation to make her complaint against Calvin. When Nodine suggested that she knew about a Stan Lee Magazine that he owned that might be valuable as the possible motivation, Detective Colangelo coached Nodine again, suggesting that the better answer was that she was aware of the family business that existed for over fifty years.

After this repeated coaching by Detective Colangelo and an opportunity to discuss strategy with his attorney, Mr. Nodine changed his story to state that Ms. Chase was the aggressor.  She pulled him into the bathroom, Ms. Chase lowered his pants, and that she spontaneously performed fellatio on him.

After Nodine's admission that he had repeatedly lied to the Canton Police and his own attorney, Detective Colangelo comforted him:  "I understand it's embarrassing, but I've heard worse."

Mr. Nodine claimed that he was surprised by Ms. Chase's spontaneous act, denied that there was any other contact with Ms. Chase or any other employees, and claimed they were not previously flirting. Detective Colangelo

**EXHIBIT B**

never asked Mr. Nodine whether he struck his head or asked to see whether he had an injury.

When Detective Colangelo pointed out that Mr. Nodine's story changed, he replied that he was "trying to protect himself."  Detective Colangelo then commiserates with Mr. Nodine and his attorney about Colangelo being the subject of a potential civil action, citing an example of a citizen who attempted unsuccessfully to find a lawyer to assert a frivolous claim of police brutality against Detective Colangelo.  Detective Colangelo analogizes his own experience of responding to a frivolous allegation, to Nicole Chase's accusation against Calvin Nodine.  He asks Attorney Moraghan (in front of Nodine):

You've probably had clients come in to talk to you and you're like, no, that's not a case, right? . . . Probably more than the ones that are cases, *everybody wants a slice of somebody else's pie.*

About ten minutes later, Detective Colangelo initiates discussion about polygraph tests. He states that he cannot ask Ms. Chase to take a polygraph test, which he characterizes as a "problem with sex assault cases."  Detective Colangelo suggested to him that he take a polygraph.

Detective Nodine told a story to encourage Calvin Nodine to take a polygraph test:

So, you talk about the polygraph, you talk about it and I'll tell you my theory behind it is, if you pass a polygraph, she can be brought in and

**EXHIBIT B**

now she can be really [unintelligible]. It gives us leverage, if the story changes. And that's a big thing. And I had a case, and it was a sex assault, I'm blanking on- and I could prove pretty substantially that it was a fake. And she put the whole town on this girl's - you know - it was a tactic. She put the whole town on - you know how these things can be, can go - once I knew it was a fake complaint, in my - in my writings, in what I wrote to the state's attorney, she's no longer a victim of sex assault. Because I've proven it's not real. Now she's a suspect in a false statement investigation. In a false police report. Now she can be asked if she can take a polygraph. Completely different animal. So, we switched the case. . . .

Detective Colangelo intimated that his relationship with the prosecutor's office would facilitate his "switch" from a sex assault complaint to a false statement investigation against the victim:

DETECTIVE COLANGELO: Okay. And that was okay by the state's attorney at the time. That's probably going back seven or eight years, but and it's a different supervising state's attorney up there, with Roseanne Wagner, and Carl and Joe, and who's the D.A.?
NODINE'S ATTORNEY: [Unintelligible.]
DETECTIVE COLANGELO: Do you know Carl? He's a good guy. Um, so. So, that's where we sit.

Detective Colangelo told Nodine that he would give him a "base on balls" (a pass) for initially lying:

So, do I give you a bit of a little, uh, a base on balls [?] on that first, like, false statement? Yeah, kind of, because I know it's hard. I mean, some people come up, like, [mimics a crying voice] oh, how could I let this happen, [normal voice] you know, [crying voice] we were having an affair, [normal voice] and, and that's fine, but I don't know you as yet, and like I said, you don't know me. So, and, and you got a

**EXHIBIT B**

lot to lose. And, I guess, some guys want to lose that. Some guys are, like, oh thank God I'm caught. You know? I want to get out of that marriage anyway. It's true! I mean, you can't believe what people tell us.

