# Exhibit 2

## ADMINISTRATIVE INVESTIGATION REVIEW AND REPORT

**CASE NUMBER:**  IA-18-01

**EMPLOYEES
INVOLVED OR
MENTIONED:**

Chief Christopher Arciero
Captain Lawrence Terra
Sergeant Mark Penney
Detective John Colangelo
Officer Adam Gompper
Dispatcher David Canny

**COMPLAINANT:**  Attorney Lewis Chimes

This document is intended exclusively for the individual or entity to which it is addressed. This communication may contain restricted and/or confidential information which may be legally protected or otherwise exempt from disclosure. If you are not the intended recipient, you are hereby notified any unauthorized disclosure of this product is strictly prohibited.

**APPLICABLE
STATUTES/RULES
AND REGULATIONS:**

**1. General Order 1.7**  **CANONS OF POLICE ETHICS**

General Order 1.7 provides a baseline discussion for Canton police officers to follow regarding their conduct.  (Exhibit AA). Certain sections of the General Order that are relevant to this inquiry are as follows:

*The primary responsibility of the police profession and of the individual officer is the protection of the people of the United States through the upholding of their laws; chief among these is the Constitution of the United States and its amendments.*

*Officers of the Canton Police Department shall exercise discretion fairly and impartially in enforcing the law and performing their duties*

**2. General Order 6.1**  **CRIMINAL INVESTIGATIONS**

General Order 6.1 provides an outline of the administrative and operational guidelines of the Detective Division (Exhibit Z).  Certain sections of the General Order that are relevant to this inquiry are as follows:

*III.B. Detective Responsibilities*

1

DEF00640

*Section I states the following:  Ensure civil treatment and protection of constitutional rights of all persons coming within the scope of the investigation.*

*III.  Case Screening/Assignment*
*Section 8.  In all cases where the investigation is suspended, or administratively closed, if appropriate, the victim/complainant will be notified and advised of the change. The notification shall be noted in the supplemental report.*

**2.  General Order 6.6**          **SEXUAL ASSAULT INVESTIGATION**
General Order 6.6 provides a baseline discussion and procedure regarding the investigation of sexual assault cases. (Exhibit Y).  Certain sections of the General Order that are relevant to this inquiry are as follows:

- *It is recognized that handling cases of sexual assaults has been an area of difficulty for law enforcement personnel.*
- *The responding officer to reported sexual assaults shall show sensitive, professional behavior towards the victim in order to minimize trauma.*
- *Detective/investigators responding to reported sexual assaults shall conduct on–scene investigation involving the obtaining of statements, locating witnesses, and collecting and preserving evidence in accordance with accepted evidence collection techniques.*
- *All personnel involved in the investigation of a sexual assault case will perform their appointed function efficiently, professionally, and humanely, giving first priority to the physical and emotional condition of the victim.*

**4. General Order 10.2**          **DEPARTMENT REPORTS AND FORMS**
General Order 10.2 provides a baseline discussion for supervisors and officers to completely prepare reports. Certain sections of the General Order that are relevant to this inquiry are as follows:

DEF00641

*B.1. All reports and forms requiring a supervisor's signature should be accurately, completely and promptly submitted for approval.*

*B.2. Supervisors are required to check each report and form submitted to ensure that all the proper data and information is completely and accurately provided.*

**NATURE OF COMPLAINT:** In a letter dated February 9, 2018, Attorney Lewis Chimes, filed a Notice of Intent to File a Claim, on behalf of Nicole Chase against various Canton Police Officers concerning their investigation and arrest of Nicole Chase. (Exhibit R). In his letter, Attorney Chimes was critical of the Canton Police Department investigation, in that, among other things, the victim "was being charged with making a false statement because she did not initially give all of the details (of the alleged sexual assault) in her initial interview with the police." Subsequently, Attorney Chimes filed a lawsuit regarding the underlying issues attendant to the Chase investigation. (Exhibit R and Exhibit S).

**AUTHORITY TO INVESTIGATE:**  Between the February 9, 2018 Attorney Chimes' letter and the April 25, 2018 Executive Session of the Canton Board of Selectmen, there were various meetings/discussions to discuss Attorney Chimes' claims. (Exhibit T). After the April 25th Board of Selectmen Executive Session, Chief Christopher Arciero was formally assigned to conduct an Internal Investigation into the facts and circumstances surrounding Attorney Chimes' claims as they related to the investigation and arrest of Nicole Chase.

DEF00642

**Issue #1:**

Adequacy of Canton Police Department Policy on Sexual Assault Investigations

**Investigative Findings:**

A. Canton Police Department Policy/Training Discussion

This segment of the inquiry focuses on a preliminary discussion of Canton Police Department policies and practices. The existing Canton Police Department General Orders were reviewed to determine whether any such order(s), that dictate how to conduct sexual assault investigations, were applicable to the issues raised in Attorney Chimes' complaint.

Canton Police General Order 6.6 most closely provided such guidelines. (Exhibit Y). Moreover, Canton's General Order regarding sexual assault investigations is similar to, if not more in-depth, than other departments.[1] In addition, Canton Police Officers receive recertification training and other updates on sexual assault investigation processes and procedures. (Exhibit U, Exhibit GG). Unlike other general orders that provide clear and unambiguous direction, General Order 6.6, is more subjective. That subjectivity is understood, particularly in light of the difficulty in prescribing specific responses to the various ways 'sexual assault' type cases may be presented to a police department.

To wit:

1. Victim immediately reports the incident and is able to provide all or some of the relevant facts.
2. Victim immediately reports the incident, but because of underlying physical, psychological or emotional impediments, the victim is unable to provide all or some of the relevant facts.
3. Victim delays reporting the incident, but when the victim does report the incident the victim is able to provide all or some of the relevant facts.
4. Victim delays reporting the incident, yet when the victim does report the incident, there are underlying physical, psychological or emotional impediments that prevent the victim from providing all or some of the relevant facts.
5. Victim reports (either immediately or past tense) an incident that presents fact(s) that may not support a sexual assault; i.e. sex harassment.
6. Victim reports (either immediately or past tense) an incident, but is undecided if they want to pursue a formal complaint.
7. Third party reporting of an incident that may include all or some of the above variables.

---

[1] Exhibit FF contains Avon and Simsbury Police Department policies (or excerpts) that address sexual assault investigations. Both of these departments are CALEA certified. Granby Police does not have a specific sex assault policy.

4

As such, depending on the timing and the manner in which a complaint is received, police officers are expected to adjust to different investigation responses and resources to ensure efficiency and efficacy toward a proper resolution.

In any event, both the Canton Police Department General Order 6.6 and In-Service training curricula underscore the difficulties inherent in conducting sexual assault investigations. (Exhibit U; Exhibit Y)[2]. Such difficulties include, but are not limited to, the definition of sexual assault, impact of trauma on memory, passage of time between the alleged assault and report to the police, victim reluctance, suspect/victim relationship, and consent issues.[3]

Due to the subjectivity inherent in police investigation techniques, policies and procedures are often modified. Between the Chase criminal investigation and Attorney Chimes' February 2018 letter, Canton Police Officers were provided new procedural guidelines for investigating sexual assault incidents. (Exhibit GG).  Following Attorney Chimes' February 9 letter, revisions were made to Canton Police Department General Order 6.6. (Exhibit BB). In addition, other internal processes were added or modified as part of the overall review and update subsequent to this incident.

Accordingly, such additions or modifications to the current Canton Police General Order and training regarding sexual assault investigations will continue to ensure Canton Police personnel maximize victim safety and suspect accountability.

Irrespective of the above noted policy issues and ongoing updates, every Canton police employee is expected to adhere to recognized basic investigation responsibilities. In this matter, both Detective Colangelo and Officer Gompper were aware of the general orders and had received training on conducting sexual assault investigations. (Exhibit D, p. 3-4; Exhibit I, p. 4-5; Exhibit EE).

---

[2] Exhibit U contains selective excerpts from power point slides of in-service training that CPD officers attended in calendar years 2013-2014 and 2016-2017. The training power point slides are shown, but not provided to the officers.

[3] Along with the existing General Orders and recertification training, Canton Police Officers are provided additional roll call bulletins and "Read & Sign" publications regarding the handling sexual assault investigations.

DEF00644

**Issue #2:**

Nature of Nicole Chase's initial complaint at the Canton Police Department on May 7, 2017 and the propriety of interviewing Nicole Chase in the front lobby of the CPD

**Investigative findings**

A.   Sexual Assault vs. Sexual Harassment

This segment of the inquiry addresses the ambiguity surrounding the actual nature of Chase's complaint to the Canton Police Department on May 7, 2017. Dispatcher Canny was the first member of the Canton Police Department to communicate with Chase. Dispatcher Canny recalled that Chase's initial concerns dealt with sexual harassment in a workplace involving her boss. (Exhibit A, p. 2-3). Dispatcher Canny never recalled that Chase or her mother indicated that a sexual assault had occurred.
Officer Gompper recalled that Dispatcher Canny told him that the nature of the complaint involved workplace sexual harassment. (Exhibit D, p. 5). Dispatcher Canny contemporaneously entered the complaint into the Canton Police Department CAD system. That entry indicated that the complaint centered on sexual harassment as opposed to sexual assault. (Exhibit X).

Officer Gompper spent 30 minutes talking with Chase and her mother in the front lobby of the Canton Police Department. That encounter was audio and video taped. (Exhibit B). The lobby interview video/audio tape involving Officer Gompper and Chase initially centered on facts that were indicative of a dysfunctional workplace concerning a multitude of work-related issues involving Nodine, Chase and other employees. Chase never mentioned any sexual act between Nodine and her. Although Chase saw Nodine's exposed genitals in the bathroom, she never saw or felt them when he hugged her in the hallway before entering the bathroom. (Exhibit B). Further on during the lobby interview, Chase began to provide the framework of what Officer Gompper construed as a harassment-type complaint as opposed to a sexual assault. Moreover, throughout the 30 minute lobby interview, Chase was non-committal with regards to filing a formal complaint. Chase was willing to wait until she next encountered Nodine to determine whether she would pursue a complaint. (Exhibit B; Exhibit C). Officer Gompper was ready to transition to a more formal statement if the facts suggested that. (Exhibit D, p. 6).

