# EXHIBIT A

1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

---------------------------------X
NICOLE CHASE                     :
             Plaintiff,          :
        VS.                      :   NO. 3:18-cv-00683(VLB)
NODINE'S SMOKEHOUSE, INC.,       :
CALVIN NODINE TOWN OF            :
CANTON, JOHN COLANGELO,          :
ADAM GOMPPER, MARK J.            :
PENNEY, AND CHRISTOPHER          :
ARCIERO                          :
             Defendants.         :
---------------------------------X



D E P O S I T I O N

   THE VIDEO DEPOSITION OF CALVIN NODINE, taken on behalf of the Plaintiff, before Kevin Lombino, Registered Professional Reporter, Notary Public within the State of Connecticut Certificate Number 191, on the 7th day of February, 2019, at 10:41 a.m., at the offices of Robert Fortgang Associates, LLC, 573 Hopmeadow Street, Simsbury, CT.

GOLDFARB AND AJELLO, LLC (203) 972-8320

1    Q.   The Tuesday or the Wednesday would have been the
2  ninth or the tenth?
3    A.   Something like that.
4    Q.   And did he call you or did he text you?
5    A.   Called.
6    Q.   Okay.  And what did he say about that?  What
7  else did he say?
8    A.   Nothing, he just, he just said that they are
9  going to try to have you arrested and charges and --
10    Q.   Okay.  What, if anything, did he say about the
11  fact that they had, that Nicole had made this complaint
12  about you?
13    A.   Nothing.
14    Q.   Did he express anger at you or sympathy for you?
15    A.   No, no, just --
16    Q.   Okay.
17    A.   Jeremy is very, he doesn't vary too much.
18    Q.   Okay.  And so after Jeremy told you that, what,
19  if anything, did you do?
20    A.   Waited for the police to call.
21    Q.   Okay.  Did you reach out to get a lawyer at that
22  point or after the police called?
23    A.   I'm not sure on the timeline on that one.
24    Q.   Okay.  So again, and I'm not -- the police
25  reports indicate that Officer Gompper reached out to you

                                                              146

1   on May 12 which would have been the Thursday I believe or
2   the -- and, and you had said you would come in on the
3   13th.
4           Do you recall being called by Officer Gompper?
5       A.  Yes.
6       Q.  And what, if anything, did he tell you at that
7   point?
8       A.  I remember getting a call from him.  I don't
9   remember what we discussed, just I'll be in.
10      Q.  Okay.  Did he tell you what the complaint was or
11  what the issue was?
12      A.  I think he said something about it but I can't,
13  I can't remember it word for word.
14      Q.  Okay.  Now, and again the police report, I
15  don't -- the police report indicates that on May 13, you
16  called back to the police and said that you couldn't come
17  in that day because of a death?
18      A.  Yes.
19      Q.  Who died?
20      A.  My uncle.
21      Q.  Okay.  What's his name?
22      A.  Pete Hathaway.
23      Q.  Okay.  Was he local or was he out of state or
24  out of town?
25      A.  Down in, down around Storrs.

                GOLDFARB AND AJELLO, LLC (203) 972-8320

148

1   Q.   Were you there?
2   A.   I have to check when, when --
3   Q.   Um-hmm, okay.
4   A.   Yeah, who did what then.
5   Q.   Did you have any problems of people coming in
6   during that time?
7   A.   No.
8   Q.   Did you change the locks?  Did you change the
9   locks?
10  A.   Yes.
11  Q.   How did you -- when you opened the deli
12  restaurant, how did you pick the location in Canton?
13  A.   I think it was Jeremy or Jason that told me on
14  one of his trips back and forth to Restaurant Depot, he
15  told me about that place.
16  Q.   Was it another restaurant that had closed?
17  A.   No, it was a bar.
18  Q.   Okay.  So but it was a bar that had closed?
19  A.   Yeah, bar restaurant.
20  Q.   Did you buy the fixtures from the bar and the
21  kitchen fixtures that were already in there?
22  A.   Yeah.
23  Q.   And had you had -- prior to being contacted by
24  Officer Gompper on May 12, had you had any interactions
25  with the Canton Police Department?