Attorney Moraghan indicated that a former colleague vouched that Detective Colangelo is "absolutely honorable, and absolutely trustworthy."

After telling Mr. Nodine he will go easy on him, Detective Colangelo asks Attorney Moraghan to invite him to his private golf club stating:

That's very nice of Billy. I did tell him that we were going to work on a case, and I always call it together, because we're on the same path- I'm like -because he's talking about golf, he plays at the same country club, well, maybe you could invite me up. Because I only get invited up once a year, by my father, so. [Laughter].

After asking Attorney Moraghan to invite him to his private club, Detective Colangelo then assured Mr. Nodine that they were not going to rush the investigation, that they were not going to thoroughly investigate Chase's complaint, and that they were not going to treat the accusation seriously:

this case…doesn't have to be pushed through, you're not a menace to society- know, that's not, you're not the Green River Killer type thing where we gotta, we're gonna try to follow every lead, if we don't, well, we're remiss in our duties."

The meeting with Nodine and his attorney ended seven minutes later in the same fraternal tone in which it began.

Detective Colangelo and Officer Gompper then put inti effect the plan that

**EXHIBIT B**

Detective Colangelo described to Calvin Nodine during the interview to have Calvin Nodine take a polygraph and then turn the tables and charge Nicole Chase with Making a False Statement.

The defendant police officers, Colangelo and Gompper did not conduct any investigation after Calvin Nodine's interview while they awaited a decision as to whether Calvin Nodine would undergo a polygraph.   Neither officer communicated any information about the pending investigation to Nicole Chase.

On June 14, 2017, Mr. Nodine called the Canton Police Department and spoke to Detective Colangelo. Mr. Nodine stated that he had taken a private polygraph test but did not pass because he had not taken his medication.   He said he had a second polygraph test scheduled for Monday, June 19, 2017.

On June 19, 2017, Attorney Moraghan faxed a letter to Detective Colangelo stating that Mr. Nodine refused to undertake a police polygraph.

16. That, based on the interview with Nodine, it was decided to re interview Chase. On 6/21/17 at approximately 1000 hours, two days after they learned of Nodine's polygraph results, Chase came to the lobby of the police department and was brought into the front interview room by Affiant Colangelo. Affiant Colangelo began by explaining he had read over the reports and statements and asked Chase to tell him about Nodine's restaurant.

**EXHIBIT B**

17. That, Chase said how much she loved working at Nodine's Restaurant and didn't have too many problems initially. Chase gave Affiant Colangelo the back story about internal business issues, employees, problem employees and issues with how Nodine ran his business. She spoke about Nodine's drinking, poor management and rude jokes that were sexual in nature.

18. That, during the course of the interview, Chase said that she- loved working at Nodine's and how difficult it was to lose her job there due to this incident. worked her "butt off" and she remembers all her customers. She said that it "hurt" her to leave. Chase said, "I want him to give me his restaurant so I can run it right and for him to be gone." She then said, "That it's not happening Nodine' s, that's how much work I put into that place".

ADDNDUM:

When he spoke to Nicole Chase on June 21, 2017, Colangelo lied to her and told her that he was taking the case seriously, and that he and Officer Gompper had been busy working on the case.

During the interview, Ms. Chase told Detective Colangelo further details that confirmed that Nodine was using his power as owner of the restaurant to put pressure on her to have sex with him.  She told Det. Colangelo that Nodine had

**EXHIBIT B**

started giving her free food to bring home.  On the day of the sexual assault, he told her that she was going to be the manager of the restaurant.

19. That, Affiant Colangelo explained to Chase that he had interviewed Nodine. She was asked if they ever had any relations prior to the incident in the bathroom. She said there was not. It was eluded to the fact that Nodine took two polygraph tests. Chase was asked if anything would have come out that was truthful that she may have left out or forgot about. Detective Colangelo falsely stated that Mr. Nodine took two polygraphs and falsely implied that Nodine had passed them. She said that Nodine knew she wasn't "getting sex" at home. When asked how Nodine knew that, she explained that Nodine over heardoverheard her talking to her coworker, Allie, about it. She denied talking to Nodine about it directly. Chase was asked if there was any flirtation between her and Nodine. She replied, "Hell no."