After Chase left the police station, Officer Gompper provided Sergeant Penney with a brief summary of Chase's complaint. (Exhibit D, p. 2). Sergeant Penney construed Chase's initial complaint as grounded in a harassment issue as opposed to an assault. (Exhibit E, p. 2, 5-6).

Captain Terra indicated that had the case come in initially as a sexual assault, it would have been handled differently, with more supervisory and detective involvement.

DEF00645

> LT:(Captain Terra) *"This looks like it came in not even the normal way that I would get involved in a sexual harassment...what is it sexual...sexual harassment usually would be handled by patrol. Generally if I get a call and notified that there's a sexual assault involving a case than I would be right involved in."*
> Exhibit P, p. 2)

> LT: *"Just that this case, had it come in like a true sexual assault, it would have skipped patrol and it would have been under different circumstances, but it came in as sexual harassment,..."*
> (Exhibit P, p. 18).

On May 9, 2017, Chase returned to the Canton Police Department and spoke to Sergeant Penney and provided no new details to suggest that the incident on May 6 was a sexual assault. (Exhibit E, p. 6-7).

Finally, during her June 21, 2017 interview with Detective Colangelo, Chase admitted that she did not make an official complaint during her May 7, 2017 meeting at the Canton Police Department. In fact, on May 7, after speaking with Officer Gompper, Chase left, and on her way to work at Nodine's Restaurant, she purchased an ice coffee for Nodine. (Exhibit M).

Accordingly, the initial Chase complaint was significantly vague. Chase never mentioned the butt-grabbing nor the oral sex act. In addition, there are no facts to suggest that the three Department employees involved with Chase on May 7, 2017 intentionally or negligently misconstrued Chase's complaint in violation of any specific Canton Police Department General Order, including 6.6.

B. <u>Location of Chase Initial Visit and Interview at the Canton Police Department</u>

This segment of the inquiry focuses on the propriety of Officer Gompper's 30 minute interaction with Chase in the front lobby of the Canton Police Department on May 7, 2017. The front lobby was the location chosen by Officer Gompper to speak with Chase concerning her initial visit and complaint.

At the time of this incident, there was no specific Canton Police Department General Order that dictated what should be considered the proper location for an interview of a crime victim, including a sexual assault victim.[4] Notwithstanding the lack of specificity as to the interview location, officers were aware that depending on the type of

---

[4] G.O. 6.6 has since been amended to provide personnel with more guidance when conducting sexual assault investigations, <u>including consideration of an interview location.</u>(Exhibit AA)

DEF00646

investigation, choosing a location should take into consideration, among other things, an area that is comfortable to the victim, offers some level of privacy and minimizes distractions. (Exhibit U). Such accommodations are particularly relevant and beneficial when investigating a sexual assault incident. In addition, such accommodations underscore the officer's mindfulness and sensitivity toward a victim of sexual assault. In fact, such accommodations are part of the training provided to Canton police officers, including Detective Colangelo and Officer Gompper, which stated in relevant part, "*Interview at a location with minimal; distractions*" and "*Interview the victim in a private, quiet area*". (Exhibit U, p. 10).

The following facts, as applied to the General Orders and training, do not support a finding that Officer Gompper's use of the front lobby to conduct the lobby interview of Chase was in violation of any specific Canton Police Department General Order or training expectation.

First, because there was ambiguity as to the true nature of Chase's initial complaint, Officer Gompper reasonably believed that the lobby interview was appropriate. Moreover, Officer Gompper acknowledged that depending on what he would learn from a complainant, he could relocate the interview to a more appropriate location.

> CA:   *So you're not sure, other than being told it's a sexual harassment, you walk out, you say what's going on, no formal introduction…how were you going to record the facts that Nicole and her mother were going to present to you?*
> AG:   *(Officer Gompper)      I know the lobby is audio and video recorded.*
> CA:   *So you were going to rely solely on…*
> AG:   *Well, I was going to see what she said first.  Depending on what she told me I could either, go ahead and take a formal statement like we normally do in our front interview room but normally, when I go out and take any type of complaint, I go out and speak to the person first because a lot of times they'll come in and complain about something and they end up walking out, there's no complaint made.  That's happened numerous times with numerous different officers in this department.  (Exhibit D, p. 6).*

Second, Officer Gompper was aware from his training, that sex assault victims require more privacy.

> CA:   *Was there a point in time, going back to your training about if you're going to interview the victim of a sexual assault, that you sort of maintain some type of privacy, a setting that's comfortable for them to relate their concerns about the underlying facts of the assault?*
> AG:   *Yes. (Exhibit D, p. 6).*

8

Third, while Officer Gompper believed that the front lobby provided a more comfortable setting for certain types of interviews, he was mindful of the need to be flexible and change locations as the case warranted.

> CA:   How does that square with the fact that you maintain this lobby interview or discussion with Nicole in a public location and not take her in the back to a more private setting?
>
> AG:   I believe no one came in the lobby the entire time she was here, and that's also very much more friendly, I think. There's natural lighting, windows, a door…you bring her in the front interview room you are closed in a six by six room with florescent lighting, no inside windows and plain, bare walls.  It looks like you're being interrogated in that room.
>
> DM:   From my perspective…
>
> CA:   Hold on a second, I don't know if your perspective is relevant right now…
>
> DM:   Well, it is because the accusations of sexual harassment versus sexual assault which are two entirely different things…
>
> CA:   Correct…okay, I'll have Adam explain that.  You are saying that there is a much more natural setting, in your estimation you felt was more comfortable to interview a potential victim in the front lobby.
>
> AG:   Correct, I've interviewed numerous people in that front lobby, and there's been times when I've done other investigations where its gotten to a point where I think okay, let me step inside the EOC, let me bring them into our interrogation room or interview room…I've moved those people.  There's people that have come in previous times, unrelated to who I'm talking to, to talk to dispatch, I'll just say hold on one second please, let's take a break, lets step into the EOC room so people don't hear me. I've done that in previous investigations.
>
> CA:   But in this particular case you chose to keep that initial interview in the front lobby?
>
> AG:   Correct.  Because it was a sexual harassment complaint. It wasn't what she later claimed. Initially when it came in.
>
> CA:   Were you concerned at all that someone would be showing up at the PD maybe walking into the front lobby and you'd have to interrupt the interview process?
>
> AG:   No, I didn't even think about that because it's happened before.  I've stopped the interview process, or moved people or waited until the person left the lobby. (Exhibit D, p. 6-7).[5]

---

[5] As part of the ongoing policy and procedure review and because of Officer Gompper's comment that he was unfamiliar with the recording equipment in the interview room, changes have been made to ensure all supervisors are aware of how to access and utilize the audio recording equipment in the designated interview room. (Exhibit D, p. 13).

DEF00648

Fourth, Sergeant Penney proffered a similar understanding regarding the discretionary use of the front lobby based on the initial facts Chase provided.

CA: *There have been some issues raised about the location that Officer Gompper used to interview Nicole Chase.  I don't know if you know…I'll show you the video tape…but he interviewed her in the front lobby of the Police Department and as a supervisor do you have any issues with Officer Gompper or any Officer interviewing or using the front lobby as a location to conduct an interview?*

MP: *I guess it depends on the interview…I don't know if he knew what he was getting into, or how it was presented.*

CA: *Can you further expound on what you mean by all that.*

MP: *I mean, your question is…do I have any reservations, me personally, have any reservations on how it's done or how Officer Gompper conducted it?*

CA: *Well you knew at some point, because you said you may have walked into dispatch, when you saw them out in the front lobby…*

MP: *I may have…I said I may have…I'm not going to swear that I did or didn't…so I don't know if I did.*

CA: *Okay…*

MP: *Many times officers do interview in the lobby…sometimes I do…in fact I interviewed…I didn't interview…I spoke to her in the lobby a few days later.*

CA: *Let me ask you this, if this was a sexual assault victim, instead of sexual harassment, a sexual assault victim would that be the proper location in which to conduct any type of an interview process?*

MP: *No certainly not…not for a sexual assault interview…the front lobby…no.  I don't think that's what he was doing though.*

CA: *What do you think he was doing then?*

MP: *Well I don't think he was doing anything…I didn't know what he was doing at the time.*

CA: *Okay, so…*

MP: *You're asking me as a witness to facts as they unfolded, this is not a 20/20 hindsight or what my personal view is I'm just telling you what happened as it unfolded on that particular day.*

CA: *I'm asking you about your recollection at the time…I did ask you a hypothetical about did you have any concerns about certain types of interviews that might take place in the front lobby.*

MP: *As a supervisor my concern would be if it indeed was a sexual assault interview conducted in a place where it could be overheard by public people or…it's just not conducive for that type of an interview.  We have an interview room for that, so apart from this incident if it was a sexual assault case, no, it should go into the proper interview room.  (Exhibit E, p. 3-4).*

DEF00649

Fifth, during the lobby interview, Officer Gompper did not recall Chase telling him that she was sexually assaulted.

> CA: *Was there a point in time during that interview where Nicole related facts to you that she was sexual assaulted by Calvin Nodine?*
>
> AG: *That she was sexually assaulted?  Not that I recall, no.  She talked about how she was exposed, I believe in this first encounter with her, that he exposed himself to her in some way, shape or form.  I don't remember everything that was said.  (Exhibit D, p. 7).[6]*

Sixth, the videotape of the Chase front lobby meeting completely negated Chase's lawsuit claim that "*numerous individuals in the public lobby were walking by'*". (Exhibit B; Exhibit R, paragraph 64).

Accordingly, there is no justification to support a finding that Officer Gompper violated any specific Canton Police General Order when he interviewed Chase in the lobby of the Canton Police Department.