1    A.   Yes.
2    Q.   Tell me about that.
3    A.   We had another employee that I think it was her
4    second day, something like that.  You know, you start off
5    the day with a couple of 20s and this and that, and this
6    was one sale or she did something in there, and the other
7    girl went in, Candy went in to do it and the 20s were
8    gone.
9    Q.   Okay.
10   A.   So it's right off the bat, you know, it's first
11   thing in the morning you don't put 40 bucks in 20s and
12   the next person that cashes somebody out there is no 20s
13   in there which it didn't require that kind of change.  So
14   then she bought a sweat shirt to at least get one 20 back
15   in.  She realized she mess up so she bought a sweat
16   shirt --
17   Q.   At the restaurant?
18   A.   -- at the restaurant and put --
19   Q.   Who was that?
20   A.   I forget her name.
21   Q.   And in the interview with the cops you mentioned
22   some, a woman named -- give me a minute.
23   A.   Um-hmm.
24   Q.   Jessica, a woman named Jessica.  You mentioned
25   to the cops when you went in for the interview, a woman

1    named Jessica who had worked I believe.  You said her
2    friend, Jessica, was in trouble again.
3            Do you remember what you were talking about?
4       A.   I said that or did the police say that?
5       Q.   You did.  You said her friend's in terrible
6    again and then the police said Jessica.
7            Do you know?  Does that ring a bell or no?
8       A.   No.
9       Q.   So you remember -- so who were the police
10   officers that responded?  Did you call the police when
11   that happened?
12      A.   Yes.
13      Q.   Was she arrested or not?
14      A.   No, she wasn't arrested.  We made her go out in
15   her car and get her money and she was let go.
16      Q.   Who was that?  Who was the officers that came,
17   if you know?
18      A.   That was the detective.
19      Q.   Colangelo?
20      A.   Colangelo, and I do believe it was the chief
21   that was there.
22      Q.   Okay.  Was that the first time you met the chief
23   and Colangelo?
24      A.   They had been into the restaurant before.
25      Q.   Okay, all right.  And how about Gompper, had you

1  met him before?
2      A.  No.
3      Q.  And so how many times had you seen Colangelo
4  before, before the interview?
5      A.  I don't know.  Like I said, only when he came
6  into the restaurant get lunch or something.
7      Q.  Okay.
8      A.  Nothing.
9      Q.  But he came in a couple of times before the
10 interview?
11     A.  Yeah, yeah.
12     Q.  Did you comp him?
13     A.  Hmm?
14     Q.  Did you comp him?
15     A.  No.
16     Q.  All right.  Between when you canceled the coming
17 out on the 13th and you came in with Attorney Moraghan on
18 the 18th, what other interactions, if any, did you have
19 with the Canton Police Department between that time, if
20 you remember?
21     A.  Yeah.  It was just the phone call to set up the
22 second time, and I told him I was going to get Dave in so
23 I'm not sure who took care of that.
24     Q.  And other than the police and Attorney Moraghan,
25 did you speak with anyone else about what was going on

                                                                155

1   low-level workers.
2           Enemy implies there is somebody.  Is there
3   somebody --
4       A.  No, no big guys that are going to come take me
5   out.
6       Q.  Okay, okay.  So anyone else is your enemy?
7           Now, there came a point in the interview where
8   Detective Colangelo had suggested you taking a polygraph?
9       A.  Um-hmm.
10      Q.  Okay.  And so after the interview, the next
11  document that I have is a -- give me a minute.
12          Okay.  There is a police report from Officer
13  Gompper indicating that around June 14, that you had --
14  that you spoke to Detective Colangelo on June, on or
15  around June 14 about a polygraph you had taken that you
16  had not passed?
17      A.  Um-hmm.
18      Q.  So first of all, other than discussions with
19  your attorney which I don't want to know anything about,
20  did you have any communications with anybody about the
21  case between the date of the interview on June 18 and
22  June 14 when you called Detective Colangelo about the
23  polygraph?
24      A.  That I don't recall.
25      Q.  Okay.  So you don't have any recollection, again

1  I don't want to know about lawyers, but did you -- do you
2  know whether you spoke to the police at any point?
3       A.   I, I, I can't remember the dates on when I
4  talked to the police.
5       Q.   Okay.  Did -- after they contacted you about
6  coming in for an interview, did Detective Colangelo ever
7  come to the restaurant to look at the crime scene?
8       A.   I don't believe so.
9       Q.   Okay.  Did, did Detective Colangelo contact you
10 to ask about any information about other witnesses after
11 the, after the interview?
12      A.   Don't recall.
13      Q.   Okay, all right.  And again, except through
14 counsel, did you have any direct -- until the time that
15 you called in to talk to them about the polygraph --
16      A.   Um-hmm.
17      Q.   -- did you have any communications with
18 Detective Colangelo or Officer Gompper?
19      A.   That I can't remember.  There may have been one
20 call in there, I can't even remember what it was about.
21      Q.   Okay.  So tell me the circumstances of your
22 taking the polygraph and then calling Detective Colangelo
23 about it.
24           MR. MORAGHAN:  I'm going to object and
25      instruct him not to answer.  This is absolutely