20. That, Chase told Colangelo that she had forgotten to state that as she was leaving, Nodine tried to kiss her, but she did not kiss him back.  was asked if there was anything that Affiant Colangelo needed to know for this investigation. She said that Nodine tried to kiss her after the incident in the bathroom. She said it happened when she grabbed the fl!Oney bags that were left on the counter. Chase

**EXHIBIT B**

~~said Nodine leaned in to kiss her and touched her lips but she didn't kiss him back. Chase mentioned forgetting to put that in her statement. (This is a direct contradiction to her initial statement, in her initial statement she wrote, "I saw that the money bags were left on the counter and said to Calvin don't forget your money bags and walked out of the building.")~~

21. That, it was told to Chase that if she had consensual contact with Nodine that it was very important to this investigation that it's known. <u>Prior to this interview, no police officer had specifically asked Chase about what intimate sexual conduct had occurred.</u> She then said, "I know, _I'm trying to get myself to this point." At this point Chase became emotional, crying and placing her face into the palm of her hands.

22. That, Chase said there was nothing ever consensual. <u>She stated that that "it was just him, he pulled me in there and dropped them, as soon as he told me to do it I just did it and I just didn't know what to do</u>."<u>"</u> ~~She said when Nodine~~ pulled her into the bathroom and told her to do it, she did it. Affiant Colangelo asked if she gave Nodine oral sex. She said, "~~Yes." Chase~~<u>Yes." Chase</u> then said ~~that everything else is completely true. She explained that she wanted to come back and say this but she was in fear it would go against her story and~~

she doesn't want her boyfriend to know.

But everything else is completely true. I know that story's a lie but I wanted to come back and actually tell that, but I was afraid it would go against my story. And I just don't want my boyfriend to know, I don't want people to ask me why I did it when I didn't want to do it, but - I was just so scared. I don't even know what happened. I couldn't even tell my own mom.

23.  Chase told Colangelo that she was ashamed that she submitted to Nodine without resistance.  She had not told anyone about it because she did not to admit to doing something that she did not want to do.  That, Chase said she didn't want people know why she did it because she didn't want to.  She said she was scared and didn't even want to tell her own mother. She explained that she has been suicidal and has been to the doctor. She said she had spoke to her attorney but did not tell the attorney about this and didn't want to come back and tell what really happened because she knew it would affect her civil case.

 She had hidden the fact that she had been sexually violated from everyone, including her attorney.  Since her family and friends thought that she had gotten away before anything happened, they did not understand why she was so traumatized and devastated.   Chase told Colangelo:  I want the truth to be known, but I don't want my mom, my family, my boyfriend, and all of my friends to think that I was lying because I didn't want to tell them.   Ms. Chase understood, as a matter of common sense, that although she Had her reasons for holding back

**EXHIBIT B**

disclosing the intimate sexual violation to anyone, it could possibly affect her credibility in her criminal complaint and her civil case.

OMITTED EVIDENCE:   Watching the videotape, when Ms. Chase discloses the sexual violation by Nodine for the first time, it is obvious based upon her emotional response that Nicole Chase had no intent to mislead the police in the investigation.  She was embarrassed and ashamed that she had submitted to nonconsensual intimate sexual contact with Nodine without putting up resistance.  She did not want her family and her friends to know and was concerned that nobody would believe that it was not consensual because she had not put up a fight.

24. That, Affiant Colangelo told Chase that he had Chase's original statement.  Detective Colangelo reviewed Ms. Chase's original complaint with her and she told him that everything is true except the one part where she submitted and did not resist.  -She said she made sure to tell the truth except for the one part because she didn't want people to know.