### C. Officer Gompper's Treatment of Chase

This segment of the inquiry focuses on the manner in which Officer Gompper treated Chase during her initial visit to the Canton Police Department on May 7, 2017. At the time, the CPD General Order 6.6 on sexual assault investigations, stated in relevant part that. "*All personnel involved in the investigation of a sexual assault case will perform their appointed function efficiently, professionally, and humanely, giving first priority to the physical and emotional condition of the victim*".

The best evidence of Officer Gompper's treatment toward Chase is based on the 30 minute front lobby videotape. (Exhibit B). Initially, Officer Gompper could have been more "professionally inviting" when he first went into the lobby to meet Chase. And although Officer Gompper stated that he knew Chase, a simple introduction and being prepared with a notepad certainly would have been more indicative of a higher level of professionalism. (Exhibit D, p. 6). However, irrespective of whether or not Officer Gompper could have shown more outward empathy, he addressed the relevant points regarding his investigative responsibility and concern for a victim.[7]

During the 30 minute lobby interview, Officer Gompper asked Chase if she wanted to file a complaint, that he had "no problem" investigating the case. Several times during the meeting, he told her that she could come back later (either that day or later that

---

[6] A review of the videotape supports Off. Gompper's recollection that there was no mention of a sexual assault by Chase during the 30 minute lobby interview.

[7] Officer Gompper may not have ever investigated a sexual assault case prior to May 7, 2017. (Exhibit D, p. 2).

DEF00650

week) to file the complaint. Importantly, he demonstrated a level of caring for a victim when he told her that he believed her and understood the difficult position she was in. In addition, Officer Gompper explained the process of an investigation and provided Chase with the mandated 'victim service' information card. At no time did Officer Gompper accuse Chase, nor did he victim-shame or blame her. (Exhibit B; Exhibit C).

Officer Gompper's actions and words have to be balanced against Chase's initial complaint which was devoid of any reference to 'butt-grabbing' or oral sex (which were the bases of her later complaints) and her seeming ambivalence about whether, at the time, she wanted to pursue a formal complaint against Nodine. During her discussions with Officer Gompper, Chase wanted to see how Nodine would act when she returned to work and wanted the incident noted for future use.

Officer Gompper offered Chase sound advice when he provided her with options to deal with Nodine upon her return to work. As one option, Officer Gompper advised Chase that if she felt uncomfortable in his presence that she could contact him (Officer Gompper) to pursue the complaint. As another option, Officer Gompper advised Chase that if Nodine grabbed her or placed her in any other type of danger, Chase should immediately call 911. (Exhibit B, tape position :26.00-:29:00).

Moreover, depending on the facts presented or desires of Chase, Officer Gompper was prepared to obtain a more formal statement and case follow-up. (Exhibit D, p. 6).

Accordingly, because of the forgoing facts and Officer Gompper's interpretation that the initial case was based on a workplace harassment issue, this segment of the investigation cannot conclude that his actions violated Canton Police Department General Order 6.6.

DEF00651

**Issue #3:**

Officer Gompper's Premature Conclusion to the Chase Investigation

**Investigation findings**

This segment of the inquiry focuses on Officer Gompper's written report dated June 22, 2017 which summarized Chase's interview that took place on June 21st. (Exhibit N). While his factual summary of Chase's testimony was generally accurate, Officer Gompper added the unsolicited conclusory comments that he did not find probable cause that Nodine forced Chase to perform a sex act on him and that an arrest warrant would be applied for Chase. (Exhibit N, p. 6). For the following reasons, it was inappropriate for Officer Gompper to proffer those conclusions at that time.

At the time of Chase's interview and Officer Gompper's summary report, Officer Gompper was on administrative duty status due to a police shooting that he was involved in on June 9, 2017. At that time, Officer Gompper knew that he could not be an affiant on any warrants and he was not to be actively involved in any such investigation.

> CA:  *You were under the impression that since the shooting and your return back to an Administrative status that you were not to be an affiant on any search warrants, arrest warrants, or any other NCMARS investigations.*
> AG:  *Correct.*
> CA:  *Who gave you that directive?*
> AG:  *You did.  (Exhibit D, p. 25).*

In fact, Officer Gompper had no role in the Chase interview.

> CA:  *What was your role supposed to be if you weren't able to be part of the affidavit?  What was your role going to be during the course of this interview?*
> AG:  *I didn't have a role on the interview with Nicole. (Exhibit D, p. 25-26).*

Officer Gompper did not prepare any questions, he was not asked to provide any questions, and he was not present in the interview room. Detective Colangelo conducted the entirety of the Chase interview. (Exhibit I, p. 25-26). During the time Officer Gompper watched Chase's interview from a remote location, he was aware of the existence of potential witnesses that Chase mentioned by name and those referenced in her text messages, that had not yet been talked to. (Exhibit D, p.28-29).

Also, Officer Gompper was aware that Detective Colangelo had given Chase the opportunity to file a revised statement. (Exhibit D, p. 28). Despite those outstanding issues, Officer Gompper prepared a summary report of Chase's interview. Officer Gompper believed that Detective Colangelo may have told him to do so and because Gompper knew Detective Colangelo was busy, he did so. (Exhibit D, p. 26-27).

DEF00652

Whether or not Officer Gompper was performing a mere ministerial act of a scrivener at Detective Colangelo's behest or simply to help out, Officer Gompper should not have rendered his conclusion or comment about prospective police action, particularly when there were still outstanding factual issues to be pursued.

Accordingly, on this particular issue, due to Officer Gompper's duty status and the unresolved case issues, his actions were inconsistent with Canton General Order 6.6 which states in relevant part, "all personnel involved in the investigation of a sexual assault case will perform their appointed function efficiently [and] professionally...". (Exhibit Y).

DEF00653

**Issue #4:**

Detective Colangelo's investigative efforts and interaction with Nicole Chase and Calvin Nodine

**Investigation findings:**

A.  Pursuit of Claims against Nodine:

This segment of the inquiry focuses on the efforts to pursue charges against Nodine based on Chase's May 11, 2017 written complaint that Nodine "grabbed her butt". (Exhibit F).

Prior to her May 11, 2017 written statement, Chase never mentioned that Nodine grabbed her butt. She had multiple opportunities to do so. For instance, after the incident on the evening of May 6, 2017, Chase texted a trusted friend, (Jeremy), but never mentioned the butt-grabbing.[8]  (Exhibit V). On May 7, and pursuant to Jeremy's encouragement to contact the police, Chase went to the Canton Police Department and talked to Dispatcher Canny and Officer Gompper separately, yet never mentioned the butt-grabbing. (Exhibit C; Exhibit B). On May 9, she spoke with Sergeant Penney without mentioning the grabbing. (Exhibit E, p. 7). On May 10, Officer Gompper talked to her on the phone to set up the written statement date. Again, there was no mention of the grabbing incident.

On May 11, Officer Gompper secured written statements from Chase and her co-worker Archer. (Exhibit F; Exhibit G). For the first time, Chase disclosed the fact that Nodine had grabbed her butt.[9]

Nonetheless, at that point, the Canton Police had Chase's sworn written complaint and Archer's sworn statement that Nodine "grabbed Chase's butt".

The next investigation step was the interview of Nodine. (Exhibit I, p. 11). In fact, Detective Colangelo may have been specifically brought in to conduct Nodine's interview. (Exhibit I, p. 12-13). At the interview, Nodine made the remarkable comment about an oral sex act between Chase and him. Detective Colangelo recognized the significance that this disclosure stood in sharp contrast to Chase's prior conversations and sworn statement that made no such reference.

---

[8] Also during the several days of Chase's ongoing and numerous texts with Jeremy, she never mentioned the "butt-grabbing". (Exhibit V).

[9] When Gompper questioned Chase as to why she had not disclosed that information earlier, Chase indicated that she did not remember it until Archer mentioned it. (Exhibit D, p. 14; Exhibit K).

DEF00654

Detective Colangelo had no meaningful discussions with Officer Gompper about pursuing charges against Nodine nor did he recall if he spoke to anyone else about it as well. (Exhibit D, 30; Exhibit I, p. 39; Exhibit P, p. 12).

However, following Nodine's interview, Detective Colangelo understood the need to interview Chase to determine if Nodine was lying, (Exhibit D, p. 21, Exhibit I, p. 21-22; 25).

At that point, Detective Colangelo became the *de facto* lead investigator.[10] On June 21, 2017, Detective Colangelo interviewed Chase. At that interview, Chase admitted to the oral sex act with Nodine.

Chase's interview disclosures presented Det. Colangelo with different investigatory issues. One of the issues was the apparent discrepancy between Chase's May 11 written statement and her June 21 interview. The other issue was the pursuit of the butt-grabbing charges against Nodine.

Detective Colangelo pursued the charges against Chase[11], but did not do so with respect to Nodine.

One of the reasons for not pursuing the investigation and charges against Nodine appeared to be grounded in the fact that Detective Colangelo may have had concerns about the similarities between Chase's and Archer's written statements. During Chase's interview, Detective Colangelo raised this issue and was concerned that a defense attorney might use the similarities as either evidence of collusion or to impugn Archer. (Exhibit M).

Also, Detective Colangelo was concerned about the potential problem to prove the butt-grabbing was criminal in light of the apparent consensual relationship.

> CA: *Did you consider investigating Calvin…*
> JC: *(Detective Colangelo): I did investigate it. The totality of the circumstance showed that they had some sort of consensual relationship. Am I going to be able to pin a butt grabbing 3 weeks earlier on him after I know they have a consensual relationship going? I can't tell and I'm not going to be able to prove if it's a flirtatious thing or if it's a crazy thing, but the witnesses were not good witnesses because they were a gang against Calvin. Not that Calvin didn't deserve it, but they don't make good witnesses. Their texting, their contacting,*

---

[10] During his introduction to Chase at her interview, Detective Colangelo more or less confirmed this when he told Chase the case was now on his desk and that he handled serious cases for follow-up. (Exhibit M). Moreover, after Chase's interview, Officer Gompper performed no other investigation work. (Exhibit D, p. 31; Exhibit E, p. 12-13).

[11] This will be addressed in Issue #4, Section C. 3.