Case 3:18-cv-00683-VLB   Document 305-1   Filed 01/07/22   Page 11 of 14

159

1  Calvin Nodine has decided that he will not submit to a
2  law-enforcement polygraph examination under any
3  circumstances.
4         As we discussed at the police department, had he
5  taken a law-enforcement polygraph and passed, that still
6  would not have terminated the investigation.  If he had
7  taken a law-enforcement polygraph and failed, it would in
8  all likelihood had resulted in an arrest.  Therefore, as
9  I had explained to him on numerous occasions, there is
10 absolutely no legal upside to him submitting to a
11 polygraph.
12        If you are able to obtain an arrest warrant for
13 Mr. Nodine, I would appreciate it if we could arrange to
14 self-surrender him.  Very truly yours, David A. Moraghan.
15        Mr. Nodine, is David A. Moraghan, was he your
16 attorney on June 19, 2017?
17    A.   I do believe so, yes.
18    Q.   Now, between June 19 and -- withdrawn.
19        After June 19, did you hear -- when was the next
20 time you heard from the police?
21    A.   Don't recall.
22    Q.   Okay.  How did you become aware that -- did
23 anyone, did Detective Colangelo or anyone call you
24 directly to tell you that Nicole Chase had been arrested?
25    A.   No.

GOLDFARB AND AJELLO, LLC (203) 972-8320

1    Q.   Okay.  So did you, if you can just answer this.
2         So from whom did you learn that Nicole Chase had
3    been arrested?
4    A.   I would have to look into that.  It may have
5    been Jeremy but I, I don't know.
6    Q.   Well, was it from Attorney Moraghan?  Did you
7    learn from your counsel or from someone else?
8    A.   I'm not sure.
9    Q.   Okay.  And did you speak with Detective
10   Colangelo directly about her arrest?
11   A.   No.
12   Q.   Had you ever asked Detective Colangelo or
13   Officer Gomper to have her arrested?
14   A.   No.
15   Q.   Now, did there come a time where, again, looking
16   at the unemployment report on June 30, 2018 and it
17   indicates that you were contacted for an unemployment
18   hearing involving Nicole Chase.
19        Do you recall having been contacted about that?
20   A.   Yes.
21   Q.   All right.  And again according to the report,
22   it indicates that you had been contacted but after Nicole
23   Chase had given her statement that you were no longer on
24   the phone?
25   A.   I was on the phone.

167

1  as the Town of Canton.
2          My next question is:  The police did not provide
3  you with a copy of her statement, correct?
4      A.  No.
5      Q.  And did you ever receive any documentation at
6  all from officers with the Canton Police Department?
7      A.  No.
8          MS. MACCINI:  Okay, thank you.
9  EXAMINATION BY MR. CHIMES:
10     Q.  Do you have a copy of Ms. Chase's statement not
11 through discovery in this case but through the
12 unemployment case with Kyle Rouleau?
13     A.  Yeah, it's, it's -- I think it, I think it came
14 from Kyles.
15     Q.  Well --
16     A.  I'm not sure.  I can find out and I can get the
17 dates.
18     Q.  So if you look at exhibit 44, the second to last
19 exhibit that we just did.
20     A.  Um-hmm.
21     Q.  It was attached to Nodine's Smokehouse's
22 attorney's submission to unemployment.
23         Is that what -- so your side submitted it in
24 Ms. Chase's unemployment, not in Mr. Rouleau's
25 unemployment.

                                                                    172

1  STATE OF CONNECTICUT    )
2                          )  ss:  WALLINGFORD
3  COUNTY OF NEW HAVEN     )
4
5          I, Kevin Lombino, a Registered Professional
6  Reporter and Notary Public within and for the State of
7  Connecticut, do hereby certify that the within deposition
8  of CALVIN NODINE was held before me on the 7th day of
9  February, 2019.
10         I further certify that the witness was first
11 sworn by me to tell the truth, the whole truth and
12 nothing but the truth, and was examined by counsel, and
13 his testimony was recorded stenographically by me, it was
14 reduced to typewriting under my supervision, and I hereby
15 submit that the within contents of said deposition are
16 true and accurate to the best of my ability.
17         I further certify that I am not a relative of
18 nor an attorney for any of the parties connected with the
19 aforesaid examination, nor otherwise interested in the
20 testimony of the witness.
21         Dated at Wallingford, Connecticut, the 24th day
22 of February, 2019.
23         _____
           Kevin Lombino, CSR00191
24
25 (My commission expires October 31, 2021.)

                GOLDFARB AND AJELLO, LLC  (203) 972-8320