25. That, Affiant Colangelo then drew a picture with Chase of the layout of the business to get a better idea where Chase and ·Nodine were during the night of

**EXHIBIT B**

~~the alleged incident. As she was explaining where they were standing and how she was pulled into the bathroom she began to hesitate. As she was trying to explain where they were standing she said out loud, "well that doesn't make sense", and then began to talk about them hugging in the hallway and how Nodine was holding her hand.~~.  At some point, during the discussion, Chase says  "well that doesn't make sense." It is impossible to determine what she was referencing, because Detective Colangelo did not preserve the diagram.

Chase described to Detective Colangelo that when Nodine tried to hug her in the hallway, she felt like something was about to happen, and did not know what to do.  As she permitted him to hug her, he grabbed her hand, and she was weirded out, but was not trying to resist.  She was afraid, because Nodine was very drunk.  When they heard Kyle Rouleau, he grabbed her arm and pulled her into the bathroom.

26 That, she said they were standing in the hallway near the bathrooms when the employee, Kyle, came back into the restaurant, (who they thought had left). She said she stayed silent not because she didn't want Kyle to know, she stayed silent  because and she didn't know what to ~~do~~do and thought that if she just did it and got it over with, she could keep her job.   ~~She said she did it to get it~~

**EXHIBIT B**

over with.

27. That, Affiant Colangelo asked how they ended up from the hallway into the bathroom. She said that Nodine had her arm in the hallway and it wasn't forceful but she knew that he wanted her in the bathroom so he guided her in, closing the door and locking it behind them. She said she wanted to go home and wanted to keep her job. She said that he suddenly pulled her by the arm without warning into the bathroom and locked the door.

28.    That, Chase said that Nodine's wife kept calling his cell phone to alert him of a police spot check while they were in the bathroom. She said the wife, "kept blowing up his phone." She continued on saying that his wife called at least 6 times before Nodine answered. Chase said as soon as they entered the bathroom she performed oral sex on Nodine as Kyle was calling out for Nodine and Chase. Although defendants failed to do investigation or follow up, at the time, phone records available at the time that the arrest warrant was drafted would have corroborated Chase's statement about Nodine's wife calling.

29..  Chase described the alleged assault in the bathroom in detail, including the

**EXHIBIT B**

color of Mr. Nodine's boxers and that he smelled bad.    Chase, vividly described the violation:

> Nodine leaned against the sink.  That he was like hard, but it was like he knew that he was doing something wrong or that he knew that I did not want to do it because he was hard at first, and then, like he was not hard, and he had difficulty maintaining an erection so all he was doing was like bashing my face into his "junk" (penis).

As Chase is describing this, the video shows Ms. Chase making a motion with her hands toward her face, showing the force that Nodine was using on Chase to get himself to ejaculate. Ms. Chase tearfully told Detective Colangelo that she was physically afraid while it was happening:

> I don't even know how I'm gonna tell anybody this - I guess in my head, like, I just thought, like if I just did it and I just left, I wouldn't get hurt.

~~That, Chase said she thought if she just did it she could leave and wouldn't get hurt. She said Nodine leaned against the sink and was hard at first but then wasn't. She said Nodine kept bashing her face into his "junk". She said that because~~ Between the fact that Nodine was so intoxicated, his difficulty maintaining an erection, and his wife's phone calls, Chase thought that it took between 10 and 15 minutes for him to finish.

30.  That, Chase said that Nodine ejaculated in her mouth.  Officer Gompper never told her to preserve the clothing that she wore that night when she first

**EXHIBIT B**

saw him the next morning.   She had thrown out all of the clothes she was

wearing that night because she could not bear to look at them and did not want

to be reminded of Nodine or the restaurant.  She expressed regret that she had

been unable to tell the intimate details when she first went to the police, and

how the sexual assault came as such a shock:

> when I went to the police, they were like why didn't I go that night,
> and just tell the truth, and then I couldn't get it out of my mouth, and I
> like, I just like, you know? Why didn't I just do that? And like, trust
> me, I want to kick myself over it, but - I don't know how to - I - and
> now, and I never expected from him.

_. She said she kicked herself for not reporting the incident that night and that

she didn't have her mouth swabbed.