16

> on my thing for this one you said I can't talk to anybody.   It'd be great if I could
> say that to these people but I can't…I don't have that luxury.
> CA:  Because the witnesses text each other they're not credible?
> JC:  You're looking at one text…one series of texts…
> CA:  I'm looking at days of texts, with potential witnesses…you made a conclusion
>     that …
> JC:  That's correct… (Exhibit I, p. 38).

Another reason may have been that Chase's omission of the oral sext act from her
written statement lessened the weight of her other claims.

> CA:  So again, my question goes back…you had a statement from Nicole saying I
>     want to pursue criminal charges and the allegation is he grabbed her butt and
>     then he made some vile comments…
> JC:  She has that in a statement that she lied in.  The statement is not very good.
> CA:  So the fact that she omitted the oral sex makes everything else irrelevant?
> JC:  I didn't say it made it irrelevant but it lessens the weight of everything else.
>     (Exhibit I, p. 53).

The end result was that Detective Colangelo did not think it was necessary to pursue
criminal charges against Nodine. (Exhibit I, p. 39).
Detective Colangelo did not notify Chase concerning the decision not to pursue criminal
charges against Nodine.

Atty. Chimes' letter of February 9, 2018, was critical of the non-pursuit of charges
against Nodine and requested an investigation into Nodine be reopened. In response to
Attorney Chimes' letter, Canton Police Chief Christopher Arciero made a request to the
Connecticut State Police to review the circumstances and consider whether there was
probable cause to arrest Nodine. The Connecticut State Police accepted the request to
review the Nodine case, but ultimately concluded that there was no probable cause for
Nodine's arrest. (Exhibit DD).

Although the State Police 'finding' inures to Detective Colangelo's benefit, had there
been better communication and a more clear demarcation of investigatory responsibility,
the case against Nodine, while not necessarily resulting in a different outcome, certainly
would have been viewed as having been more appropriately and thoroughly
investigated. This is particularly so given Detective Colangelo's noteworthy past and
present experiences where he has professionally and successfully investigated high-
profile cases.

DEF00656

As this case unfolded and the putative sexual assault victim became a suspect, Detective Colangelo should have had a more in depth discussions with his immediate supervisors to ensure their collective input.[12]

At the very least, Detective Colangelo's failure to notify Chase concerning the disposition of the case regarding the butt-grabbing claim was inconsistent with Canton Police General Order 6.1, Section III.C.8. (Exhibit Z).

B.  <u>Treatment of Chase During the June 21 Interview:</u>

This segment of the inquiry focuses on Detective Colangelo's treatment of Chase during the June 21, 2017 interview. In his February 9, 2018 letter, Attorney Chimes alluded to the "abominable treatment that [Chase] received at the hands of two…police officers." (Exhibit R). In the lawsuit, Chase alleged that "[s]he met with Detective John Colangelo. She had never spoken to him before." (Exhibit S, paragraph 90).[13] Further, Chase stated that "Detective Colangelo was intimidating from the start. He spoke to her in a rapid staccato voice". (Exhibit S, paragraph 92). The entirety of Chase's interview was audio and video-taped. (Exhibit M). The interview lasted approximately ninety (90) minutes.

As a preliminary matter, Detective Colangelo has attended specialized training on conducting interviews and interrogations. (Exhibit I, p. 14-15, 19-20). In his capacity as the department's detective, he has conducted numerous interviews on many serious criminal matters.[14] He has developed an individualized manner and system for his interviews. (Exhibit I, p. 14-15).

Moreover, due to the subjective nature of interviewing techniques, at the time there was no Canton Police General Order that specifically mentioned or controlled the manner in which an interview was to be taken. There is a reference to interviewing sex assault victims in General Order 6.6 and training which states generally about ensuring the victim's comfort and recognizing that the victim may have been in crisis mode which may make their story unclear or inconsistent. (Exhibit U; p. 5, 10; Exhibit Y).

  1.  <u>Rapid Staccato Voice</u>

      While the complaint, and by extension the lawsuit did not elaborate as to the underlying facts to support the claim that Detective Colangelo spoke in a 'rapid

---

[12] This is especially so given the fact that Detective Colangelo speaks with Captain Terra on almost a daily basis. (Exhibit I, p. 41-42).

[13] That paragraph provided no frame of reference for that conclusion. In fact, Chase has had multiple contacts with the Canton Police Department, including Detective Colangelo and Officer Gompper. She has been involved in numerous incidents in the separate capacities as a victim, complainant, witness, suspect or arrestee. Detective Colangelo previously arrested her. (Exhibit D, p. 1; Exhibit I, p. 1).

[14] This investigator is unaware of any complaints regarding the methods or style used by Detective Colangelo during his formal interview processes.

DEF00657

staccato[15] voice, a review of the taped interview did not reveal any significant support for that claim. (Exhibit M).

2.  The Manner of the Interaction Between Detective Colangelo and Chase During the Interview
    The entire interview was 90 minutes in length. (Exhibit M). The first 45 minutes contained, among other things, general introduction commentary, workplace background, and review of text messages. Both Detective Colangelo and Chase appeared relaxed and non-stressed. Their manner of discourse was unremarkable and their conversation flowed. Chase presented no apparent significant difficulty remembering past facts or conversations.

    The next 25 minutes or so of the interview, as Chase's lawsuit acknowledged, Detective Colangelo *"accomplished [the] important and necessary task of getting Nicole Chase to reveal the entire story…"* (Exhibit S, paragraph 105). Detective Colangelo did not badger her during those important minutes of the interview. He systematically formulated his questions to ensure that Chase knew that he knew that people don't always tell the truth at first. He stressed the importance of not leaving anything out and that he did not want any surprises. He asked her to think hard about anything that will or had come up that might be important. At the point that Chase began to sob, Detective Colangelo told her to take a deep breath and offered her tissues. At that point, for the first time, Chase acknowledged that there was an oral sex act between Nodine and her. Thereafter, for the next 10 minutes or so, Detective Colangelo went through a series of questions to obtain the details leading up to, during and after the oral sex act.

    The last 10 minutes or so of the interview focused on discussions about Chase giving a revised statement. Detective Colangelo allowed Chase to make the ultimate decision about submitting a revised statement. Chase thanked Detective Colangelo for allowing her to tell the truth.
    Near the end of the interview, Detective Colangelo asked Chase if she would harm herself and he also took into consideration that she had a support system to ensure her well-being.

    Accordingly, the objective facts, as evidenced by the interview videotape, cannot support a finding that Detective Colangelo subjected Chase to "abominable treatment" in the manner in which he conducted her interview. Moreover, due to the lack of a specific existing Canton Police Department General Order regarding interview protocols, there was no attributable violation.

---

[15] Staccato: rapid, brief, disjointed.

DEF00658

C.  <u>Probable Cause to Arrest Chase</u>:

This segment of the inquiry focuses on Detective Colangelo's determination that probable cause existed to submit an arrest warrant for Chase. Canton Police Department General Order 1.7 provides a canon of ethics to guide Police Officers on their primary responsibility, which includes that they protect people through upholding the laws, including the United States Constitution and its amendments, and that they exercise discretion fairly and impartially. (Exhibit AA). Canton Police Department General Order 6.1 requires that the detective ensure the civil treatment and protection of the constitutional rights of those involved in an investigation. (Exhibit Z).

1.  <u>Detective Colangelo was responsible for the Arrest Warrant</u>

As a preliminary matter, there was some confusion as to who was ultimately responsible for the investigation and preparation/submission of the arrest warrant for Chase. Detective Colangelo believed that he "...*was there to specifically help with the interviews, that's what I was there for.  And then I had to sign the warrant because you wouldn't allow Adam to.   So that was my interaction with this case*". (E*xhibit I, p. 26).* Also, Detective Colangelo stated, *"It's not my investigation. I came in and I assisted in doing the interview."* (Exhibit I, p. 35). However, Detective Colangelo had extensive experience conducting investigations within the framework of both the federal and state constitutional limitations. As such, as much as Detective Colangelo appeared to minimize his responsibility and accountability, he subjectively and objectively knew or should have known that he was legally required to ensure that <u>he</u> justified the existence of probable cause in order to submit an arrest warrant. (Exhibit E, p. 18-19; Exhibit I, p. 41; Exhibit P, p. 9-10). Moreover, when Detective Colangelo began his interview of Chase, he unequivocally advised her that the case was now on his desk and that serious cases usually came to him for follow-up. (Exhibit M).

2.  <u>Probable Cause Standard</u>

A legal arrest requires the existence of probable cause. Determining what constitutes probable cause is subjective. As case law suggests, "perhaps the central teaching of our decisions bearing on the probable cause standard is that it is a practical, nontechnical concept. The process does not deal with hard certainties, but with probabilities. The evidence must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement. Probable cause is a fluid concept, turning on the assessment of probabilities in particular factual contexts-not readily, or even usefully, reduced to a neat set of legal rules." <u>Illinois v. Gates</u>, 462 U.S. 213 (1983). Probable cause does not require a police officer to be certain that the

DEF00659

individual arrested will be prosecuted successfully. <u>Krause v. Bennett</u>, 887 F.2d 362, 371 (2d Cir.1989).

3.   <u>Detective Colangelo's Determination of Probable Cause</u>

Chase's May 11, 2017 sworn written statement provided one of the seemingly important components of Detective Colangelo's determination of the probable cause for her arrest. In that sworn statement, Chase made no reference to an act of oral sex. Moreover, there was nothing to suggest that Chase's written statement was anything but an accurate and complete rendition of the event. (Exhibit D, p. 12). There was no indication that Chase's statement was provided under any undue stress or that she was suffering from any apparent mental or emotional instability. She had already spoken to members of the Canton Police Department on three separate occasions, spoke to her trusted friend (Jeremy), her mother, her other friend(s) and may have even spoke to an attorney.

Another component of Detective Colangelo's probable cause determination was based on Nodine's interview. At that interview, Nodine's version of the incident made reference to an oral sex act between Chase and him. That was the first time any such reference was made by Nodine, Chase or any other witness. However, given Nodine's omissions and misstatements made early in the interview, Detective Colangelo was leery of Nodine's disclosure. (Exhibit J; Exhibit I, p. 25-26).