31..  That, Chase was asked if she wanted to provide a new statement. She asked if

it would screw up her civil case. Affiant Colangelo told her that he didn't know

and wasn't an attorney. She said she wanted to provide a statement so the. truth

is known but didn't want her boyfriend or whole family to know what

happened did not want her mom, her family, her boyfriend, and all of her

friends to think that she was lying because she did not initially disclose the

intimate sexual details.  Although Chase had already verbally told Colangelo

the omitted intimate sexual details that had not been included in the initial

statement, Colangelo told her "I could give you the opportunity to put it in

**EXHIBIT B**

writing.  ~~She was again told she had the opportunity to put the truth in writing.~~

32.  ~~That, Chase acknowledged that she was aware that the sworn written statement she provided to Officer Gompper was not truthful.~~ <u>Nicole Chase had no idea about the legal difference between making an affirmatively false statement and an omission that is not legally a false statement.</u>  She said she wanted to consult with her attorney prior to providing another written statement.

33.  ~~That, Chase then thanked Affiant Colangelo for letting her tell the truth.~~ <u>Nicole Chase had omitted the details of the intimate sexual violation because she was ashamed, traumatized, and fearful of people believing that she consented because she submitted and did not put up resistance</u>.  <u>Her interview with Colangelo on June 21, 2017 was the first time that she was actually questioned about physical contact, and she was glad that she had the courage at that time to make the disclosure.  Although Detective Colangelo had offered her the opportunity to come back in to revise her written statement, that was false.  Detective Colangelo's statement that she had not tried to reach officer Colangelo was also false.</u>    ~~It was explained to Chase that she could call and speak to Affiant Colangero about her decision to provide a written statement.~~

**EXHIBIT B**

As of ~~717~~ /17, Chase has not called to speak to Affiant Colangelo of Officer Gompper.

OMITTED ITEM:   A~~a~~fter her June 21, 2017 interview with Detective Colangelo, she returned to the police station with the copies of the text messages he had requested. She testified that she told the dispatcher that she was there to revise her statement, but the dispatcher told her that Detective Colangelo was busy and that he would call her if he needed her. On July 25, 2017, Ms. Chase sent an email to Detective Colangelo, titled "Revise Statement/Nicole Chase" to tell him that she came to the police station two weeks earlier to provide him the requested text messages and to revise her statement.

After Detective Colangelo did not reply, Ms. Chase emailed him again on July 31, 2017, this time attaching a supplemental statement, adding the details that she described in her June 21, 2017 interview.

Detective Colangelo did not respond until August 10, 2017 and indicated that he did not know she wanted to revise her statement and that he had "already documented the change in your recount of the incident and had already sent the case to court for review. It is still with the States Attorney's-office and I should hopefully-have some direction of the next step shortly."  Detective Colangelo's email is misleading because it provided Ms. Chase with the false impression

**EXHIBIT B**

that the police were pursuing criminal charges against Mr. Nodine, not that she

was the subject of a false statement investigation.  This false impression is also

misleading because it is contradicted by his statement in the unrevised arrest

warrant that she had not changed her written statement, despite the efforts that

she had made to do so.

Detective Colangelo never contacted Ms. Chase to see whether she wanted

to change her statement before applying for the warrant, he never updated his

affidavit in support of the arrest warrant to reflect her revised statement and the

corroborating text messages, and he never forwarded any additional

information -to the prosecutor.

If Ms. Chase's supplementary statement had been incorporated into her

original statement, it would have negated probable cause for the charge of

Making a False Statement:  her statement would no longer be false, her

knowledge that she made a false statement would no longer be the case, and

their no intent to mislead the police.

34. An accurate warrant, correcting for all of the false and misleading statements

and including relevant and exculpatory omissions would be insufficient to find

probable cause that Nicole Chase has committed the crim of 53a-157b, Making

a False Statement.  ~~That, based upon the facts and circumstances contained~~

**EXHIBIT B**

herein, I have probable cause to believe that Nicole H Chase (DOB ) has committed the crime of 53a-157b, False Statement. I respectfully request that a warrant for the arrest of Nicole H Chase be issued.

**EXHIBIT B**