Yet another component of Detective Colangelo's probable cause determination was Chase's interview. After Nodine's interview, Detective Colangelo and/or Officer Gompper discussed or determined the need to interview Chase in order to reconcile the two different versions of the May 6, 2017 incident at Nodine's restaurant. (Exhibit D, p. 21). As Detective Colangelo prepared for Chase's interview, he had specific or assumed knowledge that, despite multiple opportunities (listed below), Chase never disclosed the oral sex act involving Nodine and her.

- Chase made no reference in any of her multiple texts to Jeremy.
- Chase made no reference in any of her discussions with Dispatcher Canny or Officer Gompper on May 7th.
- Chase made no reference when she spoke to Sergeant Penney on May 9th.
- Neither of the two witnesses' (Archer and Rouleau) sworn written statements had any reference from Chase regarding the oral sex act.
- Chase made no reference during discussions with Officer Gompper before and on the day of her written statement, when he called her with an update on Nodine's interview and when he called to set up her interview.

DEF00660

In any event, Detective Colangelo went into Chase's interview with an open mind, and even with the knowledge that Nodine claimed that the oral sex act was consensual, he (and Officer Gompper) did not consider Chase a subject. (Exhibit D, p. 23; Exhibit I, p. 20-21, 26).

During the early part of his interview of Chase, Detective Colangelo addressed the stereotypical assumptions about victims and reassured Chase that people don't always tell the truth, that people have different perceptions, that stress impacts the ability to recollect things and the need to corroborate information. (Exhibit M).

Of note, at about the 12 minute mark into the interview, Chase told Detective Colangelo that when she went to the Nodine Torrington location to pick up her final paycheck, employees confronted her and said that Nodine was telling employees that Chase did something to him. Detective Colangelo then asked Chase a clarifying question about what that something was. Chase said that one person said that Nodine said that he had sex with Chase and two others said that Chase gave Nodine oral (sex). Chase did not use that opportunity to provide an accurate accounting of the incident.

Detective Colangelo then continued the interview and purposefully asked open-ended questions in the hope that Chase would provide information for him to compare to Nodine's claim that the oral sex act was consensual.[16] For instance, Detective Colangelo told Chase that Nodine took two polygraph tests. He then asked Chase whether there was anything that would have come out of Nodine's polygraph that Chase forgot to tell Colangelo about and that he did not want Chase to look bad. At that moment, Chase did not mention the oral sex act, but commented about maybe Nodine would comment about the lack of sex she (Chase) was getting at home and then further stated "I don't know".

Detective Colangelo then asked Chase about flirtations between Nodine and her, which she emphatically denied.

Detective Colangelo then mentioned that there were issues in the stories and asked Chase to think hard about anything that might come up that he should know about since he did not want to be questioned by a state's attorney about the absence of such information in an arrest warrant.

Also Detective Colangelo asked Chase if there was something that he should know about this case or between Nodine and her. Further, Detective Colangelo mentioned that he did not want her to look bad and did not want any surprises. At

---

[16] Exhibit M, tape position from approximately .55 through 1:04:30.

DEF00661

that point, Chase hesitated in her response, prompting Detective Colangelo to ask her again about any contact. Once again, Chase did not mention the oral sex act, but told Detective Colangelo about Nodine's attempts to kiss her.

Again, Detective Colangelo explained to Chase the importance about getting to the truth. At that seminal moment and almost an hour into the interview, Chase finally disclosed the oral sex act.[17] Understandably, Chase displayed an emotional reaction during her disclosure of the actual oral sex act. Detective Colangelo was not dismissive of the possibility that Chase's omission was the result of the effects of the trauma that a sexual assault victim experiences that may result in the omissions or inconsistencies of the facts of the assault. (Exhibit I, p. 33).

Detective Colangelo identified other issues that he believed supported his finding of probable cause. In his calculus of the determination of probable cause, Detective Colangelo placed significance on the fact that Chase omitted the oral sex act when Chase

"… *said she spoke to her Attorney and did not tell the Attorney about this and didn't want to come back to tell what really happened because she knew it would affect her case. That's important. Very important.*" (Exhibit I, p. 59; Exhibit M, tape position: 1:05) [18].

Also, Detective Colangelo believed the oral sex act was consensual due to the manner in which Chase described it. (Exhibit I, p. 28-29, 54-55).

JC: *"Because I didn't determine it to be consensual on his words.  I determined it to be consensual on my interview with her and how the position of his hands were.  The biggest question in there was where were his hands - and they were here. They weren't on my head forcing me to do it. I was just doing it.  That was her statement…"*(Exhibit I, p. 54; Exhibit M, tape position: 1:18:00).

Additional probable cause was grounded in the fact that Detective Colangelo told Chase her statement was untruthful and it made his job harder. Chase admitted it

---

[17] But for Detective Colangelo's 'persistence' there remains a reasonable question as to whether Chase would have ever actually disclosed the act of oral sex between Nodine and her.
[18] In the taped interview, Chase alluded to the fact that she didn't tell her civil attorney because she believed it would go against her story. She also stated that she did not want to come back to the police and talk about it. When asked by Detective Colangelo if she wanted to give a new statement, Chase responded by saying, "Yeah, but then it screws up my whole civil case, right?" (Exhibit M, tape position 1:20:55). At another point, Chase stated she didn't want to come back to the police station because she knew her statement was not true. (Exhibit M, tape position 1:24).These statements suggest a conscious decision to omit relevant facts. Arguably, such a thought process stands in contrast to explanations of trauma, disorganization or fear of not being believed, as recognized reasons why sex assault victims omit facts or provide inconsistent renditions of the incident.

DEF00662

was untruthful as well. Detective Colangelo gave Chase an opportunity to consult with any attorney. He also told her that he did not want to hold up the case and wanted to move forward. Detective Colangelo then told Chase that he was working the next two days and provided her with his contact information. Seventeen days later and no contact from Chase, Detective Colangelo submitted his arrest warrant. (Exhibit M; Exhibit O, paragraph 32).

Detective Colangelo believed that Chase's omission impacted the direction of investigation.

JC:   *Look they both didn't tell me the truth right off verbally. She didn't tell Adam Gompper the truth in a sworn written statement. Do you think if I knew that piece of truth first, I could have maybe jockeyed the Calvin interview in a different way? If I had the information, don't you think it would have given me more tools to deal with Calvin? (Exhibit I, p. 31).*

Ultimately, Detective Colangelo was adamant that probable cause existed based on the fact that Chase purposely omitted the fact that she performed oral sex on Nodine when she swore to her original written statement. (Exhibit I, p. 30-31).

Similar to Detective Colangelo, Sergeant Penney was aware of Chase's changing accounts of Nodine's actions up to the disclosure of the oral sex act.

Sergeant Penney knew that Chase never mentioned the 'butt-grabbing' or the oral sex act during her initial visit to the Canton Police Department on May 7, 2017.
Sergeant Penney knew that Chase never mentioned the 'butt-grabbing' and oral sex act when she spoke to him on May 9, 2017 at the Canton Police Department. (Exhibit E, p. 6-7).
Sergeant Penney knew that Chase never mentioned the oral sex act when she gave her sworn written statement on May 11, 2017. (Exhibit E, p. 8).
Therefore when Chase finally disclosed the oral sex act at her interview on June 21, Sergeant Penney believed it was a 'material omission' to have left it out of her written statement. (Exhibit E, p. 12).
Sergeant Penney expected that when a person makes a complaint they tell the truth. (Exhibit E, p. 17). Also, Sergeant Penney believed that Chase omitted the sex act because it would have led to some doubt as to the veracity of her statements regarding the sexual harassment claims. (Exhibit E, p. 18). Finally, Sergeant Penney believed that Chase had misled the Canton Police Officers in the investigation. (Exhibit E, p. 18, 21).

DEF00663

Captain Terra also believed that probable cause existed. "*I find probable cause in this document for false statement because she gave two different stories and for whatever reason she did that, she did give a false statement.*" (Exhibit P, p. 11, 14).

In further support of probable cause for Chase's arrest was the fact a Connecticut State's Attorney, Michael Weber, and Connecticut Criminal Court Judge, Tammy Nguyen both signed the warrant. (Exhibit O). Presumably, they both believed probable cause existed, otherwise the arrest warrant would have been denied. In fact, there are numerous ways by which the State's Attorney or Judge can each separately review an arrest warrant and not sign it. (Exhibit CC). Reasons for rejecting a warrant may be based on the following: lack of probable cause, incorrect charges, non-criminal (civil) matter, or other (i.e. request for additional investigation). However, in this case, not only was the arrest warrant not denied, there was no point where either the State's Attorney or the Judge sent it back for additional information.

Current case law supports a strong inference to protect Police Officers for arrests made pursuant to an arrest warrant. "*Also normally, the issuance of a warrant by a neutral magistrate, which depends on a finding of probable cause, creates a presumption that it was objectively reasonable for the officers to believe that there was probable cause…and a plaintiff who argues that a warrant was issued on less than probable cause faces a heavy burden*" <u>Golino v. City of New Haven</u>, 950 F.2d 864, 870 (2d Cir. 1991)".

Finally, there is a subtle distinction worth noting in Attorney Chimes' February 9, 2018 complaint letter. In that letter, Attorney Chimes wrote, in relevant part, "*I could not believe that in 2017, a sexual assault victim…was being charged with making a false statement because she did not initially give all the details in her <u>initial interview</u> with the police.*" (Exhibit R). (Emphasis added). Significantly, and as previously noted, from May 6 to May 11, 2017, Chase had three prior meetings/discussions with a member of the Canton Police Department, (1) Chase was interviewed by Officer Gompper (May 7); (2) she met and spoke to Sergeant Penney (May 9) and (3) she spoke to Officer Gompper on the telephone (May 10). At no point during those prior meetings/discussions with Chase were any of her comments used as the basis for the underlying false statement charge. In fact, it wasn't until the fourth encounter with a member of the Canton Police Department-May 11th, that the predicate basis for the false statement was made when Chase provided a sworn statement omitting any reference to the act of oral sex.

In summary, there are no gradations to the probable cause standard. An officer's subjectivity as to what he/she believes is relevant toward the determination of the

DEF00664

existence of probable cause makes it difficult to codify such a standard in a Departmental General Order. In lieu of such codification, case law requires a review of an officer's finding of probable cause, internally by a supervisor and externally by the States Attorney and criminal court judge.[19] In this case, all four of these reviewers, determined that probable cause existed.[20]

Accordingly, with respect to this segment of the inquiry, it cannot be determined that any specific Canton Police Department General Order was violated with respect to Detective Colangelo's determination of probable cause. Detective Colangelo was entitled to rely on the premise that typical investigative functions of a police officer require the exercise of discretion and judgment.

D.  Follow-up with witnesses:

This segment of the inquiry focuses on Detective Colangelo's follow-up actions with respect to potential witnesses that Chase alluded to during her interview on June 21, 2017. General Order 6.6 states in relevant part that, "Detectives/investigators responding to reported sexual assaults shall…[obtain] statements [and] ...[locate witnesses].

1.  Witnesses mentioned in Chase's Interview:

    With respect to potential witnesses, Chase provided names and contact information to Detective Colangelo during her interview. (Exhibit M). Despite having that information and before submitting his arrest warrant, Detective Colangelo never contacted the witnesses. In part, Detective Colangelo justified the non-contact based on the fact that *"it's not my investigation. I came in and I assisted in doing the interview"*. (Exhibit I, p. 35).

2.  Text Messages:

    Similar to the witnesses that Chase specifically mentioned during her interview, she also showed Detective Colangelo her cellphone that contained a series of text messages that spanned several days. (Exhibit M; Exhibit V). Of significance, the text messages provided, among other things, a rendition of the incident between Chase and Nodine and information about additional witnesses. Recognizing the apparent relevance to the text messages, Detective Colangelo appropriately reviewed them and subsequently requested that Chase provide him with the text messages. Despite acknowledging the apparent importance of this potential source of information, Detective Colangelo never connected with Chase to secure a copy of the text messages before he submitted Chase's arrest

---

[19] In this case, Captain Terra provided an additional internal level of review.
[20] Judge Nguyen, States Attorney Weber and Captain Terra are all lawyers. Sg. Penney is a law school graduate.

DEF00665

warrant. (Exhibit I, p. 34-35). In part, Detective Colangelo thought the texts demonstrated an amount of "*animosity from that group against [Nodine] that… it would be difficult to take their word for what happened and not have them going after Calvin's jugular*". (Exhibit I, p. 34.) and that "*…the witnesses were not good witnesses because they were a gang against [Nodine]*. (Exhibit I, p. 38).

Around July 13, 2017, it appeared that Chase arrived at the Canton Police Department with the copies of the text messages. Detective Colangelo may have been in the building, but did not meet with Chase, either because he was busy or because he had no reason to meet with her. (Exhibit I, p. 40, 42). The next time he had any contact with Chase was his email to her on August 10, 2017.

While it cannot be determined whether the information gained from those several witnesses that Chase mentioned in her interview or referenced in the text messages would have been probative to the ultimate existence of probable cause or provide additional strengthening of probable cause, Detective Colangelo's lack of attention to those potential sources of information was inconsistent as it related to basic investigation procedures as set forth in Canton General Order 6.6. (Exhibit Y).

Accordingly, Detective Colangelo's failure to follow up on potential witnesses was inconsistent with Canton Police Department General Order 6.6.

E.  Disregarding of Chase's revised statement:

On June 21, Detective Colangelo offered Chase an opportunity to submit a revised statement. After waiting seventeen days and no revised statement, nor contact from Chase, Detective Colangelo submitted the Chase arrest warrant. (Exhibit O). Detective Colangelo did so after considering that "*[Chase] was supposed to contact me, she never did...the fact of the matter is that if she gave me a second statement, all it would have done is added to the probable cause*" (Exhibit I, p. 35). It appeared that Detective Colangelo may have taken Chase's non-action as indifference.

On July 13, Chase went to the Canton Police Department to discuss the revised statement with Detective Colangelo (Exhibit S, paragraph 112).

During Detective Colangelo's interview, he recalled that July 13, 2017 visit as follows:

> CA:  *Prior to submitting the warrant to the Sergeant, did you ever inquire to anyone at the PD whether or not Nicole had sent in a revised statement to you?*
>
> JC:  *She emailed me one at some point but I don't know when…*
>
> CA:  *My question is, prior to you signing the warrant July 7th , that's the date you put on it, did you ever ask…*

DEF00666

JC:     *She came once and went to Dispatch and they called me in my office and I was with somebody else or I was tied up with something else and they said, Nicole Chase is here, do you need to see her?  And I said no, because it wasn't me calling her in, if she wanted to see me, I would expect the dispatcher to say Nicole Chase is here she wants to talk to you type of thing.*

CA:     *I get it.  I'm only going for the date of the interview to the submission of the warrant.*

JC:     *I don't know what dates these are…*

CA:     *I'll get to that…I think what you're referring to is a date later in July or August…*

JC:     *It's possible…*

CA:     *I'll get to that…*

JC:     *It was after everything…but I took…that's when I got that packet there (referring to the text messages) I believe she dropped that off and I think Dispatch said she has a package for you do you need to see her and I said no.  (Exhibit I, p. 40).*

Later on during his interview, Detective Colangelo stated that dispatch *"…called me and said Nicole Chase is here, she has something for you, do you want to see her…and I didn't have a reason to see her. If they said she wants to see you then I would have made an appointment for her to see me the next day or day after".* (Exhibit I, p. 42).

Detective Colangelo and Chase never met that day.

On July 25, 2017, Chase sent Detective Colangelo an email in which she inquired about filing the revised statement. (Exhibit Q, p. 1). There was no indication that Detective Colangelo responded to that email.

On July 31, 2017, Chase sent another email to Detective Colangelo that contained her revised statement. In her email, Chase requested that it be added to her original written statement. (Exhibit I, p. 46; Q, p. 2-3).

Detective Colangelo took no action on the revised statement. According to Detective Colangelo, there were several reasons why he did not do so.

CA:     *The series of emails that I'm showing you the first email is dated July 31ˢᵗ and says "good afternoon Detective Colangelo, I would like to revise my voluntary statement.  Attached is the supplemental information I would like to be added to my May 11th, 2017, voluntary statement.  Please let me know when you'd like me to come in, so that I may sign the revised statement."  Do you recall getting that email?*

DEF00667

JC:   *I don't recall reading that email, but I remember the revised statement email. First, that's not how we accept statements. Secondly it would have just been more evidence against her. I could have been called in for entrapping her in another lie, and I wasn't about to do that, enough was enough. I have compassion for people even if I see it differently from them.(Exhibit I, o. 46)*

On August 10, 2017, Detective Colangelo emailed Chase a response and in part, informed Chase that he "*had already documented the change in your (Chase's) recount of the incident and had already sent the case to court for review. It is still with the States Attorney's office and I should hopefully have some direction of the next step shortly.*" (Exhibit Q, p. 4). In that response, Detective Colangelo never indicated to Chase that he had submitted a warrant for her arrest.

Chase sent two other emails to Detective Colangelo-one on August 16 and one on August 22. (Exhibit Q, p.5-6). The record indicated that Detective Colangelo never responded to those emails.

Detective Colangelo not only disregarded contact with Chase as to her revised statement, he also declined to contact the State's Attorney's Office concerning the revised statement. In particular, given the fact that Detective Colangelo believed the revised statement inculpated Chase even more so, it was counterintuitive not to bring inculpatory information to the state's attorney, in a timely manner, in order to assist them with meeting their legal standard of proof beyond a reasonable doubt. (Exhibit P, p.16).

In summary, because there was no specific departmental policy as to what constituted a reasonable time to wait for the submission of agreed upon additional documentation before continuing an investigation, this inquiry cannot conclude any violation on the part of Detective Colangelo.

CA:   *Right. Do you think John had an obligation, before he submitted the arrest warrant application, to wait for that new statement? She says she wants to give one. This is on June 21st. and within a few days…a week or so…John has the arrest warrant. There's no indication that he ever received that new statement.*

LT:   *(Capt. Terra) Does he have an obligation? He should, as normal procedure, and serving them, we should take any other statements that they want. Did he have an obligation to do it before he submitted it? He had probable cause to make the arrest at the time. Would this new statement change anything? I don't know. I don't know if one was done…it may not have been done. I'm not sure. (Exhibit P, p. 12).*

DEF00668

That being said, Detective Colangelo should have realized his ignoring Chase's emails and failure to forward the revised statement to the State's Attorney's Office was inconsistent with Canton General Orders 1.7, and 6.6.

F.   Advisement of the Submission of an Arrest Warrant

This segment of the inquiry focuses on Detective Colangelo's failure to advise Chase that he had already submitted an arrest warrant to the court for approval while they were exchanging emails about the submission of her revised statement. (Exhibit Q, p. 4-6). Detective Colangelo should have realized the significance of his failure to communicate with Chase, not only because of the uniqueness of a sexual assault 'victim' had now become the 'accused', but also because of Chase's ongoing efforts to meet with him to deliver the revised statement and the text messages and her interest in the status of the case. A reasonable reading of the emails between Detective Colangelo and Chase indicates that Detective Colangelo was unnecessary vague and reluctant to share a simple fact. A reason for why Detective Colangelo did not tell Chase that there was an arrest warrant submitted for her arrest was because he thought *"…they could deny the warrant and why put her under the stress of that."* (Exhibit I, p. 49). While there was no specific legal case law, nor Canton Police Department General Order requiring such a notification, under the implications within General Order 1.7, which espouses the maintenance of police ethics and General Order 6.6, which espouses professionalism and sensitivity, there was no compelling reason why Chase could not have been afforded an explanation of the status and potential direction of the case. Public trust and confidence and improved police/community relationships benefit when there is open and thorough communication.

That underlying proposition was supported by another Canton Police Department commander, Captain Terra, who believed the best course of action would have been for Detective Colangelo to advise Chase that she was a suspect and that an arrest warrant was applied for her arrest. *"If this was my case, I would tell the victim that she's now a suspect and I've applied for a warrant for her arrest."* (Exhibit P, p. 15).

Accordingly, under the unique facts of this case, however subjectively reasonable he felt his reasons were to not alert Chase about the existence of the arrest warrant, Detective Colangelo should have. Accordingly, Detective Colangelo's actions were inconsistent with Canton Police General Order 1.7 and 6.6.

DEF00669

**Issue #5:**

<u>Sufficiency of the Supervisory Oversight of the Chase Investigation</u>

**Investigative Findings:**

This segment of the inquiry focuses on the adequacy of the supervisory oversight of the investigation as it related to CPD General Order 6.1 and 6.6. While it is reasonable to understand that the passage of time between the criminal case investigation and the commencement of the internal investigation has adversely impacted the ability of the involved officers and/or supervisors to fully recall specific actions, there were areas of supervisory oversight that warrant discussion. Moreover, this area of inquiry underscores the importance of early and proactive supervisory communication or documentation to ensure all investigation responsibilities are met.

Finally, it should be noted that this segment of the investigation was unable to affirmatively prove that the issues attendant to the supervisory oversight of the case investigation factored into or influenced the underlying probable cause determination made by Detective Colangelo in the Chase arrest warrant.

A.  <u>Reassignment of the Case to Detective Colangelo</u>

The record was unclear as to the specific circumstances of the supervisory oversight in which the investigation was reassigned to Detective Colangelo. At the onset, due to Chase's ambiguous and non-commitment position on May 7, 2017, this case did not follow the 'traditional' flow of investigative responsibilities.

At some point, Nodine's interview was scheduled for May 18, 2017. Detective Colangelo could not recall if he spoke with any supervisory personnel that resulted in him being brought in to conduct Nodine's interview. (Exhibit I, p., 7,12-13).

Sergeant Penney stated that he was not involved in making the decision to set up Nodine's interview, yet given the complexities of the case, it was not unusual for Detective Colangelo to be involved. (Exhibit E, p. 10).

Captain Terra stated that no one came to him before Nodine's interview to have the case re-assigned, nor was he aware of the scheduling of the interview. (Exhibit P, p. 4-6).

Between Nodine's May 18 interview and Chase's June 21 interview, there was very little activity recorded on the investigation. (Exhibit E, p. 13).[21] The activity that occurred involved mainly Detective Colangelo. On June 14, Detective Colangelo spoke to

---

[21] On June 9, Officer Gompper was involved in a police-involved shooting.

DEF00670

Nodine, on June 19, Detective Colangelo received a letter from Nodine's attorney, and on June 21, Detective Colangelo conducted Chase's interview.

Despite Detective Colangelo's 'exclusive' involvement, he continued to believe that he was merely helping Officer Gompper with the interviews. (Exhibit I, p. 23-24).

Even as late as Chase's interview, the record suggested a belief that Detective Colangelo was merely assisting Officer Gompper. (Exhibit E, p. 15; Exhibit I, p. 26-27, 35; Exhibit P, p. 7-8).

B.  Officer Gompper's June 21, 2017 Report

On June 13, 2017, Officer Gompper was placed on administrative duty due to his involvement in a police-involved shooting. Both Captain Terra and Sergeant Penney knew or reasonably should have known about Officer Gompper's administrative duty status and the prohibition against him being involved in certain investigations. (Exhibit E, p. 15; Exhibit P, p. 6).

On June 21, Officer Gompper filed a report summarizing Chase's interview. (Exhibit N). In his report, Officer Gompper noted that Chase mentioned witnesses and text messages that needed to be followed up on. Also, despite those unresolved issues, Officer Gompper concluded that there was no probable cause that Nodine forced Chase to perform oral sex on him and that there would be an arrest warrant applied for Chase for filing a false statement. (Exhibit N).

At some point, either before or shortly after the arrest warrant was prepared, both Sergeant Penney and Captain Terra were aware of Officer Gompper's conclusion but did not discuss the report.

> CA:   *I think there's a point in time when you mentioned that John was sort of taking the lead on the case...*
> MP:   *(Sgt. Penney)        Mmm (affirmative) at least in the interview process...*
> CA:   *Right but was there a distinction between taking the lead on the interview process and then making decisions about making arrest?*
> MP:   *I'm not exactly sure. In the interview process John was doing all this and we hadn't made a decision on who was going to make the arrest for the arrest warrant yet.*
> CA:   *Right, but did you have any discussions with Adam?  After you read that, about coming to that conclusion that John was the one who conducted the interview?*
> MP:   *I know John conducted the interview and like I said, I know there was some talk about who would be the lead affiant on the arrest warrant and whether that was supposed to be Adam or had to be John.*

DEF00671

| | |
|---|---|
| CA: | And you say had to be John was that because Adams status after the shooting… |
| MP: | That's what I believe it is but I didn't ask you or ask the Captain whether that was the case…John and I talked about it… |
| CA: | And did you talk to the Captain at this point…at any point…about this case? |
| MP: | I did not. |
| CA: | And did you talk to anybody else? |
| MP: | I don't think so. (Exhibit E, p. 15-16). |
| | |
| CA: | Did John ever say to you that he disagreed with Adams last page of the June 22nd report that summarizes the interview of Nicole or… |
| LT: | (Capt. Terra) Here's what's throwing me for a loop, okay?  Adam is not…if he's not doing the case, why is he writing the report or if he's doing the case, he didn't do the interview? |
| CA: | I understand that. |
| LT: | That's what I'm confused about. |
| CA: | My point is that you're confused about it but you read it on July 12th, did you have a conversation with anybody to say, to try to clarify… |
| LT: | No I didn't.  The interview was done, but now that I'm looking at it, it's like Adam didn't do the interview according to your chart.  (Exhibit P, p. 9). |

Arguably, either or both Sergeant Penney and Captain Terra had the opportunity to discuss, clarify and question Officer Gompper's conclusions in his June 21, 2017 report.

C. Charges against Nodine

Chase's May 11, 2017 sworn written statement requested that criminal charges be pursued against Nodine for the alleged 'butt grabbing". (Exhibit F). Canton Police members, including supervisory personnel, were aware of Chase's desire to pursue charges against Nodine for the butt-grabbing. (Exhibit D, p. 14; Exhibit E, p. 8-9; Exhibit I, p. 11; Exhibit P, p. 12-13).

Despite this knowledge, the record indicated ambiguity as to whether a proper resolution was ever achieved regarding this issue (Exhibit E, p, 16, 20; Exhibit I, p. 38-39; Exhibit P, p.13).

In addition, there did not appear to be any steps taken to advise Chase about the Canton Police Department's decision to not pursue charges against Nodine. Canton Police Department General Order 6.1.Section III.C.8 requires that *"in all cases where the investigation is suspended, or administratively closed, if appropriate the victims/complainants will be notified and advised of the change. In addition, the notification should be documented in a supplemental report."* (Exhibit Z).

DEF00672

Even accounting for the passage of time that underscored the understandable lack of a detailed recollection of discussions or actions taken, Chase's ambiguity or omission in articulating the facts and desire to pursue charges, and the subjectivity of the then-existing general order, it appeared there was a combination of factors that led to a diffusion of supervisory oversight.

First, sexual assault cases are rare. When such cases are filed, they usually generate considerable discussion and attention. Once Chase articulated the basis for the sexual contact (butt-grabbing and a witness corroborated it) and Detective Colangelo was brought in to conduct Nodine's interview, a more robust and formal discussion could have taken place between the supervisors about the reassignment of the case to Detective Colangelo. That discussion should have taken place once Officer Gompper was placed on administrative duty status on June 13.[22]

Second, it is even rarer to have the victim of an original sexual assault complaint become a subject of an arrest warrant for providing a false statement concerning their original complaint. At the point in time when each of the supervisors (Sergeant Penney and Captain Terra) separately read Officer Gompper's June 21 report and conclusions, they could have inquired more deeply about those conclusions. Particularly, when earlier in Officer Gompper's report there were references made to outstanding investigation steps that needed attention.

Third, there was never a clear disposition to Chase's complaint about Nodine grabbing her butt. Irrespective of her being arrested, Sergeant Penney and Captain Terra could have ensured that Chase was advised as to the outcome of her original complaint.

In summary, given the nuances of the tenets of basic investigative management, a more meaningful discussion or documentation among Officer Gompper, Detective Colangelo Sergeant Penney and Captain Terra could have taken place.

**TRAINING HISTORY**

Both Detective Colangelo and Officer Gompper had attended annual recertification training dealing with the handling of sexual assault investigations. The most recent training dates attended by Detective Colangelo and Officer Gompper were during the training cycles in 2013-2014 and 2016-2017. (Exhibit U, Exhibit EE).

---

[22] At the time, Detective Colangelo spoke with Captain Terra on almost a daily basis. (Exhibit I, p. 41-42).  Also, Detective Colangelo and Sergeant Penney worked the same shift four out of five days.

DEF00673

**IA HISTORY**

Neither Detective Colangelo nor Officer Gompper have ever been a subject of an IA or administrative inquiry relating to the allegations similar to those made in this instant case.

**SUMMARY & CONCLUSION**

**DISPATCHER DAVID CANNY**: It is recommended that this investigation be closed with a finding that exonerates Dispatcher David Canny as to any specific Canton Police Department General Order in the course of his dealings with Chase.

**OFFICER ADAM GOMPPER**: It is recommended that this investigation involving Officer Gompper be closed with the following findings:

1. **General Order 1.7**    **CANONS OF POLICE ETHICS**
   General Order 1.7 provides a baseline discussion for Canton police officers to follow regarding their conduct.  (Exhibit AA). Certain sections of the General Order that are relevant to this inquiry are as follows:

   *The primary responsibility of the police profession and of the individual officer is the protection of the people of the United States through the upholding of their laws; chief among these is the Constitution of the United States and its amendments.*

   *Officers of the Canton Police Department **shall exercise discretion fairly and impartially in enforcing the law and performing their duties.***

   **Recommendation: Not Sustained**
   Justification being that in the absence of a specific policy outlining where taped interviews are to take place, it cannot be concluded that Officer Gompper misused his discretion when he chose to conduct his initial meeting with Chase in the front lobby of the Canton Police Department.

2. **General Order 6.6**    **SEXUAL ASSAULT INVESTIGATION**
   General Order 6.6 provides a baseline discussion and procedure regarding the investigation of sexual assault

35

DEF00674

cases. (Exhibit Y). Certain sections of the General Order that are relevant to this inquiry are as follows:

o *It is recognized that handling cases of sexual assaults has been an area of difficulty for law enforcement personnel.*

o ***The responding officer to reported sexual assaults shall show sensitive, professional behavior towards the victim in order to minimize trauma.***

o *Detective/investigators responding to reported sexual assaults shall conduct on–scene investigation involving the obtaining of statements, locating witnesses, and collecting and preserving evidence in accordance with accepted evidence collection techniques.*

o *All personnel involved in the investigation of a sexual assault case will perform their appointed function efficiently, professionally, and humanely, giving first priority to the physical and emotional condition of the victim.*

**<u>Recommendation: Not Sustained</u>**

Justification being that the preponderance of the evidence suggested that at Chase's initial meeting with Officer Gompper, she did not state that she was the victim of a sexual assault. Moreover, the preponderance of the evidence does not indicate that Officer Gompper was insensitive or unprofessional in his interaction with Chase.

**3. General Order 6.6**  **SEXUAL ASSAULT INVESTIGATION**

General Order 6.6 provides a baseline discussion and procedure regarding the investigation of sexual assault cases. (Exhibit Y). Certain sections of the General Order that are relevant to this inquiry are as follows:

o *It is recognized that handling cases of sexual assaults has been an area of difficulty for law enforcement personnel.*

DEF00675

- o *The responding officer to reported sexual assaults shall show sensitive, professional behavior towards the victim in order to minimize trauma.*
- o ***Detective/investigators responding to reported sexual assaults shall conduct on–scene investigation involving the obtaining of statements, locating witnesses,*** *and collecting and preserving evidence in accordance with accepted evidence collection techniques.*
- o ***All personnel involved in the investigation of a sexual assault case will perform their appointed function efficiently, professionally,*** *and humanely, giving first priority to the physical and emotional condition of the victim.*

**General Order 10.2**     **DEPARTMENT REPORTS AND FORMS**

General Order 10.2 provides a baseline discussion for supervisors and officers to completely prepare reports. Certain sections of the General Order that relevant to this inquiry are as follows:

*B.1. **All reports and forms requiring a supervisor's signature should be accurately, completely and promptly submitted for approval.***

**<u>Recommendation: Sustained</u>**

Justification being that the preponderance of the evidence suggested that given Officer Gompper's duty status at the time and the outstanding witness follow-up issues, he should have deferred any determinations as to the progress of the investigation and conclusions to Det. Colangelo for action.

**DETECTIVE JOHN COLANGELO:** This investigation has established that Detective Colangelo became involved in the Chase investigation sometime after Chase gave a sworn statement to Officer Gompper (Exhibit F). While the exact date of his initial involvement is unknown, Detective Colangelo played a significant, if not primary role in the some of the most crucial aspects of the investigation-to wit, Nodine interview, Chase interview, and Arrest Warrant submission.

This inquiry cannot conclude that Detective Colangelo's arrest warrant lacked any indicia of probable cause. Acceptable law enforcement standards recognize the proposition that sexual assault victims may omit details or make inconsistent statements for a number of reasons (Exhibit S, paragraph 61 i). What the proposition does not

DEF00676

provide for is the point in time during the fact gathering process that the officer can point to as the material basis as to what happened and who was involved. In this case Detective Colangelo was confronted with two completely different stories. One was Chase's sworn written statement that made no reference to an oral sex act. The other was Nodine's interview in which he alleged the oral sex act was consensual. Prior to Chase's interview on June 21, Detective Colangelo was aware that Chase's numerous renditions of the incident did not include a disclosure about the oral sex act. During Chase's interview, Detective Colangelo phrased his questions in various ways to elicit the details of the oral sex act from Chase. After several different responses, Chase eventually disclosed the oral sex act. At that point Detective Colangelo believed that such an omission was intentional and done to mislead his investigation. Upon further questioning, Detective Colangelo believed that Chase's description of the actual oral sex act was indicative of a consensual act. Also, Detective Colangelo factored in Chase's admission that her earlier sworn written statement was untruthful and that some of her reasons for not disclosing the oral sex act were to protect her civil case. Detective Colangelo probable cause determination also factored in Chase's failure to provide the revised statement. In the end, Detective Colangelo used the recognized underpinnings of probable cause-an officer's discretion and judgment-to conclude that Chase submitted a false statement.

As to other actions involving Detective Colangelo, it is recommended that this investigation involving Detective Colangelo's actions be closed with the following findings:

1. **General Order 6.6**     **SEXUAL ASSAULT INVESTIGATION (Interview Process)** General Order 6.6 provides a baseline discussion and procedure regarding the investigation of sexual assault cases. (Exhibit Y).  Certain sections of the General Order that are relevant to this inquiry are as follows:

   - *It is recognized that handling cases of sexual assaults has been an area of difficulty for law enforcement personnel.*
   - ***The responding officer to reported sexual assaults shall show sensitive, professional behavior towards the victim in order to minimize trauma.***
   - *Detective/investigators responding to reported sexual assaults shall conduct on–scene investigation involving the obtaining of statements, locating witnesses, and collecting and preserving evidence in accordance with accepted evidence collection techniques.*

DEF00677

   o ***All personnel involved in the investigation of a sexual assault case will perform their appointed function efficiently, professionally, and humanely, giving first priority to the physical and emotional condition of the victim.***

**Recommendation: Not Sustained**

Justification being that based on the subjectivity inherent in interview techniques, it cannot be concluded that Detective Colangelo's treatment, mannerisms, and questioning of Chase was a violation of this general order.

**2. General Order 6.6**  **SEXUAL ASSAULT INVESTIGATION (Investigation Process)**

General Order 6.6 provides a baseline discussion and procedure regarding the investigation of sexual assault cases. (Exhibit Y).  Certain sections of the General Order that are relevant to this inquiry are as follows:

   o *It is recognized that handling cases of sexual assaults has been an area of difficulty for law enforcement personnel.*

   o ***The responding officer to reported sexual assaults shall show sensitive, professional behavior towards the victim in order to minimize trauma****.*

   o *Detective/investigators responding to reported sexual assaults **shall conduct on–scene investigation involving the obtaining of statements, locating witnesses**, and collecting and preserving evidence in accordance with accepted evidence collection techniques.*

   o ***All personnel involved in the investigation of a sexual assault case will perform their appointed function efficiently, professionally, and humanely, giving first priority to the physical and emotional condition of the victim.***

**General Order 10.2**  **DEPARTMENT REPORTS AND FORMS**

General Order 10.2 provides a baseline discussion for supervisors and officers to completely prepare reports. Certain sections of the General Order that relevant to this inquiry are as follows:

DEF00678

*B.1. **All reports and forms requiring a supervisor's signature should be accurately, completely and promptly submitted for approval.***

**Recommendation: Sustained**
Justification being that the preponderance of the evidence suggested that Detective Colangelo:

- Should have followed up on Chase's witnesses she mentioned during her interview and those that were referenced in her text messages.
- Should have been more forthcoming in his email discussions with Chase as to the true nature of the case status-i.e. that he already submitted the arrest warrant application.
- Should have been more accommodating when Chase came to the Canton Police Department to talk and when she sent several emails about either the text messages or the revised statement.
- Should have communicated to the State's Attorney's office that he received Chase's revised statement, particularly in light of the fact the warrant at not yet been returned.

**3. General Order 6.1**       **CRIMINAL INVESTIGATIONS (Victim Follow-up)**
General Order 6.1 provides an outline of the administrative and operational guidelines of the Detective Division (Exhibit Z).  Certain sections of the General Order that are relevant to this inquiry are as follows:

*III.B. Detective Responsibilities*
*Section I states the following:  Ensure civil treatment and protection of constitutional rights of all persons coming within the scope of the investigation.*

***III.  Case Screening/Assignment***
***Section 8.  In all cases where the investigation is suspended, or administratively closed, if appropriate, the victim/complainant will be notified and advised of the change. The notification shall be noted in the supplemental report.***

**Recommendation: Sustained**

DEF00679

Justification being that the preponderance of the evidence suggested that Detective Colangelo should have communicated to Chase the disposition of the case that related to her complaint that Nodine "grabbed her butt".

**SERGEANT MARK PENNEY AND CAPTAIN LAWRENCE TERRA:** Due to the passage of time, lack of recall regarding specific decision-making discussions and the lack of definitive policy deviations, this investigation did not find that either supervisor violated any specific existing Canton Police Department General Order. However, closer scrutiny of submitted reports could have resulted in earlier reconciliation of outstanding issues for case follow-up.

**POLICY/PROCEDURES (Chief Arciero):** Finally, in an effort to ensure that the Canton Police Department exceeds basic tenets of investigation protocol, the following procedural or policy changes have been implemented that should provide guidance for future investigations.

1. All non-traditional, non-emergency arrest or search warrants will undergo a second level of supervisory review.
2. Supervisory training on how to operate the interview room taping equipment.
3. Continue to maintain resource library on handling sex assault investigations. (With mandatory referral to review resource library in situations with unusual situations)
4. Mandatory special notification and discussion with supervisory personnel in situations where the putative victim becomes an accused.
5. Mandatory supervisory review of taped interviews before warrant submission.
6. Mandatory record management notation of case reassignment.

Incorporating the above remedial changes should result in more effective and efficient criminal investigation outcomes that ensure victim safety and offender accountability.

Moreover, these changes will ensure clarity, consistency and enhance existing department policies and practices that officers and supervisors can rely upon for more acceptable performance expectations.

DEF00680